**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>INVERSIONES LATIN AMERICA<br>POWER LTDA., *et al.*,[1]<br><br>        Debtors. | Chapter 11<br><br>Case No. 23-[_____] ([____])<br><br>(Joint Administration Requested) |

---

## DEBTORS' JOINT PREPACKAGED CHAPTER 11 PLAN

---

**GREENBERG TRAURIG, LLP**
Oscar N. Pinkas
Brian E. Greer
Leo Muchnik
Sara A. Hoffman
Jessica M. Wolfert
One Vanderbilt Avenue
New York, New York 10017
Telephone:    (212) 801-9200
Facsimile:    (212) 801-6400

*Proposed Counsel for the Debtors and Debtors in Possession*

Dated:  November 29, 2023

---

[1]    The Debtors, together with each of the Debtor's Chilean identification number, as applicable, are: Inversiones Latin America Power Ltda. (76.299.635-9); San Juan S.A. (76.319.883-9); and Norvind S.A. (76.919.070-8). The location of the corporate headquarters and the service address for Inversiones Latin America Power Ltda. is Cerro El Plomo 5680, Oficina 1202 Las Condes, Santiago, Chile.

## <u>TABLE OF CONTENTS</u>

**Page**

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION
OF TIME, GOVERNING LAW AND OTHER REFERENCES............................1

1.1    Defined Terms ...............................................................................................1
1.2    Rules of Interpretation ................................................................................15
1.3    Computation of Time ..................................................................................15
1.4    Governing Law ...........................................................................................15
1.5    Reference to Monetary Figures...................................................................16
1.6    Reference to the Debtors or the Reorganized Debtors.............................16

ARTICLE II ADMINISTRATIVE AND PRIORITY CLAIMS.....................................16

2.1    Administrative Claims ................................................................................16
2.2    Professional Claims ....................................................................................16
2.3    Priority Tax Claims.....................................................................................17
2.4    Payment of Restructuring Expenses ...........................................................17

ARTICLE III CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND
INTERESTS ..........................................................................................18

3.1    Classification of Claims and Interests.......................................................18
3.2    Treatment of Classes of Claims and Interests...........................................18
3.3    Special Provision Governing Unimpaired Claims.....................................22

ARTICLE IV PROVISIONS FOR IMPLEMENTATION OF THE PLAN ...................22

4.1    General Settlement of Claims .....................................................................22
4.2    Subordination..............................................................................................22
4.3    Sources of Cash for Plan Distributions......................................................22
4.4    Restructuring Transactions .........................................................................22
4.5    The New Notes & Substitute Consideration ..............................................24
4.6    Issuance of the New Notes and New Equity ..............................................27
4.7    Sales Facilitation Agreement; Company Sale............................................27
4.8    Preservation of Rights of Action................................................................28
4.9    Vesting of Assets in the Reorganized Debtors ..........................................28
4.10   Discharge from Notes, Instruments, Certificates, and Other Documents.............29
4.11   Execution of Plan Documents.....................................................................30
4.12   Corporate Action.........................................................................................30
4.13   New Corporate Governance Documents ....................................................30
4.14   Effectuating Documents; Further Transactions .........................................30
4.15   Section 1146(a) Exemption.........................................................................30
4.16   Managers, Directors and Officers ..............................................................31

ARTICLE V TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........................................................................................................31

    5.1    Assumption of Executory Contracts and Unexpired Leases....................................31
    5.2    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ........33
    5.3    Pre-Existing Payment and Other Obligations ........................................................34
    5.4    Rejection Damages Claims and Objections to Rejections .....................................34
    5.5    Contracts and Leases Entered Into After the Petition Date ...................................34
    5.6    Reservation of Rights.............................................................................................34

ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS .................................................35

    6.1    Distributions on Account of Claims Allowed as of the Plan Effective Date.........35
    6.2    Special Rules for Distributions to Holders of Disputed Claims ...........................35
    6.3    Disbursing Agent ...................................................................................................35
    6.4    Distributions of Take-back SSNs and Convertible Notes  to Holders of Senior Debt Claims .............................................................................................36
    6.5    Distribution Form...................................................................................................40
    6.6    Delivery of Distributions and Undeliverable or Unclaimed Distributions ...........40
    6.7    Exemption from Registration Requirements; Restriction on Certain Holders ..................................................................................................................43
    6.8    Claims Paid or Payable by Third Parties ...............................................................44
    6.9    Setoffs; Recoupments ...........................................................................................44
    6.10    Allocation Between Principal and Accrued Interest .............................................45

ARTICLE VII PROCEDURES FOR RESOLVING DISPUTED CLAIMS ...............................45

    7.1    Disputed Claims.....................................................................................................45
    7.2    Resolution of Disputed Claims ..............................................................................46
    7.3    Estimation of Claims..............................................................................................46
    7.4    No Interest..............................................................................................................47
    7.5    No Distributions Pending Allowance .....................................................................47
    7.6    Disallowance of Claims and Interests....................................................................47

ARTICLE VIII EFFECT OF CONFIRMATION OF THE PLAN .............................................47

    8.1    Compromise and Settlement of Claims, Interests, and Controversies...................47
    8.2    Discharge of Claims and Termination of Interests ................................................48
    8.3    Releases by the Debtors..........................................................................................48
    8.4    Releases by Releasing Parties ................................................................................49
    8.5    Exculpation ............................................................................................................50
    8.6    Injunction ...............................................................................................................50
    8.7    Protection Against Discriminatory Treatment .......................................................51
    8.8    Indemnification ......................................................................................................51
    8.9    Release of Liens.....................................................................................................52
    8.10    Reimbursement or Contribution ..........................................................................52

ARTICLE IX CONDITIONS PRECEDENT TO THE PLAN EFFECTIVE DATE...................53

9.1     Conditions Precedent to the Plan Effective Date.....................................................53
9.2     Waiver of Conditions Precedent ............................................................................55
9.3     Effect of Non-Occurrence of Conditions to Consummation ................................55

ARTICLE X MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN..........55

10.1    Modification of Plan ..............................................................................................55
10.2    Revocation or Withdrawal of Plan.........................................................................56
10.3    Confirmation of the Plan .......................................................................................56

ARTICLE XI RETENTION OF JURISDICTION ........................................................................56

11.1    Jurisdiction ............................................................................................................56

ARTICLE XII MISCELLANEOUS PROVISIONS .....................................................................58

12.1    Additional Documents ...........................................................................................58
12.2    Payment of Statutory Fees ....................................................................................58
12.3    Reservation of Rights.............................................................................................59
12.4    Elimination of Vacant Classes ..............................................................................59
12.5    Successors and Assigns..........................................................................................59
12.6    Service of Documents ............................................................................................59
12.7    Term of Injunctions or Stays.................................................................................60
12.8    Entire Agreement ...................................................................................................60
12.9    Plan Supplement Exhibits......................................................................................60
12.10   Non-Severability ...................................................................................................60
12.11   Foreign Representative ..........................................................................................61

## INTRODUCTION

Inversiones Latin America Power Ltda., San Juan S.A., and Norvind S.A. (collectively, the "Debtors") jointly propose this Plan. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding claims against and interests in each Debtor pursuant to the Bankruptcy Code. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of claims and interests set forth in Article III shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. The Plan contemplates no substantive consolidation of any of the Debtors. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, businesses, properties and operations, projections, risk factors, a summary and analysis of this Plan and certain related matters.

## ARTICLE I

## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND OTHER REFERENCES

### 1.1    Defined Terms

1.    "*Ad Hoc Group*" means the beneficial holders of, or the investment advisors to funds and accounts that hold, the Existing Notes listed in Schedule I of the RSA.

2.    "*Ad Hoc Group Advisors*" means, collectively, the professional advisors to the Ad Hoc Group, consisting of Cleary Gottlieb Steen & Hamilton LLP, Claro & Cia., Conyers Dill & Pearman and Rothschild & Co.

3.    "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Plan Effective Date to preserve the Estates and operate the Debtors' businesses; (b) Professional Claims; and (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

4.    "*Affiliate*" shall have the meaning ascribed to it in section 101(2) of the Bankruptcy Code. With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

5.    "*Allowed*" means, with respect to any Claim or Interest: (a) a Claim or Interest (i) as to which no objection has been filed and that is evidenced by a Proof of Claim or Interest, as applicable, timely filed by the applicable bar date, if any, or (ii) that is not required to be evidenced by a filed Proof of Claim or Interest, as applicable, under the Plan, the Bankruptcy Code, or a Final Order; (b) a Claim or Interest that is allowed (i) pursuant to the Plan, (ii) in any stipulation that is entered into with the consent of the Required Consenting Creditors (such consent not to be unreasonably withheld, conditioned or delayed) and approved by the Bankruptcy Court, (iii) by order of the Bankruptcy Court, or (iv) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith; or (c) a Claim for which the obligation or liability payable by the Debtors that is not Disputed by the Debtors on or before the later of

(A) the period set forth in <u>Section 7.2</u> of the Plan or (B) such deadline as provided for by law or contract (as, in each case, may be extended from time to time). Except as otherwise specified in the Plan or any order, the amount of an Allowed Claim shall not include interest or other charges on such Claim from and after the Petition Date.

6.      "***Avoidance Actions***" means any and all causes of action to avoid a transfer of property or an obligation incurred by any of the Debtors arising under sections 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code or other similar or related Law.

7.      "***Ballot***" means the form or forms distributed to certain Holders of Claims and Interests that are entitled to vote on the Plan by which such Entities may indicate acceptance or rejection of the Plan.

8.      "***Bankruptcy Code***" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

9.      "***Bankruptcy Court***" means the United States Bankruptcy Court in which the Chapter 11 Cases are commenced.

10.      "***Bankruptcy Rules***" means the Federal Rules of Bankruptcy Procedure.

11.      "***Business Day***" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, either the state of New York or Chile.

12.      "***Cash***" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

13.      "***Cause of Action***" or "***Causes of Action***" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise. Causes of Action also include:  (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any Avoidance Action.

14.      "***Certification***" has the meaning given to such term in <u>Section 6.4</u> of the Plan.

15.      "***Chapter 11 Cases***" means the Debtors' voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

16.      "***Chile***" means the Republic of Chile.

17.    "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

18.    "*Class*" means a category of Holders of Claims or Interests pursuant to section 1122(a) of the Bankruptcy Code.

19.    "*Collateral Agent*" means (a) UMB Bank, N.A., in its capacity as the successor Offshore Collateral Agent (as defined in the Existing Indenture), (b) Citibank, N.A., in its capacity as predecessor Offshore Collateral Agent to the extent of the survival of its rights thereunder, and (c) Banco de Chile, in its capacity as the Onshore Collateral Agent (as defined in the Existing Indenture), under the Prepetition Security Documents (and, in each case, any successor thereto).

20.    "*Company Sale*" has the meaning given to such term in <u>Section 4.7</u> of the Plan.

21.    "*Confirmation*" means entry of the Confirmation Order on the docket of the Chapter 11 Cases.

22.    "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

23.    "*Confirmation Hearing*" means the hearing(s) before the Bankruptcy Court under section 1128 of the Bankruptcy Code at which the Debtors seek entry of the Confirmation Order.

24.    "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code, which order shall be reasonably acceptable to the Debtors, the ILAP Partners and the Required Consenting Creditors (and, if there is any modification of the Confirmation Order that adversely affects the rights of the Super Priority Notes Financing Parties, then any such modification shall also be reasonably acceptable to the Super Priority Notes Financing Parties).

25.    "*Consenting Creditors*" means the holders of Existing Notes and Holders of LC Facility Claims that have executed and delivered counterpart signature pages to the RSA or a Joinder to counsel to ILAP from time to time agreeing to be bound thereby, including the provisions requiring such holder to vote to accept the Plan.

26.    "*Consummation*" means the occurrence of the Plan Effective Date.

27.    "*Convertible Notes*" means the United States dollar-denominated secured notes in the principal amount of $173,345,973 that the New Issuer will issue to Holders of Allowed Class 3 Claims on the Plan Effective Date pursuant to the substantially final version of the Convertible Notes Indenture included in the Plan Supplement; <u>provided</u>, <u>further</u>, that if the LC Facility Settlement is consummated, then the principal amount of the Convertible Notes will be reduced by $8,225,018. The Convertible Notes is included in the Plan Supplement.

28.    "*Convertible Notes Indenture*" means the indenture by and among the Reorganized Debtors, the Convertible Notes Indenture Trustee, and New Issuer to be entered into in connection

3

with the issuance of the Convertible Notes. A substantially final version of the Convertible Notes Indenture is included in the Plan Supplement.

29.    "*Convertible Notes Indenture Trustee*" means UMB Bank, N.A., in its capacity as the trustee under the Convertibles Notes Indenture (and any successor thereto).

30.    "*Cure*" or "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default which is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

31.    "*Debtors*" means, collectively, ILAP and the Guarantor Debtors.

32.    "*Determination Date*" means 180 days after the Plan Effective Date.

33.    "*Disbursing Agent*" means the Reorganized Debtors or any Entity selected by the Debtors or Reorganized Debtors, as applicable, to make or facilitate distributions contemplated under the Plan.

34.    "*Disclosure Statement*" means the related disclosure statement with respect to the Plan, as may be amended, supplemented, or modified from time to time.

35.    "*Disputed*" means a Claim or Interest, or any portion thereof, that (a) is not Allowed; (b) is not disallowed under the Plan, the Bankruptcy Code, as applicable, or a Final Order; (c) is the subject of an objection or request for estimation filed in the Bankruptcy Court and which objection or request for estimation has not been withdrawn, resolved or overruled by a Final Order of the Bankruptcy Court, or (d) is otherwise disputed by the Debtors or the Reorganized Debtors in accordance with applicable law, which dispute has not been withdrawn, resolved or overruled by a Final Order.

36.    "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Debtors, on or after the Plan Effective Date, upon which the Debtors or their duly appointed Disbursing Agent shall make distributions to Holders of Allowed Claims and Interests entitled to receive distributions under the Plan.

37.    "*Distribution Form*" means an instruction to be delivered by (i) the beneficial holder of Existing Notes to its Nominee or (ii) by the Holder of an LC Facility Claim directly to the Disbursing Agent in which such holder (a) certifies that is a Qualified Holder or Non-Qualified Holder and (b) provides any certifications, documents, or representations as are consistent with the Plan. The Distribution Form will be included in the Plan Supplement.

38.    "*Distribution Record Date*" means the earlier of (a) the date set by the Bankruptcy Court in the Scheduling Order and (b) the date that the Confirmation Order is entered by the Bankruptcy Court. For the avoidance of doubt, the Distribution Record Date shall not apply to publicly traded securities, which shall receive distributions in accordance with the Plan and the applicable procedures of DTC.

39.    "*DTC*" means The Depository Trust Company.

40.    "*DWAC*" has the meaning given to such term in <u>Section 6.4</u> of the Plan.

41.    "*Entity*" shall have the meaning ascribed to it in section 101(15) of the Bankruptcy Code.

42.    "*Estate*" means the estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

43.    "*Exculpated Claim*" means any Claim related to any act or omission in connection with, relating to, or arising out of the Debtors' in-court or out-of-court efforts to negotiate, enter into or implement the RSA, the Chapter 11 Cases, the formulation, preparation, solicitation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created or entered into in connection with or pursuant to the RSA, the Solicitation Materials, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan, to the maximum extent permitted by law.

44.    "*Exculpated Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) any official committees appointed in the Chapter 11 Cases and each of their respective members; (c) ILAP Partners; (d) ILAP Sponsors; (e) the Consenting Creditors; and (f) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

45.    "*Executory Contract*" means a contract or lease (other than an Unexpired Lease) to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

46.    "*Existing Guarantor Equity Interest*" means an Interest in any of the Guarantor Debtors.

47.    "*Existing ILAP Equity Interest*" means an Interest in ILAP.

48.    "*Existing Indenture*" means that certain Indenture dated as of June 15, 2021, by and among ILAP, as issuer, the Guarantor Debtors, as guarantors, and Citibank, N.A., in its capacity as the Trustee, Offshore Collateral Agent, Registrar, Transfer Agent and Paying Agent, as amended (including by that certain Indenture Amendment Agreement dated August 28, 2023) as amended, modified or supplemented and in effect from time to time.

49.    "*Existing Indenture Trustee*" means UMB Bank, N.A., in its capacity as the successor trustee, Offshore Collateral Agent, Registrar, Transfer Agent, Paying Agent, Intercreditor Agent and as Offshore Depositary Bank, and Citibank, N.A., in its capacity as predecessor trustee, Offshore Collateral Agent, Registrar, Transfer Agent, Paying Agent and Intercreditor Agent to the extent of its surviving rights thereunder, under the Existing Indenture

and the Prepetition Security and Depositary Agreement, as applicable, pursuant to the Agreement of Resignation, Appointment and Acceptance, dated August 28, 2023 (and any successor thereto).

50. "***Existing Notes***" means the 5.125% senior secured notes due 2033 issued by ILAP pursuant to the Existing Indenture and guaranteed by the Guarantor Debtors.

51. "***Existing Notes Claim***" means any Claim evidenced by, arising under, on account of, related or in connection with the Existing Notes or the Existing Indenture, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder or related thereto (but excluding fees and expenses from the Entities set forth in clause (b) under the definition of "Restructuring Expenses").

52. "***Final Decree***" means the decree contemplated under Bankruptcy Rule 3022.

53. "***Final Order***" means an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, which has not been stayed, set aside or vacated, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order will not preclude such order from being a Final Order.

54. "***Second Amendment***" means that certain Second Amendment and Joinder to the Restructuring Support Agreement, dated as of November 29, 2023, between and among the Debtors, the ILAP Partners, the Ad Hoc Group and Citibank, N.A.

55. "***General Unsecured Claim***" means any Claim other than an Administrative Claim (including Professional Claims), a Priority Tax Claim, an Other Priority Claim, Senior Debt Claim (including any portion that may not be Secured), or an Other Secured Claim.

56. "***Governmental Unit***" shall have the meaning ascribed to it in section 101(27) of the Bankruptcy Code.

57. "***Guarantor Debtors***" means, collectively, San Juan and Norvind.

58. "***Holder***" means an Entity holding a Claim or Interest.

59. "***ILAP***" means Inversiones Latin America Power Limitada, a *sociedad de responsabilidad limitada* organized and existing under the Laws of Chile.

60. "***ILAP Partners***" means, collectively, LAP Chile and LAP BV.

6

61.    "*ILAP Sponsors*" means, collectively, GMR Holding B.V., BTG Pactual Brazil Infrastructure Fund II LP, Patria Infrastructure Fund II LP, Patria Infrastructure Fund II LAP Co-Invest, LP, Patria Infrastructure Fund II LAP Co-Invest, UK LP, PI Fund II (Ontario) LP, PI Fund II (Ontario 1) LP, PI Fund II (Ontario 2) LP.

62.    "*Impaired*" means, with respect to any Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

63.    "*Independent Director*" means the independent director, reasonably acceptable to the Required Consenting Creditors on or before the Plan Effective Date, to be appointed by the ILAP Partners to the boards of directors for Reorganized ILAP, the New Issuer and the Reorganized Guarantor Debtors on the Plan Effective Date.

64.    "*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

65.    "*Issue Date*" means the date on which the Existing Notes were originally issued under the Existing Indenture.

66.    "*Joinder*" means a joinder agreement to the RSA, whereby a Holder of a Senior Debt Claim that is not a party to the RSA as of the effective date thereof may become a Consenting Creditor by executing such joinder agreement pursuant to and consistent with the terms and conditions set forth in <u>Section 10.03</u> of the RSA.

67.    "*LAP BV*" means LAP Renewables B.V.

68.    "*LAP Chile*" means Latin America Power S.A., a *sociedad anónima* organized and existing under the Laws of Chile.

69.    "*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

70.    "*LC Facility Agent*" means Citibank, N.A., in its capacity as administrative agent under the Credit Agreement (and any successor thereto).

71.    "*LC Facility Agreement*" means the certain Credit Agreement dated June 15, 2021 by and among ILAP, as borrower, the Guarantor Debtors, as guarantors, the LC Facility Agent, and the lenders party thereto, as amended (including by that certain First Amendment to Credit Agreement dated August 28, 2023), modified or supplemented and in effect from time to time.

72.    "*LC Facility Claims*" means any Claim evidenced by, arising under, on account of, related or in connection with the LC Facility Agreement, including Claims for all principal

7

amounts outstanding, cash collateral, interest, fees, expenses, costs, and other charges arising thereunder or related thereto (but excluding fees and expenses from the Entities set forth in clause (b) under the definition of "Restructuring Expenses").

73.     "*LC Facility Settlement*" means, collectively, the provisions in Section 4.4(g) of the Plan.

74.     "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

75.     "*Mandatory Cash Sweep*" has the meaning given to such term in Section 4.5(e) of the Plan.

76.     "*Net Cash Proceeds*" has the meaning given to such term in Section 4.5(f) of the Plan.

77.     "*New Equity Interests*" means, collectively, the New Issuer Equity Interests and the interests in the Reorganized ILAP.

78.     "*New Issuer*" means a newly formed exempted company incorporated under the Laws of the Cayman Islands, which will be established and maintained for the purpose of issuing the Convertible Notes and which will own 100% of the equity of Reorganized ILAP on the Plan Effective Date, and will guarantee the Take-back SSNs and the Super Priority Notes.

79.     "*New Issuer Equity Interests*" means interests in the New Issuer.

80.     "*New Corporate Governance Documents*" means the memorandum and articles of association and/or bylaws (in each case as may be amended and/or restated from time to time), or other similar organizational and constituent documents, for each of New Issuer and the Reorganized Debtors, which forms of memorandum and articles of association, bylaws and similar organizational and constituent documents are included in the Plan Supplement, and which (if not included in the Plan Supplement) shall be in form and substance reasonably acceptable to the Debtors, the ILAP Partners and the Required Consenting Creditors.

81.     "*New Notes*" means, collectively, the Take-back SSNs, the Convertible Notes and the Super Priority Notes.

82.     "*New Notes Documents*" means, collectively, the New Notes, the Super Priority/Take-back SSN Indenture, the Convertible Notes Indenture, or other agreement governing the New Notes, and any and all other agreements, documents, and instruments delivered or to be entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, in each case if any, the terms of which documents shall be as provided in the RSA, and acceptable to the Debtors, ILAP Partners, and the Required Consenting Creditors. The New Notes, the Super Priority/Take-back SSN Indenture, and the Convertible Notes Indenture are included in the Plan Supplement.

83.     "*Nominee*" has the meaning given to such term in Section 6.4 of the Plan.

8

84.     "*Non-Qualified Holders*" has the meaning given to such term in <u>Section 6.4</u> of the Plan.

85.     "*Non-Qualified Holders' Notes*" has the meaning given to such term in <u>Section 4.5(f)</u> of the Plan.

86.     "*Non-Qualified Threshold Amount*" means 35 Non-Qualified Holders.

87.     "*Norvind*" means Norvind S.A., a *sociedad anónima* organized and existing under the Laws of Chile.

88.     "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

89.     "*Other Secured Claim*" means any Secured Claim other than a Senior Debt Claim.

90.     "*PEC 1 Receivables*" means the "*Saldos*" assigned to in the Tariff Stabilization Resolution (*Resolución Exenta* No. 72) issued on March 5, 2020, by the *Comisión Nacional de Energía* of Chile, as clarified and rectified by the *Resolución Exenta* No. 114 issued on April 9, 2020, by the *Comisión Nacional de Energía* of Chile, as further amended, clarified or rectified in accordance with applicable Law.

91.     "*Person*" shall have the meaning ascribed to it in section 101(41) of the Bankruptcy Code.

92.     "*Petition Date*" means the date on which each of the Debtors filed their petitions for relief commencing the Chapter 11 Cases.

93.     "*Plan*" means the joint chapter 11 plan of reorganization filed by the Debtors as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes and attachments thereto, which plan shall not be inconsistent with the Restructuring Term Sheet, and to the extent not consistent with the Restructuring Term Sheet in any material respect, be in form and substance be reasonably acceptable to the Debtors, ILAP Partners and the Required Consenting Creditors.

94.     "*Plan Effective Date*" means the date that is the first Business Day after the Confirmation Date on which all conditions precedent to the Plan Effective Date under <u>Section 9.1</u> of the Plan have been satisfied or waived in accordance with the Plan.

95.     "*Plan Supplement*" means any compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan, which shall be filed by the Debtors concurrently with the Plan, and additional documents filed with the Bankruptcy Court prior to the Plan Effective Date as amendments to the Plan Supplement, each of which shall not be inconsistent with, and shall contain, the terms and conditions set forth in the RSA and the Restructuring Term Sheet, attached as <u>Exhibit A</u> to the RSA, where applicable, and which shall include, without limitation, (a) the New Corporate Governance Documents; (b) the New Notes; (c) the Super Priority/Take-back SSN Indenture; (d) Convertible Notes Indenture; (e) the Rejection Schedule, if any; (f) the

list of directors and officers of New Issuer and the Reorganized Debtors; (g) the Super Priority Notes Commitment Agreement; (h) Sales Facilitation Agreement; and (i) the Distribution Form.

96.     "***Prepetition Chilean Security Document***" means each prepetition Security Document (as defined in the Existing Indenture) governed by the Chilean law.

97.     "***Prepetition Security and Depositary Agreement***" means the security and depositary agreement dated as of the Issue Date among ILAP, the Guarantor Debtors, Citibank, in its various capacities, and Banco de Chile.

98.     "***Prepetition Security Documents***" means, collectively, (a) each Prepetition Chilean Security Document, (b) the Security and Depositary Agreement and (c) any other mortgages, deeds of trust, security agreements, mandates, trust arrangements, pledge agreements or control agreements entered into on or after the Issue Date and prior to the Petition Date and of a similar nature relating to the Projects (as defined in the Existing Indenture), in each case for the benefit of the Secured Parties (as defined in the Existing Indenture).

99.     "***Pro Rata Senior Debt Take-back SSN Amount***" means with respect to any Holder of a Class 3 Claim, such Holder's *pro rata* share calculated based on the proportion that such Holder's Allowed Class 3 Claim bears to $260 million.

100.    "***Pro Rata Senior Debt Convertible Notes Amount***" means with respect to any Holder of a Class 3 Claim, such Holder's *pro rata* share calculated based on the proportion that such Holder's Allowed Class 3 Claim bears to $173,345,973.

101.    "***Pro Rata Share***" means with respect to any Holder of a Class 3 Claim, such Holder's *pro rata* share calculated based on the proportion that such Holder's Allowed Class 3 Claim bears to the aggregate amount of all Allowed Claims in Class 3, as of the date of such distribution.

102.    "***Priority Tax Claims***" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

103.    "***Professional***" means an Entity: (a) employed in the Chapter 11 Cases pursuant to an order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Plan Effective Date pursuant to this Plan and sections 327, 328, 329, 330, and 331 of the Bankruptcy Code or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

104.    "***Professional Claim***" means a Claim by a professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Plan Effective Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

105.    "***Professional Fee Escrow***" shall have the same meaning as set forth in <u>Section 2.2</u> of the Plan.

106.    "***Proof of Claim***" means a proof of claim filed against any of the Debtors in the Chapter 11 Cases.

107.    "***Purchased PEC 1 Receivables***" means the PEC 1 Receivables assigned to LAP Chile pursuant to that certain *Cesión de Saldos* agreement, dated as of August 28, 2023.

108.    "***Qualified Holders***" has the meaning given to such term in <u>Section 6.4</u> of the Plan.

109.    "***Reinstatement***" or "***Reinstated***" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired and reinstated in accordance with section 1124 of the Bankruptcy Code.

110.    "***Rejection Schedule***" means the schedule of Executory Contracts and Unexpired Leases in the Plan Supplement, if any, as may be amended from time to time, setting forth certain Executory Contracts and Unexpired Leases for rejection as of the Plan Effective Date under section 365 of the Bankruptcy Code.

111.    "***Related Party***" means, collectively, current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns, subsidiaries, affiliates, managed accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, heirs, executors, and assigns, and other professionals (including Professionals), in each case solely in their capacities as such, together with their respective past and present directors, officers, shareholders, partners, members, employees, agents, attorneys, representatives, heirs, executors and assigns, in each case solely in their capacities as such.

112.    "***Released Parties***" means, collectively, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) the New Issuer; (d) ILAP Partners; (e) ILAP Sponsors; (f) the Existing Indenture Trustee; (g) the LC Facility Agent; (h) each Consenting Creditor that voted to accept the Plan; (i) each Super Priority Notes Financing Party; (j) each current and former Affiliate of each Entity in clauses (a) through (i); and (k) each Related Party of each Entity in clause (a) through (j).

113.    "***Releasing Parties***" means, collectively, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) the New Issuer; (d) the Existing Indenture Trustee; (e) the LC Facility Agent; (f) each Super Priority Notes Financing Party; (g) each Consenting Creditor; (h) all Holders of Claims or Interests that are eligible to vote to accept or reject the Plan that vote to accept for any Class; (i) all Holders of Claims or Interests that are deemed to accept the Plan and elect to opt in to the releases provided by the Plan; (j) all Holders of Claims or Interests that are eligible to vote to accept or reject the Plan that abstain from voting on the Plan for all Classes in which they are eligible to vote and who affirmatively opt-in to the releases provided by the Plan by checking the box on the applicable Ballot indicating that they opt to grant the releases provided in the Plan; (k) all Holders of Claims or Interests that are eligible to vote to accept or reject the Plan that vote to reject the Plan for all Classes in which they are eligible to vote and who affirmatively opt in to the releases provided by the Plan by checking the box on

11

the applicable Ballot indicating that they opt to grant the releases provided in the Plan; (l) each current and former Affiliate of each Entity in clause (a) through (k); and (m) each Related Party of each Entity in clause (a) through (n).

114.    "*Reorganized Debtor*" means a Debtor, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Plan Effective Date.

115.    "*Reorganized Guarantor Debtors*" means, collectively, Norvind and San Juan, or any of their successors or assigns, by merger, consolidation, or otherwise, on or after the Plan Effective Date.

116.    "*Reorganized ILAP*" means ILAP, as transformed into a Chilean stock corporation (*sociedad por acciones*), or any successor or assign, by merger, consolidation, or otherwise, on or after the Plan Effective Date.

117.    "*Required Consenting Creditors*" means, as of the relevant date, the Consenting Creditors holding a majority of the outstanding principal amount of the Existing Notes Claims and LC Facility Claims held by all Consenting Creditors on such date.

118.    "*Restructuring*" means the restructuring of ILAP and its direct subsidiaries, as contemplated by and described in the RSA, the Restructuring Term Sheet and the Plan.

119.    "*Restructuring Expenses*" means all prepetition and postpetition reasonable and documented fees and expenses of (a) the Ad Hoc Group Advisors and counsel for the Holders of the LC Facility Claims, including Milbank, LLP, in connection with the negotiation, formulation, preparation, execution, delivery, implementation, and consummation of the RSA, the Plan, the Definitive Documents (as defined in the RSA), and the transactions contemplated thereby, and (b) the Existing Indenture Trustee and the Collateral Agent.

120.    "*Restructuring Term Sheet*" means that certain term sheet attached as <u>Exhibit A</u> to the RSA, as amended from time to time, including by the Second Amendment.

121.    "*Restructuring Transactions*" means those certain restructuring and recapitalization transactions with respect to the Debtors' capital structure required to effect the Restructuring on the terms and conditions set forth in the RSA, the Restructuring Term Sheet, and the Plan.

122.    "*RSA*" shall mean that certain Restructuring Support Agreement for implementation of the Restructuring dated as of October 30, 2023 between the Debtors, ILAP Partners, and the Ad Hoc Group, as amended from time to time, including by the Second Amendment.

123.    "*Sale Period*" has the meaning given to such term in <u>Section 4.5(f)</u> of the Plan.

124.    "*Sales Facilitation Agreement*" has the meaning given to such term in <u>Section 4.7</u> of the Plan.

125.    "**San Juan**" means San Juan S.A., a *sociedad anónima* organized and existing under the Laws of Chile.

126.    "**Scheduling Order**" means the order of the Bankruptcy Court scheduling the Confirmation Hearing.

127.    "**SEC**" means the United States Securities and Exchange Commission.

128.    "**Secured**" means when referring to a Claim, a Claim:  (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) otherwise Allowed pursuant to the Plan as a Secured Claim.

129.    "**Securities Act**" means the United States Securities Act of 1933, as amended and now in effect and as it may further be amended from time to time prior to the Plan Effective Date.

130.    "**Security**" means a security as defined in Section 2(a)(1) of the Securities Act of 1933.

131.    "**Selling Agent**" has the meaning given to such term in in <u>Section 4.5(f)</u> of the Plan.

132.    "**Selling Agent Agreement**" has the meaning given to such term in <u>Section 4.5(f)</u> of the Plan.

133.    "**Senior Debt Claims**" means, collectively, the Existing Notes Claims and LC Facility Claims.

134.    "**Settlement Take-back SSNs**" means the Take-back SSNs in the principal amount of $4,305,966 that will be issued to the Holders of the LC Facility Claims pursuant to the LC Facility Settlement (if such settlement is consummated). For the avoidance of doubt, the issuance of the Settlement Take-back SSNs pursuant to the LC Facility Settlement (if consummated) will be in addition to the $260 million in Take-back SSNs that the Reorganized ILAP will issue on the Plan Effective Date to Holders of Class 3 Claims, including the Holders of the LC Facility Claims.

135.    "**Solicitation Materials**" means the solicitation materials and documents included in the solicitation packages that will be sent to, among others, Holders of Claims and Interests entitled to vote to accept or reject the Plan, in compliance with Bankruptcy Rules 3017(d) and 2002(b).

136.    "**Substitute Consideration**" has the meaning given to such term in <u>Section 4.5(f)</u> of the Plan.

137.    "**Super Priority/Take-back SSN Indenture**" means the indenture by and among the Reorganized Debtors, the Super Priority/Take-back SSN Indenture Trustee, and New Issuer entered into in connection with the issuance of the Super Priority Notes and Take-back SSNs.

A substantially final version of the Super Priority/Take-back SSN Indenture is included in the Plan Supplement.

138.    "***Super Priority/Take-back SSN Indenture Trustee***" means UMB Bank, N.A., in its capacity as the trustee under the Super Priority/Take-back SSN Indenture (and any successor thereto).

139.    "***Super Priority Notes***" means the United States dollar-denominated senior secured notes, with super-priority relative to the Take-back SSNs and the Convertible Notes, in the principal amount of $14 million that will be issued to the Super Priority Notes Financing Parties pursuant to the substantially final version of the Super Priority Note Indenture included in the Plan Supplement.

140.    "***Super Priority Notes Commitment***" means the commitment of the Super Priority Notes Financing Parties to advance funds to the Debtors or Reorganized Debtors, as applicable, to purchase $14 million in Super Priority Notes on or before the Plan Effective Date.

141.    "***Super Priority Notes Commitment Agreement***" means that certain agreement dated November 29, 2023 by and among the Super Priority Notes Financing Parties, as purchasers, and the Debtors, as issuer and guarantors (as applicable), to purchase $14 million in Super Priority Notes on or before the Plan Effective Date.

142.    "***Super Priority Notes Financing Parties***" means the parties who are signatories to the Super Priority Notes Commitment Agreement that are providing the Super Priority Notes Commitment.

143.    "***Take-back SSNs***" means the United States dollar-denominated senior secured notes in the principal amount of $260 million that will be issued to Holders of Allowed Class 3 Claims on the Plan Effective Date.  For the avoidance of doubt, if the LC Facility Settlement is consummated, then the Take-back SSNs in the amount of the Settlement Take-back SSNs shall also be issued pursuant to the terms of the LC Facility Settlement. The Take-back SSN is included in the Plan Supplement.

144.    "***Trustee***" means the Super Priority/Take-back SSN Indenture Trustee and the Convertible Notes Indenture Trustee, individually and collectively as the context may require.

145.    "***Unclaimed Distribution***" means any distribution under the Plan on account of an Allowed Claim to a Holder that has not:  (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

146.    "***Unexpired Lease***" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

147.   "***Unimpaired***" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Impaired.

148.   "***United States Trustee***" means the United States Trustee for the jurisdiction in which the Chapter 11 Cases are commenced.

## 1.2   Rules of Interpretation

For purposes of the Plan:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (g) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; and (i) the Debtors shall be authorized to and may rely upon any written statement (including by email) from Cleary Gottlieb Steen & Hamilton LLP that confirms or declines a consent, waiver or other form of approval by the Ad Hoc Group.

In the case of a conflict between the provisions contained in the RSA or the Restructuring Term Sheet and the Plan, the terms of the Plan shall control in all respects. In the event of an inconsistency between this Plan and the Disclosure Statement, the terms of this Plan shall control in all respects. In the event of an inconsistency between this Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order). In the event of an inconsistency between the Confirmation Order and this Plan, the Confirmation Order shall control.

## 1.3   Computation of Time

Bankruptcy Rule 9006(a) applies in computing any period of time prescribed or allowed herein.

## 1.4   Governing Law

Except to the extent the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to conflict of laws principles.

1.5    **Reference to Monetary Figures**

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

1.6    **Reference to the Debtors or the Reorganized Debtors**

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

## ARTICLE II

## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article III.

2.1    **Administrative Claims**

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim, the Required Consenting Creditors, and the Debtors or Reorganized Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim either:  (a) on the Plan Effective Date, or as soon as reasonably practicable thereafter; (b) if the Administrative Claim is not Allowed as of the Plan Effective Date, no later than thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; or (c) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims without any further action by the Holders of such Allowed Administrative Claims. Cash payments to creditors outside of the United States of America may be made in such currency and by such means as are necessary or customary in a particular foreign jurisdiction.

2.2    **Professional Claims**

All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Plan Effective Date must be filed no later than thirty (30) days after the Plan Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code. The Reorganized Debtors shall pay Professional Claims in Cash in the amount Allowed by the Bankruptcy Court. From and after the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the

Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

On or before the Plan Effective Date, the Debtors shall use proceeds from the sale of the Super Priority Notes, and, if necessary, Cash on hand, to fund an escrow for Professionals (the "Professional Fee Escrow") in an amount sufficient to pay all Professional Claims in full in Cash, pending the Bankruptcy Court's approval of such fees and expenses.

At least one (1) Business Day prior to the Plan Effective Date, each Professional shall provide to the Debtors its respective amount of fees and expenses to be funded into the Professional Fee Escrow for such Professional. The Professional Fee Escrow shall operate on a per Professional Basis, with each Professional's respective amount of fees and expenses segregated for the sole benefit of the Professional in the amount set forth for such Professional. The Professional Fee Escrow shall not be considered property of the Debtors' estates or an asset of the Reorganized Debtors, it shall be for the sole benefit of the Professionals; provided, however, that any funds remaining in the Professional Fee Escrow after the Bankruptcy Court enters an order allowing and directing payment of all Professional Fees shall revert to the Reorganized ILAP. The Professional Fee Escrow shall not act as a cap on any Professional Fees; instead they shall be paid by the Reorganized Debtors in full in Cash should the funds in the Professional Fee Escrow be insufficient to do so.

2.3    **Priority Tax Claims**

Each Holder of an Allowed Priority Tax Claim due and payable on or before the Plan Effective Date shall receive in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Priority Tax Claim: (a) the treatment provided by section 1129(a)(9)(C) of the Bankruptcy Code; (b) a Cash payment on, or as soon as reasonably practicable after, the later of the Plan Effective Date or the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, equal to the amount of such Allowed Priority Tax Claim; or (c) such other less favorable treatment as may be agreed upon between the Holder of such Allowed Priority Tax Claim and the applicable Debtor. If payment is made in accordance with section 1129(a)(9)(C), installment payments shall be made quarterly, and interest shall accrue in accordance with 26 U.S.C. § 6621. Cash payments to creditors outside of the United States of America may be made in such currency and by such means as are necessary or customary in a particular foreign jurisdiction.

2.4    **Payment of Restructuring Expenses**

The Restructuring Expenses payable by the Debtors shall constitute Allowed Administrative Claims and shall be paid on a current basis in full in Cash pursuant to (and subject to) the RSA, the Existing Indenture and Prepetition Security Documents (as applicable) without the need to file a proof of such Claim and without further order of the Bankruptcy Court. On the Plan Effective Date, the Debtors or Reorganized Debtors, as applicable, shall pay the Restructuring Expenses that have accrued and are unpaid as of the Plan Effective Date from the proceeds of the sales of the Super Priority Notes and, if necessary, Cash on hand. For the avoidance of doubt, any Restructuring Expenses incurred but not yet paid on or prior to the Plan Effective Date shall be payable by the Reorganized Debtors after the Plan Effective Date.

## ARTICLE III

## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

This Plan constitutes a separate Plan proposed by each Debtor. Except for the Claims addressed in Article II, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 of the Bankruptcy Code. Unless otherwise stated, a Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Plan Effective Date.

3.1    **Classification of Claims and Interests**

Claims against and Interests in each of the Debtors are divided into the following Classes:

| Number | Class |
| --- | --- |
| Class 1 | Class 1 consists of all Other Secured Claims. |
| Class 2 | Class 2 consists of all Other Priority Claims. |
| Class 3 | Class 3 consists of all Senior Debt Claims. |
| Class 4 | Class 4 consists of all General Unsecured Claims. |
| Class 5 | Class 5 consists of all Existing Guarantor Equity Interests |
| Class 6 | Class 6 consists of all Existing ILAP Equity Interests |

3.2    **Treatment of Classes of Claims and Interests**

The following chart designates the Class of Claims against and Interests in each of the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code and (c) deemed to accept or reject the Plan. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Section 12.4 of the Plan.

| Class | Claim or Interest | Status | Voting Rights |
| --- | --- | --- | --- |
| 1 | Other Secured Claims | Unimpaired | Deemed To Accept; Not Entitled To Vote |
| 2 | Other Priority Claims | Unimpaired | Deemed To Accept; Not Entitled To Vote |
| 3 | Senior Debt Claims | Impaired | Entitled To Vote |

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 4 | General Unsecured Claims | Unimpaired | Deemed To Accept; Not Entitled To Vote |
| 5 | Existing Guarantor Equity Interests | Unimpaired | Deemed To Accept; Not Entitled To Vote |
| 6 | Existing ILAP Equity Interests | Impaired | Entitled To Vote |

Except to the extent that a Holder of an Allowed Claim against or Interest in any of the Debtors, as applicable, agrees to a less favorable treatment, and unless otherwise expressly indicated below, such Holder shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Interest. Unless otherwise indicated, the Holder of an Allowed Claim or Interest, as applicable, shall receive such treatment on the Plan Effective Date, or as soon as reasonably practicable thereafter:

(a)     **Class 1 (Other Secured Claims)**

   (1)     *Classification*:  Class 1 consists of all Other Secured Claims against the applicable Debtor.

   (2)     *Treatment*:  Each Holder of an Allowed Other Secured Claim shall receive, at the Debtors or Reorganized Debtors' option (as applicable): (a) payment in full in Cash; (b) the collateral securing its Allowed Other Secured Claim; (c) Reinstatement of its Allowed Other Secured Claim; or (d) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. Cash payments to creditors outside of the United States of America may be made in such currency and by such means as are necessary or customary in a particular foreign jurisdiction.

   (3)     *Voting*:  Class 1 is Unimpaired. Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Other Secured Claims are not entitled to vote to accept or reject the Plan.

(b)     **Class 2 (Other Priority Claims)**

   (1)     *Classification*:  Class 2 consists of all Other Priority Claims against the applicable Debtor.

   (2)     *Treatment*:  On the Plan Effective Date, each Holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. Cash payments to creditors outside of the United States of America may be made in such currency and

by such means as are necessary or customary in a particular foreign jurisdiction.

(3)    *Voting*:  Class 2 is Unimpaired. Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

(c)    **Class 3 (Senior Debt Claims)**

(1)    *Classification*:  Class 3 consists of all Senior Debt Claims against the applicable Debtor. Notwithstanding anything in this Plan to the contrary, Senior Debt Claims held by Holders of Existing Notes Claims and Holders of LC Facility Claims shall only receive the treatment and distribution provided for in this Section 3.2(c), subject to the LC Facility Settlement (if consummated), including as to any unsecured deficiency Claims, and shall not be classified in any other Class of Claims.

(2)    *Allowance*: The Senior Debt Claims are Allowed in the amount of $433,345,973.

(3)    *Treatment*:

    A    In full and final satisfaction, settlement, release, and in exchange for the Senior Debt Claims, on the Plan Effective Date (or as soon as practicable thereafter), each Holder of an Allowed Senior Debt Claim shall receive its Pro Rata Share of each of the Take-back SSNs and the Convertible Notes. For the avoidance of doubt, the Take-back SSNs being issued under this Section 3.2(c) shall not include the Settlement Take-back SSNs.

    B    To the extent necessary, this Section 3.2(c) shall be deemed modified to classify separately the votes of Class 3 into two sub-classes—(A) Secured Senior Debt Claims and (B) unsecured Senior Debt Claims—with the vote submitted on the Ballot of a Holder of a Senior Debt Claim to be tabulated the same across both sub-classes.

(4)    *Voting*:  Class 3 is Impaired. Holders of Senior Debt Claims are entitled to vote on the Plan.

(d)    **Class 4 (General Unsecured Claims)**

(1)    *Classification*:  Class 4 consists of all General Unsecured Claims against the applicable Debtor.

(2)    *Treatment*: On the Plan Effective Date, each Holder of an Allowed General Unsecured Claim shall, at the election of the applicable Debtor or

20

Reorganized Debtor, (A) have the legal, equitable and contractual rights of such Holder Reinstated or (B) receive Cash in an amount equal to such Allowed General Unsecured Claims in the ordinary course of business. Cash payments to creditors outside of the United States of America may be made in such currency and by such means as are necessary or customary in a particular foreign jurisdiction.

(3)    *Voting*:  Class 4 is Unimpaired. Holders of Allowed General Unsecured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed General Unsecured Claims are not entitled to vote to accept or reject the Plan.

(e)    **Class 5 (Existing Guarantor Equity Interests)**

(1)    *Classification*:  Class 5 consists of all Existing Guarantor Equity Interests.

(2)    *Treatment*:  Each Existing Guarantor Equity Interest is Allowed as of the Plan Effective Date. On the Plan Effective Date, each Holder of an Allowed Existing Guarantor Equity Interest shall have such Interest Reinstated.

(3)    *Voting*:  Class 5 is Unimpaired. Holders of Allowed Existing Guarantor Equity Interests are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Existing Guarantor Equity Interests are not entitled to vote to accept or reject the Plan.

(f)    **Class 6 (Existing ILAP Equity Interests)**

(1)    *Classification*:  Class 6 consists of all Existing ILAP Equity Interests.

(2)    *Treatment*:  Each Existing ILAP Equity Interest is Allowed as of the Plan Effective Date. On the Plan Effective Date: (A) ILAP will be transformed into a Chilean stock corporation (*sociedad por acciones*) and as a result of such transformation, the Existing ILAP Equity Interest will be represented by shares; (B) the Existing ILAP Equity Interest held by LAP BV, as amended due to the transformation of ILAP, will be transferred to LAP Chile; (C) the Existing ILAP Equity Interest held by LAP Chile, as amended due to the transformation of ILAP (together with the Existing ILAP Equity Interest held by LAP BV that will be transferred to LAP Chile) will be contributed to New Issuer, and LAP Chile will receive all of the New Issuer Equity Interests; and (D) equity in the Reorganized ILAP will be issued to the New Issuer in accordance with Section 4.4(a) and Section 4.4(b) of the Plan.

(3)    *Voting*:  Class 6 is Impaired. Holders of Existing ILAP Equity Interests are entitled to vote on the Plan.

21

3.3  **Special Provision Governing Unimpaired Claims**

Notwithstanding anything to the contrary herein, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights and defenses regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

## ARTICLE IV

## PROVISIONS FOR IMPLEMENTATION OF THE PLAN

4.1  **General Settlement of Claims**

Unless otherwise set forth in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Plan Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims and Interests.

4.2  **Subordination**

The allowance, classification, and treatment of all Claims and Interests under the Plan shall conform to and with the respective contractual, legal, and equitable subordination rights of such Claims and Interests, and any such rights shall be settled, compromised, and released pursuant to the Plan. Notwithstanding anything to the contrary herein, pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim (other than Senior Debt Claims held by Consenting Creditors) in accordance with any contractual, legal, or equitable subordination relating thereto.

4.3  **Sources of Cash for Plan Distributions**

All Cash consideration necessary for the Reorganized Debtors to make payments or distributions pursuant to this Plan shall be obtained from the Cash proceeds received from the Super Priority Notes described in Section 4.4(f) and Section 4.5(c) herein, Cash on hand, and Cash derived from post-petition business operations. Further, the Debtors and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan. Any changes in intercompany account balances resulting from such transfers will not violate the terms of the Plan or the New Notes Documents.

4.4  **Restructuring Transactions**

(a)  <u>Incorporation of New Issuer</u>. Effective as of the Confirmation Date, the ILAP Partners are authorized and directed, on or prior to the Plan Effective Date to form and incorporate the New Issuer in the Cayman Islands. Upon implementation of the Restructuring Transactions on the Plan Effective Date, the New Issuer shall hold all of the equity interests in the Reorganized

ILAP from and after the Plan Effective Date. The Existing ILAP Equity Interests will be contributed to the New Issuer.

(b)     Restructuring of ILAP. On or immediately before the Plan Effective Date, ILAP shall reorganize as a Chilean stock corporation (*sociedad por acciones*), with the equity in the Reorganized ILAP to be contributed by LAP Chile to the New Issuer.

(c)     Contribution of Purchased PEC 1 Receivables: On or prior to the Plan Effective Date, LAP Chile is authorized and directed to contribute the Purchased PEC 1 Receivables, at its discretion, to the New Issuer or Reorganized ILAP; provided, further that if LAP Chile contributes the Purchased PEC 1 Receivables to New Issuer, then the New Issuer is authorized and directed to contribute the Purchased PEC 1 Receivables to the Reorganized ILAP.

(d)     Exchange of Senior Debt Claims for Take-back SSNs. The Reorganized ILAP's issuance of the Take-back SSNs to Holders of the Senior Debt Claims shall be deemed in consideration for each such Holder deeming to have assigned, conveyed and contributed such Holder's Pro Rata Senior Debt Take-Back SSN Amount of the Senior Debt Claim to the Reorganized ILAP as of the Plan Effective Date; provided, further, that if the LC Facility Settlement is consummated, then such issuance shall be deemed in consideration for Holders of the LC Facility Claims deeming to have assigned, conveyed and contributed such Holder's Pro Rata Senior Convertible Notes Amount of the Senior Debt Claim to the Reorganized ILAP as of the Plan Effective Date. Such Holder's Pro Rata Senior Debt Take-back SSN Amount of the Senior Debt Claim (and, if the LC Facility Settlement is consummated, then the LC Facility Holders' Pro Rata Senior Convertible Notes Amount of the Senior Debt Claim) shall be deemed to have been transferred to, and will vest with, the Reorganized ILAP on the Plan Effective Date without further order of the Bankruptcy Court and without further act or action under applicable law, regulation, order or rule, from any Entity. The Existing Indenture Trustee, the LC Facility Agent, Consenting Creditors and any other Holder of an Allowed Senior Debt Claim shall take such actions as may be reasonably requested to give effect to the foregoing provisions.

(e)     Exchange of Senior Debt Claims for Convertible Notes. The New Issuer's issuance of the Convertible Notes to Holders of the Senior Debt Claims shall be deemed in consideration each such Holder deeming to have assigned, conveyed and contributed such Holder's Pro Rata Senior Debt Convertible Notes Amount of the Senior Debt Claim to New Issuer as of the Plan Effective Date. Such Holder's Pro Rata Senior Debt Convertible Notes Amount of the Senior Debt Claim shall be deemed to have been transferred to, and will vest with, the New Issuer on the Plan Effective Date without further order of the Bankruptcy Court and without further act or action under applicable law, regulation, order or rule, from any Entity. On the Plan Effective Date, the New Issuer is authorized and directed to contribute such Senior Debt Claims to the Reorganized ILAP. The Existing Indenture Trustee, the LC Facility Agent, Consenting Creditors and any other Holder of an Allowed Senior Debt Claim shall take such actions as may be reasonably requested, and the Consenting Creditors shall direct the Existing Indenture Trustee and the LC Facility Agent to take such actions, to give effect to the foregoing provisions, including an acknowledgment that

the issuance of the Convertible Notes, is for an exchange of the aggregate Pro Rata Senior Debt Convertible Notes Amount of the Senior Debt Claim.

(f)    <u>Exit Financing (Super Priority Notes)</u>. Subject to the terms and conditions set forth in the Super Priority Notes Commitment Agreement, on or before the Plan Effective Date, the Super Priority Notes Financing Parties shall purchase the Super Priority Notes for $14 million.

(g)    <u>Settlement with Holders of LC Facility Claims</u>.

(1)    Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, including the Settlement Take-back SSNs, the Holders of the LC Facility Claims have agreed to forfeit, and shall be deemed to have forfeited, any right to receive Convertible Notes in exchange for the issuance by the Reorganized ILAP of the Settlement Take-back SSNs to such Holders on the Plan Effective Date.

(2)    The foregoing settlement is conditioned upon the Holders of the LC Facility Claims (x) voting to support the Plan, and (y) being party to the RSA as of the Plan Effective Date. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement with the Holders of the LC Facility Claims. For the avoidance of doubt, the agreement of the Holders of the LC Facility Claims to forfeit their right to receive Convertible Notes is conditioned upon the Bankruptcy Court's approval of the issuance by the Reorganized ILAP of the Settlement Take-back SSNs, in the amount set forth in the Plan, to such Holders on the Plan Effective Date.

(3)    If at any time prior to the Plan Effective Date, the Holders of the LC Facility Claims (x) vote to reject the Plan, (y) withdraw their vote to accept the Plan, or (z) are not party to the RSA (whether by way of withdrawing from the RSA or pursuant to a termination of the RSA or the Second Amendment, in each case pursuant to the terms thereof), then the settlement with the Holders of the LC Facility Claims shall be considered null and void *ab initio* in all respects, and all applicable parties in interest shall go back to the status quo ante as if the Holders of the LC Facility Claims did not execute the RSA; <u>provided</u>, <u>further</u> nothing contained in the Plan or Disclosure Statement shall (a) prejudice in any manner the rights of any Debtor or any other Entity; or (b) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

4.5    **The New Notes & Substitute Consideration**

(a)    <u>Take-back SSNs</u>

On the Plan Effective Date, (i) the Reorganized ILAP shall be authorized to issue the Take-Back SSNs in the principal amount of $260 million (plus the principal amount of the Settlement Take-back SSNs pursuant to the LC Facility Settlement if such settlement is

consummated) pursuant to the Super Priority/Take-back SSN Indenture for distributions to Qualified Holders pursuant to <u>Section 6.4</u> and to the Selling Agent pursuant to <u>Section 4.5(f)</u>; (ii) each of the Reorganized Guarantor Debtors and the New Issuer shall guarantee the obligations of the Take-back SSNs under the Super Priority/Take-back SSN Indenture; (iii) each of the Reorganized Debtors, LAP Chile, and New Issuer, as appropriate, shall pledge the collateral as set forth in the Super Priority/Take-back SSN Indenture and/or the applicable New Notes Documents; and (iv) in each case, the Reorganized Debtors and the New Issuer shall be authorized to do so without further act or action under applicable law, regulation, order or rule, and without further corporate proceedings or action.

(b)    <u>Convertible Notes</u>

On the Plan Effective Date, (i) the New Issuer shall issue the Convertible Notes in the principal amount of $173,345,973 (*less*, if the LC Facility Settlement is consummated, the Pro Rata Senior Debt Convertible Amount of the Holders of the LC Facility Claims, which distribution the Holders of the LC Facility Claims have agreed to forgo if the LC Facility Settlement is consummated) pursuant to the Convertible Notes Indenture for distributions to Qualified Holders pursuant to <u>Section 6.4</u> and to the Selling Agent pursuant to <u>Section 4.5(f)</u>; (ii) each of the Reorganized Debtors shall guarantee the obligations under the Convertibles Notes Indenture, (iii) LAP Chile shall, with the receipt of the New Issuer Equity as set forth in <u>Section 3.2(f)</u> hereof, pledge or charge the New Issuer Equity as set forth in the Convertible Notes Indenture and/or the applicable New Notes Documents, and (iv) in each case, the Reorganized Debtors, LAP Chile and the New Issuer shall be authorized to do so without further act or action under applicable law, regulation, order or rule, and without further corporate proceedings or action.

(c)    <u>Super Priority Notes</u>

On the Plan Effective Date, (i) Reorganized ILAP shall be authorized to issue the Super Priority Notes in the principal amount of $14 million pursuant to the Super Priority/Take-back SSN Indenture to the Super Priority/Take-back SSN Indenture Trustee for subsequent distributions by the Super Priority/Take-back SSN Indenture Trustee thereunder to the Super Priority Notes Financing Parties, and pay any fees and expense due and owing under the Super Priority Notes Commitment Agreement, (ii) each of the Reorganized Guarantor Debtors and the New Issuer shall guarantee the obligations of the Super Priority Notes under the Super Priority/Take-back SSN Indenture, (iii) each of the Reorganized Debtors, LAP Chile, and New Issuer, as appropriate, shall pledge the collateral as set forth in the Super Priority/Take-back SSN Indenture and/or the applicable New Notes Documents, and (iv) in each case, the Reorganized Debtors and New Issuer shall be authorized to do so without further act or action under applicable law, regulation, order or rule, and without further corporate proceedings or action.

(d)    <u>Priority; Collateral Matters for New Notes</u>

The Take-back SSNs and the Super Priority Notes shall be secured by substantially the same collateral securing the obligations of the Existing Notes, <u>provided</u>, <u>further</u>, that the New Issuer shall guarantee the obligations of the Take-back SSNs and the Super Priority Notes and provide a pledge of 100% of its present and future interests in the Reorganized ILAP. The Prepetition Chilean Security Documents shall be fully amended and restated, when appropriate;

and upon such amendment and restatement shall be considered included in the definition of the New Notes Documents. For the avoidance of doubt, neither the Take-back SSNs nor Super Priority Notes shall be secured by any letters of credit issued by Citibank, N.A.

The Take-back SSNs, Convertible Notes and the Super Priority Notes shall constitute senior obligations of the Reorganized Debtors and the New Issuer, and will be equal in right of payment with each other and any other senior indebtedness of the Reorganized Debtors and the New Issuer on the Plan Effective Date; provided, however: (i) Mandatory Cash Sweeps will be used to redeem the Super Priority Notes first and, after the Super Priority Notes are paid in full, then to redeem the Take-back SSNs (the Convertible Notes shall not be redeemed pursuant to any Mandatory Cash Sweep); and (ii) upon a Company Sale, the Super Priority Notes will be senior in payment to the Take-back SSNs and the Convertible Notes.

(e)    Mandatory Cash Sweeps

The Super Priority/Take-back SSN Indenture shall provide that thirty (30) days following December 15, 2024, and semi-annually thereafter thirty (30) days following each of June 15 and December 15, there will be cash payments to holders of Super Priority Notes and Take-back SSNs in amounts equivalent to the lesser of (i) the Reorganized Debtors' Cash (excluding proceeds obtained from issuance of the Super Priority Notes) at the close of business on the immediately preceding interest payment date, in excess of $15 million and (ii) the total outstanding principal amount of the Take-back SSNs and Super Priority Notes as of each interest payment date (as further described in the Super Priority/Take-back SSN Indenture, the "Mandatory Cash Sweeps").

(f)    Substitute Consideration. The following Section 4.5(f) applies in the event that, on the Determination Date, the sum of all Non-Qualified Holders is greater than the Non-Qualified Threshold Amount.

(1)    All Take-back SSNs and Convertible Notes under the Plan that would have been issuable and deliverable to Non-Qualified Holders (collectively, the "Non-Qualified Holders' Notes", if they had been Qualified Holders, will be deposited with an agent (the "Selling Agent").

(2)    The Selling Agent shall offer the Non-Qualified Holders' Notes in one or more sale transactions within 180 days following the Determination Date (the "Sale Period"), pursuant to a selling agreement to be entered into between the Debtors and the Selling Agent (the "Selling Agent Agreement"). The consideration to be received by Non-Qualified Holders under the Selling Agent Agreement is referred to as the "Substitute Consideration." The price, terms and manner of sale will be on the best terms reasonably available at the time using a transparent open market process and shall be for Cash. The proceeds of any and all such sales (net of the costs of sale including the fees of any agent, broker, marketing agent, placement agent or underwriter appointed in relation to the sale and any taxes and provisions for taxes on sale) shall be distributed, on a *pro rata* basis, to such Non-Qualified Holders at the end of the Sale Period (the "Net Cash Proceeds").

26

(3)     In the event that a sale of the Non-Qualified Holders' Notes is unable to be consummated within the Sale Period, there shall be no Substitute Consideration such that the Non-Qualified Holders' Notes shall be cancelled for no consideration. None of the Debtors, the Reorganized Debtors, the Consenting Creditors and the Selling Agent shall have any liability for any loss or alleged loss arising from such sale or a failure to procure any purchaser for any Non-Qualified Holders' Notes.

(4)     For the avoidance of doubt, any Non-Qualified Holders who would have been entitled to receive any New Notes under the Plan if they had been Qualified Holders shall only be entitled to receive the Substitute Consideration in respect thereof.

## 4.6     Issuance of the New Notes and New Equity

On the Plan Effective Date, the guarantees, pledges, Liens and other security interests, as applicable, granted pursuant to the New Notes Documents (whether prior to or on the Plan Effective Date) shall be deemed to have been granted in good faith as an inducement to the Holders of Allowed Senior Debt Claims and the Super Priority Notes Financing Parties to agree to the treatment contemplated by the Plan and (a) shall be deemed to be approved, (b) shall be legal, binding, and creating or continuing fully perfected and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Notes Documents, (c) shall be deemed perfected on the earlier of the date originally perfected and the Plan Effective Date, subject only to such Liens and security interests as may be permitted under the New Notes Documents, as the case may be, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law, including any applicable law of the Republic of Chile.

The Reorganized Debtors, the New Issuer, and LAP Chile as the holder of the New Issuer Equity granting such Liens and the persons and entities granted such Liens and security interests are authorized and directed to make all filings and recordings, and to obtain all governmental approvals and consents necessary to continue as perfected or to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign), on and after the Plan Effective Date that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection or continuance of perfection shall occur automatically by virtue of the entry of the Confirmation Order and no such filings, recordings, approvals, and consents shall be necessary), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

## 4.7     Sales Facilitation Agreement; Company Sale

On the Plan Effective Date, Reorganized ILAP and the New Issuer are each authorized and directed, without further act or action under applicable law, regulation, order or rule, and without further corporate proceedings or action, to enter into the sales facilitation agreement included in the Plan Supplement (the "Sales Facilitation Agreement") with LAP Chile and the Trustee,

pursuant to which the parties will agree to make their best efforts to sell 100% of the equity interests in the Reorganized ILAP (or substantially all of its assets, inclusive of a concurrent sale of 100% of the equity interests of San Juan and Norvind) by December 31, 2025, subject to the terms and conditions set forth therein (the "Company Sale").

## 4.8    Preservation of Rights of Action

Other than the Causes of Action expressly waived, relinquished, exculpated, released, compromised, or settled in Section 8.3, Section 8.4, and Section 8.5 of the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Debtors (pre-Plan Effective Date) and the Reorganized Debtors (post-Plan Effective Date) shall retain and may enforce all rights to commence and pursue any and all Causes of Action of, or that may be claimed or prosecuted by, the Debtors, whether arising before or after the Petition Date, and the rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Plan Effective Date. **No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them. The Debtors (pre-Plan Effective Date) and the Reorganized Debtors (post-Plan Effective Date) expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in Section 8.3, Section 8.4, and Section 8.5 of the Plan, the Debtors and Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel, judicial, equitable, or otherwise, or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Debtors (pre-Plan Effective Date) and Reorganized Debtors (post-Plan Effective Date) reserve and shall retain such Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any such Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action on and after the Plan Effective Date. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court on and after the Plan Effective Date.

## 4.9    Vesting of Assets in the Reorganized Debtors

Except as otherwise provided herein, or in any agreement, instrument, or other document incorporated in the Plan, on the Plan Effective Date, all property in each Estate and all Causes of Action not released pursuant to Section 8.3, Section 8.4 and Section 8.5 hereof (including all Causes of Action retained by the Debtors and all insurance policies), shall automatically vest in each respective Reorganized Debtor as of the Plan Effective Date, free and clear of all Liens,

Claims, charges, setoff, recoupment, or other encumbrances (other than, for the avoidance of doubt, those Liens and security interests granted under the New Notes Documents pursuant to <u>Section 4.6</u>). On and after the Plan Effective Date, except as otherwise provided in the Plan or in the New Notes Documents, or any other agreement or document related thereto or entered into in connection therewith, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

4.10    <u>**Discharge from Notes, Instruments, Certificates, and Other Documents**</u>

(a)    On the Plan Effective Date, other than any securities, instruments, certificates, or other documents governing or evidencing obligations or interests that will remain Unimpaired under the Plan and subject to <u>Section 8.9</u> of the Plan, the obligations of the Debtors, Reorganized Debtors, the LC Facility Agent, and/or the Existing Indenture Trustee under or in any way related to all notes, instruments, certificates, agreements (including the Existing Indenture and the LC Facility Agreement), and other documents evidencing Claims or Interests shall be discharged; <u>provided</u>, <u>further</u>, <u>however</u>, notwithstanding Confirmation or the occurrence of the Plan Effective Date, such discharge shall not affect (i) any such indenture or agreement that governs the rights of the Holder of a Claim solely for purposes of enabling Holders of Allowed Claims to receive distributions under the Plan as provided herein; (ii) any such notes or other documents entered into related to the incurrence of debt in the ordinary course of business after the Petition Date; (iii) preserve any rights of the Existing Indenture Trustee or LC Facility Agent to payment of fees and expenses from or on any money or property to be distributed in respect of the Existing Notes Claims or LC Facility Claims, respectively, solely to the extent provided in the Plan, including permitting the Existing Indenture Trustee or LC Facility Agent to maintain, enforce, and exercise a charging lien against such distributions; (iv) preserve any rights of the Existing Indenture Trustee or LC Facility Agent to indemnification obligations under the Existing Notes Indenture or LC Facility Agreement, respectively; and (v) the transfer of the Senior Debt Claims to, and the vesting of the Senior Debt Claims with, the Reorganized ILAP and New Issuer pursuant to <u>Section 4.4</u> hereof; <u>provided</u> <u>further</u> that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any expense or liability to the Reorganized Debtors, except to the extent set forth in or provided for under this Plan.

(b)    As of the Plan Effective Date, all letters of credit issued by Citibank, N.A. under the LC Facility Agreement shall be deemed terminated. Citibank, N.A. shall have no obligations in any capacity under such letters of credit, and any draw request made under any such letters of credit at any time on or following the Petition Date shall be deemed null and void *ab initio*. As soon as reasonably practicable following Confirmation, Citibank, N.A. shall receive from the beneficiary under each letter of credit issued by Citibank, N.A. under the LC Facility Agreement a duly executed consent to termination certificate of such letters of credit in the form attached to each such letter of credit. The Existing Indenture Trustee, the LC Facility Agent, Consenting Creditors and any other Holder of an Allowed Senior Debt Claim shall take such actions as may

be reasonably requested by the Debtors, the Reorganized Debtors, or Citibank, N.A. to promptly give effect to the foregoing provisions.

**4.11    Execution of Plan Documents**

Except as otherwise provided herein, on the Plan Effective Date, or as soon as practicable thereafter, the Reorganized Debtors shall execute all instruments and other documents required to be executed under the Plan.

**4.12    Corporate Action**

The Debtors or the Reorganized Debtors, as applicable, and the New Issuer are each authorized to take all further corporate actions necessary to effectuate the RSA and the Plan and authorize each of the matters provided for by the Plan involving the corporate structure of the Debtors or corporate or related actions to be taken by or required of the Reorganized Debtors and the New Issuer, whether taken prior to or as of the Plan Effective Date, including the Restructuring Transactions and the issuance of the New Notes.

**4.13    New Corporate Governance Documents**

To the extent required by applicable law, on or immediately before the Plan Effective Date, the Reorganized Debtors will file their respective New Corporate Governance Documents with the applicable authorities in their respective provinces or countries of incorporation or formation in accordance with applicable law. The New Corporate Governance Documents will be consistent with the provisions of the Plan and the Bankruptcy Code.

**4.14    Effectuating Documents; Further Transactions**

On and after the Plan Effective Date, the Reorganized Debtors and the New Issuer, and the directors (and, if applicable, officers and other members of the boards (or similar governing body) thereof) are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

**4.15    Section 1146(a) Exemption**

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of assets or interests under the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

4.16    **Managers, Directors and Officers**

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, and except as may otherwise be disclosed in the Disclosure Statement, on the Plan Effective Date, the directors and officers who are identified in the Plan Supplement shall serve as the initial board of directors and officers of the New Issuer and the Reorganized Debtors.

On the Plan Effective Date, the Independent Director shall be appointed to the boards of the Reorganized Debtors and the New Issuer. Reorganized ILAP shall pay the Independent Director compensation reasonably agreed by the Required Consenting Creditors. Reorganized ILAP shall procure customary D&O insurance for the benefit of the Independent Director in amounts and with coverages as are customary for directors of private companies in Chile as reasonably agreed by the Required Consenting Creditors.

The Reorganized Debtors and the New Issuer shall not, among other things, (i) remove the Independent Director (except if, at any point after his or her designation, he or she fails to meet the eligibility requirements thereunder) or (ii) reduce the compensation payable to, or terminate or reduce the level of D&O insurance coverage for the benefit of, any Independent Director, in each case without the (x) with respect to the Independent Director of the Reorganized Debtors, the consent of the Super Priority/Take-back SSN Indenture Trustee (acting at the direction of the holders of the majority of the outstanding principal amount of the Take-back SSNs) and (y) with respect to the New Issuer, with the consent of the Convertible Notes Indenture Trustee (acting at the direction of the holders of the majority of the outstanding principal amount of the Convertible Notes)

Pursuant to section 1129(a)(5), the Debtors will disclose in the Plan Supplement the identity and affiliations of any Person proposed to serve on a Reorganized Debtor's board of directors and, to the extent such Person is an insider, the nature of any compensation for such Person.

Corporate governance documents for New Issuer and the Reorganized Debtors, whether or not included in the Plan Supplement, shall:  (a) be consistent with section 1123(a)(6) of the Bankruptcy Code and (b) otherwise be acceptable to the Reorganized Debtors, the ILAP Partners, and the Required Consenting Creditors.

## ARTICLE V

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

5.1    **Assumption of Executory Contracts and Unexpired Leases**

On the Plan Effective Date, except as otherwise provided herein or pursuant to the Confirmation Order, Executory Contracts (including for the avoidance of doubt the RSA) and Unexpired Leases shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Plan Effective Date under section 365 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease:  (a) was previously assumed or rejected; (b) was previously expired or terminated pursuant to its own terms; (c) is the

subject of a motion to assume or assume and assign filed on or before the Confirmation Date; or
(d) is designated specifically, or by category, as an Executory Contract or Unexpired Lease on the
Rejection Schedule. The Confirmation Order will constitute an order of the Bankruptcy Court
approving the above-described assumptions, assignments, and rejections.

Except as otherwise expressly provided herein or agreed to by the Debtor(s) and the
applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all
modifications, amendments, supplements, restatements, or other agreements related thereto, and
all rights related thereto, if any, including all easements, licenses, permits, rights, privileges,
immunities, options, rights of first refusal, and any other interests, unless any of the foregoing
agreements has been previously rejected or repudiated or is rejected or repudiated hereunder.
Modifications, amendments, supplements, and restatements to prepetition Executory Contracts
and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall
not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the
validity, priority, or amount of any Claims that may arise in connection therewith.

With respect to all Executory Contracts and Unexpired Leases that are assumed, any
provision in any such agreement that:

(i) prohibits, restricts, or conditions the assumption and/or assignment, or purports to
prohibit, restrict, or condition the assumption and/or assignment (including any "change of
control" provision) of such agreement or allows any party to such agreement to terminate,
recapture, impose any penalty, condition renewal or extension, or modify any term or
condition upon the assumption and/or assignment of such agreement constitutes an
unenforceable anti-assignment and/or discrimination provision and is void and of no force
an effect; and

(ii) provides for modification, breach, default, event of default, or termination, or deemed
modification, breach, default, event of default, or termination shall be deemed cured and
such Executory Contracts and Unexpired Leases shall be in full force and effect as of the
Plan Effective Date as if such modification, breach, default, event of default, or termination
never existed, including, but not limited to, on account of or related to any of the following:
(A) the commencement or continuation of the Chapter 11 Cases, (B) the insolvency or
financial condition of any of the Debtors at any time, (C) the Debtors' assumption and/or
assignment of such agreement, (D) a change of control or similar occurrence, or (E) the
consummation of this Plan, the Plan Documents, or the Restructuring Transactions;
provided, further, that, such provisions shall be deemed modified so as to preclude any
non-Debtor party thereto from any right to prohibit, restrict, or condition assumption and/or
assignment, to modify, terminate, or declare a breach or default under such agreement, and
to preclude exercise of any other breach- or default-related rights or remedies with respect
thereto, which shall also preclude any non-Debtor party right to terminate or recapture such
agreement, impose any penalty thereunder, condition any renewal or extension thereof,
impose any rent acceleration or assignment fee, or increase or otherwise impose any other
fees or other charges in connection therewith.

Without limiting the effect of the preceding paragraph, all provisions referenced in the
preceding paragraph constitute unenforceable discriminatory or anti-assignment provisions that

are void and of no force and effect pursuant to sections 365(b), 365(e), 365(f), and 525 of the Bankruptcy Code. The Consummation of the Plan and the implementation of the Restructuring Transactions is not intended to, and shall not, constitute a "change of control" or "change in control" under any lease, contract, or agreement which a Debtor is a party.

5.2    **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**

The Debtors or the Reorganized Debtors, as applicable, shall pay Cures, if any, on the Plan Effective Date or as soon as reasonably practicable thereafter, with the amount and timing of payment of any such Cure dictated by the underlying agreement and the Debtors' ordinary course of business. The Reorganized Debtors also may settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the ordinary course amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be filed with the Bankruptcy Court on or before the deadline set by the Bankruptcy Court for objections to confirmation of the Plan; provided, however, that nothing herein shall prevent the Reorganized Debtors from paying any Cure Claim despite the failure of the relevant counterparty to file such request for payment of such Cure. **Any such request that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable, without the need for any objection or any further notice to or action, order, or approval of the Bankruptcy Court**. Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure in the Debtors' ordinary course of business.

In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be filed with the Bankruptcy Court on or before the deadline set by the Bankruptcy Court for objections to confirmation of the Plan. Any such objection will be scheduled to be heard by the Bankruptcy Court at the earlier of the Confirmation Hearing or the Debtors' or the Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely filed. **Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.**

If there is any dispute regarding any Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as reasonably practicable after the Bankruptcy Court's adjudication of such dispute and the entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and full payment of any applicable Cure pursuant to this Section 5.2, in the amount and at the time dictated above, shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the Plan Effective Date

of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this <u>Section 5.2</u>, in the amount and at the time dictated by the Debtors' ordinary course of business, shall be deemed disallowed and expunged as of the Plan Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

5.3     <u>Pre-Existing Payment and Other Obligations</u>

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors or Reorganized Debtors, as applicable, under such Executory Contract or Unexpired Lease. In particular, notwithstanding any applicable non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide:  (a) payment to the contracting Debtors or Reorganized Debtors, as applicable, of outstanding and future amounts owing thereto under or in connection with rejected Executory Contracts or Unexpired Leases or (b) warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or Reorganized Debtors, as applicable, from counterparties to rejected Executory Contracts.

5.4     <u>Rejection Damages Claims and Objections to Rejections</u>

In the event that the rejection of an Executory Contract or Unexpired Lease by any of the Debtors results in damages to the other party or parties to such contract or lease, a Claim for such damages shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors or their respective properties or interests in property as agents, successors, or assigns, unless a Proof of Claim is filed with the Bankruptcy Court and served upon counsel for the Debtors or the Reorganized Debtors **no later than thirty (30) days after the Plan Effective Date**. Any such Claims, to the extent Allowed, shall be classified as General Unsecured Claims and shall be treated in accordance with <u>Article III</u> of this Plan.

5.5     <u>Contracts and Leases Entered Into After the Petition Date</u>

Contracts and leases entered into after the Petition Date by any Debtor, and any Executory Contracts and Unexpired Leases assumed by any Debtor, may be performed by the applicable Reorganized Debtor in the ordinary course of business.

5.6     <u>Reservation of Rights</u>

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have forty five (45) days following entry of a Final Order resolving such dispute to alter their treatment to assume or reject such contract or lease, which revised treatment shall be effective as of the Plan Effective Date.

34

# ARTICLE VI

## PROVISIONS GOVERNING DISTRIBUTIONS

6.1    **Distributions on Account of Claims Allowed as of the Plan Effective Date**

Except as otherwise provided in the Plan, a Final Order, or as otherwise agreed to by the Debtors, the New Issuer or the Reorganized Debtors (as the case may be) and the Holder of the applicable Allowed Claim, on the Distribution Date, the Reorganized Debtors and New Issuer, as applicable, shall make initial distributions under the Plan on account of Claims Allowed on or before the Plan Effective Date, subject to the Debtors' and Reorganized Debtors' right to object to Claims; provided, however, that (a) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Plan Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, subject to all of the Debtors' and Reorganized Debtors' legal and equitable defenses to or setoffs or recoupments against any such Administrative Claim, (b) Allowed Priority Tax Claims shall be paid in accordance with Section 2.3 and to the extent any Allowed Priority Tax Claim is not due and owing on the Plan Effective Date, such Claim may be paid in full in Cash in accordance with the terms of any agreement between the Debtors or the Reorganized Debtors (as the case may be) and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business, and (c) Allowed General Unsecured Claims with respect to liabilities incurred by the Debtors in the ordinary course of business prior to the filing of the Chapter 11 Cases shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, subject to all of the Debtors' and Reorganized Debtors' legal and equitable defenses to or setoffs or recoupments against any such General Unsecured Claim.

6.2    **Special Rules for Distributions to Holders of Disputed Claims**

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties:  (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order or the Claim has been Allowed or expunged. Any dividends or other distributions arising from property distributed to Holders of Allowed Claims in a Class and paid to such Holders under the Plan shall be paid also, in the applicable amounts, to any Holder of a Disputed Claim, as applicable, in such Class that becomes an Allowed Claim after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims in such Class.

6.3    **Disbursing Agent**

Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Disbursing Agent on or as soon as practicable after the Plan Effective Date. On the Plan

Effective Date, the Reorganized Debtors shall be the Disbursing Agent, which agent may be changed by the Reorganized Debtors at any time. To the extent the Disbursing Agent is one or more of the Reorganized Debtors or the New Issuer, the Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Plan Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent may be paid in Cash upon invoice by the Reorganized Debtors.

### 6.4 Distributions of Take-back SSNs and Convertible Notes to Holders of Senior Debt Claims

(a)     Take-back SSNs and Convertible Notes are being issued only to Qualified Holders and, if the total number of Non-Qualified Holders is equal to or less than the Non-Qualified Threshold Amount, the Non-Qualified Holders. A "Qualified Holder" is a Holder of an Allowed Senior Debt Claim who provides either one of the following two certifications (the "Certification"):

> (1)     A certification that it is located in the United States, and is either (A) a "Qualified Institutional Buyer" as such term is defined in Rule 144A under the Securities Act or (B) an "accredited investor" as defined in Regulation D under the Securities Act, and, in either case, acknowledges that it will be receiving "restricted securities" within the meaning of Rule 144 under the Securities Act; or

> (2)     A certification that it is not a "U.S. Person" as defined in Rule 902(k) under the Securities Act and is qualified to participate in acquiring the Take-back SSNs and Convertible Notes, in accordance with the laws of its jurisdiction of location or residence.

(b)     Deadline to Submit Certifications. All Holders of Senior Debt Claims must provide their respective Certification by no later than the Determination Date; provided, however, that Citibank, N.A. is deemed a Qualified Holder under the Plan, and notwithstanding anything to the contrary in the Plan or the Disclosure Statement, Citibank, N.A. shall not be required to provide a Certification to receive Take-back SSNs (or Convertible Notes, if applicable) as a Holder of LC Facility Claims. **Any Holder of a Senior Debt Claim that fails to submit the Certification by the Determination Date shall have forfeited its rights to receive distribution of Take-back**

**SSNs and Convertible Notes pursuant to the Plan on account of its Senior Debt Claims, and shall not participate in any distribution under the Plan. Any property (including the Take-back SSNs and Convertible Notes) in respect of such forfeited Senior Debt Claims shall revert to the Reorganized Debtors**. On or promptly after the Determination Date, the Reorganized Debtors shall calculate the total number of Non-Qualified Holders.

(c)    <u>Non-Qualified Holders</u>.

   (1)    Any Holder of an Allowed Senior Debt Claim that is not a Qualified Holder shall be a "<u>Non-Qualified Holder</u>."

   (2)    If on the Determination Date, the number of Non-Qualified Holders is equal to or less than Non-Qualified Threshold Amount, then the Non-Qualified Holders shall receive the Take-back SSNs and the Convertible Notes, <u>provided</u>, all such other information required to be submitted by any such Non-Qualified Holder was timely submitted.

   (3)    If on the Determination Date, the number of Non-Qualified Holders is greater than the Non-Qualified Threshold Amount, then all Non-Qualified Holders shall not be entitled to receive any Take-back SSNs or Convertible Notes, and shall only be entitled the Substitute Consideration in respect thereof. The Substitute Consideration for Non-Qualified Holders shall be distributed by the Selling Agent after the Sale Period, as described in <u>Section 4.5(f)</u> of the Plan.

(d)    <u>LC Facility Claims</u>.

   (1)    As a condition to participation under the Plan, each Holder of an LC Facility Claim that is a Qualified Holder is required to review and complete the Distribution Form and provide their Deposit/Withdrawal at Custodian ("<u>**DWAC**</u>") information. **Any Holder of an LC Facility Claim who fails to submit a completed Distribution Form to the Disbursing Agent together with any documents required in connection therewith within one hundred and eighty (180) days after the Plan Effective Date shall have forfeited its rights to receive distribution of Take-back SSNs and Convertible Notes pursuant to the Plan on account of its LC Facility Claims, and shall not participate in any distribution under the Plan. Any property (including the Take-back SSNs and Convertible Notes) in respect of such forfeited Senior Debt Claims shall revert to the Reorganized Debtors.**

   (2)    All Distributions to Holders of Allowed LC Facility Claims by the Disbursing Agent shall be deemed completed when made to the LC Facility Agent, which shall be deemed to be the Holder of all Allowed LC Facility Claims for purposes of Distributions to be made hereunder. The LC Facility Agent shall thereafter hold or direct such Distributions for the benefit of the Holders of Allowed LC Facility Claims. On the Plan Effective Date or soon

as practicable thereafter in accordance with the requirements set forth in this Article VI, the LC Facility Agent shall arrange to deliver such Take-back SSNs, including the Settlement Take-back SSNS if the LC Facility Settlement is consummated, and the Convertible Notes if the LC Facility Settlement is not consummated, via DWAC Deposit to or on behalf of such Holders of Allowed LC Facility Claims.

(3)     Upon delivery to the LC Facility Agent by the Disbursing Agent of the Take-back SSNs, including the Settlement Take-back SSNS if the LC Facility Settlement is consummated, and the Convertible Notes if the LC Facility Settlement is not consummated, the Reorganized Debtors shall be released of all liability with respect to the holding and/or delivery of such distributions to the Holders of LC Facility Claims.

(e)     Existing Notes Claims.

(1)     The Distribution Record Date shall not apply to publicly traded securities, which shall receive distributions in accordance with the Plan and the applicable procedures of DTC.

(2)     With respect to a Holder of an Allowed Existing Note Claim, to receive its entitlement pursuant to the Plan, each such Holder is required to review and provide the necessary certification, and take one of the following actions as applicable to verify its position in the Existing Notes:

A     prior to the Plan Effective Date, through the electronic delivery by such Holder's Nominee of the Holder's certification and Existing Notes position via ATOP by the applicable deadline[2]; or

B     after the Plan Effective Date and through and including the Determination Date, complete and return to the Disbursing Agent a duly-completed Distribution Form together with the required certifications in connection therewith.

(3)     The Debtors, through its Disbursing Agent, shall use reasonable best efforts to announce the distribution procedures to enable the submission into ATOP or transfer via DWAC Withdrawal of the Existing Notes prior to the Plan Effective Date to facilitate the distribution of the Take-back SSNs and Convertible Notes.

(4)     On the Plan Effective Date, or as soon as reasonably practicable thereafter, the Debtors will cause to be distributed, in accordance with the Plan and DTC's customary procedures (which may be through ATOP or via DWAC Deposit), the Take-back SSNs and Convertible Notes corresponding to each

---

[2]     If ATOP is not utilized then Existing Notes may be submitted by the Nominee via DWAC Withdrawal with an accompanying Distribution Form containing the necessary certification.

Holder of an Existing Notes Claim that has completed the required procedures.

(5)    All Existing Notes shall be cancelled as of the Plan Effective Date, and DTC shall be requested to (i) remove all Existing Notes from its platform, and (ii) shall be requested to provide records to the Debtors (on customary terms) for any positions not previously submitted through ATOP or via DWAC Deposit.

(6)    **Any Holder of the Existing Notes who fails to (a) surrender the applicable Existing Notes prior to the Plan Effective Date through ATOP or via DWAC Withdrawal, including any required certification with respect to such holder's eligibility status, or (b) following the Plan Effective Date, verify its position in the applicable Existing Notes on the Distribution Form, which form must include (I) the required certification by the Holder with respect to the holder's eligibility status and (II) the certification of such holder's Nominee to verify such holder's untendered position in the Existing Notes, to the Disbursing Agent together with any documents required in connection therewith, within one hundred and eighty (180) days after the Plan Effective Date shall have forfeited its rights to receive distribution of Take-back SSNs and Convertible Notes pursuant to the Plan on account of its Existing Notes Claims, and shall not participate in any distribution under the Plan. Any property (including the Take-back SSNs and Convertible Notes) in respect of such forfeited Senior Debt Claims shall revert to the Reorganized Debtors.**

(7)    Upon delivery by the Disbursing Agent of the Take-back SSNs and Convertible Notes to DTC pursuant to this <u>Section 6.4</u>, the Reorganized Debtors shall be released of all liability with respect to the holding and/or delivery of such distributions to the Holders of Existing Notes Claims.

(8)    <u>Exchange of Notes</u>:

A    The Disbursing Agent will work with DTC to establish the distribution event relating to the Existing Notes on DTC's ATOP system.[3] A beneficial owner of Existing Notes that are held by or registered in the name of a broker, dealer, commercial bank, trust company or other nominee or custodian (each, a "<u>Nominee</u>") is urged to contact such Nominee promptly if such beneficial owner wishes to participate. Only Nominees that are direct participants of DTC can effectuate an electronic delivery of the Existing Notes on

---

[3]    In the event DTC is unwilling or unable to utilize the ATOP system to facilitate the distribution event or the ATOP system is otherwise not utilized, the Debtors reserve the right to require a Nominee to certify each Holder's position in the Existing Notes by including its DTC participant number and a medallion guarantee stamp on the Distribution Form, validating the Holder's position in the Existing Notes.

a holder's behalf. Beneficial holders of the Existing Notes, whether by delivery through ATOP or DWAC Withdrawal, must allow sufficient time for its Nominee to effectuate the electronic delivery of its Existing Notes prior to any deadline.

B     At the holder's instruction, a Nominee will electronically deliver the holder's Existing Notes, whether by ATOP or DWAC Withdrawal. The ATOP process will include an express acknowledgement that the underlying holder has reviewed and agreed to be bound by the certifications made through ATOP and that the Debtors may enforce such certifications against such holder.  If the DWAC Withdrawal process is utilized, the certifications must be included in the related Distribution Form.

C     **ALL QUESTIONS AS TO THE VALIDITY, FORM, ELIGIBILITY (INCLUDING TIME OF RECEIPT), AND ACCEPTANCE OF NOTES THROUGH ATOP OR DWAC WITHDRAWAL WILL BE RESOLVED BY THE REORGANIZED DEBTORS OR NEW ISSUER, WHOSE DETERMINATION WILL BE FINAL AND BINDING, SUBJECT ONLY TO REVIEW BY THE BANKRUPTCY COURT UPON APPLICATION WITH DUE NOTICE TO ANY AFFECTED PARTIES IN INTEREST. THE DEBTORS RESERVE THE RIGHT TO REJECT ANY AND ALL SUBMISSIONS THROUGH ATOP AND TENDERED EXISTING NOTES NOT IN PROPER FORM, OR SUBMISSIONS THROUGH ATOP AND TENDERED EXISTING NOTES THE DEBTORS' ACCEPTANCE OF WHICH WOULD, IN THE OPINION OF THE DEBTORS OR THEIR COUNSEL, BE UNLAWFUL.**

6.5     **Distribution Form**

To the extent a Holder of a Senior Debt Claim is required to deliver a Distribution Form to the Disbursing Agent, the Nominee must also provide any required certifications, including, in the event such Distribution Form is submitted following the Plan Effective Date, the certification of the Holder's untendered position in the Existing Notes.

6.6     **Delivery of Distributions and Undeliverable or Unclaimed Distributions**

(a)     **Delivery of Distributions**

Except as otherwise provided in the Plan (including in <u>Section 4.5(f)</u> and <u>Section 6.4</u> above), distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date by the Disbursing Agent, as appropriate:  (a) as indicated on the applicable register or in the Debtors' records as of the date of any such distribution; (b) to the signatory set forth on any of the Proofs of Claim filed by such Holder or other representative

identified therein (or at the last known addresses of such Holder if no Proof of Claim is filed or if the Debtors have not been notified in writing of a change of address); (c) any counsel that has appeared in the Chapter 11 Cases on a Holder's behalf; or (d) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent, as appropriate, after the date of any related Proof of Claim. The Debtors shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date, <u>provided</u>, <u>however</u>, that distributions on account of the Senior Debt Claims shall be made in accordance with <u>Section 4.5(f)</u> and <u>Section 6.4</u> above.

Subject to this <u>Article VI</u>, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan. The Debtors, the Reorganized Debtors, the New Issuer and the Disbursing Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for its respective fraud, gross negligence, or willful misconduct.

(b)    **Minimum; *De Minimis* Distributions**

Notwithstanding anything to the contrary contained in the Plan, the Disbursing Agent shall not be required to distribute Cash or other property to the Holder of any Allowed Claim if the amount of Cash or other property to be distributed on account of such Allowed Claim is less than $50. Any Holder of an Allowed Claim on account of which the amount of Cash or other property to be distributed is less than such amount shall have such Claim discharged and shall be forever barred from asserting such Claim against the Debtors, the Reorganized Debtors, the New Issuer or their respective property. Any Cash or other property not distributed pursuant to this provision shall be the property of the Reorganized Debtors.

(c)    **Compliance Matters**

In connection with the Plan, to the extent applicable, the Reorganized Debtors, the New Issuer or the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors, the New Issuer or the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors and New Issuer reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances. All Persons holding Claims shall be required to provide any information necessary to effect information reporting and the withholding of such taxes. Notwithstanding any other provision of this Plan to the contrary, (a) each Holder of an Allowed Claim shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding and other tax obligations, on account of such distribution, and (b) no distribution shall be made to or on behalf of such Holder pursuant to the

41

Plan unless and until such Holder has made arrangements satisfactory to the Reorganized Debtors or the New Issuer for the payment and satisfaction of such tax obligations.

(d) **Cash Payments**

Except as otherwise set forth in this Section 6.6(d), distributions of Cash under the Plan shall be made by the Disbursing Agent on behalf of the applicable Debtor (or Debtors or Reorganized Debtors) in U.S. dollars. At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements. Cash payments to creditors outside of the United States of America may be made, at the option of the Disbursing Agent, in such currency and by such means as are necessary or customary in a particular foreign jurisdiction.

(e) **Undeliverable and Unclaimed Distributions**

(1) *Undeliverable Distributions.* If any distribution to a Holder of an Allowed Claim is returned to the Reorganized Debtors, the New Issuer or the Disbursing Agent as undeliverable or is otherwise unclaimed, no further distributions shall be made to such Holder unless and until the Reorganized Debtors, the New Issuer or the Disbursing Agent are notified in writing of such Holder's then-current address or other necessary information for delivery pursuant to the time frame set forth herein. Subject to the succeeding sentence, the Reorganized Debtors, the New Issuer or the Disbursing Agent shall retain undeliverable distributions until such time as a distribution becomes deliverable. **Except as otherwise provided in Section 6.4, each Holder of an Allowed Claim whose distribution remains (a) undeliverable for one hundred and eighty (180) days after the distribution is returned as undeliverable or (b) otherwise has not been deposited, endorsed or negotiated within one hundred and eighty (180) days of the date of issuance shall have no claim to or interest in such distribution and shall be forever barred from receiving any distribution under the Plan. Nothing contained in this Plan shall require the Debtors, the Reorganized Debtors, the New Issuer or the Disbursing Agent to attempt to locate any Holder of an Allowed Claim**.

(2) *Reversion.* Any distribution under the Plan that is an Unclaimed Distribution for a period of one hundred and eighty (180) days after distribution or is otherwise unclaimed or undelivered as set forth in Section 6.4 and/or Section 6.6(e)(1) above shall, in each case, be deemed unclaimed property under section 347(b) of the Bankruptcy Code, and such Unclaimed Distribution shall revest in the applicable Reorganized Debtor or the New Issuer, as applicable. Upon such revesting, the Claim or Interest of any Holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable foreign, federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.

42

6.7    **Exemption from Registration Requirements; Restriction on Certain Holders**

The offer, sale, issuance, and distribution under the Plan of the New Notes and New Equity Interests will, in each case, be exempt from registration under the Securities Act and any other applicable U.S. state or local law requiring registration prior to offering pursuant to Section 4(a)(2) of the Securities Act or Regulation D or Regulation S thereunder and section 1145 of the Bankruptcy Code, as applicable, and the indentures governing the New Notes shall be exempt from qualification under the Trust Indenture Act of 1939 pursuant to Section 304(b) thereof.

The Super Priority Notes, Take-back SSNs and the Convertible Notes are all being issued under the Plan in reliance on the exemption provided in Section 4(a)(2) of the Securities Act will be "restricted securities" under the Securities Act, and therefore will not be able to be resold absent an exemption under the Securities Act, which may be available under Rule 144 under the Securities Act, Rule 144A under the Securities Act, or Regulation S under the Securities Act, and further subject to any other applicable regulatory approval and any restrictions contained in the New Notes Documents.

The New Equity Interests issued under will be "restricted securities" under the Securities Act by the recipients thereof, pursuant to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in Section 2(a)(11) of the Securities Act and in compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the SEC, and any further restrictions contained in the New Corporate Governance Document (as applicable), and any other applicable regulatory approval.

**Parties are advised to consult with their own counsel as to the availability of the exemption provided by Rule 144, Rule 144A or Regulation S.**

All documents, agreements and instruments entered into and delivered on or as of the Plan Effective Date contemplated by or in furtherance of the Plan, including the New Notes Documents and any other agreement or document related thereto or entered into in connection therewith, shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity (other than as expressly required by such applicable agreement).

Notwithstanding anything to the contrary in the Plan, no Person (including, for the avoidance of doubt, (i) the Selling Agent, (ii) Holders of the Senior Debt Claims (including any Consenting Noteholder), (iii) DTC, and (iv) any transfer agent) may require a legal opinion by or on behalf of the Debtors, the Reorganized Debtors or the New Issuer regarding the validity of any transaction contemplated by the Plan, including, but not limited to, whether the issuance of the New Notes or the New Equity Interests is exempt from registration and/or eligible for book-entry, delivery, settlement, and depository services or validly issued, fully paid, and nonassessable.

6.8    <u>Claims Paid or Payable by Third Parties</u>

(a)    **Claims Paid by Third Parties**

A Claim shall be reduced in full, and such Claim shall be disallowed without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, a Reorganized Debtor or the New Issuer. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, a Reorganized Debtor or the New Issuer on account of such Claim, such Holder shall repay, return or deliver any distribution held by or transferred to the Holder to the applicable Reorganized Debtor to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount distributable in respect of such Claim as of the date of any such distribution under the Plan.

(b)    **Claims Payable by Insurance Carriers**

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction, or otherwise as agreed to by the Debtors or Reorganized Debtors), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)    **Applicability of Insurance Policies**

Except as otherwise expressly provided herein, distributions to Holders of Allowed Claims shall be in accordance with the provisions of an applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors, the Reorganized Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers. The Reorganized Debtors shall succeed to all of the Debtors' rights and defenses in respect of any insurance policy on the Plan Effective Date.

6.9    <u>Setoffs; Recoupments</u>

(a)    Except as to Senior Debt Claims held by Consenting Creditors, each Reorganized Debtor, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off or recoup against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any Claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Plan Effective Date (whether pursuant to the Plan or otherwise); <u>provided</u>, <u>however</u>,

44

that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action that such Reorganized Debtor may possess against such Holder.

(b)    In no event shall any Holder of a Claim be entitled to set off any Claim against any Claim, right, or Cause of Action of the Debtor or Reorganized Debtor, as applicable, unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise.

(c)    In no event shall any Holder of a Claim be entitled to recoup any Claim against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

6.10    **Allocation Between Principal and Accrued Interest**

Except as otherwise provided in the Plan and to the extent permitted by applicable law, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan for income tax purposes as allocated, first, to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to the interest accrued through and including the Plan Effective Date.

## ARTICLE VII

## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

7.1    **Disputed Claims**

Notwithstanding section 502(a) of the Bankruptcy Code, and in light of the Unimpaired status of all General Unsecured Claims under the Plan, except as required by Article II, Section 5.4, and any other sections of the Plan that require filing Proofs of Claims, Holders of Claims need not file Proofs of Claim, and the Reorganized Debtors and the Holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Cases had not been commenced, except that (unless expressly waived pursuant to the Plan) the Allowed amount of such Claims shall be subject to the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable.

All Proofs of Claim filed in these Chapter 11 Cases, except those required by Article II and Section 5.4, shall not be considered Allowed for any purposes under the Plan and without further action by the Debtors. Upon the Plan Effective Date, all Proofs of Claim filed against the Debtors, regardless of the time of filing, and including Claims filed after the Plan Effective Date, shall be deemed withdrawn and expunged, other than as provided below, and such creditor that files a Proof

of Claim with the Bankruptcy Court retains any right it may have to pursue remedies in a forum other than the Bankruptcy Court in accordance with applicable law, and the Debtors and Reorganized Debtors shall retain all rights to assert all claims, legal and equitable defenses, and setoffs or recoupments with respect to all such Claims. Notwithstanding anything in this Section 7.1, the Debtors or the Reorganized Debtors may settle and/or Allow (a) all Claims against the Debtors that result from the Debtors' rejection of an Executory Contract or Unexpired Lease, (b) disputes regarding the amount of any Cure pursuant to section 365 of the Bankruptcy Code, and (c) Claims that the Debtors or Reorganized Debtors seek to have determined by the Bankruptcy Court. From and after the Plan Effective Date, the Reorganized Debtors may satisfy, dispute, settle, or otherwise compromise any Claim without approval of the Bankruptcy Court.

## 7.2    **Resolution of Disputed Claims**

Except insofar as a Claim is Allowed under the Plan, the Debtors or the Reorganized Debtors, as applicable, shall be entitled to object to any Claim in the Bankruptcy Court. Any objections to Claims in the Bankruptcy Court shall be served and filed on or before the 120th day after the Plan Effective Date or by such later date as may be ordered by the Bankruptcy Court. Notwithstanding any authority to the contrary, any such objection to a Claim shall be deemed properly served on the Holder thereof if service is effected in any of the following manners:  (a) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004; or (b) by first class mail, postage prepaid, on any counsel that has appeared on the Holder's behalf in the Chapter 11 Cases.

The Debtors and the Reorganized Debtors shall be authorized to, and shall resolve all Disputed Claims or Interests for which an objection is filed in the Bankruptcy Court by withdrawing or settling such objections thereto or by litigating to Final Order in the Bankruptcy Court the validity, nature and/or amount thereof. All Claims not objected to by the end of the later of the 120-day period set forth in the preceding paragraph (as may be extended) or otherwise by a deadline provided for by law or contract (as may be extended) shall be deemed Allowed. For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Plan Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Plan Effective Date with respect to any Disputed Claim, including the Causes of Action retained pursuant to Section 4.8, and the right to adjudicate such claim in any court of competent jurisdiction regardless of whether a Claim or Interest objection is filed in the Bankruptcy Court.

## 7.3    **Estimation of Claims**

The Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated in accordance with section 502(c) of the Bankruptcy Code for any reason, regardless of whether any Entity previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. If the Bankruptcy Court estimates any contingent or unliquidated Claim, the estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate amount of or distribution on such Claim or Interest.

7.4    **No Interest**

Unless otherwise expressly ordered by the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Plan Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

7.5    **No Distributions Pending Allowance**

Notwithstanding any other provision of this Plan to the contrary, no payments or distributions of any kind or nature shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order and the Disputed Claim has become an Allowed Claim. Distributions on account of Disputed Claims that become Allowed Claims shall be made pursuant to Section 6.2.

7.6    **Disallowance of Claims and Interests**

All Claims of any Entity from which property is sought by the Debtors under section 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if:  (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

## ARTICLE VIII

## EFFECT OF CONFIRMATION OF THE PLAN

8.1    **Compromise and Settlement of Claims, Interests, and Controversies**

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any other Claim or Interest or any treatment or distribution to be made on account of an Allowed Claim or Allowed Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests, and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court. After the Plan

Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

8.2    **Discharge of Claims and Termination of Interests**

**Except as otherwise provided for herein and effective as of the Plan Effective Date: (a) the rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their assets, property, or Estates; (b) the Plan shall bind all Holders of Claims and Interests, notwithstanding whether any such Holders failed to vote to accept or reject the Plan or voted to accept or reject the Plan; (c) all Claims and Interests shall be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Entities shall be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, the New Issuer, each of their successors, assigns, assets and properties, any Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Plan Effective Date; provided, however, that the foregoing shall not affect the treatment of the Senior Debt Claims as provided in Section 4.4(d) and Section 4.4(e) of the Plan. For the avoidance of doubt, nothing in this section shall affect the rights of Holders of Claims and Interests to seek to enforce the Plan or any post-Plan Effective Date obligations, including the distributions to which Holders of Allowed Claims and Interests are entitled under the Plan.**

8.3    **Releases by the Debtors**

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise expressly provided herein, for good and valuable consideration, as of the Plan Effective Date, to the extent permitted by applicable laws, the Released Parties are conclusively, absolutely, unconditionally, irrevocably, and forever deemed released and discharged by the Debtors, the Reorganized Debtors, and the Estates from any and all actions, claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether for tort, contract, violations of foreign, federal or state securities laws and Avoidance Actions, including any derivative claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, asserted or that could possibly have been asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or the Estates, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Existing Indenture, the Existing Notes, the LC Facility Agreement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or during the Chapter 11 Cases, the negotiation, formulation, solicitation, or preparation of the RSA, the Disclosure Statement,**

the Plan, the Plan Supplement, or related agreements, instruments or other documents, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date; provided, however, that the foregoing provisions of this Section 8.3 shall have no effect (x) on the liability of any of the Released Parties for gross negligence, willful misconduct, fraud, or criminal conduct; (y) any Causes of Action retained by the Debtors against any Person other than the Released Parties; and (z) the Debtors' rights and defenses in respect of creditors and contract counterparties that are Unimpaired under the Plan; provided, further, that nothing in this Section 8.3 shall release any post-Plan Effective Date obligations of any party under the Plan or any document, instrument, or agreement executed to implement, or otherwise given effect under, the Plan, including the New Notes Documents and any other agreement or document related thereto or entered into in connection therewith, as applicable.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, including pursuant to Bankruptcy Rule 9019, of the release set forth in this Section 8.3, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that such release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the claims released by this Section 8.3; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors asserting any claim or Cause of Action released by this Section 8.3.

8.4     **Releases by Releasing Parties**

As of the Plan Effective Date, to the extent permitted by applicable law, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Estates and the Released Parties from any and all claims, interests, obligations, rights, liabilities, actions, causes of action, suits, debts, demands, damages, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims (including all claims and actions against any Entities under the Bankruptcy Code) whatsoever, whether for tort, contract, violations of foreign, federal or state securities laws and Avoidance Actions, including any derivative claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Releasing Party asserted or that could possibly have been asserted, or would have been legally entitled to assert (whether individually or collectively), based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Existing Indenture, the Existing Notes, the LC Facility Agreement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Releasing Party, the restructuring of Claims and Interests prior to or during the Chapter 11 Cases, the negotiation, formulation, solicitation, or preparation

of the RSA, the Disclosure Statement, the Plan, the Plan Supplement, or related agreements, instruments or other documents, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date; _provided_, _however_, that the foregoing provisions of this Section 8.4 shall have no effect on (x) the liability of any of the Released Parties for gross negligence, willful misconduct, or criminal conduct and (y) the treatment of the Senior Debt Claims as provided in Section 4.4(d) and Section 4.4(e) of the Plan; _provided_ _further_ that nothing in this Section 8.4 shall release any post-Plan Effective Date obligations (except Cure Claims that have not been timely filed) of any party under the Plan or any document, instrument, or agreement executed to implement, or otherwise given effect under, the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, including pursuant to Bankruptcy Rule 9019, of the release set forth in this Section 8.4, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that such release is: (a) important to the Plan; (b) in exchange for the good and valuable consideration provided by the Debtors, the Reorganized Debtors, the Estates and the Released Parties; (c) a good faith settlement and compromise of the claims released by this Section 8.4; (d) in the best interests of the Debtors and all Holders of Claims and Interests; (e) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (g) a bar to any Entity granting a release under this Section 8.4 from asserting any claim or Cause of Action released by this Section 8.4.

8.5    **Exculpation**

No Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Exculpated Claim or any obligation, Cause of Action, or liability for any Exculpated Claim; _provided_, _however_, that the foregoing "exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted fraud, gross negligence, or willful misconduct; _provided_, _further_, that in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to, or in connection with, the Plan. The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of acceptances and rejections of the Plan and the making of distributions pursuant to the Plan and, therefore, are not and shall not be liable at any time for the violation of any applicable, law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or distributions made pursuant to the Plan.

8.6    **Injunction**

Except as otherwise provided herein or for obligations issued pursuant hereto, all Entities that have held, hold, or may hold claims or interests that have been released pursuant to Section 8.3 or Section 8.4, discharged pursuant to Section 8.2, or are subject to exculpation pursuant to Section 8.5 are permanently enjoined, from and after the Plan Effective Date, from taking any of the following actions against, as applicable, the Debtors,

50

the Reorganized Debtors, the New Issuer, the Released Parties, or the Exculpated Parties, as well as their assets or property:  (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or Estates of such Entities on account of or in connection with or with respect to any such claims or interests; (d) asserting any right of setoff or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of or in connection with or with respect to any such claims or interests unless, with respect to the Debtors and the Reorganized Debtors (as well as their assets and property), such holder has filed a motion requesting the right to perform such set off pursuant to <u>Section 6.9(b)</u> or performed such recoupment and provided notice thereof in writing to the Debtors pursuant to <u>Section 6.9(c)</u>, in each case on or before the Confirmation Date; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released, exculpated, or settled pursuant to the Plan.

8.7    <u>Protection Against Discriminatory Treatment</u>

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Debtor or Reorganized Debtor, or any Entity with which a Debtor or Reorganized Debtor has been or is associated, as to a Reorganized Debtor solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

8.8    <u>Indemnification</u>

On and from the Plan Effective Date, and notwithstanding anything provided under the Plan, all indemnification provisions in place as of the Plan Effective Date (whether in the bylaws, certificates of incorporation or formation, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, financial advisors, investment bankers, and other professionals (including the Professionals) of the Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive Consummation and the effectiveness of the Restructuring and remain enforceable; <u>provided</u> that the Reorganized Debtors shall not indemnify officers, directors, managers, employees, attorneys, accountants, investment bankers or other professionals (including the Professionals) of the Debtors for any claims or Causes of Action arising out of or relating to any act or omission by them that is a criminal act or constitutes intentional fraud, gross negligence, or willful misconduct.

8.9      **Release of Liens**

Except (a) with respect to the Liens securing Other Secured Claims (if such Liens survive the treatment of such Claims pursuant to Section 3.2(a)(2)), (b) as otherwise expressly provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, including, without limitation, the New Notes Documents, or (c) with respect to mortgages, deeds of trust, Liens, pledges, and other security interests related to the Existing Notes and LC Facility Claims if and to the extent that the governing documents of such security interests expressly provide that such security documents will secure obligations incurred as a substitution, replacement, refunding or refinancing of the Existing Notes and LC Facility Claims (including the documents or security interests), on the Plan Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any assets or property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall vest in and revert to the applicable Reorganized Debtor and its successors and assigns; provided, however, that notwithstanding the foregoing, mortgages, deeds of trust, Liens, pledges, and other security interests created under or pursuant to the Prepetition Security Documents that are being amended, amended and restated, or otherwise modified in connection with this Plan to secure the obligations under the New Notes (at which point, such Prepetition Security Documents shall be deemed included in the definition of New Notes Documents) shall remain pursuant to the terms of the New Notes Documents, but shall not secure any of the obligations of the Class 3 Claims.

From and after the Plan Effective Date, any Holder of a Secured Claim (and the applicable agents for such Holder) secured by Liens or security interests which are to be released under this Plan shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to give effect to the Plan and to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any foreign, federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Plan Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Reorganized Debtors that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests in accordance with the Plan, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

8.10     **Reimbursement or Contribution**

Except as otherwise provided in Section 8.8, if the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Plan Effective Date, such Claim

shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Plan Effective Date (a) such Claim has been adjudicated as noncontingent or (b) the relevant Holder of a Claim has filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

## ARTICLE IX

## CONDITIONS PRECEDENT TO THE PLAN EFFECTIVE DATE

9.1    **Conditions Precedent to the Plan Effective Date.**

It shall be a condition to the Plan Effective Date that the following conditions shall have been satisfied or waived pursuant to Section 9.2 of the Plan:

(a)    the Bankruptcy Court shall have entered the Confirmation Order, which:

    (1)    authorizes the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with, or to implement, this Plan in a manner consistent in all respects with this Plan;

    (2)    decrees that the provisions in the Confirmation Order and this Plan are non-severable and mutually dependent;

    (3)    authorizes the Debtors, the Reorganized Debtors and the New Issuer, as applicable to:  (A) implement the Restructuring Transactions; (B) make all distributions and issuances as required under this Plan; and (C) enter into any agreements and transactions, in each case, in a manner consistent in all respects with the terms of this Plan;

    (4)    if Citibank is party to the RSA as of such date, approves the issuance of the Settlement Take-back SSNs to the Holders of LC Facility Claims in accordance with the Plan;

    (5)    provides that the solicitation, offer, sale and issuance of the securities under the Plan was in compliance with, and pursuant to, all relevant sections of the Securities Act, and any similar state laws;

    (6)    authorizes the implementation of this Plan in accordance with its terms; and

    (7)    provides that, pursuant to section 1146 of the Bankruptcy Code, the vesting of assets, the delivery of any deed or other instrument or transfer, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under this Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax;

(b)      the RSA shall not have been terminated at any time (excluding, however, any termination of the Second Amendment), and no condition shall exist under the RSA that would permit the Majority Members (as defined in the RSA) to terminate the RSA pursuant to Section 3.01(b)(xiii) of the RSA;

(c)      the Debtors shall not have received any notice of any charge, sanction, levy, or fine imposed by any government regulator:  (i) enjoining, prohibiting, ceasing, or terminating the ability of the Debtors to implement the Restructuring, or (ii) imposing criminal liability on any of the Debtors or any of its managers;

(d)      the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to Consummate this Plan;

(e)      the final version of each of the Plan and all documents contained in any supplement to the Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications, or supplements thereto required for Consummation or other documents contained therein required for Consummation, shall have been executed or filed (other than any collateral perfection requirements), as applicable, in each case in form and substance acceptable to the Debtors, the ILAP Partners and the Required Consenting Creditors, in each case, in their reasonable discretion;

(f)      the New Notes Documents shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Plan Effective Date) to the effectiveness of the New Notes Documents (other than any collateral perfection requirements) shall have been satisfied or duly waived in writing in accordance with the terms of each the New Notes Documents and the issuance of each of the New Notes shall have occurred;

(g)      the Super Priority Notes Financing Parties shall purchase in Cash the Super Priority Notes;

(h)      all professional fees and expenses of professionals for the Debtors or any official committee appointed in the Chapter 11 Cases that require the Bankruptcy Court's approval shall have been paid in full in Cash or amounts sufficient to pay such fees and expenses in full in cash after the Plan Effective Date shall have been placed in the Professional Fee Escrow pursuant to an escrow agreement acceptable to the Debtors and such Professionals pending the Bankruptcy Court's approval of such fees and expenses;

(i)      all Restructuring Expenses shall have been paid in Cash in full; and

(j)      this Plan and all documents and agreements necessary for Consummation of the Plan (other than any collateral perfection requirements) shall have:  (i) all conditions precedent to such documents and agreements satisfied or waived pursuant to the terms of such documents or agreements; (ii) been tendered for delivery to the required parties and, to the extent required, filed with and approved by any applicable Governmental Units in accordance with applicable laws; and (iii) been effected or executed.

9.2    **Waiver of Conditions Precedent**

At any time, without any notice to any other parties in interest, without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm or Consummate the Plan, the Debtors may (x) with the consent of the Required Consenting Creditors if impacted thereby (which consent shall not be unreasonably withheld, conditioned or delayed), waive any of the conditions to the Plan Effective Date set forth in Section 9.1 and/or (y) subject to Section 10.1 hereof, amend, modify or supplement any of the conditions to the Plan Effective Date set forth in Section 9.1.

9.3    **Effect of Non-Occurrence of Conditions to Consummation**

If prior to Consummation, the Confirmation Order is vacated pursuant to a Final Order, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan and Disclosure Statement will be null and void *ab initio* in all respects, all parties in interest shall go back to the status *quo ante* as if this Plan and Disclosure Statement had never existed, and nothing contained in the Plan or Disclosure Statement shall:  (a) constitute a waiver or release of any Claims, Interests, or Causes of Action; (b) prejudice in any manner the rights of any Debtor or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

## ARTICLE X

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

10.1    **Modification of Plan**

Effective as of the date hereof, and subject to the last sentence of this Section 10.1:  (a) the Debtors, with the consent of the Required Consenting Creditors (which consent shall not unreasonably be withheld, delayed, or conditioned), may amend or modify the Plan before the entry of the Confirmation Order in accordance with the Bankruptcy Code and the Bankruptcy Rules; and (b) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, with the consent of the Required Consenting Creditors (which consent shall not unreasonably be withheld, delayed, or conditioned), may amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code; provided, further, that the consent of Citibank, N.A. shall also be required for any waiver, amendment, modification or supplement of Section 4.10(b) of the Plan. Notwithstanding the foregoing consent rights provided to the Consenting Creditors, the Debtors may amend, modify or supplement the Plan, from time to time without the consent of any Consenting Noteholder, solely to cure any ambiguity, defect (including any technical defect) or inconsistency, provided that any such amendments, modifications or supplements (i) are not material; (ii) do not adversely affect the rights, interests, or treatment of any member of Class 3; (iii) do not change the material terms and conditions of any New Notes, including without limitation any financial terms, events of default, covenants or substantive protections benefiting the Consenting Creditors; and (iv) for the avoidance of doubt, are not inconsistent with the terms of the Restructuring Term Sheet; provided, further that the Debtors provide counsel for the Ad Hoc Group, counsel for the Holders of the LC Facility Claims, and counsel for the Existing Indenture

Trustee with a copy of the proposed amendment, modification or supplement at least two (2) days before the proposed effectiveness of such amendments, modification or supplements.

10.2    **Revocation or Withdrawal of Plan**

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan, or if Confirmation or the Plan Effective Date does not occur, then: (a) the Plan will be null and void *ab initio* in all respects; (b) any allowance of a Claim or any other settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto will be null and void *ab initio* in all respects; (c) nothing contained in the Plan shall (1) constitute a waiver or release of any Claims, Interests, or Causes of Action, (2) prejudice in any manner the rights of any Debtor or any other Entity, or (3) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity; and (d) all rights and defenses of the Consenting Creditors, the Debtors and the ILAP Partners under the RSA and Restructuring Term Sheet are preserved.

10.3    **Confirmation of the Plan**

To the extent any Class rejects the Plan, the Debtors will request confirmation of the Plan under section 1129(b) of the Bankruptcy Code. The Debtors, subject to Section 10.1 hereof, reserve the right to alter, amend, modify, revoke or withdraw the Plan or any exhibit or Plan Supplement in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

## ARTICLE XI

## RETENTION OF JURISDICTION

11.1    **Jurisdiction**

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Plan Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under and/or related to the Chapter 11 Cases and the Plan to the fullest extent permitted by applicable law, including jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Claim or Interest and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.    decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

56

3.      resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors' amendment, modification, or supplement, after the Plan Effective Date, pursuant to Article V, of the Rejection Schedule or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Plan Effective Date;

6.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan or the Confirmation Order, including contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Plan Supplement or the Disclosure Statement, including the New Notes Documents and any other agreement or document related thereto or entered into in connection therewith;

7.      enter and enforce any order for the sale or disposition of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.      grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

9.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

10.      hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including: (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Section 6.8(a); (b) with respect to the releases, injunctions, and other provisions contained in Article VIII, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan or the Confirmation Order, or any Entity's rights arising from or obligations incurred in connection with the Plan or the Confirmation Order, including those arising under agreements, documents, or instruments executed in connection with the Plan; (d) related to section 1141 of the Bankruptcy Code; or (e) with respect to any Claims arising under or in connection with the Senior Debt Claims asserted against the Reorganized Debtors by any current or former Holder of Senior Debt Claims;

57

11.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

12.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

13.     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, or the Confirmation Order;

14.     hear and determine matters concerning U.S. state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

15.     enter an order or Final Decree concluding or closing any of the Chapter 11 Cases;

16.     adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.     hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in connection with and under the Plan, including under Article VIII;

18.     enforce all orders previously entered by the Bankruptcy Court; and

19.     hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

### 12.1    **Additional Documents**

On or before the Plan Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims and Interests receiving distributions pursuant to the Plan, and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### 12.2    **Payment of Statutory Fees**

All fees payable pursuant to section 1930 of title 28 of the United States Code, and any applicable interest payable under section 3717 of title 31 of the United States Code, as of the entry of the Confirmation Order as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Plan Effective Date. The Debtors or the Reorganized Debtors shall continue to pay fees pursuant to section 1930 of title 28 of the United States Code, and any applicable interest payable under section 3717 of title 31 of the United States Code, until the Chapter 11 Cases are converted, dismissed, or closed by entry of the Final Decree, whichever occurs first.

The Debtors or the Reorganized Debtors shall file and serve on the United States Trustee post-Plan Effective Date quarterly reports of the disbursements made, which reports will be filed and served on or prior to the later of (a) the date that is thirty (30) days after the conclusion of each such period and (b) such later date as has been agreed to by the Debtors or the Reorganized Debtors and the United States Trustee, until the Chapter 11 Cases are converted, dismissed, or closed by entry of the Final Decree. Any such reports shall be prepared consistent with (both in terms of content and format) the applicable Bankruptcy Court and United States Trustee's Guidelines for such matters. Nothing herein will prejudice the right of the Debtors to seek closure of any of the Chapter 11 Cases pursuant to section 350(a) of the Bankruptcy Code, and no appeal of any relief granted pursuant hereto shall prejudice the Debtors' right to argue that any of the Chapter 11 Cases have been fully administered within the meaning of section 350(a) of the Bankruptcy Code.

## 12.3    Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action (or any omission) by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Plan Effective Date.

## 12.4    Elimination of Vacant Classes

Any Class of Claims or Interests that (a) does not have a Holder of an Allowed Claim or a Claim temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing or (b) is entitled to vote on the Plan but with respect to which no Ballots are cast or no Ballots are deemed to be cast, shall be deemed eliminated from the Plan for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

## 12.5    Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

## 12.6    Service of Documents

After the Plan Effective Date, any pleading, notice, or other document required by the Plan to be filed with the Court and served on or delivered to the Reorganized Debtors shall be served on:

| Reorganized Debtors | **Inversiones Latin America Power Limitada**<br>Cerro El Plomo 5680, Oficina 1202<br>Las Condes, Santiago, Chile<br>Attention: Esteban Moraga |
|---|---|

|                                        | With a copy to: |
|----------------------------------------|------------------|
| **Counsel to the Reorganized Debtors** | **Greenberg Traurig, LLP** <br> One Vanderbilt Avenue <br> New York, New York 10017 <br> Attention: Oscar N. Pinkas / Brian E. Greer / Leo Muchnik |
| **Counsel to the Ad Hoc Group**        | **Cleary Gottlieb Steen & Hamilton LLP** <br> One Liberty Plaza <br> New York, New York 10006 <br> Attention: Richard J. Cooper / Adam Brenneman / Thomas S. Kessler |

## 12.7    Term of Injunctions or Stays

**Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to section 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Plan Effective Date. All post-Plan Effective Date injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

## 12.8    Entire Agreement

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, including but not limited to the RSA, all of which have become merged and integrated into the Plan.

## 12.9    Plan Supplement Exhibits

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel or by downloading such exhibits and documents from the Bankruptcy Court's website, https://www.nysb.uscourts.gov/.

## 12.10    Non-Severability

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and

provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan; and (c) non-severable and mutually dependent.

12.11 **Foreign Representative**

ILAP and the Reorganized ILAP (as applicable) is authorized to act as the foreign representative of the Debtors in any judicial or other proceeding in any foreign country, including Chile.

61

Dated: November 29, 2023

Respectfully Submitted,

**INVERSIONES LATIN AMERICA POWER LIMITADA**

By: _____
Name: Esteban Moraga
Title:   Chief Executive Officer

**SAN JUAN S.A.**

By: _____
Name: Esteban Moraga
Title:   Chief Executive Officer

**NORVIND S.A.**

By: _____
Name: Esteban Moraga
Title:   Chief Executive Officer