**GREENBERG TRAURIG, LLP**
Oscar N. Pinkas
Brian E. Greer
Leo Muchnik
Sara A. Hoffman
Jessica M. Wolfert
One Vanderbilt Avenue
New York, New York 10017
Telephone: (212) 801-9200
Facsimile: (212) 801-6400

*Proposed Counsel for the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>INVERSIONES LATIN AMERICA POWER LTDA., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 23-[_____] ([_____])<br><br>(Joint Administration Requested) |

---

### DISCLOSURE STATEMENT FOR THE JOINT PREPACKAGED PLAN OF REORGANIZATION OF INVERSIONES LATIN AMERICA POWER LTDA. AND ITS DEBTOR SUBSIDIARIES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

---

**Dated: November 29, 2023**

> **THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE DEBTORS' JOINT PREPACKAGED CHAPTER 11 PLAN (AS FURTHER DEFINED HEREIN, THE "<u>PLAN</u>") IN ACCORDANCE WITH SECTION 1125 AND WITHIN THE MEANING OF SECTION 1126 OF THE BANKRUPTCY CODE, 11 U.S.C. §§ 1125, 1126.**
>
> **THE POTENTIAL DEBTORS ARE: INVERSIONES LATIN AMERICA POWER LTDA. ("<u>ILAP</u>"), SAN JUAN S.A. ("<u>SAN JUAN</u>"), AND NORVIND S.A. ("<u>NORVIND</u>").**
>
> **PURSUANT TO THE PLAN, HOLDERS OF ILAP'S 5.125% SENIOR SECURED NOTES DUE 2033 (THE "<u>EXISTING NOTES</u>" AND THE CLAIMS OF SUCH HOLDERS, AS FURTHER DEFINED IN THE PLAN, THE "<u>EXISTING NOTES CLAIMS</u>") AND HOLDERS OF CLAIMS UNDER THE CREDIT AGREEMENT DATED JUNE 15, 2021 BY AND AMONG ILAP AS BORROWER, SAN JUAN AND NORVIND AS GUARANTORS, CITIBANK N.A. AS ADMINISTRATIVE AGENT AND THE LENDERS PARTY**

---

[1]   The Debtors, together with each of the Debtor's Chilean identification number, as applicable, are: Inversiones Latin America Power Ltda. (76.299.635-9); San Juan S.A. (76.319.883-9); and Norvind S.A. (76.919.070-8). The location of the corporate headquarters and the service address for Inversiones Latin America Power Ltda. is Cerro El Plomo 5680, Oficina 1202 Las Condes, Santiago, Chile.

**THERETO (AS FURTHER DEFINED IN THE PLAN, THE "LC FACILITY CLAIMS") WILL RECEIVE NEW DEBT SECURITIES AS MORE FULLY DESCRIBED BELOW.**

**THIS SOLICITATION IS SEEKING VOTES ONLY FROM THE HOLDERS OF EXISTING NOTES CLAIMS AND LC FACILITY CLAIMS, AND FROM HOLDERS OF INTERESTS IN ILAP, WHICH ARE THE ONLY NON-DEBTOR PARTIES BEING AFFECTED BY THE PLAN. THE CLAIMS OF TRADE AND OTHER GENERAL UNSECURED CREDITORS WILL BE UNIMPAIRED AND FULLY SATISFIED.**

**THE HOLDERS OF APPROXIMATELY 83.8% OF THE HOLDERS OF THE EXISTING NOTES, 100% OF THE HOLDERS OF THE LC FACILITY CLAIMS, AND THE HOLDERS OF INTERESTS IN ILAP SUPPORT THE PLAN PURSUANT TO A RESTRUCTURING SUPPORT AGREEMENT.**

**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTORS' FILING FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY SECURITIES.**

Inversiones Latin America Power Ltda. ("ILAP"), San Juan S.A. ("San Juan"), and Norvind S.A. ("Norvind," and together with San Juan, the "Guarantor Debtors"; and the Guarantor Debtors and ILAP, collectively, the "Debtors" or the "Company") are sending you this document and the accompanying materials (the "Disclosure Statement") because you hold an Existing Notes Claim or LC Facility Claim (collectively, the "Senior Debt Claims"), and therefore are entitled to vote on the Debtors' Joint Prepackaged Chapter 11 Plan (including all exhibits annexed thereto and the Plan Supplement, as it may be modified, amended or supplemented from time to time, the "Plan").[2] As discussed herein, the other parties entitled to vote on the Plan are ILAP's equity holders, who have signed the RSA, support the Plan and have taken all necessary corporate actions to accept the Plan simultaneously with the commencement of the solicitation.

The Debtors are commencing the solicitation of your vote to approve the Plan (the "Solicitation") before the Debtors file voluntary cases under chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code").

The Debtors may file voluntary reorganization cases under chapter 11 of the Bankruptcy Code to implement the Plan (the "Chapter 11 Cases"). Because the Chapter 11 Cases have not yet been commenced, this Disclosure Statement has not been approved by the Bankruptcy Court as containing "adequate information" within the meaning of section 1125(a) of the Bankruptcy Code. If the Debtors file the Chapter 11 Cases, they will promptly seek an order of the Bankruptcy Court (a) approving this Disclosure Statement as having contained "adequate information," (b) approving the solicitation of votes as having been in compliance with section 1126(b) of the Bankruptcy Code, and (c) confirming the Plan. The Bankruptcy Court may order additional disclosures.

## SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

Neither this Disclosure Statement nor the Plan has been filed with or reviewed by the Bankruptcy Court, and the securities to be issued on or after the Plan Effective Date will not have been the subject of a registration statement filed with the United States Securities and Exchange Commission (the "SEC") under the United States Securities Act of 1933, as amended (the "Securities Act"), or any securities regulatory authority of any state under any state securities law ("Blue Sky Laws"). The Debtors are relying on Section 4(a)(2), Regulation S and Regulation D under the Securities Act, and similar Blue Sky Laws provisions, as applicable, to exempt from registration under the Securities Act the offer of the securities described in this Disclosure Statement to be issued under the Plan. Further, the indentures governing the New Notes shall be exempt from qualification under the Trust Indenture Act of 1939 pursuant to Section 304(b) thereof.

After the filing of the Chapter 11 Cases, the Debtors are relying on the exemption from the Securities Act, and equivalent state law registration requirements, provided by section 1145 of the Bankruptcy Code, Section 4(a)(2), Regulation S and Regulation D under the Securities Act, and similar Blue Sky Laws provisions, as applicable, to exempt from registration under the Securities Act and Blue Sky Laws the offer and sale of the securities described in this Disclosure Statement to be issued under the Plan.

**The Plan has not been approved or disapproved by the SEC or any state securities commission, and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of the information contained herein. In addition, none of the securities described herein have been approved or disapproved by the SEC, any state securities commission or any other regulatory authority, nor have any of the foregoing authorities passed upon or endorsed the merits of the Plan or the accuracy or adequacy of this Disclosure Statement. Any representation to the contrary is a criminal offense. This Disclosure Statement does not constitute an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.**

## SPECIAL NOTICE REGARDING CHILEAN SECURITIES LAWS

The securities to be issued on or after the Plan Effective Date will not be registered under the Chilean Securities Market Law No. 18,045 (*Ley de Mercado de Valores*, the "Chilean Securities Market Law"), as amended, with the Chilean Financial Markets Commission (*Comisión para el Mercado Financiero*, the "CMF"), and, accordingly, may not be offered or sold to persons in Chile except in circumstances that do not constitute a public offering under Chilean law, and in

---

[2]   Unless otherwise defined in this Disclosure Statement, all capitalized terms used, but not otherwise defined, in this Disclosure Statement shall have the meanings ascribed to them in the Plan.

compliance with Rule (*Norma de Carácter General*) No. 336, dated June 27, 2012, as amended by Rule (*Norma de Carácter General*) No. 452 dated February 22, 2021 ("CMF Rule 452"), both issued by the CMF ("CMF Rule 336"). Consequently, the notes are not and will be not subject to the supervision of the CMF. Pursuant to CMF Rule 336, the notes may be privately offered in Chile to certain "qualified investors," identified as such therein (which in turn are further described in CMF Rule No. 216, dated June 12, 2008) and in compliance with regulations applicable to such investors.

### SPECIAL NOTICE REGARDING CAYMAN ISLANDS SECURITIES LAWS

No offer or invitation, whether directly or indirectly, may be made or will be made to the public in the Cayman Islands to subscribe for any securities to be issued by the New Issuer (as defined below) (including, without limitation, the Convertible Notes and the New Issuer Equity (each as defined below)).

### VOTING DEADLINE

The deadline for (1) Holders of Senior Debt Claims and (2) Holders of Existing ILAP Equity Interests to accept or reject the Plan is **5:00 p.m. (prevailing Eastern Time) on December 28, 2023 (the "Voting Deadline")** unless the Debtors extend the Voting Deadline.

In order to be counted, the ballot (the "Ballot") or master ballot (the "Master Ballot") indicating acceptance or rejection of the Plan must be actually received by the Debtors' notice, claims, and balloting agent, Epiq Corporate Restructuring LLC ("Epiq" or the "Balloting Agent") no later than the Voting Deadline.

### IMPORTANT INFORMATION

The Debtors cannot assure you that the disclosure statement, including any exhibits thereto, that is ultimately approved by the Bankruptcy Court in the Chapter 11 Cases (a) will contain all of the terms described in this Disclosure Statement or (b) will not contain different, additional, or material terms that do not appear in this Disclosure Statement. The Debtors urge each Holder of a Claim or Interest (i) to read and consider carefully this entire Disclosure Statement (including the Plan and the matters described under Section X of this Disclosure Statement, entitled "*Risk Factors*") and (ii) to consult with its own advisors with respect to reviewing this Disclosure Statement, the Plan and each of the proposed transactions contemplated thereby prior to deciding whether to accept or reject the Plan. You should not rely on this Disclosure Statement for any purpose other than to determine whether to vote to accept or reject the Plan.

If the Plan is confirmed by the Bankruptcy Court and the Plan Effective Date occurs, all Holders of Claims against, and Holders of Interests in, the Debtors (including, without limitation, those Holders of Claims or Interests who do not submit Ballots to accept or reject the Plan, who are not entitled to vote on the Plan, or who voted to reject the Plan) will be bound by the terms of the Plan and the transactions contemplated thereby.

THIS DISCLOSURE STATEMENT CONTAINS PROJECTED FINANCIAL INFORMATION REGARDING THE REORGANIZED DEBTORS AND CERTAIN OTHER FORWARD-LOOKING STATEMENTS, ALL OF WHICH ARE BASED ON VARIOUS ESTIMATES AND ASSUMPTIONS. SUCH INFORMATION AND STATEMENTS ARE SUBJECT TO INHERENT UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE RISKS, INCLUDING, AMONG OTHERS, THOSE SUMMARIZED HEREIN. SEE SECTION X OF THE DISCLOSURE STATEMENT ("*RISK FACTORS*"). CONSEQUENTLY, ACTUAL EVENTS, CIRCUMSTANCES, EFFECTS, AND RESULTS MAY VARY SIGNIFICANTLY FROM THOSE INCLUDED IN OR CONTEMPLATED BY THE PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS CONTAINED HEREIN THAT, THEREFORE, ARE NOT NECESSARILY INDICATIVE OF THE FUTURE FINANCIAL CONDITION OR RESULTS OF OPERATIONS OF THE DEBTORS OR REORGANIZED DEBTORS AND SHOULD NOT BE REGARDED AS REPRESENTATIONS BY THE DEBTORS, THEIR ADVISORS, OR ANY OTHER PERSONS THAT THE PROJECTED FINANCIAL CONDITION OR RESULTS CAN OR WILL BE ACHIEVED. NEITHER THE DEBTORS' INDEPENDENT AUDITORS NOR ANY OTHER INDEPENDENT ACCOUNTANTS HAVE COMPILED, EXAMINED, OR PERFORMED ANY PROCEDURES WITH RESPECT TO THE FINANCIAL PROJECTIONS AND THE LIQUIDATION ANALYSIS CONTAINED HEREIN, NOR HAVE THEY

EXPRESSED ANY OPINION OR ANY OTHER FORM OF ASSURANCE AS TO SUCH INFORMATION OR ITS ACHIEVABILITY, AND ASSUME NO RESPONSIBILITY FOR, AND DISCLAIM ANY ASSOCIATION WITH THE FINANCIAL PROJECTIONS OR LIQUIDATION ANALYSIS. THERE CAN BE NO ASSURANCE THAT THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS WILL PROVE CORRECT OR THAT THE DEBTORS' ACTUAL ABILITY TO COVER THEIR FUTURE PRINCIPAL AND CASH INTEREST PAYMENT OBLIGATIONS WILL NOT DIFFER FROM THE INFORMATION CONTAINED WITHIN THIS DISCLOSURE STATEMENT. THE DEBTORS AND THEIR ADVISORS DO NOT INTEND TO UPDATE OR OTHERWISE REVISE ANY INFORMATION DISCLOSED HEREIN TO REFLECT ANY CHANGES ARISING AFTER THE DATE HEREOF OR TO REFLECT FUTURE EVENTS, EVEN IF ANY ASSUMPTIONS CONTAINED HEREIN ARE SHOWN TO BE IN ERROR. FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES AND RISKS DESCRIBED HEREIN.

Except as set forth elsewhere herein, no person has been authorized by the Debtors in connection with the Plan or the Solicitation to give any information or to make any representation other than as contained in this Disclosure Statement and the exhibits attached hereto or referred to herein, and, if given or made, such information or representation may not be relied upon as having been authorized by the Debtors. This Disclosure Statement does not constitute an offer to sell or the solicitation of an offer to buy any securities other than those to which it relates, or an offer to sell or a solicitation of an offer to buy any securities in any jurisdiction in which, or to any person to whom, it is unlawful to make such offer or solicitation.

The statements contained in this Disclosure Statement are made as of the date hereof, and neither the delivery of this Disclosure Statement nor any issuance of the securities made pursuant to the Plan will, under any circumstance, create any implication that the information contained herein is correct at any time subsequent to the date hereof. Any estimates of claims and interests set forth in this Disclosure Statement may vary from the amounts of claims or interests ultimately allowed by the Bankruptcy Court.

The summaries of the Plan and the other documents contained in this Disclosure Statement are qualified in their entirety by reference to the Plan itself, the exhibits thereto and all documents described herein. The information contained in this Disclosure Statement, including, but not limited to, the information regarding the history, businesses and operations of the Debtors, the historical and projected financial information of the Debtors (including the projected results of operations of the Reorganized Debtors) and the liquidation analysis relating to the Debtors is included herein solely for purposes of soliciting acceptances of the Plan. Such information, including projected financial information and valuation of the Reorganized Debtors, is not to be construed as admissions or stipulations but rather as statements made in settlement negotiations.

**TABLE OF CONTENTS**

Page

I.   EXECUTIVE SUMMARY ................................................................................................1

II.   IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT .........................3

III.   QUESTIONS AND ANSWERS REGARDING THIS  DISCLOSURE STATEMENT AND THE PLAN ..4

    A.   What is Chapter 11? ...............................................................................................4

    B.   Why are the Debtors sending me this Disclosure Statement? ................................4

    C.   Am I entitled to vote on the Plan? ..........................................................................5

    D.   What will I receive from the Debtors if the Plan is consummated? ........................6

    E.   How do I vote on the plan? .....................................................................................7

    F.   What is deadline to vote on the Plan? .....................................................................8

    G.   Is there anything else that I will need to do to receive the Take-back SSNs and Convertible Notes? .....8

    H.   What happens to my recovery if the Plan is not confirmed, or does not go effective? ...........................8

    I.   Are any regulatory approvals required to consummate the Plan? ...........................8

    J.   If the Plan provides that I am entitled to a distribution, do I receive it upon Confirmation or when the Plan goes effective, and what do you mean when you refer to "Confirmation," "Plan Effective Date" and "Consummation?" .............................................................................................8

    K.   Will the Reorganized Debtors be obligated to continue to pay statutory fees as part of the bankruptcy process after the Plan Effective Date?................................................................9

    L.   When will the Plan Supplement be filed and what will it include?.........................9

    M.   What are the Debtors' Intercompany Claims and Interests? ................................10

    N.   How will Claims asserted with respect to rejection damages affect my recovery under the Plan?........10

    O.   Is there anything else that I will need to do to receive a recovery with respect to rejection damages?..10

    P.   Will there be releases granted to parties in interest as part of the Plan?...............10

    Q.   What is a Confirmation Hearing and will the Bankruptcy Court hold a Confirmation Hearing? ..........10

    R.   What is the effect of the Plan on the Debtors' ongoing businesses?.....................11

    S.   Do the Debtors recommend voting in favor of the Plan? .....................................11

IV.   THE DEBTORS' CORPORATE HISTORY, STRUCTURE AND BUSINESS OVERVIEW ..................11

    A.   The Debtors' Prepetition Organizational Chart.....................................................11

    B.   Summary of the Debtors' Businesses and History ................................................12

    C.   Overview of the Company's Prepetition Capital Structure ...................................18

V.   EVENTS LEADING TO CHAPTER 11 AND  PREPETITION RESTRUCTURING INITIATIVES........20

    A.   Recent Operations .................................................................................................20

    B.   The Debtors' Debt Service Obligations ................................................................21

    C.   LAP Chile Support: PEC 1 Receivables Sale Transaction ...................................21

VI.   THE PROPOSED REORGANIZATION OF THE DEBTORS.................................................22

|  | A. | Pre-Solicitation Negotiations | 22 |
|  | B. | Solicitation | 28 |
| VII. | | SUMMARY OF THE PLAN | 29 |
|  | A. | General Basis for the Plan | 29 |
|  | B. | Governing Law | 29 |
|  | C. | Treatment of Unclassified Claims | 30 |
|  | D. | Classification and Treatment of Claims and Interests | 31 |
|  | E. | Means for Implementation of the Plan | 34 |
|  | F. | Treatment of Executory Contracts and Unexpired Leases | 41 |
|  | G. | Provisions Governing Distributions | 44 |
|  | H. | Conditions Precedent to Confirmation and Consummation of the Plan | 52 |
|  | I. | Modification, Revocation or Withdrawal of the Plan | 54 |
|  | J. | Effect of Confirmation of the Plan | 55 |
| VIII. | | ANTICIPATED EVENTS OF THE CHAPTER 11 CASES | 59 |
|  | A. | Voluntary Petitions | 59 |
|  | B. | Expected Timetable of the Chapter 11 Cases | 59 |
|  | C. | First Day Relief | 59 |
| IX. | | PROJECTED FINANCIAL INFORMATION | 60 |
| X. | | RISK FACTORS | 63 |
|  | A. | Risks Relating to the Plan Solicitation and Confirmation | 63 |
|  | B. | Risks Related to the Debtors' Business | 69 |
|  | C. | Risks Related to Chile | 77 |
|  | D. | Risks Related to the Plan Securities | 79 |
| XI. | | CONFIRMATION OF THE PLAN | 87 |
|  | A. | Requirements for Confirmation of the Plan | 87 |
|  | B. | Best Interests of Creditors/Liquidation Analysis | 87 |
|  | C. | Feasibility | 87 |
|  | D. | Acceptance by Impaired Class | 88 |
| XII. | | ALTERNATIVES TO CONFIRMATION AND  CONSUMMATION OF THE PLAN | 88 |
|  | A. | Liquidation Under Chapter 7 | 88 |
|  | B. | Alternative Plan(s) of Reorganization | 89 |
|  | C. | Dismissal of the Debtors' Chapter 11 Cases | 89 |
| XIII. | | CERTAIN SECURITIES LAW MATTERS | 89 |

A.    Plan Securities.................................................................................................................89

B.    Chilean Securities Law ....................................................................................................92

C.    Cayman Islands Securities Law .......................................................................................92

XIV.    CERTAIN CHILEAN, UNITED STATES FEDERAL INCOME, AND CAYMAN ISLANDS  TAX
CONSEQUENCES OF THE PLAN .........................................................................................93

XV.    SOLICITATION AND VOTING PROCEDURES..................................................................105

XVI.    RECOMMENDATION..........................................................................................................110

**EXHIBITS**

**EXHIBIT A**      Debtors' Joint Prepackaged Chapter 11 Plan

**EXHIBIT B**      Restructuring Support Agreement

**EXHIBIT C**      Liquidation Analysis

**EXHIBIT D**      Financial Projections

**EXHIBIT E**      Valuation Analysis

**EXHIBIT F**      Form of New Notes and Indentures for New Notes

---

**THE DEBTORS HEREBY ADOPT AND
INCORPORATE EACH EXHIBIT ATTACHED TO
THIS DISCLOSURE STATEMENT BY REFERENCE
AS THOUGH FULLY SET FORTH HEREIN**

I.    **EXECUTIVE SUMMARY**

The Debtors submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to certain Holders of Claims against and Interests in the Debtors in connection with the solicitation of acceptances of the Plan. A copy of the Plan is attached hereto as **Exhibit A**. The Plan constitutes a separate chapter 11 plan for each Debtor unless otherwise provided for in the Plan. Except for the Claims addressed in Article II of the Plan, all Claims and Interests are placed in Classes for each of the Debtors.

As of November 29, 2023, the Debtors had outstanding funded indebtedness in the aggregate principal amount of $408,730,000 consisting primarily of (x) $391,230,000 in outstanding principal amount under their Existing Notes and (y) $17,500,000 in outstanding principal amount under that certain Credit Agreement, dated as of June 15, 2021, between and among, ILAP, as borrower, San Juan and Norvind, each as guarantors, Citibank, N.A., as administrative agent (in such capacity, the "LC Facility Agent"), and the lenders party thereto (as amended and supplemented and in effect from time to time, the "LC Facility Agreement").

The Debtors are pleased to report that after extensive, good faith and arms'-length negotiations with certain of the holders of the Existing Notes and the Holder of the LC Facility Claims, the Plan embodies a comprehensive settlement among the Debtors and a majority of their key creditor constituencies on a consensual transaction that will reduce the Debtors' debt service obligations and position the Debtors for continued operations. To evidence their support of the Debtors' restructuring plan, holders of the Existing Notes representing approximately 83.8% of the aggregate outstanding principal amount of the Existing Notes have executed the Restructuring Support Agreement, dated as of October 30, 2023 (as amended and supplemented and in effect from time to time, "RSA"). Further, the Holder of 100% of the LC Facility Claims executed a joinder to the RSA on November 29, 2023. The RSA provides for the implementation of the restructuring through an expedited chapter 11 process and commits the Consenting Creditors and the Debtors to support the Plan subject to the terms and conditions of the RSA. A copy of the RSA and the amendments thereto are attached hereto as **Exhibit B**.

The RSA contemplates that, if the Debtors need to incur post-petition financing, the Consenting Noteholders (as defined in the RSA) will, subject to the terms and conditions set forth in the RSA, engage with the Debtors on providing such financing.

After giving effect to the following transactions contemplated by the RSA and the Plan, the Debtors will emerge from chapter 11 appropriately capitalized to support their emergence and going-forward business needs.

• On the Plan Effective Date, the Reorganized ILAP shall issue to Holders of Senior Debt Claims senior secured notes in the principal amount of $260,000,000 (as further defined in the Plan, the "Take-back SSNs"), which shall have the terms indicated in the form annexed hereto as **Exhibit F**, and as further described in Section VI of this Disclosure Statement. Furthermore, in settlement of disputes and claims, the Holder of the LC Facility Claims have agreed to forfeit their rights to receive Convertible Notes (as defined below) in exchange for the issuance of the Settlement Take-back SSNs in the principal amount of $4,305,966. The obligations under the Take-back SSNs shall be guaranteed by the Reorganized Guarantor Debtors and the New Issuer (as defined below), which will be an entity that, on the Plan Effective Date, will hold all of the Interests in the Reorganized ILAP. The Take-back SSNs shall be secured by substantially all of the assets of the Reorganized Debtors and the New Issuer.

• On the Plan Effective Date, the New Issuer shall issue to Holders of Senior Debt Claims convertible notes in the principal amount of $173,345,973 (as further defined in the Plan, the "Convertible Notes"), which shall have the terms indicated in the form annexed hereto as **Exhibit F**, and as further described in Section VI of this Disclosure Statement. The Convertibles Notes shall be secured by a charge over the equity shares in the New Issuer (the "New Issuer Equity"). Furthermore, as noted, the Holder of the LC Facility Claims have agreed to forfeit their Pro Rata Share of the Convertible Notes (totaling approximately $8.23 million in principal amount of the Convertible Notes) in exchange for the issuance of the Settlement Take-back SSNs.

• On the Plan Effective Date, the Reorganized ILAP shall issue senior secured notes, with super-priority relative to the Take-back SSNs and Convertible Notes, in the principal amount of $14,000,000 (as further defined in the Plan, the "Super Priority Notes"), which shall have the terms indicated in the form annexed

1

hereto as **Exhibit F**, and as further described in <u>Section VI</u> of this Disclosure Statement. The obligations under the Super Priority Notes shall be guaranteed by the Reorganized Guarantor Debtors and the New Issuer, which will be an entity that, on the Plan Effective Date, will hold all of the Interests in the Reorganized ILAP (the "<u>Reorganized ILAP Equity</u>"). The Super Priority Notes shall be secured by substantially all of the assets of the Reorganized Debtors and the New Issuer. The proceeds from the sale of the Super Priority Notes will be used largely to fund costs associated with the Restructuring and to provide working capital to the Reorganized Debtors.

- On the Plan Effective Date, the New Issuer shall issue all of the New Issuer Equity to Latin America Power S.A., a corporation (*sociedad anónima*) formed under the laws of Chile ("<u>LAP Chile</u>"), which is the Holder of substantially all of the Existing ILAP Equity Interest.

- On or prior to the Plan Effective Date, a holding company structured as a Cayman Islands exempted company shall be formed ("<u>New Issuer</u>" and together with the Reorganized Debtors, the "<u>Reorganized Business</u>"). Upon implementation of the Restructuring Transactions, from and after the Plan Effective Date, the New Issuer shall hold all of the Reorganized ILAP Equity.

- On or prior to the Plan Effective Date, ILAP shall reorganize as a Chilean stock corporation (*sociedad por acciones*).

- On or prior to the Plan Effective Date, LAP Chile shall contribute the Purchased PEC 1 Receivables (as defined below) to the Reorganized Business.

- On the Plan Effective Date, the New Issuer, the Reorganized Debtors, the ILAP Partners (as defined below) and the Convertible Notes Indenture Trustee (as defined below) will enter into a Sales Facilitation Agreement (as defined below), pursuant to which the parties thereto will agree to make their best efforts to sell 100% of the Reorganized ILAP Equity by December 31, 2025 in a manner designed to maximize the sales proceeds to all stakeholders.

On the Plan Effective Date:

- Except as otherwise expressly provided in the Plan, each Holder of an Allowed Administrative Claim shall receive payment in full in cash.

- Each Holder of an Allowed Priority Tax Claim shall receive treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code.

- Each Holder of an Allowed Other Secured Claim shall receive, at the Debtors' or Reorganized Debtors' option (as applicable): (a) payment in full in cash; (b) the collateral securing its Allowed Other Secured Claim; (c) Reinstatement of its Allowed Other Secured Claim; or (d) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

- Each Holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code.

- The Senior Debt Claims shall be Allowed in an amount of $433,345,973. On the Plan Effective Date (or as soon as practicable thereafter), each Holder of an Allowed Existing Notes Claim and Allowed LC Facility Claim shall receive their Pro Rata Share of the Take-back SSNs and the Convertible Notes. Furthermore, in settlement of disputes and claims, the Holder of the LC Facility Claims have agreed to forfeit their rights to receive Convertible Notes in exchange for the issuance of the Settlement Take-back SSNs.

- Each Holder of an Allowed General Unsecured Claim shall either be Reinstated or otherwise paid in full in Cash in the ordinary course of business.

- Each Holder of an Existing Guarantor Equity Interest shall have such Interest Reinstated.

2

- LAP Renewables B.V., a Dutch corporation ("LAP BV"), the minority Holder of the Existing ILAP Equity Interest, shall transfer such Interest to LAP Chile; LAP Chile, in turn, will contribute to the New Issuer all Existing ILAP Equity Interest (inclusive of the Interest that LAP BV will transfer to LAP Chile), and LAP Chile shall receive 100% of the New Issuer Equity.

**THE DEBTORS BELIEVE THAT THE COMPROMISE CONTEMPLATED UNDER THE PLAN IS FAIR AND EQUITABLE, WILL MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES AND PROVIDES THE BEST RECOVERY TO HOLDERS OF CLAIMS AND INTERESTS. AT THIS TIME, THE DEBTORS BELIEVE THIS IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THESE CHAPTER 11 CASES. THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.    IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

This Disclosure Statement provides information regarding the Plan. The Debtors believe that the Plan is in the best interests of all creditors and parties in interest, and urge all Holders of Claims and Interests entitled to vote to vote in favor of the Plan.

Unless the context requires otherwise, references to "we," "our," and "us" are to the Debtors. The confirmation of the Plan and effectiveness of the Plan are subject to certain material conditions precedent described herein and in the Plan. There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied will be satisfied (or waived).

You are encouraged to read this Disclosure Statement in its entirety, including without limitation, the Plan, which is annexed as **Exhibit A** hereto, and the Section entitled "*Risk Factors*," before submitting your Ballot to vote on the Plan.

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan, this Disclosure Statement and the Plan Supplement, as applicable, and the summaries of the financial information and the documents annexed to this Disclosure Statement are qualified in their entirety by reference to those documents. The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date. Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and confirmation of, the Plan and may not be relied on for any other purpose. The Debtors believe that the summary of certain provisions of the Plan and certain other documents and financial information contained or referenced in this Disclosure Statement is fair and accurate. The summaries of the financial information and the documents annexed to this Disclosure Statement, including, but not limited to, the Plan are qualified in their entirety by reference to those documents.

This Disclosure Statement has not been approved or disapproved by the SEC or the CMF, or any federal, state, local or foreign regulatory agency, nor has the SEC, the CMF, nor any other such agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement. The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement, but the financial information contained in this Disclosure Statement has not been, and will not be, audited or reviewed by the Debtors' independent auditors unless explicitly stated herein.

Upon the Plan Effective Date, the securities described in this Disclosure Statement—including the Take-back SSNs, the Convertible Notes, the Super Priority Notes (collectively, the Take-back SSNs, the Convertible Notes and the Super Priority Notes, the "New Notes") and the Reorganized ILAP Equity and the New Issuer Equity (collectively, with the Reorganized ILAP Equity, the "New Equity", and the New Equity and New Notes, collectively, the "Plan Securities")—will be issued without registration under the Securities Act, or similar federal, state, local or foreign laws, in reliance on the exemptions provided under section 1145 of the Bankruptcy Code, Section 4(a)(2), Regulation S and Regulation D under the Securities Act, and similar Blue Sky Laws provisions, as applicable, to exempt from registration

3

under the Securities Act and Blue Sky Laws the offer and sale of the securities described in this Disclosure Statement to be issued under the Plan. Such Plan Securities may not be offered or sold except pursuant to a valid exemption or upon registration under the Securities Act. Further, the indentures governing the New Notes shall be exempt from qualification under the Trust Indenture Act of 1939 pursuant to Section 304(b) thereof. See Section XIII of this Disclosure Statement, "*Certain Securities Law Matters*."

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under the federal securities laws. Statements concerning these and other matters are not guarantees of the Debtors' future performance. Such forward-looking statements represent the Debtors' estimates and assumptions only as of the date such statements were made and involve known and unknown risks, uncertainties and other unknown factors that could impact the Debtors' restructuring plans or cause the actual results of the Debtors to be materially different from the historical results or from any future results expressed or implied by such forward-looking statements. In addition to statements which explicitly describe such risks and uncertainties, readers are urged to consider statements labeled with the terms "believes," "belief," "expects," "intends," "anticipates," "plans," or similar terms to be uncertain and forward-looking. There can be no assurance that the restructuring transaction described herein will be consummated. Creditors and other interested parties should see the Section entitled "*Risk Factors*" of this Disclosure Statement for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

## III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A.    What is Chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession".

Consummating a plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

A "prepackaged" plan of reorganization is one in which a debtor seeks approval of a plan of reorganization from affected creditors before filing for bankruptcy. Because solicitation of acceptances begins before the bankruptcy filing, the amount of time required for the bankruptcy case is often less than in non-prepackaged bankruptcy cases. Increased certainty of results and reduced costs are other benefits generally associated with prepackaged bankruptcy cases. We expect the solicitation of votes in the cases to extend beyond the Petition Date, such that the timeline of this prepackaged Plan may extend beyond the timeline of other prepackaged cases, although may still be less than non-prepackaged cases.

### B.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. To perform a prepetition solicitation of the Plan, section 1126(b) of the Bankruptcy Code requires that the Debtors comply with section 1125 of the Bankruptcy Code, which requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding whether to accept or reject the Plan, and otherwise comply with appropriate non-bankruptcy law. This Disclosure Statement is being submitted in accordance with such requirements.

**C.    Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan depends on what type of Claim or Interest you hold. In general, a Holder of a Claim or an Interest may vote to accept or reject a plan of reorganization if (i) no party in interest has objected to such Claim or Interest (or the Claim or Interest has been Allowed subsequent to any objection or estimated for voting purposes), (ii) the Claim or Interest is Impaired by the Plan and (iii) the Holder of such Claim or Interest will receive or retain property under the Plan on account of such Claim or Interest.

Under the Plan, the only class of Claims that meet these requirements is Class 3. A Holder of a Claim in Class 3 is entitled to vote to accept or reject the Plan if such Holder held such Claim as of November 27, 2023 (the "Voting Record Date").

Under the Plan, the only Class of Interests that meet these requirements is Class 6. A Holder of an Interest in Class 6 is entitled to vote to accept or reject the Plan if such Holder held such Interest as of the Voting Record Date. The Holders of Interest in Class 6 are comprised of the Debtors' current equity holders that have signed the RSA and support the Plan. While Class 6 is technically Impaired in order to permit implementation of the Restructuring Transactions, the Holders have taken all necessary actions to accept the Plan.

In general, if a Claim or an Interest is Unimpaired under a plan of reorganization, section 1126(f) of the Bankruptcy Code deems the Holder of such Claim or Interest to have accepted such plan, and thus the Holders of Claims in such Unimpaired Classes are not entitled to vote on such plan. Because the following Classes are Unimpaired under the Plan, the Holders of Claims in these Classes are not entitled to vote:

• Class 1 (Other Secured Claims);

• Class 2 (Other Priority Claims);

• Class 4 (General Unsecured Claims); and

• Class 5 (Existing Guarantor Equity Interests).

In general, if the Holder of an Impaired Claim or Impaired Interest will not receive any distribution under a plan of reorganization in respect of such Claim or Interest, section 1126(g) of the Bankruptcy Code deems the Holder of such Claim or Interest to have rejected such plan, and thus the Holders of Claims in such Classes are not entitled to vote on such plan. The Plan does not provide for such treatment. Accordingly, no Holders of Claims or Interests are conclusively presumed to have rejected the Plan.

A summary of the classes of Claims (each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class") and their respective status and entitlement to vote is set forth below. The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth in the Plan shall apply separately to each of the Debtors. All of the potential Classes for the Debtors are set forth herein and in the Plan. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Section 12.4 of the Plan.

The Claims against and Interests in each Debtor have been assigned to separate numbered classes with respect to each Debtor based on the type of Claim or Interest involved:

| Class | Claim / Interest | Status | Voting Rights |
|-------|------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Deemed to Accept; Not Entitled to Vote. |

| Class | Claim / Interest | Status | Voting Rights |
|-------|------------------|--------|---------------|
| 2 | Other Priority Claims | Unimpaired | Deemed to Accept; Not Entitled to Vote. |
| 3 | Senior Debt Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Unimpaired | Deemed to Accept; Not Entitled to Vote. |
| 5 | Existing Guarantor Equity Interests | Unimpaired | Deemed to Accept; Not Entitled to Vote. |
| 6 | Existing ILAP Equity Interests | Impaired | Entitled to Vote. |

**D.  What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to holders of Claims or Interests under the Prepackaged Plan. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[3]

| Class | Claim / Interest | Treatment | Projected Amount | Projected Recovery |
|-------|------------------|-----------|------------------|--------------------|
| 1 | Other Secured Claims | Each Holder of an Allowed Other Secured Claim shall receive, at the Debtors or Reorganized Debtors' option (as applicable): (a) payment in full in Cash; (b) the collateral securing its Allowed Other Secured Claim; (c) Reinstatement of its Allowed Other Secured Claim; or (d) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. Cash payments to creditors outside of the United States of America may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction. | N/A | 100% |
| 2 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. Cash payments to creditors outside of the United States of America may be made in such funds and | N/A | 100% |

---

[3]    The recoveries set forth below may change based upon changes in the amount of Claims that are Allowed as well as other factors related to the Debtors' business operations and general economic conditions.

| Class | Claim / Interest | Treatment | Projected Amount | Projected Recovery |
|---|---|---|---|---|
| | | by such means as are necessary or customary in a particular foreign jurisdiction. | | |
| 3 | Senior Debt Claims | Each Holder of an Allowed Senior Debt Claim shall receive its Pro Rata Share of each of the Take-back SSNs and the Convertible Notes. | ~$433.3 million | >69% |
| 4 | General Unsecured Claims | Each Holder of an Allowed General Unsecured Claim shall, at the election of the applicable Debtor or Reorganized Debtor, (A) have the legal, equitable and contractual rights of such Holder Reinstated or (B) receive Cash in an amount equal to such Allowed General Unsecured Claims in the ordinary course of business. Cash payments to creditors outside of the United States of America may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction. | ~$14.6 million | 100% |
| 5 | Existing Guarantor Equity Interests | Each Holder of an Allowed Existing Guarantor Equity Interest shall have such Interest Reinstated. | N/A | 100% |
| 6 | Existing ILAP Equity Interests | On the Plan Effective Date: (A) ILAP will be transformed into a Chilean stock corporation (sociedad por acciones) and as a result of such transformation, the Existing ILAP Equity Interest will be represented by shares; (B) the Existing ILAP Equity Interest held by LAP BV, as amended due to the transformation of ILAP, will be transferred to LAP Chile; (C) the Existing ILAP Equity Interest held by LAP Chile, as amended due to the transformation of ILAP (together with the Existing ILAP Equity Interest held by LAP BV that will be transferred to LAP Chile) will be contributed to New Issuer, and LAP Chile will receive all of the New Issuer Equity Interests, and (D) equity in the Reorganized ILAP will be issued to the New Issuer in accordance with Section 4.4(a) and Section 4.4(b) of the Plan. | N/A | 100% of equity in the New Issuer. |

**E.    How do I vote on the plan?**

Only the Holders of Claims in Class 3 and Holders of Interests in Class 6 are entitled to vote to accept or reject the Plan.

Holders of LC Facility Claims and Holders of Interests in Class 6 may vote on the Plan by completing and signing an enclosed Ballot and returning it to the Balloting Agent on or before the Voting Deadline—i.e., December 28, 2023, at 5:00 p.m., prevailing Eastern Time—by returning a hard copy Ballot, using the return envelope provided, or to the address listed on the Ballot, or, alternatively, by sending an electronic copy of the ballot to the e-mail address provided in the Ballot.

Importantly, for Holders of Existing Notes Claims, for your vote to be counted, the Master Ballot containing your vote and returned by your Nominee (as defined below), or the "pre-validated" ballot provided by your Nominee for direct return by you must be properly completed, executed, and delivered as directed, so that the Master Ballot case on your behalf or pre-validated ballot containing your vote is actually received by the Balloting Agent on or before the Voting Deadline, i.e. December 28, 2023, at 5:00 p.m., prevailing Eastern Time.

Furthermore, Holders of Existing Notes Claims and Senior Debt Claims shall be asked to certify whether they are a Qualified Holder or a Non-Qualified Holder (each, as defined below). If a Holder of an Existing Note Claim or LC Facility Claim is a Non-Qualified Holder, then any vote cast by such Holder shall be listed on the Irregular Ballot report and its vote not counted (unless otherwise determined by the Bankruptcy Court).

Detailed instructions regarding how to vote on the Plan are contained in the Ballots distributed to Holders of Claims and Interests that are entitled to vote on the Plan. See Section XV of this Disclosure Statement, "*Solicitation and Voting Procedures*" which begins on page 105 for more information.

**F.   What is deadline to vote on the Plan?**

5:00 p.m. (prevailing Eastern Time) on December 28, 2023.

**G.   Is there anything else that I will need to do to receive the Take-back SSNs and Convertible Notes?**

Yes. In order for a Holder of a Senior Debt Claim to receive a distribution under the Plan, such Holder will be required to certify whether it is or is not a Qualified Holder by no later than 180 days after the Plan Effective Date. See Section VII.G.iv of this Disclosure Statement ("Summary of the Plan – Provisions Governing Distributions – Distribution of Take-back SSNs and Convertible Notes to Holders of Senior Debt Claims,") which begins on page 45. **Failure to submit the certification and any other documents required in the Plan to be delivered on or before 180 days after the Plan Effective Date will result in such Holder forfeiting its right to receive any distribution under the Plan**. In addition, such Holders will need to provide certain delivery details and take certain steps to receive any Take-back SSNs and Convertible Notes to which the Holder may be entitled.

**H.   What happens to my recovery if the Plan is not confirmed, or does not go effective?**

In the event that the Plan is not confirmed, there is no assurance that the Debtors will be able to reorganize their businesses. It is possible that any alternative may provide Holders of Claims with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended chapter 11 proceeding, or of a liquidation scenario under U.S. or Chilean law, see "*Confirmation of the Plan – Best Interests of Creditors/Liquidation Analysis*" beginning on page 87 and the Liquidation Analysis attached as **Exhibit C** to this Disclosure Statement.

**I.   Are any regulatory approvals required to consummate the Plan?**

No regulatory approvals are required to consummate the Plan.

**J.   If the Plan provides that I am entitled to a distribution, do I receive it upon Confirmation or when the Plan goes effective, and what do you mean when you refer to "Confirmation," "Plan Effective Date" and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can be consummated and go effective.

Initial distributions to Holders of Allowed Claims will only be made on the Plan Effective Date or as soon as practicable thereafter. See Section XI of this Disclosure Statement, "*Confirmation of the Plan,*" which begins on page 87, for a discussion of the conditions to Consummation of the Plan.

Upon Consummation of the Plan, the Take-back SSNs and Convertible Notes will be issued only to Holders of Allowed Senior Debt Claims that are Qualified Holders that submitted the required information prior to the Plan Effective Date. After the Plan Effective Date, the Take-back SSNs and Convertible Notes will be issued to Holders of Allowed Senior Debt Claims that are Qualified Holders who submit the required information on or before 180 days after the Plan Effective Date. Further, if there are 35 or fewer Non-Qualified Holders that hold Allowed Senior Debt Claims, which amount will be determined on or about the 180th day after the Plan Effective Date, the Take-back SSNs and Convertible Notes will be issued to such Non-Qualified Holders. In all such cases, the New Notes will be issued to Qualified Holders without registration under the Securities Act, or similar federal, state, local or foreign laws, in reliance on the exemptions provided under Section 4(a)(2), Regulation S and Regulation D of the Securities Act, as applicable. These securities may not be offered or sold except pursuant to a valid exemption or upon registration under the Securities Act. Further, the indentures governing the New Notes shall be exempt from qualification under the Trust Indenture Act of 1939 pursuant to Section 304(b) thereof.

If there are more than 35 Non-Qualified Holders that hold Allowed Senior Debt Claims, the Plan provides for such Holders to receive Substitute Consideration (as defined below). See Section VII.E.v of this Disclosure Statement ("*Summary of the Plan – Means for Implementation of the Plan – The New Notes & Substitute Consideration*") which begins on page 36.

**K.    Will the Reorganized Debtors be obligated to continue to pay statutory fees as part of the bankruptcy process after the Plan Effective Date?**

Yes. The Debtors or Reorganized Debtor (as applicable) will be required to pay in Cash any fees due and owing to the U.S. Trustee at the time of Confirmation on the Plan Effective Date. Additionally, on and after the Confirmation Date, the Reorganized Debtors must pay all statutory fees due and payable under 28 U.S.C. § 1930(a)(6) until the entry of a final decree, dismissal or conversion of the cases to chapter 7 of the Bankruptcy Code.

The Reorganized Debtors will also be required to comply with reporting requirements, such as filing with the Bankruptcy Court quarterly post-Confirmation reports until the entry of a final decree, dismissal or conversion of the cases to chapter 7 of the Bankruptcy Code.

**L.    When will the Plan Supplement be filed and what will it include?**

The Plan Supplement will be filed with the Bankruptcy Court no later than five (5) business days before the date first scheduled for the Confirmation Hearing, or such later date as may be approved by the Bankruptcy Court, on notice to parties in interest that have filed appearances in the case, and additional documents will be filed with the Bankruptcy Court before the Plan Effective Date as supplements or amendments to the Plan Supplement, all such documents being in form and substance satisfactory to the Required Consenting Creditors in accordance with the terms of the Plan and the RSA, including the following: (i) the New Corporate Governance Documents; (ii) the New Notes; (ii) the Super Priority/Take-back SSN Indenture; (iv) Convertible Notes Indenture; (v) the Rejection Schedule, if any; (vi) the list of directors and officers of New Issuer and the Reorganized Debtors; (vii) the Super Priority Notes Commitment Agreement; (viii) Sales Facilitation Agreement; and (ix) the Distribution Form.

The detailed terms of the documents to be contained in the Plan Supplement have yet to be finalized and will continue to be negotiated by the Debtors. When filed with the Bankruptcy Court, the Plan Supplement will be available in both electronic and hard copy form, although the Debtors will not serve paper or compact disk read-only memory ("CD-ROM") copies.

The Debtors will not serve copies of the Plan Supplement to parties who have not filed appearances in the bankruptcy cases; however, parties may obtain a copy of the Plan Supplement from Epiq by: (i) visiting the Debtors' restructuring website, https://dm.epiq11.com/ILAP; (ii) emailing ILAP@epiqglobal.com; and/or (iii) writing to ILAP Ballot Processing, c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Boulevard, Beaverton, OR 97005.

**M.  What are the Debtors' Intercompany Claims and Interests?**

In the ordinary course of business and as a result of their corporate structure, ILAP holds substantially all of the equity interests in the Guarantor Debtors—with the remaining equity in the Guarantor Debtors held by LAP Chile, an Affiliate of ILAP—and the Debtors maintain business relationships with each other, resulting in intercompany Claims and Interests.

The intercompany Claims reflect costs and revenues, which are allocated among the appropriate Debtor entities, resulting in intercompany Claims. Further, the intercompany Claims include Claims arising from intercompany receivables by and between certain Debtors.

**N.  How will Claims asserted with respect to rejection damages affect my recovery under the Plan?**

Because the Plan provides for payment in full to the Holders of General Unsecured Claims, the allowance of Claims arising from the Debtors' rejection of Executory Contracts and Unexpired Leases will not impact the recoveries to Holders of any Claims in any Class.

**O.  Is there anything else that I will need to do to receive a recovery with respect to rejection damages?**

Yes. In the event that your contract or lease is rejected results in damages, you need to file a Proof of Claim with the Balloting Agent and serve a copy of the Proof of Claim on Reorganized Debtors' counsel no later than thirty (30) days after the Plan Effective Date. **If you fail to timely file a Proof of Claim, then a Claim for rejection damages shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors or their respective properties or interests in property.**

**P.  Will there be releases granted to parties in interest as part of the Plan?**

The Plan proposes to release: (i) the Debtors; (ii) the Reorganized Debtors; (iii) the New Issuer; (iv) ILAP Partners; (v) ILAP Sponsors; (vi) the Existing Indenture Trustee; (vii) the LC Facility Agent; (viii) each Consenting Creditor that voted to accept the Plan; (ix) each Super Priority Notes Financing Party; (x) each current and former Affiliate of each Entity in clauses (i) through (ix); and (xi) each Related Party of each Entity in clause (i) through (x).

PURSUANT TO THE PLAN, IF YOU RETURN A BALLOT THAT VOTES TO ACCEPT THE PLAN FOR ANY CLASS FOR WHICH YOU ARE ELIGIBLE TO VOTE, YOU WILL BE DEEMED, AS OF THE PLAN EFFECTIVE DATE, TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER RELEASED AND DISCHARGED ALL CLAIMS AND ALL CAUSES OF ACTION (AS SET FORTH IN THE PLAN) AGAINST THE RELEASED PARTIES (AS DEFINED IN THE PLAN).

IF YOU RETURN A BALLOT IN RESPECT OF ANY CLASS FOR WHICH YOU ARE ELIGIBLE TO VOTE THAT VOTES TO REJECT OR ABSTAINS FROM VOTING ON THE PLAN AND, IN EITHER CASE, YOU AFFIRMATIVELY OPT IN TO THE RELEASE PROVISIONS IN ARTICLE VIII OF THE PLAN, YOU WILL BE DEEMED, AS OF THE PLAN EFFECTIVE DATE, TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER RELEASED AND DISCHARGED ALL CLAIMS AND ALL CAUSES OF ACTION (AS SET FORTH IN THE PLAN) AGAINST THE RELEASED PARTIES (AS DEFINED IN THE PLAN).

For more detail see Section VII.J of this Disclosure Statement ("*Summary of the Plan – Effect of Confirmation of the Plan*") which begins on page 55.

**Q.  What is a Confirmation Hearing and will the Bankruptcy Court hold a Confirmation Hearing?**

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization. If the Debtors file the Chapter 11 Cases, they will file a motion with the Bankruptcy Court on the Petition Date requesting that the Bankruptcy Court set a date and time approximately 35 days after the

Petition Date for the Confirmation Hearing in the Bankruptcy Court. The Debtors also will request that the Bankruptcy Court approve this Disclosure Statement at the Confirmation Hearing.

The Confirmation Hearing, once set, may be continued from time to time, subject to the terms of the RSA, without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on those parties who have requested notice under Bankruptcy Rule 2002 and the Entities who have filed an objection to the Plan, if any, without further notice to parties in interest. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. Subject to section 1127 of the Bankruptcy Code and the RSA, the Plan may be modified, if necessary, prior to, during or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation. The Debtors, in the same motion requesting a date for the Confirmation Hearing, will request that the Bankruptcy Court set a date and time for parties in interest to file Plan objections. All objections to the Plan must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that they are received on or before the deadline to file such objections.

**R.   What is the effect of the Plan on the Debtors' ongoing businesses?**

The Debtors are reorganizing pursuant to chapter 11 of the Bankruptcy Code. As a result, if the Debtors obtain Confirmation of the Plan and the Plan Effective Date occurs, the Debtors will not be liquidated or forced to go out of business. The Reorganized Debtors will continue to operate their businesses going forward using cash from operations as well as cash from the sale of the Super Priority Notes.

**S.   Do the Debtors recommend voting in favor of the Plan?**

Yes. The Debtors believe the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative. The Plan embodies a settlement among the Debtors and their key creditor constituencies on a consensual transaction that will reduce the Debtors' debt service obligations and position the Debtors for continued operations. Therefore, the Debtors believe the Plan is in the best interest of all creditors.

**IV.   THE DEBTORS' CORPORATE HISTORY, STRUCTURE AND BUSINESS OVERVIEW**

**A.   The Debtors' Prepetition Organizational Chart**

The Debtors' organizational chart is set forth below:



### B.    Summary of the Debtors' Businesses and History

i.    *__Summary of Operations__*

The Company is a clean energy company that owns and operates wind generation plants with an aggregate installed capacity of 239.2 megawatts (MW) and is engaged in the generation of electricity business in northern Chile.

ILAP is a limited liability company (*sociedad de responsabilidad limitada*) formed under the laws of Chile, and is 99.999991% owned by LAP Chile and 0.000009% by LAP BV (together with LAP Chile, the "ILAP Partners"), a Dutch corporation. LAP BV, in turn, owns all but one share of LAP Chile, and Latin America Power Panamá S.A. owns the remaining share.

San Juan and Norvind are each corporations (*sociedades anónimas*) organized and existing under the laws of Chile. ILAP owns all but one share in San Juan and all but one share in Norvind; LAP Chile owns the remaining share in each of San Juan and Norvind.

As of the date hereof, the Debtors own and operate two wind farm projects: (1) a 193.2 MW facility located in Freirina, Vallenar in the region of Atacama (the "San Juan Project"), currently the second largest wind farm project by capacity in Chile, and (2) a 46.0 MW facility located in Canela, in the region of Coquimbo (the "Totoral Project" and together with the San Juan Project, the "Projects"). The San Juan Project has been fully operational since March 2017 and the Totoral Project has been fully operational since January 2010. Both wind projects are located in areas characterized for their strong and highly predictable wind resource.

The Company sells the electric power generated by its wind farm projects into the SEN (*Sistema Eléctrico Nacional*), the national electric system of transmission that provides electricity to almost the entire country. The SEN was created in 2017 after the interconnection of the two largest existing systems in the country, the SIC (*Sistema Interconectado Central*) and the SING (*Sistema Interconectado del Norte Grande*). The National Electrical Coordinator coordinates the operation of the SEN, the SIC and the SING.

The Company's main customers are distribution companies ("DisCos") and other large, experienced companies in varied industrial sectors through long-term power purchase agreements ("PPAs"), which provide a recurring source of cash flow.

For the nine-month period ending September 30, 2023, the Company's total net generation was 405.8 GWh. For each of the years ended December 31, 2022 and 2021, the Company's aggregate net generation was 529.5 GWh and 591.5 GWh, respectively, with an aggregate availability factor of 97% and 97% and an aggregate capacity factor of 25% and 28%, respectively.

For the nine-month period September 30, 2023, the Company's revenue totaled approximately $60.3 million, and with respect to each of the fiscal years ended December 31, 2022 and 2021, our revenue totaled approximately $76.9 million and $68.3 million, respectively.

The Company's principal executive offices and corporate headquarters are located at Cerro El Plomo 5680, Oficina 1202, Las Condes, Santiago, Chile.

ii.    *__The Projects__*

*San Juan Project*

The San Juan Project is a 193.2 MW wind farm facility located in Freirina, Vallenar, Region of Atacama, Chile (approximately 650 km north of Santiago). The asset is comprised of 56 Vestas V117-3.45 MW wind turbines, making it the second largest independent wind farm in Chile by capacity. The San Juan Project began partial operations in July 2016 and achieved full commercial operation in March 2017.

The San Juan Project was built by Elecnor, a leading global EPC and renewable energy investor, and employs wind turbines supplied by Vestas, one of the world's most experienced wind turbine manufacturer.

San Juan, as the legal owner of the San Juan Project, is party to 72 long-term PPAs with diversified group of distribution companies. These PPAs consist of U.S. Dollar denominated 15-year "take-and-pay" agreements, and were entered into after the tender process known as "2013-3 Second Call Auction/Tender Process" administered by the National Energy Commission (*Comisión Nacional de Energía*) ("CNE") that was held in December 2014.

In 2016, San Juan also entered into an additional offtake agreement with Metro S.A. (Empresa de Transporte de Pasajeros Metro S.A., the operator of Santiago's subway system), a government-controlled entity rated by Moody's. Under that agreement, San Juan has contractually committed to supply up to 60% of Metro's hourly consumption that is not supplied by solar power suppliers.

In addition, San Juan has a PPA entered into in 2017 with Enel Distribución Chile S.A. ("Enel Distribución"), pursuant to which San Juan provides an annual average contracted energy of 180 GWh (with a "take-or-pay" of 70%, 126 GWh) through December 31, 2023. Effective January 1, 2021, Enel Distribución assigned the PPA to Enel Generación S.A. ("Enel Generación") as a result of regulatory changes introduced to the Chilean General Law of Electrical Services (*Ley General de Servicios Eléctricos*, or D.F.L. No. 4/2006 of the Chilean Ministry of Economy, as amended from time to time, the "Electricity Law") that prevented distribution companies to dedicate to business other than the supply of electricity to regulated customers. Enel Generación is the largest power company in Chile, also controlled by Enel Chile S.A.

The San Juan Project provides annual average contracted energy of 264.8 GWh with respect to the PPAs with distribution companies, 55 GWh with respect to the PPA with Metro and 176.8 GWh with respect to the PPA with Enel Generación, at average PPA prices of $101.27/MWh, $108.86/MWh, and $50.39/MWh respectively.

Additionally, San Juan has four (4) bilateral PPAs with customers to supply an average of 170 GWh expiring between 2023 and 2025.

***Totoral Project***

The Totoral Project is a 46.0 MW wind farm facility located in Canela, Region of Coquimbo, Chile (approximately 300 km north of Santiago). The asset is comprised of 23 Vestas V90-2.0 MW wind turbines and began commercial operations in January 2010. The Totoral Project was built by SKANSKA, a world-leading project development and construction group, and with wind turbines supplied by Vestas.

Norvind, as the legal owner of the Totoral Project, was also awarded long-term U.S. Dollar denominated PPAs as a result of "2013-3 Second Call Auction/Tender Process" in December 2014. Norvind has 24 PPAs with 24 distribution companies that began in January 2019 and will continue through December 2033. Under these agreements, the Totoral Project will sell an annual average of 31 GWh of contracted energy at an average PPA price of $111.88/MWh.

Additionally, Norvind has thirteen (13) bilateral PPAs with customers to supply an average of 7.9 GWh expiring between 2023 and 2025. The unregulated customers range from large retail stores to universities and agro-industrial facilities.

iii.     ***PPAs; and Sales and Purchases in the Spot Market***

***PPAs***

The Company earns contracted revenues from its PPAs with contracted customers (i.e., customers subject to a PPA), consisting of DisCos, unregulated customers and certain power companies. The Company sells any excess power in the spot market.

As of the date hereof, San Juan and Norvind are party to 113 PPAs with 41 separate counterparties: San Juan is party to 72 PPAs with DisCos and four (4) with unregulated customers, and Norvind is party to 24 PPAs with DisCos and thirteen (13) with unregulated customers. Our PPAs, in aggregate, have a weighted average term of 7.9 years.

13

For the fiscal year 2023, the Company estimates that 652 GW/h of its total generation capacity (at P50) will be contracted, representing 103% of the estimated total generation for the period. During the nine months ended September 30, 2023 the Company sold 512.3 GW/h to contracted customers, and during the years ended December 31, 2022 and 2021, the Company sold 606.4 GW/h and 615.5 GW/h to contracted customers, respectively.

These PPAs generally consist of U.S. Dollar denominated 15-year "take-and-pay" agreements, and were entered into after the tender process known as "2013-3 Second Call Auction/Tender Process" administered by the CNE, held in December 2014. During that process, San Juan was awarded Blocks 2-A, 2-C and 3, and Norvind was awarded Block 4, with end dates between December 31, 2031 and December 31, 2033. As a result, the Company currently has in place favorable long-term contracts with a diversified group of DisCos.

During the nine months ended September 30, 2023, approximately 95% of the Company's total revenues corresponded to energy sold pursuant to its PPAs, and during the years ended December 31, 2022 and 2021, the energy sold pursuant to its PPAs represented 92% and 91% of the Company's total revenues, respectively.[4]

***Spot Market (Wholesale)***

Chile has a highly-regulated spot merchant market run by National Electrical Coordinator, the system operator, which coordinates the dispatch of generation assets in the marketplace. All generators provide their variable operational cost parameters to the National Electrical Coordinator which, in turn, optimally dispatches the market, thereby minimizing total costs to the system. Because generators provide their full cost structure to National Electrical Coordinator, there is no "bidding" process.

Generators, such as the Guarantor Debtors, buy and sell energy from other generators in the real-time spot market. The market clearing price at each pricing node is called the Short Run Marginal Cost or spot price, and it is the marginal cost of the last generator required to balance supply and demand, taking into account transmission constraints and losses. Neither DisCos nor large consumers are allowed to buy and sell energy on the spot market; only generators are allowed to trade in the spot market.

Generators receive merchant spot market revenue as a result of the net value of energy injected (supplied) into the system less the energy withdrawn (taken) from the system. The National Electrical Coordinator is responsible for conducting balancing analyses and overseeing the billing/payments on a monthly basis in order to ensure that generators receive the appropriate revenue for the supply they sell.

During the nine months ended September 30, 2023, approximately 5% of the Company's total revenues corresponded to energy sold in the spot market, and during the years ended December 31, 2022 and 2021, the energy sold to the spot market represented 8% and 9% of the Company's total revenues, respectively.

During the nine months ended September 30, 2023, the energy purchased in the spot market represented approximately 53% of the Company's total expenses, and during the years ended December 31, 2022 and 2021, represented 50% and 49% of the Company's total expenses, respectively.

iv.   ***PEC Receivables***

***Tariff Stabilization Law and PEC 1***

On November 2, 2019, Chile enacted the Tariff Stabilization Law (Chilean Law No. 21,185, together with subsequent resolutions No. 72, 114 and 240 of 2020, issued by the CNE, the "Tariff Stabilization Law") which established the tariff stabilization mechanism for energy and power prices that regulated customers pay to distribution companies by bringing forward the projected reduction in supply prices for the following years, meant to occur by the

---

[4]   The foregoing revenues *includes* the PEC 1 Receivables due from PPA counterparties and the PEC 2 Receivables, each as further discussed below.

replacement of old (and more expensive) contracts by new (and cheaper) contracts that reflect the latest bids for the CNE tenders of electricity (the "Tariff Stabilization Mechanism").

The main purposes of the Tariff Stabilization Law are (i) to unwind the 9.2% electricity tariff increase which came into effect on October 10, 2019 and (ii) to avoid future increases on tariffs that regulated customers pay to distribution companies, temporarily stabilizing tariffs between July 1, 2019, and December 31, 2020, at the rates in effect on June 30, 2019. Tariffs applicable as of June 30, 2019, are known as the regulated customer stabilized price (*precio estabilizado a cliente regulado*), or "PEC".

In addition, the Tariff Stabilization Mechanism provides that the PEC may be adjusted only for inflation by the Chilean CPI (*Indice de Precios al Consumidor*) from January 1, 2021 to December 31, 2024. The PEC so adjusted for inflation, is known as the "Adjusted PEC." The cost of the Tariff Stabilization Mechanism will be borne by the generation companies because distribution companies will pay the prices established by the rules issued by the CNE and not those prices previously agreed with the generation companies in PPAs currently in effect. Other contractual indexations such as U.S. CPI, exchange rate differences or fuel price changes are not considered in PEC adjustments.

As a result of the Tariff Stabilization Law, DisCos have paid their suppliers the lower of (a) the PNLPs[5] (i.e., the average PPAs prices over a tariff period), or (b) the PECs or Adjusted PECs set out in each tariff decree. If, as a result of the Tariff Stabilization Mechanism, the PEC or Adjusted PEC applicable during a tariff period is lower than the PNLP that would otherwise have applied during that tariff period by a distribution company to a generation company under a PPA were the Tariff Stabilization Mechanism would not be in effect, the difference between that PEC or Adjusted PEC and that PNLP will constitute an unpaid balance (*saldo*), and the Ministry of Energy of Chile will be required to recognize it in the subsequent tariff decrees as a receivable, creating a PEC Receivable payable by that distribution company to that generation company. The Tariff Stabilization Mechanism will be in effect from July 1, 2019, until the earlier of (a) December 31, 2027, and (b) the date on which the PEC Receivables have been paid in full.

### *PEC 1 Receivables due from PPA Counterparties*

Generation companies, such as the Guarantor Debtors, must record monthly a difference between "original" indexed prices under the PPAs with distribution companies and the stabilized prices. Receivables become irrevocable obligations of the distribution companies when they are recognized by the Ministry of Energy of Chile in a tariff decree, and they are required under the Tariff Stabilization Law to be paid in full by December 31, 2027 ("PEC 1 Receivables").

The Company estimates that as of December 31, 2023, distribution companies will owe the Company approximately $16.5 million in PEC 1 Receivables pursuant to the Tariff Stabilization Law.

### *PEC 1 Receivables Sale Transaction*

On or about August 28, 2023, the Guarantor Debtors entered into the *Cesión de Saldos* agreement with LAP Chile, pursuant to which the Guarantor Debtors assigned to LAP Chile PEC 1 Receivables (i.e., accounts receivables) with a face value of approximately $10,000,000 for $7,000,000 (the "PEC 1 Receivables Sale Transaction" and the assigned PEC 1 Receivables, the "Purchased PEC 1 Receivables").

The proceeds of the PEC 1 Receivables Sale Transaction were used to pay outstanding accounts payable, insurance premiums, and fees incurred in connection with the transaction.

---

[5]    "PNLPs" means the purchase prices for electricity (*precios de nudo de largo plazo*) payable by the DisCos to electricity generation companies under a PPA awarded pursuant to a public tender (together with any adjustments).

***Consumer Protection Mechanism MPC Law and PEC 2***

On August 2, 2022, Chile enacted the Consumer Protection Mechanism MPC Law (the "MPC Law"), which, together with the MPC Resolution (*Resolución Exenta No. 86*) issued on March, 2023 by the CNE, regulates a newly-created Tariff Stabilization Fund.

The MPC Law complements the Tariff Stabilization Mechanism set forth under the Tariff Stabilization Law because the aggregate amount of PEC 1 Receivables (or *Saldos*) reached the legal limit established by the Tariff Stabilization Law ($1,350 million) in March 2022. As a result, the Government of Chile, decided to implement a new mechanism to avoid an increase in energy tariffs affecting final consumers where the difference between the PPA prices charged by generator companies for sales of energy and the tariff amounts charged to consumers by distribution companies will originate a negotiable instrument ("PEC 2 Receivables") for the benefit of the generator companies issued by the Chilean Ministry of Finance, hence, guaranteed by the full faith and credit of the Republic of Chile.

The aggregate amount of PEC 2 Receivables that can be issued against the Tariff Stabilization Fund created by the MPC Law is $1,800 million, which includes the excess of $410 million in Saldos accounted under the Tariff Stabilization Law after its limit was reached in March 2022.

PEC 2 Receivables will be payable over time as determined by the regulators and the Chilean Ministry of Finance in accordance with the levels forecasted for the Tariff Stabilization Fund vis-à-vis the tariffs charged to consumers by distribution companies, but in any event no later than December 31, 2032. Pursuant to the MPC Law, the regulators must coordinate the payments made under the PEC 1 and PEC 2 regimes to ensure compliance with the Tariff Stabilization Fund limits.

PEC 2 Receivables have been, and in the future will be, issued as a "dematerialized" instrument that will allow generator companies to freely transfer or assign them for value. The Company estimates that as of December 31, 2023, the Company will be owed approximately $18.9 million in PEC 2 Receivables under the MPC Law.  PEC 2 Receivables are expected to be collected starting in January 2025 and, consequently, are classified as non-current assets.

As a result of the enactment and application of the MPC Law to Chilean generator companies, San Juan and Norvind have or will become the legal and beneficial owner of certain PEC 2 Receivables. Pursuant to the MPC Law and other applicable laws of Chile, the sale of such PEC 2 Receivables is permitted. Chilean generator companies have sold all their PEC 2 Receivables on August 14, 2023, to the Inter-American Investment Corporation ("IDB Invest") as purchaser, as a "true sale" for all legal, accounting, tax and commercial purposes. In turn, IDB Invest used such PEC 2 Receivables as collateral for the issuance of securities offered to investors on August 30, 2023, in the international markets in reliance of Rule 144A and Regulation S under the Securities Act.

Following the Plan Effective Date, it is expected that San Juan and Norvind will sell from time to time the PEC 2 Receivables they receive to IDB Invest by selling them first to LAP Chile, the current majority owner of ILAP (and following the Plan Effective Date, the owner of New Issuer, which, in turn will be the sole owner of Reorganized ILAP), and concurrently or simultaneously with such sale, LAP Chile will enter into a purchase and sale agreement with IDB Invest as part of its program with all Chilean generator companies.

v.      ***Operations and Maintenance***

Under the Service and Availability Agreement between San Juan and Vestas Chile Turbinas Eólicas Limitada ("Vestas") dated March 25, 2015, as amended on December 14, 2016, and January 29, 2021 (the "San Juan O&M Agreement") and the Service and Availability Agreement between Norvind and Vestas dated April 1, 2013, as amended on December 14, 2016 (the "Totoral O&M Agreement," and together with the San Juan O&M Agreement, the "O&M Agreements"), Vestas is responsible for the operation and maintenance of the San Juan Project and Totoral Project.

16

The terms of the O&M Agreements with Vestas guarantee generation availability of 98% per turbine with respect to the San Juan Project and 97% per turbine with respect to the Totoral Projects. As of the date hereof, availability per turbine has remained at or above the guaranteed level in both Projects.

The O&M Agreements ensure the full productivity and long-term performance of the wind turbines. The operations and maintenance strategy for the Projects is built around original equipment manufacturer maintenance solutions. The O&M Agreements cover substantially all of the operation and maintenance costs, subject to certain exceptions, and effectively transfers the maintenance cost risk to Vestas, who has a long-standing history and experience with operating and maintaining wind turbines and is well positioned to manage the responsibilities thereof effectively. Under the O&M Agreements, Vestas will also provide repairs and replace parts of the turbines in the event of failures, thus ensuring the full productivity and long-term functionality of the wind turbines that comprise the Projects.

In addition, Vestas offers a life extension program as part of their operation and maintenance services. Vestas offers this service, typically on or around the 15th to the 20th year of operation mark, subject to detailed inspections, assessments and testings of certain key components.

Further to the services provided under the O&M Agreements, the Company has instituted independent site maintenance and management personnel with a 24/7 control room. The control room is located at the Company's headquarters in Santiago, Chile, thus enabling highly qualified engineers and technicians to proactively troubleshoot challenges that may arise by providing real time oversight, supervision and monitoring capabilities for all generating units at both Projects.

The operation and maintenance of other assets, excluding the wind turbines and towers, has been outsourced to local contractors who are used to support lower risk items, including building maintenance, estate management, and substation maintenance.

vi.    ***Interconnection and Interconnection Maintenance Agreements***

Geographically, Chile is a long, thin country that extends 4,270 km (approximately 2,653 miles) from north to south, making it relatively expensive to connect the majority of the country. The transmission system in Chile is a key factor impacting the long-term locational marginal price forecast in the SEN.

The San Juan Project is connected to the grid at the Punta Colorada substation via an 85 km transmission line at 220 kV. The Totoral Project also sells power into the SEN, and is connected to the grid at the Las Palmas substation via a 7 km transmission line at 220 kV. The Punta Colorada and Las Palmas substations are owned by Transelec S.A. ("Transelec"). In connection with the foregoing, the San Juan and Totoral Projects have entered into agreements with Transelec for the interconnection of the Projects.

vii.    ***Employees***

As of the date of hereof, none of ILAP, San Juan nor Norvind have employees, and the operation of the energy generating plants is handled by third party contractors. Likewise, labor and bookkeeping aspects are covered under the Services Agreements (defined below) with LAP Chile, pursuant to which San Juan and Norvind pay LAP Chile a monthly fee.

viii.    ***Related Party Transactions***

In the ordinary course of business, the Company engages in a variety of transactions with certain of its affiliates, primarily for the purchase, at fair market prices negotiated on an arm's-length basis, of goods or services that may also be provided by other suppliers.

LAP Chile is party to the following contracts with the Guarantor Debtors (collectively, the "Services Agreements"): (i) that certain Agreement for the Provision of Services dated April 29, 2015, as amended on October 4, 2016 with San Juan and (ii) that certain Intercompany Services Agreement dated as of September 6, 2016. Pursuant

to the Services Agreements, LAP Chile provides services in the following areas: legal, human resources, internal control, finance and budgets, purchasing and supplying, accounting, computer and information technology, marketing, and project evaluation for a monthly fee of approximately $170,000.

In addition, on or about August 28, 2023, LAP Chile purchased from the Guarantor Debtors the Purchased PEC 1 Receivables for $7,000,000. The proceeds of the PEC 1 Receivables Sale Transaction were used to pay outstanding accounts payable, insurance premiums, and fees incurred in connection with the transaction. If the Plan is confirmed, LAP Chile will contribute the Purchased PEC 1 Receivables to the Reorganized Business on or before the Plan Effective Date.

### C.   Overview of the Company's Prepetition Capital Structure

i.   *__Secured Obligations__*

**5.125% Senior Secured Notes due 2033 (the Existing Notes)**

On June 15, 2021, ILAP issued $403,900,000 aggregate principal amount of its Existing Notes pursuant to an indenture dated as of such date (as amended and supplemented and in effect from time to time, the "Existing Indenture") among ILAP, as issuer, San Juan and Norvind, each as guarantors, and Citibank, N.A., as Trustee, Offshore Collateral Agent, Registrar, Transfer Agent and Paying Agent. (As discussed below, Citibank, N.A. subsequently resigned from all such positions.)

Under the terms of the Existing Indenture, ILAP is required to pay fixed-rate interest at a rate of 5.125% per annum, payable semi-annual in arrears, on January 3 and July 3 of each year. In addition, the Existing Indenture provides for an amortization of principal also to be paid on January 3 and July 3 of each year. Finally, to the extent there is Available Cash (as defined in the Existing Indenture), ILAP is required to redeem the Existing Notes equal to 100% of the outstanding principal amount of the Existing Notes being redeemed based on a Target Debt Balance (as defined in the Existing Indenture), without premium.

The Existing Notes are guaranteed by San Juan and Norvind, and are secured by substantially all of the assets of the Debtors. The Existing Notes are listed on the Singapore Exchange.

As of November 29, 2023, the aggregate outstanding principal amount of the Existing Notes was $391,230,000, which does not include unliquidated amounts including interest, fees, expenses, charges and other obligations, if applicable.

**LC Facility Agreement**

The Company is party to the LC Facility Agreement, dated as of June 15, 2021, in the principal amount not to exceed $21,000,000. The LC Facility Agreement was entered into in connection with the Company's issuance of the Existing Notes and entry into Existing Indenture, for the purpose of the lenders under the LC Facility Agreement to issue one or more standby letters of credit to fund the Debt Service Reserve Account and O&M Reserve Account (each, as defined in the Security Agreement (as defined below)) to support payment of the Existing Notes. Given the issuance as part of the payment mechanisms of the Existing Notes, the obligations under the LC Facility Agreement are guaranteed by San Juan and Norvind, and are secured by substantially all of the assets of the Debtors, the liens over which are *pari passu* with those of the Existing Notes.

As of November 29, 2023, the aggregate outstanding principal amount under the LC Facility Agreement was $17,500,000, which does not include unliquidated amounts including interest, fees, expenses, charges and other obligations, if applicable.

**Security Agreement**

In connection with the Existing Indenture and LC Facility Agreement, the Company is party to that certain Security and Depositary Agreement, dated as of June 15, 2021 (as amended and supplemented and in effect from time

to time, the "Security Agreement"), between and among, the Debtors, Citibank, N.A., as the Trustee under the Existing Indenture, the LC Agent, and the Offshore Collateral Agent, Offshore Depository Bank and Intercreditor Agent under the Security Agreement, and Banco de Chile, as the Onshore Collateral Agent and Onshore Depository Bank.[6]

Pursuant to the Security Agreement, the Company pledged substantially all of its assets as security for the obligations under the Existing Indenture and LC Facility Agreement. Furthermore, the Security Agreement provides that the obligations under the LC Facility Agreement rank *pari passu* with the Existing Notes. Each of the secured parties to the Security Agreement agreed that, with limited exceptions not applicable, all of the collateral was for the joint benefit for all secured parties. In addition, the Security Agreement includes certain intercreditor provisions, including, voting, treatment of certain remedies and amendment of certain provisions that require the vote of all affected creditors.

## ii. *Trade Debt*

In addition to the Existing Notes and the LC Facility Agreement, the Company incurred (and continues to incur) trade debt and other unsecured debt in the ordinary course of business. As of November 29, 2023, the Company estimates its unsecured claims total approximately $14.6 million.

## iii. *Equity Holdings*

As of the date hereof, the equity interest of ILAP is fully paid and is 99.999991% owned by LAP Chile and 0.000009% by LAP BV.[7]

As of the date hereof, the capital stock of San Juan consisted of a single class of 12,213 common shares without par value, fully subscribed and paid. As of the date hereof, ILAP owns all but one share in San Juan. LAP Chile holds the remaining share in San Juan.

As of the date hereof, the capital stock of Norvind consisted of a single class of 64,401,325 common shares without par value, fully subscribed and paid. As of the date hereof, ILAP owns all but one share in Norvind. LAP Chile holds the remaining share in Norvind.

LAP Chile and LAP BV have taken all necessary corporate actions to approve the Plan and the transactions contemplated thereby.

The Company's ultimate beneficial owners of the Debtors are: BTG Pactual Brazil Infrastructure Fund II (45.85%), which is managed by BTG Pactual Brazil, a leading investment bank in Latin America; (ii) Patria Investments (Patria) (45.85%), and (iii) GMR Holding B.V. (8.30%), which is wholly owned by Mr. Roberto Sahade.

---

[6]    On August 2, 2023, Citibank, N.A. sent a notice of resignation, resigning its roles as the Trustee, Registrar, Paying Agent and Transfer Agent under the Existing Indenture and the Offshore Collateral Agent, Offshore Depository Bank and Intercreditor Agent under the Security Agreement. UMB Bank, N.A. was subsequently appointed as the replacement to Citibank, N.A. in such roles pursuant to the Agreement of Resignation, Appointment and Acceptance dated as of August 28, 2023 by and among the Debtors, UMB Bank, N.A., Citibank, N.A. and certain holders of the Existing Notes.

[7]    ILAP is currently a *sociedad de responsabilidad limitada*, with no shares. On the Plan Effective Date, after its transformation into a *sociedad por acciones*, LAP Chile will be ILAP's sole shareholder. Immediately thereafter (on the same day), LAP Chile will contribute its shares in ILAP to New Issuer, and as a result, New Issuer will become the sole shareholder of ILAP.

V.    **EVENTS LEADING TO CHAPTER 11 AND
PREPETITION RESTRUCTURING INITIATIVES**

The Debtors intend to commence the Chapter 11 Cases to restructure a balance sheet that, as of November 29, 2023, is burdened by $408.73 million in principal amount on account of the obligations under the Existing Notes and the LC Facility Agreement (plus accrued interest and fees), described in <u>Section IV</u> of this Disclosure Statement.

A restructuring of the Debtors' balance sheet is necessary in order for the Debtors to be able to meet their financial obligations over the long term. Since the issuance of the Existing Notes and the entry into the LC Facility Agreement, the Debtors' results have been adversely affected by volatility in the Chilean energy market driven by severe drought conditions, resulting in unusually high marginal cost and therefore the Company purchasing energy at significantly higher prices in the spot market in order to meet its PPA contract obligations when the Projects are not generating sufficient energy. As a result of these factors, results are lower than expected at the time of the issuance of the Existing Notes and the Debtors' entry into the LC Facility Agreement, and the Debtors' cash flows do not support their current debt service obligations.

The proposed Plan will reduce significantly the Company's debt service obligations. The Debtors do not have the capacity to execute on their business strategy or continue paying their debt without the implementation and Consummation of the Plan.

A.    **Recent Operations**

i.    ***Complex and Competitive Market Environment***

In 2019, the Chilean government announced a plan to phase out coal plants and make the country carbon neutral by 2050, resulting in an influx of renewable energy options and uncertainty in the conventional power industry. The disruption caused by the government's focus on renewable energy was further exacerbated by Covid-19 construction delays and high energy costs. These combined factors caused widespread distress across the power generation sector in Chile, which ultimately had a negative impact on energy prices.

The authorities' transmission plan also did not anticipate the rapid growth of investments in new renewable projects, resulting in a shortage of transmission capacity, particularly in the northern part of Chile, where most of the renewable projects are located, to the central region. And as energy prices are determined and set at both the injection and withdrawal points, power generators like the Guarantor Debtors are responsible for any discrepancies in prices between the injection node and the withdrawal node. Starting in mid-2022, the oversupply of renewable energy in northern Chile and the lack of transmission infrastructure led to lower prices at injection nodes, while high coal and gas prices inflated prices at withdrawal nodes in central Chile, generating a price decoupling between injection and withdrawal prices, leading to a strong decrease in the Guarantor Debtors' PPA margins.

In addition, during the last few years, the Projects' generation has been affected by a lower availability of wind resources and congestion in the main transmission line, restricting the total potential energy generated from being transferred to the main consumption points. This decrease in generation has required the Company to make purchases in the spot market to satisfy its obligations under its PPAs. These purchases have been made at notably high spot prices, leading to significant commercialization costs for both Projects.

Furthermore, increased government intervention in connection with the Tariff Stabilization Law and MPC Law have negatively impacted the short- and medium-term revenues of the Company. <u>See</u> discussion on PEC Receivables which begins on page 14 of this Disclosure Statement.

For the nine-month period ending September 30, 2023, our revenue totaled approximately $60.3 million, and with respect to each of the fiscal years ended December 31, 2022 and 2021, our revenue totaled approximately $76.9 million and $68.3 million, respectively.

ii. ***Downgrade Reports and Resulting Risk on Future Operations***

On August 17, 2023, the International Credit Risk Rating Company Ltd. (*ICR Compañía Clasificadora de Riesgo Ltda.*) downgraded the credit ratings of San Juan and Norvind from BBB-/Negative Category to the B+/Under Observation Category (the reports, the "Downgrade Reports") due to the low levels of generation with respect to the energy committed in the Guarantor Debtors' contracts and the sustained weakening of their liquidity position and the impact that the increase in operational costs and market conditions have had on the Guarantor Debtors' ability to generate cash flow.

The Downgrade Reports caused defaults under the PPAs with the DisCos. If such defaults are not cured within six months, counterparties could seek to terminate their respective PPAs, which would have a material adverse effect on the Company's financial results.

The Company believes that, after giving effect to the Restructuring Transactions, the defaults caused by the Downgrade Reports will be cured.

**B. The Debtors' Debt Service Obligations**

The Debtors' current debt service obligations place significant strain on the Debtors' available cash flows. The principal amount of the Senior Debt Claims total $408.73 million. The Debtors are facing approximately $76 million in scheduled cash interest and amortization payments over the next nineteen months (through June 2025), putting severe pressure on the Debtors' ability to generate sufficient cash to service such debt obligations.

The Debtors failed to make their scheduled principal and interest payments on the Existing Notes and interest payments under the LC Facility Agreement, both due on July 3, 2023, and have not cured such defaults. On July 4, 2023, the Debtors entered into a standstill and forbearance agreement with Ad Hoc Group, pursuant to which the members of the Ad Hoc Group agreed, subject to certain terms and conditions, not to exercise any enforcement rights, or otherwise take remedial actions, in respect of the foregoing defaults. On August 28, 2023, the Debtors entered into a standstill and forbearance agreement with the LC Facility Agent, on behalf of itself and the lenders and issuing lenders under the LC Facility Agreement, pursuant to which the LC Facility Agent agreed, subject to certain terms and conditions, not to exercise any enforcement rights, or otherwise take remedial actions, in respect of the foregoing defaults during the standstill period thereunder.

Negotiations to a restructuring of the Debtors' balance sheet continued and, on October 30, 2023, the Debtors, their equity holders and the Consenting Noteholders executed the RSA; thereafter, the Holder of the LC Facility Claims joined the RSA, as amended pursuant to the Second Amendment, on November 29, 2023. The cases would be filed to implement the transactions contemplated by the RSA that restructure the Debtors' balance sheet. Absent a restructuring of the Debtors' balance sheet and elimination of a substantial amount of obligations in respect of near- and medium-term debt, the Debtors will not be able to service their debt or conduct their business in the ordinary course.

**C. LAP Chile Support: PEC 1 Receivables Sale Transaction**

On or about August 28, 2023, the Company was able to receive a cash infusion by selling to LAP Chile the Purchased PEC 1 Receivables for $7,000,000. The cash proceeds were used to pay outstanding accounts payable, insurance premiums, and fees incurred in connection with the Restructuring. As part of the Restructuring, LAP Chile has agreed to contribute to the Reorganized Business the Purchased PEC 1 Receivables on the Plan Effective Date.

*** *

In response to the Debtors' depressed financial performance and declining financial condition described above, and after thoroughly evaluating their options, the Debtors determined that it was in the best interests of their businesses to effectuate their reorganization through the Chapter 11 Cases.

The Debtors retained restructuring counsel, Greenberg Traurig, LLP ("Greenberg Traurig"), local counsel, Barros, Silva, Varela & Vigil Abogados Limitada ("BSVV") and financial advisors, Lazard Frères & Co. LLC ("Lazard") and AlixPartners, LLP ("AlixPartners"), to assist them with the negotiation and implementation of this transaction and the Chapter 11 Cases.

The Debtors now seek to consummate the Plan and emerge as reorganized entities. The Debtors believe that the Chapter 11 Cases represent the best prospect for restructuring the Debtors' capital structure and positioning the Debtors for successful operations as a going-forward concern.

## VI.    THE PROPOSED REORGANIZATION OF THE DEBTORS

### A.    Pre-Solicitation Negotiations

In the months leading up to the dissemination of this Disclosure Statement, the Debtors and their advisors engaged in extensive, good faith and arm's-length negotiations and discussions with an ad hoc group of holders of approximately $328 million in principal amount of Existing Notes, or approximately 83.8% of the outstanding Existing Notes by amount, the Holder of 100% of the LC Facility Claims, and their respective advisors.

On October 30, 2023, the Debtors and the Consenting Noteholders reached an agreement with respect to a consensual restructuring on the terms set forth in the Plan, and formalized by the RSA, which was subsequently amended on November 29, 2023 when the Holder of the LC Facility Claims joined the RSA.

Before commencing the Solicitation, the Debtors and the Consenting Creditors finalized the Plan, which provides that the Allowed Claims of the Debtors' general unsecured creditors will be unimpaired and fully satisfied. Furthermore, the Plan provides that the Senior Debt Claims shall be Allowed in the amount of $433,345,973.

On the Plan Effective Date (or as soon as practicable thereafter), each Holder of an Allowed Senior Debt Claim—i.e., the Allowed Existing Notes Claim and Allowed LC Facility Claims—shall receive their Pro Rata Share (calculated based on such Holder's applicable Senior Debt Claim over the sum of the Allowed Senior Debt Claims): (A) Take-back SSNs in the principal amount of $260 million with respect to such Holder's Claim and (B) Convertible Notes in the principal amount of $173,345,937, with respect to such Holder's Claim. Furthermore, in settlement of disputes and claims, the Holder of the LC Facility Claims has agreed to forfeit their rights to receive their Pro Rata Senior Debt Convertible Notes Amount (approximately $8.23 million in principal amount of Convertible Notes) in exchange for the issuance to such Holder of the Settlement Take-back SSNs in the principal amount of $4,305,966.

Finally, the Plan provides for the creation of the New Issuer that, in addition to issuing the Convertible Notes, will own ILAP on the Plan Effective Date and guarantee the obligations under the Take-back SSNs. The New Issuer, in turn, will be owned by LAP Chile on the Plan Effective Date.

The Plan is consistent with the terms of the RSA, attached hereto as **Exhibit B**.

   *i.*    **New Notes & Substitute Consideration**[8]

***Take-Back SSNs***

As described further in the RSA, the Reorganized ILAP will be the issuer of Take-back SSNs, which will have a maximum aggregate principal amount equal to $260 million (plus the Settlement Take-back SSNs in the principal amount of $4,305,966). The Reorganized Guarantor Debtors and the New Issuer will guarantee all of the obligations under the Take-back SSNs.

The Take-back SSNs will be secured by a first priority security interest over substantially the same assets that secured the Existing Notes, plus the New Issuer shall grant an equity pledge over the shares of Reorganized ILAP

---

[8]    Copies of the forms of Take-back SSNs, Convertible Notes, Super Priority Notes, the Super Priority/Take-back SSN Indenture and the Convertible Notes Indenture are attached hereto as **Exhibit F**.

to secure its guarantee of the Take-back SSNs. For the avoidance of doubt, the Take-back SSNs will not be secured by any letters of credit issued by Citibank, N.A.

The Take-back SSNs will accrue interest at the following rates per annum, with interest to be paid semi-annual in arrears on each of June 15 and December 15 and with the Reorganized ILAP having the option to pay interest either in kind or in cash for the interest payments that come due in the first two years after the Plan Effective Date:

| Period | Interest Rate if PIK Option Elected | Interest Rate if Cash Option Elected |
|---|---|---|
| From the Plan Effective Date to December 31, 2024 | 11.50% | 9.50% |
| From January 1, 2025 to June 30, 2025 | 12.25% | 10.25% |
| From July 1, 2025 to the 24 months after the Plan Effective Date (the "Cash Pay Date") | 13.00% | 11.00% |
| From the Cash Pay Date to the Maturity Date | No PIK option | 11.00% |

The indenture governing the Take-back SSNs, which will also govern the Super Priority Notes (the "Super Priority/Take-back SSN Indenture") provides that thirty (30) days following December 15, 2024, and semi-annual thereafter thirty (30) days following each of June 15 and December 15, there will be cash payments to holders of Take-back SSNs in amounts equivalent to the lesser of (i) the Reorganized Debtors' cash (excluding proceeds obtained from the Super Priority Notes) at the close of business on the immediately preceding interest payment date, in excess of $15 million and (ii) the total outstanding principal amount of the Take-back SSNs and Super Priority Notes as of each interest payment date (the "Mandatory Cash Sweeps").

The Reorganized ILAP will have a call option to purchase back the Take-back SSNs at par from the holders of the Take-back SSNs at any time unless there is a default or an event of default under the Super Priority/Take-back SSN Indenture that has occurred and is continuing.

The holders of the Take-back SSNs will have a put option to sell their Take-back SSNs at par back to the Reorganized ILAP upon the occurrence of any of the following events (a "Change of Control"): (A) the ILAP Sponsors[9] shall cease to beneficially own, at any time, in the aggregate, directly or indirectly, all of the capital stock of the New Issuer, Reorganized ILAP or any of their direct or indirect subsidiaries (other than as a result of the conversion of the Convertible Notes); (B) the ILAP Sponsors shall cease to have the right to elect all of the directors of the New Issuer, the Reorganized ILAP or any of their respective subsidiaries; (C) there is a sale, lease or transfer, directly or indirectly, of all or substantially all of the assets of the Reorganized ILAP or any of its subsidiaries to any Person other than an ILAP Sponsor; or (D) the adoption of a plan or resolution relating to the liquidation or dissolution of the Reorganized ILAP, the Reorganized Guarantor Debtors or the New Issuer.

The Take-back SSNs are to mature on June 15, 2033, the same maturity date as the Existing Notes.

The Super Priority/Take-back SSN Indenture and any other documentation governing the Take-back SSNs shall be governed by the laws of the State of New York (other than certain collateral documents, which will be governed by the laws of Chile and/or the Cayman Islands).

***Convertible Notes***

As described further in the RSA, the New Issuer will be the issuer of the Convertible Notes, which will have an initial principal of $173,345,937, *less* the amount that the Holder of the LC Facility Claims has agreed to forfeit its

---

[9]   "ILAP Sponsors" means, collectively, GMR Holding B.V., BTG Pactual Brazil Infrastructure Fund II LP, Patria Infrastructure Fund II LP, Patria Infrastructure Fund II LAP Co-Invest, LP, Patria Infrastructure Fund II LAP Co-Invest, UK LP, PI Fund II (Ontario) LP, PI Fund II (Ontario 1) LP, and PI Fund II (Ontario 2) LP.

rights to receive in exchange for the issuance to such Holder of the Settlement Take-back SSNs. The Reorganized Debtors will guarantee all of the obligations under the Take-back SSNs.

The Convertible Notes will be secured only by an equity charge over the New Issuer Equity.

The Convertible Notes will accrue interest at the rate of 5.0% per year, with interest to be paid in kind semi-annual in arrears on each of June 15 and December 15.

The Convertible Notes shall be mandatorily redeemable upon a qualifying Company Sale (as defined below) at the amounts set forth below in Section VI.A.iii (*Sale Facilitation Agreement & Company Sale*).

On the Conversion Date (as defined in the next sentence), the Convertible Notes shall automatically, irrevocably and without the need of any further notice or action by any party, convert into 90% of the total equity interests of the New Issuer, with the ILAP Partners retaining the remaining 10%. The "Conversion Date" means the earlier of: (i) December 31, 2025 (the "Final Conversion Date"), (ii) the date on which the Reorganized Debtors or the New Issuer, as applicable, fails to make a principal and/or interest payment under the Take-back SSNs or Super Priority Notes, (iii) the date on which the Reorganized ILAP or any subsidiary thereof files for insolvency, liquidation, bankruptcy, reorganization, restructuring or similar proceeding (in each case, after the Plan Effective Date but excluding any recognition proceeding in Chile if one is brought), (iv) the date on which a Change of Control of the Reorganized ILAP occurs, other than as a result of a Company Sale, or (v) the date a Company Sale occurs in breach of the terms of the Sales Facilitation Agreement; provided, however, that if, in connection with the Company Sale, if an agreement for a Company Sale has been executed by December 31, 2025 (by providing a notice to the Convertible Notes Indenture Trustee requesting such extension and attaching a copy of the agreement for a company sale by 5:00 p.m. (Eastern Standard Time) on such date), but the actual sale has not yet been closed as of said date, the Final Conversion Date will be automatically extended until June 30, 2026.

The Convertible Notes are to mature on June 15, 2033.

The indenture governing the Convertible Notes (the "Convertible Notes Indenture") and any other documentation governing the Convertible Notes shall be governed by the laws of the State of New York (other than certain collateral documents, which will be governed by the laws of Chile and/or the Cayman Islands).

***Super Priority Notes***

As described further in the RSA, the Reorganized ILAP will be the issuer of the Super Priority Notes, which will have an initial principal amount equal to $14 million. The Reorganized Guarantor Debtors and the New Issuer will guarantee all of the obligations under the Super Priority Notes.

The proceeds from the sale of the Super Priority Notes will be used largely to fund costs associated with the Restructuring.

The Super Priority Notes will be secured by the same collateral and will have the same covenants and events of default as the Take-back SSNs.

The Super Priority Notes will accrue interest at the following rates per annum, with interest to be paid semi-annual in arrears on each of June 15 and December 15 and the Reorganized ILAP shall have the option to pay interest either in kind or in cash for the interest payments that come due:

| Period | Interest Rate if PIK Option Elected | Interest Rate if Cash Option Elected |
|---|---|---|
| From the Plan Effective Date to June 15, 2033 | 14.00% | 12.00% |

The Super Priority Notes will have the same Mandatory Cash Sweep mechanism as the Take-back SSNs; provided, further, that the proceeds from the Mandatory Cash Sweeps will be used to redeem the Super Priority Notes first and, after the Super Priority Notes are paid in full, then to redeem the Take-back SSNs.

The Reorganized ILAP will also have a call option to purchase back the Super Priority Notes at 103% of their value from the holders of the Super Priority Notes; provided, however, that there will be no premium owed or payable if the Super Priority Notes are redeemed pursuant to a Mandatory Cash Sweep, except where the Reorganized Debtors obtain any proceeds from new financings or PEC 1 Receivables sales closed following the Plan Effective Date, in which case the immediately subsequent Mandatory Cash Sweep will be subject to this premium up to an amount equivalent to the total amount of new proceeds obtained by the Company from new financings and/or PEC 1 Receivables sales.

The Super Priority Notes are to mature on June 15, 2033.

The Super Priority Notes will be governed under the Super Priority/Take-back SSN Indenture. The Super Priority/Take-back SSN Indenture and any other documentation governing the Take-back SSNs shall be governed by the laws of the State of New York (other than certain collateral documents, which will be governed by the laws of Chile).

### Priority of the New Notes

The New Issuer's and the Reorganized Debtors' obligations under the Take-back SSNs and the Super Priority Notes would rank *pari passu* with each other; provided, however, that the Mandatory Cash Sweeps will be used to redeem the Super Priority Notes first and, after the Super Priority Notes are paid in full, then to redeem the Take-back SSNs; and upon a Company Sale, the Super Priority Notes will be senior in payment to the Take-back SSNs and the Convertible Notes.

The New Issuer's and the Reorganized Debtors' obligations under the Convertible Notes would rank junior to the Take-back SSNs and the Super Priority Notes. In addition, the Mandatory Cash Sweeps will not be used to redeem the Convertible Notes.

### Substitute Consideration for Non-Qualified Holders

The Plan requires each Holder of an Allowed Senior Debt Claim to submit a certification on or before 180 days after the Plan Effective Date (the "Determination Date") certifying whether or not the Holder is a Qualified Holder or Non-Qualified Holder. In the event that on the Determination Date, there are more than 35 Non-Qualified Holders, then all Take-back SSNs and Convertible Notes that would have been issuable and deliverable to all such Non-Qualified Holders (collectively, the "Non-Qualified Holders' Notes"), if they had been Qualified Holders, will be deposited with an agent (the "Selling Agent").

The Selling Agent shall offer the Non-Qualified Holders' Notes in one or more sale transactions within 180 days following the Determination Date (the "Sale Period"). The consideration to be received by Non-Qualified Holders under the Selling Agent Agreement is referred to as the "Substitute Consideration." The price, terms and manner of sale will be on the best terms reasonably available at the time using a transparent open market process and shall be for cash. The proceeds of any and all such sales (net of the costs of sale including the fees of any agent, broker, marketing agent, placement agent or underwriter appointed in relation to the sale and any taxes and provisions for taxes on sale), if any, shall be distributed, on a *pro rata* basis, to such Non-Qualified Holders at the end of the Sale Period (the "Net Cash Proceeds").

In the event that a sale of the Non-Qualified Holders' Notes is unable to be consummated within the Sale Period, such debt securities shall be cancelled. None of the Debtors, the Consenting Creditors and the Selling Agent shall have any liability for any loss or alleged loss arising from such sale or a failure to procure any purchaser or proceeds for any Non-Qualified Holders' Notes. For the avoidance of doubt, any Non-Qualified Holders who would have been entitled to receive any New Notes under the Plan if they had been Qualified Holders shall only be entitled to receive Substitute Consideration, if any, in respect thereof.

ii. *__Reorganized Debtors and New Issuer Equity__*

On or immediately before the Plan Effective Date, ILAP shall reorganize as a Chilean stock corporation (*sociedad por acciones*), and as a result of such transformation, the Existing ILAP Equity Interest will be represented by shares. The Existing ILAP Equity Interest held by LAP BV, as amended due to the transformation of ILAP, will be transferred to LAP Chile, and the Existing ILAP Equity Interest held by LAP Chile, as amended due to the transformation of ILAP (together with the Existing ILAP Equity Interest held by LAP BV that will be transferred to LAP Chile) will be contributed to New Issuer, and LAP Chile will receive all of the New Issuer Equity Interests. Accordingly, on the Plan Effective Date, (x) the New Issuer shall hold 100% of the Reorganized ILAP Equity and (y) LAP Chile shall hold 100% of the New Issuer Equity.

The New Issuer shall have a board of directors of not less than three (3) and not more than five (5) members. At least one director shall be an independent director initially selected by the ILAP Partners, with the consent of a majority of the outstanding principal amount of the Existing Notes Claims held by the Ad Hoc Group. Any replacement of the independent director selected by LAP Chile shall require the consent of holders of the majority of the outstanding principal amount of the Convertible Notes, except as outlined below.

The independent director will be a person (i) with experience in the sale of energy assets in South America, (ii) that does not directly or indirectly receive and has not in the past five years directly or indirectly received compensation from LAP Chile and/or LAP BV, or any of their related parties, and (iii) that has good moral character and has not been convicted in the prior ten years of a crime of moral turpitude or fraud and has not been subject to a bar on participation in the securities or banking industry and has not been in the prior ten years subject to a bankruptcy proceeding.

The New Issuer shall not be permitted to, in each case without the consent of the holders of the majority of the outstanding principal amount of the Convertible Notes: (i) remove the independent director (except if, at any point after his or her designation, he or she fails to meet eligibility requirements), (ii) reduce the compensation payable to, or terminate or reduce the level of D&O insurance coverage for the benefit of, any independent director, or (iii) impose any limitations on the ability of the independent director to review documents related to the Company Sale.

The holders of the majority of the outstanding principal amount of the Convertible Notes in principal amount are granted consent rights over the appointment of a replacement independent director in the event the independent director appointed on or before the Plan Effective Date in accordance with the Plan resigns or is removed. If the holders of a majority of the outstanding principal amount of the Convertible Notes fail to communicate to the Convertible Notes Indenture Trustee in writing about their approval or rejection of a proposed nominee within 120 days after notice indicating the name and the biography and certification described above of such proposed nominee is provided to the Convertible Notes Indenture Trustee, then the nominee shall be deemed to be approved. The New Issuer shall only propose for nomination as replacement independent director a person (i) with experience in the sale of energy assets in South America, (ii) that does not directly or indirectly receive and has not in the past five years directly or indirectly received compensation from LAP Chile and/or LAP BV, or any of their related parties, and (iii) that has good moral character and has not been convicted in the prior ten years of a crime of moral turpitude or fraud and has not been subject to a bar on participation in the securities or banking industry and has not been in the prior ten years subject to a bankruptcy proceeding.

On the Plan Effective Date, the independent director appointed to serve as independent director of the New Issuer shall also be appointed to the boards of directors of each of the Reorganized Debtors. The criteria on removal and replacement of an independent director each as set forth above would apply to each Reorganized Debtor, except that the consent rights given to the Convertible Notes Indenture Trustee (acting at the direction of the holders of the majority of the outstanding principal amount of the Convertible Notes) shall be given to the Super Priority/Take-back SSN Indenture Trustee (acting at the direction of the holders of the majority of the outstanding principal amount of the Take-back SSNs).

iii. *__Sale Facilitation Agreement & Company Sale__*

As part of the Restructuring, LAP Chile, the New Issuer, Reorganized ILAP and the Trustee will enter into a Sales Facilitation Agreement (the "Sales Facilitation Agreement"), pursuant to which the parties will agree to make

26

their best efforts to sell 100% of the Reorganized ILAP Equity (or substantially all its assets, inclusive of a concurrent sale of 100% of the equity interests of San Juan and Norvind) by December 31, 2025 (the "Sale Outside Date") in a manner designed to maximize the sales proceeds to all stakeholders, subject to the terms and conditions set forth below (the "Company Sale").

If the Company Sale is closed on or before the Sale Outside Date, as may be extended pursuant to the terms of the Sales Facilitation Agreement:

(i)    the proceeds obtained from the Company Sale (the "Sale Proceeds") will be applied as follows:

    a.    *First*, to repay the Super Priority Notes and accrued and unpaid interest and additional amounts thereon in full;

    b.    *Second*, to repay the Take-back SSNs and accrued and unpaid interest and additional amounts thereon in full amounts due to the Super-Priority/Take-back SSN Indenture Trustee under the Super-Priority/Take-back SSN Indenture;

    c.    *Third*, an amount equivalent to $7 million plus a 6% interest rate per annum as from August 28, 2023 (the "First Threshold Amount"), will be allocated to LAP Chile;

    d.    *Fourth*, the Sale Proceeds in excess of the amounts mentioned in (a), (b) and (c) above, will be used by the New Issuer to redeem the Convertible Notes, to pay any amounts due to the Trustee, Registrar, Paying Agent, Collateral Agent under the New Notes Documents or any other agent under the Convertible Notes Indenture, and make a distribution to LAP Chile as set forth below:

| Allocation of Excess Sale Proceeds above the First Threshold Amount to Holders of Convertible Notes ("Convertible Noteholders") and LAP Chile | | | | | | | |
|---|---|---|---|---|---|---|---|
| Distribution Date | First Threshold Amount - $70 million | | $70 million - $90 million | | $90 million to "Full Repayment of Convertible Notes" (as defined below) | | Above Full Repayment of Convertible Notes | |
| | Convertible Noteholders | LAP Chile | Convertible Noteholders | LAP Chile | Convertible Noteholders | LAP Chile | Convertible Noteholders | LAP Chile |
| On or before December 31, 2024 | 59.5% | 40.5% | 55% | 45% | 50% | 50% | 0% | 100% |
| January 1, 2025 to June 30, 2025 | 67.0% | 33.0% | 62.5% | 37.5% | | | | |
| July 1, 2025 to December 31, 2025 (or the Extended Conversion Date, as applicable) | 74.5% | 25.5% | 70.0% | 30.0% | | | | |

For purposes of the Sale Proceeds allocation established in the table above, (A) "Full Repayment of Convertible Notes" shall mean the full repayment of the principal amount of the Convertible Notes plus any and all accrued and unpaid interest, and (B) "Distribution Date" shall mean the date on which the Sale Proceeds are actually distributed to the holders of Super Priority Notes, the holders of Take-back SSNs and the Convertible Noteholders, as applicable.

The Convertible Notes will provide that they shall be mandatorily redeemable upon a Company Sale at a discount using the amount of proceeds specified in the table above. Notwithstanding the foregoing, the Convertible Notes will not be deemed cancelled, discharged or redeemed and the Convertible Notes Indenture will not be deemed

satisfied or discharged until the applicable Distribution Date on which the full amount of all Sale Proceeds (guaranteed, contingent or otherwise) have been actually distributed to the Convertible Noteholders.

Absent consents from the indenture trustees for the New Notes, no Company Sale may be consummated unless concurrently with such Company Sale the payment of the Super Priority Notes, the Take-back SSNs and any payments required to be made in connection with a mandatory redemption of the Convertible Notes has been completed in full.

Prior to entering the Sales Facilitation Agreement, LAP Chile will engage either (A) (x) BTG Pactual Chile S.A. Corredores de Bolsa ("BTG") and (y) another financial advisor that the ILAP Partners shall select from a list that the Ad Hoc Group pre-approved (the "Third-Party FA") or (B) if BTG is not engaged, only a Third-Party FA (the "Third-Party FA," together with BTG, as applicable, the "Sale Advisors") to run the sale process for the Company Sale. If BTG is engaged as a Sale Advisor, BTG will certify in writing to the Company and the Trustee that it has established walls and controls to avoid any conflict of interest between its role as a Sale Advisor and its position as one of the ultimate equity holders of the Reorganized Business. In the event that an additional investment bank is to be appointed as a Sale Advisor, such bank shall be selected from the list that the Ad Hoc Group pre-approved. In no event shall BTG be the sole Sale Advisor in connection with the Company Sale.

iv.    ***Plan Milestones***

Pursuant to the RSA, the Consenting Creditors have agreed to support the Plan, subject to certain terms and conditions and provided that the Debtors are successful in taking the steps necessary to meet the various agreed upon milestones, which include, but are not limited to, the following:

- No later than November 30, 2023, the Debtors shall have commenced the solicitation of the Plan and distributed the Disclosure Statement and the solicitation materials to Holders of Claims and Interests entitled to vote to accept or reject the Plan;

- No later than December 3, 2023, the Debtors shall have filed petitions commencing the Chapter 11 Cases along with a motion seeking entry of an order scheduling the Confirmation Hearing.

- No later than the Petition Date, the Debtors shall have filed the Plan, the Disclosure Statement, the motion to seek approval of the Disclosure Statement and confirmation of the Plan, and the solicitation materials.

- No later than twenty (20) business days from the commencement of the solicitation, the Debtors shall have completed solicitation of the Plan.

- No later than seven weeks from the Petition Date, the Debtors shall have obtained entry of the Confirmation Order.

- No later than seven weeks from the entry of the Confirmation Order and in no event later than February 10, 2024, the Plan Effective Date shall have occurred.

If the RSA terminates due to the Debtors' failure to meet the conditions outlined above or otherwise pursuant to the RSA, any and all votes of the Consenting Creditors occurring prior to such termination by the Consenting Creditors shall be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner in connection with the Restructuring and the RSA or otherwise.

**B.    Solicitation**

On or about November 29, 2023, before filing the Chapter 11 Cases, the Debtors caused a copy of this Disclosure Statement (with the Plan attached as **Exhibit A**) and the appropriate Ballots to be delivered to the Holders of Claims relating to the Existing Notes and the LC Facility Agreement and the Holders of Interests in ILAP, in each case as of the Voting Record Date.

In order to effectuate certain terms of the RSA, the Debtors provided to counsel for the Ad Hoc Group a special, preliminary response ballot the "Preliminary Ballot"), substantially similar to the beneficial holder ballot that the Nominee will distribute to Holders of Existing Notes Claims (the "Beneficial Holder Ballot"). The Preliminary Ballot is returnable directly to the Balloting Agent. The Consenting Noteholders who submit the Preliminary Ballot must also vote their Beneficial Holder Ballot consistent with the procedures set forth in Section XV.E.2 of the Disclosure Statement. As indicated herein, pursuant to the RSA, the Consenting Noteholders have agreed to vote in favor of the Plan.

The Debtors established **December 28, 2023 at 5:00 p.m. (prevailing Eastern Time)** as the deadline for the receipt of votes to accept or reject the Plan.

On the Petition Date, along with the Plan and this Disclosure Statement, the Debtors intend to file with the Bankruptcy Court a motion seeking approval of the adequacy of this Disclosure Statement, approval of the Solicitation Packages and Confirmation of the Plan.

## VII.    SUMMARY OF THE PLAN[10]

### A.    General Basis for the Plan

The Debtors have determined that prolonged Chapter 11 Cases would damage severely their ongoing business operations and threaten their viability as a going concern. The prepackaged nature of the Plan (as set forth in the Plan and described herein) allows the Debtors to exit chapter 11 quickly, while the provisions of the Plan allow the Debtors to reduce their debt service obligations and position the Debtors for continued operations through the issuance of Take-back SSNs and Convertible Notes, as well as incurring needed financing from the sale of the Super Priority Notes.

Under the Plan, the Reorganized ILAP and the New Issuer will issue Take-back SSNs and Convertible Notes, respectively, in satisfaction of the Existing Notes Claims and the LC Facility Claims. Importantly, the New Notes will provide the Reorganized Debtors with flexibility to manage their future cash interest obligations.

The Debtors' Plan proposes to pay all Allowed General Unsecured Claims (classified in Class 4) in full in Cash on the later of the Plan Effective Date or in the ordinary course of business in accordance with the terms of particular transaction giving rise to such Allowed General Unsecured Claim.

### B.    Governing Law

Except to the extent the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection with the Plan, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to conflict of laws principles.

---

[10]    This Section VII is intended only to provide a summary of the key terms, structure, classification, treatment, and implementation of the Plan, and is qualified in its entirety by reference to the entire Plan and exhibits thereto. Although the statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in documents referred to therein, this Disclosure Statement does not purport to be a precise or complete statement of all such terms and provisions, and should not be relied on for a comprehensive discussion of the Plan. Instead, reference is made to the Plan and all such documents for the full and complete statements of such terms and provisions. The Plan itself (including attachments) will control the treatment of creditors and equity holders under the Plan. To the extent there are any inconsistencies between this Section VII and the Plan (including attachments thereto), the latter shall govern.

## C.    Treatment of Unclassified Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims set forth in <u>Article III</u> of the Plan.

### i.    *Administrative Claims*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim, the Required Consenting Creditors, and the Debtors or Reorganized Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim either:  (a) on the Plan Effective Date, or as soon as reasonably practicable thereafter; (b) if the Administrative Claim is not Allowed as of the Plan Effective Date, no later than thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; or (c) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims without any further action by the Holders of such Allowed Administrative Claims. Cash payments to creditors outside of the United States of America may be made in such currency and by such means as are necessary or customary in a particular foreign jurisdiction.

### ii.    *Professional Claims*

All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Plan Effective Date must be filed no later than <u>thirty (30) days after the Plan Effective Date</u>. The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code. The Reorganized Debtors shall pay Professional Claims in Cash in the amount Allowed by the Bankruptcy Court. From and after the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

On or before the Plan Effective Date, the Debtors shall use proceeds from the sale of the Super Priority Notes, and, if necessary, Cash on hand, to fund an escrow for Professionals (the "<u>Professional Fee Escrow</u>") in an amount sufficient to pay all Professional Claims in full in Cash, pending the Bankruptcy Court's approval of such fees and expenses. At least one (1) Business Day prior to the Plan Effective Date, each Professional shall provide to the Debtors its respective amount of fees and expenses to be funded into the Professional Fee Escrow for such Professional. The Professional Fee Escrow shall operate on a per Professional Basis, with each Professional's respective amount of fees and expenses segregated for the sole benefit of the Professional in the amount set forth for such Professional. The Professional Fee Escrow shall not be considered property of the Debtors' estates or an asset of the Reorganized Debtors, it shall be for the sole benefit of the Professionals; <u>provided</u>, <u>however</u>, that any funds remaining in the Professional Fee Escrow after the Bankruptcy Court enters an order allowing and directing payment of all Professional Fees shall revert to the Reorganized ILAP. The Professional Fee Escrow shall not act as a cap on any Professional Fees; instead they shall be paid by the Reorganized Debtors in full in Cash should the funds in the Professional Fee Escrow be insufficient to do so.

### iii.    *Priority Tax Claims*

Each Holder of an Allowed Priority Tax Claim due and payable on or before the Plan Effective Date shall receive in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Priority Tax Claim: (a) the treatment provided by section 1129(a)(9)(C) of the Bankruptcy Code; (b) a Cash payment on, or as soon as reasonably practicable after, the later of the Plan Effective Date or the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, equal to the amount of such Allowed Priority Tax Claim; or (c) such other less favorable treatment as may be agreed upon between the Holder of such Allowed Priority Tax Claim

and the applicable Debtor. If payment is made in accordance with section 1129(a)(9)(C), installment payments shall be made quarterly, and interest shall accrue in accordance with 26 U.S.C. § 6621. Cash payments to creditors outside of the United States of America may be made in such currency and by such means as are necessary or customary in a particular foreign jurisdiction.

    *iv.*    **_Payment of Restructuring Expenses_**

       The Restructuring Expenses payable by the Debtors shall constitute Allowed Administrative Claims and shall be paid on a current basis in full in Cash pursuant to (and subject to) the RSA, the Existing Indenture and Prepetition Security Documents (as applicable) without the need to file a proof of such Claim and without further order of the Bankruptcy Court. On the Plan Effective Date, the Debtors or Reorganized Debtors, as applicable, shall pay the Restructuring Expenses that have accrued and are unpaid as of the Plan Effective Date from the proceeds of the sales of the Super Priority Notes and, if necessary, Cash on hand. For the avoidance of doubt, any Restructuring Expenses incurred but not yet paid on or prior to the Plan Effective Date shall be payable by the Reorganized Debtors after the Plan Effective Date.

    **D.  Classification and Treatment of Claims and Interests**

    *i.*    **_Classification of Claims and Interests_**

       Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Interests. All Claims and Interests, except for those identified in Article II of the Plan, are classified in the Classes set forth in Article III of the Plan. Unless otherwise stated, a Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Plan Effective Date.

    *ii.*    **_Treatment of Classes of Claims and Interests_**

       The following chart designates the Class of Claims against and Interests in each of the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code and (c) deemed to accept or reject the Plan. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Section 12.4 of the Plan.

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Deemed To Accept; Not Entitled To Vote |
| 2 | Other Priority Claims | Unimpaired | Deemed To Accept; Not Entitled To Vote |
| 3 | Senior Debt Claims | Impaired | Entitled To Vote |
| 4 | General Unsecured Claims | Unimpaired | Deemed To Accept; Not Entitled To Vote |
| 5 | Existing Guarantor Equity Interests | Unimpaired | Deemed To Accept; Not Entitled To Vote |
| 6 | Existing ILAP Equity | Impaired | Entitled To Vote |

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
|       | Interests         |        |               |

Except to the extent that a Holder of an Allowed Claim against or Interest in any of the Debtors, as applicable, agrees to a less favorable treatment, and unless otherwise expressly indicated below, such Holder shall receive under the Plan the treatment described in the Plan in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Interest. Unless otherwise indicated, the Holder of an Allowed Claim or Interest, as applicable, shall receive such treatment on the Plan Effective Date, or as soon as reasonably practicable thereafter.

    a.   **_Class 1 (Other Secured Claims)_**

    (1)   *Classification*:  Class 1 consists of all Other Secured Claims against the applicable Debtor.

    (2)   *Treatment*:  Each Holder of an Allowed Other Secured Claim shall receive, at the Debtors or Reorganized Debtors' option (as applicable): (a) payment in full in Cash; (b) the collateral securing its Allowed Other Secured Claim; (c) Reinstatement of its Allowed Other Secured Claim; or (d) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. Cash payments to creditors outside of the United States of America may be made in such currency and by such means as are necessary or customary in a particular foreign jurisdiction.

    (3)   *Voting*:  Class 1 is Unimpaired. Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Other Secured Claims are not entitled to vote to accept or reject the Plan.

    b.   **_Class 2 (Other Priority Claims)_**

    (1)   *Classification*:  Class 2 consists of all Other Priority Claims against the applicable Debtor.

    (2)   *Treatment*:  On the Plan Effective Date, each Holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. Cash payments to creditors outside of the United States of America may be made in such currency and by such means as are necessary or customary in a particular foreign jurisdiction.

    (3)   *Voting*:  Class 2 is Unimpaired. Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

    c.   **_Class 3 (Senior Debt Claims)_**

    (1)   *Classification*:  Class 3 consists of all Senior Debt Claims against the applicable Debtor. Notwithstanding anything in the Plan to the contrary, Senior Debt Claims held by Holders of Existing Notes and Holders of LC Facility Claims shall only receive the treatment and distribution provided for in Section 3.2(c) of the Plan, subject to the LC Facility Settlement (if consummated), including as to any unsecured deficiency Claims, and shall not be classified in any other Class of Claims.

(2)  *Allowance:* The Senior Debt Claims are Allowed in the amount of $433,345,973.

(3)  *Treatment*:

    A   In full and final satisfaction, settlement, release, and in exchange for the Senior Debt Claims, on the Plan Effective Date (or as soon as practicable thereafter), each Holder of an Allowed Senior Debt Claim shall receive its Pro Rata Share of each of the Take-back SSNs and the Convertible Notes. For the avoidance of doubt, the Take-back SSNs being issued under Section 3.2(c) of the Plan shall not include the Settlement Take-back SSNs.

    B   To the extent necessary, Section 3.2(c) of the Plan shall be deemed modified to classify separately the votes of Class 3 into two sub-classes—(A) Secured Senior Debt Claims and (B) unsecured Senior Debt Claims—with the vote submitted on the Ballot of a Holder of a Senior Debt Claim to be tabulated the same across both sub-classes.

(4)  *Voting*:  Class 3 is Impaired. Holders of Senior Debt Claims are entitled to vote on the Plan.

### d.  Class 4 (General Unsecured Claims)

(1)  *Classification*:  Class 4 consists of all General Unsecured Claims against the applicable Debtor.

(2)  *Treatment*:  On the Plan Effective Date, each Holder of an Allowed General Unsecured Claim shall, at the election of the applicable Debtor or Reorganized Debtor, (A) have the legal, equitable and contractual rights of such Holder Reinstated or (B) receive Cash in an amount equal to such Allowed General Unsecured Claims in the ordinary course of business. Cash payments to creditors outside of the United States of America may be made in such currency and by such means as are necessary or customary in a particular foreign jurisdiction.

(3)  *Voting*:  Class 4 is Unimpaired. Holders of Allowed General Unsecured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed General Unsecured Claims are not entitled to vote to accept or reject the Plan.

### e.  Class 5 (Existing Guarantor Equity Interests)

(1)  *Classification*:  Class 5 consists of all Existing Guarantor Equity Interests.

(2)  *Treatment*:  Each Existing Guarantor Equity Interest is Allowed as of the Plan Effective Date. On the Plan Effective Date, each Holder of an Allowed Existing Guarantor Equity Interest shall have such Interest Reinstated.

(3)  *Voting*:  Class 5 is Unimpaired. Holders of Allowed Existing Guarantor Equity Interests are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Existing Guarantor Equity Interests are not entitled to vote to accept or reject the Plan.

### f.  Class 6 (Existing ILAP Equity Interests)

(1)  *Classification*:  Class 6 consists of all Existing ILAP Equity Interests.

(2)   *Treatment*: Each Existing ILAP Equity Interest is Allowed as of the Plan Effective Date. On the Plan Effective Date: (A) ILAP will be transformed into a Chilean stock corporation (*sociedad por acciones*) and as a result of such transformation, the Existing ILAP Equity Interest will be represented by shares; (B) the Existing ILAP Equity Interest held by LAP BV, as amended due to the transformation of ILAP, will be transferred to LAP Chile; (C) the Existing ILAP Equity Interest held by LAP Chile, as amended due to the transformation of ILAP (together with the Existing ILAP Equity Interest held by LAP BV that will be transferred to LAP Chile) will be contributed to New Issuer, and LAP Chile will receive all of the New Issuer Equity Interests; and (D) equity in the Reorganized ILAP will be issued to the New Issuer in accordance with <u>Section 4.4(a)</u> and <u>Section 4.4(b)</u> of the Plan.

(3)   *Voting*: Class 6 is Impaired. Holders of Existing ILAP Equity Interests are entitled to vote on the Plan.

### iii.   *Special Provision Governing Unimpaired Claims*

Notwithstanding anything to the contrary in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights and defenses regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

## E.   Means for Implementation of the Plan

### i.   *General Settlement of Claims*

Unless otherwise set forth in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Plan Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims and Interests.

### ii.   *Subordination*

The allowance, classification, and treatment of all Claims and Interests under the Plan shall conform to and with the respective contractual, legal, and equitable subordination rights of such Claims and Interests, and any such rights shall be settled, compromised, and released pursuant to the Plan. Notwithstanding anything to the contrary in the Plan, pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim (other than Senior Debt Claims held by Consenting Creditors) in accordance with any contractual, legal, or equitable subordination relating thereto.

### iii.   *Source of Cash for Plan Distributions*

All Cash consideration necessary for the Reorganized Debtors to make payments or distributions pursuant to the Plan shall be obtained from the Cash proceeds received from the Super Priority Notes described in <u>Section 4.4(f)</u> and <u>Section 4.5(c)</u> of the Plan, Cash on hand, and Cash derived from post-petition business operations. Further, the Debtors and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan. Any changes in intercompany account balances resulting from such transfers will not violate the terms of the Plan or the New Notes Documents.

### iv.   *Restructuring Transactions*

#### a.   Incorporation of New Issuer

Effective as of the Confirmation Date, the ILAP Partners are authorized and directed, on or prior to the Plan Effective Date to form and incorporate the New Issuer in the Cayman Islands. Upon implementation of the

Restructuring Transactions on the Plan Effective Date, the New Issuer shall hold all of the equity interests in the Reorganized ILAP from and after the Plan Effective Date. The Existing ILAP Equity Interests will be contributed to the New Issuer.

b.    Restructuring of ILAP

On or immediately before the Plan Effective Date, ILAP shall reorganize as a Chilean stock corporation (*sociedad por acciones*), with the equity in the Reorganized ILAP to be contributed by LAP Chile to the New Issuer.

c.    Contribution of Purchased PEC 1 Receivables

On or prior to the Plan Effective Date, LAP Chile is authorized and directed to contribute the Purchased PEC 1 Receivables, at its discretion, to the New Issuer or Reorganized ILAP; provided, further that if LAP Chile contributes the Purchased PEC 1 Receivables to New Issuer, then the New Issuer is authorized and directed to contribute the Purchased PEC 1 Receivables to the Reorganized ILAP.

d.    Exchange of Senior Debt Claims for Take-back SSNs

The Reorganized ILAP's issuance of the Take-back SSNs to Holders of the Senior Debt Claims shall be deemed in consideration for each such Holder deeming to have assigned, conveyed and contributed such Holder's Pro Rata Senior Debt Take-Back SSN Amount of the Senior Debt Claim to the Reorganized ILAP as of the Plan Effective Date; provided, further, that if the LC Facility Settlement is consummated, then such issuance shall be deemed in consideration for Holders of the LC Facility Claims deeming to have assigned, conveyed and contributed such Holder's Pro Rata Senior Convertible Notes Amount of the Senior Debt Claim to the Reorganized ILAP as of the Plan Effective Date. Such Holder's Pro Rata Senior Debt Take-back SSN Amount of the Senior Debt Claim (and, if the LC Facility Settlement is consummated, then the LC Facility Holders' Pro Rata Senior Convertible Notes Amount of the Senior Debt Claim) shall be deemed to have been transferred to, and will vest with, the Reorganized ILAP on the Plan Effective Date without further order of the Bankruptcy Court and without further act or action under applicable law, regulation, order or rule, from any Entity. The Existing Indenture Trustee, the LC Facility Agent, Consenting Creditors and any other Holder of an Allowed Senior Debt Claim shall take such actions as may be reasonably requested to give effect to the foregoing provisions.

e.    Exchange of Senior Debt Claims for Convertible Notes

The New Issuer's issuance of the Convertible Notes to Holders of the Senior Debt Claims shall be deemed in consideration each such Holder deeming to have assigned, conveyed and contributed such Holder's Pro Rata Senior Debt Convertible Notes Amount of the Senior Debt Claim to New Issuer as of the Plan Effective Date. Such Holder's Pro Rata Senior Debt Convertible Notes Amount of the Senior Debt Claim shall be deemed to have been transferred to, and will vest with, the New Issuer on the Plan Effective Date without further order of the Bankruptcy Court and without further act or action under applicable law, regulation, order or rule, from any Entity. On the Plan Effective Date, the New Issuer is authorized and directed to contribute such Senior Debt Claims to the Reorganized ILAP. The Existing Indenture Trustee, the LC Facility Agent, Consenting Creditors and any other Holder of an Allowed Senior Debt Claim shall take such actions as may be reasonably requested, and the Consenting Creditors shall direct the Existing Indenture Trustee and the LC Facility Agent to take such actions, to give effect to the foregoing provisions, including an acknowledgment that the issuance of the Convertible Notes, is for an exchange of the aggregate Pro Rata Senior Debt Convertible Notes Amount of the Senior Debt Claim.

f.    Exist Financing (Super Priority Notes)

Subject to the terms and conditions set forth in the Super Priority Notes Commitment Agreement, on or before the Plan Effective Date, the Super Priority Notes Financing Parties shall purchase the Super Priority Notes for $14 million.

g.    Settlement with Holder of LC Facility Claims

(4)    Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, including the Settlement Take-back SSNs, the Holders of the LC Facility Claims have agreed to forfeit, and shall be deemed to have forfeited, any right to receive Convertible Notes in exchange for the issuance by the Reorganized ILAP of the Settlement Take-back SSNs to such Holders on the Plan Effective Date.

(5)    The foregoing settlement is conditioned upon the Holders of the LC Facility Claims (x) voting to support the Plan, and (y) being party to the RSA as of the Plan Effective Date. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement with the Holders of the LC Facility Claims. For the avoidance of doubt, the agreement of the Holders of the LC Facility Claims to forfeit their right to receive Convertible Notes is conditioned upon the Bankruptcy Court's approval of the issuance by the Reorganized ILAP of the Settlement Take-back SSNs, in the amount set forth in the Plan, to such Holders on the Plan Effective Date.

(6)    If at any time prior to the Plan Effective Date, the Holders of the LC Facility Claims (x) vote to reject the Plan, (y) withdraw their vote to accept the Plan, or (z) are not party to the RSA (whether by way of withdrawing from the RSA or pursuant to a termination of the RSA or the Second Amendment, in each case pursuant to the terms thereof), then the settlement with the Holders of the LC Facility Claims shall be considered null and void *ab initio* in all respects, and all applicable parties in interest shall go back to the status quo ante as if the Holders of the LC Facility Claims did not execute the RSA; provided, further nothing contained in the Plan or Disclosure Statement shall (a) prejudice in any manner the rights of any Debtor or any other Entity; or (b) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

v.    ***The New Notes & Substitute Consideration***

a.    Take-back SSNs

On the Plan Effective Date, (i) the Reorganized ILAP shall be authorized to issue the Take-Back SSNs in the principal amount of $260 million (plus the principal amount of the Settlement Take-back SSNs pursuant to the LC Facility Settlement if such settlement is consummated) pursuant to the Super Priority/Take-back SSN Indenture for distributions to Qualified Holders pursuant to Section 6.4 of the Plan and to the Selling Agent pursuant to Section 4.5(f) of the Plan; (ii) each of the Reorganized Guarantor Debtors and the New Issuer shall guarantee the obligations of the Take-back SSNs under the Super Priority/Take-back SSN Indenture; (iii) each of the Reorganized Debtors, LAP Chile, and New Issuer, as appropriate, shall pledge the collateral as set forth in the Super Priority/Take-back SSN Indenture and/or the applicable New Notes Documents; and (iv) in each case, the Reorganized Debtors and the New Issuer shall be authorized to do so without further act or action under applicable law, regulation, order or rule, and without further corporate proceedings or action.

b.    Convertible Notes

On the Plan Effective Date, (i) the New Issuer shall issue the Convertible Notes in the principal amount of $173,345,973 (*less*, if the LC Facility Settlement is consummated, the Pro Rata Senior Debt Convertible Amount of the Holders of the LC Facility Claims, which distribution the Holders of the LC Facility Claims have agreed to forgo if the LC Facility Settlement is consummated) pursuant to the Convertible Notes Indenture for distributions to Qualified Holders pursuant to Section 6.4 of the Plan and to the Selling Agent pursuant to Section 4.5(f) of the Plan; (ii) each of the Reorganized Debtors shall guarantee the obligations under the Convertibles Notes Indenture, (iii) LAP Chile shall, with the receipt of the New Issuer Equity as set forth in Section 3.2(f) of the Plan, pledge or charge the New Issuer Equity as set forth in the Convertible Notes Indenture and/or the applicable New Notes Documents, and

(iv) in each case, the Reorganized Debtors, LAP Chile and the New Issuer shall be authorized to do so without further act or action under applicable law, regulation, order or rule, and without further corporate proceedings or action.

        c.   <u>Super Priority Notes</u>

On the Plan Effective Date, (i) Reorganized ILAP shall be authorized to issue the Super Priority Notes in the principal amount of $14 million pursuant to the Super Priority/Take-back SSN Indenture to the Super Priority/Take-back SSN Indenture Trustee for subsequent distributions by the Super Priority/Take-back SSN Indenture Trustee thereunder to the Super Priority Notes Financing Parties, and pay any fees and expense due and owing under the Super Priority Notes Commitment Agreement, (ii) each of the Reorganized Guarantor Debtors and the New Issuer shall guarantee the obligations of the Super Priority Notes under the Super Priority/Take-back SSN Indenture, (iii) each of the Reorganized Debtors, LAP Chile, and New Issuer, as appropriate, shall pledge the collateral as set forth in the Super Priority/Take-back SSN Indenture and/or the applicable New Notes Documents, and (iv) in each case, the Reorganized Debtors and New Issuer shall be authorized to do so without further act or action under applicable law, regulation, order or rule, and without further corporate proceedings or action.

        d.   <u>Priority; Collateral Matter for New Notes</u>

The Take-back SSNs and the Super Priority Notes shall be secured by substantially the same collateral securing the obligations of the Existing Notes, <u>provided</u>, <u>further</u>, that the New Issuer shall guarantee the obligations of the Take-back SSNs and the Super Priority Notes and provide a pledge of 100% of its present and future interests in the Reorganized ILAP. The Prepetition Chilean Security Documents shall be fully amended and restated, when appropriate; and upon such amendment and restatement shall be considered included in the definition of the New Notes Documents. For the avoidance of doubt, neither the Take-back SSNs nor Super Priority Notes shall be secured by any letters of credit issued by Citibank, N.A.

The Take-back SSNs, Convertible Notes and the Super Priority Notes shall constitute senior obligations of the Reorganized Debtors and the New Issuer, and will be equal in right of payment with each other and any other senior indebtedness of the Reorganized Debtors and the New Issuer on the Plan Effective Date; <u>provided</u>, <u>however</u>: (i) Mandatory Cash Sweeps will be used to redeem the Super Priority Notes first and, after the Super Priority Notes are paid in full, then to redeem the Take-back SSNs (the Convertible Notes shall not be redeemed pursuant to any Mandatory Cash Sweep); and (ii) upon a Company Sale, the Super Priority Notes will be senior in payment to the Take-back SSNs and the Convertible Notes.

        e.   <u>Mandatory Cash Sweeps</u>

The Super Priority/Take-back SSN Indenture shall provide that thirty (30) days following December 15, 2024, and semi-annually thereafter thirty (30) days following each of June 15 and December 15, there will be cash payments to holders of Super Priority Notes and Take-back SSNs in amounts equivalent to the lesser of (i) the Reorganized Debtors' Cash (excluding proceeds obtained from issuance of the Super Priority Notes) at the close of business on the immediately preceding interest payment date, in excess of $15 million and (ii) the total outstanding principal amount of the Take back SSNs and Super Priority Notes as of each interest payment date (as further described in the Super Priority/Take-back SSN Indenture).

        f.   <u>Substitute Consideration</u>

<u>Section 4.5(f)</u> of the Plan applies in the event that, on the Determination Date, the sum of all Non-Qualified Holders is greater than the Non-Qualified Threshold Amount.

     (1)      All Non-Qualified Holders' Notes will be deposited with the Selling Agent.

     (2)      The Selling Agent shall offer the Non-Qualified Holders' Notes in one or more sale transactions within the Sale Period (i.e., 180 days following the Determination Date), pursuant to a selling agreement to be entered into between the Debtors and the Selling Agent (the "<u>Selling Agent Agreement</u>"). The price, terms and manner of sale will be on

the best terms reasonably available at the time using a transparent open market process and shall be for Cash. The Net Cash Proceeds shall be distributed, on a *pro rata* basis, to such Non-Qualified Holders at the end of the Sale Period.

(3)     In the event that a sale of the Non-Qualified Holders' Notes is unable to be consummated within the Sale Period, there shall be no Substitute Consideration such that the Non-Qualified Holders' Notes shall be cancelled for no consideration. None of the Debtors, the Reorganized Debtors, the Consenting Creditors and the Selling Agent shall have any liability for any loss or alleged loss arising from such sale or a failure to procure any purchaser for any Non-Qualified Holders' Notes.

(4)     For the avoidance of doubt, any Non-Qualified Holders who would have been entitled to receive any New Notes under the Plan if they had been Qualified Holders shall only be entitled to receive the Substitute Consideration in respect thereof.

*vi.*     **_Issuance of the New Notes and New Equity_**

On the Plan Effective Date, the guarantees, pledges, Liens and other security interests, as applicable, granted pursuant to the New Notes Documents (whether prior to or on the Plan Effective Date) shall be deemed to have been granted in good faith as an inducement to the Holders of Allowed Senior Debt Claims and the Super Priority Notes Financing Parties to agree to the treatment contemplated by the Plan and (a) shall be deemed to be approved, (b) shall be legal, binding, and creating or continuing fully perfected and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Notes Documents, (c) shall be deemed perfected on the earlier of the date originally perfected and the Plan Effective Date, subject only to such Liens and security interests as may be permitted under the New Notes Documents, as the case may be, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law, including any applicable law of the Republic of Chile.

The Reorganized Debtors, the New Issuer, and LAP Chile as the holder of the New Issuer Equity granting such Liens and the persons and entities granted such Liens and security interests are authorized and directed to make all filings and recordings, and to obtain all governmental approvals and consents necessary to continue as perfected or to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign), on and after the Plan Effective Date that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection or continuance of perfection shall occur automatically by virtue of the entry of the Confirmation Order and no such filings, recordings, approvals, and consents shall be necessary), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

*vii.*     **_Sales Facilitation Agreement; Company Sale_**

On the Plan Effective Date, Reorganized ILAP and the New Issuer are each authorized and directed, without further act or action under applicable law, regulation, order or rule, and without further corporate proceedings or action, to enter into the Sales Facilitation Agreement with LAP Chile and the Trustee, pursuant to which the parties will agree to make their best efforts to sell 100% of the equity interests in the Reorganized ILAP (or substantially all of its assets, inclusive of a concurrent sale of 100% of the equity interests of San Juan and Norvind) by December 31, 2025, subject to the terms and conditions set forth therein.

*viii.*     **_Preservation of Rights of Action_**

Other than the Causes of Action expressly waived, relinquished, exculpated, released, compromised, or settled in Section 8.3, Section 8.4, and Section 8.5 of the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Debtors (pre-Plan Effective Date) and the Reorganized Debtors (post-Plan Effective Date) shall retain and may enforce all rights to commence and pursue any and all Causes of Action of, or that may be claimed or prosecuted by, the Debtors, whether arising before or after the Petition Date, and the rights to commence, prosecute, or settle such

Causes of Action shall be preserved notwithstanding the occurrence of the Plan Effective Date. **No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them. The Debtors (pre-Plan Effective Date) and the Reorganized Debtors (post-Plan Effective Date) expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in Section 8.3, Section 8.4, and Section 8.5 of the Plan, the Debtors and Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel, judicial, equitable, or otherwise, or as a consequence of the Confirmation or Consummation.

The Debtors (pre-Plan Effective Date) and Reorganized Debtors (post-Plan Effective Date) reserve and shall retain such Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any such Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action on and after the Plan Effective Date. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court on and after the Plan Effective Date.

ix.    ***Vesting of Assets in the Reorganized Debtors***

Except as otherwise provided in the Plan, or in any agreement, instrument, or other document incorporated in the Plan, on the Plan Effective Date, all property in each Estate and all Causes of Action not released pursuant to Section 8.3, Section 8.4 and Section 8.5 of the Plan (including all Causes of Action retained by the Debtors and all insurance policies), shall automatically vest in each respective Reorganized Debtor as of the Plan Effective Date, free and clear of all Liens, Claims, charges, setoff, recoupment, or other encumbrances (other than, for the avoidance of doubt, those Liens and security interests granted under the New Notes Documents pursuant to Section 4.6 of the Plan). On and after the Plan Effective Date, except as otherwise provided in the Plan or in the New Notes Documents, or any other agreement or document related thereto or entered into in connection therewith, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

39

x.    *__Discharge from Notes, Instruments, Certificates, and Other Documents__*

a.    On the Plan Effective Date, other than any securities, instruments, certificates, or other documents governing or evidencing obligations or interests that will remain Unimpaired under the Plan and subject to Section 8.9 of the Plan, the obligations of the Debtors, Reorganized Debtors, the LC Facility Agent, and/or the Existing Indenture Trustee under or in any way related to all notes, instruments, certificates, agreements (including the Existing Indenture and the LC Facility Agreement), and other documents evidencing Claims or Interests shall be discharged; provided, further, however, notwithstanding Confirmation or the occurrence of the Plan Effective Date, such discharge shall not affect (i) any such indenture or agreement that governs the rights of the Holder of a Claim solely for purposes of enabling Holders of Allowed Claims to receive distributions under the Plan as provided therein; (ii) any such notes or other documents entered into related to the incurrence of debt in the ordinary course of business after the Petition Date; (iii) preserve any rights of the Existing Indenture Trustee or LC Facility Agent to payment of fees and expenses from or on any money or property to be distributed in respect of the Existing Notes Claims or LC Facility Claims, respectively, solely to the extent provided in the Plan, including permitting the Existing Indenture Trustee or LC Facility Agent to maintain, enforce, and exercise a charging lien against such distributions; (iv) preserve any rights of the Existing Indenture Trustee or LC Facility Agent to indemnification obligations under the Existing Notes Indenture or LC Facility Agreement, respectively; and (v) the transfer of the Senior Debt Claims to, and the vesting of the Senior Debt Claims with, the Reorganized ILAP and New Issuer pursuant to Section 4.4 of the Plan; provided further that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any expense or liability to the Reorganized Debtors, except to the extent set forth in or provided for under the Plan.

b.    As of the Plan Effective Date, all letters of credit issued by Citibank, N.A. under the LC Facility Agreement shall be deemed terminated. Citibank, N.A. shall have no obligations in any capacity under such letters of credit, and any draw request made under any such letters of credit at any time on or following the Petition Date shall be deemed null and void *ab initio*. As soon as reasonably practicable following Confirmation, Citibank, N.A. shall receive from the beneficiary under each letter of credit issued by Citibank, N.A. under the LC Facility Agreement a duly executed consent to termination certificate of such letters of credit in the form attached to each such letter of credit. The Existing Indenture Trustee, the LC Facility Agent, Consenting Creditors and any other Holder of an Allowed Senior Debt Claim shall take such actions as may be reasonably requested by the Debtors, the Reorganized Debtors, or Citibank, N.A. to promptly give effect to the foregoing provisions.

xi.    *__Execution of Plan Documents__*

Except as otherwise provided in the Plan, on the Plan Effective Date, or as soon as practicable thereafter, the Reorganized Debtors shall execute all instruments and other documents required to be executed under the Plan.

xii.    *__Corporation Action__*

The Debtors or the Reorganized Debtors, as applicable, and the New Issuer are each authorized to take all further corporate actions necessary to effectuate the RSA and the Plan and authorize each of the matters provided for by the Plan involving the corporate structure of the Debtors or corporate or related actions to be taken by or required of the Reorganized Debtors and the New Issuer, whether taken prior to or as of the Plan Effective Date, including the Restructuring Transactions and the issuance of the New Notes.

xiii.    *__New Corporate Governance Document__*

To the extent required by applicable law, on or immediately before the Plan Effective Date, the Reorganized Debtors will file their respective New Corporate Governance Documents with the applicable authorities in their respective provinces or countries of incorporation or formation in accordance with applicable law. The New Corporate Governance Documents will be consistent with the provisions of the Plan and the Bankruptcy Code.

*xiv.*   **_Effectuating Documents; Further Transactions_**

On and after the Plan Effective Date, the Reorganized Debtors and the New Issuer, and the directors (and, if applicable, officers and other members of the boards (or similar governing body) thereof) are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

*xv.*   **_Section 1146(a) Exemption_**

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of assets or interests under the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

*xvi.*   **_Managers, Directors and Officers_**

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, and except as may otherwise be disclosed in the Disclosure Statement, on the Plan Effective Date, the directors and officers who are identified in the Plan Supplement shall serve as the initial board of directors and officers of the New Issuer and the Reorganized Debtors.

On the Plan Effective Date, the Independent Director shall be appointed to the boards of the Reorganized Debtors and the New Issuer. Reorganized ILAP shall pay the Independent Director compensation reasonably agreed by the Required Consenting Creditors. Reorganized ILAP shall procure customary D&O insurance for the benefit of the Independent Director in amounts and with coverages as are customary for directors of private companies in Chile as reasonably agreed by the Required Consenting Creditors.

The Reorganized Debtors and the New Issuer shall not, among other things, (i) remove the Independent Director (except if, at any point after his or her designation, he or she fails to meet the eligibility requirements thereunder) or (ii) reduce the compensation payable to, or terminate or reduce the level of D&O insurance coverage for the benefit of, any Independent Director, in each case without the (x) with respect to the Independent Director of the Reorganized Debtors, the consent of the Super Priority/Take-back SSN Indenture Trustee (acting at the direction of the holders of the majority of the outstanding principal amount of the Take-back SSNs) and (y) with respect to the New Issuer, with the consent of the Convertible Notes Indenture Trustee (acting at the direction of the holders of the majority of the outstanding principal amount of the Convertible Notes)

Pursuant to section 1129(a)(5), the Debtors will disclose in the Plan Supplement the identity and affiliations of any Person proposed to serve on a Reorganized Debtor's board of directors and, to the extent such Person is an insider, the nature of any compensation for such Person.

Corporate governance documents for New Issuer and the Reorganized Debtors, whether or not included in the Plan Supplement, shall:  (a) be consistent with section 1123(a)(6) of the Bankruptcy Code and (b) otherwise be acceptable to the Reorganized Debtors, the ILAP Partners, and the Required Consenting Creditors.

**F.   Treatment of Executory Contracts and Unexpired Leases**

*i.*   **_Assumption of Executory Contracts and Unexpired Leases_**

On the Plan Effective Date, except as otherwise provided in the Plan or pursuant to the Confirmation Order, Executory Contracts (including for the avoidance of doubt the RSA) and Unexpired Leases shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Plan Effective

Date under section 365 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (a) was previously assumed or rejected; (b) was previously expired or terminated pursuant to its own terms; (c) is the subject of a motion to assume or assume and assign filed on or before the Confirmation Date; or (d) is designated specifically, or by category, as an Executory Contract or Unexpired Lease on the Rejection Schedule. The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, assignments, and rejections.

Except as otherwise expressly provided in the Plan or agreed to by the Debtor(s) and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated hereunder. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

With respect to all Executory Contracts and Unexpired Leases that are assumed, any provision in any such agreement that:

(i) prohibits, restricts, or conditions the assumption and/or assignment, or purports to prohibit, restrict, or condition the assumption and/or assignment (including any "change of control" provision) of such agreement or allows any party to such agreement to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assumption and/or assignment of such agreement constitutes an unenforceable anti-assignment and/or discrimination provision and is void and of no force an effect; and

(ii) provides for modification, breach, default, event of default, or termination, or deemed modification, breach, default, event of default, or termination shall be deemed cured and such Executory Contracts and Unexpired Leases shall be in full force and effect as of the Plan Effective Date as if such modification, breach, default, event of default, or termination never existed, including, but not limited to, on account of or related to any of the following: (A) the commencement or continuation of the Chapter 11 Cases, (B) the insolvency or financial condition of any of the Debtors at any time, (C) the Debtors' assumption and/or assignment of such agreement, (D) a change of control or similar occurrence, or (E) the consummation of the Plan, the Plan Documents, or the Restructuring Transactions; provided, further, that, such provisions shall be deemed modified so as to preclude any non-Debtor party thereto from any right to prohibit, restrict, or condition assumption and/or assignment, to modify, terminate, or declare a breach or default under such agreement, and to preclude exercise of any other breach- or default-related rights or remedies with respect thereto, which shall also preclude any non-Debtor party right to terminate or recapture such agreement, impose any penalty thereunder, condition any renewal or extension thereof, impose any rent acceleration or assignment fee, or increase or otherwise impose any other fees or other charges in connection therewith.

Without limiting the effect of the preceding paragraph, all provisions referenced in the preceding paragraph constitute unenforceable discriminatory or anti-assignment provisions that are void and of no force and effect pursuant to sections 365(b), 365(e), 365(f), and 525 of the Bankruptcy Code. The Consummation of the Plan and the implementation of the Restructuring Transactions is not intended to, and shall not, constitute a "change of control" or "change in control" under any lease, contract, or agreement which a Debtor is a party.

   ii.   *__Cure of Defaults for Assumed Executory Contracts and Unexpired Leases__*

The Debtors or the Reorganized Debtors, as applicable, shall pay Cures, if any, on the Plan Effective Date or as soon as reasonably practicable thereafter, with the amount and timing of payment of any such Cure dictated by the underlying agreement and the Debtors' ordinary course of business. The Reorganized Debtors also may settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the ordinary course amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be filed with the Bankruptcy Court on or before the deadline set by the Bankruptcy

Court for objections to confirmation of the Plan; provided, however, that nothing in the Plan shall prevent the Reorganized Debtors from paying any Cure Claim despite the failure of the relevant counterparty to file such request for payment of such Cure. **Any such request that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable, without the need for any objection or any further notice to or action, order, or approval of the Bankruptcy Court.** Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure in the Debtors' ordinary course of business.

**In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be filed with the Bankruptcy Court on or before the deadline set by the Bankruptcy Court for objections to confirmation of the Plan. Any such objection will be scheduled to be heard by the Bankruptcy Court at the earlier of the Confirmation Hearing or the Debtors' or the Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.**

If there is any dispute regarding any Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as reasonably practicable after the Bankruptcy Court's adjudication of such dispute and the entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and full payment of any applicable Cure pursuant to Section 5.2 of the Plan, in the amount and at the time dictated above, shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the Plan Effective Date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to Section 5.2 of the Plan, in the amount and at the time dictated by the Debtors' ordinary course of business, shall be deemed disallowed and expunged as of the Plan Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

  *iii. **Pre-Existing Obligations and Other Obligations***

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors or Reorganized Debtors, as applicable, under such Executory Contract or Unexpired Lease. In particular, notwithstanding any applicable non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide:  (a) payment to the contracting Debtors or Reorganized Debtors, as applicable, of outstanding and future amounts owing thereto under or in connection with rejected Executory Contracts or Unexpired Leases or (b) warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or Reorganized Debtors, as applicable, from counterparties to rejected Executory Contracts.

  *iv. **Rejection Damages Claims and Objections to Rejections***

In the event that the rejection of an Executory Contract or Unexpired Lease by any of the Debtors results in damages to the other party or parties to such contract or lease, a Claim for such damages shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors or their respective properties or interests in property as agents, successors, or assigns, unless a Proof of Claim is filed with the Bankruptcy Court and served upon counsel for the Debtors or the Reorganized Debtors **no later than thirty (30) days after the Plan Effective Date**. Any such Claims, to the extent Allowed, shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

*v.*    ***Contracts and Leases Entered Into After the Petition Date***

Contracts and leases entered into after the Petition Date by any Debtor, and any Executory Contracts and Unexpired Leases assumed by any Debtor, may be performed by the applicable Reorganized Debtor in the ordinary course of business.

*vi.*    ***Reservation of Rights***

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have forty five (45) days following entry of a Final Order resolving such dispute to alter their treatment to assume or reject such contract or lease, which revised treatment shall be effective as of the Plan Effective Date.

**G.  Provisions Governing Distributions**

*i.*    ***Distribution on Account of Claims Allowed as of the Plan Effective Date***

Except as otherwise provided in the Plan, a Final Order, or as otherwise agreed to by the Debtors, the New Issuer or the Reorganized Debtors (as the case may be) and the Holder of the applicable Allowed Claim, on the Distribution Date, the Reorganized Debtors and New Issuer, as applicable, shall make initial distributions under the Plan on account of Claims Allowed on or before the Plan Effective Date, subject to the Debtors' and Reorganized Debtors' right to object to Claims; provided, however, that (a) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Plan Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, subject to all of the Debtors' and Reorganized Debtors' legal and equitable defenses to or setoffs or recoupments against any such Administrative Claim, (b) Allowed Priority Tax Claims shall be paid in accordance with Section 2.3 of the Plan and to the extent any Allowed Priority Tax Claim is not due and owing on the Plan Effective Date, such Claim may be paid in full in Cash in accordance with the terms of any agreement between the Debtors or the Reorganized Debtors (as the case may be) and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business, and (c) Allowed General Unsecured Claims with respect to liabilities incurred by the Debtors in the ordinary course of business prior to the filing of the Chapter 11 Cases shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, subject to all of the Debtors' and Reorganized Debtors' legal and equitable defenses to or setoffs or recoupments against any such General Unsecured Claim.

*ii.*    ***Special Rules for Distribution to Holders of Disputed Claims***

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties: (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order or the Claim has been Allowed or expunged. Any dividends or other distributions arising from property distributed to Holders of Allowed Claims in a Class and paid to such Holders under the Plan shall be paid also, in the applicable amounts, to any Holder of a Disputed Claim, as applicable, in such Class that becomes an Allowed Claim after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims in such Class.

*iii.*    ***Disbursing Agent***

Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Disbursing Agent on or as soon as practicable after the Plan Effective Date. On the Plan Effective Date, the Reorganized Debtors

shall be the Disbursing Agent, which agent may be changed by the Reorganized Debtors at any time. To the extent the Disbursing Agent is one or more of the Reorganized Debtors or the New Issuer, the Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Plan Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent may be paid in Cash upon invoice by the Reorganized Debtors.

iv.    ***Distribution of Take-back SSNs and Convertible Notes to Holders of Senior Debt Claims***

a.    Take-back SSNs and Convertible Notes are being issued only to Qualified Holders and, if the total number of Non-Qualified Holders is equal to or less than the Non-Qualified Threshold Amount, the Non-Qualified Holders. A "Qualified Holder" is a Holder of an Allowed Senior Debt Claim who provides either one of the following two certifications (the "Certification"):

(1)    A certification that it is located in the United States, and is either (A) a "Qualified Institutional Buyer" as such term is defined in Rule 144A under the Securities Act or (B) an "accredited investor" as defined in Regulation D under the Securities Act, and, in either case, acknowledges that it will be receiving "restricted securities" within the meaning of Rule 144 under the Securities Act; or

(2)    A certification that it is not a "U.S. Person" as defined in Rule 902(k) under the Securities Act and is qualified to participate in acquiring the Take-back SSNs and Convertible Notes, in accordance with the laws of its jurisdiction of location or residence.

b.    Deadline to Submit Certifications. All Holders of Senior Debt Claims must provide their respective Certification by no later than the Determination Date; provided, however, that Citibank, N.A. is deemed a Qualified Holder under the Plan, and notwithstanding anything to the contrary in the Plan or the Disclosure Statement, Citibank, N.A. shall not be required to provide a Certification to receive Take-back SSNs (or Convertible Notes, if applicable) as a Holder of LC Facility Claims. **Any Holder of a Senior Debt Claim that fails to submit the Certification by the Determination Date shall have forfeited its rights to receive distribution of Take-back SSNs and Convertible Notes pursuant to the Plan on account of its Senior Debt Claims, and shall not participate in any distribution under the Plan. Any property (including the Take-back SSNs and Convertible Notes) in respect of such forfeited Senior Debt Claims shall revert to the Reorganized Debtors**. On or promptly after the Determination Date, the Reorganized Debtors shall calculate the total number of Non-Qualified Holders.

c.    Non-Qualified Holders

(1)    Any Holder of an Allowed Senior Debt Claim that is not a Qualified Holder shall be a "Non-Qualified Holder."

(2)    If on the Determination Date, the number of Non-Qualified Holders is equal to or less than Non-Qualified Threshold Amount, then the Non-Qualified Holders shall

receive the Take-back SSNs and the Convertible Notes, <u>provided</u>, all such other information required to be submitted by any such Non-Qualified Holder was timely submitted.

(3)    If on the Determination Date, the number of Non-Qualified Holders is greater than the Non-Qualified Threshold Amount, then all Non-Qualified Holders shall not be entitled to receive any Take-back SSNs or Convertible Notes, and shall only be entitled the Substitute Consideration in respect thereof. The Substitute Consideration for Non-Qualified Holders shall be distributed by the Selling Agent after the Sale Period, as described in <u>Section 4.5(f)</u> of the Plan.

d.   <u>LC Facility Claims</u>

(1)    As a condition to participation under the Plan, each Holder of an LC Facility Claim that is a Qualified Holder is required to review and complete the Distribution Form and provide their Deposit/Withdrawal at Custodian ("<u>DWAC</u>") information. **Any Holder of an LC Facility Claim who fails to submit a completed Distribution Form to the Disbursing Agent together with any documents required in connection therewith within one hundred and eighty (180) days after the Plan Effective Date shall have forfeited its rights to receive distribution of Take-back SSNs and Convertible Notes pursuant to the Plan on account of its LC Facility Claims, and shall not participate in any distribution under the Plan. Any property (including the Take-back SSNs and Convertible Notes) in respect of such forfeited Senior Debt Claims shall revert to the Reorganized Debtors.**

(2)    All Distributions to Holders of Allowed LC Facility Claims by the Disbursing Agent shall be deemed completed when made to the LC Facility Agent, which shall be deemed to be the Holder of all Allowed LC Facility Claims for purposes of Distributions to be made hereunder. The LC Facility Agent shall thereafter hold or direct such Distributions for the benefit of the Holders of Allowed LC Facility Claims. On the Plan Effective Date or soon as practicable thereafter in accordance with the requirements set forth in <u>Article VI</u> of the Plan, the LC Facility Agent shall arrange to deliver such Take-back SSNs, including the Settlement Take-back SSNS if the LC Facility Settlement is consummated, and the Convertible Notes if the LC Facility Settlement is not consummated, via DWAC Deposit to or on behalf of such Holders of Allowed LC Facility Claims.

(3)    Upon delivery to the LC Facility Agent by the Disbursing Agent of the Take-back SSNs, including the Settlement Take-back SSNS if the LC Facility Settlement is consummated, and the Convertible Notes if the LC Facility Settlement is not consummated, the Reorganized Debtors shall be released of all liability with respect to the holding and/or delivery of such distributions to the Holders of LC Facility Claims.

e.   <u>Existing Notes Claims</u>

(1)    The Distribution Record Date shall not apply to publicly traded securities, which shall receive distributions in accordance with the Plan and the applicable procedures of DTC.

(2)    With respect to a Holder of an Allowed Existing Note Claim, to receive its entitlement pursuant to the Plan, each such Holder is required to review and provide the necessary certification, and take one of the following actions as applicable to verify its position in the Existing Notes:

A      prior to the Plan Effective Date, through the electronic delivery by such Holder's Nominee of the Holder's certification and Existing Notes position via ATOP by the applicable deadline[11]; or

B      after the Plan Effective Date and through and including the Determination Date, complete and return to the Disbursing Agent a duly-completed Distribution Form together with the required certifications in connection therewith.

(3)      The Debtors, through its Disbursing Agent, shall use reasonable best efforts to announce the distribution procedures to enable the submission into ATOP or transfer via DWAC Withdrawal of the Existing Notes prior to the Plan Effective Date to facilitate the distribution of the Take-back SSNs and Convertible Notes.

(4)      On the Plan Effective Date, or as soon as reasonably practicable thereafter, the Debtors will cause to be distributed, in accordance with the Plan and DTC's customary procedures (which may be through ATOP or via DWAC Deposit), the Take-back SSNs and Convertible Notes corresponding to each Holder of an Existing Notes Claim that has completed the required procedures.

(5)      All Existing Notes shall be cancelled as of the Plan Effective Date, and DTC shall be requested to (i) remove all Existing Notes from its platform, and (ii) shall be requested to provide records to the Debtors (on customary terms) for any positions not previously submitted through ATOP or via DWAC Deposit.

(6)      **Any Holder of the Existing Notes who fails to (a) surrender the applicable Existing Notes prior to the Plan Effective Date through ATOP or via DWAC Withdrawal, including any required certification with respect to such holder's eligibility status, or (b) following the Plan Effective Date, verify its position in the applicable Existing Notes on the Distribution Form, which form must include (I) the required certification by the Holder with respect to the holder's eligibility status and (II) the certification of such holder's Nominee to verify such holder's untendered position in the Existing Notes, to the Disbursing Agent together with any documents required in connection therewith, within one hundred and eighty (180) days after the Plan Effective Date shall have forfeited its rights to receive distribution of Take-back SSNs and Convertible Notes pursuant to the Plan on account of its Existing Notes Claims, and shall not participate in any distribution under the Plan. Any property (including the Take-back SSNs and Convertible Notes) in respect of such forfeited Senior Debt Claims shall revert to the Reorganized Debtors.**

(7)      Upon delivery by the Disbursing Agent of the Take-back SSNs and Convertible Notes to DTC pursuant to <u>Section 6.4</u> of the Plan, the Reorganized Debtors shall be released of all liability with respect to the holding and/or delivery of such distributions to the Holders of Existing Notes Claims.

(8)      Exchange of Notes:

A      The Disbursing Agent will work with DTC to establish the distribution event relating to the Existing Notes on DTC's ATOP system.[12] A beneficial

---

[11]   If ATOP is not utilized then Existing Notes may be submitted by the Nominee via DWAC Withdrawal with an accompanying Distribution Form containing the necessary certification.

[12]   In the event DTC is unwilling or unable to utilize the ATOP system to facilitate the distribution event or the ATOP system is otherwise not utilized, the Debtors reserve the right to require a Nominee to certify each Holder's

47

owner of Existing Notes that are held by or registered in the name of a Nominee is urged to contact such Nominee promptly if such beneficial owner wishes to participate. Only Nominees that are direct participants of DTC can effectuate an electronic delivery of the Existing Notes on a holder's behalf. Beneficial holders of the Existing Notes, whether by delivery through ATOP or DWAC Withdrawal, must allow sufficient time for its Nominee to effectuate the electronic delivery of its Existing Notes prior to any deadline.

B      At the holder's instruction, a Nominee will electronically deliver the holder's Existing Notes, whether by ATOP or DWAC Withdrawal. The ATOP process will include an express acknowledgement that the underlying holder has reviewed and agreed to be bound by the certifications made through ATOP and that the Debtors may enforce such certifications against such holder.  If the DWAC Withdrawal process is utilized, the certifications must be included in the related Distribution Form.

C      **ALL QUESTIONS AS TO THE VALIDITY, FORM, ELIGIBILITY (INCLUDING TIME OF RECEIPT), AND ACCEPTANCE OF NOTES THROUGH ATOP OR DWAC WITHDRAWAL WILL BE RESOLVED BY THE REORGANIZED DEBTORS OR NEW ISSUER, WHOSE DETERMINATION WILL BE FINAL AND BINDING, SUBJECT ONLY TO REVIEW BY THE BANKRUPTCY COURT UPON APPLICATION WITH DUE NOTICE TO ANY AFFECTED PARTIES IN INTEREST. THE DEBTORS RESERVE THE RIGHT TO REJECT ANY AND ALL SUBMISSIONS THROUGH ATOP AND TENDERED EXISTING NOTES NOT IN PROPER FORM, OR SUBMISSIONS THROUGH ATOP AND TENDERED EXISTING NOTES THE DEBTORS' ACCEPTANCE OF WHICH WOULD, IN THE OPINION OF THE DEBTORS OR THEIR COUNSEL, BE UNLAWFUL.**

*v.      **Distribution Form***

To the extent a Holder of a Senior Debt Claim is required to deliver a Distribution Form to the Disbursing Agent, the Nominee must also provide any required certifications, including, in the event such Distribution Form is submitted following the Plan Effective Date, the certification of the Holder's untendered position in the Existing Notes.

*vi.      **Delivery of Distributions and Undeliverable or Unclaimed Distributions***

a.      Delivery of Distributions

Except as otherwise provided in the Plan (including in Section 4.5(f) and Section 6.4 of the Plan), distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date by the Disbursing Agent, as appropriate:  (a) as indicated on the applicable register or in the Debtors' records as of the date of any such distribution; (b) to the signatory set forth on any of the Proofs of Claim filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is filed or if the Debtors have not been notified in writing of a change of address); (c) any counsel that has appeared in the Chapter 11 Cases on a Holder's behalf; or (d) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent, as appropriate, after the date of any related Proof of Claim. The Debtors shall have no obligation

---

position in the Existing Notes by including its DTC participant number and a medallion guarantee stamp on the Distribution Form, validating the Holder's position in the Existing Notes.

to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date, provided, however, that distributions on account of the Senior Debt Claims shall be made in accordance with Section 4.5(f) and Section 6.4 of the Plan.

Subject to Article VI of the Plan, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan. The Debtors, the Reorganized Debtors, the New Issuer and the Disbursing Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for its respective fraud, gross negligence, or willful misconduct.

b.    Minimum; De Minimis Distributions

Notwithstanding anything to the contrary contained in the Plan, the Disbursing Agent shall not be required to distribute Cash or other property to the Holder of any Allowed Claim if the amount of Cash or other property to be distributed on account of such Allowed Claim is less than $50. Any Holder of an Allowed Claim on account of which the amount of Cash or other property to be distributed is less than such amount shall have such Claim discharged and shall be forever barred from asserting such Claim against the Debtors, the Reorganized Debtors, the New Issuer or their respective property. Any Cash or other property not distributed pursuant to this provision shall be the property of the Reorganized Debtors.

c.    Compliance Matters

In connection with the Plan, to the extent applicable, the Reorganized Debtors, the New Issuer or the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors, the New Issuer or the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors and New Issuer reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances. All Persons holding Claims shall be required to provide any information necessary to effect information reporting and the withholding of such taxes. Notwithstanding any other provision of the Plan to the contrary, (a) each Holder of an Allowed Claim shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding and other tax obligations, on account of such distribution, and (b) no distribution shall be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements satisfactory to the Reorganized Debtors or the New Issuer for the payment and satisfaction of such tax obligations.

d.    Cash Payments

Except as otherwise set forth in Section 6.6(d) of the Plan, distributions of Cash under the Plan shall be made by the Disbursing Agent on behalf of the applicable Debtor (or Debtors or Reorganized Debtors) in U.S. dollars. At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements. Cash payments to creditors outside of the United States of America may be made, at the option of the Disbursing Agent, in such currency and by such means as are necessary or customary in a particular foreign jurisdiction.

e.    Undeliverable and Unclaimed Distributions

(1)    *Undeliverable Distributions.* If any distribution to a Holder of an Allowed Claim is returned to the Reorganized Debtors, the New Issuer or the Disbursing Agent as undeliverable or is otherwise unclaimed, no further distributions shall be made to such Holder unless and until the Reorganized Debtors, the New Issuer or the Disbursing Agent

are notified in writing of such Holder's then-current address or other necessary information for delivery pursuant to the time frame set forth in the Plan. Subject to the succeeding sentence, the Reorganized Debtors, the New Issuer or the Disbursing Agent shall retain undeliverable distributions until such time as a distribution becomes deliverable. **Except as otherwise provided in <u>Section 6.4</u> of the Plan, each Holder of an Allowed Claim whose distribution remains (a) undeliverable for one hundred and eighty (180) days after the distribution is returned as undeliverable or (b) otherwise has not been deposited, endorsed or negotiated within one hundred and eighty (180) days of the date of issuance shall have no claim to or interest in such distribution and shall be forever barred from receiving any distribution under the Plan. Nothing contained in the Plan shall require the Debtors, the Reorganized Debtors, the New Issuer or the Disbursing Agent to attempt to locate any Holder of an Allowed Claim.**

(2)    *Reversion.* Any distribution under the Plan that is an Unclaimed Distribution for a period of one hundred and eighty (180) days after distribution or is otherwise unclaimed or undelivered as set forth in <u>Section 6.4</u> and/or <u>Section 6.6(e)(1)</u> of the Plan shall, in each case, be deemed unclaimed property under section 347(b) of the Bankruptcy Code, and such Unclaimed Distribution shall revest in the applicable Reorganized Debtor or the New Issuer, as applicable. Upon such revesting, the Claim or Interest of any Holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable foreign, federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.

vii.    <u>**_Exemption from Registration Requirements; Restrictions on Certain Holders_**</u>

The offer, sale, issuance, and distribution under the Plan of the New Notes and New Equity Interests will, in each case, be exempt from registration under the Securities Act and any other applicable U.S. state or local law requiring registration prior to offering pursuant to Section 4(a)(2) of the Securities Act or Regulation D or Regulation S thereunder and section 1145 of the Bankruptcy Code, as applicable, and the indentures governing the New Notes shall be exempt from qualification under the Trust Indenture Act of 1939 pursuant to Section 304(b) thereof.

The Super Priority Notes, Take-back SSNs and the Convertible Notes are all being issued under the Plan in reliance on the exemption provided in Section 4(a)(2) of the Securities Act will be "restricted securities" under the Securities Act, and therefore will not be able to be resold absent an exemption under the Securities Act, which may be available under Rule 144 under the Securities Act, Rule 144A under the Securities Act or Regulation S under the Securities Act, and further subject to any other applicable regulatory approval and any restrictions contained in the New Notes Documents.

The New Equity Interests issued under will be "restricted securities" under the Securities Act by the recipients thereof, pursuant to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in Section 2(a)(11) of the Securities Act and in compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the SEC, and any further restrictions contained in the New Corporate Governance Document (as applicable), and any other applicable regulatory approval.

**Parties are advised to consult with their own counsel as to the availability of the exemption provided by Rule 144, Rule 144A or Regulation S.**

All documents, agreements and instruments entered into and delivered on or as of the Plan Effective Date contemplated by or in furtherance of the Plan, including the New Notes Documents and any other agreement or document related thereto or entered into in connection therewith, shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity (other than as expressly required by such applicable agreement).

Notwithstanding anything to the contrary in the Plan, no Person (including, for the avoidance of doubt, (i) the Selling Agent, (ii) Holders of the Senior Debt Claims (including any Consenting Noteholder), (iii) DTC, and (iv) any transfer agent) may require a legal opinion by or on behalf of the Debtors, the Reorganized Debtors or the New Issuer regarding the validity of any transaction contemplated by the Plan, including, but not limited to, whether the issuance of the New Notes or the New Equity Interests is exempt from registration and/or eligible for book-entry, delivery, settlement, and depository services or validly issued, fully paid, and nonassessable.

viii.    **_Claims Paid or Payable by Third Parties_**

a.    <u>Claims  Paid by Third Parties</u>

A Claim shall be reduced in full, and such Claim shall be disallowed without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, a Reorganized Debtor or the New Issuer. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, a Reorganized Debtor or the New Issuer on account of such Claim, such Holder shall repay, return or deliver any distribution held by or transferred to the Holder to the applicable Reorganized Debtor to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount distributable in respect of such Claim as of the date of any such distribution under the Plan.

b.    <u>Claims Payable by Insurance Carriers</u>

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction, or otherwise as agreed to by the Debtors or Reorganized Debtors), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

c.    <u>Applicability of Insurance Policies</u>

Except as otherwise expressly provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of an applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors, the Reorganized Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained in the Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers. The Reorganized Debtors shall succeed to all of the Debtors' rights and defenses in respect of any insurance policy on the Plan Effective Date.

ix.    ***Setoffs; Recoupments***

a.    Except as to Senior Debt Claims held by Consenting Creditors, each Reorganized Debtor, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off or recoup against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any Claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Plan Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action that such Reorganized Debtor may possess against such Holder.

b.    In no event shall any Holder of a Claim be entitled to set off any Claim against any Claim, right, or Cause of Action of the Debtor or Reorganized Debtor, as applicable, unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise.

c.    In no event shall any Holder of a Claim be entitled to recoup any Claim against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

x.    ***Allocation Between Principal and Accrued Interest***

Except as otherwise provided in the Plan and to the extent permitted by applicable law, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan for income tax purposes as allocated, first, to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to the interest accrued through and including the Plan Effective Date.

## H.  Conditions Precedent to Confirmation and Consummation of the Plan

i.    ***Conditions Precedent***

It shall be a condition to the Plan Effective Date that the following conditions shall have been satisfied or waived pursuant to Section 9.2 of the Plan:

(a)    the Bankruptcy Court shall have entered the Confirmation Order, which:

i.    authorizes the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with, or to implement, the Plan in a manner consistent in all respects with the Plan;

ii.    decrees that the provisions in the Confirmation Order and the Plan are non-severable and mutually dependent;

iii.   authorizes the Debtors, the Reorganized Debtors and the New Issuer, as applicable to: (A) implement the Restructuring Transactions; (B) make all distributions and issuances as required under the Plan; and (C) enter into any agreements and transactions, in each case, in a manner consistent in all respects with the terms of the Plan;

iv.   if Citibank is party to the RSA as of such date, approves the issuance of the Settlement Take-back SSNs to the Holders of LC Facility Claims in accordance with the Plan;

v.   provides that the solicitation, offer, sale and issuance of the securities under the Plan was in compliance with, and pursuant to, all relevant sections of the Securities Act, and any similar state laws;

vi.   authorizes the implementation of the Plan in accordance with its terms; and

vii.   provides that, pursuant to section 1146 of the Bankruptcy Code, the vesting of assets, the delivery of any deed or other instrument or transfer, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax;

(b)   the RSA shall not have been terminated at any time (excluding, however, any termination of the Second Amendment), and no condition shall exist under the RSA that would permit the Majority Members (as defined in the RSA) to terminate the RSA pursuant to Section 3.01(b)(xiii) of the RSA;

(c)   the Debtors shall not have received any notice of any charge, sanction, levy, or fine imposed by any government regulator: (i) enjoining, prohibiting, ceasing, or terminating the ability of the Debtors to implement the Restructuring, or (ii) imposing criminal liability on any of the Debtors or any of its managers;

(d)   the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to Consummate the Plan;

(e)   the final version of each of the Plan and all documents contained in any supplement to the Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications, or supplements thereto required for Consummation or other documents contained therein required for Consummation, shall have been executed or filed (other than any collateral perfection requirements), as applicable, in each case in form and substance acceptable to the Debtors, the ILAP Partners and the Required Consenting Creditors, in each case, in their reasonable discretion;

(f)   the New Notes Documents shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Plan Effective Date) to the effectiveness of the New Notes Documents (other than any collateral perfection requirements) shall have been satisfied or duly waived in writing in accordance with the terms of each the New Notes Documents and the issuance of each of the New Notes shall have occurred;

(g)   the Super Priority Notes Financing Parties shall purchase in Cash the Super Priority Notes;

(h)   all professional fees and expenses of professionals for the Debtors or any official committee appointed in the Chapter 11 Cases that require the Bankruptcy Court's approval shall have been paid in full in Cash or amounts sufficient to pay such fees and expenses in full in cash after the Plan Effective Date shall have been placed in the Professional Fee Escrow pursuant to an escrow agreement acceptable to the Debtors and such Professionals pending the Bankruptcy Court's approval of such fees and expenses;

(i)   all Restructuring Expenses shall have been paid in Cash in full; and

(j)   the Plan and all documents and agreements necessary for Consummation of the Plan (other than any collateral perfection requirements) shall have: (i) all conditions precedent to such documents and agreements satisfied or waived pursuant to the terms of such documents or agreements; (ii) been tendered for delivery to the required parties and, to the extent required, filed with and approved by any applicable Governmental Units in accordance with applicable laws; and (iii) been effected or executed.

### ii. *Waiver of Conditions Precedent*

At any time, without any notice to any other parties in interest, without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm or Consummate the Plan, the Debtors may (x) with the consent of the Required Consenting Creditors if impacted thereby (which consent shall not be unreasonably withheld, conditioned or delayed), waive any of the conditions to the Plan Effective Date set forth in <u>Section 9.1</u> and/or (y) subject to <u>Section 10.1</u> of the Plan, amend, modify or supplement any of the conditions to the Plan Effective Date set forth in <u>Section 9.1</u> of the Plan.

### iii. *Effect of Non-Occurrence of Conditions to Consummation*

If prior to Consummation, the Confirmation Order is vacated pursuant to a Final Order, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan and Disclosure Statement will be null and void *ab initio* in all respects, all parties in interest shall go back to the status *quo ante* as if the Plan and Disclosure Statement had never existed, and nothing contained in the Plan or Disclosure Statement shall: (a) constitute a waiver or release of any Claims, Interests, or Causes of Action; (b) prejudice in any manner the rights of any Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

## I. Modification, Revocation or Withdrawal of the Plan

### i. *Modification of Plan*

Effective as of the date hereof, and subject to the last sentence below: (a) the Debtors, with the consent of the Required Consenting Creditors (which consent shall not unreasonably be withheld, delayed, or conditioned), may amend or modify the Plan before the entry of the Confirmation Order in accordance with the Bankruptcy Code and the Bankruptcy Rules; and (b) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, with the consent of the Required Consenting Creditors (which consent shall not unreasonably be withheld, delayed, or conditioned), may amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code; <u>provided, further,</u> that the consent of Citibank, N.A. shall also be required for any waiver, amendment, modification or supplement of <u>Section 4.10(b)</u> of the Plan. Notwithstanding the foregoing consent rights provided to the Consenting Creditors, the Debtors may amend, modify or supplement the Plan, from time to time without the consent of any Consenting Noteholder, solely to cure any ambiguity, defect (including any technical defect) or inconsistency, provided that any such amendments, modifications or supplements (i) are not material; (ii) do not adversely affect the rights, interests, or treatment of any member of Class 3; (iii) do not change the material terms and conditions of any New Notes, including without limitation any financial terms, events of default, covenants or substantive protections benefiting the Consenting Creditors; and (iv) for the avoidance of doubt, are not inconsistent with the terms of the Restructuring Term Sheet; <u>provided, further</u> that the Debtors provide counsel for the Ad Hoc Group, counsel for the Holders of the LC Facility Claims, and counsel for the Existing Indenture Trustee with a copy of the proposed amendment, modification or supplement at least two (2) days before the proposed effectiveness of such amendments, modification or supplements.

### ii. *Revocation or Withdrawal of Plan*

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan, or if Confirmation or the Plan Effective Date does not occur, then: (a) the Plan will be null and void *ab initio* in all respects; (b) any allowance of a Claim or any other settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto will be null and void *ab initio* in all respects; (c) nothing contained in the Plan shall (1) constitute a waiver or release of any Claims, Interests, or Causes of Action, (2) prejudice in any manner the rights of any Debtor or any other Entity, or (3) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity; and (d) all rights and defenses of the Consenting Creditors, the Debtors and the ILAP Partners under the RSA and Restructuring Term Sheet are preserved.

*iii.*    **_Confirmation of the Plan_**

To the extent any Class rejects the Plan, the Debtors will request confirmation of the Plan under section 1129(b) of the Bankruptcy Code. The Debtors, subject to <u>Section 10.1</u> of the Plan, reserve the right to alter, amend, modify, revoke or withdraw the Plan or any exhibit or Plan Supplement in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

**J.    Effect of Confirmation of the Plan**

*i.*    **_Compromise and Settlement of Claims, Interests and Controversies_**

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any other Claim or Interest or any treatment or distribution to be made on account of an Allowed Claim or Allowed Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests, and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court. After the Plan Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

*ii.*    **_Discharge of Claims and Termination of Interests_**

**Except as otherwise provided for in the Plan and effective as of the Plan Effective Date:  (a) the rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their assets, property, or Estates; (b) the Plan shall bind all Holders of Claims and Interests, notwithstanding whether any such Holders failed to vote to accept or reject the Plan or voted to accept or reject the Plan; (c) all Claims and Interests shall be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Entities shall be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, the New Issuer, each of their successors, assigns, assets and properties, any Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Plan Effective Date; <u>provided</u>, <u>however</u>, that the foregoing shall not affect the treatment of the Senior Debt Claims as provided in <u>Section 4.4(d)</u> and <u>Section 4.4(e)</u> of the Plan. For the avoidance of doubt, nothing in this section shall affect the rights of Holders of Claims and Interests to seek to enforce the Plan or any post-Plan Effective Date obligations, including the distributions to which Holders of Allowed Claims and Interests are entitled under the Plan.**

*iii.*    **_Releases by the Debtors_**

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise expressly provided in the Plan, for good and valuable consideration, as of the Plan Effective Date, to the extent permitted by applicable laws, the Released Parties are conclusively, absolutely, unconditionally, irrevocably, and forever deemed released and discharged by the Debtors, the Reorganized Debtors, and the Estates from any and all actions, claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether for tort, contract, violations of foreign, federal or state securities laws and Avoidance Actions, including any derivative claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, asserted or that could possibly have been asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or the Estates, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Existing Indenture, the Existing Notes, the LC**

Facility Agreement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or during the Chapter 11 Cases, the negotiation, formulation, solicitation, or preparation of the RSA, the Disclosure Statement, the Plan, the Plan Supplement, or related agreements, instruments or other documents, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date; _provided_, _however_, that the foregoing provisions of __Section 8.3__ of the Plan shall have no effect (x) on the liability of any of the Released Parties for gross negligence, willful misconduct, fraud, or criminal conduct; (y) any Causes of Action retained by the Debtors against any Person other than the Released Parties; and (z) the Debtors' rights and defenses in respect of creditors and contract counterparties that are Unimpaired under the Plan; _provided_, _further_, that nothing in __Section 8.3__ of the Plan shall release any post-Plan Effective Date obligations of any party under the Plan or any document, instrument, or agreement executed to implement, or otherwise given effect under, the Plan, including the New Notes Documents and any other agreement or document related thereto or entered into in connection therewith, as applicable.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, including pursuant to Bankruptcy Rule 9019, of the release set forth in __Section 8.3__ of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such release is:  (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the claims released by __Section 8.3__ of the Plan; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors asserting any claim or Cause of Action released by __Section 8.3__ of the Plan.

_iv._    __*Releases by Releasing Parties*__

As of the Plan Effective Date, to the extent permitted by applicable law, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Estates and the Released Parties from any and all claims, interests, obligations, rights, liabilities, actions, causes of action, suits, debts, demands, damages, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims (including all claims and actions against any Entities under the Bankruptcy Code) whatsoever, whether for tort, contract, violations of foreign, federal or state securities laws and Avoidance Actions, including any derivative claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Releasing Party asserted or that could possibly have been asserted, or would have been legally entitled to assert (whether individually or collectively), based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Existing Indenture, the Existing Notes, the LC Facility Agreement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Releasing Party, the restructuring of Claims and Interests prior to or during the Chapter 11 Cases, the negotiation, formulation, solicitation, or preparation of the RSA, the Disclosure Statement, the Plan, the Plan Supplement, or related agreements, instruments or other documents, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date; _provided_, _however_, that the foregoing provisions of __Section 8.4__ of the Plan shall have no effect on (x) the liability of any of the Released Parties for gross negligence, willful misconduct, fraud, or criminal conduct and (y) the treatment of the Senior Debt Claims as provided in __Section 4.4(d)__ and __Section 4.4(e)__ of the Plan; _provided further_ that nothing in __Section 8.4__ of the Plan shall release any post-Plan Effective Date obligations (except Cure Claims that have not been timely filed) of any party under the Plan or any document, instrument, or agreement executed to implement, or otherwise given effect under, the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, including pursuant to Bankruptcy Rule 9019, of the release set forth in __Section 8.4__ of the Plan, which includes by

reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such release is:  (a) important to the Plan; (b) in exchange for the good and valuable consideration provided by the Debtors, the Reorganized Debtors, the Estates and the Released Parties; (c) a good faith settlement and compromise of the claims released by <u>Section 8.4</u> of the Plan; (d) in the best interests of the Debtors and all Holders of Claims and Interests; (e) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (g) a bar to any Entity granting a release under <u>Section 8.4</u> of the Plan from asserting any claim or Cause of Action released by <u>Section 8.4</u> of the Plan.

   *v.*  <u>*Exculpation*</u>

   No Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Exculpated Claim or any obligation, Cause of Action, or liability for any Exculpated Claim; **provided, however,** that the foregoing "exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted fraud, gross negligence, or willful misconduct; **provided, further,** that in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to, or in connection with, the Plan. The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of acceptances and rejections of the Plan and the making of distributions pursuant to the Plan and, therefore, are not and shall not be liable at any time for the violation of any applicable, law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or distributions made pursuant to the Plan.

   *vi.*  <u>*Injunction*</u>

   Except as otherwise provided in the Plan or for obligations issued pursuant hereto, all Entities that have held, hold, or may hold claims or interests that have been released pursuant to <u>Section 8.3</u> or <u>Section 8.4</u> of the Plan, discharged pursuant to <u>Section 8.2</u> of the Plan, or are subject to exculpation pursuant to <u>Section 8.5</u> of the Plan are permanently enjoined, from and after the Plan Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the New Issuer, the Released Parties, or the Exculpated Parties, as well as their assets or property:  (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or Estates of such Entities on account of or in connection with or with respect to any such claims or interests; (d) asserting any right of setoff or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of or in connection with or with respect to any such claims or interests unless, with respect to the Debtors and the Reorganized Debtors (as well as their assets and property), such holder has filed a motion requesting the right to perform such set off pursuant to <u>Section 6.9(b)</u> of the Plan or performed such recoupment and provided notice thereof in writing to the Debtors pursuant to <u>Section 6.9(c)</u> of the Plan, in each case on or before the Confirmation Date; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released, exculpated, or settled pursuant to the Plan.

   *vii.*  <u>*Protection Against Discriminatory Treatment*</u>

   In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Debtor or Reorganized Debtor, or any Entity with which a Debtor or Reorganized Debtor has been or is associated, as to a Reorganized Debtor solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

*viii.*    **_Indemnification_**

On and from the Plan Effective Date, and notwithstanding anything provided under the Plan, all indemnification provisions in place as of the Plan Effective Date (whether in the bylaws, certificates of incorporation or formation, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, financial advisors, investment bankers, and other professionals (including the Professionals) of the Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive Consummation and the effectiveness of the Restructuring and remain enforceable; provided that the Reorganized Debtors shall not indemnify officers, directors, managers, employees, attorneys, accountants, investment bankers or other professionals (including the Professionals) of the Debtors for any claims or Causes of Action arising out of or relating to any act or omission by them that is a criminal act or constitutes intentional fraud, gross negligence, or willful misconduct.

*ix.*    **_Release of Liens_**

Except (a) with respect to the Liens securing Other Secured Claims (if such Liens survive the treatment of such Claims pursuant to Section 3.2(a)(2) of the Plan), (b) as otherwise expressly provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, including, without limitation, the New Notes Documents, or (c) with respect to mortgages, deeds of trust, Liens, pledges, and other security interests related to the Existing Notes and LC Facility Claims if and to the extent that the governing documents of such security interests expressly provide that such security documents will secure obligations incurred as a substitution, replacement, refunding or refinancing of the Existing Notes and LC Facility Claims (including the documents or security interests), on the Plan Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any assets or property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall vest in and revert to the applicable Reorganized Debtor and its successors and assigns; provided, however, that notwithstanding the foregoing, mortgages, deeds of trust, Liens, pledges, and other security interests created under or pursuant to the Prepetition Security Documents that are being amended, amended and restated, or otherwise modified in connection with the Plan to secure the obligations under the New Notes (at which point, such Prepetition Security Documents shall be deemed included in the definition of New Notes Documents) shall remain pursuant to the terms of the New Notes Documents, but shall not secure any of the obligations of the Class 3 Claims.

From and after the Plan Effective Date, any Holder of a Secured Claim (and the applicable agents for such Holder) secured by Liens or security interests which are to be released under the Plan shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to give effect to the Plan and to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any foreign, federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Plan Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Reorganized Debtors that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests in accordance with the Plan, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

*x.*    **_Reimbursement or Contribution_**

Except as otherwise provided in Section 8.8 of the Plan, if the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Plan Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Plan Effective Date (a) such Claim has been adjudicated as

noncontingent or (b) the relevant Holder of a Claim has filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

## VIII.    ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

In order to facilitate the Chapter 11 Cases and minimize disruption to the Debtors' operations, the Debtors will seek certain relief, including but not limited to, the relief summarized below. The relief sought will facilitate the administration of the Chapter 11 Cases, however, there is no guarantee that the Bankruptcy Court will grant any or all of the requested relief.

### A.    Voluntary Petitions

The following entities will file chapter 11 bankruptcy petitions on the Petition Date commencing the Chapter 11 Cases: (i) Inversiones Latin America Power Ltda.; (ii) San Juan S.A.; and (iii) Norvind S.A.

### B.    Expected Timetable of the Chapter 11 Cases

The Debtors expect the Chapter 11 Cases to proceed quickly pursuant to the terms and timeframe set forth in the RSA. As described above, the Debtors have been in extensive negotiations with the Consenting Creditors to reduce their debt service burden through a prepackaged restructuring. The Debtors cannot assure you, however, that the Bankruptcy Court will enter various orders on the timetable anticipated by the Debtors.

On the Petition Date, the Debtors will promptly request the Bankruptcy Court to set a hearing date to approve this Disclosure Statement and to confirm the Plan approximately 35 days after the Petition Date or as soon thereafter as the Bankruptcy Court's schedule permits. If the Plan is confirmed, the Plan Effective Date is projected to be as soon as practicable after the date the Bankruptcy Court enters the Confirmation Order and the other conditions to Consummation of the Plan set forth in Section 9.1 of the Plan are satisfied or waived (to the extent permitted under the Plan and applicable law).

### C.    First Day Relief

The Debtors intend to present certain motions (the "First Day Motions") to the Bankruptcy Court on the Petition Date seeking relief. The First Day Motions may include, but are not necessarily limited to, the following:

#### (i)    *Approval of Solicitation Procedures and Scheduling of Confirmation Hearing*

To expedite the Chapter 11 Cases, the Debtors intend to seek an immediate order setting dates for a combined hearing to (a) approve the adequacy of this Disclosure Statement, (b) approve the procedures for the Solicitation and (c) confirm the Plan. The Debtors will seek the earliest possible date permitted by the applicable rules and the Bankruptcy Court's calendar for such hearing.

#### (ii)    *Joint Administration Motion*

The Debtors—ILAP and its subsidiaries, the Guarantor Debtors—will file a motion seeking entry an order directing the joint administration of the Chapter 11 Cases.

#### (iii)    *Schedules Extension/Waiver Motion*

The Debtors will seek entry of an order (a) extending the time within which the Debtors must file their schedules and statements required by Bankruptcy Rule 1007(a)(3) through and including sixty-one (61) days after the date required under Bankruptcy Rule 1007(c) and (b) waiving the requirement that the Debtors file their schedules and statements required by Bankruptcy Rule 1007(a)(3) upon the Plan Effective Date if the effective date of the Plan occurs on or before seventy-five (75) days from the Petition Date (without prejudice to the Debtors' right to request additional extensions should it become necessary).

*(iv)*     ***Consolidated Creditors List Motion***

The Debtors will seek entry of an order (a) waiving the requirement that each of the Debtors file a list of creditors and equity security holders and authorizing the Debtors to prepare a consolidated list of creditors in lieu of submitting a formatted matrix and (b) authorizing the Debtors to file a single, consolidated list of the Debtors' thirty (30) largest unsecured creditors.

*(v)*     ***Cash Collateral Motion***

The Debtors will seek entry of an order (a) authorizing their ability to use cash collateral and (b) granting adequate protection to certain of their prepetition secured creditors, including the Holders of Senior Debt Claims.

*(vi)*     ***Automatic Stay Motion***

The Debtors will seek entry of an order enforcing the automatic stay existent pursuant to section 362 of the Bankruptcy Code and the *ipso facto* and anti-discrimination provisions of the Bankruptcy Code and confirming the Debtors' authority to continue to operate their businesses post-petition, pursuant to sections 363, 1107 and 1108 of the Bankruptcy Code.

*(vii)*     ***Cash Management System Motion***

In order to, among other things, avoid administrative inefficiencies on and after the Petition Date, the Debtors intend to move the Bankruptcy Court for an order (a) approving the continued use of the existing cash management system and (b) granting certain other relief.

*(viii)*     ***General Unsecured Claims Motion***

The Debtors will seek an order from the Bankruptcy Court authorizing the payment to trade creditors of their prepetition unsecured claims as they become due in the ordinary course of business, subject to the continuation of customary trade terms. This relief will allow the Debtors to maintain critical business operations and avoid severe reputational damage.

*(ix)*     ***Taxes and Fees Motion***

The Debtors will seek entry of an order authorizing the payment of certain prepetition taxes and fees and to continue paying such taxes and fees in the ordinary course.

*(x)*     ***Insurance Motion***

In order to prevent costly distractions to key management, the Debtors will seek authority to pay certain liability, property and other insurance premiums in the ordinary course of business.

*(xi)*     ***Other Procedural Motions and Professional Retention Applications***

The Debtors also plan to file several procedural motions that are standard in Chapter 11 Cases. On or shortly after the Petition Date, the Debtors will file applications to retain the various Professionals—including Greenberg Traurig, BSVV, Lazard, AlixPartners, and Epiq—who will be assisting the Debtors during these Chapter 11 Cases and a motion for the retention of certain ordinary course professionals that will continue to provide services to the Debtors during these proceedings.

## IX.     PROJECTED FINANCIAL INFORMATION

The Debtors have attached their projected financial information as **<u>Exhibit D</u>** to this Disclosure Statement. The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the

Debtors or any successor under the Plan. In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies this feasibility standard, the Debtors' management analyzed the Debtors' ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources. The Debtors' management developed a business plan and prepared financial projections (the "Projections") for the period ending 2024 through 2046 (the "Projection Period").

After the date of the Disclosure Statement, the Reorganized Debtors do not intend to update or otherwise revise the Projections to reflect circumstances existing since their preparation in November 2023 or to reflect the occurrence of unanticipated events, even in the event that any or all of the underlying assumptions are shown to be in error. Furthermore, the Reorganized Debtors do not intend to update or revise the Projections to reflect changes in general economic or industry conditions.

In connection with the planning and development of the Plan, the Projections were prepared by the Debtors' management to present the anticipated impact of the Plan. The Projections assume that the Plan will be implemented in accordance with its stated terms. The Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, changes in the competitive environment, energy prices, regulatory changes and/or a variety of other factors, including those factors listed in the Plan and the Disclosure Statement. Accordingly, the estimates and assumptions underlying the Projections are inherently uncertain and are subject to significant business, economic and competitive uncertainties. Therefore, such Projections, estimates and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein.

The Projections should be read in conjunction with the significant assumptions, qualifications and notes set forth below and in **Exhibit D**.

THE DEBTORS' MANAGEMENT DID NOT PREPARE SUCH PROJECTIONS TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS AND THE RULES AND REGULATIONS OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION. THE DEBTORS' INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE PROJECTIONS THAT ACCOMPANY THE DISCLOSURE STATEMENT AND, ACCORDINGLY, DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE PROJECTIONS, ASSUME NO RESPONSIBILITY FOR THE PROJECTIONS AND DISCLAIM ANY ASSOCIATION WITH THE PROJECTIONS. EXCEPT FOR PURPOSES OF THE DISCLOSURE STATEMENT, THE DEBTORS DO NOT PUBLISH PROJECTIONS OF THE DEBTORS' ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS. MOREOVER, THE PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, CURRENCY EXCHANGE RATE FLUCTUATIONS, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, ADVERSE TAX CHANGES, INDUSTRY-SPECIFIC RISK FACTORS (AS DETAILED IN SECTION X OF THE DISCLOSURE STATEMENT ENTITLED "*RISK FACTORS*"), AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD- LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE

MADE AS TO THE ACCURACY OF THE PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE DEBTORS PREPARED THESE PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE THE DISCLOSURE STATEMENT IS INITIALLY FILED OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under the federal securities laws. Statements concerning these and other matters are not guarantees of the Debtors' future performance. Such forward-looking statements represent the Debtors' estimates and assumptions only as of the date such statements were made and involve known and unknown risks, uncertainties and other unknown factors that could impact the Debtors' restructuring plans or cause the actual results of the Debtors to be materially different from the historical results or from any future results expressed or implied by such forward-looking statements. In addition to statements which explicitly describe such risks and uncertainties, readers are urged to consider statements labeled with the terms "believes," "belief," "expects," "intends," "anticipates," "plans," or similar terms to be uncertain and forward-looking. There can be no assurance that the restructuring transaction described herein will be consummated. Creditors and other interested parties should see the Section entitled "*Risk Factors*" of this Disclosure Statement for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors. The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- any future effects as a result of the pendency of the Chapter 11 Cases;
- the Debtors' expected future financial position, liquidity, results of operations, profitability, and cash flows;
- competitive position;
- business strategy;
- budgets;
- projected cost reductions;
- projected and estimated liability costs;
- disruption of operations;
- plans and objectives of management for future operations;
- contractual obligations;
- projected price increases;
- projected general market conditions;
- benefits from new technology; and
- effect of changes in accounting due to recently issued accounting standards.

The Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement and the Plan.

Creditors and other interested parties should see the following Section entitled "*Risk Factors*" of this Disclosure Statement for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

X.     **RISK FACTORS**

There are risks, uncertainties and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project and the Debtors undertake no obligation to update any such statement. These risks, uncertainties and factors include:

- the Debtors' ability to develop, confirm and consummate the Plan;

- the potential adverse impact of the Chapter 11 Cases on the Debtors' operations and management, and the risks associated with operating businesses in the Chapter 11 Cases;

- the applicable Debtor's and New Issuer's ability to comply with the terms of the New Notes;

- Customer and vendor response to the Chapter 11 Cases;

- general economic, business, and market conditions;

- the Debtors' ability to generate sufficient revenues or cash flow to meet their operating needs or other obligations;

- financial conditions of the Debtors' customers;

- the Debtors' ability to cure the Downgrade Reports;

- exposure to litigation;

- dependence upon key personnel;

- adverse tax changes;

- interest rate fluctuations;

- the devaluation of the Chilean Peso relative to the U.S. dollar;

- high levels of inflation in Chile relative to the United States;

- limited access to capital resources;

- changes in laws and regulations;

- inability to implement business plan; and

- significant existing and future competition.

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE IMPAIRED SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.

THIS SECTION DOES NOT DESCRIBE ALL RISKS APPLICABLE TO THE DEBTORS. ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE PLAN AND ITS IMPLEMENTATION.

A.     **Risks Relating to the Plan Solicitation and Confirmation**

*The Debtors may fail to satisfy vote requirements to confirm the Plan.*

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation.

If the Plan does not receive the required support from Class 3, the Debtors may elect to seek Confirmation regardless of the rejection by seeking to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims and Allowed Interests as those proposed in the Plan.

If the Debtors are not able to confirm the Plan or an alternative chapter 11 plan, there is substantial doubt that the Debtors will be able to generate the necessary cash to continue operations. As a result, the Debtors may decide or be required to file for bankruptcy proceedings in Chile, which is subject to Chilean laws and regulations and related uncertainties. See "The Bankruptcy Court may not confirm the Plan" and "If the solicitation is not successful, the Plan

is not confirmed or the restructuring is not consummated, the Debtors face a substantial risk of local liquidation proceedings".

***The Debtors may fail to satisfy solicitation requirements.***

The solicitation of votes by the Debtors to accept the Plan is subject to several requirements under applicable bankruptcy law. If the Bankruptcy Court does not find that the Debtors' solicitation complied with such requirements, confirmation of the Plan could be denied.

Section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) require that:

- the plan of reorganization be transmitted to substantially all creditors and other interest holders entitled to vote;

- the time prescribed for voting is not unreasonably short; and

- the solicitation of votes is in compliance with any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in such solicitation or, if no such law, rule or regulation exists, votes be solicited only after the disclosure of "adequate information". Section 1125(a)(1) of the Bankruptcy Code describes adequate information as information of a kind and in sufficient detail as would enable a hypothetical reasonable investor typical of holders of claims and interests to make an informed judgment about the plan.

To satisfy the requirements of section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b), the Debtors intend to deliver this Disclosure Statement to all Holders of Allowed Class 3 Claims and Allowed Class 6 Interests as of the Voting Record Date. In that regard, the Debtors believe that the solicitation of votes to accept or reject the Plan is proper under applicable non-bankruptcy law, rules and regulations. The Debtors cannot be certain, however, that the solicitation of acceptances or rejections will be approved by the Bankruptcy Court. If such approval is not obtained, the Confirmation of the Plan could be denied. See "The Bankruptcy Court may not confirm the Plan".

***If the original solicitation by the Debtors is not successful, the Debtors may opt to resolicit.***

If the Bankruptcy Court were to conclude that the Debtors did not satisfy the solicitation requirements, then the Debtors may seek to resolicit votes to accept or reject the Plan or to solicit votes to accept or reject the Plan from one or more Classes that were not previously solicited. Typically, if done after filing for chapter 11 protection, this process involves a 60-to-90-day period and includes a court hearing for the required approval of disclosure statement(s), followed (after bankruptcy court approval) by another solicitation of claim and interest holder votes for the plan of reorganization, followed by a confirmation hearing where the bankruptcy court will determine whether the requirements for confirmation have been satisfied, including the requisite claim and interest holder acceptances.

The Debtors cannot provide any assurances that such a re-solicitation would be successful. In addition, Confirmation of the Plan could be delayed and possibly jeopardized as a result. Furthermore, if the Confirmation Date or Plan Effective Date is significantly delayed, there is a risk that the RSA may expire or be terminated in accordance with its terms. See "The Consenting Creditors' support for the Plan is subject to the terms and conditions of the RSA". The need to undertake a re-solicitation or any other delay in the Confirmation Date or Plan Effective Date may also result in a deterioration in the Debtors' relationships with PPA counterparties, trade vendors or holders of other indebtedness and could affect the Debtors' ability to continue operations. See "If the solicitation is not successful, the Plan is not confirmed or the restructuring is not consummated, the Debtors face a substantial risk of local liquidation proceedings".

***Holders of Claims or Interests may object to, and the Bankruptcy Court may disagree with, the Plan's classification of Claims and Interests.***

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors

believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class.

However, a Holder of a Claim or Interest could challenge the Debtors' classification. In such an event, the cost of the Chapter 11 Cases and the time needed to confirm the Plan may increase and there can be no assurance that the Bankruptcy Court will agree with the Debtors' classification. If the Bankruptcy Court agrees with the objection to the Plan's classification of Claims and Interests, the Debtors may be required to modify the Plan, which could require re-solicitation of votes on the Plan and/or amending the Plan. In addition, the Plan may not be confirmed if the Bankruptcy Court determines that the Debtors' classification of Claims and Interests is not appropriate. See "The Bankruptcy Court may not confirm the Plan".

***The Bankruptcy Court may not confirm the Plan.***

In the event that votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek Confirmation of the Plan by the Bankruptcy Court. However, even if the requisite votes are received, the Bankruptcy Court is not obligated to confirm the Plan as proposed. In addition, a dissenting Holder of a Claim against the Debtors could challenge the balloting procedures as not being in compliance with the Bankruptcy Code, which could mean that the balloting results may be invalid. Even if the Bankruptcy Court determined that the balloting procedures were appropriate and the results were valid, the Bankruptcy Court could still decline to confirm the Plan, if the Bankruptcy Court found that any of the statutory requirements for confirmation had not been met.

Section 1129 of the Bankruptcy Code, which sets forth the requirements for confirmation of a plan of reorganization, requires, among other things, a finding by the Bankruptcy Court that the plan of reorganization is "feasible," that all claims and interests have been classified in compliance with the provisions of section 1122 of the Bankruptcy Code and that, under the plan of reorganization, each holder of a claim or interest within each impaired class either accepts the plan of reorganization or receives or retains cash or property of a value, as of the date the plan of reorganization becomes effective, that is not less than the value such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code. There can be no assurance that the Bankruptcy Court will conclude that the feasibility test and other requirements of sections 1122, 1123, 1129 and the other applicable provisions of the Bankruptcy Code have been met with respect to the Plan. In addition, the Bankruptcy Court may decline to accept the Debtors' petition based on jurisdictional or venue grounds, which would also result in the Debtors not being able to obtain Confirmation of the Plan. See "The Debtors may fail to satisfy solicitation requirements" and "Holders of Claims or Interests may object to, and the Bankruptcy Court may disagree with, the Plan's classification of Claims and Interests".

If the Plan is not confirmed by the Bankruptcy Court, (a) the Debtors may not be able to reorganize their businesses, (b) the distributions that Holders of Claims ultimately would receive, if any, with respect to their Claims are uncertain, (c) there is no assurance that the Debtors will be able successfully to develop, prosecute, confirm and consummate an alternative plan that will be acceptable to the Bankruptcy Court and the Holders of Claims, (d) there can be no assurance that any Chapter 11 Cases would continue rather than be converted into liquidation cases under chapter 7 of the Bankruptcy Code and (e) the Debtors may be required to liquidate their entire operations through a liquidation process in Chile.

It is also possible that third parties may seek and obtain approval from the Bankruptcy Court to terminate or shorten the exclusivity period during which only the Debtors may propose and confirm a plan of reorganization. If a liquidation or protracted reorganization of the Debtors' Estates were to occur, under either the Bankruptcy Code or through a Chilean bankruptcy proceeding, there is a substantial risk that the Debtors' going concern value would be substantially eroded to the detriment of all stakeholders. See "If the solicitation is not successful, the Plan is not confirmed or the restructuring is not consummated, the Debtors face a substantial risk of local liquidation proceedings".

***The Debtors may seek to amend, waive, modify or withdraw the Plan at any time prior to Confirmation.***

The Debtors reserve the right, prior to the Confirmation of the Plan or substantial Consummation thereof, subject to the provisions of section 1127 of the Bankruptcy Code and applicable law and the RSA, to amend the terms of the Plan or waive any conditions thereto if and to the extent such amendments or waivers are necessary or desirable to consummate the Plan. The potential impact of any such amendment or waiver on the Holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes. Holders of Claims and Interests will receive notice of such amendments or waivers as required by applicable law and the Bankruptcy Court. If, after receiving sufficient acceptances, but prior to Confirmation of the Plan, the Debtors seek to modify the Plan, subject to the terms of the RSA, the previously solicited acceptances will be valid only if (a) all Classes of adversely affected Holders of Claims and Interests accept the modification in writing, or (b) the Bankruptcy Court determines, after notice to designated parties, that such modification was *de minimis* or purely technical or otherwise did not adversely change the treatment of Holders of accepting Claims and Interests or is otherwise permitted by the Bankruptcy Code.

***Other parties in interest might be permitted to propose alternative plans of reorganization that may be less favorable to certain of the Debtors' constituencies than the Plan.***

Other parties in interest could seek authority from the Bankruptcy Court to propose an alternative plan of reorganization to the Plan. Under the Bankruptcy Code, a debtor-in-possession initially has the exclusive right to propose and solicit acceptances of a plan of reorganization for a period of 120 days from filing. However, such exclusivity period can be reduced or terminated upon an order of the Bankruptcy Court. If such an order were to be entered, other parties in interest would then have the opportunity to propose alternative plans of reorganization.

If other parties in interest were to propose an alternative plan of reorganization following expiration or termination of the Debtors' exclusivity period, such a plan may be less favorable to existing Holders of Claims and Interests. Alternative plans of reorganization also may treat less favorably the Claims of a number of other constituencies, including but not limited to Holders of Senior Debt Claims and the Debtors' vendors and customers.

The Debtors consider maintaining relationships with their secured creditors, common stockholders, PPAs and other contract counterparties and vendors as critical to maintaining the value of the Reorganized Debtors following the Plan Effective Date, and have sought to treat those constituencies accordingly. However, proponents of alternative plans of reorganization may not share the Debtors' assessments and may seek to impair the Claims of such constituencies to a greater degree. If there were competing plans of reorganization, the Chapter 11 Cases likely would become longer, more complicated and much more expensive. In addition, there would be a greater likelihood that the Debtors would be required to file for reorganization or liquidation of their operations in Chile. See "If the solicitation is not successful, the Plan is not confirmed or the restructuring is not consummated, the Debtors face a substantial risk of local liquidation proceedings".

***The Debtors may be unsuccessful in obtaining orders to permit them to pay their vendors and their counterparties or to continue to provide service as expected by their customers in the ordinary course of business.***

The Debtors have tried to address potential concerns of their key customers, vendors, and other key parties in interest that might arise from the filing of the Plan through a variety of provisions incorporated into or contemplated by the Plan, including the Debtors' intention to seek appropriate court orders to permit the Debtors to pay their prepetition and postpetition accounts payable to parties in interest in the ordinary course. However, there can be no guarantee that the Debtors will be successful in obtaining the necessary approvals of the Bankruptcy Court for such arrangements or for every party in interest the Debtors may seek to treat in this manner, and, as a result, the Debtors' businesses might suffer.

***Distributions under the Plan will not be made prior to Consummation and may be delayed due to appeal.***

The Debtors estimate that the process of obtaining Confirmation will last approximately 35 days from the date of the commencement of the Chapter 11 Cases and, although some prepackaged cases have been confirmed in less than 35 days, this period could be significantly longer.

***The conditions precedent to the Plan Effective Date may not occur.***

As more fully set forth in the Plan, the Plan Effective Date is subject to a number of conditions precedent. If such conditions precedent are not met or waived, the Plan Effective Date will not take place. If the Plan Effective Date does not take place, the Debtors may not be able to restructure their operations and may be required to liquidate their operations. See "If the solicitation is not successful, the Plan is not confirmed or the restructuring is not consummated, the Debtors face a substantial risk of local liquidation proceedings".

***The Debtors' emergence from chapter 11 is not assured.***

While the Debtors expect to emerge from chapter 11, there can be no assurance that the Debtors will successfully reorganize or when this reorganization will occur, irrespective of the Debtors' obtaining Confirmation of the Plan. Any significant delay in emerging from chapter 11 or in the Consummation of the reorganization will increase the risk that the Debtors will nonetheless be unable to continue operations in Chile. See "If the solicitation is not successful, the Plan is not confirmed or the restructuring is not consummated, the Debtors face a substantial risk of local liquidation proceedings".

***The Consenting Creditors' support for the Plan is subject to the terms and conditions of the RSA.***

Subject to the terms and conditions of the RSA, the Consenting Creditors have agreed to vote in favor of the Plan and support the Debtors' Chapter 11 Cases and the Confirmation and Consummation of the Plan. However, if the Chapter 11 Cases last longer than permitted under the RSA or the Plan, there is a breach by any of the Debtors of the representations and warranties in the RSA or upon the occurrence of another termination event under the RSA, the RSA may terminate. If the RSA terminates pursuant to its terms, any votes in favor of the Plan submitted by the Consenting Creditors will be deemed to be null and void and will not be considered or otherwise used in connection with the Plan. If that occurs, the Debtors may no longer have the support required under section 1126 of the Bankruptcy Code to proceed to Confirmation.

***If the Solicitation is not successful, the Plan is not confirmed or the restructuring is not Consummated, the Debtors face a substantial risk of local liquidation proceedings.***

If the Debtors are unable to consummate a restructuring by means of the Plan, there is substantial doubt that the Debtors will be able to generate sufficient cash flows to service their existing obligations under the Existing Notes and LC Facility Agreement or to continue as going concerns. As a result of the Debtors' default on their obligations under the Existing Notes and LC Facility Agreement, some or all of the Debtors' creditors may attempt to take legal action against the Debtors, including through instituting local liquidation proceedings. See "Even if the requisite number and amount of Holders of Claims and Interests vote to accept the Plan and the Bankruptcy Court confirms the Plan, Holders of Claims who are not subject to the jurisdiction of a U.S. court may try to force the Debtors into local liquidation proceedings or take other adverse actions"; "Even if the Plan is Confirmed, Holders of Claims and third parties who are not subject to the jurisdiction of a U.S. court may not recognize and comply with the terms of the Confirmation Order and Plan".

In addition, the Debtors may opt to institute voluntary reorganization or liquidation proceedings in Chile. In any such proceedings, which will be governed by Chilean law, the Debtors cannot predict the duration thereof or the ability of the Debtors or the ability of the Holders of the Senior Debt Claims to influence the outcome of such proceedings, including their ability to prove their claims in a Chilean court. A liquidation proceeding is likely to result in significant changes to the Debtors' existing obligations, including the Senior Debt Claims, the accrual of interest and the currency of denomination of existing claims, which could include the cancellation or restructuring of all or part of those obligations. During the pendency of any such liquidation proceeding, the ability of the Debtors to operate or manage their businesses, to continue perform under their contracts, to obtain goods and services from suppliers, to continue to collect payments or to obtain any type of funding or financing would likely be materially adversely affected. In the opinion of the Debtors, the recovery that would be received by Holders of the Senior Debt Claims in a liquidation scenario would very likely be materially less than they would receive under the Plan. See the Liquidation Analysis attached as **Exhibit C** to this Disclosure Statement.

***Even if the Plan is Confirmed, Holders of Claims and third parties who are not subject to the jurisdiction of a U.S. court may not recognize and comply with the terms of the Confirmation Order and Plan.***

The Debtors' primary creditors and vendors are located in Chile. A Holder of a Claim and/or party with whom the Debtors do business that is not a U.S. citizen and does not have a significant presence or significant assets in the U.S. may not recognize, and refuse to comply with, the terms of the Confirmation Order and Plan. The Debtors may be unable to prevent such parties from taking adverse actions.

***Even if the requisite number and amount of Holders of Claims and Interests vote to accept the Plan and the Bankruptcy Court confirms the Plan, Holders of Claims who are not subject to the jurisdiction of a U.S. court may try to force the Debtors into local liquidation proceedings or take other adverse actions.***

If the Debtors meet the statutory conditions for an involuntary bankruptcy proceeding under local law, a Holder of a Claim who is not a U.S. citizen and who does not have a significant presence or significant assets in the U.S. may attempt to force the Debtors into a Chilean liquidation proceeding during the Chapter 11 Cases. Were that to occur, the Debtors may be unable to prevent a Chilean court from forcing the Debtors into such a proceeding.

The Debtors cannot predict the duration or outcome of a Chilean liquidation proceeding or the ability of the Debtors or the Holders of Senior Debt Claims to influence the outcome of such proceedings. If the Debtors are forced to submit to a Chilean liquidation proceeding, the restructuring through the Plan will very likely not be implemented and the liquidation of the Debtors' operations will likely occur. See the Liquidation Analysis attached as **Exhibit C** to this Disclosure Statement.

***Chilean reorganization laws differ from U.S. insolvency and bankruptcy laws, which may lead to a different financial outcome for Holders of Claims and Interests.***

The bankruptcy laws of Chile currently in effect significantly differ both procedurally and substantively from, and may lead to differing outcomes for creditors than, those of the United States. In particular, these differences pertain to the voting rights of creditors, the priority and preference of creditor claims, the treatment of secured claims and the currency in which debts are denominated.

Significant uncertainties are inherent in a local bankruptcy proceeding that may result in different outcomes and delays that could adversely impact the value of the Debtors' businesses and their collateral and the value of creditors' claims. Delays in proceedings, the inadequacy of available remedies and the inability of a receiver or an equivalent to exercise available remedies could result in a substantial deterioration of the Debtors' businesses and assets during the pendency of any such proceeding.

***It is difficult to predict whether creditors of the Debtors would be subject to greater risks in a liquidation proceeding under local law than under the U.S. Bankruptcy Code.***

In the event of liquidation, dissolution, reorganization, bankruptcy or any similar proceeding, secured creditors will have claims that have priority over claims of the holders of unsecured claims with respect to, and up to the value of, the assets securing those secured obligations. However, assets securing claims may not be sufficient to satisfy the amounts due under such claims. Accordingly, in the event of liquidation, dissolution, reorganization, bankruptcy or any similar proceeding, there may not be sufficient funds arising from assets securing claims remaining to pay amounts due on all or any of the notes and the note guarantees. Whether specific creditor recoveries would be worse under a local liquidation or a U.S. proceeding cannot be determined with certainty. See "Impediments exist to any foreclosure on the collateral, which may adversely affect the proceeds of any foreclosure".

***The Debtors' businesses may be negatively affected if the Debtors are unable to assume their Executory Contracts.***

An executory contract is a contract on which performance remains due to some extent by both parties to the contract. The Plan provides for the assumption of all Executory Contracts and Unexpired Leases, unless designated on a schedule of rejected contracts. The Debtors intend to preserve as much of the benefit of their existing contracts and leases as possible. However, there may be Executory Contracts that require consent of the counterparty for the

Debtors to maintain the benefit of the contract. There is no guarantee that such consent either would be forthcoming or that conditions would not be attached to any such consent that makes assuming the contracts unattractive. The Debtors then would be required to either forgo the benefits offered by such contracts or to find alternative arrangements to replace them.

***The effects of a U.S. bankruptcy on agreements between the Debtors and third parties upon commencement of the Chapter 11 Cases is uncertain.***

Certain of the agreements between the Debtors and various third parties permit the termination of such agreements if the relevant Debtor party becomes the subject of a judicial declaration of bankruptcy or insolvency. Although such so-called *ipso facto* provisions are generally unenforceable under section 365(b)(2) of the Bankruptcy Code when a debtor is in chapter 11, no assurance can be given that local courts would prohibit a third party from terminating a contract pursuant to such ipso facto clauses in Chile. Therefore, the Debtors can give no assurance that some of the Debtors' agreements would not be terminated as a result of the commencement of the Debtors' Chapter 11 Cases.

***Releases, Injunctions, and Exculpations Provisions May Not Be Approved***

Article VIII of the Plan provides for certain releases, injunctions, and exculpations for Claims and Causes of Action that may otherwise be asserted against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases and exculpations are not approved, certain parties may not be considered Releasing Parties, Released Parties, or Exculpated Parties, and certain Released Parties or Exculpated Parties may withdraw their support for the Plan.

**B.    Risks Related to the Debtors' Business**

***The Plan may have a material adverse effect on the Debtors' operations.***

The Plan or any subsequent commencement of a U.S. or local liquidation proceeding could adversely affect the relationships between the Debtors and their customers. There is a risk, due to uncertainty about the Debtors' future, that parties with whom the Debtors have contractual relationships could terminate their relationship with the Debtors or require financial assurances or enhanced performance. In addition, bankruptcy cases are often viewed much more negatively in Chile than in the U.S.

***Indebtedness may adversely affect the Reorganized Debtors' operations and financial condition.***

As of November 29, 2023, the Debtors had a consolidated funded indebtedness of $408.73 million in principal amount. According to the terms and conditions of the Plan, upon the Plan Effective Date, the Reorganized Debtors (together with the New Issuer) will have outstanding indebtedness of approximately $444 million on account of the New Notes.

The Reorganized Debtors' ability to service their debt obligations will depend upon, among other things, their future operating performance and the results of a Company Sale. These factors depend partly on economic, financial, competitive and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may not be able to generate sufficient cash from operations to meet their debt obligations as well as fund necessary capital expenditures and investments. In addition, if the Reorganized Debtors need to refinance their debt, obtain additional financing or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

***The Company is dependent on its counterparties to generate substantially all of its revenues.***

The Company is dependent on its counterparties to generate substantially all of its revenue and its financial results are dependent upon counterparties under PPAs fulfilling their contractual obligations. The majority of our PPAs are under "take and pay" terms, and not subject to a minimum amount of energy purchase for the relevant period. As of the date hereof, we are a party to 113 PPAs with 41 separate counterparties with a weighted average term of

69

7.9 years. For the fiscal year 2023, we estimate that 652 GW/h of our total generation capacity (at P50) will be contracted, representing 103% of the estimated total generation for the period. Revenues derived from these long-term agreements constitute the Company's main source of revenue and are expected to continue to constitute most of its revenue until 2031. Accordingly, the Company is dependent on its counterparties' continued willingness and ability to timely meet their respective contractual obligations.

In addition, the Company relies on a limited number of contracted customers to purchase a significant portion of its output. On average, for the fiscal years ending December 31, 2022 and 2021, revenues associated with the Company's three largest contracted customers (Enel Distribución, CGE Distribución S.A. and Metro), represented in aggregate 31% and 34% of the Company's total sales, respectively. A loss of one of the Company's main contracted customers may be difficult or impossible to replace. Likewise, further concentration of counterparties would increase the Company's dependence on any one counterparty. The failure of any material counterparty to perform its contractual obligations or make required payments may negatively impact the Company's results of operations.

***The Company depends on wind conditions and other factors beyond its control to generate electricity.***

Electricity generated from wind energy depends heavily on suitable wind conditions, wind speeds and other conditions at the relevant site. Objects such as buildings, trees or other wind turbines near our wind farms, especially in more built-up areas may reduce the Company's wind resources due to the disruption of wind flows, known as "wake effects."

Other existing or future projects, when developed, would have a negative wake effect on our Projects. We cannot assure you that owners of land near the Project sites will not lease or transfer their land use rights to other developers who may construct wind turbines or other structures that would have negative wake effects. Such developments may reduce the operational performance of the Company's wind farms, which could have a material adverse effect on its business, financial condition or results of operations.

Furthermore, the Company may be affected by certain other factors, such as severe weather and other factors beyond its control. If such conditions are unfavorable or below the Company's expectations, the Projects' electricity generation and the revenue generated from the Projects may be substantially below the Company's expectations. Operation and maintenance problems at Projects, including as a result of natural events, may cause the Company's electricity generation to fall below its expectations. Adverse conditions caused by one or more of these factors beyond the Company's control could adversely affect its business, financial condition, results of operations and cash flows.

***Oversupply conditions may affect our profitability and results of operations.***

In the context of the tender process, the CNE develops demand projections for the procurement of supply for Regulated Customers, based on each DisCo's projected requirements. To reduce the risks and uncertainty associated with demand projections, the forecasts are updated annually. Because these demand projections are based upon assumptions that may prove to be inaccurate, actual energy demand from regulated customers may deviate substantially from the forecasts used in the procurement of the PPAs. In the case that actual demand is below the contracted energy at a particular time (that is, the DisCos are over-contracted), the actual demand will be covered by all generators in proportion to their contracted energy. Therefore, the oversupply risk is distributed evenly (*pro rata*) across the generation market.

The Company's revenues are affected by the supply and oversupply levels projected by the CNE within the context of each auction process for the determination of energy prices in Chile. Likewise, some of the projections that underpin the *pro forma* projections directly correlate to such projections made by the CNE. Such projections may be based on assumptions that may be erroneous or inaccurate, or may be subject to other factors that are beyond the Company's control. In addition, change of circumstances in the Chilean energy market may make such projections erroneous, such as changes in consumption patterns or the level of efficiency in the production of energy by generating companies.

These and other factors may affect the Company's business, financial condition, results of operations and cash flows.

***The enactment of the Tariff Stabilization Law and MPC Law have, and will continue to have, effects on the Company's revenues.***

As a result of the social unrest that began in Chile in October 2019, the Tariff Stabilization Law was enacted in November 2019 to stabilize electricity prices for regulated customers temporarily, by rescinding a recent increase in electricity tariffs payable by regulated customers and effectively preventing the Company from collecting revenues at the levels set forth in its existing PPAs.

While the Tariff Stabilization Law, and the subsequent MPC Law, create a mechanism to record and recover any differences between PPA prices and stabilized prices via PEC 1 Receivables and PEC 2 Receivables, the Company has suffered, and may continue to suffer, negative effects on its revenues. The Tariff Stabilization Law, MPC Law and/or other future legal or regulatory intervention in the determination of energy prices in the Chilean market, could cause the Company to have a cash flow shortfall, negatively affecting our business, financial condition, results of operations and cash flows.

***Our PPAs are subject to certain termination, renewal or rollover risks.***

The Company's PPAs are subject to termination prior to expiration in certain circumstances, including, in the case of PPAs with DisCos a downgrade of the Company's credit rating. When a PPA expires or is terminated, it may be difficult for the Company to secure a new PPA on acceptable terms or timing, if at all, the price received under subsequent arrangements may be reduced significantly, and/or there may be a delay in securing a new PPA until a significant time after the expiration of the original PPA. In addition, if the Company is not able to secure a new PPA on acceptable terms, the Company may be forced to sell energy in the spot market, which may make the Company's projected revenues difficult to predict. Furthermore, the Company's projections do not consider the renewal or rollover of existing PPAs, or the entering into new PPAs on terms at least similar to those PPAs currently in effect. The Company cannot guarantee that PPAs will be executed after the expiration of its current PPAs or that the terms of new PPAs, if any, will be similar to the Company's existing PPAs. Each of these situations, alone or in the aggregate, could negatively affect the Company's results of operations.

***Prices of PPAs determined as a result of recent auction processes have had lower rates than those PPAs the Company currently have in effect.***

In Chile, prices under PPAs between DisCos and generation companies are set through a public tender process, subject to certain adjustments. PPA prices are expected to decrease as a result of the expected introduction of renewable generation assets and other more efficient technologies into the Chilean electricity generation matrix. PPAs that become effective in 2019, 2020 and 2021 have already been awarded at lower prices than those from the Company's existing PPAs, and prices in subsequent PPA auctions are expected to continue to decline given the increase in competition due to additional power generation sources.

This decline in PPA prices is expected to translate into a PNP (i.e., the price of electricity that DisCos must charge to regulated customers for the supply of electricity) below the Adjusted PEC, resulting in the generation of surpluses which will support PEC Receivables repayment. In addition to these dynamics, the CNE is obligated to adjust the PEC for the Tariff Periods between January 1, 2025 and December 31, 2027 so that sufficient surpluses are generated to repay the PEC Receivables in full by the latter date.

Subsequent PPAs may not be available at prices comparable to those set forth in the Company's existing PPAs, in case one of the Company's existing PPAs is terminated. The early termination of one of the Company's existing PPAs could affect the Company's profitability and its results of operations. If this occurs, the Company will further have to rely on the spot market to obtain profitability, which prices are difficult to predict. If the Company is unable to maintain profitability, the Company could temporarily or permanently cease operations of the Projects, which could have a material adverse effect on the Company's financial results.

***High volatility in the spot market may increase the Company's energy purchases.***

71

Spot prices have shown significant volatility in recent years, primarily due to an increase in fuel prices and a severe drought that has affected the country over the last 13 years, leading to a decrease in hydroelectric power generation and a reduction in water reserves in the main reservoirs. The Company's operations are impacted by this volatility because it must purchase energy during times when it is not generating sufficient energy (either due to a lack of resources or maintenance) to meet the energy withdrawal requirements of its PPA contracts. This volatility implies the risk of energy purchases at very high prices, which could significantly impact the commercial costs of the Projects. Consequently, the Company is exposed to various factors that can affect the spot market, such as hydrology, fuel prices, and transmission deficiencies.

***The Company may experience a downward pressure in the price of energy it sells.***

As new participants have entered the SEN and existing generators expand their renewable generation capacity, the Company could continue to experience downward pricing pressure, including pressure from its customers to renegotiate its PPAs or political pressure to force the government to change the terms and conditions of existing PPAs with DisCos to supply regulated customers. PPAs that become effective in 2019, 2020 and 2021 have already been awarded at lower prices (when compared to those awarded in 2017 or earlier), and prices in subsequent PPA auctions are expected to continue to decline given the increase in competition due to additional power generation sources. Consequently, in the long term, the Company expects that a majority of its sales of energy will derive from the spot market upon the expiration of its PPAs with DisCos between 2031 and 2033 in the event the Company is not able to enter into new PPAs in terms and with prices substantially similar to the Company's existing PPAs or economically beneficial to the Company.

Spot market sales represented 5% of the Company's total revenue for nine-month period ending September 30, 2023 and 8% of the Company's total revenue for the fiscal year ending December 31, 2022. The Company's revenues derived from the spot market are partially dependent on the actions of third parties and factors beyond its control.

***The Company's revenues derived from the spot market depend, in part, on factors beyond its control.***

Generators like the Guarantor Debtors receive merchant spot market revenue as a result of the net value of energy injected (supplied) into the system less the energy withdrawn (demanded) into the system. The following factors, most of which are beyond the Company's control, may unfavorably impact our revenues in the spot market:

- adverse general economic conditions, political instability or social unrest in Chile;

- an increase or decrease in marginal production costs of generators in the Chilean market;

- a deterioration of the Company's financial condition and profitability;

- changes in policy, regulation and actions and interpretations of regulatory bodies;

- unforeseeable changes in weather conditions and phenomena, or natural disasters, such as earthquakes;

- health epidemics or pandemics or other contagious outbreaks, such as the COVID-19 outbreak;

- increases in local and national taxes resulting from changes in tax regulations or the interpretation thereof;

- opposition to energy infrastructure development, particularly in environmentally and socially sensitive areas or in areas inhabited by indigenous populations;

- availability and competitiveness of alternative energy sources or more efficient power plants;

- difficulties obtaining the necessary rights or permits for national transmission system expansion or major maintenance projects;

- availability of spare parts or the ability of the Company's O&M provider to fix or replace malfunctioning parts on a timely basis or at all;

- fluctuations in energy prices caused by regional, domestic and international supply and demand;

- changes in availability and demand of electricity in Chile;

- increases in capital costs;

- early termination of significant contracts for which renewal does not depend on the Company; and

- the ability of the Company's service providers to comply with their contractual obligations.

These and other factors could materially and adversely affect our energy generation, cash flows, financial condition and results of operations.

***The Company's business is dependent on overall macro-economic conditions of Chile.***

General economic conditions of Chile may affect the Company's activities. Certain general macro-economic risks include currency exchange rates, interest rates, inflation rates, industry conditions, political and diplomatic events and trends, health concerns, and general levels of economic activity. The profitability of a significant portion of revenue-generating activities depends, to a great extent, on correct assessments of the future course of price movements in energy prices and other factors that are beyond Company's control or that Company may not be able preemptively to identify. Negative macro-economic conditions may negatively affect Company's results of operations and revenues.

***Payments on the New Notes are dependent solely on the cash flows generated by the Company's Projects and a future Company Sale. Failure to generate energy or to perform our obligations will result in reduced revenue and could materially and adversely affect our results of operations and ability to make payments on the New Notes.***

We are dependent upon the cash flows produced from operating our Projects, and therefore dependent upon successfully operating our Projects and selling electricity at prices sufficient to continue operations and to meet our financial and debt payment obligations. Failure to generate electricity or to provide capacity, breach of obligations under the PPAs, or non-compliance with applicable rules and regulations that may result in sanctions or cancellations of permits by the relevant governmental agencies, may have a material adverse effect on our cash flow, financial condition and results of operations, and could impair our ability to make repay the New Notes.

***Energy generation activities carry inherent operating hazards.***

The Company anticipates its activities will involve a number of operating hazards related to the generation of electricity, including hazards related to operating large pieces of rotating equipment, structural collapse, machinery failure, and delivering electricity to transmission and distribution systems. In addition, the Company is exposed to natural disaster risks and other hazards such as fire and explosions. These and other hazards can cause significant personal injury or loss of life, severe damage to and destruction of property, plant and equipment, disruption of communication systems and technology, contamination of, or damage to, the environment and suspension of operations. The occurrence of any one of these events may result in the Company being subject to various litigation matters, including regulatory and administrative proceedings, asserting claims for substantial damages, may result in the Company being involved from time to time in administrative and judicial proceedings relating to such matters. The Company has implemented environmental, health and safety management programs designed to regularly improve environmental, health and safety performance, but there can be no guarantee that such programs will fully and effectively eliminate the inherent risk of environmental, health and safety liabilities related to the Company's operations.

Our service providers and other third parties may be in close proximity with, among other things, large pieces of mechanized equipment, moving vehicles, manufacturing or industrial processes, and regulated materials. If the Company fails to design and implement adequate practices and procedures, if the practices and procedures the Company implements are ineffective or if the Company's service providers or other suppliers do not follow them, such persons may become injured and the Company and others' property may become damaged. Unsafe work sites

also have the potential to increase provider turnover or raise the Company's operating costs. Any of the foregoing could result in financial losses, which could have a material adverse effect on the Company's financial results.

***The Company engages in transactions with related parties and such transactions present possible conflicts of interest that could have an adverse effect on the Company.***

The Company has entered into transactions with related parties. Related party transactions create the possibility of conflicts of interest. Such a conflict could cause an affiliate to seek to advance its economic interest above the Company's. In addition, other related parties may from time to time provide services to the Company if and as approved by the Company's management. It is possible that the Company could obtain such goods and services from unrelated persons at a lesser price and that a conflict of interest could have a material adverse effect on the Company's business, financial condition, results of operations, and cash flows.

***Compliance with environmental regulations may require significant expenditures that could adversely affect the Company's results of operations.***

The Company's operations are regulated by a wide range of environmental requirements in Chile. Failure to comply with environmental requirements can result in civil, administrative or criminal fines or sanctions, claims for environmental damages, remediation obligations, the revocation of environmental authorizations or the temporary or permanent closure of facilities.

Chilean environmental regulations have become increasingly stringent in recent years, as well as the enforcement of existing legal and permit requirements, and this trend is likely to continue in the near future. New environmental requirements or changes in the application, interpretation or enforcement of existing requirements, could result in substantially increased capital, operating or compliance costs, and could impose conditions that restrict or limit the Company's operations. In addition, changes to environmental regulations could create additional conditions to the Company's operations, could adversely affect its revenues, and thus could have an adverse effect on the Company's financial condition and results of operations.

***Regulatory authorities may impose fines on the Company as a result of energy supply failures.***

The Company may be subject to regulatory fines in Chile for breach of current regulations, including the system experiencing a blackout and/or a delay in re-establishing energy after a blackout. All electricity companies may be subject to these fines if a system blackout results from any generator's or the transmission system operator's operational mistake, including failures related to the coordination of duties of system participants. A power generation company may also be obligated to make compensatory payments to Regulated Customers affected by electricity shortages or to unregulated customers.

The Ministry of Energy of Chile may dictate a rationing decree when an electricity system is facing or is expected to face a generation deficit as a consequence of prolonged breakdown of generating units, or as a consequence of a drought or as a result of unusually high demand. If a rationing decree is enacted, fines may be imposed on power generation companies that do not comply with the measures ordered in the decree. Any such fines may have a material adverse effect on the Company's business, results of operations or financial condition.

***The Company and the grid itself are subject to the risk of mechanical or electrical failures and any resulting unavailability may affect our ability to fulfill our contractual commitments and/or make us liable for fines by the Chilean Superintendency of Electricity and Fuels, and thus adversely affect our financial performance.***

Although the Company performs regular maintenance and operational enhancements to maintain the commercial availability of the Projects, the grid itself is at risk of mechanical or electrical failure and may experience periods of unavailability. Any unplanned unavailability of the Projects may adversely affect the Company's financial performance as it may need to buy electricity on the spot market at a higher price than the price the Company receives under its PPAs in order to fulfill its obligations with its counterparties. Under the Company's PPAs, the Company also has guaranteed certain efficiency parameters to its counterparties, which could be adversely affected during any periods of commercial unavailability. Similarly, the Company is dependent upon Chile's transmission system, which

74

is in need of expansion and continuous upgrades to support the delivery of energy from the north of Chile to the rest of the country. Failure to accomplish any such expansions or upgrades may have a material adverse effect on the Company's business, results of operations or financial condition.

***There is no assurance that the Company's insurance policies, which cover losses related to earthquakes and business interruptions, among others, would be sufficient or adequate in the event of a loss of the Company's insured facilities.***

The Company maintains comprehensive insurance with respect to its facilities, including general liability insurance and other insurance policies customary in the power industry, which cover losses related to earthquakes, property damages and business interruptions, among others. Such insurance coverage may not be available in the future at commercially reasonable costs or the amounts for which the Company is insured or amounts which the Company will receive under such insurance coverage may not cover all of the Company's losses. In the event there is a total or significant loss at the Company's facilities, the proceeds received in respect thereof may not be sufficient to satisfy the Company's obligations under the New Notes.

***The performance and management of the O&M Agreements with Vestas may adversely affect the Company's business, financial position and results of operations.***

Under the O&M Agreements, Vestas is responsible for the operation and maintenance for the Projects. Any failure to perform such operation and maintenance activities could disrupt the Company's operations and adversely affect its business, financial position and results of operations.

***The Chilean Government's heightened requirements regarding the use of NCREs may lead to increased competition and increased volatility in spot prices.***

As the Chilean government heightens its requirements regarding the use of NCREs, the Company expects new participants in the renewable energy sector to enter the market. The current regulatory framework targets a 20% NCRE power generation requirement by 2025, which has already been met. If new participants enter, the Company could experience downward pricing pressure, including pressure from its unregulated customer counterparties to renegotiate the Company's PPAs, which could have a material adverse effect on the Company's profit margins, thereby adversely affecting its business, financial condition and results of operations. In addition, NCREs are likely to lead to very low spot prices at certain times of the day, and very high prices at other times, particularly at night. This may create instability in prices in the spot market and may have a negative impact on the Company's financial condition and results of operations.

***The Company operates in a highly regulated environment; any changes in laws or changes in the interpretation of existing laws may negatively impact our business, financial condition and results of operations.***

Chile's electricity sector has a regulatory framework that has been in effect and has evolved significantly over more than three decades. This has enabled the development of an industry with a high level of participation of private capital to drive the industry's development. The electricity sector and its private participants are subject to various regulations and the supervision of various technical bodies. The material laws and regulations covering the Chilean electricity sector are contained in the Electricity Law, the Transmission Law (Chilean Law No. 20,936, as amended from time to time), and the Environmental Law (Chilean Law No. 19,300, as amended from time to time).

New laws and regulations, changes to existing legislation and new interpretations of existing laws or regulations, together with their political and social considerations, are beyond our control. The outcome of any of these events alone or taken together may be difficult to predict, and if they impose onerous obligations or requirements to the Company's business or its operations, such events may result in a decrease in the Company's revenues.

***The Company is subject to a number of laws, violations of which may result in the imposition of fines and reputational damage; the Company's risk management and internal controls may not be successful in preventing or detecting all violations of law or of company-wide policies.***

In addition to environmental and electricity industry regulations, the Company's business is subject to a significant number of laws, rules and regulations, including those relating to competition and antitrust, anti-bribery and anti- corruption, health, safety and the environment, labor and employment, and taxation. The Company is subject, from time to time, to investigations and proceedings by authorities for alleged infringements of these laws. These proceedings may result in fines or other forms of liability and could have a material adverse effect on the Company's reputation, business, financial condition and results of operations.

The Company's existing compliance processes and internal control systems may not be sufficient to prevent or detect all inappropriate practices, fraud or violations of law by its officers or agents. The Company may in the future discover instances in which it has failed to comply with applicable laws and regulations or internal controls. If officers or agents engage in fraudulent, corrupt or other unfair business practices or otherwise violate applicable laws, regulations or internal controls, the Company could become subject to one or more enforcement actions or otherwise be found to be in violation of such laws, which may result in penalties, fines and sanctions and in turn adversely affect the Company's reputation, business, financial condition and results of operations.

***Labor laws currently in effect may negatively impact us.***

As of the date of hereof, none of ILAP, San Juan nor Norvind have employees, and the operation of the energy generating plants is handled by third party contractors. Likewise, labor and bookkeeping aspects are covered under a management agreement with LAP Chile, pursuant to which San Juan and Norvind pay LAP Chile a monthly fee. While this operation model mitigates many of the most common issues concerning labor relations, the Company remains liable for certain labor obligations under the relevant subcontracting provisions of the Chilean Labor Code, which hold companies jointly and severally responsible of the labor obligations of the contractors in certain circumstances. The Company is unable to predict the risk of insolvency or other managerial failures by any of the contractors or other service providers used by the Company in its current and future activities.

***The Company may encounter significant competition from private companies, governments and state-owned companies.***

The power generation industry is characterized by intense competition and the Company may encounter competition from utilities, industrial companies and other independent power producers, in particular with respect to uncontracted output. In recent years, there has been increasing competition among generators for PPAs, which has contributed to a reduction in electricity prices where supply has surpassed demand plus appropriate reserve margins. Further, changes in technology may facilitate the entrance of new competitors, increase the supply of electricity or reduce the cost of methods of producing power that we do not currently use. If these technologies became cost competitive, the Company could face increasing competition.

In addition, the Chilean government has exercised and continues to exercise substantial influence over many aspects of the private sector. In some cases, the government owns or controls many companies, including some of the largest in Chile. The availability of investment opportunities depends in part on the government continuing to liberalize its policies regarding private investment and to encourage further private sector initiatives. Increasing competition among participants in the power generation industry or from the government may negatively affect the Company's results of operations and revenues.

***Political conditions in the United States may adversely affect our results of operations and financial condition.***

The Chilean economy and the market value of securities issued by Chilean issuers may be, to varying degrees, affected by economic and market conditions in other emerging market countries and in the United States. Adverse economic conditions in the United States could have an adverse effect on the Chilean economy. Although economic conditions in other emerging market countries and in the United States may differ significantly from economic conditions in Chile, investors' reactions to developments in other countries may have an adverse effect on the market

value of securities of Chilean issuers. There can be no assurance that future developments in other emerging market countries and in the United States, over which the Company has no control, will not have a material adverse effect on the Company's ability to satisfy its obligations under the New Notes.

### C. Risks Related to Chile

***Chilean political and economic conditions may adversely affect the Company's business.***

The Company's main business operations and assets are located in Chile and all of its customers are Chilean companies. In the past, unfavorable general economic conditions, including the 2008 financial crisis that affected the global banking system and financial markets, have caused a decrease in the amount of foreign capital invested in emerging markets, including Chile and Latin America. In turn, this caused securities markets in many emerging markets, including Chile and Latin America, to decrease in value and led to depreciation of emerging market currencies compared to the U.S. Dollar. Because international investors' reactions to the events occurring in one market sometimes affect other regions or disfavor certain investments, the Chilean economy could be adversely affected by negative economic or financial developments in other countries. The Company cannot assure you that negative developments in Latin America or other emerging markets or in developed economies will not occur or that such negative developments would not adversely affect the securities markets in which the New Notes will trade, affect the Company's access to sources of financing, or affect the Company's ability to consummate a Company Sale.

The Chilean economy has recently experienced a slowdown in growth, and the Company cannot assure you that the Chilean economy will grow in the future or that future developments in or affecting the Chilean economy, including further consequences of economic difficulties in other emerging markets or in the financial markets of developed economies, will not impair the Company's ability to proceed with its business plan or materially adversely affect the Company's business, financial condition or consolidated results of operations.

Historically, Chile has experienced high rates of inflation from time to time. Although inflation rates had been relatively low in recent years, Chile has experienced a higher rate of inflation in the last two years. The annual rates of inflation and (deflation), as measured by changes in the CPI, in 2018, 2019, 2020, 2021 and 2022 were 2.6%, 2.2%, 3.1%, 4.5%, and 11.6% respectively. High levels of inflation in Chile could adversely affect the Chilean economy and have an adverse effect on the Company's results of operations if the high inflation is not accompanied by a matching devaluation of the local currency. There can be no assurance that Chilean inflation will not revert to prior levels in the future.

In addition, the measures the Central Bank of Chile has taken to control inflation have often included maintaining a tight monetary policy with high interest rates, thereby restricting the availability of credit and economic growth. A significant portion of the Company's operating costs are denominated in U.S. Dollars and could therefore be significantly affected by a decrease in economic activity levels in Chile. If inflation in Chile were to increase without a corresponding depreciation of the Peso, or if the value of the Peso were to appreciate relative to the U.S. Dollar without the Peso experiencing corresponding deflation in Chile, the financial position and results of the Company's operations as well as the value of the New Notes could be materially and adversely affected.

The Chilean government has modified in the past and has the ability to modify monetary, fiscal, tax and other policies to influence the Chilean economy. The Company has no control over government policies and cannot predict how those policies or government intervention will affect the Chilean economy or, directly and indirectly, the Company's business, consolidated results of operations and financial condition. Changes in policies involving exchange controls, taxation and other matters related to the Company's sector may adversely affect the Company's business, consolidated results of operations and financial condition.

***Political developments in Chile could affect the Debtors' business, financial condition and results of operations.***

The Company is exposed to economic and political volatility, including civil unrest, in Chile, which could impact Chilean economy and our business, results of operations and financial condition in Chile. The Debtors' financial condition and results of operations may also be adversely affected by changes in Chile's political climate to

the extent that these changes affect the nation's economic policies, growth, stability, outlook or regulatory environment.

*A severe earthquake or tsunami in Chile could adversely affect the Chilean economy and our infrastructure and, as a result, negatively impact our business, financial condition and consolidated results of operations.*

Chile lies on the Nazca tectonic plate, one of the world's most seismically active regions. Chile has been adversely affected by powerful earthquakes in the past, including an 8.8 Richter Scale magnitude earthquake in central south regions in 2010, an 8.3 Richter Scale magnitude earthquake in Northern Chile in 2014 that caused several blackouts due to damage to the local electricity distribution network, and an 8.4 Richter Scale magnitude earthquake, in Northern Chile, in 2015. A 9.5 Richter Scale magnitude earthquake occurred in Valdivia, Chile in 1960, which remains the largest earthquake recorded in modern history.

A severe earthquake or tsunami in Chile could damage the Company's facilities and have an adverse impact on the Chilean economy and on the Company, including the Company's business, financial condition and consolidated results of operations. The Company's facilities are also susceptible to damage caused by fires and other catastrophic disasters arising from natural or accidental human causes, as well as acts of terrorism and health pandemics or other contagious outbreaks. A catastrophic event could cause disruptions in the Company's business, significant decreases in the Company's revenues or significant additional costs that may not be covered (or only partly covered) by the Company's insurance. Furthermore, there may be lags between a major accident or catastrophic event and the final reimbursement from the insurance policies, which typically carry a deductible and are subject to per event policy maximum amounts.

*Changes in tax laws may increase the Debtors' tax burden and, as a result, negatively affect financial performance.*

The Chilean tax rules applicable to the Debtors may change. From time to time the Chilean government presents to Congress bills of law with proposed changes to tax regulations that may increase the Debtors' tax burden. These changes may include increases on the Corporate Income Tax rate, limitations on the determination of the tax basis for Corporate Income Tax purposes, increases in certain specific taxes applicable to the energy industry, or increases on the existing withholding tax rates for Chilean source income obtained by non-Chilean residents, among others.

The likelihood and effects of these tax reforms and any other changes resulting from the enactment of additional tax reforms have not been quantified. These reforms may result in increases in the Debtors' overall tax burden, which could negatively affect the Debtors' overall financial performance.

*The Company's environmental permits may be revoked or it may experience operational delays related to legal claims challenging the Company's environmental permits that allow citizens affected by any environmental decision-making process to challenge the process or permit.*

The Company's environmental permits may be revoked by the Supreme Court of Chile and other Chilean courts because citizens affected by any environmental decision-making process may petition for relief to a Chilean Court of Appeals, which has the power to require the suspension of the offending activity and to adopt protective measures through a constitutional protection remedy (*recurso de protección*).

The protection remedy challenge has been a widely utilized tool to obstruct and to delay projects. Moreover, environmental regulations provide specific claims to challenge environmental licenses (*recurso de reclamación*), along with remedies set forth in general administrative regulations that are frequently used to seek the revocation of granted environmental approvals (*solicitud de invalidación*). As a result, in the future, the resolution of the Company's environmental permits may be annulled or delayed through judicial action brought by the affected communities. These challenges may result in revocation of the approved permits and consequently, in a disruption of the Company' operations.

***Chile's changes to environmental regulations and policies may lead to significant changes in the Company's industry and business.***

Chile has adopted a number of policies and regulation that have benefited NCRE sources, like wind power, focusing on energy modernization, the social impact of energy, energy development, low emission energy, sustainable transport, energy efficiency and energy education and training. The current regulatory framework targets a 20% NCRE power generation requirement by 2025, which has been achieved in advance.

The Company's facilities and operations are subject to a series of environmental laws and regulations, including, but not limited to, laws and regulations related to protected areas, licensing, use of dangerous products, and interface with indigenous territories, among others, which are becoming increasingly rigid and more strictly enforced and supervised. Furthermore, new or more rigorous environmental standards (including measures to address global warming) imposed on the Company, or a more rigorous application of such standards, could require the Company to expend additional funds in order to comply with such standards, which expenditure may be significantly longer than currently foreseen, which could have an adverse effect on the Company's financial condition and results of operations.

***The Chilean Government could seize or expropriate the Company's assets under certain circumstances.***

Pursuant to Article 19 No. 24 of the Chilean Constitution, the Chilean Government may exercise its eminent domain powers in respect of our assets, in the event such action is required in order to protect public interests. According to Decree Law No. 2,186 of 1978, eminent domain powers may be exercised through an administrative expropriation process, the result of which can be appealed before a civil court. In the case of expropriation, we would be entitled to compensation for the expropriated assets. However, the compensation may be lower than the price for which the expropriated asset could be sold in a free market sale or the value of the asset as part of an ongoing business, which may adversely affect the Company's ability to make payments under the New Notes.

***Chile has different corporate disclosure and accounting standards than those you may be familiar with in the United States and other jurisdictions.***

Accounting, financial reporting and securities disclosure requirements in Chile differ in certain significant respects from those required in the United States. With respect to accounting standards, there are material differences between IFRS and U.S. GAAP. Accordingly, the information about us available to you will not be the same as the information available to holders of notes issued by a U.S. company. In addition, although Chilean law imposes restrictions on insider trading and price manipulation, applicable Chilean laws are different from those in the United States, and the Chilean securities markets are not as highly regulated and supervised as the U.S. securities markets.

### D.  Risks Related to the Plan Securities

***The Plan Securities will be issued pursuant to Section 4(a)(2), Regulation S and Regulation D under the Securities Act.***

The Debtors are relying on Section 4(a)(2), Regulation D and Regulation S under the Securities Act to exempt the offer of the Plan Securities from registration under the Securities Act. Section 4(a)(2) of the Securities Act exempts from registration the offer and sale of an issuer's securities in a transaction not involving any public offering. Regulation D exempts from registration offers and sales that occur to Qualified Institutional Buyers (as such term is defined in Rule 144A under the Securities Act) and Accredited Investors (as such term is defined in Regulation D under the Securities Act). Regulation S exempts from registration offers and sales to non-U.S. persons outside the United States. Further, the indentures governing the New Notes shall be exempt from qualification under the Trust Indenture Act of 1939 pursuant to Section 304(b) thereof.

The Company believes that the Holders of the Existing Notes Claims and LC Facility Claims are Qualified Holders. Further, the Company, upon information and belief, does not expect there to be Holders of Senior Debt Claims that are Non-Qualified Holders. Further, if there are any Non-Qualified Holders, the Company believes that the number of such holders would be insignificant.

Securities issued in reliance on the exemption provided in Section 4(a)(2) of the Securities Act will be considered "restricted securities", and therefore will not be able to be resold absent an exemption under the Securities Act. **Parties are advised to consult with their own counsel as to the availability of the exemption.** For a discussion of certain restrictions on resale and transfer, see Section XIII of this Disclosure Statement, "*Certain Securities Law Matters*".

Furthermore, the Plan Securities cannot and will not be publicly offered or sold in Chile, or to any resident in Chile, and may be privately offered or sold in Chile only in circumstances which have not resulted and will not result in a public offering under Chilean law, and in compliance with CMF Rule 336. The definition of a public offering of securities under Chilean law includes both offers directed to the general public and offers directed to a part or specific group thereof. Pursuant to CMF Rule 336, the Plan Securities may be privately offered in Chile to certain "qualified investors," defined as such therein (which in turn are further described in Rule No. 216 (*Norma de Carácter General 216*), dated June 12, 2008, of the CMF, "CMF Rule 216")) and in compliance with regulations applicable to such investors. For a discussion of certain restrictions on resale and transfer, see Section XIII of this Disclosure Statement, "*Certain Securities Law Matters*".

Furthermore, no offer or invitation, whether directly or indirectly, may be made or will be made to the public in the Cayman Islands to subscribe for any securities to be issued by the New Issuer (including, without limitation, the Convertible Notes and the New Issuer Equity), see Section XIII of this Disclosure Statement, "*Certain Securities Law Matters*".

***There are restrictions on the ability to transfer the Plan Securities.***

The Plan Securities have not been, and will not be, registered under the Securities Act or any state securities laws and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and applicable state securities laws. Restrictions also apply with respect to Chilean and Cayman Islands securities laws. For a discussion of certain restrictions on resale and transfer, see Section XIII of this Disclosure Statement , "*Certain Securities Law Matters*".

***An active trading market for the Plan Securities may not develop.***

There is currently no market for the Plan Securities. While the Company intends to apply for the listing of the New Notes on a securities exchange, there can be no assurance that any market for the New Notes will develop or be sustained. If an active market does not develop or is not sustained, the market price and liquidity of the New Notes may be adversely affected. Further, the Company has no intent to list the Reorganized ILAP Equity or the New Issuer Equity on any exchange.

There can be no assurance that any market for the Plan Securities will develop or be sustained. If an active market does not develop or is not sustained, the market price and liquidity of the Plan Securities may be adversely affected. The liquidity of any market for the Plan Securities will depend on a number of factors, including, without limitation:

- the number of holders of each Plan Security;

- the Reorganized Debtors' operating performance and financial condition;

- the market for similar securities; and

- the interest of securities dealers in making a market for each Plan Security.

If a market for the Plan Securities were to develop, the Plan Securities may trade at a discount, depending upon many factors, including prevailing interest rates, the market for similar securities, general economic conditions, the ratings assigned to the debt by credit rating agencies, the liquidity of the Plan Securities, and the Reorganized Debtors' operating performance and financial condition.

***Implied value is not intended to represent trading value of the Plan Securities.***

The valuation of the Reorganized Debtors is not intended to represent the trading value of any of the Plan Securities in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things: (i) prevailing interest rates; (ii) conditions in the financial markets; (iii) the anticipated initial securities that Holders of Claims or Interests are receiving under the Plan, some of which may prefer to liquidate their investment rather than hold it on a long-term basis; and (iv) other factors that generally influence the prices of securities. The actual market prices of the Plan Securities are likely to be volatile. Many factors, including factors unrelated to the Reorganized Debtors' actual operating performance and other factors not possible to predict, could cause the market prices of the Plan Securities to rise and fall. Accordingly, the implied value, stated herein and in the Plan, of the securities to be issued does not necessarily reflect, and should not be construed as reflecting, values that will be attained for the any of the Plan Securities in the public or private markets.

***The Net Cash Proceeds to which the Non-Qualified Holders are entitled may be less than the face value of the New Notes due to such holder.***

Depending on market conditions, the volume of Take-back SSNs and Convertible Notes sold or other developments, the Net Cash Proceeds may be less than the face value of such notes due to a Non-Qualified Holder. The Debtors will not be obligated to pay any amount other than, or additional to, the Net Cash Proceeds, and payment of the Net Cash Proceeds (if any) will fully and finally discharge the obligation to deliver the Substitute Consideration (instead of any New Notes) to the relevant Non-Qualified Holders. For the avoidance of doubt, in the event the Net Cash Proceeds are zero, then the Debtors shall have no liability to any Non-Qualified Holder in respect thereof nor any obligation whatsoever to deliver securities or cash to such Non-Qualified Holders.

***Projections and other Forward-Looking Statements are not assured, and actual results may vary.***

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, and contains estimates and assumptions which might ultimately prove to be incorrect, and contains projections that may differ materially from actual future experiences. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be Allowed.

The Debtors have prepared financial projections (the "Financial Projections") on a consolidated basis based on certain assumptions, as set forth in **Exhibit D** hereto. The Financial Projections have not been compiled, audited, or examined by independent accountants, and neither the Debtors nor their advisors make any representations or warranties regarding the accuracy of the Financial Projections or the ability to achieve forecasted results.

Many of the assumptions underlying the Financial Projections are subject to uncertainties that are beyond the control of the Debtors or Reorganized Debtors including the timing, confirmation, and consummation of the Plan, demand or price for services, inflation, and other unanticipated market and economic conditions. Some assumptions may not materialize, and unanticipated events and circumstances may affect the actual results. Projections are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, economic, and competitive risks, and the assumptions underlying the Financial Projections may be inaccurate in material respects. In addition, unanticipated events and circumstances occurring after the approval of this Disclosure Statement by the Bankruptcy Court including any natural disasters, terrorist attacks, or health epidemics may affect the actual financial results achieved. Such results may vary significantly from the forecasts and such variations may be material.

***The value of the collateral may not be sufficient to satisfy the Debtors' obligations under the New Notes.***

The Super Priority Notes and the Take-back SSNs will be secured by first priority security interests in the assets of the Reorganized Debtors and the Reorganized ILAP Equity, while the Convertible Notes will be secured by a first priority security interest in the New Issuer Equity. The value of the respective collateral and any amount to be received upon a sale or foreclosure of such collateral will fluctuate depending upon many factors including, among others, the Debtors' financial situation at the time of such sale or foreclosure, changes in the Debtors' industry that

may have occurred, the availability of buyers at such time, the condition of the Chilean and U.S. economies and exchange rates. No appraisal of any of the collateral has been prepared by the Debtors or on the Debtors' behalf in connection with the issuance of the New Notes. The Reorganized Debtors can provide no assurance as to the amount that would be distributed in respect of the New Notes upon any foreclosure or otherwise, or that the proceeds from the sale of the collateral would be sufficient to satisfy the Reorganized Debtors' and New Issuer's obligations under the New Notes. If the value of the collateral is insufficient to satisfy the Reorganized Debtors' and New Issuer's obligations under the New Notes, holders of New Notes may experience losses.

***Impediments exist to any foreclosure on the collateral, which may adversely affect the proceeds of any foreclosure.***

Substantially all of the documents that create liens on the collateral for the benefit of the Super Priority Notes and Take-back SSNs are governed by the laws of and substantially all of the collateral is located in Chile. Any foreclosure regarding the assets in Chile would therefore be required to comply with applicable local legal and procedural requirements, which may require that foreclosure only be permitted upon receipt of a judicial order and carried out by public auction before the same court, and differ substantially from those in the United States.

In particular, Chilean law does not allow for self-executing mechanisms or expedited foreclosure proceedings with respect to these types of liens. Any proceeding against the collateral in Chile would be required to be initiated in a Chilean court, and could involve significant delays. In the absence of a recognition of debt deed, in order to foreclose on the collateral as a consequence of an event of default under the documents governing the Super Priority Notes and Take-back SSNs, a Chilean court will require a final and conclusive judgment for the payment of money rendered from a U.S. court. The courts of Chile then will enforce such final and conclusive foreign judgment for the payment of money rendered by the U.S. court in accordance with the *exequatur* procedure used for the enforcement of foreign judgments (including, among other things, the issuance of letters rogatory) in the Chilean Civil Procedure Code without any retrial or re-examination of the merits of the original action. The time required to obtain a U.S. order and then have such order recognized and enforced by a Chilean court could result in a deterioration of the collateral and a decrease in the value that would otherwise be realizable upon foreclosure. In order potentially to expedite the process for foreclosing on the collateral as a consequence of an event of default under the documents governing the Super Priority Notes and Take-back SSNs, the Debtors will enter into a recognition of debt deed, which may permit the Banco de Chile as Onshore Collateral Agent to foreclose on the collateral more expeditiously through an abbreviated proceeding which would typically take between one (1) to three (3) years.

In addition, the charge over the New Issuer Equity to be granted to secure the Convertibles Notes will be governed by the laws of the Cayman Islands and the New Issuer Equity will be located in the Cayman Islands. Accordingly, any enforcement or realization of that share charge and that collateral would be required to comply with applicable local legal and procedural requirements. The most common enforcement actions with respect to security over the shares in an exempted company incorporated in the Cayman Islands can generally be exercised without the need to bring any action in the Grand Court of the Cayman Islands (the "Grand Court"). However, certain other enforcement actions, including foreclosure, can only be taken pursuant to an order of the Grand Court. In addition, any transfer of shares or alteration in the status of the exempted company's members made after the commencement of a winding up pursuant to a winding up order made by the Grand Court is, unless the Grand Court otherwise orders, void. The time required to obtain such an order could result in a deterioration of the collateral and a decrease in the value that would otherwise be realizable upon enforcement.

***Third parties' rights may affect the ability of Holders of New Notes to foreclose on the collateral and the priority of the New Notes with respect to the collateral.***

Third parties may have rights and be entitled to remedies that diminish the ability of Holders of New Notes to foreclose upon or otherwise realize the collateral or that affect the priority of the New Notes with respect to the collateral, or amounts available to pay the New Notes after foreclosure or other realization of the collateral for repayment. Under Chilean bankruptcy law, the obligations under the New Notes are subordinated to certain statutory preferences. In the event of liquidation, such statutory preferences, including claims for salaries, wages, secured obligations, social security contributions, taxes and court fees and expenses, will have preference over any other claims, including claims by any investor in respect of the New Notes. Similar statutory preference apply under the laws of the Cayman Islands in a liquidation scenario, whereby certain secured and preferential creditors will be repaid prior to ordinary unsecured creditors and equity holders. The rights and remedies to which these and other third-party creditors

are entitled may limit the ability to foreclose on or otherwise realize the collateral for the New Notes or may otherwise reduce the proceeds available to satisfy the Reorganized Debtors' and/or New Issuer's obligations under the New Notes.

***The Company may not be able to repurchase the New Notes upon the occurrence of a Change of Control.***

Upon the occurrence of a Change of Control, the Reorganized Debtors may be required by the holders of the New Notes to offer to repurchase all of the outstanding notes plus accrued and unpaid interest to, but excluding, the date of purchase. The source of funds for any such purchase of the New Notes will be our available cash or cash generated from our operations or other sources, including a Company Sale. Our failure to repurchase the notes upon a Change of Control would cause a default under the indentures governing the New Notes.

***The Super Priority Notes and Take-back SSNs are subject to certain mandatory redemption events without premium.***

Upon the occurrence of certain events, the Reorganized ILAP will be required to redeem the Super Priority Notes and Take-back SSNs at a redemption price equal to 100% of the outstanding principal amount of the Take-back Notes being redeemed without premium. See discussion on Mandatory Cash Sweeps in Section VI.A.i of this Disclosure Statement.

***The Convertible Notes are subject to certain mandatory redemption events at a price less than par.***

Upon the occurrence of a qualifying Company Sale, the New Issuer will be required to redeem the Convertible Notes at a redemption price that may equal to less than par and based on an allocation of sale proceeds as set forth above. *See* allocation splits discussed in Section VI.A.iii of this Disclosure Statement.

***We may incur additional indebtedness ranking equally to the New Notes or secured indebtedness.***

Subject to the terms and conditions of the indentures governing the New Notes, we may incur additional debt that ranks on an equal and ratable basis with the New Notes or is subordinated to the New Notes. If we incur any additional debt that ranks on an equal and ratable basis with the New Notes, the holders of that debt will be entitled to share ratably with the holders of the New Notes, in any proceeds distributed in connection with an insolvency, liquidation, reorganization, dissolution or other winding-up of us subject to satisfaction of certain debt limitations, other than to the extent of the proceeds in the collateral.

***Equity Interests are subordinated to Reorganized Debtors' indebtedness in Chile and the Cayman Islands.***

In any subsequent liquidation, dissolution, or winding up of the Reorganized Debtors, the Reorganized ILAP Equity and New Issuer Equity would rank below all debt claims against the Reorganized Debtors. As a result, holders of such interests will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all the Reorganized Debtors' debt obligations have been satisfied.

***Holders of the New Notes may find it difficult or impossible to enforce civil liabilities against the Company, the New Issuer or their respective directors, officers and controlling persons.***

The Company is organized under the laws of Chile and its principal place of business is in Chile. The New Issuer is to be incorporated under the laws of the Cayman Islands. With the potential exception of the independent director, all of the Company's and the New Issuer's directors, officers and controlling persons reside outside of the United States. In addition, all of the Company's and New Issuer's assets are located outside of the United States. As a result, it may be difficult for holders of the New Notes to effect service of process within the United States on such persons or to enforce judgments against them or the Company or the New Issuer, including in any action based on civil liabilities under the U.S. federal securities laws. There is doubt as to the enforceability against such persons in Chile, whether in original actions or in actions to enforce judgments of U.S. courts, of liabilities based solely on the U.S. federal securities laws.

In addition, the New Issuer has been advised by Ogier (Cayman) LLP, its Cayman Islands legal counsel, that there is uncertainty as to whether the courts of the Cayman Islands would (i) recognize or enforce judgments of United States courts obtained against the New Issuer or its directors or officers predicated upon the civil liability provisions of the securities laws of the United States or any state in the United States or (ii) in original actions brought in the Cayman Islands, to impose liabilities against the New Issuer predicated upon the securities laws of the United States or any state in the United States, so far as the liabilities imposed by those provisions are penal in nature or otherwise contrary to public policy in the Cayman Islands.

Although there is no statutory enforcement in the Cayman Islands of judgments obtained in the United States, the courts of the Cayman Islands will recognize and enforce a foreign money judgment of a foreign court of competent jurisdiction without retrial on the merits based on the principle that a judgment of a competent foreign court imposes upon the judgment debtor an obligation to pay the sum for which judgment has been given provided certain conditions are met. For such a foreign judgment to be enforced in the Cayman Islands, such judgment must be final and conclusive, given by a court of competent jurisdiction (the courts of the Cayman Islands will apply the rules of Cayman Islands private international law to determine whether the foreign court is a court of competent jurisdiction), and must not be in respect of taxes or a fine or penalty, inconsistent with a Cayman Islands judgment in respect of the same matter, impeachable on the grounds of fraud or obtained in a manner, and/or be of a kind the enforcement of which is, contrary to natural justice or the public policy of the Cayman Islands (awards of punitive or multiple damages may well be held to be contrary to public policy). A Cayman Islands court may stay enforcement proceedings if concurrent proceedings are being brought elsewhere.

In addition, your rights under the New Notes will be subject to the insolvency and administrative laws of Chile and the Cayman Islands, and the Company cannot assure that you will be able to effectively enforce your rights in any bankruptcy, insolvency or similar proceedings. In addition, the bankruptcy, insolvency, administrative and other laws of Chile and the Cayman Islands may be materially different from, or in conflict with, each other, including in the areas of rights of creditors, priority of government entities and other third party and related party creditors', ability to obtain post-bankruptcy filing loans or to pay interest and the duration of proceedings. The laws of Chile and the Cayman Islands may not be as favorable to your interests as the laws of those jurisdictions with which you are familiar. The application of these laws, or any conflict among them, could call into question what and how Chilean and/or Cayman Islands laws should apply. Such issues may adversely affect your ability to enforce your rights under the New Notes in Chile or the Cayman Islands or limit any amounts that you may receive.

***Exchange controls and restrictions on foreign currency remittance could impede our ability to make payments under the New Notes.***

Exchange control risks include availability risk, the risk that even though the Company has sufficient Chilean Peso-denominated revenues to meet its obligations, U.S. Dollars are not available for conversion; convertibility risk, the risk that a Chilean government entity will restrict, condition or terminate our legal right to convert Chilean Pesos into U.S. Dollars; and transferability risk, the risk that a Chilean government entity will allow the Company to convert currency into U.S. Dollars, but will place restrictions or prohibitions on those U.S. Dollars leaving the country.

Chilean issuers are authorized to offer securities internationally complying with the provisions of Chapter XIV of the Compendium of Foreign Exchange Regulations of the Central Bank (the "Chilean Central Bank Compendium"), including the obligation to provide certain information to the Central Bank of Chile. Under Chapter XIV of the Chilean Central Bank Compendium, payments and remittances of funds from Chile are governed by the rules in effect at the time the payment or remittance is made. Therefore, any change made to Chilean laws and regulations after the date hereof shall affect foreign investors who have acquired the New Notes.

There can be no assurance that further Central Bank of Chile's regulations or legislative changes to the current foreign exchange control regime in Chile will not restrict or prevent the Reorganized Debtors from acquiring U.S. Dollars; or further restrictions applicable to the Company which affect its ability to remit U.S. Dollars for payment on the New Notes. There can be no assurance that restrictions applicable to the holders will not be imposed in the future, nor can there be any assessment of the duration or impact of such restrictions if imposed.

***The security over the collateral will not be granted directly to the holders of the New Notes.***

The security interests in the collateral that will secure the obligations under the Take-back SSNs and the Super Priority Notes will not be granted directly to such holders but will be granted in favor of the Onshore Collateral Agent for the benefit of such holders and the other secured parties under the new indenture documents. The Super Priority/Take-back SSN Indenture and the security documents will provide that only the Onshore Collateral Agent has the right to enforce the collateral. As a result, holders of the Take-back SSNs and the Super Priority Notes will not have the right to enforce directly any security interests and will not be entitled to take enforcement action in respect of the collateral or such notes, except through the Onshore Collateral Agent and in accordance with, and subject to the terms of, the relevant security documents.

Likewise, the security interests in the collateral that will secure the obligations under the Convertible Notes will not be granted directly to such holders but will be granted in favor of the Collateral Agent for the benefit of such holders and the other secured parties under the new indenture documents. The Convertible Notes Indenture and the security documents will provide that only the Collateral Agent has the right to enforce against the collateral securing the Convertible Notes. As a result, holders of the Convertible Notes will not have the right to enforce directly any security interests and will not be entitled to take enforcement action in respect of the collateral or such notes, except through the Collateral Agent and in accordance with, and subject to the terms of, the relevant security documents.

***Rights of holders of the Take-back SSNs and the Super Priority Notes in the collateral may be adversely affected by the failure to create or perfect security interests in certain collateral on a timely basis or at all.***

The Onshore Collateral Agent's ability to foreclose on the collateral on the secured parties' behalf is subject to perfection and priority issues. We cannot assure that all of the security interests in the collateral will be effective (valid and enforceable) on the date the Take-back SSNs and Super Priority Notes are issued, or at all. We expect the necessary filings with the relevant Chilean registries for perfection of the security interest to become effective, in the case of pledges without conveyance, within 45 calendar days from the execution of each pledge (or of its amendment and restatement, when applicable), and in the case of the mortgages, within 60 calendar days from the date of execution of such mortgage (or of its amendment and restatement, when applicable). The commercial pledge and conditional assignment of some Material Project Documents (as defined in the Existing Indenture and will be further defined in the Super Priority/Take-back SSN Indenture) will require the acceptance, acknowledgment or notice thereof to such counterparties through a Chilean Notary Public, which will be made within 60 calendar days form the date of execution of such pledge or conditional assignment (or of its amendment and restatement, when applicable); in circumstances in which the acceptance of the relevant counterparties to the granting of the commercial pledges and conditional assignments, which was necessary for their perfection, was given when these Material Project Documents were executed and is expressly stated in the text of the aforementioned contracts. As per the endorsement and designation as loss payee an additional insured under all of the insurance policies of the Guarantors, such actions to be completed within 90 calendar days from the date of the execution of such endorsement (or of its amendment and restatement, when applicable). Unless and until we take all necessary actions under Chilean law in Chilean jurisdictions where collateral is located to create valid and enforceable security interests and, where applicable, perfect these security interests, holders of the Take-back SSNs and Super Priority Notes will not have valid and enforceable and perfected security interests in those portions of the collateral. In addition, any inability or failure of the Reorganized Debtors or New Issuer, as appropriate, to take all necessary actions under Chilean law in Chilean jurisdiction where collateral is located to create properly perfected security interests in the collateral in which we have agreed to perfect the security interests may result in the loss of the priority of the noteholders to such collateral, to which they would have been entitled had the security interests been perfected prior to closing.

The security interests in portions of the collateral may not be capable of, where applicable, perfection or registration according to customary established means of filing financing statements, recording charges, possession or otherwise. To the extent the security interest in any property or asset comprising part of the collateral cannot be perfected or registered by established customary means, we may not be able to perfect or register such security interest in that portion of the collateral. Moreover, the Onshore Collateral Agent for the Take-back SSNs and the Super Priority Notes has no obligation to monitor the acquisition of additional property or rights that constitute collateral or the perfection of any security interest in favor of the Take-back SSNs and the Super Priority Notes against third parties.

***The ability of the Onshore Collateral Agent to foreclose on the collateral securing the Take-back SSNs and the Super Priority Notes may be limited pursuant to the Chilean bankruptcy law and the Electricity Law.***

The collateral securing the obligations under the Take-back SSNs and Super Priority Notes will generally consist of a first-priority security interest on our material tangible assets and the real estate property, rights under the Material Project Documents (as defined in the Existing Indenture and will be further defined in the Super Priority/Take-back SSN Indenture), the equity interests or shares, as applicable, in each of ILAP and the Guarantors, as well as certain transaction accounts. The rights of the Onshore Collateral Agent as a secured party under the collateral for the benefit of the holders of the Take-back SSNs and Super Priority Notes to foreclose upon and sell the collateral upon the occurrence of a default may be significantly impaired by applicable bankruptcy laws if a bankruptcy, liquidation or reorganization proceeding were to be commenced by or against us. In particular, under Chilean bankruptcy laws and the Electricity Law, the right of a secured creditor to foreclose the collateral may be affected in special circumstances during reorganization and liquidation proceedings.

We cannot predict whether or when the Onshore Collateral Agent could foreclose upon or sell the collateral or whether or to what extent holders of the Take-back SSNs and Super Priority Notes would be compensated for any delay in payment or loss of value of the collateral following the commencement, and during the pendency, of a bankruptcy case.

***The rights and responsibilities of holders of New Issuer Equity will be governed by Cayman Islands law and will differ in some respects from the rights and responsibilities of shareholders under U.S. law.***

The New Issuer will be an exempted company limited by shares incorporated with limited liability under the laws of the Cayman Islands. As a general rule, the liability of shareholders of a Cayman Islands company which has been incorporated with limited liability is limited to the amount from time to time unpaid on their shares. The corporate affairs of the New Issuer will be governed by its memorandum and articles of association ("New Issuer Governing Documents"), the Companies Act (As Revised) of the Cayman Islands (the "Companies Act"), certain other Cayman Islands statutes and the common law of the Cayman Islands. In addition, certain United Kingdom legislation is extended to the Cayman Islands by the United Kingdom legislature and is effective in the Cayman Islands.

The common law of the Cayman Islands is derived in part from comparatively limited judicial precedent in the Cayman Islands as well as from English common law, the decisions of whose courts are of persuasive authority, but are not binding on a court in the Cayman Islands. The Judicial Committee of the Privy Council sitting in London is the highest appellate court for the Cayman Islands and decisions of that Committee, where such rulings arise out of appeals from the Cayman Islands courts, are formally binding upon the Cayman Islands courts. In general, the rights of New Issuer's shareholders will be governed by the provisions of the Companies Act, common law principles and the provisions contained in the New Issuer Governing Documents. Each New Issuer shareholder will be bound by the voting and other provisions set out in the New Issuer Governing Documents and will be subject to the decisions of the majority or special majorities required under the Companies Act and the New Issuer Governing Documents.

The rights of holders of the New Notes and of the New Issuer Equity to take action against, and the fiduciary responsibilities of, the New Issuer's directors and officers under Cayman Islands law are, to a large extent, governed by the common law of the Cayman Islands, and are different from what they would be under statutes or judicial precedent in some jurisdictions in the United States. In particular, the Cayman Islands has a less prescriptive body of securities laws as compared to the United States (thus providing significantly less protection to investors), and certain states, such as Delaware, may have more fully developed and judicially interpreted bodies of corporate law.

The New Issuer will have a single board of directors and provisions relating to matters such as the number of directors, board meetings and the exercise of their powers will be contained in the New Issuer Governing Documents. The members of the board of directors of a Cayman Islands company are all subject to equal fiduciary duties and are collectively responsible for the proper management of the company and the supervision of its activities. As a matter of Cayman Islands law, directors of a Cayman Islands company owe fiduciary duties, and a separate duty of skill, care and diligence, to the company. Under Cayman Islands law, the fiduciary duties that directors owe include: (i) a duty to act loyally, honestly and in good faith in what the director believes to be in the best interests of the company as a whole; (ii) a duty to exercise powers for the purposes for which those powers were conferred and not for a personal, collateral or other improper purpose; (iii) a duty not to fetter the exercise of future discretion; (iv) a

86

duty to exercise independent judgment; and (v) unless modified (such as through the company's memorandum and articles of association), a duty not to put themselves in a position in which there is a conflict between their duty to the company and their personal interests or a duty owed to another person. With respect to the duty referred to at (i) above, in the ordinary course, the "interests of the company" may be equated to the interests of the company's shareholders, but in the case of a company which is or may be insolvent, the directors must consider the company's creditors' interests as a whole as part of their duty to act in the interests of the company itself.

In addition, because the New Issuer is a holding company, its ability to pay cash dividends on the New Issuer Equity may be limited by restrictions on its ability to obtain sufficient funds through dividends from subsidiaries, including restrictions under the terms of the agreements governing its and its subsidiaries' indebtedness. Subject to these limitations, the payment of cash dividends in the future, if any, will depend upon such factors as earnings levels, capital requirements and other applicable legal requirements, contractual restrictions, its financial condition and any other factors deemed relevant by the New Issuer's board of directors.

## XI.    CONFIRMATION OF THE PLAN

### A.    Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by an Impaired Class of Claims and Interests, or if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (i) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11; (ii) the Debtors have complied or will have complied with all of the necessary requirements of chapter 11 for plan confirmation; and (iii) the Plan has been proposed in good faith.

### B.    Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value that is not less than the amount that such holder would receive or retain if the debtor liquidated under chapter 7.

To determine what the holders of claims or interests would receive if a debtor were to be liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the debtor's assets in a chapter 7 liquidation case. The amount that would be available for satisfaction of allowed claims and interests of the debtor would consist of the proceeds resulting from the disposition of the assets of the debtor augmented by the cash held by the debtor at the time of the commencement of the chapter 7 case. Such amounts would be reduced by the costs and expenses of the liquidation and by such additional administrative expense claims and other priority claims that might result from the chapter 7 case.

The Debtors have attached hereto as **Exhibit C**, a Liquidation Analysis prepared by the Debtors' management with the assistance of AlixPartners, the Debtors' financial advisor.

### C.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtors, or any successor to the debtors (unless such liquidation or reorganization is proposed in the plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors prepared the Projections, as set forth on **Exhibit D** attached hereto.

### D.  Acceptance by Impaired Class

The Bankruptcy Code requires, as a condition to confirmation, that, except in certain circumstances, each class of claims or equity interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.[13]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of allowed claims in that class, counting only those claims that *actually* voted to accept or to reject the plan. Thus, a Class of Claims will have voted to accept the Plan only if two-thirds (2/3) in amount and a majority in number actually voting cast their Ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired interests as acceptance by holders of at least two-thirds (2/3) in dollar amount of allowed interests in that class, counting only those interests that *actually* voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds (2/3) in amount actually voting cast their Ballots in favor of acceptance.

Section 506(a) of the Bankruptcy Code provides that holders of allowed claims secured by Liens on property of a Debtor shall have an allowed secured claim to the extent of the value of such holder's interest in the Debtors' estates' property and shall have an unsecured claim to the extent the value of such holder's interest is less than the allowed amount of such claim. For purposes of Voting, to the extent the value of the interest of a Holder of a Senior Debt Claim in property of the Estates exceeds the Allowed amount of such Senior Debt Claim, such Holder shall be deemed to vote the unsecured portion of such Claim in Class 3 and shall not be permitted to Vote in Class 4 with the General Unsecured Claims. To the extent necessary, the Plan will be deemed modified to classify separately the votes of Class 3 into two sub-classes—(1) the Allowed Secured Senior Debt Claim and (2) the Allowed unsecured Senior Debt Claim—with the vote submitted on the Ballot of a Holder of a Senior Debt Claim to be counted in each such sub-class.

## XII.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not consummated, the Debtors' capital structure will remain highly leveraged and the Debtors will remain unable to service their debt obligations or to cure defaults thereunder. Accordingly, if the Plan is not confirmed and consummated, the alternatives include:

### A.  Liquidation Under Chapter 7

If no plan is confirmed, the Debtors may choose to file a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by chapter 7 of the Bankruptcy Code. A discussion of the effects that a liquidation would have on the recoveries of Holders of Claims and Interests is set forth in the Liquidation Analysis attached hereto as **Exhibit C**. However, there is substantial doubt as to whether the local government or creditors not subject to the jurisdiction of the Bankruptcy Court would choose to respect such a liquidation, and instead, the Debtors would likely file local bankruptcy proceedings under Chilean law. For the reasons articulated in Section X above, the Debtors

---

[13]  A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

believe that a liquidation would result in lower aggregate distributions being made to creditors than those provided in the Plan.

### B.    Alternative Plan(s) of Reorganization

The Debtors believe that failure to confirm the Plan will likely lead to expensive and protracted Chapter 11 Cases. In formulating and developing the Plan, the Debtors have explored numerous other alternatives and engaged in an extensive negotiating process.

The Debtors believe that not only does the Plan fairly adjust the rights of various Classes of Holders of Claims and Interests, and enable each to maximize their returns, but also that rejection of the Plan in favor of some alternative method of reconciling the Claims and Interests will require, at the very least, an extensive and time consuming process (including the possibility of protracted and costly litigation) and will not result in a better recovery for any Class.

THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS PREFERABLE TO ANY ALTERNATIVE BECAUSE THE PLAN MAXIMIZES THE AMOUNT OF DISTRIBUTIONS TO ALL HOLDERS OF CLAIMS, AND ANY ALTERNATIVE TO CONFIRMATION OF THE PLAN WILL RESULT IN SUBSTANTIAL DELAYS IN THE DISTRIBUTION OF ANY RECOVERIES. THEREFORE, THE DEBTORS RECOMMEND THAT ALL HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.

### C.    Dismissal of the Debtors' Chapter 11 Cases

Dismissal of the Debtors' Chapter 11 Cases would have the effect of restoring (or attempting to restore) all parties to the status quo ante. Upon dismissal of the Debtors' Chapter 11 Cases, the Debtors would lose the protection of the Bankruptcy Code, thereby requiring, at the very least, an extensive and time-consuming process of negotiation with the creditors, and possibly resulting in costly and protracted litigation in various jurisdictions.

Dismissal will also permit unpaid secured and unsecured creditors to obtain and enforce judgments against the Debtors. The Debtors believe that these actions would seriously undermine their ability to continue operations. Therefore, the Debtors believe that dismissal of the Debtors' Chapter 11 Cases is not a viable reorganizational alternative to the Plan. However, the Debtors may determine that a Chilean law bankruptcy is necessary and advisable if the Plan cannot be consummated, in which circumstance the Debtors reserve their right to seek dismissal of these Chapter 11 Cases.

## XIII.    CERTAIN SECURITIES LAW MATTERS

### A.    Plan Securities

The Plan provides for the Reorganized Debtors and New Issuer, collectively, to issue and distribute (i) Take-back SSNs, (ii) Convertibles Notes, (iii) Super Priority Notes, (iv) Reorganized ILAP Equity, and (v) the New Issuer Equity.

The Debtors believe that the New Notes and New Equity Instruments constitute "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and all applicable state Blue Sky Laws. The Debtors further believe that the offer and sale of the Plan Securities are exempt from registration under applicable securities laws pursuant to section 1145 of the Bankruptcy Code, Section 4(a)(2), Regulation S and Regulation D under the Securities Act, and similar Blue Sky Laws provisions, as applicable. Accordingly, the Plan Securities will constitute "restricted securities" within the meaning of Rule 144 under the Securities Act and may therefore not be resold absent registration or an exemption from registration under the Securities Act. Further, the indentures governing the New Notes shall be exempt from qualification under the Trust Indenture Act of 1939 pursuant to Section 304(b) thereof. **Recipients of Plan Securities are advised to consult their own counsel as to their ability to freely trade such securities without compliance with the registration requirements under the Bankruptcy Code, the Securities Act and state Blue Sky Laws or a valid exemption from such requirements.**

*Section 4(a)(2) of the Securities Act Exemption and Subsequent Transfers*

The Debtors are relying on exemptions from the registration requirements of the Securities Act, including Section 4(a)(2), Regulation S, and Regulation D under the Securities Act, to exempt the offer and issuance of the Plan Securities from registration under the Securities Act. Section 4(a)(2) of the Securities Act exempts from registration the sale of securities by an issuer in a transaction not involving any public offering; Regulation D exempts from registration offers and sales that occur to "qualified institutional buyers" (as such term is defined in Rule 144A under the Securities Act) and "accredited investors" (as such term is defined in Regulation D under the Securities Act); and Regulation S exempts from registration offers and sales to non-U.S. persons outside the United States as such terms are defined under the Securities Act and its regulations.[14]

The Solicitation is being made pursuant to Section 4(a)(2), Regulation D and Regulation S of the Securities Act; provided, however, that the Holder of the Senior Debt Claim is a Qualified Holder. If a Holder of Senior Debt Claim is a Non-Qualified Holder, then any vote cast by such Holder shall be listed on the Irregular Ballot report and its vote not counted (unless otherwise determined by the Bankruptcy Court).

The Plan Securities will, in each case, be exempt from registration under the Securities Act. The Plan Securities issued pursuant to Section 4(a)(2) will therefore be restricted and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act and any other applicable securities laws.

The New Notes will, in each case, be considered "restricted securities" (within the meaning of Rule 144 under the Securities Act) and bear customary legends (as set forth below). Further, to the extent certificated or issued by way of direct registration on the records of the issuer or the issuer's transfer agent, certificates and book entry notations evidencing shares of the New Equity Interests held by holders of 10% or more of the outstanding amount of such New Equity Interests (and therefore may be "affiliates" as such term is defined under Rule 405 under the Securities Act) or who are otherwise underwriters as defined in section 1145(b) of the Bankruptcy Code and/or Section 2(a)(11) of the Securities Act, may bear a legend:

With respect to the Super Priority Notes and Take-back SSNs:

"THE NOTES AND THE NOTE GUARANTEES EVIDENCED HEREBY HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT (A) (1) TO A PERSON WHO THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, (2) IN AN OFFSHORE TRANSACTION COMPLYING WITH RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURITIES ACT, (3) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT (IF AVAILABLE) OR (4) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND (B) IN ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF THE STATES OF THE UNITED STATES AND OTHER JURISDICTIONS. AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTION" AND "UNITED STATES" HAVE THE MEANING GIVEN TO THEM BY REGULATION S UNDER THE SECURITIES ACT.

---

[14]    The Take-back SSNs and the Convertible Notes will not be issued to Non-Qualified Holders if there are more than 35 Holders of Senior Debt Claims that are Non-Qualified Holders. If there are more than 35 Holders of Senior Debt Claims that are Non-Qualified Holders, then all such Non-Qualified Holders will receive the Substitute Consideration pursuant to the terms of the Plan.

With respect to the Convertible Notes:

"THE NOTES, THE COMMON STOCK OR ORDINARY SHARES, IF ANY, ISSUABLE UPON CONVERSION OF THESE NOTES, AND THE NOTE GUARANTEES EVIDENCED HEREBY HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT (A) (1) TO A PERSON WHO THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, (2) IN AN OFFSHORE TRANSACTION COMPLYING WITH RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURITIES ACT, (3) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT (IF AVAILABLE) OR (4) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND (B) IN ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF THE STATES OF THE UNITED STATES AND OTHER JURISDICTIONS. AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTION" AND "UNITED STATES" HAVE THE MEANING GIVEN TO THEM BY REGULATION S UNDER THE SECURITIES ACT.

Recipients of any of the Plan Securities issued pursuant to Regulation S that are not "affiliates" of the Reorganized Debtors will receive Plan Securities that are not restricted and therefore may be sold without registration outside the United States in accordance with the exception on resale available pursuant to Regulation S. "Affiliates" of the Reorganized Debtors may resell their Plan Securities subject to the provisions of Rule 144, absent registration or another appropriate exemption. Generally, Rule 144 of the Securities Act would permit the public sale of securities issued pursuant to Section 4(a)(2), if current information regarding the issuer is publicly available and certain other conditions are met. Whether any particular Person would be deemed to be an "affiliate" would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "affiliate" with respect to the Plan Securities and, in turn, whether any Person may freely resell the Plan Securities.

The Debtors and Reorganized Debtors, as applicable, reserve the right to reasonably require certification, legal opinions or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of any such securities. The Debtors and Reorganized Debtors, as applicable, also reserve the right to stop the transfer of any such securities if such transfer is not in compliance with Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws. In any case, recipients of securities issued under the Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

Distributions of Plan Securities made under the Plan may be made through the facilities of The Depository Trust Company ("DTC") in accordance with DTC's customary practices; provided, that such Plan Security will only be issued in accordance with DTC book-entry procedures if the same is permitted to be held through DTC's book-entry system; provided, further, that to the extent that any Plan Security is not distributed through the facilities of DTC, the Debtors or Reorganized Debtors, as applicable, will take such reasonable actions as may be required to cause distributions of the Plan Securities under, and pursuant to the terms of, the Plan.

DTC and all other Persons and Entities (including, for the avoidance of doubt, any transfer agent for the New Equity) shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether a Plan Security is exempt from registration. Notwithstanding anything to the contrary in the Plan or otherwise, no Person or Entity (including, for the avoidance of doubt, (i) the Selling Agent, (ii) Holders of the Senior Debt Claims (including any Consenting Creditor), (iii) DTC, and (iv) any transfer agent) may require a legal opinion by or on behalf of the Debtors, the Reorganized Debtors or the New Issuer regarding the validity of any

transaction contemplated by the Plan, including, for the avoidance of doubt, whether the Plan Securities are exempt from registration and/or validly issued, fully paid and non-assessable.

BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE, SECTION 4(A)(1) OF THE SECURITIES ACT, SECTION 4(A)(2) OF THE SECURITIES ACT AND REGULATION S THEREUNDER, AND RULE 144 AND RULE 144A UNDER THE SECURITIES ACT, NONE OF THE DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY RESELL SUCH SECURITIES.

### B. Chilean Securities Law

The offer of the New Notes is subject to CMF Rule 336 and will not be registered under the Chilean Securities Market Law (*Ley de Mercado de Valores*) in the Securities Registry (*Registro de Valores*) or in the Foreign Securities Registry (*Registro de Valores Extranjeros*) both kept by the CMF and, therefore, the New Notes are not subject to the oversight of the CMF.

As unregistered securities in Chile, the New Issuer is not required to disclose public information about the New Notes in Chile. Accordingly, the New Notes cannot and will not be publicly offered or sold in Chile, or to any resident in Chile, and may be privately offered or sold in Chile only in circumstances which have not resulted and will not result in a public offering under Chilean law and in compliance with CMF Rule 336. The definition of a public offering of securities under Chilean law includes both offers directed to the general public and offers directed to a part or specific group thereof. Pursuant to CMF Rule 336, the New Notes may be privately offered in Chile to certain "qualified investors", defined as such therein (which in turn are further described in CMF Rule 216), and in compliance with regulations applicable to such investors.

Furthermore, CMF Rule 336 requires the following information to be provided to prospective investors in Chile:

(1) Date of commencement of the offer and that the offer of the New Notes is subject to CMF Rule 336.

(2) The subject matter of the offer are securities not registered with the Securities Registry (*Registro de Valores*), nor with the Foreign Securities Registry (*Registro de Valores Extranjeros*) both kept by CMF. As a consequence, the New Notes are not subject to the oversight of CMF.

(3) Since the New Notes are not registered in Chile, the issuer is not obliged to provide public information about the New Notes in Chile.

(4) The New Notes shall not be subject to public offering in Chile unless registered with the relevant Securities Registry kept by the CMF.

### C. Cayman Islands Securities Law

Pursuant to the Companies Act, no offer or invitation, whether directly or indirectly, may be made or will be made to the public in the Cayman Islands (within the meaning of the Companies Act) to subscribe for any securities to be issued by the New Issuer (including, without limitation, the Convertible Notes and the New Issuer Equity). It is not anticipated that any of the recipients of the Convertible Notes or New Issuer Equity pursuant to the Plan would constitute members of the public in the Cayman Islands for the purposes of this restriction.

## XIV.    CERTAIN CHILEAN, UNITED STATES FEDERAL INCOME, AND CAYMAN ISLANDS TAX CONSEQUENCES OF THE PLAN

### A.   Introduction

The following discussion is a summary of certain material Chilean, U.S. federal income and Cayman Islands tax consequences of the Consummation of the Plan to the Debtors and to certain Holders of Allowed Senior Debt Claims. The following summary does not address the Chilean, Cayman Islands, or U.S. federal income tax consequences to Holders of Claims or Interests not entitled to vote to accept or reject the Plan. In addition, this discussion does not address any consideration being received on account of a person's capacity other than as a Holder of a Claim.

This summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder, judicial authorities and published administrative positions of the U.S. Internal Revenue Service (the "IRS"), the Chilean Income Tax Law (*Ley sobre Impuesto a la Renta*) (the "Chilean Income Tax Law"), the Chilean Stamp Tax Law (*Ley sobre Impuesto de Timbres y Estampillas*) (the "Stamp Tax Law"), and regulations and interpretations issued by the Chilean Tax Authority (*Servicio de Impuestos Internos*) (the "SII"), and the Tax Concessions Act (As Revised), the Stamp Duty Act (As Revised), and the Land Holding Companies Share Transfer Tax Act (As Revised) of the Cayman Islands, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.

Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS or the SII as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts in the United States, on the SII or the courts in Chile, or on the Cayman Islands authorities or the courts in the Cayman Islands. No assurance can be given that the IRS, the SII or the Cayman Islands authorities would not assert, or that a court would not sustain, a different position than any position discussed herein.

On February 4, 2010, Chile and the United States entered into an income tax treaty (the "Treaty"), which had been ratified by the Chilean Congress. The Treaty was approved on July 22, 2023, by the U.S. Senate, with two amendments, which were approved by the Chilean Congress on November 15, 2023. Certain diplomatic and ratification processes are currently pending for its entry into force, which applies to income generated in Chile or the United States by a resident of either country. Holders should consult their own advisors regarding the application of the Treaty to their particular circumstances and the date on which a particular Treaty provision will enter into effect.

This discussion does not purport to address all aspects of U.S. federal income and Chilean and Cayman Islands taxation that may be relevant to the Debtors or to certain Holders in light of their individual circumstances. In particular, the discussion of U.S. federal income tax consequences does not address tax issues with respect to Holders that are not "U.S. Holders" (as defined below) or Holders that are subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies, persons who are related to the Debtors within the meaning of the IRC, persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, Holders that own or are deemed to own 10% or more of the Reorganized ILAP Equity and/or New Issuer Equity, and regulated investment companies and those holding, or who will hold, the Existing Notes or New Notes, as part of a hedge, straddle, conversion, or other integrated transaction).

In addition, this summary does not address the Medicare tax on net investment income or the special timing rules prescribed under Section 451(b) of the IRC. No aspect of state, local, estate, gift, or taxes other than Chilean, Cayman Islands and U.S. federal income taxation is addressed. Furthermore, this summary assumes that a Holder of a Claim holds a Claim as a "capital asset" (within the meaning of Section 1221 of the IRC).

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN CHILEAN, CAYMAN ISLANDS, AND U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL

CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, NON-CHILEAN, NON-CAYMAN ISLANDS AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.

**B.  Certain Chilean Tax Consequences of the Plan**

For purposes of the description of the Chilean tax consequences of the Plan, in this Disclosure Statement, the term "Foreign Holder" refers to an Allowed Claim Holder who meets one of the following criteria:

- An individual who is not a resident or does not have a domicile in Chile.

- A legal entity that is not established under Chilean laws, unless it has a permanent establishment in Chile with respect to which the respective income can be attributed.

For Chilean tax purposes, an individual is considered a resident of Chile if either (i) the individual has remained in Chile for over 183 days within a twelve-month timeframe or (ii) the individual resides in Chile with the intention of staying in Chile.

As a general rule, non-residents are subject to taxation in Chile on income sourced within the country, which generally derives either from assets located in the country or activities conducted there.

### (i) Thin Capitalization Rules

Any interest, fees, service remuneration, financial charges, or other contractual surcharges paid to "related entities" of the issuer of debt instruments regarding loans or debts during a year of excessive indebtedness are subject to a single 35% tax payable by the issuer. The withholding tax applied by issuers can be credited against this 35% tax.

Indebtedness is considered excessive at the end of a fiscal year if the "total annual indebtedness" to both related and unrelated entities in foreign or Chilean jurisdictions exceeds three times the Issuer's tax equity. Under thin capitalization rules, a lender or creditor is considered related to the issuer if: (i) the beneficiary (lender or creditor) is incorporated, domiciled, resident, or established in a preferential tax regime falling under Article 41 H of the Chilean Income Tax Law; (ii) the beneficiary and the issuer belong to the same corporate group, directly or indirectly own or participate in 10% or more of each other's capital or profits, or have a common partner/shareholder that owns or participates in 10% or more of both capital or projects, provided the beneficiary is incorporated, domiciled, resident, or established outside Chile; (iii) the indebtedness is guaranteed directly or indirectly by a related entity, which is resident or domiciled in a foreign country and the beneficiary of interest payments; (iv) the relevant financial instruments, documenting such indebtedness, are initially acquired by independent entities and subsequently transferred to a related entity according to conditions mentioned in (i) to (iii); or (v) one party conducts operations with a third party who, directly or indirectly, conducts similar operations with a related party of the other. The penalty tax resulting from thin capitalization rules is borne and payable by the issuer. Any corresponding withholding tax paid on the relevant amounts can be credited against this penalty tax.

Currently, ILAP does not meet the criteria set in the thin capitalization rules, and it is not expected to change after the restructuring of its debts pursuant to the Plan.

### (ii) Taxation on Interest Payments; Capitalization of Interest and Payment in Kind

For tax purposes, interest payments from debt instruments will be deemed as Chilean sourced income to the extent that the debtor is domiciled or resides in Chile. Likewise, interest payments made by permanent establishments of a Chilean company will also be treated as Chilean income.

At the Reorganized Debtors' option, Foreign Holders may receive interest payments in cash or in kind on the Take-back SSNs and the Super Priority Notes. In such case, the in-kind payment will result in the acquisition of respective New Notes. Interest payments on the Take-back SSNs and the Super Priority Notes, whether paid in cash

or in kind, will trigger withholding tax in Chile at a rate of 4%. ILAP is obligated to declare and pay the applicable withholding tax.

Furthermore, interest payments received by the Foreign Holders deriving from the Senior Debt Claims on account of the exchange for New Notes will be subject to a 4% withholding tax. ILAP is obligated to declare and pay the applicable withholding tax.

Interest payments received by Chilean companies will be subject to the First Category Tax, either at a rate of 27% or 25% (unless a reduction applies), depending on the tax regime they fall under. For Chilean-resident individuals, interest payments will be subject to the Complementary Global Tax, with progressive rates varying between 0% and 40%.

### (iii) Stamp Tax on Exchange of Senior Debt Claims and Capitalized Interest

The Stamp Tax is levied on documents that serve as evidence for cash credit operations and bond issuances. Under the Stamp Tax Law, the responsibility for settling this tax falls upon the Chilean debtor when the creditors or holders are not residents of Chile. The Stamp Tax Law also provides that the documents that have not paid Stamp Tax cannot be presented before judicial, administrative, and municipal authorities, nor will they have executive merit until the payment of the tax, along with the corresponding adjustments, interests, and penalties.

The issuance of the Super Priority Notes by the Reorganized ILAP will trigger Stamp Tax at a rate of 0.8% on the principal of such notes. Additionally, the issuance of the Take-back SSNs by the Reorganized ILAP in exchange for the LC Facility Claims will trigger Stamp Tax at a rate of 0.8% on the principal of the Take-back SSNs that is being issued to the Holder of the LC Facility Claims. Further, the capitalization of interest of the Existing Notes, if any, through the issuance of the Take-back SSNs would trigger Stamp Tax at a rate of 0.8% on the capitalized interest on the Existing Notes. Lastly, the issuance of the Take-back SSNs by the Reorganized ILAP in exchange for the Existing Notes will trigger a Stamp Tax at a rate of 0.8% on the principal on the Take-back SSNs that is being issued to the Holders of the Existing Notes.

### (iv) Taxation of Principal

The payment of the principal on the Existing Notes, the LC Facility Claims, the Super Priority Notes and the Take-back SSNs will not be subject to income tax or any tax in Chile.

### (v) Notes Disposal and Exchange of Existing Notes

The sale or transfer of the Take-Back SSNs and the Super Priority Notes by a Foreign Holder will not be subject to withholding tax in Chile. The sale or transfer of the Convertible Notes by a Foreign Holder may be subject to indirect sales taxation in Chile, pursuant to Articles 10 and 58 No. 3 of the Chilean Income Tax Law.

The sale or transfer of the New Notes by a Chilean holder would trigger income tax in Chile if the sale price exceeds the par value, including any applicable inflation adjustments. For a Chilean company selling these New Notes, the resulting income would be subject to the First Category Tax. If the seller is a Chilean individual, the income from the sale would be subject to the Complementary Global Tax.

The exchange of Existing Notes and LC Facility Claims by Foreign Holders for Take-back SSNs and Convertible Notes at their par value would not be subject to withholding tax in Chile. However, any accrued but unpaid interest which are paid or otherwise satisfied through such exchange will be subject to withholding tax in Chile. Likewise, the exchange of Existing Notes by Chilean holders for Take-back SSNs and Convertible Notes at their par value would not be subject to income tax in Chile.

### (vi) Additional Amounts

Subject to certain conditions and restrictions, the Debtors (or the Guarantors Debtors, as applicable) have agreed to pay Super Priority/Take Back SSN Indenture Additional Amounts (as such term is defined in the Super

Priority/Take Back SSN Indenture) to Foreign Holders, so that after making all required deductions or withholdings, the net amount received by such Foreign Holders or other beneficial owners of the Super Priority Notes and Take-back SSNs (as applicable) will not be less than the amounts as would have been received by them had no such withholding or deduction been required.

### C.    Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors

The Debtors do not have a material income tax presence in the United States, and therefore any U.S. federal income tax consequences to the Debtors as a result of the Plan are expected to be immaterial.

### D.    Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Senior Debt Claims

As used herein, the term "U.S. Holder" means a beneficial owner of a Senior Debt Claim, a Take-back SSN or a Convertible Note that, for U.S. federal income tax purposes, is any of the following:

- an individual citizen or resident of the United States;

- a corporation or any other entity treated as a corporation for U.S. federal income tax purposes created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust if it (1) is subject to the primary supervision of a court within the United States and one or more U.S. persons have the authority to control all substantial decisions of the trust or (2) has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person.

If an entity or arrangement treated as a partnership for U.S. federal income tax purposes holds a Senior Debt Claim, a Take-back SSN or a Convertible Note, the U.S. federal income tax treatment of a partner generally will depend upon the status of the partner and the activities of the partnership and accordingly, this summary does not apply to partnerships. A partner of a partnership exchanging such Claim for a Take-back SSN and a Convertible Note should consult its tax advisor regarding the U.S. federal income tax consequences to the partner of exchanging such Claim pursuant to the Plan and owning a Take-back SSN and a Convertible Note.

#### (i) Characterization of the Convertible Notes

Whether an instrument is debt or equity for U.S. federal income tax purposes is a factual matter. The Convertible Notes will be debt in legal form. However, a strong likelihood exists that the Convertible Notes will be treated as equity of the New Issuer for U.S. federal income tax purposes. Although the matter is not free from doubt, the New Issuer intends to treat the Convertible Notes as preferred stock for U.S. federal income tax purposes and the remainder of this discussion assumes that the Convertible Notes are preferred stock of the New Issuer. No assurance can be given, however, that the IRS will respect this treatment of Convertible Notes. In general, the characterization of an instrument for such purposes as debt or equity by its issuer as of the time of issuance is binding on a holder (but not the IRS) unless the holder takes an inconsistent position and discloses such position in its tax return. U.S. Holders should consult their tax advisors regarding possible alternative treatment of the Convertible Notes.

#### (ii) Consequences to U.S. Holders of Allowed Senior Debt Claims

##### (A) Tax Consequences of the Exchange

The U.S. federal income tax consequences to a U.S. Holder of the exchange of the U.S. Holder's Allowed Senior Debt Claim for the Take-back SSNs and Convertible Notes pursuant to the Plan (the "Exchange") will depend on whether the Allowed Existing Notes Claim or Allowed LC Facility Claim, as applicable, and the Take-back SSNs are securities for U.S. federal income tax purposes. Neither the IRC nor the Treasury Regulations promulgated thereunder define the term "security." Whether a debt instrument constitutes a "security" is determined based on all relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument at

initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that the instrument is a security.

Although the treatment is not free from doubt, Reorganized ILAP intends to take the position that both the Allowed Existing Notes Claims and the Take-back SSNs are securities for U.S. federal income tax purposes, but the Allowed LC Facility Claims are not securities for U.S. federal income tax purposes. Under this treatment, the delivery of a Take-back SSN to a holder of an Allowed Existing Note Claim will be made pursuant to a recapitalization for U.S. federal income tax purposes.

The Convertible Notes are issued by an entity other than the issuer of the Existing Notes and, therefore, the receipt of a Convertible Note by a holder of an Allowed Existing Note Claim should be treated as taxable boot received in the recapitalization. Additionally, under this treatment, the receipt of a Take-back SSN and a Convertible Note in satisfaction of an Allowed LC Facility Claim should be a taxable exchange. The remainder of this discussion assumes that the Exchange will be so treated. There can be no assurance, however, that the IRS will not take a contrary position or that a court will not agree with such contrary position. U.S. Holders of Senior Debt Claims should consult their tax advisors regarding the U.S. federal income tax consequences of receiving Take-back SSNs and Convertible Notes pursuant to the Plan.

1.    <u>Tax Consequences of the Exchange to a U.S. Holder of an Allowed Existing Notes Claim</u>

On the Exchange, a U.S. Holder of an Allowed Existing Notes Claim should not recognize loss but should recognize any realized gain to the extent of the fair market value of the Convertible Notes received. The gain realized by a U.S. Holder is equal to the excess (if any) of (i) sum of (x) the issue price of the Take-back SSNs (described below under "Tax Consequences of Owning and Disposing of the Take-back SSNs—Issue Price") and (y) the fair market value of the Convertible Notes (but not including amounts attributable to accrued but unpaid interest, which will be taxable as described below in "—Tax Consequences of Receipt of Amounts Attributable to Accrued Interest") over (ii) the U.S. Holder's adjusted tax basis in its Allowed Existing Notes Claim. A U.S. Holder's adjusted tax basis in an Allowed Existing Notes Claim generally will equal the U.S. dollar value of the cost of the Allowed Existing Notes Claim to such holder on the date of purchase, increased by the amount of any original issue discount ("<u>OID</u>") and market discount previously taken into account by the U.S. Holder, and reduced by the amount of any amortized bond premium previously amortized by the U.S. Holder with respect to the Allowed Existing Notes Claim and any payments other than payments of "qualified stated interest" (as defined below) made on the Allowed Existing Notes Claim.

The character of any such gain as capital or ordinary will be determined by a number of factors including the tax status of the U.S. Holder, whether the Allowed Existing Notes Claim constitutes a capital asset in the hands of the U.S. Holder, whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to such Claim, and the potential application of the accrued interest and market discount rules discussed below. If any such recognized gain or loss is capital in nature, subject to the discussion of market discount below, it generally would be long-term capital gain if the U.S. Holder held the Claim for more than one year at the time of the Exchange.

The holding period for a Take-back SSN received by a U.S. Holder of an Allowed Existing Note Claim in the Exchange should include the holding period for the Allowed Existing Note Claim exchanged therefor. A U.S. Holder should obtain an initial tax basis in the Take-back SSN equal to its adjusted tax basis in its Allowed Existing Note Claim surrendered, increased by the amount of any gain recognized pursuant to such exchange and decreased by the fair market value of the Convertible Note received.

The holding period for the Convertible Note received in the Exchange should begin on the day following the date the U.S. Holder receives such note. A U.S. Holder should obtain a tax basis in the Convertible Note equal to its fair market value.

2.        Tax Consequences of the Exchange to a U.S. Holder of an Allowed LC Facility Claim

A U.S. Holder of an Allowed LC Facility Claim generally will recognize gain or loss equal to the excess of (i) the sum of (a) the issue price of the Take-back SSN (as described below under "Tax Consequences of Owning and Disposing of the Take-back SSNs—Issue Price") and (b) the fair market value of the Convertible Note (but not including amounts attributable to accrued but unpaid interest, which will be taxable as described below in "—Tax Consequences of Receipt of Amounts Attributable to Accrued Interest") over (ii) the U.S. Holder's adjusted tax basis in the Allowed LC Facility Claim.

A U.S. Holder's adjusted tax basis in the Allowed LC Facility Claim generally will equal the cost of such Allowed LC Facility Claim to such holder on the date of purchase, increased by the amount of any OID and market discount previously taken into account by the U.S. Holder, and reduced by the amount of any amortized bond premium previously amortized by the U.S. Holder with respect to the Allowed LC Facility Claim and any payments other than payments of "qualified stated interest" made on such Allowed LC Facility Claim.

The character of any such gain or loss as capital or ordinary will be determined by a number of factors including the tax status of the U.S. Holder, whether the Allowed LC Facility Claim constitutes a capital asset in the hands of the U.S. Holder, whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to the Claim, and the potential application of the accrued interest and market discount rules discussed below. If any such recognized gain or loss is capital in nature, subject to the discussion of market discount below, it generally would be long-term capital gain if the U.S. Holder held the Claim for more than one year at the time of the Exchange. The deductibility of capital losses is subject to significant limitations.

The holding period for the Take-back SSN and Convertible Note received in the Exchange by a U.S. Holder of an Allowed LC Facility Claim should begin on the day following the date the U.S. Holder receives such notes. A U.S. Holder should obtain a tax basis in each of the Take-back SSN and the Convertible Note equal to the applicable instrument's fair market value.

3.        Tax Consequences of Receipt of Amounts Attributable to Accrued Interest

To the extent that any amount received by a U.S. Holder of an Allowed Senior Debt Claim is attributable to accrued but unpaid interest (including OID) on its Allowed Senior Debt Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (if not previously included in such U.S. Holder's gross income). Conversely, a U.S. Holder of an Existing Note will generally recognize a deductible loss to the extent that any accrued interest (including OID) was previously included in the U.S. Holder's gross income but was not paid in full. U.S. Holders should consult their tax advisors concerning the receipt of amounts attributable to accrued but unpaid interest on their Allowed Senior Debt Claims.

4.        Market Discount

An Allowed Senior Debt Claim generally will be treated as purchased at a market discount if the "revised issue price" of the Allowed Senior Debt Claim exceeded the amount for which the U.S. Holder purchased the Allowed Senior Debt Claim by at least 0.25% of the Allowed Senior Debt Claim's stated redemption price at maturity multiplied by the number of complete years from the date the Allowed Senior Debt Claim was acquired by the U.S. Holder to the Allowed Senior Debt Claim's maturity. Market discount accrues on a straight-line basis unless such U.S. Holder elected to accrue the market discount on a constant yield basis. In the case of a U.S. Holder that purchased an Allowed Senior Debt Claim with market discount and has not elected to include market discount in income on a current basis, gain recognized by the U.S. Holder will be treated as ordinary income to the extent of the market discount that has accrued at the time of the Exchange.

Any market discount on an Allowed Existing Note Claim that is not recognized on the Exchange generally will carry over to the Take-back SSN received in the Exchange except to the extent converted into OID, and will continue to be subject to the market discount rules. The Take-back SSN received by a U.S. Holder of an Allowed Existing Note Claim generally will be treated as acquired with market discount (including any accrued market discount described above) if the issue price equals or exceeds the U.S. Holder's initial tax basis in the Take-back SSN by a

statutorily defined *de minimis* amount. As a result of this rule, a U.S. Holder who acquired a Take-back SSN with market discount generally may be required to accrue OID on the Take-back SSN corresponding to some or all of that market discount on a constant yield basis, rather than deferring recognition of market discount until the sale, exchange or other taxable disposition of the Take-back SSN. U.S. Holders should carefully review the discussion below under "*Tax Consequences of Owning and Disposing of the Take-back SSNs—Interest (including OID).*" U.S. Holders should consult their tax advisors concerning the application of the market discount rules to their claims.

#### (B) Tax Consequences of Owning and Disposing of the Take-back SSNs

1.   Issue Price

The determination of the issue price of the Take-back SSNs will depend on whether the Take-back SSNs or are "traded on an established market." Debt instruments are considered to be traded on an established market if, at any time during the 31-day period ending 15 days after the date of the deemed exchange there is a sales price for the debt or there are one or more firm or indicative quotes for the debt instrument. If the Take-back SSNs are traded on an established securities market, they will have an issue price equal to their fair market value on the date of issuance. The Debtors expect that the Take-back SSNs will be treated as traded on an established market. Reorganized ILAP, will make the determination of the issue price of the Take-back SSNs available to holders in a commercially reasonable fashion, including by electronic publication, within 90 days of the date on which such notes are issued.

2.   Interest (Including OID)

If the "stated redemption price at maturity" of the Take-back SSNs received by U.S. Holders exceeds the "issue price" of the Take-back SSNs by an amount equal to or greater than a statutorily defined *de minimis* amount, the notes will be treated as issued with OID for U.S. federal income tax purposes. The stated redemption price at maturity of the Take-back SSNs is the total of all payments due on the Take-back SSNs, other than payments of qualified stated interest. In general, qualified stated interest is stated interest that is payable unconditionally in cash or in property (other than debt instruments of the issuer) at least annually at a single fixed rate (or at certain qualifying floating rates). For the first 24 months after the Plan Effective Date, Reorganized ILAP has the option to pay PIK-interest on the Take-back SSNs in lieu of cash interest. Accordingly, none of the stated interest on the Take-back SSNs will be qualified stated interest. A U.S. Holder generally will be required to include the OID on the Take-back SSNs in gross income as ordinary interest income as it accrues on a constant yield basis over the term of the Take-back SSNs, in advance of the receipt of cash attributable to such OID and regardless of the U.S. Holder's method of accounting for U.S. federal income tax purposes, but will not be required to recognize additional income upon the receipt of any cash payment on the Take-back SSNs that is attributable to previously accrued OID that has been included in its income.

3.   Sale, Exchange or Other Taxable Disposition of the Take-back SSNs

Upon the sale, exchange or other taxable disposition of a Take-back SSN, a U.S. Holder will generally recognize taxable gain or loss equal to the difference, if any, between the amount realized on the sale, exchange or other taxable disposition (other than accrued but unpaid interest, which shall be taxable as interest) and the U.S. Holder's adjusted tax basis in the Take-back SSN. A U.S. Holder's initial tax basis in a Take-back SSN will be increased by any previously accrued OID and decreased by any payments on the Take-back SSN. Subject to the discussion on market discount below, any such gain or loss generally will be long-term capital gain or loss if at the time of the sale, redemption or other taxable disposition, the U.S. Holder has held the Take-back SSN for more than one year. Certain non-corporate U.S. Holders (including individuals) may be eligible for preferential tax rates on long-term capital gains. The deductibility of capital losses is subject to significant limitations.

If a U.S. Holder's Take-back SSN has market discount (see "*Tax Consequences of the Exchange—Market Discount*" above), under the market discount rules, the U.S. Holder will be required to treat any gain on the sale, exchange or other taxable disposition of such note as ordinary income to the extent of the market discount that has accrued on such note at the time of the sale, exchange or other taxable disposition and which the U.S. Holder has not previously included in income. Any market discount will be considered to accrue ratably during the period from the date of acquisition to the maturity date of the Take-back SSNs unless the U.S. Holder elects to accrue on a constant

yield basis. U.S. Holders may elect to include market discount in income currently as it accrues, either ratably or on a constant yield basis, in which case any gain recognized will not be recharacterized as ordinary income.

        4.      <u>Foreign Tax Credits</u>

Subject to generally applicable limitations and conditions, Chilean interest withholding tax paid at the appropriate rate applicable to the U.S. Holder may be eligible for credit against such U.S. Holder's U.S. federal income tax liability. These generally applicable limitations and conditions include new requirements adopted by the IRS in December 2021 and any Chilean tax will need to satisfy these requirements in order to be eligible to be a creditable tax for a U.S. Holder.

In the case of a U.S. Holder that is eligible for, and properly elects, the benefits of the Treaty (once it has entered into effect) the Chilean tax on interest generally will be treated as meeting the new requirements and therefore as a creditable tax. In the case of all other U.S. Holders, the application of these requirements to the Chilean tax on interest is uncertain and we have not determined whether these requirements have been met. If the Chilean tax is not a creditable tax for a U.S. Holder or the U.S. Holder does not elect to claim a foreign tax credit for any foreign income taxes, the U.S. Holder may be able to deduct the Chilean tax in computing the U.S. Holder's taxable income for U.S. federal income tax purposes, subject to applicable limitations and requirements. Interest and Additional Amounts will constitute income from sources without the United States and, for U.S. Holders that validly claim foreign tax credits generally will constitute "passive category income" for foreign tax credit purposes. The availability and calculation of foreign tax credits and deductions for foreign taxes may depend on a U.S. Holder's particular circumstances and involve the application of complex rules to those circumstances. In a recent notice, the Treasury and the IRS announced that they are considering proposing amendments to the 2021 regulations and will allow, subject to certain conditions, taxpayers to defer the application of many aspects of such regulations for taxable years ending on or before December 31, 2023 (the notice also indicates that the Treasury and the IRS are considering whether, and under what conditions, to provide additional temporary relief for later taxable years). U.S. Holders should consult their tax advisors regarding the application of these rules to their particular situations.

    ***(C) Tax Consequences of Owning and Disposing of Convertible Notes***

        1.      <u>Investment in a Passive Foreign Investment Company</u>

Special U.S. tax rules apply to companies that are considered to be passive foreign investment companies ("<u>PFICs</u>"). The New Issuer will be classified as a PFIC in a particular taxable year if either:

- 75 percent or more of the New Issuer's gross income for the taxable year is passive income; or

- the average percentage of the value of the New Issuer's assets that produce or are held for the production of passive income is at least 50 percent.

If the New Issuer owns at least 25% (by value) of the stock of another corporation, for purposes of determining whether it is a PFIC, the New Issuer generally will be treated as owning its proportionate share of the other corporation's assets and receiving its proportionate share of the other corporation's income. For purposes of these tests, passive income generally includes dividends, interest, gains from certain commodities transactions, rents, royalties and the excess of gains over losses from the disposition of assets that produce passive income. Gains from commodities transactions, however, are generally excluded from the definition of passive income if such gains are active business gains from the sale of commodities and the foreign corporation's commodities meet specified criteria. The law is unclear as to what constitutes "active business gains" and there are also other uncertainties regarding the criteria that commodities must meet. The Debtors believe that there is a significant risk that the New Issuer will be a PFIC in its first taxable year and in future taxable years.

If the New Issuer is classified as a PFIC (and assuming that the New Issuer is not a "controlled foreign corporation" as discussed below) and a U.S. Holder of a Convertible Note does not make a "qualified electing fund" election, as described below, the U.S. Holder of a Convertible Note will be subject to a special tax at ordinary income tax rates on "excess distributions" made by the New Issuer and gain that the U.S. Holder recognizes on the sale or

other taxable disposition of the U.S. Holder's Convertible Note. The amount of income tax on any excess distributions will be increased by an interest charge to compensate for tax deferral, calculated as if the excess distributions were earned ratably over the period the U.S. Holder holds its shares. U.S. Holders should consult their tax advisors regarding the application of the PFIC rules to their ownership of a Convertible Note.

If the New Issuer is a PFIC, and the New Issuer has any direct, and in certain circumstances, indirect subsidiaries that are PFICs (each a "Subsidiary PFIC"), a U.S. Holder will be treated as owning its *pro rata* share of the stock of each such Subsidiary PFIC and will be subject to the PFIC rules with respect to each such Subsidiary PFIC.

A U.S. Holder may be subject to alternative treatment by making a valid qualified electing fund election (a "QEF" and the election, a "QEF election"). If a timely QEF election is made, an electing U.S. Holder of a Convertible Note generally will be required to include in income on a current basis its *pro rata* share of the PFIC's income and net capital gains, regardless of whether or not such earnings and gains are actually distributed to the U.S. Holder, assuming that the New Issuer is not a "controlled foreign corporation" as discussed below. Under Section 1293 of the IRC, a U.S. Holder's *pro rata* share of the New Issuer's ordinary income and net capital gain is the amount which would have been distributed with respect to such holder's Convertible Notes if, on each day during the taxable year of the New Issuer, the New Issuer had distributed to each holder of an equity interest in the New Issuer of a *pro rata* share of that day's ratable share of the New Issuer's ordinary earnings and net capital gain for such year. In certain cases in which a QEF does not distribute all of its earnings in a taxable year, its U.S. Holders may also be permitted to elect to defer payment of some or all of the taxes on the QEF's undistributed income, but will then be subject to an interest charge on the deferred amount. The application of the QEF election rules to preferred stock is not clear.

To make a QEF election, the PFIC must provide shareholders with certain information compiled according to U.S. federal income tax principles. The New Issuer shall upon reasonable request provide to a U.S. Holder (i) all information that a U.S. Holder making a QEF election with respect to New Issuer and any Subsidiary PFIC is required to obtain for U.S. federal income tax purposes (e.g., the U.S. Holder's pro rata share of ordinary income and net capital gain), and (ii) a "PFIC Annual Information Statement" as described in Treasury regulations section 1.1295–1 (or in any successor IRS release or Treasury regulation), including all representations and statements required by such statement, and will take any other steps it reasonably can to facilitate such election.

A U.S. Holder that owns an equity interest in a PFIC generally must annually file IRS Form 8621, and may be required to file other IRS forms. A failure to file one or more of these forms as required may toll the running of the statute of limitations in respect of each of the U.S. Holder's taxable years for which such form is required to be filed. As a result, the taxable years with respect to which the U.S. Holder fails to file the form may remain open to assessment by the IRS indefinitely, until the form is filed.

The application of the QEF election rules to preferred stock, such as the Convertible Notes, is not entirely clear. Each U.S. Holder should consult its tax advisor regarding the U.S. federal income tax considerations discussed above and the availability and desirability of making a QEF election.

2.    Investment in a Controlled Foreign Corporation

Depending on the degree of ownership of the Convertible Notes by U.S. Shareholders (as defined below), the New Issuer may be considered a controlled foreign corporation ("CFC"). In general, a foreign corporation will be a CFC if more than 50% of the shares of the corporation, measured by combined voting power or value, are held, directly or indirectly, by U.S. Shareholders. A "U.S. Shareholder" for this purpose is any U.S. person who owns or is treated as owning, under specified attribution rules, 10% or more of the combined voting power or the total value of all classes of shares of a corporation. As a result, if more than 50% of the shares in New Issuer (including Convertible Notes and the New Issuer Equity) are owned or treated as owned by U.S. persons owning 10% or more of the shares of New Issuer, the New Issuer generally would be treated as a CFC. Due to the application of the attribution rules (among other things), it is possible that the New Issuer may not have access to sufficient information to determine whether it is treated as a CFC for any taxable year.

If the New Issuer were a CFC, subject to certain exceptions, a U.S. Shareholder of the New Issuer at the end of a taxable year of the New Issuer would be required to recognize ordinary income in an amount equal to that person's

*pro rata* share of the "subpart F income" and GILTI (as defined below) of the New Issuer for the year, whether or not such income is distributed currently to the U.S. Shareholder. Subject to certain exceptions, subpart F income generally includes income that would also be considered passive income for purposes of the PFIC rules. If the New Issuer were a CFC, the Debtors have not determined the extent to which its income would be subpart F income and/or GILTI. If more than 70% of the New Issuer's income is subpart F income, then 100% of its income will be so treated.

Global intangible low-taxed income ("GILTI") of a U.S. Shareholder for a tax year is equal to the excess of (i) the net "tested" income of all CFCs owned by such U.S. Shareholder in the same tax year over (ii) a deemed 10% return on the aggregate basis in depreciable tangible property (reduced by certain interest expense) owned by such CFCs. A CFC's tested income does not include any income that is effectively connected with the conduct of a trade or business within the United States, any amount that is already taken into account in determining the subpart F income of the CFC or certain other income. Individual U.S. Shareholders will be subject to tax on GILTI at ordinary individual tax rates. Corporate U.S. Shareholders, however, will be entitled to deduct 50% of their GILTI (37.5% for tax years starting after 2025). A corporate U.S. Shareholder of a CFC will also be entitled to a "deemed paid" foreign tax credit not to exceed 80% of the non-U.S. income taxes paid by the CFC with respect to income subject to the GILTI inclusion.

If the New Issuer were a CFC, a U.S. Shareholder of the New Issuer would be taxable on the subpart F income and GILTI of the New Issuer under the CFC regime and not under the PFIC rules previously described. As a result, to the extent subpart F income of the New Issuer includes net capital gains, such gains would be treated as ordinary income of the U.S. Shareholder, notwithstanding the fact that generally the character of such gains otherwise would be preserved under the PFIC rules if a QEF election were made. Also, the PFIC rule permitting the deferral of tax on undistributed earnings would not apply.

A holder of a Convertible Notes that is a U.S. Shareholder of the New Issuer subject to the CFC rules for only a portion of the time in which it holds Convertible Notes should consult its tax advisors regarding the interaction of the PFIC and CFC rules.

U.S. Holders of Convertible Notes could be treated as holding an indirect investment in a CFC with respect to the New Issuer's subsidiaries and could be subject to certain adverse tax consequences (including additional reporting obligations). U.S. Holders should consult their tax advisors regarding the issues relating to such investments.

      3.      <u>Interest on the Convertible Notes</u>

Generally, payments of interest in-kind will be treated as dividends to the extent of the New Issuer's current or accumulated earnings and profits (as determined for U.S. federal income tax purposes).

The treatment of interest on the Convertible Notes, in very general terms, will vary depending on whether a U.S. Holder has made a timely QEF election as described above. <u>See</u> "— Investment in a Passive Foreign Investment Company." If a timely QEF election has been made, interest payments treated as dividends allocable to amounts previously taxed pursuant to the QEF election will not be taxable to U.S. holders. Similarly, if the New Issuer is a CFC of which the U.S. Holder is a U.S. Shareholder, dividends will be allocated first to amounts previously taxed pursuant to the CFC rules and to this extent will not be taxable to U.S. Holders. Dividends in excess of such previously taxed amounts will be taxable to U.S. Holders as ordinary income upon receipt. Interest payments in excess of any current and accumulated earnings and profits will be treated first as a nontaxable return of capital, to the extent of the holder's tax basis in the Convertible Notes, and then as capital gain.

In the event that a U.S. Holder of a Convertible Note does not make a timely QEF election, then except to the extent that dividends may be attributable to amounts previously taxed pursuant to the CFC rules, some or all of any dividends with respect to the Convertible Note may be considered excess distributions, taxable as previously described. <u>See</u> "— Investment in a Passive Foreign Investment Company."

The New Issuer does not expect to maintain calculations of earnings and profits in accordance with U.S. federal income tax principles. U.S. Holder should therefore expect that interest payments generally will be treated as dividends for U.S. federal income tax purposes.

4.      Sale, Redemption or other Taxable Disposition of Convertible Notes

In general, a U.S. Holder of a Convertible Note will recognize gain or loss (which generally will be capital gain or loss, except as discussed below) upon the sale or exchange of a Convertible Note equal to the difference between the amount realized and such holder's adjusted tax basis in the Convertible Note. A U.S. Holder's adjusted tax basis in Convertible Note will generally equal the fair market value of the Convertible Note at the time of acquisition, increased by amounts taxable to such holder by virtue of a QEF election, or under the CFC rules, and decreased by actual distributions from the New Issuer that are deemed to consist of such previously taxed amounts or represent a return of capital.

If a U.S. Holder does not make a timely QEF election as described above and the PFIC rules are otherwise applicable, any gain realized on the sale or exchange of a Convertible Note will be treated as an excess distribution and effectively taxed as ordinary income with an interest charge under the special tax rules described above. See "- Investment in a Passive Foreign Investment Company."

If the New Issuer were treated as a CFC and a U.S. Holder were treated as a U.S. Shareholder therein, then any gain realized by such holder upon the disposition of a Convertible Note, other than gain constituting an excess distribution under the PFIC rules, would be treated as ordinary income to the extent of the U.S. Holder's share of the current and accumulated earnings and profits of the New Issuer (subject to a special limitation on the tax liability of an individual U.S. holder that has held such Convertible Note for more than one year). In this respect, earnings and profits would not include any amounts previously taxed pursuant to a QEF election or pursuant to the CFC rules.

5.      Adjustment to Conversion Ratio

The conversion rate of the Convertible Notes will be adjusted in certain circumstances. Adjustments (or failures to make adequate adjustments) that have the effect of increasing a U.S. Holder's proportionate interest in the New Issuer's assets or earnings may in some circumstances result in a deemed distribution to a U.S. Holder for U.S. federal income tax purposes, even though no cash or other property is received. Adjustments to the conversion rate made pursuant to a bona fide reasonable adjustment formula that have the effect of preventing the dilution of the interest of the beneficial owners of the Convertible Notes (such as in the case of a stock split) will generally not be deemed to result in a constructive distribution of shares. Constructive distributions generally are taxable to a U.S. Holder in the same manner as interest payments as described above under "–Interest on Convertible Notes." A U.S. Holder's tax basis in the Convertible Notes will be increased to the extent of any such deemed distribution treated as a dividend.

5.      Conversion of Convertible Notes

A U.S. Holder generally will not recognize any income, gain or loss in respect of the receipt of New Issuer Equity upon a conversion of a Convertible Note. A U.S. Holder's tax basis in the New Issuer Equity it receives upon a conversion of a Convertible Note generally will equal the adjusted tax basis of the Convertible Note that was so converted. A U.S. Holder's holding period for its New Issuer Equity will include its holding period for the Convertible Note so converted. U.S. Holders are urged to consult their tax advisors with respect to the U.S. federal income tax consequences of the conversion of their Convertible Notes into New Issuer Equity.

### (C) Tax Consequences of Owning and Disposing of New Issuer Equity

The tax consequences to a U.S. Holder of ownership and disposition of New Issuer Equity generally will be similar to those described above with respect to the ownership and disposition of a Convertible Note.

### (D) Specified Foreign Financial Assets

Individual U.S. Holders that own "specified foreign financial assets" with an aggregate value in excess of $50,000 on the last day of the taxable year or $75,000 at any time during the taxable year are generally required to file an information statement along with their tax returns, currently on Form 8938, with respect to such assets. "Specified foreign financial assets" include any financial accounts held at a non-U.S. financial institution, as well as securities

issued by a non-U.S. issuer that are not held in accounts maintained by financial institutions. Higher reporting thresholds apply to certain individuals living abroad and to certain married individuals. Regulations extend this reporting requirement to certain entities that are treated as formed or availed of to hold direct or indirect interests in specified foreign financial assets based on objective criteria. U.S. Holders who fail to report the required information could be subject to substantial penalties. In addition, the statute of limitations for assessment of tax would be suspended, in whole or part. U.S. Holders are encouraged to consult with their tax advisors regarding the possible application of these rules, including the application of the rules to their particular circumstances.

### *(E) Information Reporting and Backup Withholding*

Information reporting requirements may apply with respect to the Exchange and to payments of interest on the Take-back SSNs and the Convertible Notes, any OID accruals on the Take-back SSNs and the Convertible Notes, any distributions with respect to New Issuer Equity and the proceeds from a sale, exchange or other taxable disposition (including a retirement or redemption) of the Take-back SSNs, the Convertible Notes and the New Issuer Equity (except, in each case, with respect to a U.S. Holder that establishes that it is an exempt recipient). Backup withholding may apply to any payments described in the preceding sentence if a U.S. Holder fails to provide a taxpayer identification number or a certification that it is not subject to backup withholding. Backup withholding is not an additional tax, and any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against the U.S. Holder's U.S. federal income tax liability, provided that the required information is timely furnished to the IRS.

### E.    Certain Cayman Islands Tax Consequences of the Plan

The following discussion summarizes certain Cayman Islands tax consequences of the implementation of the Plan.

The New Issuer is an exempted company to be incorporated in the Cayman Islands. There is at present no corporation, income, capital gains or profits tax, tax by way of withholding in the Cayman Islands, or taxation in the nature of inheritance tax or estate duty, and so except as expressly set out below there is no tax in the Cayman Islands that would apply to: (a) payments of money or property in connection with the execution, delivery or enforcement of the Plan; or (b) the payments of money or property in exchange for Allowed Claims made under, or pursuant to, the Plan.

No stamp, registration or other duties or fees are required to be paid in the Cayman Islands in respect of the execution or performance of the Plan, except that stamp duties may be applicable (a) on documents related to the Plan if executed in, or, after execution, brought within the jurisdiction of the Cayman Islands (including being produced to a court of the Cayman Islands) or (b) in respect of the issue of shares in the New Issuer or on an instrument of transfer in respect of shares in the New Issuer if the New Issuer holds direct or indirect interests in land in the Cayman Islands.

There are no foreign exchange controls or foreign exchange regulations in the Cayman Islands.

The New Issuer will be incorporated under the laws of the Cayman Islands as an exempted company with limited liability and, as such, plans to apply for an undertaking from the Financial Secretary of the Cayman Islands in substantially the following form:

### "The Tax Concessions Act

### Undertaking as to Tax Concessions

In accordance with the Tax Concessions Act (As Revised) of the Cayman Islands, the following undertaking is hereby given to the New Issuer:

1.    That no law which is hereafter enacted in the Cayman Islands imposing any tax to be levied on profits, income, gains or appreciations shall apply to the New Issuer or its operations; and

2.     In addition, that no tax to be levied on profits, income, gains or appreciations or which is in the nature of estate duty or inheritance tax shall be payable:

a.   on or in respect of the shares, debentures or other obligations of the New Issuer; or

b.   by way of the withholding in whole or in part of any relevant payment as defined in the Tax Concessions Act (As Revised).

These concessions shall be for a period of twenty years from [●] 2023."

## XV.    SOLICITATION AND VOTING PROCEDURES

### A.   The Solicitation Package

The following materials constitute the solicitation package (the "Solicitation Package") distributed to Holders of Claims and Interests entitled to vote to accept or reject the Plan:

o   the appropriate Ballot or Master Ballot, as applicable, and applicable Voting Instructions;

o   a pre-addressed, postage pre-paid return envelope; and

o   this Disclosure Statement with all exhibits, including the Plan, provided in hard copy format or on a flash drive, at the discretion of the Debtors.

### B.   Holders of Claims and Interests Entitled to Vote on the Plan

The voting Classes, Classes 3 and 6, entitled to vote to accept or reject the Plan shall be served the Solicitation Package (including the appropriate Ballot) to:

(A) with respect to Class 3 Claims that are Existing Notes Claims: to brokers, banks, common representatives or other nominees, or agents of brokers, banks, common representatives or other nominees (each of the foregoing, a "Nominee') by overnight delivery and by electronic mail (if available), with instructions for the Nominees to distribute Solicitation Packages to Beneficial holders of the Debtors' Existing Notes ("Beneficial Owners") who hold a position as of the Voting Record Date. Nominees may use customary methods to convey solicitation and other voting-related information to their Beneficial Owner clients;

(B) with respect to Class 3 Claims that are LC Facility Claims: by overnight delivery and by electronic mail (if available) to Holder of the LC Facility Claims, with a copy by electronic mail to counsel to the Holder of the LC Facility Claims; and

(C) with respect to Class 6, by overnight delivery and by electronic mail.

The Debtors *are not* soliciting votes from holders of Claims or Interests in Classes 1, 2, 4, or 5.

### C.   Voting Record Date

The Voting Record Date is November 27, 2023, which is the date for determining which Holders of Claims and Interests in Classes 3 and 6, respectively, are entitled to vote on the Plan.

### D.   Voting Deadline

The period during which Ballots and Master Ballots with respect to the Plan will be accepted by the Debtors will terminate at **5:00 p.m. (prevailing Eastern Time) on December 28, 2023**. Except to the extent the Debtors so determine, or as permitted by the Bankruptcy Court, Ballots and Master Ballots that are received after the Voting

Deadline may not be counted or otherwise used by the Debtors in connection with the Debtors' request for Confirmation of the Plan (or any permitted modification thereof).

The Debtors reserve the right at any time or from time to time, to extend the period of time (on a daily basis, if necessary) during which Ballots and Master Ballots will be accepted for any reason, including determining whether or not the requisite number of acceptances have been received, by making a public announcement of such extension no later than the first Business Day next succeeding the previously announced Voting Deadline. The Debtors will give notice of any such extension in a manner deemed reasonable to the Debtors in their discretion. There can be no assurance that the Debtors will exercise their right to extend the Voting Deadline.

**E.    Voting Instructions**

Only the Holders of Claims in Class 3 and Holders of Interests in Class 6 as of the Voting Record Date are entitled to vote to accept or reject the Plan.

The Debtors have engaged Epiq as the Balloting Agent to assist in the balloting and tabulation process. The Balloting Agent will process and tabulate Ballots and Master Ballots for each Class entitled to vote to accept or reject the Plan and will file the Voting Report as soon as practicable after the Voting Deadline.

Any Ballot or Master Ballot that is properly executed, but which does not clearly indicate an acceptance or rejection of the Plan or which indicates both an acceptance and a rejection of the Plan, shall not be counted.

1.    Class 3 Claims on Account of LC Facility Claims

The Debtors are providing a Solicitation Package to Holders of LC Facility Claims.

Holders of LC Facility Claims in Class 3 in may vote on the Plan by completing and signing an enclosed Ballot and returning it to the Balloting Agent on or before the Voting Deadline, by returning a hard copy Ballot, using the return envelope provided, or in accordance with the instructions provided on the Ballot, that is, at the address listed on the Ballot, or, alternatively, by sending an electronic copy of the Ballot to the e-mail address provided in the Ballot.

2.    Class 3 Claims on Account of Existing Notes Claims

The Debtors are providing Solicitation Packages to Nominees of the Beneficial Owners of the Existing Notes Claims in Class 3.

The Nominees shall provide Beneficial Owners who hold a position as of the Voting Record Date with a Solicitation Package and instructions for voting.

Each Nominee shall forward the Solicitation Package together with, (i) the unexecuted Beneficial Holder Ballot to the Beneficial Owner as of the Voting Record Date with instructions for the Beneficial Owner to complete and return the executed Beneficial Holder Ballot to the Nominee, or (ii) a pre-validated Beneficial Holder Ballot with instructions for the Beneficial Owner to complete and return the pre-validated Beneficial Holder Ballot directly to the Solicitation Agent. Each Nominee is required to advise its Beneficial Owners to return their Beneficial Holder ballot to the Nominee by a date that would permit the Nominee sufficient time to prepare and return its Master Ballot to the proposed Balloting Agent by the Voting Deadline. If it is a Nominee's customary and accepted practice to forward the Solicitation Packages to (and collect votes or elections from) Beneficial Owners by voter information form, email, telephone, or other customary means of communication, as applicable, the Nominee (or Nominee's agent) is permitted to employ that method of communication in lieu of sending the full Solicitation Package.

In order to effectuate certain terms of the RSA, the Debtors provided to counsel for the Ad Hoc Group the Preliminary Ballot, substantially similar to the Beneficial Holder Ballot. The Preliminary Ballot is returnable directly to the Balloting Agent. The Consenting Noteholders who submit the Preliminary Ballot must also vote their Beneficial Holder Ballot consistent with the procedures set forth in this Section XV.E.2. As indicated herein, pursuant to the RSA, the Consenting Noteholders have agreed to vote in favor of the Plan.

3.    Class 6 Interests

The Debtors are providing the Solicitation Package to Holders of Interests in Class 6 as of the Voting Record Date in the records maintained by the Debtors.

Holders of Class 6 Interests may vote on the Plan by completing and signing an enclosed Ballot and returning it to the Balloting Agent on or before the Voting Deadline by returning a hard copy Ballot, using the return envelope provided, or in accordance with the instructions provided on the Ballot, that is, at the address listed on the Ballot, or, alternatively, by sending an electronic copy of the Ballot to the e-mail address provided in the Ballot.

**F.    Voting Tabulation**

The Ballot and/or Master Ballot do not constitute, and shall not be deemed to be, a Proof of Claim or Interest, or an assertion or admission of a Claim or Interest. Only Holders of Claims and Interests in the voting Classes shall be entitled to vote with regard to such Claims and Interests, respectively.

Except as otherwise provided in the solicitation procedures, a Ballot or Master Ballot will be deemed delivered only when the Balloting Agent actually receives the executed Ballot or Master Ballot as instructed in the Voting Instructions. Further, unless otherwise permitted by the Debtors, to be counted, Ballots or Master Ballots must be received by the Balloting Agent the Voting Deadline; provided that Holders of Claims or Interests who are parties to the RSA that cast a Ballot prior to the time of filing of any of the Debtors' chapter 11 petitions shall not be entitled to change their vote or cast new Ballots after the Chapter 11 Cases are commenced, unless the Debtors consent or the Plan is modified in a manner that materially adversely affects the rights of the Holders of Claims; provided, however, that upon the occurrence of any termination of the RSA, any and all consents or votes tendered prior to such termination by the Consenting Creditors and the Holders of the Existing ILAP Equity Interests shall be deemed, for all purposes, to be null and void *ab initio*. Upon any such termination, the affected Consenting Creditors and Interest Holder shall have the right (i) to freely vote their Existing Notes Claims or LC Facility Claims, as applicable, and Existing ILAP Equity Interests, respectively, with respect to any chapter 11 plan with respect to the Debtors, (ii) to object to confirmation of any plan, including the Plan, whether or not an objection deadline regarding such plan has passed or (iii) seek the reversal or modification of the confirmation of any plan, including the Plan, in any of the Chapter 11 Cases.

Furthermore, each Holder of a Senior Debt Claim shall be asked to certify whether it is a Qualified Holder or a Non-Qualified Holder. If a Holder of a Senior Debt Claim is a Non-Qualified Holder, then any vote cast by such Holder shall be listed on the Irregular Ballot report and its vote not counted (unless otherwise determined by the Bankruptcy Court). Notwithstanding anything to the contrary in the Plan or the Disclosure Statement, Citibank, N.A. shall be deemed a Qualified Holder under the Plan and shall not be required to certify that it is a Qualified Holder.

No Ballot or Master Ballot should be sent to the Debtors, the Debtors' agents (other than the Balloting Agent) or the Debtors' financial or legal advisors. The Debtors expressly reserve the right to amend from time to time the terms of the Plan (subject to compliance with the requirements of section 1127 of the Bankruptcy Code and the terms of the Plan and the RSA regarding modifications). The Bankruptcy Court may require the Debtors to disseminate additional Solicitation Packages if the Debtors make material changes to the terms of the Plan or if the Debtors waive a material condition to Plan Confirmation. In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court. To the extent there are multiple Claims within Classes, the Debtors may, in their discretion, and to the extent possible, aggregate the Claims of any particular Holder within a Class for the purpose of counting votes.

In the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

The following additional procedures shall apply with respect to tabulating Master Ballots:

   o    votes cast by holders of public securities through Nominees will be applied to the applicable positions held by such Nominees as of the Voting Record Date, as evidenced by the record and

depository listings. Votes submitted by a Nominee shall not be counted in excess of the amount of public securities held by such Nominee as of the Voting Record Date;

o   if conflicting votes or "over-votes" are submitted by a Nominee, the Balloting Agent shall use reasonable efforts to reconcile discrepancies with the Nominee;

o   if over-votes are submitted by a Nominee that are not reconciled prior to the preparation of the certification of vote results, the votes to accept and to reject the Plan shall be applied in the same proportion as the votes to accept and to reject the Plan submitted by the Nominee, but only to the extent of the Nominee's Voting Record Date position in the public securities; and

o   for the purposes of tabulating votes, each Beneficial Owner shall be deemed (regardless of whether such holder includes interest in the amount voted on its Ballot) to have voted only the principal amount of its public securities; any principal amounts thus voted may be thereafter adjusted by the Balloting Agent, on a proportionate basis with a view to the amount of securities actually voted, to reflect the corresponding claim amount, including any accrued but unpaid prepetition interest, with respect to the securities thus voted.

Additionally, the following Ballots or Master Ballots will not be counted in determining the acceptance or rejection of the Plan:

o   any Ballot that is illegible or contains insufficient information to permit the identification of the Holder;

o   any unsigned Ballot;

o   any Ballot not marked to accept or reject the Plan;

o   any Ballot (other than a Master Ballot) marked both to accept and reject the Plan;

o   any Ballot submitted by a Person or Entity not entitled to cast a vote with respect to the Plan;

o   any Ballot sent to any party other than the Balloting Agent (e.g., the Debtors, any official committee, if any, or the Court);

o   any Ballot received after the Voting Deadline, unless otherwise determined by the Debtors;

o   any Ballot transmitted to the Balloting Agent by facsimile;

o   any Ballot superseded by another timely valid Ballot;

o   any Ballot cast on a form other than the Ballot sent by the Balloting Agent; and

o   any Ballot (or group of Ballots from a single creditor) that partially rejects and partially accepts the Plan.

Further, tabulation of Ballots cast by Holders of LC Facility Claims and Existing ILAP Equity Interests will be based on the amounts as shown in the Debtors' records, and in the event of a discrepancy between the voting amount shown in the records of the Debtors' and the amount asserted by the voter, the Balloting Agent shall use reasonable efforts to reconcile the discrepancy. In the event such amount cannot be timely reconciled, the amount shown in the Debtors' records will prevail for voting purposes.

The Balloting Agent will file the Voting Report as soon as practicable after the Voting Deadline; provided, that the Balloting Agent will file a supplemental Voting Report if necessary. The Voting Report shall, among other things, delineate every Ballot or Master Ballot that does not conform to the Voting Instructions or that contains any

form of irregularity (each, an "Irregular Ballot"), including, but not limited to, those Ballots or Master Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information or damaged.

The Voting Report also shall indicate the Debtors' intentions with regard to such Irregular Ballots. Neither the Debtors nor any other Person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots or Master Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification.

### G.  Additional Information; Plan Supplement Filings

Any party who desires additional or paper copies of the Solicitation Materials may request copies from the Balloting Agent by (i) writing to ILAP Ballot Processing, c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Boulevard, Beaverton, OR 97005, or (ii) by emailing ILAP@epiqglobal.com.

Prior to the Confirmation Hearing, the Debtors intend to file the Plan Supplement. As the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website. The Debtors will not serve copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement from Epiq by: (i) visiting the Debtors' restructuring website, https://dm.epiq11.com/ILAP; (ii) emailing ILAP@epiqglobal.com; and/or (iii) writing to ILAP Ballot Processing, c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Boulevard, Beaverton, OR 97005.

[Concluded on Following Page]

## XVI.    RECOMMENDATION

The Debtors believe the Plan is in the best interests of all creditors and interest holders and urge Holders of Claims and Interests entitled to vote to accept the Plan and to evidence such acceptance by returning their Ballots and Master Ballots so they will be received by the Balloting Agent by no later than **5:00 p.m. (prevailing Eastern Time) on December 28, 2023**.

Dated: November 29, 2023

Respectfully Submitted,

Inversiones Latin America Power Ltda. (on behalf of itself and each of the Debtors)

By: _____

Name:    Esteban Moraga

Title:    Chief Executive Officer

Prepared by:

**GREENBERG TRAURIG, LLP**
One Vanderbilt Avenue
New York, New York 10017
Telephone:    (212) 801-9200
Facsimile:    (212) 801-6400

*Proposed Counsel for the Debtors and Debtors in Possession*

**Exhibit A**

Debtors' Joint Prepackaged Chapter 11 Plan

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| INVERSIONES LATIN AMERICA POWER LTDA., *et al.*,[1] | Case No. 23-[_____] ([____]) |
| Debtors. | (Joint Administration Requested) |

---

### DEBTORS' JOINT PREPACKAGED CHAPTER 11 PLAN

---

**GREENBERG TRAURIG, LLP**
Oscar N. Pinkas
Brian E. Greer
Leo Muchnik
Sara A. Hoffman
Jessica M. Wolfert
One Vanderbilt Avenue
New York, New York 10017
Telephone:    (212) 801-9200
Facsimile:    (212) 801-6400

*Proposed Counsel for the Debtors and Debtors in Possession*

Dated:  November 29, 2023

---

[1]   The Debtors, together with each of the Debtor's Chilean identification number, as applicable, are: Inversiones Latin America Power Ltda. (76.299.635-9); San Juan S.A. (76.319.883-9); and Norvind S.A. (76.919.070-8). The location of the corporate headquarters and the service address for Inversiones Latin America Power Ltda. is Cerro El Plomo 5680, Oficina 1202 Las Condes, Santiago, Chile.

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION
      OF TIME, GOVERNING LAW AND OTHER REFERENCES ........................... 1

    1.1     Defined Terms ........................................................................................ 1
    1.2     Rules of Interpretation ........................................................................ 15
    1.3     Computation of Time ........................................................................... 15
    1.4     Governing Law .................................................................................... 15
    1.5     Reference to Monetary Figures ........................................................... 16
    1.6     Reference to the Debtors or the Reorganized Debtors ......................... 16

ARTICLE II ADMINISTRATIVE AND PRIORITY CLAIMS ................................... 16

    2.1     Administrative Claims ......................................................................... 16
    2.2     Professional Claims ............................................................................. 16
    2.3     Priority Tax Claims .............................................................................. 17
    2.4     Payment of Restructuring Expenses .................................................... 17

ARTICLE III CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND
      INTERESTS ........................................................................................ 18

    3.1     Classification of Claims and Interests ................................................. 18
    3.2     Treatment of Classes of Claims and Interests ..................................... 18
    3.3     Special Provision Governing Unimpaired Claims ............................... 22

ARTICLE IV PROVISIONS FOR IMPLEMENTATION OF THE PLAN .................... 22

    4.1     General Settlement of Claims .............................................................. 22
    4.2     Subordination ...................................................................................... 22
    4.3     Sources of Cash for Plan Distributions ............................................... 22
    4.4     Restructuring Transactions .................................................................. 22
    4.5     The New Notes & Substitute Consideration ........................................ 24
    4.6     Issuance of the New Notes and New Equity ........................................ 27
    4.7     Sales Facilitation Agreement; Company Sale ...................................... 27
    4.8     Preservation of Rights of Action ......................................................... 28
    4.9     Vesting of Assets in the Reorganized Debtors .................................... 28
    4.10    Discharge from Notes, Instruments, Certificates, and Other Documents ............. 29
    4.11    Execution of Plan Documents .............................................................. 30
    4.12    Corporate Action ................................................................................. 30
    4.13    New Corporate Governance Documents .............................................. 30
    4.14    Effectuating Documents; Further Transactions ................................... 30
    4.15    Section 1146(a) Exemption .................................................................. 30
    4.16    Managers, Directors and Officers ........................................................ 31

i

ARTICLE V TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES ........................................................................................31

    5.1    Assumption of Executory Contracts and Unexpired Leases...................................31
    5.2    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ........33
    5.3    Pre-Existing Payment and Other Obligations......................................................34
    5.4    Rejection Damages Claims and Objections to Rejections....................................34
    5.5    Contracts and Leases Entered Into After the Petition Date .................................34
    5.6    Reservation of Rights............................................................................................34

ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS ................................................35

    6.1    Distributions on Account of Claims Allowed as of the Plan Effective Date.........35
    6.2    Special Rules for Distributions to Holders of Disputed Claims ...........................35
    6.3    Disbursing Agent ..................................................................................................35
    6.4    Distributions of Take-back SSNs and Convertible Notes  to Holders of
            Senior Debt Claims...............................................................................................36
    6.5    Distribution Form...................................................................................................40
    6.6    Delivery of Distributions and Undeliverable or Unclaimed Distributions ............40
    6.7    Exemption from Registration Requirements; Restriction on Certain
            Holders .................................................................................................................43
    6.8    Claims Paid or Payable by Third Parties .............................................................44
    6.9    Setoffs; Recoupments ...........................................................................................44
    6.10   Allocation Between Principal and Accrued Interest ............................................45

ARTICLE VII PROCEDURES FOR RESOLVING DISPUTED CLAIMS ...............................45

    7.1    Disputed Claims....................................................................................................45
    7.2    Resolution of Disputed Claims .............................................................................46
    7.3    Estimation of Claims.............................................................................................46
    7.4    No Interest.............................................................................................................47
    7.5    No Distributions Pending Allowance ....................................................................47
    7.6    Disallowance of Claims and Interests...................................................................47

ARTICLE VIII EFFECT OF CONFIRMATION OF THE PLAN .............................................47

    8.1    Compromise and Settlement of Claims, Interests, and Controversies...................47
    8.2    Discharge of Claims and Termination of Interests ...............................................48
    8.3    Releases by the Debtors ........................................................................................48
    8.4    Releases by Releasing Parties ..............................................................................49
    8.5    Exculpation ...........................................................................................................50
    8.6    Injunction .............................................................................................................50
    8.7    Protection Against Discriminatory Treatment ......................................................51
    8.8    Indemnification.....................................................................................................51
    8.9    Release of Liens ....................................................................................................52
    8.10   Reimbursement or Contribution ..........................................................................52

ARTICLE IX CONDITIONS PRECEDENT TO THE PLAN EFFECTIVE DATE...................53

ii

9.1    Conditions Precedent to the Plan Effective Date...................................................53
9.2    Waiver of Conditions Precedent ...........................................................................55
9.3    Effect of Non-Occurrence of Conditions to Consummation .................................55

ARTICLE X MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN..........55

10.1    Modification of Plan ...........................................................................................55
10.2    Revocation or Withdrawal of Plan.......................................................................56
10.3    Confirmation of the Plan .....................................................................................56

ARTICLE XI RETENTION OF JURISDICTION .........................................................................56

11.1    Jurisdiction ........................................................................................................56

ARTICLE XII MISCELLANEOUS PROVISIONS ....................................................................58

12.1    Additional Documents .........................................................................................58
12.2    Payment of Statutory Fees ..................................................................................58
12.3    Reservation of Rights...........................................................................................59
12.4    Elimination of Vacant Classes ............................................................................59
12.5    Successors and Assigns........................................................................................59
12.6    Service of Documents..........................................................................................59
12.7    Term of Injunctions or Stays...............................................................................60
12.8    Entire Agreement .................................................................................................60
12.9    Plan Supplement Exhibits ....................................................................................60
12.10  Non-Severability ..................................................................................................60
12.11  Foreign Representative ........................................................................................61

# INTRODUCTION

Inversiones Latin America Power Ltda., San Juan S.A., and Norvind S.A. (collectively, the "Debtors") jointly propose this Plan. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding claims against and interests in each Debtor pursuant to the Bankruptcy Code. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of claims and interests set forth in Article III shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. The Plan contemplates no substantive consolidation of any of the Debtors. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, businesses, properties and operations, projections, risk factors, a summary and analysis of this Plan and certain related matters.

# ARTICLE I

## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND OTHER REFERENCES

### 1.1    Defined Terms

1.      "*Ad Hoc Group*" means the beneficial holders of, or the investment advisors to funds and accounts that hold, the Existing Notes listed in Schedule I of the RSA.

2.      "*Ad Hoc Group Advisors*" means, collectively, the professional advisors to the Ad Hoc Group, consisting of Cleary Gottlieb Steen & Hamilton LLP, Claro & Cia., Conyers Dill & Pearman and Rothschild & Co.

3.      "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Plan Effective Date to preserve the Estates and operate the Debtors' businesses; (b) Professional Claims; and (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

4.      "*Affiliate*" shall have the meaning ascribed to it in section 101(2) of the Bankruptcy Code. With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

5.      "*Allowed*" means, with respect to any Claim or Interest:  (a) a Claim or Interest (i) as to which no objection has been filed and that is evidenced by a Proof of Claim or Interest, as applicable, timely filed by the applicable bar date, if any, or (ii) that is not required to be evidenced by a filed Proof of Claim or Interest, as applicable, under the Plan, the Bankruptcy Code, or a Final Order; (b) a Claim or Interest that is allowed (i) pursuant to the Plan, (ii) in any stipulation that is entered into with the consent of the Required Consenting Creditors (such consent not to be unreasonably withheld, conditioned or delayed) and approved by the Bankruptcy Court, (iii) by order of the Bankruptcy Court, or (iv) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith; or (c) a Claim for which the obligation or liability payable by the Debtors that is not Disputed by the Debtors on or before the later of

(A) the period set forth in <u>Section 7.2</u> of the Plan or (B) such deadline as provided for by law or contract (as, in each case, may be extended from time to time). Except as otherwise specified in the Plan or any order, the amount of an Allowed Claim shall not include interest or other charges on such Claim from and after the Petition Date.

6.      "***Avoidance Actions***" means any and all causes of action to avoid a transfer of property or an obligation incurred by any of the Debtors arising under sections 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code or other similar or related Law.

7.      "***Ballot***" means the form or forms distributed to certain Holders of Claims and Interests that are entitled to vote on the Plan by which such Entities may indicate acceptance or rejection of the Plan.

8.      "***Bankruptcy Code***" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

9.      "***Bankruptcy Court***" means the United States Bankruptcy Court in which the Chapter 11 Cases are commenced.

10.      "***Bankruptcy Rules***" means the Federal Rules of Bankruptcy Procedure.

11.      "***Business Day***" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, either the state of New York or Chile.

12.      "***Cash***" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

13.      "***Cause of Action***" or "***Causes of Action***" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise. Causes of Action also include:  (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any Avoidance Action.

14.      "***Certification***" has the meaning given to such term in <u>Section 6.4</u> of the Plan.

15.      "***Chapter 11 Cases***" means the Debtors' voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

16.      "***Chile***" means the Republic of Chile.

17.     "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

18.     "*Class*" means a category of Holders of Claims or Interests pursuant to section 1122(a) of the Bankruptcy Code.

19.     "*Collateral Agent*" means (a) UMB Bank, N.A., in its capacity as the successor Offshore Collateral Agent (as defined in the Existing Indenture), (b) Citibank, N.A., in its capacity as predecessor Offshore Collateral Agent to the extent of the survival of its rights thereunder, and (c) Banco de Chile, in its capacity as the Onshore Collateral Agent (as defined in the Existing Indenture), under the Prepetition Security Documents (and, in each case, any successor thereto).

20.     "*Company Sale*" has the meaning given to such term in <u>Section 4.7</u> of the Plan.

21.     "*Confirmation*" means entry of the Confirmation Order on the docket of the Chapter 11 Cases.

22.     "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

23.     "*Confirmation Hearing*" means the hearing(s) before the Bankruptcy Court under section 1128 of the Bankruptcy Code at which the Debtors seek entry of the Confirmation Order.

24.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code, which order shall be reasonably acceptable to the Debtors, the ILAP Partners and the Required Consenting Creditors (and, if there is any modification of the Confirmation Order that adversely affects the rights of the Super Priority Notes Financing Parties, then any such modification shall also be reasonably acceptable to the Super Priority Notes Financing Parties).

25.     "*Consenting Creditors*" means the holders of Existing Notes and Holders of LC Facility Claims that have executed and delivered counterpart signature pages to the RSA or a Joinder to counsel to ILAP from time to time agreeing to be bound thereby, including the provisions requiring such holder to vote to accept the Plan.

26.     "*Consummation*" means the occurrence of the Plan Effective Date.

27.     "*Convertible Notes*" means the United States dollar-denominated secured notes in the principal amount of $173,345,973 that the New Issuer will issue to Holders of Allowed Class 3 Claims on the Plan Effective Date pursuant to the substantially final version of the Convertible Notes Indenture included in the Plan Supplement; <u>provided</u>, <u>further</u>, that if the LC Facility Settlement is consummated, then the principal amount of the Convertible Notes will be reduced by $8,225,018. The Convertible Notes is included in the Plan Supplement.

28.     "*Convertible Notes Indenture*" means the indenture by and among the Reorganized Debtors, the Convertible Notes Indenture Trustee, and New Issuer to be entered into in connection

with the issuance of the Convertible Notes. A substantially final version of the Convertible Notes Indenture is included in the Plan Supplement.

29.     "***Convertible Notes Indenture Trustee***" means UMB Bank, N.A., in its capacity as the trustee under the Convertibles Notes Indenture (and any successor thereto).

30.     "***Cure***" or "***Cure Claim***" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default which is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

31.     "***Debtors***" means, collectively, ILAP and the Guarantor Debtors.

32.     "***Determination Date***" means 180 days after the Plan Effective Date.

33.     "***Disbursing Agent***" means the Reorganized Debtors or any Entity selected by the Debtors or Reorganized Debtors, as applicable, to make or facilitate distributions contemplated under the Plan.

34.     "***Disclosure Statement***" means the related disclosure statement with respect to the Plan, as may be amended, supplemented, or modified from time to time.

35.     "***Disputed***" means a Claim or Interest, or any portion thereof, that (a) is not Allowed; (b) is not disallowed under the Plan, the Bankruptcy Code, as applicable, or a Final Order; (c) is the subject of an objection or request for estimation filed in the Bankruptcy Court and which objection or request for estimation has not been withdrawn, resolved or overruled by a Final Order of the Bankruptcy Court, or (d) is otherwise disputed by the Debtors or the Reorganized Debtors in accordance with applicable law, which dispute has not been withdrawn, resolved or overruled by a Final Order.

36.     "***Distribution Date***" means, except as otherwise set forth herein, the date or dates determined by the Debtors, on or after the Plan Effective Date, upon which the Debtors or their duly appointed Disbursing Agent shall make distributions to Holders of Allowed Claims and Interests entitled to receive distributions under the Plan.

37.     "***Distribution Form***" means an instruction to be delivered by (i) the beneficial holder of Existing Notes to its Nominee or (ii) by the Holder of an LC Facility Claim directly to the Disbursing Agent in which such holder (a) certifies that is a Qualified Holder or Non-Qualified Holder and (b) provides any certifications, documents, or representations as are consistent with the Plan. The Distribution Form will be included in the Plan Supplement.

38.     "***Distribution Record Date***" means the earlier of (a) the date set by the Bankruptcy Court in the Scheduling Order and (b) the date that the Confirmation Order is entered by the Bankruptcy Court. For the avoidance of doubt, the Distribution Record Date shall not apply to publicly traded securities, which shall receive distributions in accordance with the Plan and the applicable procedures of DTC.

39.     "***DTC***" means The Depository Trust Company.

40.    "**_DWAC_**" has the meaning given to such term in <u>Section 6.4</u> of the Plan.

41.    "**_Entity_**" shall have the meaning ascribed to it in section 101(15) of the Bankruptcy Code.

42.    "**_Estate_**" means the estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

43.    "**_Exculpated Claim_**" means any Claim related to any act or omission in connection with, relating to, or arising out of the Debtors' in-court or out-of-court efforts to negotiate, enter into or implement the RSA, the Chapter 11 Cases, the formulation, preparation, solicitation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created or entered into in connection with or pursuant to the RSA, the Solicitation Materials, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan, to the maximum extent permitted by law.

44.    "**_Exculpated Parties_**" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) any official committees appointed in the Chapter 11 Cases and each of their respective members; (c) ILAP Partners; (d) ILAP Sponsors; (e) the Consenting Creditors; and (f) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

45.    "**_Executory Contract_**" means a contract or lease (other than an Unexpired Lease) to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

46.    "**_Existing Guarantor Equity Interest_**" means an Interest in any of the Guarantor Debtors.

47.    "**_Existing ILAP Equity Interest_**" means an Interest in ILAP.

48.    "**_Existing Indenture_**" means that certain Indenture dated as of June 15, 2021, by and among ILAP, as issuer, the Guarantor Debtors, as guarantors, and Citibank, N.A., in its capacity as the Trustee, Offshore Collateral Agent, Registrar, Transfer Agent and Paying Agent, as amended (including by that certain Indenture Amendment Agreement dated August 28, 2023) as amended, modified or supplemented and in effect from time to time.

49.    "**_Existing Indenture Trustee_**" means UMB Bank, N.A., in its capacity as the successor trustee, Offshore Collateral Agent, Registrar, Transfer Agent, Paying Agent, Intercreditor Agent and as Offshore Depositary Bank, and Citibank, N.A., in its capacity as predecessor trustee, Offshore Collateral Agent, Registrar, Transfer Agent, Paying Agent and Intercreditor Agent to the extent of its surviving rights thereunder, under the Existing Indenture

and the Prepetition Security and Depositary Agreement, as applicable, pursuant to the Agreement of Resignation, Appointment and Acceptance, dated August 28, 2023 (and any successor thereto).

50.     "***Existing Notes***" means the 5.125% senior secured notes due 2033 issued by ILAP pursuant to the Existing Indenture and guaranteed by the Guarantor Debtors.

51.     "***Existing Notes Claim***" means any Claim evidenced by, arising under, on account of, related or in connection with the Existing Notes or the Existing Indenture, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder or related thereto (but excluding fees and expenses from the Entities set forth in clause (b) under the definition of "Restructuring Expenses").

52.     "***Final Decree***" means the decree contemplated under Bankruptcy Rule 3022.

53.     "***Final Order***" means an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, which has not been stayed, set aside or vacated, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order will not preclude such order from being a Final Order.

54.     "***Second Amendment***" means that certain Second Amendment and Joinder to the Restructuring Support Agreement, dated as of November 29, 2023, between and among the Debtors, the ILAP Partners, the Ad Hoc Group and Citibank, N.A.

55.     "***General Unsecured Claim***" means any Claim other than an Administrative Claim (including Professional Claims), a Priority Tax Claim, an Other Priority Claim, Senior Debt Claim (including any portion that may not be Secured), or an Other Secured Claim.

56.     "***Governmental Unit***" shall have the meaning ascribed to it in section 101(27) of the Bankruptcy Code.

57.     "***Guarantor Debtors***" means, collectively, San Juan and Norvind.

58.     "***Holder***" means an Entity holding a Claim or Interest.

59.     "***ILAP***" means Inversiones Latin America Power Limitada, a *sociedad de responsabilidad limitada* organized and existing under the Laws of Chile.

60.     "***ILAP Partners***" means, collectively, LAP Chile and LAP BV.

6

61.    "***ILAP Sponsors***" means, collectively, GMR Holding B.V., BTG Pactual Brazil Infrastructure Fund II LP, Patria Infrastructure Fund II LP, Patria Infrastructure Fund II LAP Co-Invest, LP, Patria Infrastructure Fund II LAP Co-Invest, UK LP, PI Fund II (Ontario) LP, PI Fund II (Ontario 1) LP, PI Fund II (Ontario 2) LP.

62.    "***Impaired***" means, with respect to any Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

63.    "***Independent Director***" means the independent director, reasonably acceptable to the Required Consenting Creditors on or before the Plan Effective Date, to be appointed by the ILAP Partners to the boards of directors for Reorganized ILAP, the New Issuer and the Reorganized Guarantor Debtors on the Plan Effective Date.

64.    "***Interest***" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

65.    "***Issue Date***" means the date on which the Existing Notes were originally issued under the Existing Indenture.

66.    "***Joinder***" means a joinder agreement to the RSA, whereby a Holder of a Senior Debt Claim that is not a party to the RSA as of the effective date thereof may become a Consenting Creditor by executing such joinder agreement pursuant to and consistent with the terms and conditions set forth in <u>Section 10.03</u> of the RSA.

67.    "***LAP BV***" means LAP Renewables B.V.

68.    "***LAP Chile***" means Latin America Power S.A., a *sociedad anónima* organized and existing under the Laws of Chile.

69.    "***Law***" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

70.    "***LC Facility Agent***" means Citibank, N.A., in its capacity as administrative agent under the Credit Agreement (and any successor thereto).

71.    "***LC Facility Agreement***" means the certain Credit Agreement dated June 15, 2021 by and among ILAP, as borrower, the Guarantor Debtors, as guarantors, the LC Facility Agent, and the lenders party thereto, as amended (including by that certain First Amendment to Credit Agreement dated August 28, 2023), modified or supplemented and in effect from time to time.

72.    "***LC Facility Claims***" means any Claim evidenced by, arising under, on account of, related or in connection with the LC Facility Agreement, including Claims for all principal

7

amounts outstanding, cash collateral, interest, fees, expenses, costs, and other charges arising thereunder or related thereto (but excluding fees and expenses from the Entities set forth in clause (b) under the definition of "Restructuring Expenses").

73.     "*LC Facility Settlement*" means, collectively, the provisions in Section 4.4(g) of the Plan.

74.     "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

75.     "*Mandatory Cash Sweep*" has the meaning given to such term in Section 4.5(e) of the Plan.

76.     "*Net Cash Proceeds*" has the meaning given to such term in Section 4.5(f) of the Plan.

77.     "*New Equity Interests*" means, collectively, the New Issuer Equity Interests and the interests in the Reorganized ILAP.

78.     "*New Issuer*" means a newly formed exempted company incorporated under the Laws of the Cayman Islands, which will be established and maintained for the purpose of issuing the Convertible Notes and which will own 100% of the equity of Reorganized ILAP on the Plan Effective Date, and will guarantee the Take-back SSNs and the Super Priority Notes.

79.     "*New Issuer Equity Interests*" means interests in the New Issuer.

80.     "*New Corporate Governance Documents*" means the memorandum and articles of association and/or bylaws (in each case as may be amended and/or restated from time to time), or other similar organizational and constituent documents, for each of New Issuer and the Reorganized Debtors, which forms of memorandum and articles of association, bylaws and similar organizational and constituent documents are included in the Plan Supplement, and which (if not included in the Plan Supplement) shall be in form and substance reasonably acceptable to the Debtors, the ILAP Partners and the Required Consenting Creditors.

81.     "*New Notes*" means, collectively, the Take-back SSNs, the Convertible Notes and the Super Priority Notes.

82.     "*New Notes Documents*" means, collectively, the New Notes, the Super Priority/Take-back SSN Indenture, the Convertible Notes Indenture, or other agreement governing the New Notes, and any and all other agreements, documents, and instruments delivered or to be entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, in each case if any, the terms of which documents shall be as provided in the RSA, and acceptable to the Debtors, ILAP Partners, and the Required Consenting Creditors. The New Notes, the Super Priority/Take-back SSN Indenture, and the Convertible Notes Indenture are included in the Plan Supplement.

83.     "*Nominee*" has the meaning given to such term in Section 6.4 of the Plan.

8

84.    "*Non-Qualified Holders*" has the meaning given to such term in <u>Section 6.4</u> of the Plan.

85.    "*Non-Qualified Holders' Notes*" has the meaning given to such term in <u>Section 4.5(f)</u> of the Plan.

86.    "*Non-Qualified Threshold Amount*" means 35 Non-Qualified Holders.

87.    "*Norvind*" means Norvind S.A., a *sociedad anónima* organized and existing under the Laws of Chile.

88.    "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

89.    "*Other Secured Claim*" means any Secured Claim other than a Senior Debt Claim.

90.    "*PEC 1 Receivables*" means the "*Saldos*" assigned to in the Tariff Stabilization Resolution (*Resolución Exenta* No. 72) issued on March 5, 2020, by the *Comisión Nacional de Energía* of Chile, as clarified and rectified by the *Resolución Exenta* No. 114 issued on April 9, 2020, by the *Comisión Nacional de Energía* of Chile, as further amended, clarified or rectified in accordance with applicable Law.

91.    "*Person*" shall have the meaning ascribed to it in section 101(41) of the Bankruptcy Code.

92.    "*Petition Date*" means the date on which each of the Debtors filed their petitions for relief commencing the Chapter 11 Cases.

93.    "*Plan*" means the joint chapter 11 plan of reorganization filed by the Debtors as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes and attachments thereto, which plan shall not be inconsistent with the Restructuring Term Sheet, and to the extent not consistent with the Restructuring Term Sheet in any material respect, be in form and substance be reasonably acceptable to the Debtors, ILAP Partners and the Required Consenting Creditors.

94.    "*Plan Effective Date*" means the date that is the first Business Day after the Confirmation Date on which all conditions precedent to the Plan Effective Date under <u>Section 9.1</u> of the Plan have been satisfied or waived in accordance with the Plan.

95.    "*Plan Supplement*" means any compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan, which shall be filed by the Debtors concurrently with the Plan, and additional documents filed with the Bankruptcy Court prior to the Plan Effective Date as amendments to the Plan Supplement, each of which shall not be inconsistent with, and shall contain, the terms and conditions set forth in the RSA and the Restructuring Term Sheet, attached as <u>Exhibit A</u> to the RSA, where applicable, and which shall include, without limitation, (a) the New Corporate Governance Documents; (b) the New Notes; (c) the Super Priority/Take-back SSN Indenture; (d) Convertible Notes Indenture; (e) the Rejection Schedule, if any; (f) the

list of directors and officers of New Issuer and the Reorganized Debtors; (g) the Super Priority Notes Commitment Agreement; (h) Sales Facilitation Agreement; and (i) the Distribution Form.

96.     "***Prepetition Chilean Security Document***" means each prepetition Security Document (as defined in the Existing Indenture) governed by the Chilean law.

97.     "***Prepetition Security and Depositary Agreement***" means the security and depositary agreement dated as of the Issue Date among ILAP, the Guarantor Debtors, Citibank, in its various capacities, and Banco de Chile.

98.     "***Prepetition Security Documents***" means, collectively, (a) each Prepetition Chilean Security Document, (b) the Security and Depositary Agreement and (c) any other mortgages, deeds of trust, security agreements, mandates, trust arrangements, pledge agreements or control agreements entered into on or after the Issue Date and prior to the Petition Date and of a similar nature relating to the Projects (as defined in the Existing Indenture), in each case for the benefit of the Secured Parties (as defined in the Existing Indenture).

99.     "***Pro Rata Senior Debt Take-back SSN Amount***" means with respect to any Holder of a Class 3 Claim, such Holder's *pro rata* share calculated based on the proportion that such Holder's Allowed Class 3 Claim bears to $260 million.

100.    "***Pro Rata Senior Debt Convertible Notes Amount***" means with respect to any Holder of a Class 3 Claim, such Holder's *pro rata* share calculated based on the proportion that such Holder's Allowed Class 3 Claim bears to $173,345,973.

101.    "***Pro Rata Share***" means with respect to any Holder of a Class 3 Claim, such Holder's *pro rata* share calculated based on the proportion that such Holder's Allowed Class 3 Claim bears to the aggregate amount of all Allowed Claims in Class 3, as of the date of such distribution.

102.    "***Priority Tax Claims***" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

103.    "***Professional***" means an Entity: (a) employed in the Chapter 11 Cases pursuant to an order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Plan Effective Date pursuant to this Plan and sections 327, 328, 329, 330, and 331 of the Bankruptcy Code or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

104.    "***Professional Claim***" means a Claim by a professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Plan Effective Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

105.    "***Professional Fee Escrow***" shall have the same meaning as set forth in <u>Section 2.2</u> of the Plan.

106.    "***Proof of Claim***" means a proof of claim filed against any of the Debtors in the Chapter 11 Cases.

107.    "***Purchased PEC 1 Receivables***" means the PEC 1 Receivables assigned to LAP Chile pursuant to that certain *Cesión de Saldos* agreement, dated as of August 28, 2023.

108.    "***Qualified Holders***" has the meaning given to such term in Section 6.4 of the Plan.

109.    "***Reinstatement***" or "***Reinstated***" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired and reinstated in accordance with section 1124 of the Bankruptcy Code.

110.    "***Rejection Schedule***" means the schedule of Executory Contracts and Unexpired Leases in the Plan Supplement, if any, as may be amended from time to time, setting forth certain Executory Contracts and Unexpired Leases for rejection as of the Plan Effective Date under section 365 of the Bankruptcy Code.

111.    "***Related Party***" means, collectively, current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns, subsidiaries, affiliates, managed accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, heirs, executors, and assigns, and other professionals (including Professionals), in each case solely in their capacities as such, together with their respective past and present directors, officers, shareholders, partners, members, employees, agents, attorneys, representatives, heirs, executors and assigns, in each case solely in their capacities as such.

112.    "***Released Parties***" means, collectively, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) the New Issuer; (d) ILAP Partners; (e) ILAP Sponsors; (f) the Existing Indenture Trustee; (g) the LC Facility Agent; (h) each Consenting Creditor that voted to accept the Plan; (i) each Super Priority Notes Financing Party; (j) each current and former Affiliate of each Entity in clauses (a) through (i); and (k) each Related Party of each Entity in clause (a) through (j).

113.    "***Releasing Parties***" means, collectively, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) the New Issuer; (d) the Existing Indenture Trustee; (e) the LC Facility Agent; (f) each Super Priority Notes Financing Party; (g) each Consenting Creditor; (h) all Holders of Claims or Interests that are eligible to vote to accept or reject the Plan that vote to accept for any Class; (i) all Holders of Claims or Interests that are deemed to accept the Plan and elect to opt in to the releases provided by the Plan; (j) all Holders of Claims or Interests that are eligible to vote to accept or reject the Plan that abstain from voting on the Plan for all Classes in which they are eligible to vote and who affirmatively opt-in to the releases provided by the Plan by checking the box on the applicable Ballot indicating that they opt to grant the releases provided in the Plan; (k) all Holders of Claims or Interests that are eligible to vote to accept or reject the Plan that vote to reject the Plan for all Classes in which they are eligible to vote and who affirmatively opt in to the releases provided by the Plan by checking the box on

11

the applicable Ballot indicating that they opt to grant the releases provided in the Plan; (l) each current and former Affiliate of each Entity in clause (a) through (k); and (m) each Related Party of each Entity in clause (a) through (n).

114. "***Reorganized Debtor***" means a Debtor, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Plan Effective Date.

115. "***Reorganized Guarantor Debtors***" means, collectively, Norvind and San Juan, or any of their successors or assigns, by merger, consolidation, or otherwise, on or after the Plan Effective Date.

116. "***Reorganized ILAP***" means ILAP, as transformed into a Chilean stock corporation (*sociedad por acciones*), or any successor or assign, by merger, consolidation, or otherwise, on or after the Plan Effective Date.

117. "***Required Consenting Creditors***" means, as of the relevant date, the Consenting Creditors holding a majority of the outstanding principal amount of the Existing Notes Claims and LC Facility Claims held by all Consenting Creditors on such date.

118. "***Restructuring***" means the restructuring of ILAP and its direct subsidiaries, as contemplated by and described in the RSA, the Restructuring Term Sheet and the Plan.

119. "***Restructuring Expenses***" means all prepetition and postpetition reasonable and documented fees and expenses of (a) the Ad Hoc Group Advisors and counsel for the Holders of the LC Facility Claims, including Milbank, LLP, in connection with the negotiation, formulation, preparation, execution, delivery, implementation, and consummation of the RSA, the Plan, the Definitive Documents (as defined in the RSA), and the transactions contemplated thereby, and (b) the Existing Indenture Trustee and the Collateral Agent.

120. "***Restructuring Term Sheet***" means that certain term sheet attached as <u>Exhibit A</u> to the RSA, as amended from time to time, including by the Second Amendment.

121. "***Restructuring Transactions***" means those certain restructuring and recapitalization transactions with respect to the Debtors' capital structure required to effect the Restructuring on the terms and conditions set forth in the RSA, the Restructuring Term Sheet, and the Plan.

122. "***RSA***" shall mean that certain Restructuring Support Agreement for implementation of the Restructuring dated as of October 30, 2023 between the Debtors, ILAP Partners, and the Ad Hoc Group, as amended from time to time, including by the Second Amendment.

123. "***Sale Period***" has the meaning given to such term in <u>Section 4.5(f)</u> of the Plan.

124. "***Sales Facilitation Agreement***" has the meaning given to such term in <u>Section 4.7</u> of the Plan.

125.    "*San Juan*" means San Juan S.A., a *sociedad anónima* organized and existing under the Laws of Chile.

126.    "*Scheduling Order*" means the order of the Bankruptcy Court scheduling the Confirmation Hearing.

127.    "*SEC*" means the United States Securities and Exchange Commission.

128.    "*Secured*" means when referring to a Claim, a Claim:  (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) otherwise Allowed pursuant to the Plan as a Secured Claim.

129.    "*Securities Act*" means the United States Securities Act of 1933, as amended and now in effect and as it may further be amended from time to time prior to the Plan Effective Date.

130.    "*Security*" means a security as defined in Section 2(a)(1) of the Securities Act of 1933.

131.    "*Selling Agent*" has the meaning given to such term in in <u>Section 4.5(f)</u> of the Plan.

132.    "*Selling Agent Agreement*" has the meaning given to such term in <u>Section 4.5(f)</u> of the Plan.

133.    "*Senior Debt Claims*" means, collectively, the Existing Notes Claims and LC Facility Claims.

134.    "*Settlement Take-back SSNs*" means the Take-back SSNs in the principal amount of $4,305,966 that will be issued to the Holders of the LC Facility Claims pursuant to the LC Facility Settlement (if such settlement is consummated). For the avoidance of doubt, the issuance of the Settlement Take-back SSNs pursuant to the LC Facility Settlement (if consummated) will be in addition to the $260 million in Take-back SSNs that the Reorganized ILAP will issue on the Plan Effective Date to Holders of Class 3 Claims, including the Holders of the LC Facility Claims.

135.    "*Solicitation Materials*" means the solicitation materials and documents included in the solicitation packages that will be sent to, among others, Holders of Claims and Interests entitled to vote to accept or reject the Plan, in compliance with Bankruptcy Rules 3017(d) and 2002(b).

136.    "*Substitute Consideration*" has the meaning given to such term in <u>Section 4.5(f)</u> of the Plan.

137.    "*Super Priority/Take-back SSN Indenture*" means the indenture by and among the Reorganized Debtors, the Super Priority/Take-back SSN Indenture Trustee, and New Issuer entered into in connection with the issuance of the Super Priority Notes and Take-back SSNs.

A substantially final version of the Super Priority/Take-back SSN Indenture is included in the Plan Supplement.

138. "*Super Priority/Take-back SSN Indenture Trustee*" means UMB Bank, N.A., in its capacity as the trustee under the Super Priority/Take-back SSN Indenture (and any successor thereto).

139. "*Super Priority Notes*" means the United States dollar-denominated senior secured notes, with super-priority relative to the Take-back SSNs and the Convertible Notes, in the principal amount of $14 million that will be issued to the Super Priority Notes Financing Parties pursuant to the substantially final version of the Super Priority Note Indenture included in the Plan Supplement.

140. "*Super Priority Notes Commitment*" means the commitment of the Super Priority Notes Financing Parties to advance funds to the Debtors or Reorganized Debtors, as applicable, to purchase $14 million in Super Priority Notes on or before the Plan Effective Date.

141. "*Super Priority Notes Commitment Agreement*" means that certain agreement dated November 29, 2023 by and among the Super Priority Notes Financing Parties, as purchasers, and the Debtors, as issuer and guarantors (as applicable), to purchase $14 million in Super Priority Notes on or before the Plan Effective Date.

142. "*Super Priority Notes Financing Parties*" means the parties who are signatories to the Super Priority Notes Commitment Agreement that are providing the Super Priority Notes Commitment.

143. "*Take-back SSNs*" means the United States dollar-denominated senior secured notes in the principal amount of $260 million that will be issued to Holders of Allowed Class 3 Claims on the Plan Effective Date.  For the avoidance of doubt, if the LC Facility Settlement is consummated, then the Take-back SSNs in the amount of the Settlement Take-back SSNs shall also be issued pursuant to the terms of the LC Facility Settlement. The Take-back SSN is included in the Plan Supplement.

144. "*Trustee*" means the Super Priority/Take-back SSN Indenture Trustee and the Convertible Notes Indenture Trustee, individually and collectively as the context may require.

145. "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim to a Holder that has not:  (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

146. "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

147.    "***Unimpaired***" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Impaired.

148.    "***United States Trustee***" means the United States Trustee for the jurisdiction in which the Chapter 11 Cases are commenced.

## 1.2    Rules of Interpretation

For purposes of the Plan:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (g) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; and (i) the Debtors shall be authorized to and may rely upon any written statement (including by email) from Cleary Gottlieb Steen & Hamilton LLP that confirms or declines a consent, waiver or other form of approval by the Ad Hoc Group.

In the case of a conflict between the provisions contained in the RSA or the Restructuring Term Sheet and the Plan, the terms of the Plan shall control in all respects. In the event of an inconsistency between this Plan and the Disclosure Statement, the terms of this Plan shall control in all respects. In the event of an inconsistency between this Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order). In the event of an inconsistency between the Confirmation Order and this Plan, the Confirmation Order shall control.

## 1.3    Computation of Time

Bankruptcy Rule 9006(a) applies in computing any period of time prescribed or allowed herein.

## 1.4    Governing Law

Except to the extent the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to conflict of laws principles.

1.5     **Reference to Monetary Figures**

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

1.6     **Reference to the Debtors or the Reorganized Debtors**

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

# ARTICLE II

## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article III.

2.1     **Administrative Claims**

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim, the Required Consenting Creditors, and the Debtors or Reorganized Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim either: (a) on the Plan Effective Date, or as soon as reasonably practicable thereafter; (b) if the Administrative Claim is not Allowed as of the Plan Effective Date, no later than thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; or (c) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims without any further action by the Holders of such Allowed Administrative Claims. Cash payments to creditors outside of the United States of America may be made in such currency and by such means as are necessary or customary in a particular foreign jurisdiction.

2.2     **Professional Claims**

All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Plan Effective Date must be filed no later than thirty (30) days after the Plan Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code. The Reorganized Debtors shall pay Professional Claims in Cash in the amount Allowed by the Bankruptcy Court. From and after the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the

Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

On or before the Plan Effective Date, the Debtors shall use proceeds from the sale of the Super Priority Notes, and, if necessary, Cash on hand, to fund an escrow for Professionals (the "Professional Fee Escrow") in an amount sufficient to pay all Professional Claims in full in Cash, pending the Bankruptcy Court's approval of such fees and expenses.

At least one (1) Business Day prior to the Plan Effective Date, each Professional shall provide to the Debtors its respective amount of fees and expenses to be funded into the Professional Fee Escrow for such Professional. The Professional Fee Escrow shall operate on a per Professional Basis, with each Professional's respective amount of fees and expenses segregated for the sole benefit of the Professional in the amount set forth for such Professional. The Professional Fee Escrow shall not be considered property of the Debtors' estates or an asset of the Reorganized Debtors, it shall be for the sole benefit of the Professionals; provided, however, that any funds remaining in the Professional Fee Escrow after the Bankruptcy Court enters an order allowing and directing payment of all Professional Fees shall revert to the Reorganized ILAP. The Professional Fee Escrow shall not act as a cap on any Professional Fees; instead they shall be paid by the Reorganized Debtors in full in Cash should the funds in the Professional Fee Escrow be insufficient to do so.

## 2.3 **Priority Tax Claims**

Each Holder of an Allowed Priority Tax Claim due and payable on or before the Plan Effective Date shall receive in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Priority Tax Claim: (a) the treatment provided by section 1129(a)(9)(C) of the Bankruptcy Code; (b) a Cash payment on, or as soon as reasonably practicable after, the later of the Plan Effective Date or the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, equal to the amount of such Allowed Priority Tax Claim; or (c) such other less favorable treatment as may be agreed upon between the Holder of such Allowed Priority Tax Claim and the applicable Debtor. If payment is made in accordance with section 1129(a)(9)(C), installment payments shall be made quarterly, and interest shall accrue in accordance with 26 U.S.C. § 6621. Cash payments to creditors outside of the United States of America may be made in such currency and by such means as are necessary or customary in a particular foreign jurisdiction.

## 2.4 **Payment of Restructuring Expenses**

The Restructuring Expenses payable by the Debtors shall constitute Allowed Administrative Claims and shall be paid on a current basis in full in Cash pursuant to (and subject to) the RSA, the Existing Indenture and Prepetition Security Documents (as applicable) without the need to file a proof of such Claim and without further order of the Bankruptcy Court. On the Plan Effective Date, the Debtors or Reorganized Debtors, as applicable, shall pay the Restructuring Expenses that have accrued and are unpaid as of the Plan Effective Date from the proceeds of the sales of the Super Priority Notes and, if necessary, Cash on hand. For the avoidance of doubt, any Restructuring Expenses incurred but not yet paid on or prior to the Plan Effective Date shall be payable by the Reorganized Debtors after the Plan Effective Date.

## ARTICLE III

## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

This Plan constitutes a separate Plan proposed by each Debtor. Except for the Claims addressed in Article II, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 of the Bankruptcy Code. Unless otherwise stated, a Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Plan Effective Date.

3.1    **Classification of Claims and Interests**

Claims against and Interests in each of the Debtors are divided into the following Classes:

| Number | Class |
|--------|-------|
| Class 1 | Class 1 consists of all Other Secured Claims. |
| Class 2 | Class 2 consists of all Other Priority Claims. |
| Class 3 | Class 3 consists of all Senior Debt Claims. |
| Class 4 | Class 4 consists of all General Unsecured Claims. |
| Class 5 | Class 5 consists of all Existing Guarantor Equity Interests |
| Class 6 | Class 6 consists of all Existing ILAP Equity Interests |

3.2    **Treatment of Classes of Claims and Interests**

The following chart designates the Class of Claims against and Interests in each of the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code and (c) deemed to accept or reject the Plan. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Section 12.4 of the Plan.

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Deemed To Accept; Not Entitled To Vote |
| 2 | Other Priority Claims | Unimpaired | Deemed To Accept; Not Entitled To Vote |
| 3 | Senior Debt Claims | Impaired | Entitled To Vote |

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 4 | General Unsecured Claims | Unimpaired | Deemed To Accept; Not Entitled To Vote |
| 5 | Existing Guarantor Equity Interests | Unimpaired | Deemed To Accept; Not Entitled To Vote |
| 6 | Existing ILAP Equity Interests | Impaired | Entitled To Vote |

Except to the extent that a Holder of an Allowed Claim against or Interest in any of the Debtors, as applicable, agrees to a less favorable treatment, and unless otherwise expressly indicated below, such Holder shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Interest. Unless otherwise indicated, the Holder of an Allowed Claim or Interest, as applicable, shall receive such treatment on the Plan Effective Date, or as soon as reasonably practicable thereafter:

(a)    **Class 1 (Other Secured Claims)**

(1)    *Classification*:  Class 1 consists of all Other Secured Claims against the applicable Debtor.

(2)    *Treatment*:  Each Holder of an Allowed Other Secured Claim shall receive, at the Debtors or Reorganized Debtors' option (as applicable): (a) payment in full in Cash; (b) the collateral securing its Allowed Other Secured Claim; (c) Reinstatement of its Allowed Other Secured Claim; or (d) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. Cash payments to creditors outside of the United States of America may be made in such currency and by such means as are necessary or customary in a particular foreign jurisdiction.

(3)    *Voting*:  Class 1 is Unimpaired. Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Other Secured Claims are not entitled to vote to accept or reject the Plan.

(b)    **Class 2 (Other Priority Claims)**

(1)    *Classification*:  Class 2 consists of all Other Priority Claims against the applicable Debtor.

(2)    *Treatment*:  On the Plan Effective Date, each Holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. Cash payments to creditors outside of the United States of America may be made in such currency and

by such means as are necessary or customary in a particular foreign jurisdiction.

(3)  *Voting*: Class 2 is Unimpaired. Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

(c)  **Class 3 (Senior Debt Claims)**

(1)  *Classification*:  Class 3 consists of all Senior Debt Claims against the applicable Debtor. Notwithstanding anything in this Plan to the contrary, Senior Debt Claims held by Holders of Existing Notes Claims and Holders of LC Facility Claims shall only receive the treatment and distribution provided for in this Section 3.2(c), subject to the LC Facility Settlement (if consummated), including as to any unsecured deficiency Claims, and shall not be classified in any other Class of Claims.

(2)  *Allowance*: The Senior Debt Claims are Allowed in the amount of $433,345,973.

(3)  *Treatment*:

A  In full and final satisfaction, settlement, release, and in exchange for the Senior Debt Claims, on the Plan Effective Date (or as soon as practicable thereafter), each Holder of an Allowed Senior Debt Claim shall receive its Pro Rata Share of each of the Take-back SSNs and the Convertible Notes. For the avoidance of doubt, the Take-back SSNs being issued under this Section 3.2(c) shall not include the Settlement Take-back SSNs.

B  To the extent necessary, this Section 3.2(c) shall be deemed modified to classify separately the votes of Class 3 into two sub-classes—(A) Secured Senior Debt Claims and (B) unsecured Senior Debt Claims—with the vote submitted on the Ballot of a Holder of a Senior Debt Claim to be tabulated the same across both sub-classes.

(4)  *Voting*: Class 3 is Impaired. Holders of Senior Debt Claims are entitled to vote on the Plan.

(d)  **Class 4 (General Unsecured Claims)**

(1)  *Classification*:  Class 4 consists of all General Unsecured Claims against the applicable Debtor.

(2)  *Treatment*: On the Plan Effective Date, each Holder of an Allowed General Unsecured Claim shall, at the election of the applicable Debtor or

Reorganized Debtor, (A) have the legal, equitable and contractual rights of such Holder Reinstated or (B) receive Cash in an amount equal to such Allowed General Unsecured Claims in the ordinary course of business. Cash payments to creditors outside of the United States of America may be made in such currency and by such means as are necessary or customary in a particular foreign jurisdiction.

(3)    *Voting*:  Class 4 is Unimpaired. Holders of Allowed General Unsecured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed General Unsecured Claims are not entitled to vote to accept or reject the Plan.

(e)    **Class 5 (Existing Guarantor Equity Interests)**

(1)    *Classification*:  Class 5 consists of all Existing Guarantor Equity Interests.

(2)    *Treatment*:  Each Existing Guarantor Equity Interest is Allowed as of the Plan Effective Date. On the Plan Effective Date, each Holder of an Allowed Existing Guarantor Equity Interest shall have such Interest Reinstated.

(3)    *Voting*:  Class 5 is Unimpaired. Holders of Allowed Existing Guarantor Equity Interests are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Existing Guarantor Equity Interests are not entitled to vote to accept or reject the Plan.

(f)    **Class 6 (Existing ILAP Equity Interests)**

(1)    *Classification*:  Class 6 consists of all Existing ILAP Equity Interests.

(2)    *Treatment*:  Each Existing ILAP Equity Interest is Allowed as of the Plan Effective Date. On the Plan Effective Date: (A) ILAP will be transformed into a Chilean stock corporation (*sociedad por acciones*) and as a result of such transformation, the Existing ILAP Equity Interest will be represented by shares; (B) the Existing ILAP Equity Interest held by LAP BV, as amended due to the transformation of ILAP, will be transferred to LAP Chile; (C) the Existing ILAP Equity Interest held by LAP Chile, as amended due to the transformation of ILAP (together with the Existing ILAP Equity Interest held by LAP BV that will be transferred to LAP Chile) will be contributed to New Issuer, and LAP Chile will receive all of the New Issuer Equity Interests; and (D) equity in the Reorganized ILAP will be issued to the New Issuer in accordance with Section 4.4(a) and Section 4.4(b) of the Plan.

(3)    *Voting*:  Class 6 is Impaired. Holders of Existing ILAP Equity Interests are entitled to vote on the Plan.

21

3.3    **Special Provision Governing Unimpaired Claims**

Notwithstanding anything to the contrary herein, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights and defenses regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

**ARTICLE IV**

**PROVISIONS FOR IMPLEMENTATION OF THE PLAN**

4.1    **General Settlement of Claims**

Unless otherwise set forth in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Plan Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims and Interests.

4.2    **Subordination**

The allowance, classification, and treatment of all Claims and Interests under the Plan shall conform to and with the respective contractual, legal, and equitable subordination rights of such Claims and Interests, and any such rights shall be settled, compromised, and released pursuant to the Plan. Notwithstanding anything to the contrary herein, pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim (other than Senior Debt Claims held by Consenting Creditors) in accordance with any contractual, legal, or equitable subordination relating thereto.

4.3    **Sources of Cash for Plan Distributions**

All Cash consideration necessary for the Reorganized Debtors to make payments or distributions pursuant to this Plan shall be obtained from the Cash proceeds received from the Super Priority Notes described in <u>Section 4.4(f)</u> and <u>Section 4.5(c)</u> herein, Cash on hand, and Cash derived from post-petition business operations. Further, the Debtors and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan. Any changes in intercompany account balances resulting from such transfers will not violate the terms of the Plan or the New Notes Documents.

4.4    **Restructuring Transactions**

(a)    <u>Incorporation of New Issuer</u>. Effective as of the Confirmation Date, the ILAP Partners are authorized and directed, on or prior to the Plan Effective Date to form and incorporate the New Issuer in the Cayman Islands. Upon implementation of the Restructuring Transactions on the Plan Effective Date, the New Issuer shall hold all of the equity interests in the Reorganized

ILAP from and after the Plan Effective Date. The Existing ILAP Equity Interests will be contributed to the New Issuer.

(b)    Restructuring of ILAP. On or immediately before the Plan Effective Date, ILAP shall reorganize as a Chilean stock corporation (*sociedad por acciones*), with the equity in the Reorganized ILAP to be contributed by LAP Chile to the New Issuer.

(c)    Contribution of Purchased PEC 1 Receivables: On or prior to the Plan Effective Date, LAP Chile is authorized and directed to contribute the Purchased PEC 1 Receivables, at its discretion, to the New Issuer or Reorganized ILAP; provided, further that if LAP Chile contributes the Purchased PEC 1 Receivables to New Issuer, then the New Issuer is authorized and directed to contribute the Purchased PEC 1 Receivables to the Reorganized ILAP.

(d)    Exchange of Senior Debt Claims for Take-back SSNs. The Reorganized ILAP's issuance of the Take-back SSNs to Holders of the Senior Debt Claims shall be deemed in consideration for each such Holder deeming to have assigned, conveyed and contributed such Holder's Pro Rata Senior Debt Take-Back SSN Amount of the Senior Debt Claim to the Reorganized ILAP as of the Plan Effective Date; provided, further, that if the LC Facility Settlement is consummated, then such issuance shall be deemed in consideration for Holders of the LC Facility Claims deeming to have assigned, conveyed and contributed such Holder's Pro Rata Senior Convertible Notes Amount of the Senior Debt Claim to the Reorganized ILAP as of the Plan Effective Date.  Such Holder's Pro Rata Senior Debt Take-back SSN Amount of the Senior Debt Claim (and, if the LC Facility Settlement is consummated, then the LC Facility Holders' Pro Rata Senior Convertible Notes Amount of the Senior Debt Claim) shall be deemed to have been transferred to, and will vest with, the Reorganized ILAP on the Plan Effective Date without further order of the Bankruptcy Court and without further act or action under applicable law, regulation, order or rule, from any Entity. The Existing Indenture Trustee, the LC Facility Agent, Consenting Creditors and any other Holder of an Allowed Senior Debt Claim shall take such actions as may be reasonably requested to give effect to the foregoing provisions.

(e)    Exchange of Senior Debt Claims for Convertible Notes. The New Issuer's issuance of the Convertible Notes to Holders of the Senior Debt Claims shall be deemed in consideration each such Holder deeming to have assigned, conveyed and contributed such Holder's Pro Rata Senior Debt Convertible Notes Amount of the Senior Debt Claim to New Issuer as of the Plan Effective Date. Such Holder's Pro Rata Senior Debt Convertible Notes Amount of the Senior Debt Claim shall be deemed to have been transferred to, and will vest with, the New Issuer on the Plan Effective Date without further order of the Bankruptcy Court and without further act or action under applicable law, regulation, order or rule, from any Entity. On the Plan Effective Date, the New Issuer is authorized and directed to contribute such Senior Debt Claims to the Reorganized ILAP. The Existing Indenture Trustee, the LC Facility Agent, Consenting Creditors and any other Holder of an Allowed Senior Debt Claim shall take such actions as may be reasonably requested, and the Consenting Creditors shall direct the Existing Indenture Trustee and the LC Facility Agent to take such actions, to give effect to the foregoing provisions, including an acknowledgment that

the issuance of the Convertible Notes, is for an exchange of the aggregate Pro Rata Senior Debt Convertible Notes Amount of the Senior Debt Claim.

(f)     <u>Exit Financing (Super Priority Notes)</u>. Subject to the terms and conditions set forth in the Super Priority Notes Commitment Agreement, on or before the Plan Effective Date, the Super Priority Notes Financing Parties shall purchase the Super Priority Notes for $14 million.

(g)     <u>Settlement with Holders of LC Facility Claims</u>.

(1)     Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, including the Settlement Take-back SSNs, the Holders of the LC Facility Claims have agreed to forfeit, and shall be deemed to have forfeited, any right to receive Convertible Notes in exchange for the issuance by the Reorganized ILAP of the Settlement Take-back SSNs to such Holders on the Plan Effective Date.

(2)     The foregoing settlement is conditioned upon the Holders of the LC Facility Claims (x) voting to support the Plan, and (y) being party to the RSA as of the Plan Effective Date. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement with the Holders of the LC Facility Claims. For the avoidance of doubt, the agreement of the Holders of the LC Facility Claims to forfeit their right to receive Convertible Notes is conditioned upon the Bankruptcy Court's approval of the issuance by the Reorganized ILAP of the Settlement Take-back SSNs, in the amount set forth in the Plan, to such Holders on the Plan Effective Date.

(3)     If at any time prior to the Plan Effective Date, the Holders of the LC Facility Claims (x) vote to reject the Plan, (y) withdraw their vote to accept the Plan, or (z) are not party to the RSA (whether by way of withdrawing from the RSA or pursuant to a termination of the RSA or the Second Amendment, in each case pursuant to the terms thereof), then the settlement with the Holders of the LC Facility Claims shall be considered null and void *ab initio* in all respects, and all applicable parties in interest shall go back to the status quo ante as if the Holders of the LC Facility Claims did not execute the RSA; <u>provided</u>, <u>further</u> nothing contained in the Plan or Disclosure Statement shall (a) prejudice in any manner the rights of any Debtor or any other Entity; or (b) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

4.5     **The New Notes & Substitute Consideration**

(a)     <u>Take-back SSNs</u>

On the Plan Effective Date, (i) the Reorganized ILAP shall be authorized to issue the Take-Back SSNs in the principal amount of $260 million (plus the principal amount of the Settlement Take-back SSNs pursuant to the LC Facility Settlement if such settlement is

consummated) pursuant to the Super Priority/Take-back SSN Indenture for distributions to Qualified Holders pursuant to Section 6.4 and to the Selling Agent pursuant to Section 4.5(f); (ii) each of the Reorganized Guarantor Debtors and the New Issuer shall guarantee the obligations of the Take-back SSNs under the Super Priority/Take-back SSN Indenture; (iii) each of the Reorganized Debtors, LAP Chile, and New Issuer, as appropriate, shall pledge the collateral as set forth in the Super Priority/Take-back SSN Indenture and/or the applicable New Notes Documents; and (iv) in each case, the Reorganized Debtors and the New Issuer shall be authorized to do so without further act or action under applicable law, regulation, order or rule, and without further corporate proceedings or action.

(b)      Convertible Notes

On the Plan Effective Date, (i) the New Issuer shall issue the Convertible Notes in the principal amount of $173,345,973 (*less*, if the LC Facility Settlement is consummated, the Pro Rata Senior Debt Convertible Amount of the Holders of the LC Facility Claims, which distribution the Holders of the LC Facility Claims have agreed to forgo if the LC Facility Settlement is consummated) pursuant to the Convertible Notes Indenture for distributions to Qualified Holders pursuant to Section 6.4 and to the Selling Agent pursuant to Section 4.5(f); (ii) each of the Reorganized Debtors shall guarantee the obligations under the Convertibles Notes Indenture, (iii) LAP Chile shall, with the receipt of the New Issuer Equity as set forth in Section 3.2(f) hereof, pledge or charge the New Issuer Equity as set forth in the Convertible Notes Indenture and/or the applicable New Notes Documents, and (iv) in each case, the Reorganized Debtors, LAP Chile and the New Issuer shall be authorized to do so without further act or action under applicable law, regulation, order or rule, and without further corporate proceedings or action.

(c)      Super Priority Notes

On the Plan Effective Date, (i) Reorganized ILAP shall be authorized to issue the Super Priority Notes in the principal amount of $14 million pursuant to the Super Priority/Take-back SSN Indenture to the Super Priority/Take-back SSN Indenture Trustee for subsequent distributions by the Super Priority/Take-back SSN Indenture Trustee thereunder to the Super Priority Notes Financing Parties, and pay any fees and expense due and owing under the Super Priority Notes Commitment Agreement, (ii) each of the Reorganized Guarantor Debtors and the New Issuer shall guarantee the obligations of the Super Priority Notes under the Super Priority/Take-back SSN Indenture, (iii) each of the Reorganized Debtors, LAP Chile, and New Issuer, as appropriate, shall pledge the collateral as set forth in the Super Priority/Take-back SSN Indenture and/or the applicable New Notes Documents, and (iv) in each case, the Reorganized Debtors and New Issuer shall be authorized to do so without further act or action under applicable law, regulation, order or rule, and without further corporate proceedings or action.

(d)      Priority; Collateral Matters for New Notes

The Take-back SSNs and the Super Priority Notes shall be secured by substantially the same collateral securing the obligations of the Existing Notes, provided, further, that the New Issuer shall guarantee the obligations of the Take-back SSNs and the Super Priority Notes and provide a pledge of 100% of its present and future interests in the Reorganized ILAP. The Prepetition Chilean Security Documents shall be fully amended and restated, when appropriate;

and upon such amendment and restatement shall be considered included in the definition of the New Notes Documents. For the avoidance of doubt, neither the Take-back SSNs nor Super Priority Notes shall be secured by any letters of credit issued by Citibank, N.A.

The Take-back SSNs, Convertible Notes and the Super Priority Notes shall constitute senior obligations of the Reorganized Debtors and the New Issuer, and will be equal in right of payment with each other and any other senior indebtedness of the Reorganized Debtors and the New Issuer on the Plan Effective Date; provided, however: (i) Mandatory Cash Sweeps will be used to redeem the Super Priority Notes first and, after the Super Priority Notes are paid in full, then to redeem the Take-back SSNs (the Convertible Notes shall not be redeemed pursuant to any Mandatory Cash Sweep); and (ii) upon a Company Sale, the Super Priority Notes will be senior in payment to the Take-back SSNs and the Convertible Notes.

(e)    Mandatory Cash Sweeps

The Super Priority/Take-back SSN Indenture shall provide that thirty (30) days following December 15, 2024, and semi-annually thereafter thirty (30) days following each of June 15 and December 15, there will be cash payments to holders of Super Priority Notes and Take-back SSNs in amounts equivalent to the lesser of (i) the Reorganized Debtors' Cash (excluding proceeds obtained from issuance of the Super Priority Notes) at the close of business on the immediately preceding interest payment date, in excess of $15 million and (ii) the total outstanding principal amount of the Take-back SSNs and Super Priority Notes as of each interest payment date (as further described in the Super Priority/Take-back SSN Indenture, the "Mandatory Cash Sweeps").

(f)    Substitute Consideration. The following Section 4.5(f) applies in the event that, on the Determination Date, the sum of all Non-Qualified Holders is greater than the Non-Qualified Threshold Amount.

(1)    All Take-back SSNs and Convertible Notes under the Plan that would have been issuable and deliverable to Non-Qualified Holders (collectively, the "Non-Qualified Holders' Notes", if they had been Qualified Holders, will be deposited with an agent (the "Selling Agent").

(2)    The Selling Agent shall offer the Non-Qualified Holders' Notes in one or more sale transactions within 180 days following the Determination Date (the "Sale Period"), pursuant to a selling agreement to be entered into between the Debtors and the Selling Agent (the "Selling Agent Agreement"). The consideration to be received by Non-Qualified Holders under the Selling Agent Agreement is referred to as the "Substitute Consideration." The price, terms and manner of sale will be on the best terms reasonably available at the time using a transparent open market process and shall be for Cash. The proceeds of any and all such sales (net of the costs of sale including the fees of any agent, broker, marketing agent, placement agent or underwriter appointed in relation to the sale and any taxes and provisions for taxes on sale) shall be distributed, on a *pro rata* basis, to such Non-Qualified Holders at the end of the Sale Period (the "Net Cash Proceeds").

26

(3)     In the event that a sale of the Non-Qualified Holders' Notes is unable to be consummated within the Sale Period, there shall be no Substitute Consideration such that the Non-Qualified Holders' Notes shall be cancelled for no consideration. None of the Debtors, the Reorganized Debtors, the Consenting Creditors and the Selling Agent shall have any liability for any loss or alleged loss arising from such sale or a failure to procure any purchaser for any Non-Qualified Holders' Notes.

(4)     For the avoidance of doubt, any Non-Qualified Holders who would have been entitled to receive any New Notes under the Plan if they had been Qualified Holders shall only be entitled to receive the Substitute Consideration in respect thereof.

## 4.6    **Issuance of the New Notes and New Equity**

On the Plan Effective Date, the guarantees, pledges, Liens and other security interests, as applicable, granted pursuant to the New Notes Documents (whether prior to or on the Plan Effective Date) shall be deemed to have been granted in good faith as an inducement to the Holders of Allowed Senior Debt Claims and the Super Priority Notes Financing Parties to agree to the treatment contemplated by the Plan and (a) shall be deemed to be approved, (b) shall be legal, binding, and creating or continuing fully perfected and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Notes Documents, (c) shall be deemed perfected on the earlier of the date originally perfected and the Plan Effective Date, subject only to such Liens and security interests as may be permitted under the New Notes Documents, as the case may be, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law, including any applicable law of the Republic of Chile.

The Reorganized Debtors, the New Issuer, and LAP Chile as the holder of the New Issuer Equity granting such Liens and the persons and entities granted such Liens and security interests are authorized and directed to make all filings and recordings, and to obtain all governmental approvals and consents necessary to continue as perfected or to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign), on and after the Plan Effective Date that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection or continuance of perfection shall occur automatically by virtue of the entry of the Confirmation Order and no such filings, recordings, approvals, and consents shall be necessary), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

## 4.7    **Sales Facilitation Agreement; Company Sale**

On the Plan Effective Date, Reorganized ILAP and the New Issuer are each authorized and directed, without further act or action under applicable law, regulation, order or rule, and without further corporate proceedings or action, to enter into the sales facilitation agreement included in the Plan Supplement (the "Sales Facilitation Agreement") with LAP Chile and the Trustee,

27

pursuant to which the parties will agree to make their best efforts to sell 100% of the equity interests in the Reorganized ILAP (or substantially all of its assets, inclusive of a concurrent sale of 100% of the equity interests of San Juan and Norvind) by December 31, 2025, subject to the terms and conditions set forth therein (the "Company Sale").

## 4.8    **Preservation of Rights of Action**

Other than the Causes of Action expressly waived, relinquished, exculpated, released, compromised, or settled in Section 8.3, Section 8.4, and Section 8.5 of the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Debtors (pre-Plan Effective Date) and the Reorganized Debtors (post-Plan Effective Date) shall retain and may enforce all rights to commence and pursue any and all Causes of Action of, or that may be claimed or prosecuted by, the Debtors, whether arising before or after the Petition Date, and the rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Plan Effective Date. **No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them. The Debtors (pre-Plan Effective Date) and the Reorganized Debtors (post-Plan Effective Date) expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in Section 8.3, Section 8.4, and Section 8.5 of the Plan, the Debtors and Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel, judicial, equitable, or otherwise, or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Debtors (pre-Plan Effective Date) and Reorganized Debtors (post-Plan Effective Date) reserve and shall retain such Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any such Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action on and after the Plan Effective Date. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court on and after the Plan Effective Date.

## 4.9    **Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided herein, or in any agreement, instrument, or other document incorporated in the Plan, on the Plan Effective Date, all property in each Estate and all Causes of Action not released pursuant to Section 8.3, Section 8.4 and Section 8.5 hereof (including all Causes of Action retained by the Debtors and all insurance policies), shall automatically vest in each respective Reorganized Debtor as of the Plan Effective Date, free and clear of all Liens,

Claims, charges, setoff, recoupment, or other encumbrances (other than, for the avoidance of doubt, those Liens and security interests granted under the New Notes Documents pursuant to Section 4.6). On and after the Plan Effective Date, except as otherwise provided in the Plan or in the New Notes Documents, or any other agreement or document related thereto or entered into in connection therewith, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

4.10    **Discharge from Notes, Instruments, Certificates, and Other Documents**

(a)    On the Plan Effective Date, other than any securities, instruments, certificates, or other documents governing or evidencing obligations or interests that will remain Unimpaired under the Plan and subject to Section 8.9 of the Plan, the obligations of the Debtors, Reorganized Debtors, the LC Facility Agent, and/or the Existing Indenture Trustee under or in any way related to all notes, instruments, certificates, agreements (including the Existing Indenture and the LC Facility Agreement), and other documents evidencing Claims or Interests shall be discharged; provided, further, however, notwithstanding Confirmation or the occurrence of the Plan Effective Date, such discharge shall not affect (i) any such indenture or agreement that governs the rights of the Holder of a Claim solely for purposes of enabling Holders of Allowed Claims to receive distributions under the Plan as provided herein; (ii) any such notes or other documents entered into related to the incurrence of debt in the ordinary course of business after the Petition Date; (iii) preserve any rights of the Existing Indenture Trustee or LC Facility Agent to payment of fees and expenses from or on any money or property to be distributed in respect of the Existing Notes Claims or LC Facility Claims, respectively, solely to the extent provided in the Plan, including permitting the Existing Indenture Trustee or LC Facility Agent to maintain, enforce, and exercise a charging lien against such distributions; (iv) preserve any rights of the Existing Indenture Trustee or LC Facility Agent to indemnification obligations under the Existing Notes Indenture or LC Facility Agreement, respectively; and (v) the transfer of the Senior Debt Claims to, and the vesting of the Senior Debt Claims with, the Reorganized ILAP and New Issuer pursuant to Section 4.4 hereof; provided further that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any expense or liability to the Reorganized Debtors, except to the extent set forth in or provided for under this Plan.

(b)    As of the Plan Effective Date, all letters of credit issued by Citibank, N.A. under the LC Facility Agreement shall be deemed terminated. Citibank, N.A. shall have no obligations in any capacity under such letters of credit, and any draw request made under any such letters of credit at any time on or following the Petition Date shall be deemed null and void *ab initio*. As soon as reasonably practicable following Confirmation, Citibank, N.A. shall receive from the beneficiary under each letter of credit issued by Citibank, N.A. under the LC Facility Agreement a duly executed consent to termination certificate of such letters of credit in the form attached to each such letter of credit. The Existing Indenture Trustee, the LC Facility Agent, Consenting Creditors and any other Holder of an Allowed Senior Debt Claim shall take such actions as may

be reasonably requested by the Debtors, the Reorganized Debtors, or Citibank, N.A. to promptly give effect to the foregoing provisions.

### 4.11    **Execution of Plan Documents**

Except as otherwise provided herein, on the Plan Effective Date, or as soon as practicable thereafter, the Reorganized Debtors shall execute all instruments and other documents required to be executed under the Plan.

### 4.12    **Corporate Action**

The Debtors or the Reorganized Debtors, as applicable, and the New Issuer are each authorized to take all further corporate actions necessary to effectuate the RSA and the Plan and authorize each of the matters provided for by the Plan involving the corporate structure of the Debtors or corporate or related actions to be taken by or required of the Reorganized Debtors and the New Issuer, whether taken prior to or as of the Plan Effective Date, including the Restructuring Transactions and the issuance of the New Notes.

### 4.13    **New Corporate Governance Documents**

To the extent required by applicable law, on or immediately before the Plan Effective Date, the Reorganized Debtors will file their respective New Corporate Governance Documents with the applicable authorities in their respective provinces or countries of incorporation or formation in accordance with applicable law. The New Corporate Governance Documents will be consistent with the provisions of the Plan and the Bankruptcy Code.

### 4.14    **Effectuating Documents; Further Transactions**

On and after the Plan Effective Date, the Reorganized Debtors and the New Issuer, and the directors (and, if applicable, officers and other members of the boards (or similar governing body) thereof) are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

### 4.15    **Section 1146(a) Exemption**

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of assets or interests under the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

4.16    **Managers, Directors and Officers**

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, and except as may otherwise be disclosed in the Disclosure Statement, on the Plan Effective Date, the directors and officers who are identified in the Plan Supplement shall serve as the initial board of directors and officers of the New Issuer and the Reorganized Debtors.

On the Plan Effective Date, the Independent Director shall be appointed to the boards of the Reorganized Debtors and the New Issuer. Reorganized ILAP shall pay the Independent Director compensation reasonably agreed by the Required Consenting Creditors. Reorganized ILAP shall procure customary D&O insurance for the benefit of the Independent Director in amounts and with coverages as are customary for directors of private companies in Chile as reasonably agreed by the Required Consenting Creditors.

The Reorganized Debtors and the New Issuer shall not, among other things, (i) remove the Independent Director (except if, at any point after his or her designation, he or she fails to meet the eligibility requirements thereunder) or (ii) reduce the compensation payable to, or terminate or reduce the level of D&O insurance coverage for the benefit of, any Independent Director, in each case without the (x) with respect to the Independent Director of the Reorganized Debtors, the consent of the Super Priority/Take-back SSN Indenture Trustee (acting at the direction of the holders of the majority of the outstanding principal amount of the Take-back SSNs) and (y) with respect to the New Issuer, with the consent of the Convertible Notes Indenture Trustee (acting at the direction of the holders of the majority of the outstanding principal amount of the Convertible Notes)

Pursuant to section 1129(a)(5), the Debtors will disclose in the Plan Supplement the identity and affiliations of any Person proposed to serve on a Reorganized Debtor's board of directors and, to the extent such Person is an insider, the nature of any compensation for such Person.

Corporate governance documents for New Issuer and the Reorganized Debtors, whether or not included in the Plan Supplement, shall:  (a) be consistent with section 1123(a)(6) of the Bankruptcy Code and (b) otherwise be acceptable to the Reorganized Debtors, the ILAP Partners, and the Required Consenting Creditors.

## ARTICLE V

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

5.1    **Assumption of Executory Contracts and Unexpired Leases**

On the Plan Effective Date, except as otherwise provided herein or pursuant to the Confirmation Order, Executory Contracts (including for the avoidance of doubt the RSA) and Unexpired Leases shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Plan Effective Date under section 365 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease:  (a) was previously assumed or rejected; (b) was previously expired or terminated pursuant to its own terms; (c) is the

31

subject of a motion to assume or assume and assign filed on or before the Confirmation Date; or (d) is designated specifically, or by category, as an Executory Contract or Unexpired Lease on the Rejection Schedule. The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, assignments, and rejections.

Except as otherwise expressly provided herein or agreed to by the Debtor(s) and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated hereunder. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

With respect to all Executory Contracts and Unexpired Leases that are assumed, any provision in any such agreement that:

(i) prohibits, restricts, or conditions the assumption and/or assignment, or purports to prohibit, restrict, or condition the assumption and/or assignment (including any "change of control" provision) of such agreement or allows any party to such agreement to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assumption and/or assignment of such agreement constitutes an unenforceable anti-assignment and/or discrimination provision and is void and of no force an effect; and

(ii) provides for modification, breach, default, event of default, or termination, or deemed modification, breach, default, event of default, or termination shall be deemed cured and such Executory Contracts and Unexpired Leases shall be in full force and effect as of the Plan Effective Date as if such modification, breach, default, event of default, or termination never existed, including, but not limited to, on account of or related to any of the following: (A) the commencement or continuation of the Chapter 11 Cases, (B) the insolvency or financial condition of any of the Debtors at any time, (C) the Debtors' assumption and/or assignment of such agreement, (D) a change of control or similar occurrence, or (E) the consummation of this Plan, the Plan Documents, or the Restructuring Transactions; provided, further, that, such provisions shall be deemed modified so as to preclude any non-Debtor party thereto from any right to prohibit, restrict, or condition assumption and/or assignment, to modify, terminate, or declare a breach or default under such agreement, and to preclude exercise of any other breach- or default-related rights or remedies with respect thereto, which shall also preclude any non-Debtor party right to terminate or recapture such agreement, impose any penalty thereunder, condition any renewal or extension thereof, impose any rent acceleration or assignment fee, or increase or otherwise impose any other fees or other charges in connection therewith.

Without limiting the effect of the preceding paragraph, all provisions referenced in the preceding paragraph constitute unenforceable discriminatory or anti-assignment provisions that

are void and of no force and effect pursuant to sections 365(b), 365(e), 365(f), and 525 of the Bankruptcy Code. The Consummation of the Plan and the implementation of the Restructuring Transactions is not intended to, and shall not, constitute a "change of control" or "change in control" under any lease, contract, or agreement which a Debtor is a party.

5.2    **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**

The Debtors or the Reorganized Debtors, as applicable, shall pay Cures, if any, on the Plan Effective Date or as soon as reasonably practicable thereafter, with the amount and timing of payment of any such Cure dictated by the underlying agreement and the Debtors' ordinary course of business. The Reorganized Debtors also may settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the ordinary course amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be filed with the Bankruptcy Court on or before the deadline set by the Bankruptcy Court for objections to confirmation of the Plan; provided, however, that nothing herein shall prevent the Reorganized Debtors from paying any Cure Claim despite the failure of the relevant counterparty to file such request for payment of such Cure. **Any such request that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable, without the need for any objection or any further notice to or action, order, or approval of the Bankruptcy Court**. Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure in the Debtors' ordinary course of business.

In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be filed with the Bankruptcy Court on or before the deadline set by the Bankruptcy Court for objections to confirmation of the Plan. Any such objection will be scheduled to be heard by the Bankruptcy Court at the earlier of the Confirmation Hearing or the Debtors' or the Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely filed. **Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.**

If there is any dispute regarding any Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as reasonably practicable after the Bankruptcy Court's adjudication of such dispute and the entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and full payment of any applicable Cure pursuant to this Section 5.2, in the amount and at the time dictated above, shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the Plan Effective Date

33

of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this <u>Section 5.2</u>, in the amount and at the time dictated by the Debtors' ordinary course of business, shall be deemed disallowed and expunged as of the Plan Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

5.3    <u>Pre-Existing Payment and Other Obligations</u>

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors or Reorganized Debtors, as applicable, under such Executory Contract or Unexpired Lease. In particular, notwithstanding any applicable non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide:  (a) payment to the contracting Debtors or Reorganized Debtors, as applicable, of outstanding and future amounts owing thereto under or in connection with rejected Executory Contracts or Unexpired Leases or (b) warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or Reorganized Debtors, as applicable, from counterparties to rejected Executory Contracts.

5.4    <u>Rejection Damages Claims and Objections to Rejections</u>

In the event that the rejection of an Executory Contract or Unexpired Lease by any of the Debtors results in damages to the other party or parties to such contract or lease, a Claim for such damages shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors or their respective properties or interests in property as agents, successors, or assigns, unless a Proof of Claim is filed with the Bankruptcy Court and served upon counsel for the Debtors or the Reorganized Debtors **no later than thirty (30) days after the Plan Effective Date**. Any such Claims, to the extent Allowed, shall be classified as General Unsecured Claims and shall be treated in accordance with <u>Article III</u> of this Plan.

5.5    <u>Contracts and Leases Entered Into After the Petition Date</u>

Contracts and leases entered into after the Petition Date by any Debtor, and any Executory Contracts and Unexpired Leases assumed by any Debtor, may be performed by the applicable Reorganized Debtor in the ordinary course of business.

5.6    <u>Reservation of Rights</u>

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have forty five (45) days following entry of a Final Order resolving such dispute to alter their treatment to assume or reject such contract or lease, which revised treatment shall be effective as of the Plan Effective Date.

34

## ARTICLE VI

## PROVISIONS GOVERNING DISTRIBUTIONS

6.1    **Distributions on Account of Claims Allowed as of the Plan Effective Date**

Except as otherwise provided in the Plan, a Final Order, or as otherwise agreed to by the Debtors, the New Issuer or the Reorganized Debtors (as the case may be) and the Holder of the applicable Allowed Claim, on the Distribution Date, the Reorganized Debtors and New Issuer, as applicable, shall make initial distributions under the Plan on account of Claims Allowed on or before the Plan Effective Date, subject to the Debtors' and Reorganized Debtors' right to object to Claims; provided, however, that (a) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Plan Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, subject to all of the Debtors' and Reorganized Debtors' legal and equitable defenses to or setoffs or recoupments against any such Administrative Claim, (b) Allowed Priority Tax Claims shall be paid in accordance with Section 2.3 and to the extent any Allowed Priority Tax Claim is not due and owing on the Plan Effective Date, such Claim may be paid in full in Cash in accordance with the terms of any agreement between the Debtors or the Reorganized Debtors (as the case may be) and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business, and (c) Allowed General Unsecured Claims with respect to liabilities incurred by the Debtors in the ordinary course of business prior to the filing of the Chapter 11 Cases shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, subject to all of the Debtors' and Reorganized Debtors' legal and equitable defenses to or setoffs or recoupments against any such General Unsecured Claim.

6.2    **Special Rules for Distributions to Holders of Disputed Claims**

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties:  (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order or the Claim has been Allowed or expunged. Any dividends or other distributions arising from property distributed to Holders of Allowed Claims in a Class and paid to such Holders under the Plan shall be paid also, in the applicable amounts, to any Holder of a Disputed Claim, as applicable, in such Class that becomes an Allowed Claim after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims in such Class.

6.3    **Disbursing Agent**

Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Disbursing Agent on or as soon as practicable after the Plan Effective Date. On the Plan

35

Effective Date, the Reorganized Debtors shall be the Disbursing Agent, which agent may be changed by the Reorganized Debtors at any time. To the extent the Disbursing Agent is one or more of the Reorganized Debtors or the New Issuer, the Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Plan Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent may be paid in Cash upon invoice by the Reorganized Debtors.

### 6.4    Distributions of Take-back SSNs and Convertible Notes to Holders of Senior Debt Claims

(a)    Take-back SSNs and Convertible Notes are being issued only to Qualified Holders and, if the total number of Non-Qualified Holders is equal to or less than the Non-Qualified Threshold Amount, the Non-Qualified Holders. A "Qualified Holder" is a Holder of an Allowed Senior Debt Claim who provides either one of the following two certifications (the "Certification"):

(1)    A certification that it is located in the United States, and is either (A) a "Qualified Institutional Buyer" as such term is defined in Rule 144A under the Securities Act or (B) an "accredited investor" as defined in Regulation D under the Securities Act, and, in either case, acknowledges that it will be receiving "restricted securities" within the meaning of Rule 144 under the Securities Act; or

(2)    A certification that it is not a "U.S. Person" as defined in Rule 902(k) under the Securities Act and is qualified to participate in acquiring the Take-back SSNs and Convertible Notes, in accordance with the laws of its jurisdiction of location or residence.

(b)    Deadline to Submit Certifications. All Holders of Senior Debt Claims must provide their respective Certification by no later than the Determination Date; provided, however, that Citibank, N.A. is deemed a Qualified Holder under the Plan, and notwithstanding anything to the contrary in the Plan or the Disclosure Statement, Citibank, N.A. shall not be required to provide a Certification to receive Take-back SSNs (or Convertible Notes, if applicable) as a Holder of LC Facility Claims. **Any Holder of a Senior Debt Claim that fails to submit the Certification by the Determination Date shall have forfeited its rights to receive distribution of Take-back**

36

**SSNs and Convertible Notes pursuant to the Plan on account of its Senior Debt Claims, and shall not participate in any distribution under the Plan. Any property (including the Take-back SSNs and Convertible Notes) in respect of such forfeited Senior Debt Claims shall revert to the Reorganized Debtors**. On or promptly after the Determination Date, the Reorganized Debtors shall calculate the total number of Non-Qualified Holders.

    (c)    <u>Non-Qualified Holders</u>.

        (1)    Any Holder of an Allowed Senior Debt Claim that is not a Qualified Holder shall be a "<u>Non-Qualified Holder</u>."

        (2)    If on the Determination Date, the number of Non-Qualified Holders is equal to or less than Non-Qualified Threshold Amount, then the Non-Qualified Holders shall receive the Take-back SSNs and the Convertible Notes, <u>provided</u>, all such other information required to be submitted by any such Non-Qualified Holder was timely submitted.

        (3)    If on the Determination Date, the number of Non-Qualified Holders is greater than the Non-Qualified Threshold Amount, then all Non-Qualified Holders shall not be entitled to receive any Take-back SSNs or Convertible Notes, and shall only be entitled the Substitute Consideration in respect thereof. The Substitute Consideration for Non-Qualified Holders shall be distributed by the Selling Agent after the Sale Period, as described in <u>Section 4.5(f)</u> of the Plan.

    (d)    <u>LC Facility Claims</u>.

        (1)    As a condition to participation under the Plan, each Holder of an LC Facility Claim that is a Qualified Holder is required to review and complete the Distribution Form and provide their Deposit/Withdrawal at Custodian ("<u>DWAC</u>") information. **Any Holder of an LC Facility Claim who fails to submit a completed Distribution Form to the Disbursing Agent together with any documents required in connection therewith within one hundred and eighty (180) days after the Plan Effective Date shall have forfeited its rights to receive distribution of Take-back SSNs and Convertible Notes pursuant to the Plan on account of its LC Facility Claims, and shall not participate in any distribution under the Plan. Any property (including the Take-back SSNs and Convertible Notes) in respect of such forfeited Senior Debt Claims shall revert to the Reorganized Debtors.**

        (2)    All Distributions to Holders of Allowed LC Facility Claims by the Disbursing Agent shall be deemed completed when made to the LC Facility Agent, which shall be deemed to be the Holder of all Allowed LC Facility Claims for purposes of Distributions to be made hereunder. The LC Facility Agent shall thereafter hold or direct such Distributions for the benefit of the Holders of Allowed LC Facility Claims. On the Plan Effective Date or soon

37

as practicable thereafter in accordance with the requirements set forth in this <u>Article VI</u>, the LC Facility Agent shall arrange to deliver such Take-back SSNs, including the Settlement Take-back SSNS if the LC Facility Settlement is consummated, and the Convertible Notes if the LC Facility Settlement is not consummated, via DWAC Deposit to or on behalf of such Holders of Allowed LC Facility Claims.

(3)     Upon delivery to the LC Facility Agent by the Disbursing Agent of the Take-back SSNs, including the Settlement Take-back SSNS if the LC Facility Settlement is consummated, and the Convertible Notes if the LC Facility Settlement is not consummated, the Reorganized Debtors shall be released of all liability with respect to the holding and/or delivery of such distributions to the Holders of LC Facility Claims.

(e)     <u>Existing Notes Claims</u>.

(1)     The Distribution Record Date shall not apply to publicly traded securities, which shall receive distributions in accordance with the Plan and the applicable procedures of DTC.

(2)     With respect to a Holder of an Allowed Existing Note Claim, to receive its entitlement pursuant to the Plan, each such Holder is required to review and provide the necessary certification, and take one of the following actions as applicable to verify its position in the Existing Notes:

A       prior to the Plan Effective Date, through the electronic delivery by such Holder's Nominee of the Holder's certification and Existing Notes position via ATOP by the applicable deadline[2]; or

B       after the Plan Effective Date and through and including the Determination Date, complete and return to the Disbursing Agent a duly-completed Distribution Form together with the required certifications in connection therewith.

(3)     The Debtors, through its Disbursing Agent, shall use reasonable best efforts to announce the distribution procedures to enable the submission into ATOP or transfer via DWAC Withdrawal of the Existing Notes prior to the Plan Effective Date to facilitate the distribution of the Take-back SSNs and Convertible Notes.

(4)     On the Plan Effective Date, or as soon as reasonably practicable thereafter, the Debtors will cause to be distributed, in accordance with the Plan and DTC's customary procedures (which may be through ATOP or via DWAC Deposit), the Take-back SSNs and Convertible Notes corresponding to each

---

[2]     If ATOP is not utilized then Existing Notes may be submitted by the Nominee via DWAC Withdrawal with an accompanying Distribution Form containing the necessary certification.

Holder of an Existing Notes Claim that has completed the required procedures.

(5) All Existing Notes shall be cancelled as of the Plan Effective Date, and DTC shall be requested to (i) remove all Existing Notes from its platform, and (ii) shall be requested to provide records to the Debtors (on customary terms) for any positions not previously submitted through ATOP or via DWAC Deposit.

(6) **Any Holder of the Existing Notes who fails to (a) surrender the applicable Existing Notes prior to the Plan Effective Date through ATOP or via DWAC Withdrawal, including any required certification with respect to such holder's eligibility status, or (b) following the Plan Effective Date, verify its position in the applicable Existing Notes on the Distribution Form, which form must include (I) the required certification by the Holder with respect to the holder's eligibility status and (II) the certification of such holder's Nominee to verify such holder's untendered position in the Existing Notes, to the Disbursing Agent together with any documents required in connection therewith, within one hundred and eighty (180) days after the Plan Effective Date shall have forfeited its rights to receive distribution of Take-back SSNs and Convertible Notes pursuant to the Plan on account of its Existing Notes Claims, and shall not participate in any distribution under the Plan. Any property (including the Take-back SSNs and Convertible Notes) in respect of such forfeited Senior Debt Claims shall revert to the Reorganized Debtors.**

(7) Upon delivery by the Disbursing Agent of the Take-back SSNs and Convertible Notes to DTC pursuant to this <u>Section 6.4</u>, the Reorganized Debtors shall be released of all liability with respect to the holding and/or delivery of such distributions to the Holders of Existing Notes Claims.

(8) <u>Exchange of Notes</u>:

A    The Disbursing Agent will work with DTC to establish the distribution event relating to the Existing Notes on DTC's ATOP system.[3] A beneficial owner of Existing Notes that are held by or registered in the name of a broker, dealer, commercial bank, trust company or other nominee or custodian (each, a "<u>Nominee</u>") is urged to contact such Nominee promptly if such beneficial owner wishes to participate. Only Nominees that are direct participants of DTC can effectuate an electronic delivery of the Existing Notes on

---

[3]    In the event DTC is unwilling or unable to utilize the ATOP system to facilitate the distribution event or the ATOP system is otherwise not utilized, the Debtors reserve the right to require a Nominee to certify each Holder's position in the Existing Notes by including its DTC participant number and a medallion guarantee stamp on the Distribution Form, validating the Holder's position in the Existing Notes.

a holder's behalf. Beneficial holders of the Existing Notes, whether by delivery through ATOP or DWAC Withdrawal, must allow sufficient time for its Nominee to effectuate the electronic delivery of its Existing Notes prior to any deadline.

B        At the holder's instruction, a Nominee will electronically deliver the holder's Existing Notes, whether by ATOP or DWAC Withdrawal. The ATOP process will include an express acknowledgement that the underlying holder has reviewed and agreed to be bound by the certifications made through ATOP and that the Debtors may enforce such certifications against such holder.  If the DWAC Withdrawal process is utilized, the certifications must be included in the related Distribution Form.

C        **ALL QUESTIONS AS TO THE VALIDITY, FORM, ELIGIBILITY (INCLUDING TIME OF RECEIPT), AND ACCEPTANCE OF NOTES THROUGH ATOP OR DWAC WITHDRAWAL WILL BE RESOLVED BY THE REORGANIZED DEBTORS OR NEW ISSUER, WHOSE DETERMINATION WILL BE FINAL AND BINDING, SUBJECT ONLY TO REVIEW BY THE BANKRUPTCY COURT UPON APPLICATION WITH DUE NOTICE TO ANY AFFECTED PARTIES IN INTEREST. THE DEBTORS RESERVE THE RIGHT TO REJECT ANY AND ALL SUBMISSIONS THROUGH ATOP AND TENDERED EXISTING NOTES NOT IN PROPER FORM, OR SUBMISSIONS THROUGH ATOP AND TENDERED EXISTING NOTES THE DEBTORS' ACCEPTANCE OF WHICH WOULD, IN THE OPINION OF THE DEBTORS OR THEIR COUNSEL, BE UNLAWFUL.**

6.5      **Distribution Form**

To the extent a Holder of a Senior Debt Claim is required to deliver a Distribution Form to the Disbursing Agent, the Nominee must also provide any required certifications, including, in the event such Distribution Form is submitted following the Plan Effective Date, the certification of the Holder's untendered position in the Existing Notes.

6.6      **Delivery of Distributions and Undeliverable or Unclaimed Distributions**

(a)      **Delivery of Distributions**

Except as otherwise provided in the Plan (including in <u>Section 4.5(f)</u> and <u>Section 6.4</u> above), distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date by the Disbursing Agent, as appropriate:  (a) as indicated on the applicable register or in the Debtors' records as of the date of any such distribution; (b) to the signatory set forth on any of the Proofs of Claim filed by such Holder or other representative

identified therein (or at the last known addresses of such Holder if no Proof of Claim is filed or if the Debtors have not been notified in writing of a change of address); (c) any counsel that has appeared in the Chapter 11 Cases on a Holder's behalf; or (d) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent, as appropriate, after the date of any related Proof of Claim. The Debtors shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date, provided, however, that distributions on account of the Senior Debt Claims shall be made in accordance with Section 4.5(f) and Section 6.4 above.

Subject to this Article VI, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan. The Debtors, the Reorganized Debtors, the New Issuer and the Disbursing Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for its respective fraud, gross negligence, or willful misconduct.

(b)    **Minimum; *De Minimis* Distributions**

Notwithstanding anything to the contrary contained in the Plan, the Disbursing Agent shall not be required to distribute Cash or other property to the Holder of any Allowed Claim if the amount of Cash or other property to be distributed on account of such Allowed Claim is less than $50. Any Holder of an Allowed Claim on account of which the amount of Cash or other property to be distributed is less than such amount shall have such Claim discharged and shall be forever barred from asserting such Claim against the Debtors, the Reorganized Debtors, the New Issuer or their respective property. Any Cash or other property not distributed pursuant to this provision shall be the property of the Reorganized Debtors.

(c)    **Compliance Matters**

In connection with the Plan, to the extent applicable, the Reorganized Debtors, the New Issuer or the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors, the New Issuer or the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors and New Issuer reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances. All Persons holding Claims shall be required to provide any information necessary to effect information reporting and the withholding of such taxes. Notwithstanding any other provision of this Plan to the contrary, (a) each Holder of an Allowed Claim shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding and other tax obligations, on account of such distribution, and (b) no distribution shall be made to or on behalf of such Holder pursuant to the

41

Plan unless and until such Holder has made arrangements satisfactory to the Reorganized Debtors or the New Issuer for the payment and satisfaction of such tax obligations.

(d)    **Cash Payments**

Except as otherwise set forth in this Section 6.6(d), distributions of Cash under the Plan shall be made by the Disbursing Agent on behalf of the applicable Debtor (or Debtors or Reorganized Debtors) in U.S. dollars. At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements. Cash payments to creditors outside of the United States of America may be made, at the option of the Disbursing Agent, in such currency and by such means as are necessary or customary in a particular foreign jurisdiction.

(e)    **Undeliverable and Unclaimed Distributions**

(1)    *Undeliverable Distributions.* If any distribution to a Holder of an Allowed Claim is returned to the Reorganized Debtors, the New Issuer or the Disbursing Agent as undeliverable or is otherwise unclaimed, no further distributions shall be made to such Holder unless and until the Reorganized Debtors, the New Issuer or the Disbursing Agent are notified in writing of such Holder's then-current address or other necessary information for delivery pursuant to the time frame set forth herein. Subject to the succeeding sentence, the Reorganized Debtors, the New Issuer or the Disbursing Agent shall retain undeliverable distributions until such time as a distribution becomes deliverable. **Except as otherwise provided in Section 6.4, each Holder of an Allowed Claim whose distribution remains (a) undeliverable for one hundred and eighty (180) days after the distribution is returned as undeliverable or (b) otherwise has not been deposited, endorsed or negotiated within one hundred and eighty (180) days of the date of issuance shall have no claim to or interest in such distribution and shall be forever barred from receiving any distribution under the Plan. Nothing contained in this Plan shall require the Debtors, the Reorganized Debtors, the New Issuer or the Disbursing Agent to attempt to locate any Holder of an Allowed Claim**.

(2)    *Reversion.* Any distribution under the Plan that is an Unclaimed Distribution for a period of one hundred and eighty (180) days after distribution or is otherwise unclaimed or undelivered as set forth in Section 6.4 and/or Section 6.6(e)(1) above shall, in each case, be deemed unclaimed property under section 347(b) of the Bankruptcy Code, and such Unclaimed Distribution shall revest in the applicable Reorganized Debtor or the New Issuer, as applicable. Upon such revesting, the Claim or Interest of any Holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable foreign, federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.

6.7     **Exemption from Registration Requirements; Restriction on Certain Holders**

The offer, sale, issuance, and distribution under the Plan of the New Notes and New Equity Interests will, in each case, be exempt from registration under the Securities Act and any other applicable U.S. state or local law requiring registration prior to offering pursuant to Section 4(a)(2) of the Securities Act or Regulation D or Regulation S thereunder and section 1145 of the Bankruptcy Code, as applicable, and the indentures governing the New Notes shall be exempt from qualification under the Trust Indenture Act of 1939 pursuant to Section 304(b) thereof.

The Super Priority Notes, Take-back SSNs and the Convertible Notes are all being issued under the Plan in reliance on the exemption provided in Section 4(a)(2) of the Securities Act will be "restricted securities" under the Securities Act, and therefore will not be able to be resold absent an exemption under the Securities Act, which may be available under Rule 144 under the Securities Act, Rule 144A under the Securities Act, or Regulation S under the Securities Act, and further subject to any other applicable regulatory approval and any restrictions contained in the New Notes Documents.

The New Equity Interests issued under will be "restricted securities" under the Securities Act by the recipients thereof, pursuant to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in Section 2(a)(11) of the Securities Act and in compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the SEC, and any further restrictions contained in the New Corporate Governance Document (as applicable), and any other applicable regulatory approval.

**Parties are advised to consult with their own counsel as to the availability of the exemption provided by Rule 144, Rule 144A or Regulation S.**

All documents, agreements and instruments entered into and delivered on or as of the Plan Effective Date contemplated by or in furtherance of the Plan, including the New Notes Documents and any other agreement or document related thereto or entered into in connection therewith, shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity (other than as expressly required by such applicable agreement).

Notwithstanding anything to the contrary in the Plan, no Person (including, for the avoidance of doubt, (i) the Selling Agent, (ii) Holders of the Senior Debt Claims (including any Consenting Noteholder), (iii) DTC, and (iv) any transfer agent) may require a legal opinion by or on behalf of the Debtors, the Reorganized Debtors or the New Issuer regarding the validity of any transaction contemplated by the Plan, including, but not limited to, whether the issuance of the New Notes or the New Equity Interests is exempt from registration and/or eligible for book-entry, delivery, settlement, and depository services or validly issued, fully paid, and nonassessable.

6.8    **Claims Paid or Payable by Third Parties**

(a)    **Claims Paid by Third Parties**

A Claim shall be reduced in full, and such Claim shall be disallowed without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, a Reorganized Debtor or the New Issuer. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, a Reorganized Debtor or the New Issuer on account of such Claim, such Holder shall repay, return or deliver any distribution held by or transferred to the Holder to the applicable Reorganized Debtor to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount distributable in respect of such Claim as of the date of any such distribution under the Plan.

(b)    **Claims Payable by Insurance Carriers**

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction, or otherwise as agreed to by the Debtors or Reorganized Debtors), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)    **Applicability of Insurance Policies**

Except as otherwise expressly provided herein, distributions to Holders of Allowed Claims shall be in accordance with the provisions of an applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors, the Reorganized Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers. The Reorganized Debtors shall succeed to all of the Debtors' rights and defenses in respect of any insurance policy on the Plan Effective Date.

6.9    **Setoffs; Recoupments**

(a)    Except as to Senior Debt Claims held by Consenting Creditors, each Reorganized Debtor, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off or recoup against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any Claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Plan Effective Date (whether pursuant to the Plan or otherwise); provided, however,

44

that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action that such Reorganized Debtor may possess against such Holder.

(b)    In no event shall any Holder of a Claim be entitled to set off any Claim against any Claim, right, or Cause of Action of the Debtor or Reorganized Debtor, as applicable, unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise.

(c)    In no event shall any Holder of a Claim be entitled to recoup any Claim against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

6.10    **Allocation Between Principal and Accrued Interest**

Except as otherwise provided in the Plan and to the extent permitted by applicable law, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan for income tax purposes as allocated, first, to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to the interest accrued through and including the Plan Effective Date.

**ARTICLE VII**

**PROCEDURES FOR RESOLVING DISPUTED CLAIMS**

7.1    **Disputed Claims**

Notwithstanding section 502(a) of the Bankruptcy Code, and in light of the Unimpaired status of all General Unsecured Claims under the Plan, except as required by Article II, Section 5.4, and any other sections of the Plan that require filing Proofs of Claims, Holders of Claims need not file Proofs of Claim, and the Reorganized Debtors and the Holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Cases had not been commenced, except that (unless expressly waived pursuant to the Plan) the Allowed amount of such Claims shall be subject to the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable.

All Proofs of Claim filed in these Chapter 11 Cases, except those required by Article II and Section 5.4, shall not be considered Allowed for any purposes under the Plan and without further action by the Debtors. Upon the Plan Effective Date, all Proofs of Claim filed against the Debtors, regardless of the time of filing, and including Claims filed after the Plan Effective Date, shall be deemed withdrawn and expunged, other than as provided below, and such creditor that files a Proof

45

of Claim with the Bankruptcy Court retains any right it may have to pursue remedies in a forum other than the Bankruptcy Court in accordance with applicable law, and the Debtors and Reorganized Debtors shall retain all rights to assert all claims, legal and equitable defenses, and setoffs or recoupments with respect to all such Claims. Notwithstanding anything in this Section 7.1, the Debtors or the Reorganized Debtors may settle and/or Allow (a) all Claims against the Debtors that result from the Debtors' rejection of an Executory Contract or Unexpired Lease, (b) disputes regarding the amount of any Cure pursuant to section 365 of the Bankruptcy Code, and (c) Claims that the Debtors or Reorganized Debtors seek to have determined by the Bankruptcy Court. From and after the Plan Effective Date, the Reorganized Debtors may satisfy, dispute, settle, or otherwise compromise any Claim without approval of the Bankruptcy Court.

## 7.2    **Resolution of Disputed Claims**

Except insofar as a Claim is Allowed under the Plan, the Debtors or the Reorganized Debtors, as applicable, shall be entitled to object to any Claim in the Bankruptcy Court. Any objections to Claims in the Bankruptcy Court shall be served and filed on or before the 120th day after the Plan Effective Date or by such later date as may be ordered by the Bankruptcy Court. Notwithstanding any authority to the contrary, any such objection to a Claim shall be deemed properly served on the Holder thereof if service is effected in any of the following manners: (a) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004; or (b) by first class mail, postage prepaid, on any counsel that has appeared on the Holder's behalf in the Chapter 11 Cases.

The Debtors and the Reorganized Debtors shall be authorized to, and shall resolve all Disputed Claims or Interests for which an objection is filed in the Bankruptcy Court by withdrawing or settling such objections thereto or by litigating to Final Order in the Bankruptcy Court the validity, nature and/or amount thereof. All Claims not objected to by the end of the later of the 120-day period set forth in the preceding paragraph (as may be extended) or otherwise by a deadline provided for by law or contract (as may be extended) shall be deemed Allowed. For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Plan Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Plan Effective Date with respect to any Disputed Claim, including the Causes of Action retained pursuant to Section 4.8, and the right to adjudicate such claim in any court of competent jurisdiction regardless of whether a Claim or Interest objection is filed in the Bankruptcy Court.

## 7.3    **Estimation of Claims**

The Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated in accordance with section 502(c) of the Bankruptcy Code for any reason, regardless of whether any Entity previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. If the Bankruptcy Court estimates any contingent or unliquidated Claim, the estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate amount of or distribution on such Claim or Interest.

7.4    **No Interest**

Unless otherwise expressly ordered by the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Plan Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

7.5    **No Distributions Pending Allowance**

Notwithstanding any other provision of this Plan to the contrary, no payments or distributions of any kind or nature shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order and the Disputed Claim has become an Allowed Claim. Distributions on account of Disputed Claims that become Allowed Claims shall be made pursuant to Section 6.2.

7.6    **Disallowance of Claims and Interests**

All Claims of any Entity from which property is sought by the Debtors under section 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if:  (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

**ARTICLE VIII**

**EFFECT OF CONFIRMATION OF THE PLAN**

8.1    **Compromise and Settlement of Claims, Interests, and Controversies**

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any other Claim or Interest or any treatment or distribution to be made on account of an Allowed Claim or Allowed Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests, and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court. After the Plan

Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

8.2     **Discharge of Claims and Termination of Interests**

**Except as otherwise provided for herein and effective as of the Plan Effective Date: (a) the rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their assets, property, or Estates; (b) the Plan shall bind all Holders of Claims and Interests, notwithstanding whether any such Holders failed to vote to accept or reject the Plan or voted to accept or reject the Plan; (c) all Claims and Interests shall be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Entities shall be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, the New Issuer, each of their successors, assigns, assets and properties, any Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Plan Effective Date; _provided_, _however_, that the foregoing shall not affect the treatment of the Senior Debt Claims as provided in Section 4.4(d) and Section 4.4(e) of the Plan. For the avoidance of doubt, nothing in this section shall affect the rights of Holders of Claims and Interests to seek to enforce the Plan or any post-Plan Effective Date obligations, including the distributions to which Holders of Allowed Claims and Interests are entitled under the Plan.**

8.3     **Releases by the Debtors**

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise expressly provided herein, for good and valuable consideration, as of the Plan Effective Date, to the extent permitted by applicable laws, the Released Parties are conclusively, absolutely, unconditionally, irrevocably, and forever deemed released and discharged by the Debtors, the Reorganized Debtors, and the Estates from any and all actions, claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether for tort, contract, violations of foreign, federal or state securities laws and Avoidance Actions, including any derivative claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, asserted or that could possibly have been asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or the Estates, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Existing Indenture, the Existing Notes, the LC Facility Agreement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or during the Chapter 11 Cases, the negotiation, formulation, solicitation, or preparation of the RSA, the Disclosure Statement,**

48

the Plan, the Plan Supplement, or related agreements, instruments or other documents, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date; provided, however, that the foregoing provisions of this Section 8.3 shall have no effect (x) on the liability of any of the Released Parties for gross negligence, willful misconduct, fraud, or criminal conduct; (y) any Causes of Action retained by the Debtors against any Person other than the Released Parties; and (z) the Debtors' rights and defenses in respect of creditors and contract counterparties that are Unimpaired under the Plan; provided, further, that nothing in this Section 8.3 shall release any post-Plan Effective Date obligations of any party under the Plan or any document, instrument, or agreement executed to implement, or otherwise given effect under, the Plan, including the New Notes Documents and any other agreement or document related thereto or entered into in connection therewith, as applicable.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, including pursuant to Bankruptcy Rule 9019, of the release set forth in this Section 8.3, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that such release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the claims released by this Section 8.3; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors asserting any claim or Cause of Action released by this Section 8.3.

8.4     **Releases by Releasing Parties**

As of the Plan Effective Date, to the extent permitted by applicable law, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Estates and the Released Parties from any and all claims, interests, obligations, rights, liabilities, actions, causes of action, suits, debts, demands, damages, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims (including all claims and actions against any Entities under the Bankruptcy Code) whatsoever, whether for tort, contract, violations of foreign, federal or state securities laws and Avoidance Actions, including any derivative claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Releasing Party asserted or that could possibly have been asserted, or would have been legally entitled to assert (whether individually or collectively), based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Existing Indenture, the Existing Notes, the LC Facility Agreement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Releasing Party, the restructuring of Claims and Interests prior to or during the Chapter 11 Cases, the negotiation, formulation, solicitation, or preparation

49

of the RSA, the Disclosure Statement, the Plan, the Plan Supplement, or related agreements, instruments or other documents, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date; <u>provided</u>, <u>however</u>, that the foregoing provisions of this <u>Section 8.4</u> shall have no effect on (x) the liability of any of the Released Parties for gross negligence, willful misconduct, or criminal conduct and (y) the treatment of the Senior Debt Claims as provided in <u>Section 4.4(d)</u> and <u>Section 4.4(e)</u> of the Plan; <u>provided</u> <u>further</u> that nothing in this <u>Section 8.4</u> shall release any post-Plan Effective Date obligations (except Cure Claims that have not been timely filed) of any party under the Plan or any document, instrument, or agreement executed to implement, or otherwise given effect under, the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, including pursuant to Bankruptcy Rule 9019, of the release set forth in this <u>Section 8.4</u>, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that such release is: (a) important to the Plan; (b) in exchange for the good and valuable consideration provided by the Debtors, the Reorganized Debtors, the Estates and the Released Parties; (c) a good faith settlement and compromise of the claims released by this <u>Section 8.4</u>; (d) in the best interests of the Debtors and all Holders of Claims and Interests; (e) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (g) a bar to any Entity granting a release under this <u>Section 8.4</u> from asserting any claim or Cause of Action released by this <u>Section 8.4</u>.

8.5    <u>Exculpation</u>

No Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Exculpated Claim or any obligation, Cause of Action, or liability for any Exculpated Claim; <u>provided</u>, <u>however</u>, that the foregoing "exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted fraud, gross negligence, or willful misconduct; <u>provided</u>, <u>further</u>, that in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to, or in connection with, the Plan. The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of acceptances and rejections of the Plan and the making of distributions pursuant to the Plan and, therefore, are not and shall not be liable at any time for the violation of any applicable, law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or distributions made pursuant to the Plan.

8.6    <u>Injunction</u>

Except as otherwise provided herein or for obligations issued pursuant hereto, all Entities that have held, hold, or may hold claims or interests that have been released pursuant to <u>Section 8.3</u> or <u>Section 8.4</u>, discharged pursuant to <u>Section 8.2</u>, or are subject to exculpation pursuant to <u>Section 8.5</u> are permanently enjoined, from and after the Plan Effective Date, from taking any of the following actions against, as applicable, the Debtors,

50

**the Reorganized Debtors, the New Issuer, the Released Parties, or the Exculpated Parties, as well as their assets or property: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or Estates of such Entities on account of or in connection with or with respect to any such claims or interests; (d) asserting any right of setoff or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of or in connection with or with respect to any such claims or interests unless, with respect to the Debtors and the Reorganized Debtors (as well as their assets and property), such holder has filed a motion requesting the right to perform such set off pursuant to <u>Section 6.9(b)</u> or performed such recoupment and provided notice thereof in writing to the Debtors pursuant to <u>Section 6.9(c)</u>, in each case on or before the Confirmation Date; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released, exculpated, or settled pursuant to the Plan.**

8.7    <u>**Protection Against Discriminatory Treatment**</u>

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Debtor or Reorganized Debtor, or any Entity with which a Debtor or Reorganized Debtor has been or is associated, as to a Reorganized Debtor solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

8.8    <u>**Indemnification**</u>

On and from the Plan Effective Date, and notwithstanding anything provided under the Plan, all indemnification provisions in place as of the Plan Effective Date (whether in the bylaws, certificates of incorporation or formation, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, financial advisors, investment bankers, and other professionals (including the Professionals) of the Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive Consummation and the effectiveness of the Restructuring and remain enforceable; <u>provided</u> that the Reorganized Debtors shall not indemnify officers, directors, managers, employees, attorneys, accountants, investment bankers or other professionals (including the Professionals) of the Debtors for any claims or Causes of Action arising out of or relating to any act or omission by them that is a criminal act or constitutes intentional fraud, gross negligence, or willful misconduct.

8.9    **Release of Liens**

Except (a) with respect to the Liens securing Other Secured Claims (if such Liens survive the treatment of such Claims pursuant to Section 3.2(a)(2)), (b) as otherwise expressly provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, including, without limitation, the New Notes Documents, or (c) with respect to mortgages, deeds of trust, Liens, pledges, and other security interests related to the Existing Notes and LC Facility Claims if and to the extent that the governing documents of such security interests expressly provide that such security documents will secure obligations incurred as a substitution, replacement, refunding or refinancing of the Existing Notes and LC Facility Claims (including the documents or security interests), on the Plan Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any assets or property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall vest in and revert to the applicable Reorganized Debtor and its successors and assigns; provided, however, that notwithstanding the foregoing, mortgages, deeds of trust, Liens, pledges, and other security interests created under or pursuant to the Prepetition Security Documents that are being amended, amended and restated, or otherwise modified in connection with this Plan to secure the obligations under the New Notes (at which point, such Prepetition Security Documents shall be deemed included in the definition of New Notes Documents) shall remain pursuant to the terms of the New Notes Documents, but shall not secure any of the obligations of the Class 3 Claims.

From and after the Plan Effective Date, any Holder of a Secured Claim (and the applicable agents for such Holder) secured by Liens or security interests which are to be released under this Plan shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to give effect to the Plan and to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any foreign, federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Plan Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Reorganized Debtors that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests in accordance with the Plan, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

8.10    **Reimbursement or Contribution**

Except as otherwise provided in Section 8.8, if the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Plan Effective Date, such Claim

shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Plan Effective Date (a) such Claim has been adjudicated as noncontingent or (b) the relevant Holder of a Claim has filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

# ARTICLE IX

## CONDITIONS PRECEDENT TO THE PLAN EFFECTIVE DATE

9.1     **Conditions Precedent to the Plan Effective Date.**

It shall be a condition to the Plan Effective Date that the following conditions shall have been satisfied or waived pursuant to <u>Section 9.2</u> of the Plan:

(a)     the Bankruptcy Court shall have entered the Confirmation Order, which:

(1)     authorizes the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with, or to implement, this Plan in a manner consistent in all respects with this Plan;

(2)     decrees that the provisions in the Confirmation Order and this Plan are non-severable and mutually dependent;

(3)     authorizes the Debtors, the Reorganized Debtors and the New Issuer, as applicable to:  (A) implement the Restructuring Transactions; (B) make all distributions and issuances as required under this Plan; and (C) enter into any agreements and transactions, in each case, in a manner consistent in all respects with the terms of this Plan;

(4)     if Citibank is party to the RSA as of such date, approves the issuance of the Settlement Take-back SSNs to the Holders of LC Facility Claims in accordance with the Plan;

(5)     provides that the solicitation, offer, sale and issuance of the securities under the Plan was in compliance with, and pursuant to, all relevant sections of the Securities Act, and any similar state laws;

(6)     authorizes the implementation of this Plan in accordance with its terms; and

(7)     provides that, pursuant to section 1146 of the Bankruptcy Code, the vesting of assets, the delivery of any deed or other instrument or transfer, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under this Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax;

53

(b)      the RSA shall not have been terminated at any time (excluding, however, any termination of the Second Amendment), and no condition shall exist under the RSA that would permit the Majority Members (as defined in the RSA) to terminate the RSA pursuant to <u>Section 3.01(b)(xiii)</u> of the RSA;

(c)      the Debtors shall not have received any notice of any charge, sanction, levy, or fine imposed by any government regulator:  (i) enjoining, prohibiting, ceasing, or terminating the ability of the Debtors to implement the Restructuring, or (ii) imposing criminal liability on any of the Debtors or any of its managers;

(d)      the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to Consummate this Plan;

(e)      the final version of each of the Plan and all documents contained in any supplement to the Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications, or supplements thereto required for Consummation or other documents contained therein required for Consummation, shall have been executed or filed (other than any collateral perfection requirements), as applicable, in each case in form and substance acceptable to the Debtors, the ILAP Partners and the Required Consenting Creditors, in each case, in their reasonable discretion;

(f)      the New Notes Documents shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Plan Effective Date) to the effectiveness of the New Notes Documents (other than any collateral perfection requirements) shall have been satisfied or duly waived in writing in accordance with the terms of each the New Notes Documents and the issuance of each of the New Notes shall have occurred;

(g)      the Super Priority Notes Financing Parties shall purchase in Cash the Super Priority Notes;

(h)      all professional fees and expenses of professionals for the Debtors or any official committee appointed in the Chapter 11 Cases that require the Bankruptcy Court's approval shall have been paid in full in Cash or amounts sufficient to pay such fees and expenses in full in cash after the Plan Effective Date shall have been placed in the Professional Fee Escrow pursuant to an escrow agreement acceptable to the Debtors and such Professionals pending the Bankruptcy Court's approval of such fees and expenses;

(i)      all Restructuring Expenses shall have been paid in Cash in full; and

(j)      this Plan and all documents and agreements necessary for Consummation of the Plan (other than any collateral perfection requirements) shall have:  (i) all conditions precedent to such documents and agreements satisfied or waived pursuant to the terms of such documents or agreements; (ii) been tendered for delivery to the required parties and, to the extent required, filed with and approved by any applicable Governmental Units in accordance with applicable laws; and (iii) been effected or executed.

9.2    **Waiver of Conditions Precedent**

At any time, without any notice to any other parties in interest, without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm or Consummate the Plan, the Debtors may (x) with the consent of the Required Consenting Creditors if impacted thereby (which consent shall not be unreasonably withheld, conditioned or delayed), waive any of the conditions to the Plan Effective Date set forth in Section 9.1 and/or (y) subject to Section 10.1 hereof, amend, modify or supplement any of the conditions to the Plan Effective Date set forth in Section 9.1.

9.3    **Effect of Non-Occurrence of Conditions to Consummation**

If prior to Consummation, the Confirmation Order is vacated pursuant to a Final Order, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan and Disclosure Statement will be null and void *ab initio* in all respects, all parties in interest shall go back to the status *quo ante* as if this Plan and Disclosure Statement had never existed, and nothing contained in the Plan or Disclosure Statement shall:  (a) constitute a waiver or release of any Claims, Interests, or Causes of Action; (b) prejudice in any manner the rights of any Debtor or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

## ARTICLE X

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

10.1    **Modification of Plan**

Effective as of the date hereof, and subject to the last sentence of this Section 10.1:  (a) the Debtors, with the consent of the Required Consenting Creditors (which consent shall not unreasonably be withheld, delayed, or conditioned), may amend or modify the Plan before the entry of the Confirmation Order in accordance with the Bankruptcy Code and the Bankruptcy Rules; and (b) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, with the consent of the Required Consenting Creditors (which consent shall not unreasonably be withheld, delayed, or conditioned), may amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code; provided, further, that the consent of Citibank, N.A. shall also be required for any waiver, amendment, modification or supplement of Section 4.10(b) of the Plan. Notwithstanding the foregoing consent rights provided to the Consenting Creditors, the Debtors may amend, modify or supplement the Plan, from time to time without the consent of any Consenting Noteholder, solely to cure any ambiguity, defect (including any technical defect) or inconsistency, provided that any such amendments, modifications or supplements (i) are not material; (ii) do not adversely affect the rights, interests, or treatment of any member of Class 3; (iii) do not change the material terms and conditions of any New Notes, including without limitation any financial terms, events of default, covenants or substantive protections benefiting the Consenting Creditors; and (iv) for the avoidance of doubt, are not inconsistent with the terms of the Restructuring Term Sheet; provided, further that the Debtors provide counsel for the Ad Hoc Group, counsel for the Holders of the LC Facility Claims, and counsel for the Existing Indenture

Trustee with a copy of the proposed amendment, modification or supplement at least two (2) days before the proposed effectiveness of such amendments, modification or supplements.

10.2   **Revocation or Withdrawal of Plan**

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan, or if Confirmation or the Plan Effective Date does not occur, then: (a) the Plan will be null and void *ab initio* in all respects; (b) any allowance of a Claim or any other settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto will be null and void *ab initio* in all respects; (c) nothing contained in the Plan shall (1) constitute a waiver or release of any Claims, Interests, or Causes of Action, (2) prejudice in any manner the rights of any Debtor or any other Entity, or (3) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity; and (d) all rights and defenses of the Consenting Creditors, the Debtors and the ILAP Partners under the RSA and Restructuring Term Sheet are preserved.

10.3   **Confirmation of the Plan**

To the extent any Class rejects the Plan, the Debtors will request confirmation of the Plan under section 1129(b) of the Bankruptcy Code. The Debtors, subject to Section 10.1 hereof, reserve the right to alter, amend, modify, revoke or withdraw the Plan or any exhibit or Plan Supplement in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

## ARTICLE XI

## RETENTION OF JURISDICTION

11.1   **Jurisdiction**

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Plan Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under and/or related to the Chapter 11 Cases and the Plan to the fullest extent permitted by applicable law, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Claim or Interest and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors' amendment, modification, or supplement, after the Plan Effective Date, pursuant to Article V, of the Rejection Schedule or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Plan Effective Date;

6.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan or the Confirmation Order, including contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Plan Supplement or the Disclosure Statement, including the New Notes Documents and any other agreement or document related thereto or entered into in connection therewith;

7.      enter and enforce any order for the sale or disposition of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.      grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

9.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

10.     hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including: (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Section 6.8(a); (b) with respect to the releases, injunctions, and other provisions contained in Article VIII, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan or the Confirmation Order, or any Entity's rights arising from or obligations incurred in connection with the Plan or the Confirmation Order, including those arising under agreements, documents, or instruments executed in connection with the Plan; (d) related to section 1141 of the Bankruptcy Code; or (e) with respect to any Claims arising under or in connection with the Senior Debt Claims asserted against the Reorganized Debtors by any current or former Holder of Senior Debt Claims;

11.    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

12.    consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

13.    determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, or the Confirmation Order;

14.    hear and determine matters concerning U.S. state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

15.    enter an order or Final Decree concluding or closing any of the Chapter 11 Cases;

16.    adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.    hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in connection with and under the Plan, including under Article VIII;

18.    enforce all orders previously entered by the Bankruptcy Court; and

19.    hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

### 12.1   **Additional Documents**

On or before the Plan Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims and Interests receiving distributions pursuant to the Plan, and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### 12.2   **Payment of Statutory Fees**

All fees payable pursuant to section 1930 of title 28 of the United States Code, and any applicable interest payable under section 3717 of title 31 of the United States Code, as of the entry of the Confirmation Order as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Plan Effective Date. The Debtors or the Reorganized Debtors shall continue to pay fees pursuant to section 1930 of title 28 of the United States Code, and any applicable interest payable under section 3717 of title 31 of the United States Code, until the Chapter 11 Cases are converted, dismissed, or closed by entry of the Final Decree, whichever occurs first.

The Debtors or the Reorganized Debtors shall file and serve on the United States Trustee post-Plan Effective Date quarterly reports of the disbursements made, which reports will be filed and served on or prior to the later of (a) the date that is thirty (30) days after the conclusion of each such period and (b) such later date as has been agreed to by the Debtors or the Reorganized Debtors and the United States Trustee, until the Chapter 11 Cases are converted, dismissed, or closed by entry of the Final Decree. Any such reports shall be prepared consistent with (both in terms of content and format) the applicable Bankruptcy Court and United States Trustee's Guidelines for such matters. Nothing herein will prejudice the right of the Debtors to seek closure of any of the Chapter 11 Cases pursuant to section 350(a) of the Bankruptcy Code, and no appeal of any relief granted pursuant hereto shall prejudice the Debtors' right to argue that any of the Chapter 11 Cases have been fully administered within the meaning of section 350(a) of the Bankruptcy Code.

## 12.3   **Reservation of Rights**

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action (or any omission) by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Plan Effective Date.

## 12.4   **Elimination of Vacant Classes**

Any Class of Claims or Interests that (a) does not have a Holder of an Allowed Claim or a Claim temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing or (b) is entitled to vote on the Plan but with respect to which no Ballots are cast or no Ballots are deemed to be cast, shall be deemed eliminated from the Plan for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

## 12.5   **Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

## 12.6   **Service of Documents**

After the Plan Effective Date, any pleading, notice, or other document required by the Plan to be filed with the Court and served on or delivered to the Reorganized Debtors shall be served on:

| **Reorganized Debtors** | **Inversiones Latin America Power Limitada**<br>Cerro El Plomo 5680, Oficina 1202<br>Las Condes, Santiago, Chile<br>Attention: Esteban Moraga |
| --- | --- |

With a copy to:

| | |
|---|---|
| **Counsel to the Reorganized Debtors** | **Greenberg Traurig, LLP**<br>One Vanderbilt Avenue<br>New York, New York 10017<br>Attention: Oscar N. Pinkas / Brian E. Greer / Leo Muchnik |
| **Counsel to the Ad Hoc Group** | **Cleary Gottlieb Steen & Hamilton LLP**<br>One Liberty Plaza<br>New York, New York 10006<br>Attention: Richard J. Cooper / Adam Brenneman / Thomas S. Kessler |

## 12.7    Term of Injunctions or Stays

**Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to section 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Plan Effective Date. All post-Plan Effective Date injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

## 12.8    Entire Agreement

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, including but not limited to the RSA, all of which have become merged and integrated into the Plan.

## 12.9    Plan Supplement Exhibits

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel or by downloading such exhibits and documents from the Bankruptcy Court's website, https://www.nysb.uscourts.gov/.

## 12.10    Non-Severability

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and

provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan; and (c) non-severable and mutually dependent.

12.11    **Foreign Representative**

ILAP and the Reorganized ILAP (as applicable) is authorized to act as the foreign representative of the Debtors in any judicial or other proceeding in any foreign country, including Chile.

61

Dated: November 29, 2023                    Respectfully Submitted,

                                            **INVERSIONES LATIN AMERICA**
                                            **POWER LIMITADA**

                                            By: _____
                                            Name: Esteban Moraga
                                            Title:   Chief Executive Officer


                                            **SAN JUAN S.A.**

                                            By: _____
                                            Name: Esteban Moraga
                                            Title:   Chief Executive Officer


                                            **NORVIND S.A.**

                                            By: _____
                                            Name: Esteban Moraga
                                            Title:   Chief Executive Officer

**Exhibit B**

Restructuring Support Agreement

*Execution Version*

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as amended, supplemented or otherwise modified from time to time, this "Agreement"), dated as of October 30, 2023, is entered into by and among Inversiones Latin América Power Ltda. a limited liability company (*sociedad de responsabilidad limitada*) organized and existing under the laws of Chile (the "Company"), San Juan S.A. and Norvind S.A., corporations (*sociedades anónimas*) formed under the laws of Chile (the "Guarantors" and, together with the Company, the "Credit Parties"), Latin America Power S.A., a corporation (*sociedad anónima*) formed under the laws of Chile and LAP Renewables B.V., a Dutch corporation (*besloten vennootschap*) (the "ILAP Partners"), and each of the undersigned beneficial holders of, or the undersigned investment advisors to funds and accounts that hold, the 5.125% senior secured notes due 2033 (the "Existing Notes") issued by the Company pursuant to an indenture dated as of June 15, 2021 (as amended by the indenture amendment agreement dated August 28, 2023, the "Existing Indenture") listed in Schedule I hereto (collectively, the "Consenting Noteholders"). The Credit Parties, the ILAP Partners and the Consenting Noteholders may each be referred to herein as a "Party" and, collectively, as the "Parties." Capitalized terms used but not defined herein shall have the meanings given to such terms in the Existing Indenture.

## RECITALS

**WHEREAS**, the Consenting Noteholders (collectively, the "Ad Hoc Group"), the Credit Parties, the ILAP Partners and their respective counsel and other advisors have engaged in good-faith negotiations regarding a comprehensive restructuring of the Credit Parties' indebtedness and obligations under the Existing Indenture and the Existing Notes as described in the restructuring term sheet attached hereto as Exhibit A (together with any schedules, annexes, and exhibits attached thereto, and as may be modified in accordance with this Agreement, the "Restructuring Term Sheet"; the transactions described in this Agreement and the Restructuring Term Sheet are referred to generally as the "Restructuring");

**WHEREAS**, the Credit Parties intend to implement the Restructuring in accordance with the terms and conditions set forth in the Restructuring Term Sheet pursuant to a prepackaged chapter 11 plan of reorganization (the "Plan") to be confirmed in voluntary reorganization cases (the "Proceeding") under chapter 11 of Title 11 of the United States Code to be commenced by the Credit Parties in the United States Bankruptcy Court for the Southern District of New York (the "Court"), or as may be otherwise agreed in writing by the Credit Parties and the members of the Ad Hoc Group holding a majority of the outstanding principal amount of Existing Notes held by the Ad Hoc Group (the "Majority Members") (the "Restructuring Transactions");

**WHEREAS**, prior to the commencement of the Proceeding, the Credit Parties will distribute to the Consenting Noteholders the Plan, a disclosure statement relating to the Plan (the "Disclosure Statement"), a proposed description of the Take-back SSNs, the Convert Notes and the Super Priority Notes (as defined in the Restructuring Term Sheet) issued in connection with the Restructuring (collectively, the "New Securities"), and the related collateral arrangement in connection therewith, the ballots and certain other solicitation materials (collectively with the Plan and the Disclosure Statement, the "Plan Solicitation Materials"), each of which shall be in form and substance reasonably acceptable to each of the Parties;

WHEREAS, each Party and its respective counsel and other advisors has reviewed or has had the opportunity to review the Restructuring Term Sheet and this Agreement and each Party has agreed, subject to the conditions contained in the Restructuring Term Sheet and this Agreement, to participate in the Restructuring in accordance with this Agreement;

WHEREAS, each Party recognizes that this Agreement is not an offer or acceptance with respect to any securities or a solicitation or an acceptance of a plan of organization proposed in connection with any insolvency proceeding, and that any such offer or solicitation will comply with all applicable securities laws and any other applicable law; and

WHEREAS, on July 3, 2023, the Parties entered into a Standstill and Forbearance Agreement, which is hereby superseded in its entirety by this Agreement.

NOW, THEREFORE, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

**Section 1.    Commitments Regarding the Restructuring.**

1.01.    Restructuring Term Sheet.  The Restructuring Term Sheet is incorporated herein in its entirety and made a part of this Agreement.  In the case of a conflict between the provisions contained in this Agreement and the Restructuring Term Sheet, the provisions of the Restructuring Term Sheet shall govern.  In the case of a conflict between the provisions contained in this Agreement or the Restructuring Term Sheet and the Plan, the terms of the Plan shall govern.

1.02.    Agreement to Support.  Subject to the terms and conditions hereof, each Consenting Noteholder agrees severally and not jointly that it shall, with respect to all Existing Notes Claims (as defined in the Restructuring Term Sheet) held by such Consenting Noteholder, from the date hereof to the date of the termination of this Agreement pursuant to Section 3 hereof (the "Termination Date"):

(a)    Negotiate in good faith with the goal of reaching an agreement as promptly as possible regarding the definitive documents with respect to the Restructuring, including debtor-in-possession financing ("DIP Financing") (collectively, the "Definitive Documents"), which shall be consistent with the terms of the Restructuring Term Sheet and otherwise satisfactory in form and substance to the Majority Members, Credit Parties and the ILAP Partners, in their respective, reasonable discretion and which shall include all documents (including any related orders, agreements, instruments, schedules, or exhibits) that are contemplated by this Agreement and that are otherwise necessary or desirable to implement, the Restructuring, including, without limitation:

(i)    the New Securities and their related indentures and ancillary documents;

(ii)    amendments and restatements of the existing Security Documents and any new or additional collateral documents to implement the terms set forth in the Restructuring Term Sheet;

(iii)    any other agreements, documents, or instruments necessary or desirable to implement the terms of the New Securities;

(iv)    any organizational documents, shareholder and member-related agreements, registration rights agreements or other governance documents related to the reorganization of the Credit Parties;

(v)    the organizational documents and related board resolutions for the New Issuer (as defined in the Restructuring Term Sheet);

(vi)    the Plan Solicitation Materials;

(vii)    the Plan;

(viii)    the order of the Court (A) approving the Disclosure Statement and (B) confirming the Plan (the "Confirmation Order");

(ix)    the Agreement shall be assumed as part of the Plan, pursuant to section 365 of the Bankruptcy Code, provided, however, that the Company shall not file a motion or take any other steps to reject the Agreement pursuant to section 365 of the Bankruptcy Code prior to an occurrence and continuation of a Termination Event (as defined below);

(x)    definitive documents for DIP Financing and use of cash collateral and the related orders of the Court approving such DIP Financing and use of cash collateral, as applicable; and

(xi)    and any other such document or agreement as may be necessary to implement the Restructuring contemplated by this Agreement.

(b)    Subject to the satisfaction or waiver of the conditions set forth in Section 5 hereof as provided for herein—including the receipt by each Consenting Noteholder of initial drafts of the Definitive Documents in accordance with Section 1.03(a)(iv)(A)—vote (or cause to be voted) each of its Existing Notes Claims (as defined in the Restructuring Term Sheet) in favor of:

(i)    the Restructuring Transactions, including instructing the Trustee and the Collateral Agents to implement the Restructuring and/or to execute the Definitive Documents; and

(ii)    the approval and adoption of the Plan (and any actions required in furtherance thereof) and agree not to withdraw, amend, or revoke (or cause to be withdrawn, amended, or revoked) its vote with respect to such Plan; *provided* that the votes of each Consenting Noteholder shall be immediately and automatically without further action of any Consenting Noteholder revoked and deemed null and void *ab initio* upon termination of this Agreement pursuant to Section 3 hereof (other than following a Termination Event pursuant to Section 3.01(a)(i)).

(c)        (i) not, nor encourage any other person to, take any action that would, or would reasonably be expected to, breach this Agreement or object to, prevent, interfere with, delay, impede, challenge, frustrate, hinder or appeal the solicitation, acceptance, confirmation, approval, consummation, and/or implementation of the Restructuring, including the solicitation of votes on the Plan, in each case, to the extent applicable and to the extent inconsistent with the terms and conditions of this Agreement; (ii) not exercise any right or remedy for the enforcement, collection, or recovery of any claim against the Company or any direct or indirect subsidiaries of the Company except in a manner consistent with this Agreement, including, without limitation and for the avoidance of any doubt, initiating, seeking to initiate or taking any action (including court filings) in relation to (A) involuntary bankruptcy proceedings, (B) the appointment of any custodian, receiver, liquidator, provisional liquidator, trustee, monitor, sequestrator or other similar official for all or any substantial part of the property of any or all of the Company or any direct or indirect subsidiaries of the Company or (C) any other sort of insolvency proceeding in any court of competent jurisdiction, or otherwise exercising any right or remedy under the Existing Indenture and any related Security Document; and (iii) not directly or indirectly propose, file, commence, seek to commence, support, vote for, consent to, apply for, encourage, or take any other action (including court filings) in furtherance of the negotiation or formulation of any reorganization (including, for the avoidance of doubt, a transaction premised on an asset sale), proposal, offer, dissolution, bankruptcy, receivership, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets, or any other restructuring, application for relief or insolvency process or proceedings in any jurisdiction anywhere in the world for any of the Credit Parties other than the Restructuring; and

(d)        direct any administrative agent, collateral agent, or indenture trustee (as applicable), including the Trustee and Collateral Agent, to not take any action inconsistent with such Consenting Noteholders' obligations under this Agreement.

1.03.    <u>Covenants of the Credit Parties and the ILAP Partners</u>.  Subject to the terms and conditions hereof, each of the Credit Parties (jointly and severally) and the ILAP Partners (jointly and severally) acknowledges, covenants and agrees as follows:

(a)        *Consummation of the Restructuring*.  From the date hereof until the Termination Date, each such Party, as applicable, shall:

(i)        not, directly or indirectly, seek, solicit, encourage, propose, assist, engage in negotiations in connection with or regarding, or participate in the formulation or preparation of, any restructuring proposal, offer, bid or term sheet to, any dissolution, winding up, liquidation, sale or disposition, reorganization, merger, restructuring, consolidation, business combination, joint venture, partnership, or sale of assets of the Credit Parties, or the appointment of a receiver, in each case, other than in accordance with this Agreement and the Restructuring Term Sheet (an "<u>Alternative Transaction</u>");

(ii)        not take any action, directly or indirectly, that would reasonably be expected to prevent, interfere with, delay, challenge, frustrate, hinder or impede the implementation of the Plan (including, for the avoidance of

doubt, by directly or indirectly engaging in any negotiations with any holder of the Existing Notes with respect to an Alternative Transaction);

(iii) commence by no later than November 15, 2023 at 11:59PM (prevailing New York time), the solicitation of votes on the Plan by distributing the Plan Solicitation Materials to parties entitled to vote on the Plan by mail, email or any other means reasonably acceptable to the Credit Parties; provided that this date may be extended until November 27, 2023 by written notice from the Credit Parties to the Consenting Noteholders;

(iv) implement the Plan (or, in the case of the ILAP Partners, cause the Plan to be implemented) in accordance with the terms set forth in this Agreement and the Restructuring Term Sheet, including achieving (or, in the case of the ILAP Partners, cause to be achieved) the following milestones (which timeline may be modified at any time as agreed in writing by the Company and the Credit Parties, ILAP Partners and Majority Members):

(A) to the extent reasonably practicable, provide to each of the advisors to the Ad Hoc Group (the "Ad Hoc Group Advisors") (1) initial drafts of the Definitive Documents and the Plan, on or before ten (10) days prior to the date that any such Definitive Document is intended to be filed with the Court or expected to be finalized (if not a Definitive Document that is to be filed with the Court), (2) draft responses to any and all objections filed by third parties or the Court, as applicable, to the approval or the implementation of the Plan, at least two (2) days prior to the date on which any such responses are to be delivered to the Court, and (3) final drafts of the Definitive Documents, including the Plan, that relate to approval or implementation of the Plan, on or before five (5) days prior to the date that any such Definitive Document is intended to be filed with the Court or expected to be finalized (if not a Definitive Document that is to be filed with the Court);

(B) the Credit Parties shall file their respective bankruptcy cases (the "Bankruptcy Cases") in the Court after distributing the Plan Solicitation Materials, but in all events no later than November 19, 2023 at 11:59PM (prevailing New York time) (the "Petition Date"); provided that this date may be extended until November 30, 2023 by written notice from the Credit Parties to the Consenting Noteholders;

(C) the voting deadline on the Plan (the "Voting Deadline") shall be twenty (20) Business Days after the commencement of the solicitation as contemplated under Section 1.03(a)(iii);

(D) the Confirmation Order shall have been entered within 7 weeks of the Petition Date (the "<u>Plan Approval Date</u>"); and

(E) the effective date of the Plan (the "<u>Effective Date</u>") shall have occurred within 7 weeks of the Plan Approval Date and in any event no later than February 10, 2024 (or such later date as may be agreed in writing between the Credit Parties, the ILAP Partners and the Majority Members) (such date by which the Plan is required to be implemented hereunder, the "<u>Expiration Date</u>").

(v) timely file, in consultation with the Consenting Noteholders, an objection to any motion filed with the Court by any person seeking an order (A) directing the appointment in the Bankruptcy Cases of an examiner with expanded powers (beyond those set forth in section 1106(a)(3) or (4) of the Bankruptcy Code) or a trustee pursuant to section 1104 of the Bankruptcy Code; (B) converting any of the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code; (C) dismissing any of the Bankruptcy Cases; (D) granting any relief that is inconsistent with this Agreement, the Plan or the Restructuring Documents in any material respect; (E) modifying or terminating the Credit Parties exclusive right to file and/or solicit acceptances of a plan of reorganization; or (F) seeking an appointment of any official committee of equity holders under section 1102 of the Bankruptcy Code;

(vi) approve through a partners' resolution, or vote the equity rights or shares of the Credit Parties, as applicable, in favor of the approval, consent, ratification, implementation and adoption of the Plan;

(vii) use commercially reasonable efforts to progress, cooperate with, actively assist and take all reasonable actions and steps to implement the Restructuring in accordance with this Agreement and the Restructuring Term Sheet as soon as reasonably practicable including, in the case of the Credit Parties, satisfying the conditions precedent to the Effective Date set forth in <u>Section 6</u> hereof (collectively, the "<u>Closing Conditions</u>"), unless and to the extent that such Closing Conditions (A) are satisfied or (B) are waived by written consent of the Majority Members in their sole and absolute discretion as provided herein;

(viii) not enter into, or permit to exist, any arrangement to (A) transfer, sell, lease, convey or otherwise dispose of, or (B) pledge, hypothecate or otherwise encumber or permit to exist any Lien or other encumbrance on, direct or indirect equity interests or shares, as applicable, in any of the Credit Parties other than in connection with DIP Financing;

(ix) take no actions, directly or indirectly, and not encourage any other person to take any actions, that are inconsistent with the Restructuring or the other

transactions contemplated by this Agreement or the timely approval, confirmation and consummation of the Plan in accordance with the terms and conditions of this Agreement (including, but not limited to, any action seeking the termination or modification of any Long-Term Power Purchase Agreement entered into by the Guarantors (collectively, the "<u>PPAs</u>") or any Material Project Document entered into by the Credit Parties); and

    (x)    consult with and provide timely responses to reasonable information requests of the Ad Hoc Group Advisors in connection with the Restructuring.

    (b)    *Agreement to Negotiate*. The Credit Parties and the ILAP Partners shall, from the date hereof until the Termination Date, negotiate in good faith with the goal of reaching an agreement as promptly as possible regarding the Definitive Documents, which shall be consistent in all material respects with the Restructuring Term Sheet and this Agreement and otherwise satisfactory in form and substance to the Majority Members, the Credit Parties and the ILAP Partners in their respective reasonable discretion.

    (c)    *Insolvency Proceedings*. Neither the Credit Parties nor the ILAP Partners (or their affiliates) shall, from the date hereof until the Termination Date, take any actions, directly or indirectly, in any jurisdiction to (i) commence, seek to commence or take any action, including court filings, for the purpose of effecting a voluntary case or proceeding in respect of any of the Credit Parties under any Bankruptcy Law; (ii) consent to a voluntary case or proceeding in respect of any of the Credit Parties under any Bankruptcy Law; (iii) apply for or consent to the appointment of a custodian, receiver, liquidator, trustee, monitor, sequestrator or similar official of it (or them) for all or any substantial part of the property of any or all of the Credit Parties; (iv) make or seek to make a general assignment for the benefit of creditors in respect of any of the Credit Parties; (v) execute, file or take steps to file a bankruptcy petition under Chilean Law 20.720, whether a *procedimiento concursal de reorganización judicial, acuerdo de reorganización extrajudicial, procedimiento concursal de reorganización simplificada, procedimiento concursal de liquidación* or a *procedimiento concursal de liquidación simplificada*, of any of the Credit Parties or an answer or consent seeking reorganization or relief thereof; (vi) execute, file, agree to file, or consent to the filing of any motion, pleading or other Restructuring Document (including any modifications or amendments thereof) that is inconsistent in any material respect with this Agreement; (vii) admit in writing the inability of any of the Credit Parties to pay their debts generally as they become due; or (viii) consent to the filing of a petition in bankruptcy under Chilean law, whether a *procedimiento concursal de reorganización judicial, acuerdo de reorganización extrajudicial, procedimiento concursal de reorganización simplificada, procedimiento concursal de liquidación, procedimiento concursal de liquidación simplificada*, or any similar proceeding, in or outside of Chile, of any of the Credit Parties (each, an "<u>Insolvency Event</u>"); in each case other than the Restructuring contemplated hereby (including to seek and obtain recognition of the Restructuring).

    (d)    *Governance*. Except as set forth in the Agreement, the Restructuring Term Sheet, <u>Exhibit B</u> to this Agreement, or as otherwise agreed by the Majority Members:

    (i)    Neither the Credit Parties nor the ILAP Partners shall, from the date hereof until the Termination Date, take any action in any jurisdiction to:

(A)    other than as set forth in the Restructuring Term Sheet, appoint or cause to be appointed additional members to the board of any of the Credit Parties, the ILAP Partners (or its administrator) or any subsidiary thereof;

(B)    replace the board of directors of any of the Credit Parties, the ILAP Partners (or its administrator) or any subsidiary thereof;

(C)    other than as set forth in the Restructuring Term Sheet, amend the by-laws or constitutional documents or limited partnership agreements of any of the Credit Parties, the ILAP Partners or any subsidiary thereof, as applicable; or

(D)    cast any vote or take any action with respect to the equity interests of any of the Credit Parties, the ILAP Partners or any subsidiary thereof including any vote or action for the issuance of additional Capital Stock in the Credit Parties, the ILAP Partners or any subsidiary thereof (other than in connection with the implementation of the Restructuring or the approval of the Restructuring Transactions).

(ii)    Any decision to be taken by the Credit Parties in respect of the matters set forth in Exhibit B shall require the consent of the Majority Members (which shall not be unreasonably withheld).

1.04.    <u>Additional Covenants of the Credit Parties</u>. Subject to the terms and conditions hereof, each of the Credit Parties acknowledge, covenant and agree, in each case from the date hereof until the Termination Date, as follows:

(a)    *Notifications*. The Credit Parties shall deliver prompt written notice to the Consenting Noteholders in accordance with <u>Section 10.05</u> of:

(i)    the occurrence, or failure to occur, of any event, change, effect, occurrence, development, circumstance or change of fact of which the Credit Parties have knowledge, which occurrence or failure to occur would be reasonably likely to cause, or has caused (1) any representation or warranty of the Credit Parties contained in this Agreement or the Definitive Documents to be untrue or inaccurate in any material respect, (2) any covenant of the Credit Parties in this Agreement or the Definitive Documents not to be satisfied or not be able to be satisfied in any material respect, (3) any condition to the Consenting Noteholders' support obligations set forth herein or any Closing Condition not to be satisfied or not be able to be satisfied or (4) the occurrence of a Material Change;

(ii)    receipt by the Credit Parties of any written proposal by any Person of an Alternative Transaction and the details of such proposal;

(iii)    receipt by the Credit Parties of any written notice from any governmental body in connection with this Agreement or the Restructuring Transactions;

(iv)    receipt by the Credit Parties of any written notice regarding any proceeding commenced or pursued against any of the Credit Parties relating to or involving or that may otherwise adversely affect the terms of or the consummation of the Restructuring Transactions; and

(v)    within two (2) Business Days after receipt (A) any default, event of default or termination notices received by the Credit Parties under the credit agreement dated June 15, 2021, entered into among the Credit Parties and Citibank N.A. ("Citi") (the "Credit Agreement"), the PPAs or any other Material Project Document of the Credit Parties; (B) copies of any written notices or correspondence with respect to or related to the PPAs, the Credit Agreement or any Material Project Document (including any notices or correspondence from the counterparties thereto or any regulatory agency or authority); (C) copy of any written notices or correspondence with any *clasificadoras de riesgo* (rating agencies) specified in the PPAs.

(b)    *Notice of Termination Events*.  The Credit Parties shall give written notice to the Ad Hoc Group Advisors and the ILAP Partners within two (2) Business Days of actual knowledge by the Credit Parties of the occurrence of a Termination Event (as defined below).

(c)    *Conduct of Business.* Each Credit Party shall conduct its business as conducted on the date hereof and keep intact the material assets, operations and relationships of its business, and promptly inform the Consenting Noteholders about all occurrences that have or would reasonably be expected to result in a Material Change.

(d)    *Prohibited Transactions.* The Credit Parties shall refrain from (i) engaging in any transactions that (1) are prohibited by the Existing Indenture, the Security Documents or this Agreement, (2) except for any releases contemplated in Section 8.03 hereto, provide for any releases or indemnities to any administrator, director or officer of any of the Credit Parties, or (3) incur any Indebtedness, *provided*, *however*, the Credit Parties shall be permitted to obtain DIP Financing; (ii) making any Restricted Payments or any other payments (including through redemptions or acquisitions or by way of distributions of assets) to holders of equity interests or shares of the Credit Parties or make any declarations for payments of dividends; (iii) granting liens or suffering any liens to exist on any assets (other than in connection with DIP Financing); (iv) engaging in any asset sales; or (v) entering into any new compensation arrangements with, or modifying any existing compensation arrangements with, management of the Credit Parties.

(e)    *Prohibited Equity Transactions*. The Credit Parties shall refrain from engaging in any transactions that would result in the issuance of any new equity interests or any securities or instruments convertible or exchangeable or exercisable into equity interests, in each case, of the Credit Parties other than in accordance with the Restructuring Term Sheet.

(f)    *Regulatory Changes.* The Credit Parties shall inform the Ad Hoc Group Advisors and the ILAP Partners of the taking of any action or proposed action by the Chilean Ministry of

Energy (*Ministerio de Energía*), the National Energy Commission (*Comisión Nacional de Energía*), the Coordinator of the National Electric System (*Coordinador Independiente del Sistema Eléctrico Nacional*), or any other Governmental Authority or any material change in the economic terms of the PPAs or any other Material Project Document that would result in a Material Change of the Credit Parties, in each case, promptly and in any event within two (2) Business Days of having actual knowledge of such action or event.

(g)     *Litigation and Arbitration Matters.*  Other than as expressly permitted or contemplated hereunder, the Credit Parties shall not enter into any written or oral settlement agreement involving payment, reimbursement or release of claims by the Credit Parties, in each case, without the prior express written consent of the Majority Members (which shall not be unreasonably withheld).

(h)     *Amendments or Modifications of the Credit Agreement.* The Credit Parties shall not enter into any amendment or modification of the Credit Agreement without the express written consent of the Majority Members, the consent of which shall not be unreasonably withheld if the terms are consistent with the Restructuring Term Sheet.

(i)     *Compliance with Advisor Fees.* The Company will continue to comply with any reimbursement agreement entered into with an advisor of the Consenting Noteholders, including without limitation, Cleary Gottlieb Steen & Hamilton LLP, Claro & Cia. and Rothschild & Co., to reimburse the Consenting Noteholders for costs and expenses incurred in connection with this Agreement and the negotiation and implementation of the terms of the Restructuring.

(j)     *Payment of Fees and Expenses.* The Credit Parties shall promptly pay the Fees and Expenses set forth in the Restructuring Term Sheet.

1.05.    Transfer of Interests.

(a)     The ILAP Partners agree that, from the date hereof until the Termination Date, the ILAP Partners and their subsidiaries (or affiliates which ILAP Partners control) shall not, directly or indirectly, buy, sell or otherwise trade any of the Existing Notes or enter into any arrangement to vote or beneficially control any of the Existing Notes.

(b)     No Consenting Noteholder shall assign, transfer or otherwise pledge or dispose of any Existing Notes beneficially owned by such Consenting Noteholder, or any voting, consent or direction rights related to such Existing Notes (a "Transfer"), except that such Transfer by a Consenting Noteholder may be made:

     (i)     if the transferee is a Consenting Noteholder at the time of the Transfer;

     (ii)    if the transferee is not a Consenting Noteholder, such transferee delivers to each of the Consenting Noteholders and the Company at or prior to the time of the Transfer, the joinder attached hereto as Exhibit C pursuant to which such transferee shall assume all obligations of the Consenting Noteholder transferor hereunder in respect of the Existing Notes transferred (such transferee, a "Qualified Transferee"; any such transferee shall also be a "Consenting Noteholder" hereunder); or

10

    (iii)    to a Qualified Marketmaker (as defined below) acting in its capacity as a Qualified Marketmaker, without the requirement that such Qualified Marketmaker be or become a Consenting Noteholder; *provided* that such Qualified Marketmaker transfers (by purchase, sale, assignment, participation or otherwise) such right, title and or interest in the Existing Notes within twenty (20) Business Days after receipt thereof to (A) a Consenting Noteholder at the time of the transfer or (B) a Qualified Transferee; *provided, further*, that such Consenting Noteholder shall notify such Qualified Marketmaker that it is party to this Agreement prior to transferring any right, title or interest in the Existing Notes to such Qualified Marketmaker and such Qualified Marketmaker shall have no duty to make any investigation or inquiry as to whether any transferred Existing Note is subject to this Agreement.  For the purposes of this <u>Section 1.05(b)(iii)</u>, "<u>Qualified Marketmaker</u>" means an entity that (A) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers debt securities such as the Existing Notes or enter into with customers long and short positions in debt securities such as the Existing Notes, in its capacity as a dealer or market maker in such Existing Notes; (B) is in fact regularly in the business of making a market in debt securities; and (C) is registered with the SEC and Financial Institutions Regulatory Authority.

(c)    Notwithstanding the foregoing, no Consenting Noteholder shall transfer its Existing Notes to any of the Credit Parties or to any of affiliates of the Credit Parties (including, without limitation, the ILAP Partners), and neither the Company nor any affiliate of the Company shall be considered a Consenting Noteholder hereunder.

(d)    To the extent that a Transfer violates the provisions of <u>Section 1.05(b)</u>, the Transfer shall be void *ab initio* and the applicable transferor shall continue to remain subject to the terms of this Agreement.

(e)    Upon consummation of any Transfer in compliance with <u>Section 1.05(b)</u>, (i) any person or entity that is a transferee shall be fully bound by this Agreement as a "Consenting Noteholder" and shall be a "Party" hereunder and (ii) the Consenting Noteholder transferor shall no longer be bound by the Agreement or the obligations, nor have any rights, hereunder with respect to any Existing Notes that have been Transferred. This Agreement shall in no way be construed to preclude any Consenting Noteholder from acquiring additional Existing Notes; *provided*, *however*, that any additional Existing Notes acquired by any Consenting Noteholder after executing this Agreement shall automatically and immediately upon acquisition by such Consenting Noteholder be deemed subject to all of the terms of this Agreement whether or not notice is given to the Credit Parties and the Ad Hoc Group Advisors of such acquisition.

1.06.    <u>Corporate Actions in Furtherance of Demerger</u>. Notwithstanding anything to the contrary herein, the Credit Parties and the ILAP Partners are permitted to carry out all corporate actions in Chile necessary to reflect and implement the demerger effects of Latin America Power Holdings B.V. that occurred on or about September 5, 2023, as further described in <u>Schedule III</u>.

1.07.    <u>Additional Covenants of the Consenting Noteholders</u>.

(a)    Subject to the terms and conditions hereof, each of the Consenting Noteholders (severally and not jointly), covenants and agrees that they shall submit a ballot voting in favor of the Plan at least two (2) Business Days prior to the Petition Date.

(b)    <u>DIP Financing</u>.

(i)    The Consenting Noteholders and the Credit Parties agree that, at any time during the Proceeding, in the event that the Company's 30-day projected cash balance (excluding any payments to be made upon the Effective Date or any payments that can be reasonably delayed or deferred, provided that any payments that are required to be made to avoid a breach or default under this Agreement (unless waived) shall not be considered ones that can be reasonably delayed or deferred) is less than $3.5 million (the "<u>Trigger Date</u>"), the Consenting Noteholders shall consider in good faith providing DIP Financing to the Credit Parties subject to (1) agreement on the granting and perfection of all liens and receipt of all approvals that are contemplated by the DIP Financing, (2) agreement on the definitive documents for the DIP Financing, (3) agreement on all court filings in the U.S. and/or Chile in connection therewith, (4) receipt of information clearly documenting the aforementioned liquidity needs and (5) the continued compliance by the Company of all obligations under this Agreement, in amounts necessary to satisfy such liquidity needs but in no event exceeding the size of the exit financing (i.e., the Super Priority Notes).

(ii)    Any disbursement of funds under the DIP Financing will occur only if (1) the underlying collateral is granted and perfected and there is no material risk of imminent or threatened in writing termination of the PPAs or (2) a DIP Financing approval order has been entered, in form and substance satisfactory to the Majority Members, and this Agreement has not been terminated. With regard to (1), such condition may be waived or changed to a condition subsequent at the sole discretion of the parties lending under the DIP Financing.

(iii)    For the avoidance of doubt, the Credit Parties shall share information with the Consenting Noteholders documenting the aforementioned liquidity needs, and shall conduct their business (including with respect to making cash expenditures) in a reasonable manner consistent with their practice during the existence of the Standstill and with a view towards minimizing cash expenditures during the Proceeding to the extent practicable, that does not cause a breach or default under this Agreement, and that complies with applicable law.

(iv)    The Consenting Noteholders or any one of such Consenting Noteholders will provide the DIP Financing substantially on the terms of the Super Priority Notes described in the exit financing, with changes as are customary and necessary to reflect a DIP financing to exit facility, and which shall be rolled into the exit financing upon the Effective Date. The parties shall use reasonable efforts to agree and execute all documentation for funding and approval of the DIP Financing within two (2) weeks of the Trigger Date, and reasonably cooperate to obtain Bankruptcy Court approval and funding of the DIP Financing as soon as possible thereafter.

(v)          The Consenting Noteholders agree to provide a carve-out in the use of cash collateral that is customary for the pre-trigger notice period and $3 million for the post-trigger notice period to be used for payment of professional fees and expenses for advisors to the Credit Parties. In addition to the carve-out, any order approving use of cash collateral and/or DIP Financing shall provide for, without limitation, (A) use of cash available in the Operations Account (as defined in the Existing Indenture) to pay O&M Costs, (B) ability of the Company to provide withdrawal certificates at any time during the Proceeding (with cash to be drawn first from the Revenue Account (as defined in the Existing Indenture), and then from the O&M Reserve Account (as defined in the Existing Indenture)) to make payments due on energy payments, and (C) use of cash collateral pursuant to an agreed-to budget.

## Section 2.          <u>Representations and Warranties</u>.

2.01.          <u>Representations and Warranties of the Credit Parties</u>. The Credit Parties represent and warrant, jointly and severally, to each of the Consenting Noteholders and the ILAP Partners that, as of (i) the date hereof, (ii) the Voting Deadline and (iii) the Effective Date:

(a)          *Corporate Power and Authority*. Each Credit Party is validly existing and in good standing under the laws of Chile, has the corporate power and authority to enter into and, subject to Court approval (as applicable), perform, and has taken all necessary action to authorize the entry into, performance and execution of this Agreement;

(b)          *Consideration*. Each of the Credit Parties is receiving fair consideration for the obligations assumed in this Agreement;

(c)          *Binding Obligation*. This Agreement has been duly executed and delivered by, and, subject to Court approval (as applicable), constitutes a legally binding, valid and enforceable obligation of each Credit Party, enforceable in accordance with its terms, subject to any general principles of law or equity limiting its or their obligations hereunder;

(d)          *No Stamp Tax*. No stamp or similar taxes are required to be paid in order for this Agreement to be enforceable against the Credit Parties;

(e)          *No Violation of Law.* The execution, delivery, and, subject to Court approval (as applicable), performance by each Credit Party of this Agreement does not violate (i) any provision of law, rule or regulation applicable to it or any of its subsidiaries, or (ii) its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries;

(f)          *No Conflict*. The entry into, and performance by the Credit Parties and affiliates thereof, and the transactions contemplated by, this Agreement, do not and will not (i) conflict with any law, rule, regulation, order, judgment or decree applicable to it or them, its or their constituting documents or any agreement which is binding upon it or them or its or their assets, (ii) constitute a default (or constitute an event that with notice or lapse of time or both would become a default) under, or give others any rights of termination, amendment, acceleration or cancellation of any material agreement to which any Credit Party or affiliate thereof is a party or by which any property or asset of any Credit Party or affiliate thereof is bound (other than under the PPAs and any *ipso facto* defaults provided for in any other agreement) or (iii) result in the existence of, or oblige any Credit Party or affiliate thereof to create, any Lien over any of its assets;

13

(g)    *Consents.*  Subject to Court approval, all consents, approvals and authorizations required by any Credit Party in connection with the entry into, performance, validity and enforceability of, and the transactions contemplated by, this Agreement, have been obtained and are in full force and effect;

(h)    *Termination Event.*  No Termination Event has occurred and is continuing (other than, on the Effective Date, an Automatic Termination Event pursuant to <u>Section 3.01(a)(i)</u> hereof);

(i)    *PPAs*.  (i) The Guarantors have not received notification from the Chilean Ministry of Energy (*Ministerio de Energía*), the National Energy Commission (*Comisión Nacional de Energía*), the Coordinator of the National Electric System (*Coordinador Independiente del Sistema Eléctrico Nacional*), or any other relevant Governmental Authority of a default or an alleged default under any of the PPAs, (ii) the Guarantors have not received notification of a default or an alleged default under any of the PPAs from any counterparty to the PPAs (iii) or any downgrade notice from any of the rating agencies (*clasificadoras de riesgo*) specified in the PPAs (other than the notification received on August 17, 2023, a copy of which has been duly delivered to the Ad Hoc Group Advisors, which shall not constitute a Termination Event), and (iv) none of the Credit Parties are aware of having received any such notifications;

(j)    *Accuracy of Statements.*  The information, reports, certificates, memoranda and schedules furnished (or to be furnished) in writing by or on behalf of the Credit Parties in connection with the negotiation, preparation, or delivery and performance of the Definitive Documents and this Agreement do not, and will not as of the time it was or shall be made or furnished, contain any untrue statement of any material fact or omit to state any material fact necessary to make such information, reports, financial statements, certificates, memoranda and schedules, taken as a whole and in light of the circumstances under which they were made and as of the time at which they were made, not materially misleading;

(k)    *No Material Liabilities.*  There are no material liabilities (contingent or otherwise) except as disclosed in the financial statements as of and for the period ended June 30, 2023 or otherwise expressly contemplated in the Restructuring Term Sheet;

(l)    *No Bankruptcy or Insolvency Proceeding Filings.* Except for the Proceeding, there has been no authorization or action taken in furtherance of any Insolvency Event with respect to any of the Credit Parties;

(m)    *No Notes or Interests.* The Credit Parties and their respective affiliates do not hold directly, or indirectly through participants, total return swaps or otherwise, any Notes or interests in the Credit Agreement, except as otherwise disclosed to counsel to the Consenting Noteholders as of the date hereof;

(n)    *No Additional Reimbursement Agreements.* The Credit Parties have not entered into any reimbursement agreements other than those of the Ad Hoc Group Advisors or advisors to the Credit Parties as of the date hereof; and

(o)    *Complete Disclosure.* To the best of the Credit Parties' knowledge, the Credit Parties have made a full and complete disclosure of any Material Change (as defined below).

2.02.    <u>Representations and Warranties of the Consenting Noteholders</u>. Each of the Consenting Noteholders, severally and not jointly, represents and warrants to the ILAP Partners and the Credit Parties (and not to each other) that, as of the date hereof:

(a)    *Corporate Power and Authority.*  It is validly existing and in good standing under the laws of the state of its incorporation or organization, has the corporate power to enter into and perform, and has taken all necessary action to authorize the entry into, performance and execution of this Agreement;

(b)    *Ownership*.  As of the date hereof, it is (i) a beneficial owner, directly or indirectly, or (ii) an investment advisor or subadvisor to or manager of funds, accounts, and/or entities, that holds the principal amount of the Existing Notes set forth on their signature page hereto;

(c)    *Binding Obligation*.  With respect to it, this Agreement has been duly executed and delivered by, and constitutes a legally binding, valid and enforceable obligation in accordance with its terms, subject to any general principles of law or equity limiting its obligations hereunder;

(d)    *No Violation of Law.* The execution, delivery, and performance by each Consenting Noteholder of this Agreement does not violate (i) any provision of law, rule or regulation applicable to it or any of its subsidiaries, or (ii) its charter or bylaws (or other similar governing documents); and

(e)    *No Conflict.* The entry into, and performance by each Consenting Noteholder, and the transactions contemplated by, this Agreement, do not and will not conflict with any law, rule, regulation, order, judgment or decree applicable to it or them, its or their constituting documents or any agreement which is binding upon it or them or its or their assets.

2.03.    <u>Representations and Warranties of the ILAP Partners</u>. Each of the ILAP Partners, severally and not jointly, represents and warrants to the Credit Parties and the Consenting Noteholders (and not to each other) that, as of the date hereof:

(a)    *Corporate Power and Authority.*  It is validly existing and in good standing under the laws of the state of its incorporation or organization, has the corporate power to enter into and perform, and has taken all necessary action to authorize the entry into, performance and execution of this Agreement;

(b)    *Ownership*.  As of the date hereof, the ILAP Partners collectively own 100.0% of the equity interest in the Company;

(c)    *Binding Obligation*.  With respect to it, this Agreement has been duly executed and delivered by, and constitutes a legally binding, valid and enforceable obligation in accordance with its terms, subject to any general principles of law or equity limiting its obligations hereunder;

(d)    *No Ownership of Existing Notes*.  It does not own and will not own any of the Existing Notes;

(e)    *No Trading of Notes*.  At any time during the term hereof, it and any of its affiliates shall not, directly or indirectly, buy, sell or otherwise trade any of the Existing Notes;

15

(f)    *No Material Liabilities.*  There are no known material liabilities of the Credit Parties other than those described in the Annual Audited Financials (as defined in the Restructuring Term Sheet) or the Quarterly Reports (as defined in the Restructuring Term Sheet);

(g)    *No Bankruptcy or Insolvency Proceeding Filings.*  Except for the Proceeding, there has been no authorization or action taken in furtherance of any Insolvency Event with respect to any of the Credit Parties; and

(h)    *No Notes or Interests.* The ILAP Partners and their respective affiliates do not hold directly, or indirectly through participants, total return swaps or otherwise, any Notes or interests in the Credit Agreement, except as otherwise disclosed to counsel to the Consenting Noteholders as of the date hereof.

**Section 3.    Termination Events**.

3.01.    This Agreement shall terminate:

(a)    automatically upon the occurrence of one or more of the following events (each, an "Automatic Termination Event"):

(i)    the occurrence of the Effective Date;

(ii)    the Restructuring and other transactions related thereto have not been consummated on or prior to the Expiration Date;

(iii)    entry of a final order by the Court denying confirmation of the Plan, unless the Consenting Noteholders deliver written notice within three (3) Business Days after the entry of such order to the Company of their desire to amend the Plan to address the grounds on which such confirmation was denied;

(iv)    entry of a final order by the Court confirming the Plan is reversed or vacated, unless the Consenting Noteholders deliver written notice within two (2) business days after the entry of such order reversing or vacating confirmation to the Company of their desire to amend the Plan to address the grounds on which such confirmation was reversed or vacated;

(v)    any court of competent jurisdiction has entered a final, non-appealable judgment or order declaring this Agreement to be unenforceable;

(vi)    the occurrence of an Insolvency Event, other than the Proceeding, with respect to any Credit Party;

(vii)    except as contemplated in the Restructuring Term Sheet, a court of competent jurisdiction (A) in any voluntary or involuntary case or proceeding enters a bankruptcy order, including a decision granting financial protection and initiating any bankruptcy proceeding (*procedimiento concursal*) under Chilean Law 20.720, against any Credit Party or in respect of all or any substantial part of the property of the Credit

16

Parties, as applicable; or (B) grants an injunction (*medida cautelar o precautoria*) or any other interim order restraining dealings on property of any Credit Party or grants an attachment against all or any substantial part of the property of any of the Credit Parties, as applicable;

(viii)    a custodian, receiver, liquidator or *liquidador*, trustee, monitor, *veedor*, sequestrator or similar official is appointed out of court with respect to any Credit Party, or with respect to all or any substantial part of the assets or properties of any of the Credit Parties, as applicable;

(ix)    any Credit Party (A) issues a public statement, including by means of a court filing, or any other written statement repudiating or challenging the validity or enforceability of the Existing Indenture, the Existing Notes, the Note Guarantees or the Security Documents (collectively, the "Note Documents") or any related document, any Liens in connection with the Existing Notes and the existence of this Agreement, or any Indebtedness incurred under the Note Documents or (B) takes any action in any proceeding or in writing to challenge or contest the validity or enforceability of, or in any manner asserts in any proceeding or in writing the invalidity or unenforceability of, this Agreement, any Note Document or any provision hereof or thereof;

(x)    the Company's public announcement of its intention to terminate the Restructuring, not consummate the Restructuring on the terms set forth in this Agreement or the Restructuring Term Sheet and/or to proceed with an Alternative Transaction; or

(xi)    the passage of any law and/or decree and/or administrative regulation in Chile invalidating any liens on a material portion of the Collateral or in any way suspending, affecting or diminishing the immediate enforceability of any such lien in a material way;

(b)    In addition, at any time during the term hereof, upon the occurrence of any of the following events (each, a "Majority Holder Termination Event"), the Majority Members shall have the right, upon three (3) Business Days' prior written notice to the Company, the other Consenting Noteholders, and the ILAP Partners, to terminate this Agreement:

(i)    any of the Definitive Documents are inconsistent with the terms of the Agreement or the Restructuring Term Sheet, or the Definitive Documents are modified or amended, or proposed to be modified or amended, in a manner not acceptable to the Majority Members, in their reasonable discretion;

(ii)    the Company fails to meet any of the milestones set forth in Section 1.03(a)(iv) herein and in the Restructuring Term Sheet, other than due to a breach hereunder by any Consenting Noteholder;

(iii)    a Default, other than the Specified Events of Default listed in <u>Schedule II</u> hereto or as otherwise disclosed to counsel for the Consenting Noteholders and any default arising from entry into, and the parties' performance under, this Agreement (the "<u>Specified Events of Default</u>"), has occurred under the Existing Indenture;

(iv)    any regulatory or any other action by the Chilean Ministry of Energy (*Ministerio de Energía*), the National Energy Commission (*Comisión Nacional de Energía*), the Coordinator of the National Electric System (*Coordinador Independiente del Sistema Eléctrico Nacional*), any other Governmental Authority or any counterparty to the Material Project Documents has been taken that would result in a Material Change of the Credit Parties;

(v)    any Credit Party or any ILAP Partner fails to comply with any of the terms, covenants, provisions or conditions of this Agreement or any of the representations or warranties of the Credit Parties or of the ILAP Partners, respectively, as set forth in this Agreement are not true or accurate in any material respect on the applicable date(s) set out herein;

(vi)    the Credit Parties, without the express written consent of the Majority Members (which shall not be unreasonably withheld), enter into any restructuring support, standstill or forbearance agreement with any of its other creditors (other than trade creditors with claims against any Credit Party of less than U.S. $100,000), or any amendment, waiver, modification or supplement to any such standstill or forbearance agreement, in each case, other than expressly contemplated under this Agreement (including <u>Exhibit B</u>) and consistent with the Restructuring Term Sheet;

(vii)    (A) the settlement of any litigation, arbitration or similar proceeding involving payment (or reimbursement) in cash or other assets by the Credit Parties unless the Company has obtained the prior written consent of the Majority Members (which shall not be unreasonably withheld), (B) any judgment rendered by an applicable court against a Credit Party in excess of U.S. $1,000,000 or (C) termination of any Material Project Documents, including any operation and maintenance contracts effective as of the date hereof, in each case without the express prior written consent of the Majority Members (which shall not be unreasonably withheld);

(viii)    Either (x) lender, bondholder or creditor with a claim over U.S.$ 100,000 or (y) Citi: (A) commences any action (other than the filing of any action in the Proceeding (including any adversary proceeding)) to collect or enforce any claims against any Credit Party under any agreement or instrument governing Indebtedness of such Credit Party or (B), takes any other action to enforce or exercise offsets (except for offsets under the PPA with Enel) or similar rights, in each case, on the Collateral other than any actions by the Consenting Noteholders that are not prohibited by this Agreement;

*provided*, *however*, that in the case of either clause (A) or clause (B), if such action (1) is stopped, withdrawn or otherwise resolved in a manner that is not violative of this Agreement within five (5) Business Days of the Credit Parties' knowledge of its occurrence, or (2) is determined by the Bankruptcy Court to be violative of the automatic stay and such party has been enjoined by the Bankruptcy Court from taking such action within five (5) Business Days of the Credit Parties' knowledge of its occurrence and such delay would not reasonably be expected to have a material adverse effect on the rights or interests of the Consenting Noteholders, then, as to clause (A) or clause (B), such action shall not give rise to any Majority Holder Termination Event;

(ix)    subject to Court approval, the Credit Parties fail to perform their obligations under any engagement agreement entered into with an Ad Hoc Group Advisor in accordance with its terms and such failure continues unremedied for thirty (30) Business Days;

(x)    any material permit at any time necessary to enable any Credit Party to own, operate and conduct its business as presently conducted or as proposed to be conducted or to comply with any of its obligations under the Existing Indenture, shall be revoked, withdrawn or withheld or shall be modified or amended, resulting in a Material Change;

(xi)    any person obtains an injunction against the appointment of any of the current directors of the Guarantors;

(xii)    any Credit Party or any ILAP Partner files, propounds, solicits, votes upon, sought confirmation of or otherwise supports an Alternative Transaction;

(xiii)    the occurrence of a Material Change (as defined below) other than due to a breach hereunder by any Consenting Noteholder;

(xiv)    the Consenting Noteholders no longer hold at least 66% and two-thirds of principal amounts and fifty percent in number of the Existing Notes (including Citi if classified with the Existing Notes) (the "Bankruptcy Majority");

(xv)    the Credit Parties enter into any new financing, loan, or "debtor in possession" facility (other than as contemplated herein or in the Restructuring Term Sheet), in each case without the express written consent of the Majority Members;

(xvi)    this Agreement is no longer supported by the Bankruptcy Majority;

(xvii)    any default, event of default, or breach (in each case, other than account of a credit ratings agency downgrade or *ipso facto* clauses) or termination of the PPAs (including unilateral modifications of the PPAs issued by any Governmental Authority, other than those modifications resulting from

ordinary course regulations promulgated thereby which would be generally applicable to generators of the wholesale electricity market and would not have the effect of terminating the PPAs or depriving the Guarantors of the benefits of the PPAs), or any material provision of any of the PPAs for any reason shall cease to be in full force and effect, and such default, event of default, breach or termination or similar event has not been waived by any applicable Governmental Authority; or

(xviii)    the Credit Parties fail to make required payments under (x) any PPA (after giving effect to any cure periods set forth therein) or (y) Material Project Document (after giving effect to any cure periods set forth therein), and, in each case, to the extent that such failure could reasonably be expected to result in a Material Change.

(c)    Upon the occurrence of any of the following (each, an "ILAP Partner Termination Event"), the ILAP Partners shall have the right, upon three (3) Business Days' prior written notice to the Company and the Consenting Noteholders and subject to any cure periods described below, to terminate this Agreement, in each case other than due to a breach hereunder of the ILAP Parties:

(i)    at any time, the Plan has not been (or is not) approved by the Bankruptcy Majority of votes for confirmation of the Plan cast by the holders of the Existing Notes (the "Existing Noteholders") in accordance with the Plan Solicitation Materials on or prior to the Voting Deadline;

(ii)    at any time, any Consenting Noteholders fails to submit a ballot voting in favor of confirmation of the Plan pursuant to Section 1.07(a) hereof;

(iii)    if as of one (1) Business Day before the Petition Date, the Company is not able to determine, following consultation with counsel to the Consenting Noteholders, that the votes cast by the Consenting Noteholders that voted in favor of the Plan are sufficient to approve the Plan as of the record date for voting;

(iv)    the Parties do not agree to the terms of the Definitive Documents one (1) Business Day before the earlier of the start of solicitation of votes on the Plan or the deadline to start solicitation of votes on the Plan;

(v)    from and after the date of this Agreement, there has been a material change of liquidity of the Credit Parties and, as a result, the Credit Parties reasonably believe that they will be unable to implement the Restructuring and such ILAP Partner Termination Event is notified to the Consenting Noteholders at least three (3) business days prior to the Petition Date;

(vi)    the Confirmation Order has not been entered by the Court on or prior to the Plan Approval Date;

(vii)    (A) if any Consenting Noteholder fails to comply with any of the terms, covenants, provisions or conditions of this Agreement in a manner that

would materially impair the prospects of the Parties to consummate the Restructuring in accordance with the terms hereof and such failure continues unremedied for five (5) Business Days from the date on which the Ad Hoc Group Advisors received written notice from the ILAP Partners, or (B) any of the representations or warranties of the Consenting Noteholders as set forth in this Agreement are not true or accurate in any material respect on the applicable date(s) set out herein and such failure to be true renders impossible or impracticable the consummation of the Restructuring;

(viii)   the occurrence of a Material Change to the extent that the Material Change makes implementation of the Plan impracticable;

(ix)   the Consenting Noteholders no longer hold a Bankruptcy Majority; or

(x)   this Agreement is no longer supported by the Bankruptcy Majority.

(d)   Upon the occurrence of any of the following (each, a "Credit Party Termination Event" and, together with each of the Automatic Termination Events, the Majority Holder Termination Events, and the ILAP Partners Termination Events, the "Termination Events"), the Credit Parties shall have the right, upon three (3) Business Days' prior written notice to the Company and the Consenting Noteholders and subject to any cure periods described below, to terminate this Agreement, in each case other than due to a breach hereunder of the Credit Parties:

(i)   at any time, the Plan has not been (or is not) approved by the Bankruptcy Majority of votes for confirmation of the Plan cast by the Existing Noteholders voting in accordance with the Plan Solicitation Materials on or prior to the Voting Deadline;

(ii)   at any time, any Consenting Noteholders fails to submit a ballot voting in favor of confirmation of the Plan pursuant to Section 1.07(a) hereof;

(iii)   if as of one (1) Business Day before the Petition Date, the Company is not able to determine, following consultation with counsel to the Consenting Noteholders, that the votes cast by the Consenting Noteholders that voted in favor of the Plan are sufficient to approve the Plan as of the record date for voting;

(iv)   the Parties do not agree to the terms of the Definitive Documents one (1) Business Day before the earlier of the start of solicitation of votes on the Plan or the deadline to start solicitation of votes on the Plan;

(v)   from and after the date of this Agreement, there has been a material change of liquidity of the Credit Parties and, as a result, the Credit Parties reasonably believe that they will be unable to implement the Restructuring and such Credit Party Termination Event is notified to the Consenting Noteholders at least three (3) business days prior to the Petition Date;

(vi)      funding and approval of the DIP Financing does not occur within three weeks of the Trigger Date;

(vii)     the Confirmation Order has not been entered by the Court on or prior to the Plan Approval Date;

(viii)    the occurrence of a Material Change to the extent that the Material Change makes implementation of the Plan impracticable;

(ix)      (A) if any Consenting Noteholder fails to comply with any of the terms, covenants, provisions or conditions of this Agreement in a manner that would materially impair the prospects of the Parties to consummate the Restructuring in accordance with the terms hereof and such failure continues unremedied for five (5) Business Days from the date on which the Ad Hoc Group Advisors received written notice from the Credit Parties, or (B) any of the representations or warranties of the Consenting Noteholders as set forth in this Agreement are not true or accurate in any material respect on the applicable date(s) set out herein and such failure to be true renders impossible or impracticable the consummation of the Restructuring;

(x)       the Credit Parties determine, following consultation with outside counsel (including Greenberg Traurig, LLP, Barros Silva Varela & Vigil and/or Nelson Contador Abogados & Consultores), that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable Law or its fiduciary duties under applicable Governance Documents;

(xi)      the Consenting Noteholders no longer hold a Bankruptcy Majority; or

(xii)     this Agreement is no longer supported by the Bankruptcy Majority.

3.02.    <u>Mutual Termination</u>.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual agreement among the Credit Parties, the ILAP Partners and the Majority Members.

3.03.    <u>Effect of Termination</u>.  Subject to <u>Section 10.13</u> of this Agreement, upon termination of this Agreement pursuant to <u>Sections 3.01</u> or <u>3.02</u> hereof, this Agreement shall be of no further force and effect and each Party shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had had it not entered into this Agreement, in each case without prejudice to the rights, remedies, obligations or liabilities of any Party that have accrued.  Upon the occurrence of any termination of this Agreement (other than as a result of the occurrence of the Effective Date), any and all consents or votes given with respect to Existing Notes occurring prior to such termination by the Consenting Noteholders shall be deemed, for all purposes, to be null and void *ab initio* and

shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement or otherwise.

3.04.    Individual Holder Withdrawal. In addition, subject to Section 3.05 hereof, at any time during the term hereof, upon the occurrence of any one or more of the following events (each, an "Individual Holder Withdrawal Event"), each Consenting Noteholder shall have the right, upon three (3) Business Days' prior written notice to the Company, the ILAP Partners, and the advisors to the other Consenting Noteholders (if any), in each case, solely to the notice addresses listed for such advisors in Section 10.05 hereof, to withdraw from this Agreement, in which case it shall no longer be considered a Consenting Noteholder as of the date of delivery of such written notice:

(a)    a Change of Control occurs, directly or indirectly;

(b)    (i) a condemnation, nationalization or expropriation event has occurred, (ii) a decision has been issued by any Governmental Authority in Chile declaring the PPAs null and void or otherwise unenforceable or (iii) any Credit Party is prevented, other than as contemplated by this Agreement, from being able to continue to utilize all or a substantial part of its property; or

(c)    in the event that this Agreement is modified, amended, or supplemented pursuant to Section 7 without the written consent of such Consenting Noteholder.

3.05.    Effect of Withdrawal  Upon withdrawal from this Agreement by any Consenting Noteholder pursuant to Section 3.04, this Agreement shall continue in full force and effect and only the withdrawing Consenting Noteholder shall be immediately released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had had it not entered into this Agreement, in each case without prejudice to the rights, remedies, obligations or liabilities of any Party that have accrued prior to such termination.  Upon the occurrence of any withdrawal pursuant to Section 3.04, all consents or votes with respect to Existing Notes occurring prior to such termination by such withdrawing Noteholder shall be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement or otherwise.

**Section 4.    Conditions Precedent.**

4.01.    This Agreement shall become effective as of the first date on which:

(a)    No Termination Event hereunder has occurred and is continuing as of the date hereof; and

(b)    the Consenting Noteholders, the Credit Parties and the ILAP Partners shall have received, in form and substance satisfactory to each such Party, this Agreement, duly executed by:

(i)    each of the Credit Parties;

(ii)    each of the ILAP Partners; and

(iii)    the Consenting Noteholders who collectively hold 66% and two-thirds of principal amounts of the Existing Notes;

4.02.    The Ad Hoc Group Advisors shall notify in writing each of the Credit Parties, the ILAP Partners and the Consenting Noteholders of the effectiveness of this Agreement upon the satisfaction or waiver of the conditions precedent outlined in Section 4.01 hereof.

**Section 5.    Conditions to Consenting Noteholders' Support Obligations**. Notwithstanding anything to the contrary contained in this Agreement and without limiting any other rights of the Consenting Noteholders hereunder, each Consenting Noteholder's obligation to vote in favor of the Plan pursuant to this Agreement shall be subject to the satisfaction of the following conditions which may be waived, in whole or in part, by the Majority Members in their reasonable discretion:

5.01.    Each Credit Party and the ILAP Partners shall have executed this Agreement and delivered its signature page hereto to the Ad Hoc Group Advisors;

5.02.    The representations and warranties of the Credit Parties set forth in this Agreement shall be true and correct in all material respects as of the Voting Deadline;

5.03.    No Majority Holder Termination Event has occurred and is continuing for more than two (2) Business Days; and

5.04.    No Insolvency Event shall have occurred with respect to any Credit Party, other than the Proceeding.

**Section 6.    Conditions to the Restructuring Transactions.**    The obligations of the Consenting Noteholders to complete the Restructuring Transactions and the consummation of the Restructuring Transactions are subject to the satisfaction of the following conditions prior to or on the Effective Date, each of which is for the benefit of the Consenting Noteholders and may be waived, in whole or in part, by the Majority Members in their sole and absolute discretion:

6.01.    The Credit Parties and the ILAP Partners, as applicable, shall have (a) achieved the milestones set forth in Section 1.03(a)(iv) hereof on or before the applicable dates herein (or otherwise, in the case of the ILAP Partners, used commercially reasonable efforts to cause the milestones set forth in Section 1.03(a)(iv) to be achieved), and (b) complied in all material respects with each covenant and obligation in this Agreement and the Restructuring Term Sheet to be performed by them on or before the Effective Date;

6.02.    The representations and warranties of the Credit Parties set forth in this Agreement shall be true and correct in all material respects as of the Effective Date with the same force and effect as if made at and as of such date, except (a) that representations and warranties that are given as of a specified date shall be true and correct in all material respects as of such date and (b) as such representations and warranties may be affected by the occurrence of events or transactions contemplated and permitted by this Agreement;

6.03.    All actions taken by the Credit Parties and the ILAP Partners, as applicable, in furtherance of the Restructuring Transactions and the Plan shall be consistent in all material respects with this Agreement and the Restructuring Term Sheet;

6.04.    The Confirmation Order shall have been entered by the Court;

6.05.    All Definitive Documents shall be consistent in all material respects with the Restructuring Term Sheet and this Agreement and otherwise in form and substance acceptable to the Majority Members, the Credit Parties and the ILAP Partners in their respective reasonable discretion;

6.06.    All required regulatory, Court approvals, consents, waivers and filings required to be made by the Credit Parties shall have been obtained or made, as applicable, on terms reasonably satisfactory to the Credit Parties, the ILAP Partners and the Majority Members, and copies of any and all such approvals, consents and/or waivers shall have been provided to the Ad Hoc Group Advisors;

6.07.    All filings that are required under applicable Laws in connection with the Restructuring Transactions required to be made by the Credit Parties shall have been made and any material regulatory consents or approvals that are required in connection with the Restructuring Transactions shall have been obtained and, in the case of waiting or suspensory periods, such waiting or suspensory periods shall have expired or been terminated;

6.08.    No Governmental Authority having jurisdiction over the Credit Parties or their assets, including any regulatory authority or court of competent jurisdiction, has issued any ruling, order or any other document or official record (i) enjoining the substantial consummation of the Restructuring, (ii) making illegal or otherwise restricting, preventing, or prohibiting the Restructuring or compliance with any material term or condition of the Restructuring or (iii) otherwise substantially impeding or rendering impossible or impracticable the substantial consummation of the Restructuring in a way that cannot be reasonably remedied by the Company in a manner that is reasonably satisfactory to the Majority Members, the Credit Parties and the ILAP Partners (as evidenced in writing), and such ruling, order, or other document is not dismissed, stayed, reversed or lifted by the Expiration Date;

6.09.    No Insolvency Event, other than the Proceeding, shall have occurred with respect to any Credit Party;

6.10.    From the date of this Agreement, no material change, effect, event, circumstance or development has occurred that, individually or in the aggregate and taken together with all other material changes, has had or would reasonably be expected to have, a materially adverse effect on (i) the business, assets, operations, financial conditions, liquidity, or results of operations of the Company and its Guarantors (in each case, other than resulting from the Proceeding) or (ii) the ability of the Company or any of its Guarantors to consummate the Restructuring Transactions (collectively, "Material Changes");

6.11.    The Expiration Date shall not have passed;

6.12.    The Consenting Noteholders shall have received a certificate signed by the chief executive officer (or other comparable officer) or the chief financial officer of the Credit Parties certifying that the Closing Conditions referenced in this Section 6 have been satisfied; and

25

6.13.    The Credit Parties have paid and reimbursed all reasonable and documented professionals' fees and expenses incurred by the (i) Credit Parties (A) from the professionals' respective retainers for work performed prior to the Petition Date in respect of this Agreement and the Restructuring and (B) for work performed after the Petition Date, in accordance with applicable law, and (ii) the Consenting Noteholders with whom the Company entered into a reimbursement agreement as of the date hereof, in each case, as set forth on summary statements that provide reasonably detailed descriptions of the work performed during the relevant period (which descriptions may be limited or redacted in the professionals' sole discretion to protect matters that may be privileged or confidential), which statements have been delivered to the Credit Parties and ILAP Partners and/or Greenberg Traurig, LLP (for work performed by professionals for the Ad Hoc Group), in accordance with the terms of, and at the times set forth in, the agreements entered into with such firms or individuals.

**Section 7.    Amendments.**

7.01.    This Agreement may not be modified, amended, or supplemented (except as expressly provided herein) except in writing signed by (a) the Credit Parties, (b) the ILAP Partners and (c) each Consenting Noteholder bound by such modification, amendment or supplement; *provided* that, in the case of (c), subject to Section 3.01(c) hereof, this Agreement may be amended by the Majority Members. Notwithstanding the foregoing, the Credit Parties may amend, modify or supplement the Plan, from time to time without the consent of any Consenting Noteholder solely to cure any ambiguity, defect (including any technical defect) or inconsistency, *provided* that any such amendments, modifications or supplements (i) are not material, (ii) do not adversely affect the rights, interests, or treatment of any member of the class that includes the Consenting Noteholders, (iii) do not change the material terms and conditions of any New Securities, including without limitation any financial terms, events of default, covenants or substantive protections benefiting the Consenting Noteholders and (iv) are provided to Consenting Noteholders at least two (2) days before the proposed effectiveness of such amendments, modification or supplements.

**Section 8.    Acknowledgments, Reaffirmations, Release, etc.**

8.01.    Acknowledgments and Reaffirmations. By its execution on the respective signature lines provided below, each of the Credit Parties hereby:

(a)    Acknowledges that the Specified Events of Default have occurred and, as of the date hereof, are continuing;

(b)    Acknowledges that all amounts owing to the Secured Parties as of September 30, 2023 under the Existing Indenture including, but not limited to, the principal and all accrued interest, fees, costs (excluding costs and expenses of counsel to the trustee or to the bondholders in connection with the enforcement of their rights, which costs and expenses remain the responsibility of the Credit Parties), and other allowable charges accrued or accruing to date, is no less than $406.1 million;

(c)    Ratifies and confirms in all respects all obligations, Indebtedness and liabilities of the Credit Parties to the Consenting Noteholders as evidenced by or otherwise arising under the Note Documents;

(d)     Reaffirms all of its payment and performance obligations, contingent or otherwise, under each of the Note Documents and the security interests created thereby;

(e)     Acknowledges that any Liens purported to be created over any assets of the Credit Parties pursuant to the Security Documents in order to secure the Senior Secured Obligations (as defined in the relevant Note Documents) and any other documents evidencing, creating or perfecting Liens on the Collateral in favor of the Secured Parties are valid and enforceable first-priority Liens in favor of the Offshore Collateral Agent and/or the Onshore Collateral Agent (as defined in the relevant Note Documents) for the benefit of the Secured Parties; and

(f)     Reaffirms that each statute of limitations or other applicable law, rule or regulation governing the time by which any Consenting Noteholder must commence legal proceedings or otherwise take any action with respect to exercising any of its respective rights, powers or remedies, directly or indirectly, against any of the Credit Parties with respect to any breach or default existing on or prior to the Effective Date, including actions under or in respect of the Note Documents, shall be tolled from the date hereof to the termination of this Agreement. Each Credit Party agrees, to the fullest extent permitted by law, not to include such period of time in any assertion by it at any time that a statute of limitations or other applicable law, rule or regulation bars or otherwise acts as a defense (whether equitable or legal) to any legal proceeding or other action by any Consenting Noteholder or any party acting on its behalf or for its benefit, including the Trustee, in the exercise of its respective rights, powers or remedies, directly or indirectly, with respect to any or all of the breaches or defaults referred to in the immediately preceding sentence.

8.02.    <u>Further Acknowledgments</u>.  By its execution on the respective signature lines provided below, each of the Parties hereby acknowledge that all representations, warranties, covenants and other agreements made by any Consenting Noteholder that is a separately managed account of an investment advisor, subadvisor or manager are being made only with respect to the Existing Note Claims managed by such investment advisor, subadvisor or manager (and limited by the amount identified on the signature pages hereto), and shall not apply to (or be deemed or construed to be made in relation to) any Existing Note Claims that may be beneficially owned by such Consenting Noteholder that are not held through accounts managed by such investment advisor, subadvisor or manager.

8.03.    <u>Releases on the Effective Date</u>.

(a)     On the Effective Date of the Plan, in consideration of the agreements of the Consenting Noteholders contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Company, the Guarantors and the ILAP Partners, on behalf of itself and its affiliates, successors, assigns, and other representatives (each, a "<u>Credit Party Releasor</u>" and collectively, the "<u>Credit Party Releasors</u>"), hereby, to the fullest extent permitted by applicable law, absolutely, unconditionally and irrevocably releases and forever discharges each of the Consenting Noteholders (and, in addition to the Consenting Noteholders, where a Consenting Noteholder is an investment advisor, subadvisor, or manager for a beneficial holder of the Existing Notes, such beneficial holder), and their respective successors and assigns, and their respective present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, agents (including, for the avoidance of doubt, the Collateral Agents and the Trustee) and other

representatives (each a "Consenting Noteholder Releasee" and, collectively, the "Consenting Noteholder Releasees"), of and from all demands, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set off, demands and liabilities whatsoever of every name and nature, known or unknown, suspected or unsuspected, both at law and in equity (individually, a "Claim" and collectively, the "Claims"), which any Credit Party Releasor may now or hereafter own, hold, have or claim to have against the Consenting Noteholder Releasees or any of them for, upon, or by reason of any circumstance, action, cause or thing whatsoever arising at any time on or prior to the Effective Date for or on account of, or in relation to, or in any way in connection with this Agreement or any other Note Documents or transactions thereunder or related thereto; *provided* that in no event shall any Consenting Noteholder Releasee be released from any Claim, whether in law or in equity, that has been determined through a final, non-appealable order of a court of competent jurisdiction to have resulted from a breach of this Agreement or such Consenting Noteholder Releasee's fraudulent conduct, gross negligence or willful misconduct.

(b)        On the Effective Date of the Plan, in consideration of the agreements of the Credit Parties contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Consenting Noteholders, on behalf of itself and its affiliates, successors, assigns, and other representatives (including any affiliates who may provide DIP Financing) (each, a "Consenting Noteholder Releasor" and collectively, the "Consenting Noteholder Releasors") hereby, to the fullest extent permitted by applicable law, absolutely, unconditionally and irrevocably releases and forever discharges each of the Credit Parties and the ILAP Partners and their respective successors and assigns, and their respective present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, agents and other representatives (each a "Credit Party/ILAP Partner Releasee" and, collectively, the "Credit Party/ILAP Partner Releasees"), of and from all Claims which any Consenting Noteholder Releasor may now or hereafter own, hold, have or claim to have against the Credit Party/ILAP Partner Releasees or any of them for, upon, or by reason of any circumstance, action, cause or thing whatsoever arising at any time on or prior to the Effective Date for or on account of, or in relation to, or in any way in connection with this Agreement or any other Note Documents or transactions thereunder or related thereto; *provided* that in no event shall any Credit Party/ILAP Partner Releasees be released from any Claim, whether in law or in equity, that has been determined through a final, non-appealable order of a court of competent jurisdiction to have resulted from a breach of this Agreement or such Credit Party/ILAP Partner Releasee's fraudulent conduct, gross negligence or willful misconduct.

(c)        The Consenting Noteholder Releasors and the Credit Party Releasors (collectively, the "Releasing Parties" and each a "Releasing Party") understand, acknowledge and agree that (i) the releases set forth above may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such release, and (ii) no fact, event, circumstance, evidence or transaction in existence today or that has existed in the past and which could now be asserted or which may hereafter be discovered shall affect in any manner the final, absolute and unconditional nature of the release set forth above.

(d)      The Releasing Parties, hereby absolutely, unconditionally and irrevocably, covenant and agree with and in favor of each Consenting Noteholder Releasee and Credit Party Releasee (collectively, the "<u>Released Parties</u>" and each a "<u>Released Party</u>") that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Released Party on the basis of any Claim released, remised and discharged pursuant to this <u>Section 8.03</u>.  If any Releasing Party or any of its respective successors, assigns or other legal representatives violates the foregoing covenant, each Releasing Party for itself and its respective successors, assigns and legal representatives, agrees to pay, in addition to such other damages as any Released Party may sustain as a result of such violation, all attorneys' fees and costs incurred by any Released Party as a result of such violation.

(e)      The Plan and Confirmation Order shall contain similar releases and exculpations for the Released Parties.

8.04.      <u>Effect on Note Documents.</u>

(a)      Except as specifically set forth herein, the Restructuring Term Sheet and in the Plan, all of the terms of the Note Documents shall remain unchanged and in full force and effect and are hereby ratified and confirmed by each Credit Party.

(b)      Except as specifically set forth herein, the Restructuring Term Sheet and in the Plan, each Credit Party acknowledges and agrees that nothing contained in this Agreement and no action by, or inaction on the part of, any Consenting Noteholder shall be deemed to (i) constitute a consent to or waiver of any past, present or future violations of any provisions of the Note Documents, (ii) amend, modify or operate as a waiver of any provision of the Note Documents, or of any right, power or remedy of any Consenting Noteholder thereunder, or (iii) constitute a course of dealing or other basis for altering any obligations of any Credit Party under the Note Documents or any other agreement or instrument.

(c)      Without limiting the generality of the foregoing, the Consenting Noteholders hereby reserve all of their rights and remedies under the Note Documents, subject to any rights, claims and defenses of the Credit Parties.

(d)      For the avoidance of doubt, nothing in this Agreement shall impose on any Consenting Noteholder (or, for the avoidance of doubt, any fund, account, or entity managed or advised by such Consenting Noteholder that beneficially holds the Existing Notes) any obligation to agree to any proposal with respect to any possible amendment, modification, supplement or extension of Indebtedness owing to it under any Note Document other than as set forth in this Agreement, the Restructuring Term Sheet and the Plan.

(e)      Notwithstanding any other provision of this Agreement, no Consenting Noteholder (or, in addition to the Consenting Noteholders, where a Consenting Noteholder is an investment advisor, subadvisor, or manager for a beneficial holder of the Existing Notes, such beneficial holder) shall be liable for (i) any indirect, special, punitive or consequential damages in connection with its entry into this Agreement, or (ii) any action that it takes or the omission of any action by it that results in a Termination Event, unless due to a breach of its express obligations under this Agreement.

29

**Section 9.**        **Confidentiality.**

9.01.    No Party shall publicly disclose the names or identity of any Consenting Noteholders (or where a Consenting Noteholder is an investment advisor, subadvisor, or manager for a beneficial holder of the Existing Notes, the names or identity of any beneficial holder), the individual holdings of any Consenting Noteholder (or where a Consenting Noteholder is an investment advisor, subadvisor, or manager for a beneficial holder of the Existing Notes, the individual holdings of any beneficial holder) to the extent known by it, the signature pages or Schedule I to this Agreement or any other provision of this Agreement that discloses any Consenting Noteholder's name or identity (including, for the avoidance of doubt, the signature pages of any joinder) (or where a Consenting Noteholder is an investment advisor, subadvisor, or manager for a beneficial holder of the Existing Notes, such beneficial holder's name or identity) (collectively, the "Holder Information"), except: (a) in any legal proceeding relating to this Agreement (including the Proceeding), *provided* that each of the parties to such proceeding shall use its reasonable best efforts to maintain the confidentiality of Holder Information in the context of any such proceeding; (b) to the extent required by applicable law, rules, regulations promulgated thereunder, or obligations, including, without limitation, U.S. federal securities laws and applicable banking laws and regulations promulgated thereunder, as determined after consultation with legal counsel; (c) in response to a written question, interrogatory, request for information or documents, subpoena, civil investigative demand or other written process, or a written request from a government agency, regulatory authority or securities exchange; and (d) to such party's employees, legal counsel, independent auditors, financial adviser and other experts or agents who need to know such information and are informed of the confidential nature of such information; *provided* that in the case of clauses (b) and (c) above, the disclosing party provides notice to the applicable Consenting Noteholder (promptly upon receipt of the subpoena or request so that the Consenting Noteholder may seek an appropriate protective order or waive the relevant company's requirement for compliance with this Section 9.05), unless such notice would be prohibited by applicable law, rules, regulations promulgated thereunder, or U.S. federal securities laws.  If the applicable Consenting Noteholder (or where a Consenting Noteholder is an investment advisor, subadvisor, or manager for a beneficial holder of the Existing Notes, such beneficial holder) wishes to oppose the production of such information, it may do so at its own expense, and the Credit Parties shall cooperate, at the Consenting Noteholder's expense, with any reasonable action by such Consenting Noteholder to oppose the production of such information or to seek a protective order with respect to such information, including but not limited to providing the Consenting Noteholder with five (5) Business Days to oppose to the production of such information, unless such period of time would be prohibited by applicable law, rules, regulations promulgated thereunder, or U.S. federal securities laws.  Responding to any such subpoena or other request, after providing notice and cooperating with such Consenting Noteholder as set forth herein, shall not be deemed to be a breach of any provision of this Agreement.  For the avoidance of doubt, the provisions above shall prohibit each Credit Party from disclosing the individual holdings of any Consenting Noteholder (or where a Consenting Noteholder is an investment advisor, subadvisor, or manager for a beneficial holder of the Existing Notes, the individual holdings of any beneficial holder) to any other Consenting Noteholder.

23-11891-jpm    Doc 12    Filed 11/30/23    Entered 11/30/23 04:49:27    Main Document
Pg 218 of 578

9.02.    Notwithstanding anything to the contrary in this <u>Section 9</u>, the Company may provide the Trustee with an executed copy of this Agreement that includes the individual signature pages of each of the Consenting Noteholders.

## Section 10.    <u>Miscellaneous</u>.

10.01.    <u>Obligations of the Consenting Noteholders</u>. Any reference in this Agreement to any obligations or liability attributable to the Consenting Noteholders shall mean that such obligations or liability shall be undertaken or assumed by each Consenting Noteholder on a several, and not joint, basis.

10.02.    <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of each Party hereto and their respective successors, assigns, heirs, executors, administrators, and representatives; *provided* that nothing contained in this Section 10.02 shall be deemed to permit Transfers other than in accordance with the express terms of this Agreement.

10.03.    <u>Additional Parties</u>.

(a)    Other than parties added pursuant to <u>Section 1.05(b)</u> hereof, no additional holders or beneficial owners of Existing Notes shall become parties to this Agreement unless (a) the Majority Members provide their prior written consent (which shall not be unreasonably withheld if such additional holder is not an affiliate of any of the Credit Parties, (ii) has satisfied any know your customer requirements of any of the Parties to this Agreement and (iii) would not represent a reputational or other risk by joining this Agreement; *provided*, *further* that if written consent is not provided, then notwithstanding anything herein to the contrary, the Credit Parties may enter into a restructuring support agreement or equivalent agreement, in substance identical to this agreement, mutatis mutandis, with such holder or beneficial owner of the Existing Notes if such additional holder is not an affiliate of any of the Credit Parties) and (b) such additional holder or beneficial owner of Existing Notes executes and delivers to the Company a joinder agreement substantially in the form of <u>Exhibit C</u> hereto. Such additional holder or beneficial owner of Existing Notes shall become a Consenting Noteholder under this Agreement in accordance with the terms of this Agreement. With the consent of the Credit Parties, Citi may also become a party to this Agreement by executing a joinder on equivalent terms as the holders of Existing Notes.

(b)    The Credit Parties shall notify the Consenting Noteholders of any of the aforementioned agreements and the counterparties thereto promptly after execution.

10.04.    <u>Headings</u>. The section headings of this Agreement are included for reference purposes only and shall not affect the construction or interpretation of any of the provisions of this Agreement.

10.05.    <u>Notices</u>.  Except as otherwise expressly provided herein, all notices and other communications provided for hereunder shall be in writing and transmitted by facsimile or email:

(a)    if to the Company or Guarantors:

**Inversiones Latin América Power Limitada**
Inversiones Latin América Power Limitada

31

Cerro El Plomo 5.680, oficina 1202
Las Condes, Santiago, Chile

Attention: Esteban Moraga
Email: esteban.moraga@latampower.com

With a copy (which copy shall not constitute notice) to:

Greenberg Traurig, LLP
One Vanderbilt Avenue
New York, NY 10017

Attention: Marc M. Rossell / Oscar Stephens / Oscar Pinkas
Email: rossellm@gtlaw.com / oscar.stephens@gtlaw.com / pinkaso@gtlaw.com

(b)    if to the ILAP Partners:

Cerro El Plomo 5.680, oficina 1202
Las Condes, Santiago, Chile

(c)    if to the Consenting Noteholders:

**Cleary Gottlieb Steen & Hamilton LLP**
One Liberty Plaza
New York, NY 10006-1470
United States

Attention: Richard J. Cooper / Adam J. Brenneman
Email: rcooper@cgsh.com / abrenneman@cgsh.com

All such notices and communications shall be effective when sent.

10.06.    Counterparts; Facsimile or Electronic Signatures.    This Agreement may be executed simultaneously in multiple counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement, any and all agreements and instruments executed and delivered in accordance herewith, along with any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or other means of electronic transmission, shall be treated in all manner and respects and for all purposes as an original signature, agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

10.07.    Waiver of Jury Trial.    EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

10.08.  <u>Consent to Jurisdiction</u>.    THE COMPANY AND EACH OF THE GUARANTORS IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF ANY NEW YORK STATE COURT OR ANY FEDERAL COURT SITTING IN NEW YORK COUNTY, THE CITY OF NEW YORK, NEW YORK (EACH A "<u>SPECIFIED COURT</u>") OVER ANY LEGAL OR OTHER PROCEEDING ARISING OUT OF, BASED UPON OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY; <u>PROVIDED</u> THAT THE FOREGOING SHALL NOT BE DEEMED TO REQUIRE ANY BANKRUPTCY PROCEEDING INVOLVING ANY CREDIT PARTY OR ITS AFFILIATES  TO BE FILED IN THE SPECIFIED COURT, AND IF A CREDIT PARTY BECOMES A DEBTOR UNDER TITLE 11 OF THE UNITED STATES BANKRUPTCY CODE, DURING ANY SUCH CASE, ANY CLAIMS SHALL BE HEARD AND DETERMINED BEFORE THE BANKRUPTCY COURT.

10.09.  <u>Service of Process</u>.  Each Credit Party appoints Cogency Global Inc. (the "<u>New York Process Agent</u>"), with an office on the date hereof at 122 East 42nd Street, New York, NY 10168, as its agent to receive on behalf of itself and its property, service of copies of the summons and complaint and any other process which may be served in any legal or other proceeding with respect to matters arising from, based upon or in connection with this agreement or the transactions contemplated hereby, and agrees to promptly appoint a successor New York Process Agent in the City of New York (which appointment the successor New York Process Agent shall accept in writing prior to the termination for any reason of the appointment of the initial New York Process Agent).  In any such legal or other proceeding, such service may be made on each Credit Party by delivering a copy of such process to it in care of the appropriate New York Process Agent at such New York Process Agent's address. Each Credit Party hereby irrevocably and unconditionally authorizes and directs its New York Process Agent to accept such service on its behalf. Notwithstanding the foregoing, each Credit Party further agrees that service of any process, summons, notice or document by U.S. registered mail to the address as set forth above shall be effective service of process for any such action, suit or proceeding in the State of New York.  In any such legal or other proceeding, such service may be made on Consenting Noteholders by delivering a copy of such process via U.S. registered mail to the Consenting Noteholders' address set forth above.  Each of the parties hereto hereby waives any objection to proceedings in the State of New York on any ground relating to venue or on the ground that the proceedings have been brought in an inappropriate forum.  The foregoing shall not limit the rights of any party hereto to introduce this Agreement in any court in any jurisdiction in order to defend against a cause of action that has been brought against it or any of its affiliates or representatives in such court.

10.10.  <u>No Third Party Beneficiaries</u>.  Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person (other than (a) the Parties and (b) any party that enters into a joinder agreement pursuant to <u>Section 1.05(b)</u>, any rights or remedies under or by reason of this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

10.11.  <u>Severability</u>.  Should any one or more of the provisions of this Agreement be determined to be invalid, illegal, or unenforceable in any respect, the validity, legality, and enforceability of all remaining provisions nevertheless shall remain effective and binding and shall not be affected or impaired thereby.

10.12.   <u>Governing Law</u>.   This Agreement shall, in all respects, be governed by and interpreted in accordance with the laws of the State of New York.

10.13.   <u>Specific Performance/Remedies.</u> Each Party hereto recognizes and acknowledges that a breach by a Party of any covenants or agreements contained in this Agreement may cause the other Parties to sustain damages for which such Parties may not have an adequate remedy at law for money damages and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy. Each Party hereby waives any requirement for the security or posting of any bond or similar instrument in connection with such remedies. For the avoidance of doubt, this clause shall not constitute a waiver of any defenses, claims or counterclaims in connection with any alleged breach of this Agreement.

10.14.   <u>Survival</u>.   Notwithstanding anything contained herein to the contrary, upon the termination of this Agreement, the agreements and obligations of the Parties set forth in <u>Section 9</u> and <u>Section 10</u> shall survive the termination of this Agreement, *provided* that the Credit Parties, the ILAP Partners, and the Consenting Noteholders shall remain liable for any of their respective breach(es) of this Agreement that occurred prior to such termination and/or withdrawal (as applicable).

10.15.   <u>Recognition Proceeding</u>. Upon mutual agreement among the Majority Members, the ILAP Partners and the Credit Parties the Credit Parties are permitted to seek a recognition of the Proceeding in Chile (the "<u>Recognition Proceeding</u>") and shall be deemed part of the "Restructuring".   Upon filing the Recognition Proceeding, the reference to Proceeding in Sections <u>1.07(b)</u>, <u>2.01(l)</u>, <u>2.03(g)</u>, <u>3.01(a)(vi)</u>, <u>3.01(b)(viii)</u>, <u>5.04</u>, <u>6.09</u>, <u>6.10</u>, and <u>9.01</u> hereof shall also include the Recognition Proceeding. In considering whether to seek a Recognition Proceeding, the Parties hereto shall give due consideration to actions taken by any third party that (1) fail to comply with the Confirmation Order, (2) seek collection from, or take any enforcement action against, any of the Credit Parties in violation of the automatic stay, or (3) seek to terminate any contract with the Credit Parties in violation of the automatic stay, which, in each case, would materially impair the ability of the Credit Parties to consummate the transactions contemplated by this Agreement.

*[Signatures Pages Follow]*

## SCHEDULE II TO RESTRUCTURING SUPPORT AGREEMENT:

## SPECIFIED EVENTS OF DEFAULT

1.  An Event of Default under Section 6.1(a)(i) of the Indenture with respect to the payment of interest on the Existing Notes due and payable on July 3, 2023.

## SCHEDULE III TO RESTRUCTURING SUPPORT AGREEMENT:

1. Amending the bylaws of the Company and executing a public deed to reflect LAP Renewables B.V. as the new member of the Company.

2. Updating and amending the collateral documents to reflect LAP Renewables B.V. as the new member of the Company, including the pledge without conveyance over existing and future equity rights in the Company (prenda sin desplazamiento sobre derechos sociales) to reflect LAP Renewables B.V. as new partner of the Company.

**<u>EXHIBIT A TO RESTRUCTURING SUPPORT AGREEMENT:</u>**

**<u>RESTRUCTURING TERM SHEET</u>**

## Inversiones Latin América Power Ltda.
### Restructuring Term Sheet

This restructuring term sheet (the "Restructuring Term Sheet") is a summary of indicative terms regarding a proposed restructuring (the "Restructuring") of the 5.125% senior secured notes due 2033 (the "Existing Notes") issued by Inversiones Latin América Power Ltda., a limited liability company (*sociedad de responsabilidad limitada*) organized and existing under the laws of Chile (the "Company") and guaranteed by San Juan S.A. and Norvind S.A., corporations (*sociedades anónimas*) organized and existing under the laws of Chile  (the "Guarantors" and, together with the Company, the "Credit Parties"), which is subject to ongoing discussions between the Company and each of the beneficial holders of, or the investment advisors to funds and accounts that hold, the Existing Notes listed in Schedule I of the RSA (as defined below) (the "Ad Hoc Group").

This Restructuring Term Sheet is not intended to be a definitive list of all requirements of the Parties[1], nor does it include a description of all of the terms, conditions, and other provisions which may become part of any commitment or definitive documentation.

Capitalized terms used but not defined in this Restructuring Term Sheet shall have the meanings given to such terms in the RSA. If a capitalized term is not defined in this Restructuring Term Sheet or in the RSA, it shall have the meaning given to it in the Existing Indenture.

---

[1] "Party" or "Parties" mean, as applicable, individually or collectively, the Company and the Ad Hoc Group.

| TERMS OF THE RESTRUCTURING | | | | | |
|---|---|---|---|---|---|
| Claims to be Restructured (the "<u>Restructured Claims</u>") | **Existing Debt** | **Coupon / Amortization** | **Maturity** | **Outstanding Principal Amount** | **Claims as of September 30, 2023** [2] |
| | 5.125% Senior Secured Notes due 2033 | 5.125%, paid semi-annually<br><br>Principal on the Notes paid semi-annually on the same dates as the Coupons | June 15, 2033 | $391.2 million | $406.1 million |
| | Letter of Credit Facility granted by Citibank, N.A. pursuant to a Credit Agreement dated June 15, 2021 | 6-month LIBO Rate plus an applicable margin (5.00% per annum during first year; 6.00% per annum during second year and, 8.00% per annum thereafter). Expected to transition to 6-month Term SOFR plus SOFR adjustment (0.42826%) plus applicable margin from payment date occurring January 3, 2024. | Third Anniversary from Disbursement Date of each Loan | $17.5 million | To be determined. |
| **Restructuring Process** | The Restructuring will be implemented through a prepackaged chapter 11 plan of reorganization to be confirmed in the voluntary reorganization cases under chapter 11 of Title 11 of the United States Code, to be commenced in the United States Bankruptcy Court for the Southern District of New York or another venue as agreed with the Majority Members (as defined in the RSA) (the "<u>Proceeding</u>"), in accordance with the terms and conditions of the restructuring support agreement to which this Restructuring Term Sheet is attached as Exhibit A (the "<u>RSA</u>"). This Restructuring Term Sheet sets forth all of the | | | | |

---

[2] Includes accrued unpaid interest and expected further accrual for each series of Existing Notes through the illustrative Effective Date.

| | compensation to be received by the Claimholders (as defined below) in connection with the Restructuring thereof. |
|---|---|
| **Claimholder Treatment** | Pursuant to the terms of the Restructuring, in exchange for the cancellation of the Company's obligations under the Restructured Claims, each holder of Restructured Claims (a "<u>Claimholder</u>") will receive, on the Effective Date of the Restructuring:<br><br>(i) such Claimholder's pro rata share of the Take-back SSNs (as defined below); and<br><br>(ii) such Claimholder's pro rata share of the Convert Notes (as defined below). |
| **Treatment of PEC I Financing** | Shareholder-provided interim financing (i.e., PEC I Receivables sale to Latin America Power, S.A. in August 2023) will be equitized on the Effective Date of the Restructuring's close, whereby Latin America Power S.A. contributes the purchased PEC I Receivables to the New Issuer (as defined below) (to be further contributed from the New Issuer to the Company) in exchange for common equity. The contribution of the PEC I Receivables for common equity will not dilute or otherwise alter the split of proceeds to be received by the Claimholders upon a Company Sale (as defined below). |
| **Other Claims** | Other claims, including trade and labor claims, will remain unimpaired and unaffected by the Proceeding unless otherwise agreed by the holders of such claims (and with the consent of the Ad Hoc Group). The Plan will provide that all other claims shall be paid in full. |
| **Effective Date** | The Restructuring will become effective on the date that the conditions precedent to the effectiveness of the Plan are satisfied or waived by the Majority Members (the "<u>Effective Date</u>"). |
| **TAKE-BACK SENIOR SECURED NOTES** | |
| **Issuer** | The Company. |
| **Guarantors** | The existing Guarantors and the New Issuer. |
| **Instrument; Treatment** | United States dollar-denominated senior secured notes ("<u>Take-back SSNs</u>"). |
| **Principal Amount** | An initial principal amount equal to $260 million. |
| **Collateral** | Same as the Existing Notes except that (i) there will be no Debt Service Reserve Account ("<u>DSRA</u>"), (ii) the trustee for the Take-back SSNs shall hold the undated director and officers resignation letters and stock powers for the Company for the benefit of the holders of the Take-back SSNs, (iii) Section 4.01 of the Security and Depositary Agreement shall be amended to allow the Company to provide withdrawal certificates at any time in the case of an energy payment being due (the balance would then be payable first from the Revenue Accounts and then, if there are insufficient funds, from the O&M Reserve Account), (iv) for the avoidance of doubt, all cash will be held in pledged accounts, provided that the Company will be authorized to use any cash available in the pledged Operations Accounts for the payment of O&M Costs and (v) the collateral documentation will be reviewed by the Ad Hoc Group Advisors, who will determine which amendments may be necessary to permit a full and effective enforcement of the collateral upon a default or event of default (which for the avoidance of doubt shall include customary step-in rights in respect of the equity of the Company, a new pledge over the shares of the Company (which shall be transformed into a stock corporation), |

|  | and a pledge over the equity interest of the New Issuer, as defined below). Chilean Security Documents shall be fully amended and restated. |
| --- | --- |
| **Interest** | The Take-back SSNs will accrue interest as follows:<br><br>| **Period** | **Annual PIK / Cash Coupon** |<br>| --- | --- |<br>| From the Effective Date to December 31, 2024 | 11.50% / 9.50% |<br>| From January 1, 2025 to June 30, 2025 | 12.25% / 10.25% |<br>| From July 1, 2025 to the 24 months after the Effective Date (the "Cash Pay Date") | 13.00% / 11.00% |<br>| From the Cash Pay Date to the Maturity Date (as defined below) | No PIK option / 11.00% cash |<br><br>The first interest payment shall be calculated based on the period from the Effective Date through the first interest payment date.<br><br>PIK Interest will be payable by increasing the principal amount of the Take-back SSNs by an amount equal to the amount of the PIK Interest for the applicable interest period (rounded up to the nearest whole Dollar) (it being understood that subsequent interest payments on the Take-back SSNs shall be calculated based on such increased principal amount). After PIK Interest has been paid as set forth above, it shall constitute principal amounts for all purposes hereunder (and interest shall accrue thereon as described above).<br><br>No less than 15 Business Days prior to each interest payment date on which the Company may elect to pay PIK Interest in lieu of cash interest, the Company shall notify the Trustee in writing of its intention to pay PIK Interest or cash interest on such interest payment date. In the event the Company fails to timely deliver such notice, the Company shall be deemed to have elected to pay cash interest.<br><br>The default interest rate of the Take-back SSNs will accrue upon the occurrence of an event of default, and will be equivalent to the applicable interest rate of the Take-back SSNs plus an additional 2% rate. The default interest rate will be payable only in cash. |
| **Interest Payment Dates** | Interest on the Take-back SSNs to be paid semi-annually in arrears on each June 15 and December 15 as from the Effective Date (the "Interest Payment Dates"). |
| **Maturity** | Take-back SSNs to mature on June 15, 2033, the same maturity date as the Existing Notes (the "Maturity Date"). |
| **Cash Sweep** | On December 31, 2024 (the "Cash Sweep Effective Date"), and semi-annually thereafter on each Interest Payment Date, cash payments (the "Cash Sweep") are to be made to holders of the Take-back SSNs in amounts equivalent to the Company's cash (excluding from this concept any proceeds obtained from the Super Priority Notes) at the close of business on the immediately preceding Interest Payment Date, in excess of Minimum |

| | |
|---|---|
| | Cash (as defined below) (the "Excess Cash"). For the avoidance of doubt, proceeds obtained from financings and PEC Receivables sales will be considered part of the Company's cash for the calculation of Excess Cash (subject to the provisions under the section denominated "Call Option" below related to PEC I Receivables sales).<br><br>The Cash Sweep shall be payable semi-annually after the Cash Sweep Effective Date. For the avoidance of doubt, the Cash Sweep Effective Date will be the first applicable Cash Sweep payment date.  Cash Sweep payments will be applied in a manner such that the entire amount of Cash Sweep payment will be sufficient to make the maximum principal payment plus accrued interest and additional amounts thereon.<br><br>Application of Cash Sweep Amounts: Cash Sweep payments to holders of the Take-back SSNs will be junior to Cash Sweep payments made to holders of Super Priority Notes (as defined below). |
| **Minimum Cash** | "Minimum Cash" equals $15 million. |
| **Covenants – Take-back SSNs** | The Take-back SSNs shall have additional affirmative and negative covenants and other terms customary for restructured debt governed by New York law and for Chilean issuers, and otherwise to be agreed in the definitive documentation for the Take-back SSNs and acceptable to the Ad Hoc Group in its sole discretion.<br><br>Covenants will include, without limitation:<br><br>• Payment of Take-back SSNs;<br>• Limitations on debt incurrence;<br>• Limitations on restricted payments;<br>• Limitations on liens;<br>• Limitations on asset sales (including but not limited to receivables sales, except for customary carve-outs as described below);<br>• Performance of Material Project Documents;<br>• Limitations on the modification or termination of Material Project Documents;<br>• Limitations on transactions with affiliates;<br>• Limitations on certain agreements;<br>• Repurchase of Take-back SSNs upon a Change of Control (as defined below);<br>• Limitations on leases and sale and leaseback transactions;<br>• Limitations on merger, consolidation,  transfer of equity interests and capital increases;<br>• Limitations on the modification of bylaws, charters, articles of association or, in general, corporate organization documents;<br>• Maintenance of projects;<br>• Maintenance of office or agency;<br>• Maintenance of existence, business activities;<br>• Allowing inspection of its properties by holders of the Take-back SSNs;<br>• Compliance with laws;<br>• Compliance with anti-money laundering, anti-corruption and anti-sanctions rules;<br>• Compliance with tax reporting and payment obligations;<br>• Maintenance of accounting and management information; |

| | |
|---|---|
| | • Maintenance of ratings on the Take-back SSNs;<br>• Obtaining and maintaining government approvals and permits;<br>• Payments of additional amounts;<br>• Comprehensive reporting requirements;<br>• Maintenance of insurance; and<br>• Application of amounts derived from events of loss or destruction.<br><br>For the avoidance of doubt, regarding the limitation on capital increases mentioned above, the permitted capital increases will be limited to those that do not have a dilutive effect on either (i) the New Issuer's ownership of the Company or (ii) the ILAP Sponsors' ownership of the Company. Partial capital increases made by third parties will not be permitted without the consent of the holders of a majority of the outstanding principal amount of the Take-back SSNs.<br><br>The covenants will include customary carve-outs allowing for PEC Receivables sales after the Effective Date for fair value, the proceeds of which are used strictly for O&M expenses or to make principal repayments on the Take-back SSNs. |
| **Events of Default – Take-back SSNs** | The Take-back SSNs shall have events of default and other terms customary for restructured debt governed by New York law and for Chilean issuers, and otherwise to be agreed in the definitive documentation for the Take-back SSNs and acceptable to the Ad Hoc Group in its sole discretion.<br><br>Events of default will include, without limitation:<br><br>• Failure to pay cash interest within five (5) Business Days when the same becomes due and payable, or failure to increase the principal amount of the Take-back SSNs by an amount equal to the PIK Interest amount after electing to pay PIK Interest in lieu of cash interest;<br>• Failure to pay principal when due;<br>• Defaults on other debt, including under the Convert Notes and the Super Priority Notes (as defined below);<br>• Failure to comply with covenants in the relevant indenture after the receipt of notice from holders of the Take-back SSNs;<br>• Events related to Material Project Documents, including the occurrence of a termination event under Material Project Documents;<br>• Failure to comply with ratings requirements;<br>• Bankruptcy/insolvency events (voluntary and involuntary);<br>• Judgment default for payment of money in excess of an amount to be agreed with the Ad Hoc Group;<br>• Termination of any material Governmental Approval or permit necessary for the execution, delivery and performance of material obligations under Security Documents;<br>• Abandonment or expropriation events; and<br>• Failure of guarantees to be in full force and effect. |
| **Ranking** | The Take-back SSNs shall constitute senior obligations of the Company, the Guarantors and the New Issuer, and will be equal in right of payment with each other and any other |

6

| | |
|---|---|
| | senior indebtedness of the Company, the Guarantors and the New Issuer, but will be junior to any Super Priority Notes (as defined below). |
| **Trading; Listing** | Take-back SSNs to be eligible for clearance through the Depository Trust Company ("DTC") and subject to restrictions on transfer applicable to debt instruments issued pursuant to exemptions from registration under Rule 144A and Regulation S under the Securities Act.<br><br>The Company will use best efforts to have the Take-back SSNs listed on the Luxembourg, Irish or Singapore stock exchange. |
| **Amendments / Waivers – Take-back SSNs** | Consent of each affected holder of Take-back SSNs will be required to, including without limitation:<br><br>(i) change any principal, cash sweep payment or interest payment date, change the principal amount thereof or the interest thereon, or premium paid in connection therewith, or change the place of payment where, or the coin or currency in which, any Take-back SSN or the interest thereon is payable, or impair the right to receive any principal payment on such Take-back SSN, on or after the stated maturity thereof, or to institute suit for the enforcement of any such payment;<br><br>(ii) permit the creation of any lien prior to or *pari passu* with the lien of the Security Documents with respect to any of the Collateral, terminate the lien of or deprive any holder of Take-back SSNs of the security afforded by the lien of the Security Documents (except as provided below);<br><br>(iii) make any change in the percentage of the principal amount of the Take-back SSNs required for amendments or waivers;<br><br>(iv) reduce the amount payable upon the redemption of any Take-back SSN or the times at which any Take-back SSN may be redeemed or, once notice of redemption has been given, the time at which it must thereupon be redeemed;<br><br>(v) modify or change any provision of the indenture affecting the ranking of the Take-back SSNs or the guarantees granted by the Guarantors and the New Issuer in a manner adverse to such holder;<br><br>(vi) after the time an offer to purchase is required to have been made, reduce the purchase amount or purchase price, or extend the latest expiration date or purchase date thereunder; or<br><br>(vii) request that any rating agency cease rating the Take-back SSNs.<br><br>Consent of holders of at least 75% in aggregate principal amount of the Take-back SSNs then outstanding will be required to release all or substantially all of the Collateral from the liens securing the Take-back SSNs.<br><br>Consent of majority in aggregate principal amount of the Take-back SSNs then outstanding will be required for other matters. |

| Governing Law | The indentures and any other documentation governing the Take-back SSNs shall be governed by the laws of the State of New York (other than certain collateral documents, which will be governed by the laws of Chile). |
|---|---|
| Call Option | The Company will have a call option to purchase back the Take-back SSNs at par from the Claimholders at any time unless there is a default or an event of default that has occurred and is continuing. |
| Put Option | The Claimholders will have a put option to sell their Take-back SSNs at par back to the Company upon the occurrence of a Change of Control (as defined below) of the Company. |
| Change of Control | "Change of Control" shall mean (A) ILAP Sponsors shall cease to beneficially own, at any time, in the aggregate, directly or indirectly, all of the capital stock of the New Issuer, the Company or any of their direct or indirect subsidiaries (other than as a result of the conversion of the Convert Notes); (B) the ILAP Sponsors shall cease to have the right to elect all of the directors of the New Issuer, the Company or any of their respective subsidiaries; (C) there is a sale, lease or transfer, directly or indirectly, of all or substantially all of the assets of the Company or any of its subsidiaries to any Person other than an ILAP Sponsor; or (D) the adoption of a plan or resolution relating to the liquidation or dissolution of the Company, the Guarantors or the New Issuer.<br><br>Furthermore, "ILAP Sponsors" shall mean GMR Holding B.V., BTG Pactual Brazil Infrastructure Fund II LP, Patria Infrastructure Fund II LP, Patria Infrastructure Fund II LAP Co-Invest, LP, Patria Infrastructure Fund II LAP Co-Invest, UK LP, PI Fund II (Ontario) LP, PI Fund II (Ontario 1) LP, and PI Fund II (Ontario 2) LP. |
| **CONVERTIBLE NOTES** | |
| Issuer | A newly formed special purpose vehicle to be organized in the Cayman Islands or another jurisdiction outside of Chile that is acceptable to the Ad Hoc Group, and that is established and maintained for the purpose of issuing the Convert Notes and which will own 100% of the equity of the Company (the "New Issuer"). |
| Guarantors | The Company and the existing Guarantors. |
| Instrument; Treatment | United States dollar-denominated convertible notes ("Convert Notes"). |
| Principal Amount | An initial principal amount equal to the total amount of Restructured Claims minus $260 million. |
| Collateral | The Trustee will be named as a third party beneficiary of the Sales Facilitation Agreement (as defined below).<br><br>Furthermore, a pledge over the New Issuer's equity interest will be created. |
| Interest | Convert Notes will accrue interest at a rate *per annum* equal to 5%.<br><br>Interest on the Convert Notes will be payable as PIK Interest automatically by increasing the principal amount of the Convert Notes by an amount equal to the amount of the PIK |

|  | Interest for the applicable interest period (rounded up to the nearest whole Dollar) (it being understood that subsequent interest payments on the Convert Notes shall be calculated based on such increased principal amount). After PIK Interest has been paid as set forth above, it shall constitute principal amounts for all purposes hereunder (and interest shall accrue thereon as described above).<br><br>The default interest rate of the Convert Notes will accrue upon the occurrence of an event of default, and will be equal to 7%, and will be payable only in cash. |
|---|---|
| **Interest Payment Dates** | Interest on the Convert Notes to be paid (capitalized) annually in arrears commencing on the first anniversary of the Effective Date. |
| **Maturity** | Convert Notes to mature on the Maturity Date. |
| **Cash Sweep** | Not applicable. |
| **Conversion** | "Conversion Date" means the earlier of (i) December 31, 2025 (the "Final Conversion Date"), (ii) the date on which the Company or the New Issuer, as applicable, fails to make a principal and/or interest payment under the Take-back SSNs or Super Priority Notes (as defined below), (iii) the date on which the Company or any subsidiary thereof files for insolvency, liquidation, bankruptcy, reorganization, restructuring or similar proceeding (to be defined in the definitive documentation) or (iv) the date on which a Change of Control of the Company occurs, other than as a result of a Company Sale.<br><br>Prior to the Conversion Date, holders of a majority of the outstanding principal amount of the Convert Notes can waive or amend an event that would otherwise give rise to a Conversion Date.<br><br>On the Conversion Date, the Convert Notes shall automatically, and without the need of any further notice or action by the New Issuer, the ILAP Partners (as defined below), the Credit Parties, members of the Ad Hoc Group, or any other third party, convert into 90% of the total equity interests of the New Issuer (with the ILAP Partners retaining the remaining 10%).<br><br>Conversion Date Extension: In connection with the Company Sale (as defined below), if an agreement for a Company Sale has been executed by December 31, 2025, but the actual sale has not yet been closed as of said date, the Final Conversion Date shall be automatically extended until June 30, 2026 (the "Conversion Date Extension").<br><br>Convert Notes to contain customary anti-dilution protections. |
| **Covenants – Convert Notes** | The Convert Notes shall have additional affirmative and negative covenants and other terms customary for restructured debt governed by New York law (including customary carve-outs, cure periods and materiality thresholds), and otherwise to be agreed in the definitive documentation for the Convert Notes and acceptable to the Ad Hoc Group.<br><br>Covenants will include, without limitation: |

| | |
|---|---|
| | • Special purpose vehicle covenants (including limitations on business activities and liabilities other than the holding of the equity of the Company and activities required in connection therewith);<br>• Limitations on debt incurrence;<br>• Limitations on restricted payments;<br>• Limitations on liens;<br>• Limitation on asset sales (including direct or indirect equity issuances by the Company or its subsidiaries);<br>• Limitations on transactions with related parties;<br>• Limitations on leases and sale and leaseback transactions;<br>• Limitations on merger, consolidation and capital increases;<br>• Limitations on the modification of bylaws, charters, articles of association or, in general, corporate organization documents;<br>• Maintenance of existence, business activities;<br>• Compliance with laws;<br>• Payments of additional amounts;<br>• Comprehensive reporting requirements; and<br>• Maintenance of insurance. |
| **Events of Default – Convert Notes** | Events of default will include, without limitation:<br><br>• Failure to pay principal when due;<br>• Conversion not occurring automatically on the Conversion Date;<br>• Defaults on other debt, including under the Take-back SSNs and the Super Priority Notes (as defined below);<br>• Failure to comply with covenants in the relevant indenture after the receipt of notice from holders of the Convert Notes;<br>• Bankruptcy/insolvency events (voluntary and involuntary);<br>• Judgment default for payment of money in excess of an amount to be agreed with the Ad Hoc Group;<br>• Abandonment or expropriation events; and<br>• Failure of guarantees to be in full force and effect. |
| **Approval of Replacement Independent Director** | In the event that the independent director appointed on the Effective Date resigns or is removed, the consent of the holders of a majority of the outstanding principal amount of the Convert Notes shall be required for the nomination of a replacement independent director. If the holders of a majority of the outstanding principal amount of the Convert Notes fail to either affirmatively approve or reject a proposed nominee within 120 days after notice indicating the name and the biography and certification described below of such proposed nominee is provided to the trustee of the Convert Notes, the nominee shall be deemed to be approved.<br><br>The New Issuer shall only propose for nomination as independent director a person (i) with experience in the sale of energy assets in South America, (ii) that does not directly or indirectly receive and has not in the past five years directly or indirectly received compensation from Latin America Power S.A. and/or Latin America Power Renewables B.V. (together the "ILAP Partners") or any of their related parties, and (iii) that has good moral character and has not been convicted in the prior ten years of a crime of moral turpitude or fraud and has not been subject to a bar on participation in the securities or banking industry and has not been in the prior ten years subject to a bankruptcy proceeding. The New Issuer shall certify that any proposed independent director meets the foregoing requirements, and shall deliver a reasonably detailed biography of such |

10

| | proposed independent director to the trustee of the Convert Notes for distribution to the holders. If, at any point after his or her designation, the new independent director fails to meet the aforementioned requirements, the New Issuer shall designate a new independent director that meets said requirements, observing the procedure and voting thresholds described in the first paragraph of this section. The New Issuer shall not (i) remove, except for good cause, any independent director, (ii) reduce the compensation payable to, or terminate or reduce the level of D&O insurance coverage for the benefit of, any independent director, (iii) impose any limitations on the ability of the independent director to review documents related to the Company Sale, in each case without the consent of the holders of the majority of the outstanding principal amount of the Convert Notes. |
|---|---|
| **Ranking** | The Convert Notes shall constitute secured obligations of the New Issuer, the Company and the Guarantors and will be equal in right of payment with each other and any other secured indebtedness of the New Issuer, the Company and the Guarantors. |
| **Trading; Listing** | Convert Notes to be eligible for clearance through the Depository Trust Company ("<u>DTC</u>") and subject to restrictions on transfer applicable to debt instruments issued pursuant to exemptions from registration under Rule 144A and Regulation S under the Securities Act. The New Issuer will use reasonable best efforts to have the Convert Notes listed on the Luxembourg, Irish or Singapore stock exchange. |
| **Amendments / Waivers – Convert Notes** | Consent of each affected holder of Convert Notes will be required to, including without limitation: (i) modify or change any provision of the indenture regarding the conversion terms of the Convert Notes or affecting the conversion rights of the holders of Convert Notes; (ii) change any principal or interest payment date, change the principal amount thereof or the interest thereon, or premium paid in connection therewith, or change the place of payment where, or the coin or currency in which, any Convert Note or the interest thereon is payable, or impair the right to receive any principal payment on such Convert Note, on or after the stated maturity thereof, or to institute suit for the enforcement of any such payment; (iii) make any change in the percentage of the principal amount of the Convert Note required for amendments or waivers; (iv) reduce the amount payable upon the redemption of any Convert Note or the times at which any Convert Note may be redeemed or, once notice of redemption has been given, the time at which it must thereupon be redeemed; (v) modify or change any provision of the indenture affecting the ranking of the Convert Note in a manner adverse to such holder; or |

11

| | |
|---|---|
| | (vi) after the time an offer to purchase is required to have been made, reduce the purchase amount or purchase price, or extend the latest expiration date or purchase date thereunder.<br><br>Consent of holders of at least 75% in aggregate principal amount of the Convert Notes then outstanding will be required to release all or substantially all of the collateral from the liens securing the Convert Notes.<br><br>Consent of majority in aggregate principal amount of Convert Notes then outstanding will be required for other matters. |
| Governing Law | The indentures and any other documentation governing the Convert Notes shall be governed by the laws of the State of New York or, to the extent required, the laws of the Cayman Islands. |
| Redemption | The Convert Notes will be mandatorily redeemable at the amounts set forth below under "Company Sale" upon a qualifying Company Sale. |
| **SUPER PRIORITY NOTES** | |
| Issuer | The Company. |
| Guarantors | Same as Take-back SSNs. |
| Instrument; Treatment | The holders of the Take-back SSNs who choose to provide additional financing to the Company in the total amount of $10 million (the "Super Priority Holders") will be entitled to receive in exchange United States dollar-denominated senior secured notes with super-priority relative to the Take-back SSNs and the Convert Notes (the "Super Priority Notes"). |
| Principal Amount | An initial principal amount equal to $10 million (the "Super Priority Claims"). |
| Collateral | Same as Take-back SSNs. |
| Interest | Super Priority Notes to bear interest at a rate *per annum* equal to 12%, subject to a PIK premium (as described below) if the Company exercises its PIK Option (as defined below).<br><br>PIK Option: The Company shall have the option, in its sole discretion, to either pay interest on the Super Priority Notes (i) in cash at the interest rate mentioned above or (ii) in lieu of paying full cash interest, capitalize all or a portion of such interest at a 14% rate *per annum* by adding it to the principal amount of such Super Priority Notes on the applicable interest payment date (the "PIK Option").<br><br>The first interest payment shall be calculated based on the period from the Effective Date through the first interest payment date.<br><br>PIK Interest will be payable by increasing the principal amount of the Super Priority Notes by an amount equal to the amount of the PIK Interest for the applicable interest period (rounded up to the nearest whole Dollar) (it being understood that subsequent |

12

| | |
|---|---|
| | interest payments on the Super Priority Notes shall be calculated based on such increased principal amount.  After PIK Interest has been paid as set forth above, it shall constitute principal amounts for all purposes hereunder (and interest shall accrue thereon as described above). <br><br> No less than 15 Business Days prior to each interest payment date on which the Company may elect to pay PIK Interest in lieu of cash interest, the Company shall notify the Trustee in writing of its intention to pay PIK Interest or cash interest on such interest payment date.  In the event the Company fails to timely deliver such notice, the Company shall be deemed to have elected to pay cash interest. |
| **Interest Payment Dates** | Interest on the Super Priority Notes to be paid semi-annually in arrears commencing on the first scheduled coupon date of the Super Priority Notes. |
| **Maturity** | Same as Take-back SSNs. |
| **Cash Sweep** | Same as Take-back SSNs, except for the call option premium as described below. Cash Sweep payments to holders of the Super Priority Notes will be senior to Cash Sweep payments made to holders of Take-back SSNs. |
| **Minimum Cash** | Same as Take-back SSNs. |
| **Fees** | <u>Upfront Fee</u>: 3% PIK. Payable only if the Company closes on the Super Priority Notes. <br><br> <u>Alternative Financing Fee</u>: 4% payable in cash. Payable only if the Company closes an exit financing with an alternative provider and does not close on the Super Priority Notes. |
| **Covenants – Super Priority Notes** | Same as Take-back SSNs, subject to customary provisions to account for super priority. |
| **Events of Default – Super Priority Notes** | Same as Take-back SSNs. |
| **Ranking** | The Super Priority Notes shall constitute senior secured obligations of the Company, the Guarantors and the New Issuer, and will be equal in right of payment with each other, and senior to any other indebtedness of the Company, the Guarantors and the New Issuer, including the Take-back SSNs and the Convert Notes. |
| **Trading; Listing** | Same as Take-back SSNs. |
| **Amendments / Waivers – Super Priority Notes** | Same as Take-back SSNs. |
| **Governing Law** | Same as Take-back SSNs. |
| **Call Option** | The Company will have a call option to purchase back the Super Priority Notes from the Super Priority Holders at 103% of their value at any time prior to December 31, 2025. Cash Sweeps will not be subject to this premium, except where the Company obtained any proceeds from new financings or PEC I Receivables sales closed |

<table>
<tr><td></td><td>following the Effective Date, in which case the immediately subsequent Cash Sweep will be subject to this premium up to an amount equivalent to the total amount of new proceeds obtained by the Company from new financings and/or PEC I Receivables sales.

For the avoidance of doubt, PEC II Receivables or Future PEC Receivables shall not be subject to the premium described above.

For these purposes, (i) "PEC I Receivables" shall mean "*Saldos*" assigned to in the Tariff Stabilization Resolution (*Resolución Exenta* No. 72) issued on March 5, 2020, by the *Comisión Nacional de Energía* of Chile, as clarified and rectified by the *Resolución Exenta* No. 114 issued on April 9, 2020, by the *Comisión Nacional de Energía* of Chile, as further amended, clarified or rectified in accordance with Applicable Law; (ii) "PEC II Receivables" shall mean "*Documentos de Pago*" according to the *Resolución Exenta* No. 86, issued in March 2, 2023, by the *Comisión Nacional de Energía* of Chile, as amended and restated by the *Resolución Exenta* No. 334 issued on August 9, 2023 by the *Comisión Nacional de Energía of Chile*, as further amended, clarified or rectified in accordance with Applicable Law; and (iii) "Future PEC Receivables" shall mean any subsequent "*Saldos*", "*Documentos de Pago*", receivables, collection rights or other similar rights in favor of the Company or the Guarantors, created by the relevant governmental authority (including, without limitation, by the *Comisión Nacional de Energía of Chile* or the Ministry of Energy of Chile), either by an extension of the existing PEC II Receivables program or the creation of a new program.</td></tr>
<tr><td>**Super Priority Notes funded as DIP Financing and Roll into Exit Financing**</td><td>To the extent DIP Financing is provided during the Proceeding by any of the Consenting Noteholders (or their affiliates or designees) as contemplated in the RSA, then (x) on the Effective Date, the Credit Parties shall exchange the allowed DIP Claims (defined below) dollar for dollar with Super Priority Notes and pay DIP Claims pursuant to such notes, and (y) any portion of the Super Priority Notes not funded as DIP Financing shall be made available to the Credit Parties and funded on the Plan's Effective Date.

"DIP Claims" shall mean the obligations under the Super Priority Notes that are funded as DIP Financing, including all principal, accrued and unpaid interest, fees and expenses and non-contingent indemnity claims.</td></tr>
<tr><td colspan="2" align="center">**COMPANY SALE**</td></tr>
<tr><td>**Company Sale**</td><td>As part of the Restructuring, ILAP Partners, the New Issuer, the Company and the trustee for the Convert Notes will enter into a Sales Facilitation Agreement (the "Sales Facilitation Agreement"), pursuant to which they will agree to make their best efforts to sell 100% of the Company's equity interest to a third party purchaser by December 31, 2025 (the "Sale Outside Date") in a manner designed to maximize the sales proceeds to all stakeholders, subject to the terms and conditions set forth below (the "Company Sale").

The Trustee will be named as a third party beneficiary of the Sales Facilitation Agreement.</td></tr>
</table>

14

| **Sale Proceeds** | If the Company Sale is closed on or before the Sale Outside Date: |
|---|---|

(i)    the proceeds obtained from the Company Sale (the "Sale Proceeds") will be applied as follows:

    a.  First, to repay the Super Priority Notes and accrued and unpaid interest and additional amounts thereon in full,

    b.  Second, to repay the Take-back SSNs and accrued and unpaid interest and additional amounts thereon in full,

    c.  Third, an amount equivalent to $7 million plus a 6% interest rate per annum as from August 28, 2023 (the "First Threshold Amount"), will be allocated to the ILAP Partners on a pro rata basis.

    d.  Fourth, the Sale Proceeds in excess of the amounts mentioned in (a), (b) and (c) above, will be used by the New Issuer to redeem the Convert Notes and make a distribution to the ILAP Partners as set forth below:

| Allocation of Excess Sale Proceeds above the First Threshold Amount to Convert Holders / ILAP Partners | | | |
|---|---|---|---|
| **Transaction Date** | **First Threshold Amount - $90 million** | **$90 million to Full Repayment of Converts** (as defined below) | **Above Full Repayment of Converts** |
| On or before December 31, 2024 | 60% / 40% | 50% / 50% | 0% / 100% |
| January 1, 2025 to June 30, 2025 | 67.5% / 32.5% | | |
| July 1, 2025 to December 31, 2025 | 75% / 25% | | |

For purposes of the Sale Proceeds allocation established in the table above, "Full Repayment of Converts" shall mean the full repayment of the principal amount of the Convert Notes plus any and all accrued and unpaid interest.

The Convert Notes will provide that they shall be mandatorily redeemable at a discount using the amount of proceeds specified in the table above.

No Company Sale may be consummated unless concurrently with such Company Sale the payment of the Super Priority Notes, the Take-back SSNs and any payments required to be made in connection with a put or call of the Convert Notes has been completed in full.

15

| | |
|---|---|
| **Investment Banks in charge of the Company Sale Process** | Morgan Stanley and BTG Pactual will be engaged by the ILAP Partners to run the sale process (the "Financial Advisors").  BTG Pactual will certify in writing to the Company and the Claimholders that they have established walls and controls to avoid any conflict of interest between their role as shareholder and financial advisor. |
| | In the event that an additional investment bank is to be appointed as Financial Advisor, such bank shall be selected from a list that will be pre-agreed with the Ad Hoc Group. In no event shall BTG Pactual be the sole Financial Advisor in connection with the Company Sale. |
| | The ILAP Partners shall pay any and all fees, expenses and other amounts payable to the Financial Advisors, including any applicable indemnification liability, and under no circumstance will the New Issuer, the Company or any subsidiary thereof pay or reimburse, directly or indirectly, to any other party any such fees, expenses, indemnifications and other amounts, provided that (i) the ILAP Partners have received amounts corresponding to Sale Proceeds at least equal to the amount of such fees, expenses, indemnifications and other amounts, up to the amount of such Sale Proceeds received by the ILAP Partners, and (ii) the Company Sale occurs prior to the Conversion Date. |
| **Restriction on Sale to Related Parties** | The Sales Facilitation Agreement will provide that the Company cannot be sold within two (2) years of the sale of other assets owned by ILAP Partners in the Chilean power sector ("Other Assets") *unless* (i) the purchaser(s) of the Company and the purchaser(s) of the Other Assets are not "Related Parties" or (ii) the Company obtains consent from the holders of a majority of the principal amount of the Convert Notes to such sale (subject to the exception set forth below). |
| | The definition of "Related Parties" for purposes of the Sales Facilitation Agreement shall be acceptable to the Ad Hoc Group in its sole discretion and shall include, for the avoidance of doubt, all members of the BTG group of companies and all portfolio companies of any fund managed by BTG or Patria. |
| | In the case of a sale of Other Assets to a Party (or its Related Party) that is also the purchaser of the Company, there would be no need to obtain the consent from the holders of a majority of the principal amount of the Convert Notes to such sale if the Consideration (as defined below) for the Other Assets represents less than 5% of the aggregate Consideration paid for the Other Assets and the Company. If the Consideration paid for the Other Assets represents more than 5% of the aggregate Consideration paid for the Other Assets and the Company, then the consent from the holders of a majority of the principal amount of the Convert Notes would be needed. |
| | For the avoidance of doubt, the term "Consideration" in the preceding paragraph means the total amount of all cash and the fair market value of any securities, agreements or other property and any other consideration, including, without limitation (and without duplication), (i) consideration paid to the holders of any options, warrants, convertible securities or stock appreciation rights of the Company or the Other Assets, whether or not vested, (ii) the present value (determined as of the relevant sale closing) of any amounts, securities, agreements or other property to be paid contingent on future events or to be paid over time, and (iii) any amounts, securities, agreements or other property held in escrow, in each case paid or payable, directly or indirectly, in connection with the abovementioned Company and/or Other Assets' sale.  Any amounts held in escrow |

shall be deemed paid at the relevant sale closing. Consideration shall be deemed to include the aggregate principal amount of any indebtedness for borrowed money, shareholder loans, pension liabilities, guarantees, capitalized loans, declared and unpaid dividends and other similar obligations or liabilities (in each case, net of cash and cash equivalents as of the relevant sale closing) assumed, retired, repaid, extinguished or defeased, directly or indirectly, in connection with, or which survive the closing of, a Company or Other Assets sale. Consideration also shall be deemed to include the aggregate amount of any dividends paid or other distributions made by the Company or the Other Assets with respect to its stock after the respective sale closing date. The present value of any contingent payments or payments to be made over time shall be determined in good-faith by an independent investment bank that is selected by the Independent Director from a pre-approved list, to the extent such payments are over US$ 100,000. If the consideration to be paid is computed in any foreign currency, the value of such foreign currency shall, for purposes hereof, be converted into U.S. dollars at the prevailing exchange rate on the date or dates on which such consideration is payable. For the avoidance of doubt, if the Company conducts a sale transaction through an affiliate entity or subsidiary of the Company, then any consideration paid or payable to such affiliate entity or subsidiary shall be deemed Consideration hereunder to the same extent as if paid or payable to the Company.

Any non-cash consideration payable in connection with a Company Sale or in connection with a sale of Other Assets shall be valued by an independent financial advisor.

| | |
|---|---|
| **Independent Director Approval** | The favorable vote of the Independent Director (as defined below) will be necessary in order to approve the Company Sale if the accepted bid is not at least 95% of the highest bid by value. |
| **Fairness Opinion** | If the aggregate consideration payable for the Company is:<br><br>(i) Less than $300 million, then a fairness opinion (which opinion shall be issued for the benefit of the Company and the trustees for the Take-back SSNs and the Convert Notes) from an independent investment bank selected from a list pre-approved by the Ad Hoc Group will be required for that Company Sale.<br><br>(ii) More than $300 million, then no fairness opinion will be required to approve that Company Sale. |
| **Access to sale process information** | The Company shall make its senior management, its sell-side advisors and any of its directors available to speak with any representative or advisor of the beneficial owners of the Take-back SSNs, Convert Notes or Super Priority Notes (a "Holder Representative") from time to time on matters related to the sale of the Company and its subsidiaries. Such Holder Representative shall agree to be bound by a confidentiality agreement with the Company in a form reasonably acceptable to the Company and such Holder Representative; provided that such confidentiality agreement shall obligate the Company or the Guarantors, as applicable, to issue a "cleansing letter" or otherwise publicly disclose information for the purpose of enabling the holders or beneficial owners of Take-back SSNs, Convert Notes or Super Priority Notes to transfer such securities, only in respect of such information as may be mutually agreed between such Holder Representative and Company. |
| **GOVERNANCE** | |

17

| | |
|---|---|
| **Transformation of Company** | The Company shall be transformed into a Chilean stock corporation. |
| **New Issuer Board of Directors** | The New Issuer shall have a Board of Directors of between 3 and 5 members. At least one director shall be an independent director initially selected by the Company with the consent of the Ad Hoc Group (not to be unreasonably withheld). Any replacement of the independent director selected by the Company shall require the consent of holders of the majority of the outstanding principal amount of the Take-back SSNs.<br><br>The members of the Board of Directors shall execute undated resignation letters, which shall be held by the trustee of the Take-back SSNs in escrow, such escrow to be released only in the event of the payment and satisfaction of the Take-back SSNs. |
| **New Independent Director** | On the Effective Date, a new independent director reasonably acceptable to the Ad Hoc Group (the "Independent Director") shall be appointed to the Boards of the Company and the New Issuer and the Guarantors.<br><br>The Company shall pay the Independent Director compensation reasonably agreed by the Ad Hoc Group.<br><br>The Company shall procure customary D&O insurance for the benefit of the Independent Director in amounts and with coverages as are customary for directors of private companies in Chile as reasonably determined by the Ad Hoc Group.<br><br>The Company shall not (i) remove, except for good cause, any Independent Director, (ii) reduce the compensation payable to, or terminate or reduce the level of D&O insurance coverage for the benefit of, any Independent Director, or (iii) impose any limitations on the ability of the Independent Director to review documents related to the Company Sale, in each case without the consent of the holders of the majority of the outstanding principal amount of the Take-back SSNs.<br><br>The same rules established for the replacement of the Independent Director in the New Issuer will apply to the replacement of the Independent Director in the Company and the Guarantors. |
| **OTHER** | |
| **Affiliates** | Under the indentures regulating the Take-back SSNs, Convert Notes and Super Priority Notes, "Affiliate" shall mean, with respect to any person, any other person directly or indirectly controlling, controlled by, or under common control with, such person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with") with respect to any person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such person, whether through the ownership of voting stock, by contract or otherwise, provided that each of the Existing Holders (as this term is defined in the Existing Indenture) will be deemed to individually control the Company for purposes of this definition. |
| **Definitive Documentation and Implementation** | All terms and conditions set forth in this Restructuring Term Sheet are subject to the terms of the RSA and the other definitive documentation for the Restructuring. All definitive documentation shall be acceptable in form and substance to the Ad Hoc Group. |

| Fees and Expenses | In connection with the Restructuring, the Company will pay the reasonable and documented fees and expenses of the Ad Hoc Group, including all fees and expenses of Cleary Gottlieb Steen & Hamilton LLP, Claro & Cia., Conyers Dill & Pearman and Rothschild & Co., in accordance with the applicable fee agreements in place. |
|---|---|

## EXHIBIT B TO RESTRUCTURING SUPPORT AGREEMENT:

## GOVERNANCE MATTERS

With respect to each of the Credit Parties:

1. The incurrence of any Indebtedness.
2. The granting of any option, warrant or other right to subscribe or convert any securities into shares or equity rights.
3. The variation of the rights attaching to any class of security.
4. Any payment to any affiliate.
5. The incurrence of any lien or encumbrance (other than Liens arising by operation of applicable law without the consent of the Company and which do not secure Indebtedness).
6. The making of any loan or any extension of credit to any third party.
7. Any material change in the nature of the business.
8. The acquisition of any company or asset other than any fuel or spare parts that are necessary for the operation and maintenance of the energy plants.
9. The sale or other disposal of any asset other than in the ordinary course of business.
10. Any decision to close down or wind up the business.
11. The merger of the Company or a Guarantor (or any portion thereof) with any other person.
12. The entry into, or withdrawal from, any partnership, consortium, or joint venture.
13. Making any amendment to the constitutional documents, except as otherwise permitted under Section 1.06 hereof.
14. Authorizing or taking any action in furtherance of bankruptcy.
15. Any amendments to any debt instruments.
16. Any settlements of litigation or arbitration or any third-party releases.
17. Any change in executive officers.
18. Any decision in connection with negotiations with Chilean governmental authorities, or with the counterparties to the PPAs, in respect of amendments to PPAs.
19. Any changes to agreements with material suppliers, other than those in the ordinary course to allow for extensions or payment terms not affecting the interests of the Consenting Noteholders.
20. Any changes to the composition of the board of directors or any committee of the Credit Parties, including the number of board members.
21. The incurrence of any capital expenditures other than maintenance capital expenditures.
22. The entry into negotiations with any former direct or indirect shareholder or equity partner of the Credit Parties.
23. Any expenditure or payment in excess of U.S.$100,000 outside the ordinary course of business; provided, further, any expenditure or payment in excess of U.S.$100,000 in connection with payment plans with PPA counterparties shall be considered an ordinary course transaction.
24. The incurrence of any debt obligation in excess of U.S.$100,000.

**EXHIBIT C TO RESTRUCTURING SUPPORT AGREEMENT:**

**FORM OF CONSENTING NOTEHOLDER JOINDER**

---

[●], 20[●]

Inversiones Latin America Power Limitada
[●]
Attention: [●], Director

[*Consenting Noteholders*]

RE:  Restructuring Support Agreement, dated as of October [27], 2023 (as may be amended, supplemented or otherwise modified from time to time, including pursuant to this joinder agreement, the "Restructuring Support Agreement"), among Inversiones Latin América Power Ltda. a limited liability company (*sociedad de responsabilidad limitada*) organized and existing under the laws of Chile (the "Company"), San Juan S.A. and Norvind S.A., corporations (*sociedades anónimas*) formed under the laws of Chile (the "Guarantors" and, together with the Company, the "Credit Parties"), Latin America Power S.A., a corporation (*sociedad anónima*) formed under the laws of Chile and LAP Renewables B.V., a Dutch corporation (the "ILAP Partners"), and the noteholders party thereto (the "Consenting Noteholders").

Ladies and Gentlemen:

Reference is made to the Restructuring Support Agreement.  Capitalized terms used but not defined herein shall have the meanings given to such terms in the Restructuring Support Agreement.

Section 1.  Obligations Under the Restructuring Support Agreement.  The undersigned hereby agrees, as of the date first above written, to be bound as a Consenting Noteholder by all of the terms and conditions of the Restructuring Support Agreement to the same extent as each of the other Consenting Noteholders thereunder (it being understood that, to the extent such terms and conditions refer to any provision of the Existing Indenture, such reference shall be to the corresponding provision in the Indenture, dated as of June 15, 2021, as supplemented and amended).  The undersigned further agrees, as of the date first above written, that each reference in the Restructuring Support Agreement to a "Consenting Noteholder" shall also mean and be a reference to the undersigned.

Section 2.  Representations and Warranties.  The undersigned hereby makes each representation and warranty set forth in Section 2.02 of the Restructuring Support Agreement to the same extent as each other Consenting Noteholder.

Section 3.  Delivery; Counterparts.  Delivery of an executed counterpart of a signature page to this Restructuring Support Agreement by telecopier or in .pdf or similar format by electronic mail shall be effective as delivery of an original executed counterpart of this joinder agreement.

Section 4.  <u>Governing Law; Jurisdiction; Waiver of Jury Trial, Etc</u>.  The parties hereto hereby agree that Sections 10.06, 10.07, 10.09, 10.10, 10.11 and 10.12 of the Restructuring Support Agreement shall apply *mutatis mutandis* to this joinder agreement.

[*Signature Page Follows*]

*Executed Version*

## AMENDMENT TO RESTRUCTURING SUPPORT AGREEMENT

This AMENDMENT TO RESTRUCTURING SUPPORT AGREEMENT (this "Amendment"), dated as of November 27, 2023, is entered into by and among Inversiones Latin America Power Ltda. a limited liability company (*sociedad de responsabilidad limitada*) organized and existing under the laws of Chile (the "Company"), San Juan S.A. and Norvind S.A., corporations (*sociedades anónimas*) formed under the laws of Chile (the "Guarantors" and, together with the Company, the "Credit Parties"), Latin America Power S.A., a corporation (*sociedad anónima*) formed under the laws of Chile and LAP Renewables B.V., a Dutch corporation (*besloten vennootschap*) (collectively, the "ILAP Partners"), and the Consenting Noteholders (as such term is defined in the Restructuring Support Agreement (as defined below). Unless otherwise specified herein, capitalized and/or initially capitalized terms used in this Amendment shall have the meanings ascribed to them in the Restructuring Support Agreement, as amended hereby.

## RECITALS

**WHEREAS**, the Credit Parties, ILAP Partners, and certain beneficial holders of, or the undersigned investment advisors to funds and accounts that hold, the 5.125% senior secured notes due 2033 (the "Existing Notes") issued by the Company pursuant to an indenture dated as of June 15, 2021 (as amended by the indenture amendment agreement dated August 28, 2023, the "Existing Indenture") listed in Schedule I attached to the Restructuring Support Agreement (collectively, the "Consenting Noteholders") entered into that certain Restructuring Support Agreement, dated as of October 30, 2023 (the "Restructuring Support Agreement");

**WHEREAS**, the Parties wish to amend the Restructuring Support Agreement to extend certain milestones set forth therein;

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

**Section 1.    Amendment to the Restructuring Support Agreement**

1.01.    Modification of Milestones.

(a)    Section 1.03(a)(iii) of the Restructuring Support Agreement is amended and restated as follows:

> commence by no later than November 30, 2023, the solicitation of votes on the Plan by distributing the Plan Solicitation Materials to parties entitled to vote on the Plan by mail, email or any other means reasonably acceptable to the Credit Parties;

(b)      Section 1.03(a)(iv)(B) of the Restructuring Support Agreement is amended and restated as follows:

> the Credit Parties shall file their respective bankruptcy cases (the "Bankruptcy Cases") in the Court after distributing the Plan Solicitation Materials, but in all events no later than December 3, 2023;

## Section 2.       Representations and Warranties

2.01.    Representation and Warranties of the Credit Parties.  Each Credit Party represents and warrants to the other Parties that, as of the date hereof:

(a)      The representations and warranties of the Credit Parties contained in Section 2.01 of the Restructuring Support Agreement are true and correct in all respects (or in all material respects for such representations and warranties that are not by their terms already qualified as to materiality) on and as of the date hereof.

(b)      This Amendment and the Restructuring Support Agreement constitute legal, valid and binding obligations of the Credit Parties enforceable against the Credit Parties in accordance with their terms, except as the enforcement hereof may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting the rights and remedies of creditors or by general equitable principles.

2.02.    Representation and Warranties of the Consenting Noteholders.  Each Consenting Noteholder, severally and not jointly, represents and warrants to the other Parties that, as of the date hereof:

(a)      The representations and warranties of the Consenting Noteholders contained in Section 2.02 of the Restructuring Support Agreement are true and correct in all respects (or in all material respects for such representations and warranties that are not by their terms already qualified as to materiality) on and as of the date hereof.

(b)      This Amendment and the Restructuring Support Agreement constitute legal, valid and binding obligations of the Consenting Noteholders enforceable against the Consenting Noteholders in accordance with their terms, except as the enforcement hereof may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting the rights and remedies of creditors or by general equitable principles.

2.03.    Representation and Warranties of the ILAP Partners.   Each ILAP Partner represents and warrants to the other Parties that, as of the date hereof:

(a)      The representations and warranties of the ILAP Partners contained in Section 2.03 of the Restructuring Support Agreement are true and correct in all respects (or in all material respects for such representations and warranties that are not by their terms already qualified as to materiality) on and as of the date hereof.

(b)      This Amendment and the Restructuring Support Agreement constitute legal, valid and binding obligations of the ILAP Partners enforceable against the ILAP Partners in accordance

with their terms, except as the enforcement hereof may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting the rights and remedies of creditors or by general equitable principles.

**Section 3.**    <u>**Conditions Precedent**</u>.

3.01.    This Amendment shall become effective as of the first date on which:

(a)    No Termination Event hereunder has occurred and is continuing as of the date hereof; and

(b)    the Credit Parties and the ILAP Partners shall have received, in form and substance satisfactory to each such Party, this Amendment, duly executed by:

(i)    each of the Credit Parties;

(ii)    each of the ILAP Partners; and

(iii)    the Consenting Noteholders who collectively hold at least 66 and 2/3% of the outstanding principal amounts of the Existing Notes.

3.02.    The Ad Hoc Group Advisors shall notify in writing each of the Credit Parties, the ILAP Partners, and the Consenting Noteholders of the effectiveness of this Amendment upon the satisfaction or waiver of the conditions precedent outlined in <u>Section 3.01</u> hereof.

**Section 4.**    <u>**Miscellaneous**</u>.

4.01.    <u>Successors and Assigns</u>.  This Amendment shall be binding upon and inure to the benefit of each Party hereto and their respective successors, assigns, heirs, executors, administrators, and representatives.

4.02.    <u>Headings</u>. The section headings of this Amendment are included for reference purposes only and shall not affect the construction or interpretation of any of the provisions of this Amendment.

4.03.    <u>Counterparts; Facsimile or Electronic Signatures</u>.  This Amendment may be executed simultaneously in multiple counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  This Amendment, any and all agreements and instruments executed and delivered in accordance herewith, along with any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or other means of electronic transmission, shall be treated in all manner and respects and for all purposes as an original signature, agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

4.04.    <u>Governing Law; Jurisdiction; Waiver of Jury Trial, Etc</u>.  The Parties hereto hereby agree that <u>Sections</u> <u>10.05</u>, <u>10.07</u>, <u>10.08</u>, <u>10.10</u>, <u>10.11</u>, <u>10.12</u>, <u>10.13</u> and <u>10.14</u> of the Restructuring Support Agreement shall apply *mutatis mutandis* to this Amendment.

*Execution Version*

## SECOND AMENDMENT AND JOINDER TO
## RESTRUCTURING SUPPORT AGREEMENT

This SECOND AMENDMENT AND JOINDER TO RESTRUCTURING SUPPORT AGREEMENT (this "Amendment"), dated as of November 29, 2023, is entered into by and among Inversiones Latin America Power Ltda., a limited liability company (*sociedad de responsabilidad limitada*) organized and existing under the laws of Chile (the "Company"), San Juan S.A. and Norvind S.A., corporations (*sociedades anónimas*) formed under the laws of Chile (the "Guarantors" and, together with the Company, the "Credit Parties"), Latin America Power S.A., a corporation (*sociedad anónima*) formed under the laws of Chile and LAP Renewables B.V., a Dutch corporation (*besloten vennootschap*) (the "ILAP Partners"), the Majority Members (as such term is defined in the Initial Restructuring Support Agreement (as defined below)), and Citibank, N.A. ("Citibank"). Unless otherwise specified herein, capitalized and/or initially capitalized terms used in this Amendment shall have the meanings ascribed to them in the Restructuring Support Agreement (as defined below). The Credit Parties, the ILAP Partners, the Consenting Noteholders, and Citibank may each be referred to herein as a "Party" and, collectively, as the "Parties" for any and all purposes in this Amendment.

## RECITALS

**WHEREAS**, the Credit Parties, ILAP Partners, and certain beneficial holders of, or the undersigned investment advisors to funds and accounts that hold, the 5.125% senior secured notes due 2033 (the "Existing Notes") issued by the Company pursuant to an indenture dated as of June 15, 2021 (as amended by the indenture amendment agreement dated August 28, 2023, the "Existing Indenture") listed in Schedule I attached to the Initial Restructuring Support Agreement (collectively, the "Consenting Noteholders" and, together with Citibank, the "Consenting Creditors") entered into that certain Restructuring Support Agreement, dated as of October 30, 2023 (the "Initial Restructuring Support Agreement" and, as amended by that certain Amendment to Restructuring Support Agreement, dated as of November 27, 2023, and as further amended hereby, the "Restructuring Support Agreement");

**WHEREAS**, Citibank is the administrative agent and lender under that certain Credit Agreement with the Credit Parties, dated as of June 15, 2021 (as amended by the First Amendment to Credit Agreement, dated August 28, 2023, the "Credit Agreement");

**WHEREAS**, the Credit Parties, the ILAP Partners, the Consenting Creditors, and their respective counsel and other advisors have engaged in good-faith negotiations regarding a comprehensive restructuring of the Credit Parties' indebtedness and obligations under the Existing Indenture, the Existing Notes, and the LCF Obligations (as defined in the Credit Agreement), all as described in the restructuring term sheet attached to the Restructuring Support Agreement as Exhibit A (together with any schedules, annexes, and exhibits attached thereto, and as may be modified in accordance with the Restructuring Support Agreement, the "Restructuring Term Sheet"; the transactions described in the Restructuring Support Agreement and the Restructuring Term Sheet are referred to generally as the "Restructuring");

**WHEREAS**, each Party and its respective counsel and other advisors has reviewed or has had the opportunity to review the Restructuring Term Sheet and the Restructuring Support Agreement and each Party has agreed, subject to the conditions contained in the Restructuring Term Sheet and the Restructuring Support Agreement, to participate in the Restructuring in accordance with the Restructuring Support Agreement;

**WHEREAS**, each Party recognizes that the Restructuring Support Agreement is not an offer or acceptance with respect to any securities or a solicitation or an acceptance of a plan of reorganization proposed in connection with any insolvency proceeding, and that any such offer or solicitation will comply with all applicable securities laws and any other applicable law; and

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

**Section 1.    Amendment to the Restructuring Support Agreement**

1.01.    <u>Majority Members</u>.   Upon execution of this Amendment, the term "Majority Members" shall mean, collectively, the members of the Ad Hoc Group and Citibank holding a majority of the outstanding principal amount of the Existing Notes and Loans (as defined in the Credit Agreement) held by the Consenting Creditors, collectively.

1.02.    <u>Agreement to Support</u>.

(a)    The first paragraph of <u>Section 1.02</u> of the Restructuring Support Agreement is amended and restated as follows:

> Subject to the terms and conditions hereof, each Consenting Creditor (as defined in the Second Amendment and Joinder to Restructuring Support Agreement, dated November 29, 2023 (the "<u>RSA Amendment</u>")) agrees severally and not jointly that it shall, with respect to all Existing Notes Claims (as defined in the Restructuring Term Sheet) and LC Facility Claims[1] held by such Consenting Creditor, from the date of effectiveness of this Agreement with respect to such Consenting Creditor to the date of the termination of this Agreement with respect to such Consenting Creditor pursuant to <u>Section 3</u> hereof (the "<u>Termination Date</u>"):

(b)    The first paragraph of <u>Section 1.02(b)</u> of the Restructuring Support Agreement is amended and restated as follows:

> Subject to the satisfaction or waiver of the conditions set forth in <u>Section 5</u> hereof as provided for herein—including the receipt by each Consenting

---

[1]    "<u>LC Facility Claims</u>" shall mean means any claim evidenced by, arising under, on account of, related or in connection with the Credit Agreement (as defined in the RSA Amendment), including claims for all principal amounts outstanding, cash collateral, interest, fees, expenses, costs, and other charges arising thereunder or related thereto.

Creditor of initial drafts of the Definitive Documents in accordance with Section 1.03(a)(iv)(A)—vote (or cause to be voted) each of its Existing Notes Claims and LC Facility Claims in favor of:

(c)     The proviso in Section 1.02(b)(ii) of the Restructuring Support Agreement is amended and restated as follows:

> *provided* that the votes of each Consenting Creditor shall be immediately and automatically without further action of any Consenting Creditor revoked and deemed null and void *ab initio* upon termination of this Agreement with respect to such Consenting Creditor pursuant to Section 3 hereof (other than following a Termination Event pursuant to Section 3.01(a)(i)).

(d)     Section 1.02(d) of the Restructuring Support Agreement is amended and restated as follows:

> direct any administrative agent, collateral agent, or indenture trustee (as applicable), including the Trustee and Collateral Agent, to not take any action inconsistent with such Consenting Creditors' obligations under this Agreement.

1.03.    Amendments to Restructuring Support Agreement.

(a)     [Reserved]

(b)     [Reserved]

(c)     Consultation with Consenting Creditors.  The obligation of the Credit Parties under Section 1.03(a)(v) of the Restructuring Support Agreement to consult with the Consenting Noteholders is amended to be an obligation to consult with the Consenting Creditors.

(d)     Notices to Consenting Creditors.

(i)     The obligations of the Credit Parties or ILAP Partners, as applicable, under Sections 1.03(a)(iv)(A), 1.03(a)(x), 1.04(a), 1.04(b), 1.04(c), 1.04(f), 3.01(c), 3.01(d), and 6.06 of the Restructuring Support Agreement to deliver notices or information to the Consenting Noteholders or the Ad Hoc Group Advisors are amended to be obligations of the Credit Parties to also deliver such notices and information to Citibank.

(ii)     Section 1.04(a)(i)(3) of the Restructuring Support Agreement is amended and restated as follows:

> any condition to the Consenting Creditors' support obligations set forth herein or any Closing Condition not to be satisfied or not be able to be satisfied or

3

(e)    Advisor Fees.  Section 1.04(i) of the Restructuring Support Agreement is amended and restated as follows:

> *Compliance with Advisor Fees.*  The Credit Parties will continue to comply with any reimbursement agreement entered into with an advisor of the Consenting Noteholders or Citibank, including without limitation, Cleary Gottlieb Steen & Hamilton LLP, Claro & Cia. and Rothschild & Co., to reimburse the Consenting Noteholders or Citibank, as applicable, for costs and expenses incurred in connection with this Agreement and the negotiation and implementation of the terms of the Restructuring.

(f)    Transfers.  The following Section 1.05(f) shall be added to the Restructuring Support Agreement following Section 1.05(e):

> Citibank shall not assign, transfer or otherwise pledge or dispose of any LC Facility Claims owned by Citibank, nor any rights (including as to voting, consent or direction) related to such LC Facility Claims (a "LC Claim Transfer") unless (i) such LC Claim Transfer complies with Section 9.04 of the Credit Agreement and (ii) the transferee delivers to the Consenting Noteholders and the Company, in accordance with Section 10.05 of this Agreement, at or prior to the time of the LC Claim Transfer, an executed joinder pursuant to which such transferee shall assume all obligations of Citibank hereunder in respect of the LC Facility Claims transferred. Notwithstanding the foregoing, Citibank shall not transfer its LC Facility Claims to any of the Credit Parties or to any affiliates of the Credit Parties (including, without limitation, the ILAP Partners), and neither the Company nor any affiliate of the Company shall be considered Citibank hereunder. To the extent that a LC Claim Transfer violates the provisions of this Section 1.05(f), the LC Claim Transfer shall be void *ab initio* and Citibank shall continue to remain subject to the terms of this Agreement.  Upon consummation of any LC Claim Transfer in compliance with this Section 1.05(f), (i) any person or entity that is a transferee shall be fully bound by this Agreement as "Citibank" and shall be a "Party" and "Consenting Creditor" hereunder and (ii) Citibank shall no longer be bound by the Agreement or the obligations, nor have any rights, hereunder with respect to any LC Facility Claims that have been transferred.

(g)    Section 1.07(a) of the Restructuring Support Agreement is amended and restated as follows:

> Subject to the terms and conditions hereof, each of the Consenting Creditors (severally and not jointly), covenants and agrees that they shall submit a ballot voting in favor of the Plan at least two (2) Business Days prior to the Petition Date; *provided, further*, that each Consenting Noteholder shall also submit a beneficial holder ballot voting in favor of the Plan promptly after receipt of such beneficial holder ballot from its nominee(s) (and shall take

4

commercially reasonable efforts to cause such nominee(s) to submit such beneficial holder ballot).

(h)    <u>DIP Financing</u>.  <u>Section 1.07(b)(v)</u> of the Restructuring Support Agreement is amended and restated as follows:

> The Consenting Creditors agree to provide a carve-out in the use of cash collateral that is customary for the pre-trigger notice period and $3 million for the post-trigger notice period to be used for payment of professional fees and expenses for advisors to the Credit Parties. In addition to the carve-out, any order approving use of cash collateral and/or DIP Financing shall provide for, without limitation, (A) use of cash available in the Operations Account (as defined in the Existing Indenture) to pay O&M Costs, (B) ability of the Company to provide withdrawal certificates at any time during the Proceeding (with cash to be drawn first from the Revenue Account (as defined in the Existing Indenture), and then from the O&M Reserve Account (as defined in the Existing Indenture)) to make payments due on energy payments, and (C) use of cash collateral pursuant to an agreed-to budget.

(i)    <u>Representations and Warranties of the Credit Parties</u>.  The first paragraph of <u>Section 2.01</u> of the Restructuring Support Agreement is amended and restated as follows:

> The Credit Parties represent and warrant, jointly and severally, to each of the Consenting Creditors and the ILAP Partners that, as of (i) the date hereof, (ii) the date of the RSA Amendment, (iii) the Voting Deadline, and (iv) the Effective Date:

(i)    <u>Section 2.01(n)</u> of the Restructuring Support Agreement is amended and restated as follows:

> The Credit Parties have not entered into any reimbursement agreements other than those of the Ad Hoc Group Advisors, counsel to Citibank, or advisors to the Credit Parties as of the date hereof;

(j)    <u>Termination</u>.

(i)    <u>Section 3.01(a)(iii)</u> of the Restructuring Support Agreement is amended and restated as follows:

> entry of a final order by the Court denying confirmation of the Plan, unless the Consenting Creditors deliver written notice within three (3) business days after the entry of such order to the Company of their desire to amend the Plan to address the grounds on which such confirmation was denied;

(ii)    <u>Section 3.01(a)(iv)</u> of the Restructuring Support Agreement is amended and restated as follows:

entry of a final order by the Court confirming the Plan is reversed or vacated, unless the Consenting Creditors deliver written notice within two (2) business days after the entry of such order reversing or vacating confirmation to the Company of their desire to amend the Plan to address the grounds on which such confirmation was reversed or vacated;

(iii)    The last sentence of Section 3.03 of the Restructuring Support Agreement is amended and restated as follows:

Upon the occurrence of any termination of this Agreement (other than as a result of the occurrence of the Effective Date), any and all consents or votes given with respect to Existing Notes or LC Facility Claims occurring prior to such termination by the Consenting Creditors shall be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement or otherwise.

(iv)    The references to "Consenting Noteholders" and "Consenting Noteholder" in Section 3.01(b)(ii), (viii), and (xiii), 3.04 (other than in clause (c)), and 3.05 of the Restructuring Support Agreement are replaced with references to "Consenting Creditors" and "Consenting Creditor", respectively.

(v)    The following new clauses (d) and (e) are added to Section 3.04 of the Restructuring Supporting Agreement immediately following clause (c) of such section:

(d) subject to Court approval, the Credit Parties fail to perform their obligations under any engagement agreement entered into with an advisor to the Consenting Creditors in accordance with its terms and such failure continues unremedied for thirty (30) Business Days; and

(e) solely with respect to Citibank:

(i) in the event that this Agreement is modified, amended, or supplemented pursuant to Section 7 in a way that adversely affects Citibank, the LC Facility Claims, and/or Citibank's recovery on account of its LC Facility Claims, without the written consent of Citibank (which shall not be unreasonably withheld);

(ii) any draw request on any letter of credit issued by Citibank under the Credit Agreement is made; or

(iii) any Definitive Documents are (A) inconsistent with the terms of this Agreement or (B) modified or amended, or proposed to be modified or amended (as agreed to by the Majority Members and the Credit Parties), in each case in a manner that materially and adversely affects Citibank, the LC Facility Claims, and/or Citibank's recovery on account of its LC Facility Claims, in Citibank's reasonable discretion, without the written consent of Citibank (which shall not be unreasonably withheld).

(vi)         The following is added to the end of <u>Section 3.05</u> of the Restructuring Supporting Agreement:

> Without limiting any of the foregoing, upon the occurrence of Citibank's withdrawal from the Restructuring Support Agreement pursuant to <u>Section 3.04</u> thereof (or termination of the RSA Amendment), the (x) Parties shall be returned to the status quo ante as if the RSA Amendment had never existed (except for, the avoidance of doubt, the amendments set forth in <u>Section 1.03(g),</u> <u>Section 1.03(j)(vi),</u> <u>Sections 1.03(p)(vi)–(viii),</u> and <u>Sections 1.03(p)(xi)–(xii)</u> of the RSA Amendment which shall remain in full force and effect) and (y) the Parties shall remain liable for any of their respective breach(es) of the Restructuring Support Agreement (including the RSA Amendment) that occurred prior to such termination and/or withdrawal (as applicable). For the avoidance of doubt, at any time when Citibank is not party to the RSA, all rights of Citibank to object to the Plan are preserved. The Credit Parties and Consenting Noteholders reserve their rights and defenses to object to any filing and/or position taken by Citibank in connection with the foregoing.

(k)     <u>Conditions to Support Obligations and Restructuring Transactions.</u>

(i)         The references to "Consenting Noteholders" and "Consenting Noteholder" in <u>Sections 5</u> and <u>6</u> of the Restructuring Support Agreement are replaced with references to "Consenting Creditors" and "Consenting Creditor", respectively.

(ii)         "as of the date hereof" in clause (ii) of <u>Section 6.13</u> of the Restructuring Support Agreement is replaced with "as of the date of the RSA Amendment" and "professionals for the Ad Hoc Group" such section is replaced by "professionals for the Ad Hoc Group or Citibank".

(l)     <u>Amendments.</u>   The references to "Consenting Noteholders" and "Consenting Noteholder" in <u>Section 7</u> of the Restructuring Support Agreement are replaced with references to "Consenting Creditors" and "Consenting Creditor", respectively.

(m)     <u>Releases.</u>

(i)         <u>Section 8.03(a)</u> of the Restructuring Support Agreement is amended and restated as follows:

> On the Effective Date of the Plan, in consideration of the agreements of the Consenting Creditors contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Company, the Guarantors and the ILAP Partners, on behalf of itself and its affiliates, successors, assigns, and other representatives (each, a "<u>Credit Party Releasor</u>" and collectively, the "<u>Credit Party Releasors</u>"), hereby, to the fullest extent permitted by applicable law, absolutely, unconditionally and irrevocably releases and forever discharges each of the Consenting Creditors (and, in addition to the

Consenting Creditors, where a Consenting Noteholder is an investment advisor, subadvisor, or manager for a beneficial holder of the Existing Notes, such beneficial holder), and their respective successors and assigns, and their respective present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, agents (including, for the avoidance of doubt, the Collateral Agents and the Trustee) and other representatives (each a "Consenting Creditor Releasee" and, collectively, the "Consenting Creditor Releasees"), of and from all demands, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set off, demands and liabilities whatsoever of every name and nature, known or unknown, suspected or unsuspected, both at law and in equity (individually, a "Claim" and collectively, the "Claims"), which any Credit Party Releasor may now or hereafter own, hold, have or claim to have against the Consenting Creditor Releasees or any of them for, upon, or by reason of any circumstance, action, cause or thing whatsoever arising at any time on or prior to the Effective Date for or on account of, or in relation to, or in any way in connection with this Agreement, any other Note Documents, Financing Documents (as defined in the Credit Agreement) or transactions thereunder or related thereto; *provided* that in no event shall any Consenting Creditor Releasee be released from any Claim, whether in law or in equity, that has been determined through a final, non-appealable order of a court of competent jurisdiction to have resulted from a breach of this Agreement or such Consenting Creditor Releasee's fraudulent conduct, gross negligence or willful misconduct.

(ii)    The references to "Consenting Noteholders" and "Consenting Noteholder" in Sections 8.03(b), (c), and (d) of the Restructuring Support Agreement are replaced with references to "Consenting Creditors" and "Consenting Creditor", respectively, and the reference to "Note Documents" in Section 8.03(b) of the Restructuring Support Agreement is replaced with a reference to "Note Documents or Financing Documents".

(n)    Effect on Credit Documents.

(i)    The following Section 8.05 shall be added to the Restructuring Supporting Agreement immediately following Section 8.04 thereof:

Except as specifically set forth herein, the Restructuring Term Sheet and in the Plan, all of the terms of the Financing Documents shall remain unchanged and in full force and effect and are hereby ratified and confirmed by each Credit Party. Except as specifically set forth herein, the Restructuring Term Sheet and in the Plan, each Credit Party acknowledges and agrees that nothing contained in this Agreement and no action by, or inaction on the part of, Citibank shall be deemed to (i) constitute a consent to or waiver of any past, present or future violations of any provisions of the Financing Documents, (ii) amend, modify or operate as a waiver of any

8

provision of the Financing Documents, or of any right, power or remedy of Citibank thereunder, or (iii) constitute a course of dealing or other basis for altering any obligations of any Credit Party under the Financing Documents or any other agreement or instrument.  Without limiting the generality of the foregoing, Citibank hereby reserves all of its rights and remedies under the Financing Documents, subject to any rights, claims and defenses of the Credit Parties.  For the avoidance of doubt, nothing in this Agreement shall impose on Citibank any obligation to agree to any proposal with respect to any possible amendment, modification, supplement or extension of Indebtedness owing to it under any Financing Document other than as set forth in this Agreement, the Restructuring Term Sheet and the Plan. Notwithstanding any other provision of this Agreement, Citibank shall not be liable for (i) any indirect, special, punitive or consequential damages in connection with its entry into this Agreement, or (ii) any action that it takes or the omission of any action by it that results in a Termination Event, unless due to a breach of its express obligations under this Agreement.

(o)    <u>Miscellaneous</u>.

(i)    The references to "Consenting Noteholders" and "Consenting Noteholder" in <u>Sections 10.01</u>, <u>10.09</u>, and <u>10.14</u> of the Restructuring Support Agreement are replaced with references to "Consenting Creditors" and "Consenting Creditor", respectively.

(ii)    The following <u>Section 10.05(d)</u> shall be added to the Restructuring Supporting Agreement immediately following <u>Section 10.05(c)</u> thereof:

if to Citibank:

Citibank, N.A.
388 Greenwich Street, 7th Floor
New York, NY 10012
United States
Attention:  Chirag Shah / Daniel O'Czerny / Marco Gomez
Email: chirag2.shah@citi.com / daniel.oczerny@citi.com /
marco.gomez@citi.com

with a copy to:

Milbank LLP
55 Hudson Yards
New York, NY 10001-2163
United States
Attention: Evan R. Fleck / Abigail Debold
Email: efleck@milbank.com / adebold@milbank.com

(p)　　The Restructuring Term Sheet is amended as follows:

(i)　　The Section "TERMS OF THE RESTRUCTURING – Claims to be Restructured" under the column "Claims as of September 30, 2023" with respect to "Letter of Credit Facility granted by Citibank, N.A. pursuant to a Credit Agreement dated June 15, 2021" shall be amended to delete "To be determined" and replaced with "$19,565,604".

(ii)　　A new Section "TERMS OF THE RESTRUCTURING – Letters of Credit" shall be added as follows:  "As of the Plan Effective Date, all letters of credit issued by Citibank under the Credit Agreement shall be deemed terminated, and consummation of the Restructuring shall be conditioned on Citibank's receipt from the beneficiary under each such letter of credit of a duly executed consent to termination certificate in the form attached to such letters of credit."

(iii)　　The Section "TAKE-BACK SENIOR SECURED NOTES - Principal Amount" shall be amended and restated as follows: "An initial principal amount equal to $260 million, *provided* that if the Citibank Settlement (as set forth in the Section titled, "Citibank Settlement") is consummated, the principal amount of the Take-back SSNs shall be increased by the principal amount of the Settlement Take-back SSNs (as defined below)."

(iv)　　Clause (i) of the Section "TAKE-BACK SENIOR SECURED NOTES – Collateral" shall be amended and restated as follows:  "there will be no Debt Service Reserve Account ("DSRA") or letters of credit issued by Citibank".

(v)　　The Section "CONVERTIBLE NOTES - Principal Amount" shall be amended and restated as follows: "An initial principal amount equal to the total amount of Restructured Claims *minus* $260 million, *provided*, *further*, that if the Citibank Settlement is consummated, then the initial principal amount of the Convertible Notes shall be decreased by the amount of Convertible Notes that Citibank would have been entitled to receive had the Citibank Settlement not been consummated."

(vi)　　The first sentence of the Section "TAKE-BACK SENIOR SECURED NOTES – Cash Sweep" shall be amended and restated as follows: "Beginning on December 15, 2024 and semi-annually thereafter on each Interest Payment Date (the "Cash Sweep Calculation Date"), the Company will determine its cash balance (excluding from this concept any proceeds obtained from the Super Priority Notes and including any proceeds obtained from financings and PEC Receivables sales) in excess of Minimum Cash (as defined below) (the "Excess Cash"). On the date that is thirty (30) days after the Cash Sweep Calculation Date (the "Cash Sweep Effective Date"), payments (the "Cash Sweep") are to be made to holders of the Take-back SSNs in amounts equivalent to the Excess Cash.

(vii)　　The Section "CONVERTIBLE NOTES - Conversion" shall be amended to include a new event under the definition "Conversion Date", as follows: "or (v)  in the event  Company Sale occurs in breach of the terms of the Sales Facilitation Agreement".

(viii)　　The Section "COMPANY SALE – Investment Banks in charge of the Company Sale Process" shall be amended to delete any references to Morgan Stanley.

10

(ix)        The second sentence of the Section "OTHER – Definitive Documentation and Implementation" shall be amended and restated as follows: "All definitive documentation shall be acceptable in form and substance to the Consenting Creditors' consent as set forth in the RSA."

(x)        The Section "OTHER – Fees and Expenses" shall be amended and restated as follows: "In connection with the Restructuring, the Company will pay the reasonable and documented fees and expenses of the Ad Hoc Group and Citibank, including all fees and expenses of Cleary Gottlieb Steen & Hamilton LLP, Claro & Cia., Conyers Dill & Pearman, Rothschild & Co., and Milbank LLP, in accordance with the applicable fee agreements in place; *provided* that, if the Restructuring is implemented through a proceeding in a jurisdiction other than New York, the Company will enter into a fee agreement with Citibank's applicable local counsel prior to commencing such proceeding."

(xi)        The Section "SUPER PRIORITY NOTES – Instrument; Treatment" shall be amended to replace the amount of "$10 million" with "$14 million."

(xii)        The Section "SUPER PRIORITY NOTES – Principal Amount" shall be amended to replace the amount of "$10 million" with "$14 million."

(xiii)        The Restructuring Term Sheet is amended to include a new Section "CITIBANK SETTLEMENT" at the end, as follows:

| Citibank Settlement |
| --- |
| If Citibank is party to the RSA as of the Plan Effective Date and votes in favor of the Plan in accordance with the terms of the RSA, then Citibank agrees to forfeit, and shall be deemed to have forfeited, any right to receive Convert Notes in exchange for the issuance by the Reorganized ILAP of the Settlement Take-back SSNs to Citibank on the Plan Effective Date.  For the avoidance of doubt, at any time when Citibank is not party to the RSA, all rights of Citibank to object to the Plan are preserved. The Credit Parties and Consenting Noteholders reserve their rights and defenses to object to any filing and/or position taken by Citibank in connection with the foregoing. |
| "Settlement Take-back SSNs" shall mean Take-back SSNs in the principal amount of $4,305,966. For the avoidance of doubt, the issuance of the Settlement Take-back SSNs will be in addition to the $260 million in Take-back SSNs that the Reorganized ILAP will issue to holders of the Restructured Claims, including Citibank, on the Plan Effective Date. |

(xiv)     The table titled "Allocation of Excess Sale Proceeds above the First Threshold Amount to Convert Holders / ILAP Partners" in the Section "COMPANY SALE – Sale Proceeds" shall be amended and restated as follows:

| | | Allocation of Excess Sale Proceeds above the First Threshold Amount to Holders of Convertible Notes ("Convertible Noteholders") and LAP Chile | | | | | | |
| Distribution Date (as defined in the Sales Facilitation Agreement) | First Threshold Amount - $70 million | | $70 million - $90 million | | $90 million to "Full Repayment of Convertible Notes" (as defined below) | | Above Full Repayment of Convertible Notes | |
| | Convertible Noteholders | LAP Chile | Convertible Noteholders | LAP Chile | Convertible Noteholders | LAP Chile | Convertible Noteholders | LAP Chile |
|---|---|---|---|---|---|---|---|---|
| On or before December 31, 2024 | 59.5% | 40.5% | 55% | 45% | | | | |
| January 1, 2025 to June 30, 2025 | 67.0% | 33.0% | 62.5% | 37.5% | 50% | 50% | 0% | 100% |
| July 1, 2025 to December 31, 2025 (or the Extended Conversion Date, as applicable) | 74.5% | 25.5% | 70.0% | 30.0% | | | | |

## Section 2.     Representations and Warranties

2.01.   <u>Representation and Warranties of Citibank</u>.  Citibank represents and warrants to the other Parties that, as of the date hereof:

(a)     *Corporate Power and Authority.*  It is validly existing and in good standing under the laws of the state of its incorporation or organization, has the power to enter into and perform, and has taken all necessary action to authorize the entry into, performance and execution of the Amendment;

(b)     *Ownership*.  As of the date hereof, it holds 100% of all LC Facility Claims, including the principal amount of all of the Loans (as defined in the Credit Agreement);

(c)     *Binding Obligation*.  With respect to it, this Amendment has been duly executed and delivered by, and constitutes a legally binding, valid and enforceable obligation in accordance with its terms, subject to any general principles of law or equity limiting its obligations hereunder;

(d)     *No Violation of Law.* The execution, delivery, and performance by Citibank of this Amendment does not violate (i) any provision of law, rule or regulation applicable to it or any of its subsidiaries, or (ii) its charter or bylaws (or other similar governing documents); and

(e)    *No Conflict.* The entry into, and performance by Citibank and the transactions contemplated by, the Restructuring Support Agreement (as amended by this Amendment), do not and will not conflict with any law, rule, regulation, order, judgment or decree applicable to it or them, its or their constituting documents or any agreement which is binding upon it or them or its or their assets.

2.02.    <u>Representation and Warranties of the Credit Parties</u>.  Each Credit Party represents and warrants to the other Parties that, as of the date hereof:

(a)    The representations and warranties of the Credit Parties contained in <u>Section 2.01</u> of the Restructuring Support Agreement are true and correct in all respects (or in all material respects for such representations and warranties that are not by their terms already qualified as to materiality) on and as of the date hereof.

(b)    This Amendment and the Restructuring Support Agreement constitute legal, valid and binding obligations of the Credit Parties enforceable against the Credit Parties in accordance with their terms, except as the enforcement hereof may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting the rights and remedies of creditors or by general equitable principles.

2.03.    <u>Representation and Warranties of the Consenting Noteholders</u>.  Each Consenting Noteholder, severally and not jointly, represents and warrants to the other Parties that, as of the date hereof:

(a)    The representations and warranties of the Consenting Noteholders contained in <u>Section 2.02</u> of the Restructuring Support Agreement are true and correct in all respects (or in all material respects for such representations and warranties that are not by their terms already qualified as to materiality) on and as of the date hereof.

(b)    This Amendment and the Restructuring Support Agreement constitute legal, valid and binding obligations of the Consenting Noteholders enforceable against the Consenting Noteholders in accordance with their terms, except as the enforcement hereof may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting the rights and remedies of creditors or by general equitable principles.

2.04.    <u>Representation and Warranties of the ILAP Partners</u>.   Each ILAP Partner represents and warrants to the other Parties that, as of the date hereof:

(a)    The representations and warranties of the ILAP Partners contained in <u>Section 2.03</u> of the Restructuring Support Agreement are true and correct in all respects (or in all material respects for such representations and warranties that are not by their terms already qualified as to materiality) on and as of the date hereof.

(b)    This Amendment and the Restructuring Support Agreement constitute legal, valid and binding obligations of the ILAP Partners enforceable against the ILAP Partners in accordance with their terms, except as the enforcement hereof may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting the rights and remedies of creditors or by general equitable principles.

**Section 3.**      <u>**Conditions Precedent.**</u>

3.01.      This Amendment shall become effective as of the first date on which:

(a)      No Termination Event hereunder has occurred and is continuing as of the date hereof;

(b)      The Company and the Guarantors shall have entered into a fee letter with Milbank LLP ("<u>Milbank</u>"), as counsel to Citibank, in the form provided by Milbank to the Credit Parties' advisors on September 28, 2023, and the Accrued Fees, Retainer, and all invoiced Restructuring Fees (each as defined therein) shall have been paid to Milbank;

(c)      Citibank, the Credit Parties and the ILAP Partners shall have received, in form and substance satisfactory to each such Party, this Amendment, duly executed by:

(i)      each of the Credit Parties;

(ii)      each of the ILAP Partners;

(iii)      Citibank; and

(iv)      the Consenting Noteholders who collectively hold at least 66 and 2/3% of the outstanding principal amount of the Existing Notes.

3.02.      The Ad Hoc Group Advisors shall notify in writing each of the Credit Parties, the ILAP Partners, Citibank, and the Consenting Noteholders of the effectiveness of this Amendment upon the satisfaction or waiver of the conditions precedent outlined in <u>Section 3.01</u> hereof.

**Section 4.**      <u>**Miscellaneous**</u>.

4.01.      <u>Successors and Assigns</u>. This Amendment shall be binding upon and inure to the benefit of each Party hereto and their respective successors, assigns, heirs, executors, administrators, and representatives.

4.02.      <u>Headings</u>. The section headings of this Amendment are included for reference purposes only and shall not affect the construction or interpretation of any of the provisions of this Amendment.

4.03.      <u>Counterparts; Facsimile or Electronic Signatures</u>. This Amendment may be executed simultaneously in multiple counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Amendment, any and all agreements and instruments executed and delivered in accordance herewith, along with any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or other means of electronic transmission, shall be treated in all manner and respects and for all purposes as an original signature, agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

14

4.04.    <u>Governing Law; Jurisdiction; Waiver of Jury Trial, Etc</u>.  The Parties hereto hereby agree that <u>Sections 10.05</u>, <u>10.07</u>, <u>10.08</u>, <u>10.10</u>, <u>10.11</u>, <u>10.12</u>, <u>10.13</u> and <u>10.14</u> of the Restructuring Support Agreement shall apply *mutatis mutandis* to this Amendment.  In addition to the foregoing, in the event Citibank is in breach of its obligations under the Restructuring Support Agreement (as amended by this Amendment), the Credit Parties have the right to terminate this Amendment (without terminating the Restructuring Support Agreement), with the effect of such termination to be the same as set forth in <u>Section 3.05</u> of the Restructuring Support Agreement.

*[Signatures Pages Follow]*

**Exhibit C**

Liquidation Analysis

# LIQUIDATION ANALYSIS[1]

## Introduction

Under the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a plan of reorganization unless the plan provides each holder of an allowed claim or interest that does not otherwise vote in favor of the plan with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate that the Plan satisfies the "best interests of creditors" test, the Debtors, with the assistance of their restructuring advisors, AlixPartners, LLP, have prepared this hypothetical liquidation analysis (the "**Liquidation Analysis**"), which is based upon certain assumptions discussed in the Disclosure Statement and the accompanying notes to this Liquidation Analysis.

This Liquidation Analysis sets forth an estimated range of recovery values for each Class of Claims and Interests upon disposition of assets pursuant to a hypothetical chapter 7 liquidation. As illustrated by this Liquidation Analysis, (a) Holders of Claims in certain Unimpaired Classes that would otherwise receive a full recovery under the Plan would receive an equal or lower recovery in a hypothetical liquidation and (b) Holders of Claims or Interests in Impaired Classes would receive a lower recovery in a hypothetical liquidation than they would under the Plan. Further, no Holder of a Claim or Interest would receive or retain property under the Plan of a value that is less than such Holder would receive in a chapter 7 liquidation. Accordingly, and as set forth in greater detail below, the Debtors believe that the Plan satisfies the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code. The Debtors believe that this Liquidation Analysis and the conclusions set forth herein are fair and represent the Debtors' best judgment regarding the results of a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

## Statement of Limitations

The preparation of a liquidation analysis is an uncertain process involving the use of estimates and assumptions that, although considered reasonable by the Debtors based upon their business judgment and input from their advisors, are inherently subject to significant business, economic, and competitive risks, uncertainties and contingencies, most of which are difficult to predict and many of which are beyond the control of the Debtors, their management, and their advisors. Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in an actual chapter 7 liquidation. The Liquidation Analysis was prepared for the sole purpose of generating a reasonable, good faith estimate of the proceeds that would be generated, and the recoveries that would result, if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code after conversion of the Chapter 11 Cases. The Liquidation Analysis is not intended and should not be used for any other purpose. The underlying financial information in the Liquidation Analysis and values stated herein have not been subject to any review, compilation, or audit by any independent accounting firm. No independent appraisals were conducted in preparing the Liquidation Analysis. In addition, various liquidation decisions upon which certain assumptions are based are subject to change. As a result, the actual amount of Claims that would ultimately be Allowed against the Debtors' Estates could vary significantly from the estimates stated herein, depending on the nature and amount of Claims asserted during the

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in (a) the *Joint Prepackaged Plan of Reorganization of Inversiones Latin America Power Ltda. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "**Plan**") or (b) the *Disclosure Statement for the Joint Prepackaged Plan of Reorganization of Inversiones Latin America Power Ltda. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "**Disclosure Statement**").

pendency of the hypothetical chapter 7 case. Similarly, the value of the Debtors' assets in a liquidation scenario is uncertain and could vary significantly from the values set forth in the Liquidation Analysis.

The Debtors' estimates of Allowed Claims and Interests contained in the Liquidation Analysis reference specific Claims estimates, even though the Debtors' estimates of ranges of projected recoveries under the Plan to Holders of Allowed Claims and Interests are based on ranges of Allowed Claims and Interests. In addition, the cessation of business in a chapter 7 liquidation is likely to trigger certain Claims that otherwise would not exist under a Plan absent a liquidation. These additional Claims could be significant, and some may be administrative expenses, while others may be entitled to priority in payment over Unsecured Claims.

The Liquidation Analysis does not include estimates for: (i) certain tax consequences, either foreign or domestic, that may be triggered upon the liquidation and sale of assets, (ii) recoveries resulting from any potential preference, fraudulent transfer, or other litigation or Avoidance Actions, (iii) certain Claims that may be entitled to priority under the Bankruptcy Code, including administrative priority Claims under sections 503(b) and 507(b) of the Bankruptcy Code, (iv) environmental or other governmental Claims arising from the shut-down or sale of the Debtors' assets, or (v) additional unsecured Claims as well as contract and lease breakage and rejection damages unsecured Claims arising from a chapter 7 liquidation. More specific assumptions are detailed in the notes below. ACCORDINGLY, NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A LIQUIDATION OF THE DEBTORS WOULD OR WOULD NOT, IN WHOLE OR IN PART, APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED HEREIN. THE ACTUAL LIQUIDATION VALUE OF THE DEBTORS IS SPECULATIVE AND RESULTS COULD VARY MATERIALLY FROM ESTIMATES PROVIDED HEREIN.

In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of the Debtors' financial statements to account for other known liabilities, as necessary. In addition, the Liquidation Analysis includes estimates for Claims that could be asserted and allowed in a chapter 7 liquidation, including unpaid chapter 11 Administrative Claims, chapter 7 Administrative Claims and chapter 7 trustee fees (together, the "**Administrative Claims**"). To date, as the Chapter 11 Cases have not been commenced, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing this Liquidation Analysis. Therefore, the Debtors' estimate of Allowed Claims set forth in this Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims and Interests under the Plan. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTORS. THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.

**Basis of Presentation**

This Liquidation Analysis has been prepared assuming that the Debtors converted their current Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code on or about December 31, 2023 (the "**Liquidation Date**"). It is assumed that on the Liquidation Date, the Bankruptcy Court would appoint a chapter 7 trustee (the "**Trustee**") to convert all assets into cash. In this hypothetical scenario, the Trustee would satisfy claims by selling the Debtors' assets as a going concern in a rapid, distressed sale. The cash amount (the "**Cash Proceeds**") that would be available for satisfaction of Allowed Claims and Interest would be net of taxes resulting from the sale of the assets. The Cash Proceeds, net of liquidation-related costs, would then be distributed to creditors in accordance with applicable law: (i) *first*, for payment of Administrative Claims; (ii) *second*, to pay the secured portions of all Allowed Secured Claims from the respective collateral; and (iii) *third*, to pay amounts on the Allowed Other Priority Claims. Any remaining net cash would be distributed to creditors holding Unsecured Claims, including any applicable deficiency Claims that arise to the extent of the unsecured portion of the Allowed Secured Claims. Certain factors, such as an inability by

the Debtors or the Trustee to maintain the Debtors' operations during the liquidation process, a seizure of collateral by secured creditors, significant vendor attrition, and/or delays in the liquidation process, may limit the amount of the proceeds generated by the liquidation of the Debtors' assets. These factors could materially reduce the value, on a "present value" basis, of the liquidation proceeds and yield significantly lower recoveries than those estimated in this Liquidation Analysis.

The Liquidation Analysis has been prepared assuming that the Debtors' current Chapter 11 Cases convert to chapter 7 on the Liquidation Date. The Liquidation Analysis assumes the rapid, distressed sale of the Debtors' assets within three months post-conversion as an operating business. The sales process will take place under the direction of the Trustee, likely utilizing third-party advisors. The Liquidation Analysis is also based on the assumptions that the Debtors have continued access to cash collateral during the course of the sales process. The Liquidation Analysis was prepared on a consolidated basis. There can be no assurance that the liquidation would be completed in this limited time frame, nor is there any assurance that the recoveries assigned to the assets would in fact be realized.

Under section 704 of the Bankruptcy Code, a trustee must, among other duties, collect and convert the property of the estate as expeditiously (generally in a distressed process) as is compatible with the best interests of parties-in-interest. This Liquidation Analysis is also based on the assumptions that: (i) the Debtors have continued access to cash collateral during the course of the liquidation process to fund Administrative Claims and (ii) operations, accounting, treasury, IT, and other management services needed to sell the operating entities continue.

### DETAILED LIQUIDATION ANALYSIS

The following Liquidation Analysis should be reviewed in conjunction with the associated notes.

| Liquidation Analysis - Summary of Debtors | | | |
|---|---|---|---|
| *In $Thousands* | Note: | Recovery $ Low | Recovery $ High |
| Proceeds from Sale of Operating Assets | [A] | $ 198,618 | $ 272,109 |
| **Total Proceeds** | | **$ 198,618** | **$ 272,109** |
| | | | |
| **Administrative and Chapter 7 Claims** | [B] | | |
| Trustee fees | | $ 5,959 | $ 8,163 |
| Professional fees | | 5,959 | 8,163 |
| **Total Administrative Claims** | | **$ 11,917** | **$ 16,327** |
| Administrative Claims Recovery | | 11,917 | 16,327 |
| *Administrative Recovery %* | | *100.0%* | *100.0%* |
| | | | |
| **Secured Senior Debt Claims** | [C] | $ 433,346 | $ 433,346 |
| Secured Senior Debt Recovery | | 186,701 | 255,783 |
| *Secured Senior Debt Recovery %* | | *43.1%* | *59.0%* |
| | | | |
| **Unsecured Claims** | [D] | $ 14,600 | $ 14,600 |
| Unsecured Recovery | | - | - |
| *Unsecured Recovery %* | | *0.0%* | *0.0%* |
| | | | |
| **Total Distributions** | | **$ 198,618** | **$ 272,109** |

**Notes to the Liquidation Analysis**

**Asset Recovery Estimates**

[A] <u>Proceeds from Sale of Operating Assets</u>: The Proceeds from Sale of Operating Assets from the chapter 7 asset sale represents proceeds of the sale of the operating assets of the Company, assuming a conversion to a chapter 7 on December 31, 2023. The value of the operations was estimated by conducting a Discounted Cash Flow valuation analysis on the post-tax cash flows of the business under a chapter 7 context. The Liquidation Analysis assumes that upon conversion to chapter 7, the existing PPAs would be rejected or terminated under provisions in the agreements. The analysis utilized a liquidation discount of 15% to 30%, which reflects the rapid, distressed sale of the business along with the loss of the PPAs as contemplated under the Plan and the additional business risks related to operating without PPAs in place.

**Chapter 7 Liquidation / Administrative Claims**

[B] <u>Administrative Claims</u>: Pursuant to section 326 of the Bankruptcy Code, the Bankruptcy Court may allow reasonable compensation for the Trustee's services, subject to certain limitations. Additionally, pursuant to section 726 of the Bankruptcy Code, the allowed administrative expenses incurred by the Trustee, including expenses affiliated with selling the Debtors' assets, will be entitled to payment in full prior to any distribution to Chapter 11 Administrative Claims or Other Priority Claims. For the purpose of the Liquidation Analysis, Trustee fees and related legal/professional expenses are estimated based on a combined total 6.0% of the net cash proceeds of liquidation. The Liquidation Analysis estimates the Trustee's fees and related professional expenses ranging from $11.9 million to $16.3 million.

**Claims**

[C] <u>Secured Senior Debt Claims</u>: Recovery on the Secured Senior Debt Claims has been estimated to be between 43.1% to 59.0%.

[D] <u>Unsecured Claims</u>: Unsecured Claims represent an estimate of prepetition Unsecured Claims. There is expected to be no available proceeds for recovery on account of the Unsecured Claims.

## **Exhibit D**

Financial Projections

## **Projections**

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan.[1] In connection with the planning and development of the Plan for the purposes of determining whether such Plan would satisfy this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.

The Debtors do not, as a matter of course, publish their business plans or strategies, projections or anticipated financial position. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or Projections to Holders of Claims or other parties in interest going forward, or to include such information in documents or otherwise make such information public, unless required to do so by the SEC or other regulatory bodies pursuant to the provisions of the Plan.

In connection with the Disclosure Statement, the Debtors' management team ("Management") prepared the Projections for the years 2024 through 2046 (the "Projection Period"). The Projections are based on several assumptions made by Management with respect to the future performance of the Reorganized Debtors' operations.

The Debtors have prepared the Projections based on information available to them, including information derived from public sources that have not been independently verified. No representation or warranty, expressed or implied, is provided in relation to fairness, accuracy, correctness, completeness, or reliability of the information, opinions, or conclusions expressed herein.

THESE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH PUBLISHED GUIDELINES OF THE SEC OR GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS FOR PREPARATION AND PRESENTATION OF PROSPECTIVE FINANCIAL INFORMATION.

ALTHOUGH MANAGEMENT HAS PREPARED THE PROJECTIONS IN GOOD FAITH AND BELIEVES THE ASSUMPTIONS TO BE REASONABLE, IT IS IMPORTANT TO NOTE THAT NEITHER THE DEBTORS NOR THE REORGANIZED DEBTORS CAN PROVIDE ANY ASSURANCE THAT SUCH ASSUMPTIONS WILL BE REALIZED. AS DESCRIBED IN DETAIL IN THE DISCLOSURE STATEMENT, A VARIETY OF RISK FACTORS COULD AFFECT THE RESULTS AND MUST BE CONSIDERED. ACCORDINGLY, THE PROJECTIONS SHOULD BE REVIEWED IN CONJUNCTION WITH

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan and Disclosure Statement, as applicable.

A REVIEW OF THE DISCLOSURE STATEMENT AND THE ASSUMPTIONS DESCRIBED HEREIN, INCLUDING ALL RELEVANT QUALIFICATIONS AND FOOTNOTES.

The Projections contain certain forward-looking statements, all of which are based on various estimates and assumptions. Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including those summarized herein. When used in the Projections, the words, "anticipate," "believe," "estimate," "will," "may," "intend," "expect," and similar expressions should be generally identified as forward-looking statements. Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, they cannot be sure that they will be achieved. These statements are only predictions and are not guarantees of future performance or results. Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement. All forward-looking statements attributable to the Debtors or Persons or Entities acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth herein. Forward-looking statements speak only as of the date on which they are made. Except as required by law, the Debtors expressly disclaim any obligation to update any forward-looking statement, whether because of new information, future events, or otherwise.

The Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement and the Plan in their entirety as well as the notes and assumptions set forth below.

The Projections are subject to inherent risks and uncertainties, most of which are difficult to predict and many of which are beyond Management's control. Although Management believes these assumptions are reasonable under the circumstances, such assumptions are subject to significant uncertainties, including, but not limited to, (a) changes in wind and hydrology resources in Chile; (b) short and long-term energy spot prices in Chile, which are defined by the balance of supply and demand; (c) decarbonization of the Chilean energy matrix; (d) global oil, natural gas, and other commodity pricing; (e) applicable laws and regulations; (f) interest rates and inflation; (g) performance under the Company's PPAs; (h) severe or unseasonable weather; and (i) technical and operating performance of the Debtors' operating assets. Additional information regarding these uncertainties is described in Section X of the Disclosure Statement. Should one or more of the risks or uncertainties referenced in the Disclosure Statement occur, or should underlying assumptions prove incorrect, actual results and plans could differ materially from those expressed in the Projections. Further, new factors could cause actual results to differ materially from those described in the Projections, and it is not possible to predict all such factors, or to the extent to which any such factor or combination of factors may cause actual results to differ from those contained in the Projections. The Projections herein are not, and must not be viewed as, a representation of fact, prediction or guaranty of the reorganized Debtors' future performance.

**A. General Assumptions**

   **i. Overview**

The Company is a clean energy company that owns and operates two wind generation projects, San Juan and Totoral, with an aggregate installed capacity of 239.2 megawatts (MW) and is engaged in the generation of electricity in northern Chile.

   **ii. Plan Consummation**

The Projections are based on, and assume the successful implementation of, the Reorganized Debtors' business plan. The Projections assume that the Plan will be Consummated in or around December 2023. Both the business plan and the Projections reflect numerous assumptions, including various assumptions regarding the anticipated future performance of the Reorganized Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Reorganized Debtors. In addition, the assumptions may not fully account for the uncertainty and disruption of business that may accompany a restructuring in bankruptcy court. Therefore, although the Projections are necessarily presented with numerical specificity, the actual results achieved during the period of the Projections will likely vary from the projected results. These variations may be material. Accordingly, no representation can be or is being made with respect to the accuracy of the Projections or the ability of the Reorganized Debtors to achieve the projected results of operations.

In deciding whether to vote, to accept or reject the proposed Plan, creditors must make their own determinations as to the reasonableness of such assumptions and the reliability of the Projections.

**B. Principal Assumptions for the Projections**

   **i. Revenue**

Revenues are obtained from the production and sale of power (electricity) and capacity to regulated and unregulated customers, as well as from the sale of power and capacity in the spot market. The Company has PPAs outlining terms of contracted revenue with regulated customers, including DisCos, which represent the majority of the Company's revenue.

Management's revenue projections are based on certain market studies commissioned by Valgesta Nueva Energía ("Valgesta"), assuming P90 generation and P90 hydrology, among other assumptions. The Projections assume that the extraordinary circumstances and volatility facing the Chilean energy market will persist through 2026, but will begin to normalize thereafter.

   **ii. Commercial Costs**

Commercial costs include the following components: cost of sales, maintenance costs and other costs. Cost of sales includes fees paid in connection with the use of the transmission system, maintenance, municipal taxes and fees, depreciation, insurance and others. Transmission system

costs mainly relate to the use of the central transmission system and the payment of tolls related to that service.

Maintenance costs consist mainly in the O&M Agreements with Vestas for both Projects. Municipal taxes and fees consist of payments made to local municipalities in Canela and Freirina, mainly with respect to commercial patents. Depreciation and amortization consist mainly of the depreciation of assets in our wind farms. Insurance costs consist of the cost of our insurance premiums, mainly in connection with O&M risk. Other costs consist mainly of coordination costs with National Electrical Coordinator and other intercompany costs. Management's commercial costs projections are informed by Valgesta's market studies, assuming P90 generation and P90 hydrology.

### iii.    Operating Expenses and Selling, General & Administrative Expenses

Operating expenses ("OpEx") comprise administrative expenses and consulting expenses. Administrative expenses at each project mainly consist of depreciation and amortization expenses, consulting expenses, expenses from back office services, and other expenses. Consulting expenses relate mainly to legal and professional fees, energy consulting fees, the cost of pricing studies and the price of O&M studies. Management's projections for OpEx are established based on Vestas's operating services agreement. Management's SG&A forecast through 2024 are based on a bottoms-up budgeting process. Projections thereafter are based on prior year costs plus 2% assumed cost inflation.

### iv.    Capital Expenditures

The Projections assume all capital expenditures and related costs are captured in the Vestas service agreement. The Valuation Analysis is conducted over the useful life of the Debtors' assets and therefore, assumes no growth capital expenditure associated with replacing wind turbine assets.

### v.    Taxes

The Projections assume a corporate tax rate of 27%. The Company has certain net operating losses at each project level, which are projected to result in no cash tax payments through 2028 and 2030 for the San Juan Project and Totoral Project, respectively.

### vi.    Working Capital

The Projections assume accounts receivable reflect approximately up to approximately 60 days from invoicing to collections. The Projections further assume that accounts payables take approximately up to 30 days from the Company being invoiced to being paid. Projections assume insurance premiums are paid annually in June, with monthly accrual.

### vii.   PEC Receivables

The Company expects to collect approximately $40 million in cash on account of the PEC program from 2024 through 2027. The Projections further assume that the PEC 2 program expires in August 2024 and no PEC program is established after August 2024.

## Financial Projections

| | For the year ending December 31, | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2024E | 2025E | 2026E | 2027E | 2028E | 2029E | 2030E | 2031E | 2032E | 2033E | 2034E | 2035E | 2036E | 2037E | 2038E | 2039E | 2040E | 2041E | 2042E | 2043E | 2044E | 2045E | 2046E |
| Total Revenues | $74 | $80 | $77 | $77 | $78 | $89 | $94 | $96 | $94 | $62 | $62 | $64 | $64 | $66 | $67 | $70 | $71 | $64 | $65 | $65 | $69 | $72 | $76 |
| Less: Total Costs | (26) | (29) | (20) | (13) | (13) | (9) | (8) | (7) | (6) | (1) | – | – | – | – | – | – | – | – | – | – | – | – | – |
| **Commercial Margin** | $48 | $51 | $57 | $65 | $66 | $80 | $86 | $89 | $88 | $62 | $62 | $64 | $64 | $66 | $67 | $70 | $71 | $64 | $65 | $65 | $69 | $72 | $76 |
| Less: Operating Expenses | (10) | (11) | (11) | (11) | (11) | (12) | (12) | (13) | (14) | (12) | (12) | (12) | (13) | (14) | (14) | (14) | (15) | (13) | (13) | (13) | (13) | (14) | (14) |
| Less: SG&A | (1) | (1) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (1) | (1) | (1) | (1) | (1) | (1) | (1) |
| **EBITDA** | $37 | $39 | $45 | $52 | $53 | $67 | $73 | $74 | $72 | $48 | $49 | $50 | $49 | $51 | $52 | $54 | $54 | $50 | $51 | $51 | $54 | $57 | $61 |
| *EBITDA Margin (%)* | *50.1%* | *48.2%* | *58.0%* | *67.6%* | *67.1%* | *75.0%* | *77.5%* | *77.5%* | *76.8%* | *77.4%* | *78.2%* | *78.3%* | *76.3%* | *76.7%* | *76.5%* | *77.0%* | *76.1%* | *78.4%* | *78.3%* | *78.0%* | *78.6%* | *79.0%* | *79.7%* |
| Less: D&A | (32) | (32) | (32) | (32) | (32) | (32) | (28) | (27) | (27) | (27) | (27) | (27) | (27) | (27) | (27) | (14) | (0) | (0) | (0) | (0) | (0) | (0) | (0) |
| **EBIT** | $5 | $7 | $13 | $21 | $21 | $36 | $46 | $47 | $45 | $21 | $22 | $23 | $21 | $24 | $24 | $41 | $54 | $50 | $50 | $51 | $54 | $57 | $61 |
| Less: Taxes | (1) | (2) | (4) | (6) | (6) | (10) | (12) | (13) | (12) | (6) | (6) | (6) | (6) | (6) | (7) | (11) | (14) | (14) | (14) | (14) | (15) | (15) | (16) |
| **NOPAT** | $4 | $5 | $10 | $15 | $15 | $26 | $33 | $34 | $33 | $15 | $16 | $17 | $16 | $17 | $18 | $30 | $39 | $37 | $37 | $37 | $39 | $41 | $44 |
| Plus: D&A | 32 | 32 | 32 | 32 | 32 | 32 | 28 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 14 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Less: Deferred Taxes | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (1) | (0) | (0) | (0) | (0) | (0) | (0) | (0) |
| Less: Capex | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| Change in Working Capital | (9) | 0 | 1 | 1 | 1 | (0) | (0) | (0) | 0 | 2 | (0) | (0) | 0 | (0) | (0) | (0) | 0 | (0) | 0 | 0 | (0) | (0) | (0) |
| **Unlevered Free Cash Flow** | $24 | $34 | $39 | $45 | $45 | $54 | $57 | $58 | $57 | $41 | $40 | $41 | $40 | $41 | $42 | $42 | $39 | $37 | $37 | $37 | $39 | $41 | $44 |
| *Memo: PEC Receivables* | | | | | | | | | | | | | | | | | | | | | | | |
| PEC 1 | – | 3 | 5 | 8 | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| PEC 2 | 24 | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – |

**Exhibit E**

Valuation Analysis

## Valuation Analysis

THE INFORMATION CONTAINED HEREIN IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN. THE INFORMATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION UNDER SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS OR INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS OR ANY OF THEIR AFFILIATES.

Solely for the purposes of the Plan and the Disclosure Statement,[1] Lazard Frères & Co. LLC ("Lazard"), as investment banker to the Debtors, has estimated a range of total enterprise value ("Enterprise Value") for the Reorganized Debtors and the reorganization value of the Reorganized Debtors, reflecting the Enterprise Value plus the Reorganized Debtors' estimated excess cash and estimated present value of cash flows from the Company's PEC receivables on emergence ("Reorganization Value") on a consolidated going-concern basis and *pro forma* for the transactions contemplated by the Plan (the "Valuation Analysis").

The Valuation Analysis is based on financial information and projections provided by the Debtors' management, including the Projections attached to the Disclosure Statement as **Exhibit D** (collectively the "Projections"), and information provided by other sources. The Valuation Analysis assumes that the Effective Date will occur on December 31, 2023, and solely values the Company based on the remaining projected useful life of the San Juan and Norvind projects. The valuation estimates set forth herein represent valuation analyses of the Reorganized Debtors generally based on the application of customary valuation techniques deemed appropriate.

Based on the Projections and solely for the purposes of the Plan, the Enterprise Value is estimated to be approximately $306 million to $343 million with a selected midpoint value of approximately $325 million. Based upon the estimated Range of Enterprise Value as of the Effective Date, projected excess cash of the Reorganized Debtors of $6 million and estimated present value of PEC receivables of $35 million, the estimated Reorganization Value is $347 million to $384 million, with a selected midpoint value of $366 million. The Valuation Analysis assumes that, between the date of commencing Solicitation and the assumed Effective Date, no material changes will occur that would affect estimated valuation.

The Valuation Analysis does not constitute an opinion as to fairness from a financial point of view of the consideration to be received or paid under the Plan, of the terms and provisions of the Plan, or with respect to any other matters.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan and Disclosure Statement, as applicable.

The consolidated value of the Reorganized Debtors was estimated by primarily relying on (1) discounted cash flow analysis ("DCF Analysis"), (2) comparable companies analysis, and (3) precedent transactions analysis.

DCF Analysis is a forward-looking enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business. Under this methodology, projected future cash flows are discounted by the business's weighted average cost of capital (the "Discount Rate"). The Discount Rate reflects the estimated rate of return that would be required by debt and equity investors to invest in the business based on its capital structure. The Enterprise Value of the firm is determined by calculating the present value of the unlevered after-tax free cash flows based on the Projections that management provided for the projected remaining useful life of the assets. Because the Reorganized Debtors are projected to have a finite useful life, the DCF Analysis does not include a terminal value.

Comparable companies analysis estimates the value of a company relative to other publicly traded companies with similar operating and financial characteristics. A set of publicly traded companies was selected based on similar business and financial characteristics to the Reorganized Debtors. In deriving Enterprise Value ranges under the comparable companies analysis methodology, EBITDA and megawatt multiples were the primary valuation metrics.

Precedent transaction analysis estimates the value of a company relative to past M&A transactions involving companies with similar operating and financial characteristics. Criteria for the selected reference group in each instance included, among other relevant characteristics, similarity in business, business risks, growth prospects, product mix, customer base, margins, market presence, size, and scale of operations. The selected reference groups may not be comparable to the Reorganized Debtors in all aspects, and may differ materially in others. In deriving Enterprise Value ranges under precedent transactions analysis methodology, EBITDA and megawatt multiples were the primary valuation metrics.

THE VALUATION ANALYSIS REFLECTS WORK PERFORMED BY LAZARD ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESSES AND ASSETS OF THE DEBTORS AVAILABLE TO LAZARD AS OF NOVEMBER 2023. IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT LAZARD'S CONCLUSIONS, LAZARD DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE, OR REAFFIRM ITS VALUATION ANALYSIS AND DOES NOT INTEND TO DO SO.

LAZARD DID NOT INDEPENDENTLY VERIFY THE PROJECTIONS OR OTHER INFORMATION THAT LAZARD USED IN THE VALUATION ANALYSIS, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF THE DEBTORS WERE SOUGHT OR OBTAINED IN CONNECTION THEREWITH. THE VALUATION ANALYSIS WAS DEVELOPED SOLELY FOR PURPOSES OF THE PLAN AND THE ANALYSIS OF POTENTIAL RELATIVE RECOVERIES TO CREDITORS THEREUNDER. THE VALUATION ANALYSIS REFLECTS THE APPLICATION OF VARIOUS VALUATION TECHNIQUES, DOES NOT PURPORT TO BE AN OPINION, AND DOES NOT PURPORT TO REFLECT OR CONSTITUTE AN APPRAISAL, LIQUIDATION VALUE, OR ESTIMATE

OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED OR ASSETS TO BE SOLD PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH IN THE VALUATION ANALYSIS.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES THAT ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS. BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER THE DEBTORS, LAZARD, NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THEIR ACCURACY. IN ADDITION, THE POTENTIAL VALUATION OF NEWLY ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT. ACTUAL MARKET PRICES OF SUCH SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL AND COMMODITY MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT RATHER THAN HOLDIT ON A LONG-TERM BASIS, THE POTENTIALLY DILUTIVE IMPACT OF CERTAIN EVENTS,  AND OTHER FACTORS THAT GENERALLY INFLUENCE THE PRICES OF SECURITIES.

Lazard assumed that the Projections were reasonably prepared in good faith and on a basis reflecting the Debtors' best estimates and judgments as to the future operating and financial performance of the Reorganized Debtors. The Valuation Analysis assumes that the actual performance of the Reorganized Debtors will correspond to the Projections in all material respects. If the business performs at levels below or above those set forth in the Projections, such performance may have a materially negative or positive impact, respectively, on the Valuation Analysis and estimated potential ranges of Enterprise Value and Reorganization Value therein.

In preparing the Valuation Analysis, Lazard:  (a) reviewed certain historical financial information of the Debtors for recent years and interim periods; (b) reviewed certain financial and operating data of the Debtors, including the Projections; (c) discussed the Debtors' operations and future prospects with the Debtors' senior management team and other advisors; (d) reviewed certain publicly available financial data for, and considered the market value of, public companies that Lazard deemed generally relevant in analyzing the value of the Reorganized Debtors; (e) considered certain economic and industry information that Lazard deemed generally relevant to the Reorganized Debtors; and (f) conducted such other studies, analyses, inquiries, and investigations as deemed appropriate. Lazard assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors' management and other parties as well as publicly available information.

The Valuation Analysis does not constitute a recommendation to any Holder of Claims or Interests or any other person as to how such person should vote or otherwise act with respect to the Plan. Lazard has not been requested to, and does not express any view as to, the potential value of the Reorganized Debtors' securities on issuance or at any other time.

Lazard did not estimate the value of any tax attributes, nor did it estimate the impact of any cancellation of indebtedness income on the Projections. Such matters are subject to many uncertainties and contingencies that are difficult to predict. Any changes to the assumptions on the availability of tax attributes or the impact of cancellation of indebtedness income on the Projections could materially impact Lazard's valuation analysis.

THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE VALUATION ANALYSIS PERFORMED BY LAZARD. THE PREPARATION OF A VALUATION ANALYSIS INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH AN ANALYSIS IS NOT READILY SUITABLE TO SUMMARY DESCRIPTION. THE VALUATION ANALYSIS PERFORMED BY LAZARD IS NOT NECESSARILY INDICATIVE OF ACTUAL VALUES OR FUTURE RESULTS, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE DESCRIBED HEREIN.

LAZARD IS ACTING AS INVESTMENT BANKER TO THE DEBTORS, AND HAS NOT BEEN, WILL NOT BE RESPONSIBLE FOR, AND WILL NOT PROVIDE ANY TAX, ACCOUNTING, ACTUARIAL, LEGAL, OR OTHER SPECIALIST ADVICE.

**<u>Exhibit F</u>**

Form of New Notes and Indentures for New Notes

INVERSIONES LATIN AMERICA POWER SpA,
as Issuer,

ILAP HOLDINGS LTD.,

SAN JUAN S.A.,

and

NORVIND S.A.
as Guarantors,

UMB BANK, N.A.,
as Trustee, Offshore Collateral Agent, Registrar, Transfer Agent and Paying Agent,

and

BANCO DE CHILE,
as Onshore Collateral Agent,

INDENTURE

Dated as of [January] [●], 2024

TAKE-BACK SENIOR SECURED NOTES DUE 2033

and

SUPER PRIORITY NOTES DUE 2033

# TABLE OF CONTENTS

### Article 1
### DEFINITIONS AND INCORPORATION
### BY REFERENCE

| | | |
|---|---|---|
| Section 1.01. | Definitions. | 7 |
| Section 1.02. | Other Definitions. | 45 |
| Section 1.03. | [Reserved] | 46 |
| Section 1.04. | Rules of Construction. | 46 |

### Article 2
### THE NOTES

| | | |
|---|---|---|
| Section 2.01. | Form and Dating. | 47 |
| Section 2.02. | Execution and Authentication. | 48 |
| Section 2.03. | Registrar and Paying Agent. | 48 |
| Section 2.04. | Paying Agent to Hold Money in Trust. | 49 |
| Section 2.05. | Holder Lists. | 49 |
| Section 2.06. | Transfer and Exchange. | 49 |
| Section 2.07. | Replacement Notes. | 61 |
| Section 2.08. | Outstanding Notes. | 61 |
| Section 2.09. | Treasury Notes. | 62 |
| Section 2.10. | Temporary Notes. | 62 |
| Section 2.11. | Cancellation. | 62 |
| Section 2.12. | Defaulted Interest. | 63 |
| Section 2.13. | CUSIP Numbers | 63 |

### Article 3
### REDEMPTION AND PREPAYMENT

| | | |
|---|---|---|
| Section 3.01. | Notices to Trustee. | 63 |
| Section 3.02. | Selection of Notes to Be Redeemed or Purchased. | 64 |
| Section 3.03. | Notice of Redemption or Offer to Purchase. | 64 |
| Section 3.04. | Effect of Notice of Redemption. | 65 |
| Section 3.05. | Deposit of Redemption or Purchase Price. | 65 |
| Section 3.06. | Notes Redeemed or Purchased in Part. | 66 |
| Section 3.07. | Optional Redemption. | 66 |
| Section 3.08. | Offers to Purchase. | 67 |
| Section 3.09. | Cash Sweep Mandatory Redemption | 69 |

Article 4
COVENANTS

Section 4.01.        Payment of Notes. ....................................................................... 69

Section 4.02.        Maintenance of Office or Agency. ........................................... 70

Section 4.03.        Reports...................................................................................... 70

Section 4.04.        Taxes. ....................................................................................... 72

Section 4.05.        Compliance with Laws. ........................................................... 72

Section 4.06.        [Reserved] ................................................................................ 72

Section 4.07.        Restricted Payments. ............................................................... 72

Section 4.08.        Additional Amounts. ............................................................... 73

Section 4.09.        Limitation on Indebtedness ..................................................... 75

Section 4.10.        Transactions with Affiliates. ................................................... 76

Section 4.11.        Liens. ........................................................................................ 76

Section 4.12.        Limitation on Leases and Sale and Leaseback Transactions. ................. 77

Section 4.13.        Maintenance of Existence; Business Activities; Office or Agency. ........ 77

Section 4.14.        Offer to Repurchase Upon Change of Control. ....................... 77

Section 4.15.        Inspection. ............................................................................... 77

Section 4.16.        Governmental Approvals. ........................................................ 78

Section 4.17.        Insurance. ................................................................................. 78

Section 4.18.        Application of Net Available Amounts from Events of Loss. ............... 78

Section 4.19.        Project Maintenance. ............................................................... 79

Section 4.20.        Performance of Material Project Documents. ......................... 79

Section 4.21.        Amendment of Material Project Documents and Additional
                     Material Project Documents..................................................... 80

Section 4.22.        Certain Agreements. ................................................................ 80

Section 4.23.        Use of Proceeds. ...................................................................... 80

Section 4.24.        Transfers of Equity Interests ................................................... 81

Section 4.25.        Accounting and Financial Management................................... 81

Section 4.26.        Maintain Ratings. .................................................................... 81

Section 4.27.        Listing...................................................................................... 82

Section 4.28.        Subsidiaries. ............................................................................ 82

Section 4.29.        Maintenance of Priority of the Notes. ..................................... 82

Section 4.30.        Compliance with Security Documents. .................................... 83

Section 4.31.        Independent Director. .............................................................. 83

3

Article 5
SUCCESSORS

Section 5.01.        Merger or Consolidation, Sale of Property, Dispositions; Purchase
                     of Property, and Capital Increases............................................................ 84

Article 6
DEFAULTS AND REMEDIES

Section 6.01.        Events of Default............................................................................... 86
Section 6.02.        Acceleration...................................................................................... 88
Section 6.03.        Notice of Event of Default; Other Remedies. .................................. 89
Section 6.04.        Waiver of Past Defaults.................................................................... 89
Section 6.05.        Control by Majority.......................................................................... 89
Section 6.06.        Limitation on Suits ........................................................................... 90
Section 6.07.        Rights of Holders to Receive Payment.............................................. 90
Section 6.08.        Collection Suit by Trustee................................................................. 91
Section 6.09.        Trustee May File Proofs of Claim..................................................... 91
Section 6.10.        Priorities. .......................................................................................... 91
Section 6.11.        Undertaking for Costs. ...................................................................... 92
Section 6.12.        Power of Attorney for Enforcement in Chile. ................................... 92

Article 7
TRUSTEE

Section 7.01.        Duties of Trustee. ............................................................................. 93
Section 7.02.        Rights of Trustee. ............................................................................. 94
Section 7.03.        Individual Rights of Trustee.............................................................. 95
Section 7.04.        Trustee's Disclaimer......................................................................... 95
Section 7.05.        Notice of Defaults. ........................................................................... 96
Section 7.06.        Compensation and Indemnity............................................................ 96
Section 7.07.        Replacement of Trustee..................................................................... 97
Section 7.08.        Successor Trustee by Merger, etc...................................................... 98
Section 7.09.        Eligibility; Disqualification............................................................... 98
Section 7.10.        Rights Extended. ............................................................................... 98
Section 7.11.        Appointment of Co-Trustee............................................................... 98
Section 7.12.        Intercreditor Matters; Discretion. ..................................................... 99
Section 7.13.        Voting by Beneficial Owners .......................................................... 100

Article 8
LEGAL DEFEASANCE AND COVENANT DEFEASANCE

Section 8.01.        Option to Effect Legal Defeasance or Covenant Defeasance. .............. 100

4

Section 8.02.        Legal Defeasance and Discharge ........................................................ 100

Section 8.03.        Covenant Defeasance ........................................................................ 101

Section 8.04.        Conditions to Legal or Covenant Defeasance. ..................................... 101

Section 8.05.        Deposited Money and U.S. Government Obligations to be Held in
                     Trust; Other Miscellaneous Provisions. ................................................ 103

Section 8.06.        Repayment to Issuer. ........................................................................ 103

Section 8.07.        Reinstatement. .................................................................................. 103

Article 9
AMENDMENT, SUPPLEMENT AND WAIVER

Section 9.01.        Without Consent of Holders of Notes. ................................................. 104

Section 9.02.        With Consent of Holders of Notes. ...................................................... 105

Section 9.03.        Revocation and Effect of Consents. ..................................................... 108

Section 9.04.        Notation on or Exchange of Notes ...................................................... 108

Section 9.05.        Trustee to Sign Amendments, etc........................................................ 108

Section 9.06.        Payment. ........................................................................................... 109

Article 10
COLLATERAL AND SECURITY

Section 10.01.       Collateral Documents. ....................................................................... 109

Section 10.02.       Security Documents; Future Guarantees. .............................................. 109

Section 10.03.       Release of Collateral. ......................................................................... 111

Section 10.04.       Specified Releases of Collateral........................................................... 111

Section 10.05.       Release upon Satisfaction or Defeasance of all Outstanding
                     Obligations. ....................................................................................... 112

Section 10.06.       Form and Sufficiency of Release. ........................................................ 112

Section 10.07.       Purchaser Protected. .......................................................................... 113

Section 10.08.       Authorization of Actions to be Taken by the Collateral Agents
                     Under the Security Documents. ............................................................ 113

Section 10.09.       Authorization of Receipt of Funds by the Trustee Under the
                     Security Documents. ........................................................................... 114

Section 10.10.       Action by the Collateral Agents. .......................................................... 114

Section 10.11.       Compensation and Indemnity............................................................... 115

Section 10.12.       Delegation of Duties of the Collateral Agent. ....................................... 116

Section 10.13.       Liability of the Collateral Agent. ......................................................... 116

Section 10.14.       Reliance by the Collateral Agent.......................................................... 117

Section 10.15.       Successor Collateral Agent. ................................................................. 117

Article 11
NOTE GUARANTEE

Section 11.01.      Note Guarantee. ............................................................................ 118

Section 11.02.      Limitation on Guarantor Liability. ................................................. 120

Section 11.03.      Benefits Acknowledged. ................................................................ 120

Section 11.04.      Releases. ........................................................................................ 120

Article 12
SATISFACTION AND DISCHARGE

Section 12.01.      Satisfaction and Discharge. ........................................................... 120

Section 12.02.      Application of Trust Money. .......................................................... 121

Article 13
MISCELLANEOUS

Section 13.01.      Notices. .......................................................................................... 122

Section 13.02.      [Reserved] ..................................................................................... 124

Section 13.03.      Certificate and Opinion as to Conditions Precedent. ................... 124

Section 13.04.      Statements Required in Certificate. ............................................... 125

Section 13.05.      Rules by Trustee and Agents. ........................................................ 125

Section 13.06.      No Personal Liability of Directors, Officers, Employees and
                    Stockholders. ................................................................................ 125

Section 13.07.      No Immunity. ................................................................................. 125

Section 13.08.      Judgment Currency. ....................................................................... 126

Section 13.09.      Submission to Jurisdiction; Appointment of Process Agent. ....... 126

Section 13.10.      Governing Law. ............................................................................. 127

Section 13.11.      Waiver of Jury Trial. ..................................................................... 127

Section 13.12.      No Adverse Interpretation of Other Agreements. ........................ 127

Section 13.13.      Successors. ..................................................................................... 128

Section 13.14.      Severability. ................................................................................... 128

Section 13.15.      Security Documents. ...................................................................... 128

Section 13.16.      Counterpart Originals. ................................................................... 128

Section 13.17.      Table of Contents, Headings, etc. .................................................. 128

Section 13.18.      English Language. .......................................................................... 129

Section 13.19.      Patriot Act. ..................................................................................... 129

Section 13.20.      Statute of Limitations .................................................................... 129

INDENTURE dated as of [January] [●], 2024, among Inversiones Latin America Power SpA, a stock corporation (*sociedad por acciones*) incorporated under the laws of Chile (the "*Issuer*"), ILAP Holdings Ltd., San Juan S.A. and Norvind S.A. (collectively, the "*Guarantors*"), and UMB Bank, N.A., as trustee (in such capacity, the "*Trustee*"), registrar (in such capacity, the "*Registrar*"), and paying agent (in such capacity, the "*Paying Agent*"), offshore collateral agent (in such capacity, the "*Offshore Collateral Agent*") and as transfer agent (in such capacity, the "*Transfer Agent*"), and Banco de Chile, as onshore collateral agent (in such capacity, the "*Onshore Collateral Agent*"). The Issuer, the Guarantors, the Trustee, the Offshore Collateral Agent, the Onshore Collateral Agent and the Paying Agent agree as follows for the benefit of each other and for the equal and ratable benefit of the Holders (as defined) of the Take-back Senior Secured Notes due 2033 (the "*Take-back SSNs*") and the Super Priority Notes due 2033 (the "*Super Priority Notes*" and, together with the Take-back SSNs, the "*Notes*"):

ARTICLE 1
DEFINITIONS AND INCORPORATION
BY REFERENCE

Section 1.01.   <u>Definitions</u>.

"*144A Global Note*" means a Global Note substantially in the form of Exhibit A-1 hereto (with respect to the Take-back SSNs) or Exhibit A-2 hereto (with respect to the Super Priority Notes) bearing the Global Note Legend and the Private Placement Legend and deposited with or on behalf of, and registered in the name of, the Depositary or its nominee that will be issued in a denomination equal to the outstanding principal amount of the Notes sold in reliance on Rule 144A.

"*Additional Material Project Document*" means any contract or agreement relating to the operation, maintenance, repair, financing or use of the Projects entered into by the Issuer or any Guarantor with any other Person subsequent to the date of this issuance (including any contract(s) or agreement(s) entered into in substitution for any Material Project Document that has been terminated in accordance with its terms or otherwise); which, for the avoidance of doubt, shall include any Non-Material Project Document that may become a Material Project Document pursuant to its terms.

"*Affiliate*" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with") with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of Voting Stock, by contract or otherwise, provided that each of the Existing Holders will be deemed to individually control the Issuer for purposes of this definition.

"*Agent*" means any Registrar, co-registrar, Transfer Agent, Paying Agent or additional paying agent.

"*Annual Budget*" means an annual budget, prepared in good faith by the Issuer using reasonable assumptions, setting forth in reasonable detail for each fiscal year: (i) the amount of the Issuer's projected O&M Costs (other than capital expenditures) for each month of such fiscal year and (ii) the amount of the Issuer's projected capital expenditures for such fiscal year, in each case, taking into account the Material Project Documents, Non-Material Project Documents, and existing or reasonably expected economic, regulatory and market environments (including spot market prices), in each case as determined solely by the Issuer; provided, that if the projected O&M Costs or projected capital expenditures for a fiscal year exceed 110% of the applicable amount in the Base Case Model, such amount shall be approved by the Independent Engineer.

"*Anti-Corruption Laws*" means all applicable anti-corruption and anti-bribery laws, rules and regulations of any jurisdiction from time to time, including, without limitation, the U.S. Foreign Corrupt Practices Act of 1977, as amended.

"Anti-Money Laundering Laws" means any and all laws, rules and regulations of any jurisdiction applicable to the Issuer or its Subsidiaries or Affiliates from time to time concerning or relating to terrorism financing, money laundering or any predicate crime to money laundering, including, without limitation, any applicable provision of the Patriot Act and The Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act," 31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959).

"*Applicable Law*" means any constitution, statute, law, rule, regulation, ordinance, judgment, order or any decree, directive or requirement which has the force of law, or other governmental restriction which has the force of law, or any determination by, or interpretation of any of the foregoing by, any judicial authority, applicable to and/or binding on a given Person or the Projects, as the context may require, whether in effect as of the Issue Date or thereafter and in each case as amended (including, without limitation, all Environmental Laws and any of the foregoing pertaining to land use or zoning restrictions).

"*ATOP*" means DTC's Automated Tender Offer Program.

"*Base Case Model*" means the financial model for the Project prepared and delivered in electronic form to the Trustee on or prior to the Issue Date.

"*Beneficial Owner*" shall have the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as that term is used in Section 13(d)(3) of the Exchange Act), such "person" will be deemed to have beneficial ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only after the passage of time. The terms "Beneficially Owns" and "Beneficially Owned" have a corresponding meaning.

"*Business Day*" means any day that is not a day on which banks are required or authorized to close in the City of New York or Santiago, Chile.

"*Capital Stock*" means, with respect to any Person, any and all shares, interests, participations and/or rights in or other equivalents (however designated, whether voting or nonvoting, ordinary or preferred) in the equity or capital of such Person, now or hereafter

outstanding, and any and all rights, warrants or options exchangeable for or convertible into any thereof.

"*Capitalized Lease Obligations*" means an obligation that is required to be classified and accounted for as a capitalized lease for financial reporting purposes in accordance with IFRS and the amount of Indebtedness represented by such obligation shall be the capitalized amount of such obligation determined in accordance with IFRS.

"*Cash Balance*" means any amount of cash or Cash Equivalent Investments held in any account of the Guarantor, the Issuer or its Subsidiaries from time to time.

"*Cash Equivalents*" means:

(1)    Chilean Pesos or U.S. dollars;

(2)    securities issued or fully guaranteed or insured by the United States of America, Japan, Switzerland, Canada, Chile or a member state of the European Union or any agency or instrumentality of any thereof which are not callable or redeemable at the Issuer's option;

(3)    overnight bank deposits, time deposits, certificates of deposit or bankers' acceptances of any commercial bank having capital and surplus in excess of $500.0 million (or the foreign currency equivalent thereof as of the date of such investment) and the commercial paper of the holding company of which is rated at least A-2 or the equivalent thereof by S&P or at least P-2 or the equivalent thereof by Moody's (or if at such time neither is issuing ratings, then a comparable rating of another nationally recognized rating agency);

(4)    repurchase obligations with a term of not more than seven (7) days for underlying securities of the types described in clauses (2) and (3) above entered into with any financial institution meeting the qualification specified in clause (3) above but with respect to underlying securities issued or fully guaranteed or insured by the United States government such repurchase obligations may have a term of not more than thirty (30) days;

(5)    money market instruments, commercial paper or other short-term obligations rated at least A-1 or the equivalent thereof by S&P or at least P-1 or the equivalent thereof by Moody's (or if at such time neither is issuing ratings, then a comparable rating of another nationally recognized rating agency);

(6)    investments in money market funds subject to the risk limiting conditions of Rule 2a-7 or any successor rule of the U.S. Securities Exchange Commission under the Investment Company Act of 1940, as amended; and

(7)    investments similar to and, to the extent applicable, with the same credit ratings as any of the foregoing denominated in foreign currencies approved by the board of directors of the Issuer.

"*Cash Pay Date*" means the date that is twenty-four (24) months after the Effective Date.

"*Cash Sweep Calculation Date*" means, beginning on December 15, 2024 and semi-annually thereafter, each Interest Payment Date.

"*Cash Sweep Effective Date*" means the date that is thirty (30) days after the Cash Sweep Calculation Date.

"*Cash Sweep Payments*" means any payment made on any Cash Sweep Effective Date to satisfy the Cash Sweep Mandatory Redemption.

"*Casualty Event*" means, with respect to any Project or the property, assets, business or operations of the Issuer or any of the Guarantors, the destruction, damage, impairment or loss of use of any such Project or any such property or assets in their entirety or such a material portion thereof that the then remaining portion of such Project or such property or assets cannot practically be used in accordance with Applicable Laws and Prudent Industry Practices and for its intended purpose in accordance with the Material Project Documents. The date of occurrence of any Casualty Event will be the date of the casualty or other occurrence specified above giving rise to such Casualty Event.

"*Casualty Proceeds*" means all insurance proceeds or other amounts actually received on account of a Casualty Event, except proceeds of business interruption insurance.

"*Change of Control*" means (A) the ILAP Sponsors shall cease to beneficially own, at any time, in the aggregate, directly or indirectly, all of the Capital Stock of ILAP Holdings Ltd., the Issuer or any of their direct or indirect subsidiaries (other than as a result of the conversion of the Convert Notes which will be issued concurrently with the Notes); (B) the ILAP Sponsors shall cease to have the right to elect all of the directors of ILAP Holdings Ltd., the Issuer or any of their respective subsidiaries; (C) there is a sale, lease or transfer, directly or indirectly, of all or substantially all of the assets of the Issuer or any of its subsidiaries to any Person; or (D) the adoption of a plan or resolution relating to the liquidation or dissolution of the Issuer or the Guarantors.

"*Chile*" means the Republic of Chile.

"*Chilean Security Document*" means each Security Document governed by the Chilean law, including but not limited to: (a) an amended and restated onshore collateral agency agreement (*contrato de agencia de garantías*), entered into among the Onshore Collateral Agent, the Trustee, the Issuer, each of the Guarantors, and LAP S.A.; (b) an acknowledgement of debt (*reconocimiento de deuda*) granted by the Issuer; (c) an amended and restated joint and several guarantee (*fianza y codeuda solidaria*) granted by San Juan and Norvind; (d) Pledge Agreements; (e) Mortgage Agreements; (f) Conditional Assignments; (g) Collection Mandates; (h) Subordination Agreements; and (i) endorsement (*endoso*) of or designation as loss payee(s) and as additional insured(s) (*designación de asegurado adicional o beneficiario exclusivo de pólizas de seguro*) under all of the insurance policies issued by Chilean companies of San Juan and Norvind to the Onshore Collateral Agent.

"*Certificate*" or "*Certificate of a Responsible Officer*" means a certificate signed by a Responsible Officer of the Issuer.

"*Clearstream*" means Clearstream Banking, S.A.

"*Collateral*" means the assets required to be secured by the Security Documents.

"*Collateral Accounts*" means the Offshore Accounts and the Onshore Accounts.

"*Collateral Agent*" or "*Collateral Agents*" means, collectively, the Onshore Collateral Agent and the Offshore Collateral Agent, or as the context may require, the Onshore Collateral Agent or the Offshore Collateral Agent, as applicable.

"*Collateral Proceeds*" means all proceeds of any sale, collection or other liquidation of any Collateral and all proceeds of any such distribution.

"*Collection Mandate*" means each of the following collection mandates governed under the laws of Chile, as amended and restated on the Issue Date, and as the same may be further amended from time to time or replaced:

1.     Collection mandate over payments under existing Material Project Documents (other than Long Term Power Purchase Agreements) and promise to grant collection mandate over payments under Additional Material Project Documents (consisting in Long Term Power Purchase Agreements with non-DisCos) (*mandato irrevocable de cobro y promesa de mandato irrevocable de cobro*), by and among San Juan, the Onshore Collateral Agent, for the benefit of the Secured Parties, and LAP S.A.

2.     Collection mandate over payments under existing Material Project Documents (other than Long Term Power Purchase Agreements) and promise to grant collection mandate over payments under Additional Material Project Documents (consisting in Long Term Power Purchase Agreements with non-DisCos) (*mandato irrevocable de cobro y promesa de mandato irrevocable de cobro*), by and among Norvind, the Onshore Collateral Agent, for the benefit of the Secured Parties, and LAP S.A.

3.     Promise to grant collection mandate over payments under Additional Material Project Documents (*promesa de mandato irrevocable de cobro*) by and among ILAP, and the Onshore Collateral Agent, for the benefit of the Secured Parties.

4.     Collection mandate over payments under existing Material Project Documents (consisting in Long Term Power Purchase Agreements with DisCos) (*mandato irrevocable de cobro*), by and among San Juan, and the Onshore Collateral Agent, for the benefit of the Secured Parties.

5.     Collection mandate over payments existing Material Project Documents (consisting in Long Term Power Purchase Agreements with DisCos) (*mandato irrevocable de cobro*), by and among Norvind, and the Onshore Collateral Agent, for the benefit of the Secured Parties.

6.    Collection mandate over payments under existing Material Project Documents (Transelec S.A.) (*mandato irrevocable de cobro*), by and among San Juan, and the Onshore Collateral Agent, for the benefit of the Secured Parties.

7.    Collection mandate over payments under existing Material Project Documents (Transelec S.A.) (*mandato irrevocable de cobro*), by and among Norvind, and the Onshore Collateral Agent, for the benefit of the Secured Parties.

8.    Collection mandate over payments under existing Material Project Documents (consisting in Long Term Power Purchase Agreement with Empresa de Transporte de Pasajeros Metro S.A.) (*mandato irrevocable de cobro*), by and among San Juan, and the Onshore Collateral Agent, for the benefit of the Secured Parties.

"*Commodity Agreement*" means, with respect to any Person, any commodity swaps, commodity options or forward commodity contracts or other similar agreement or arrangement as to which such Person is party or a beneficiary.

"*Comparable Treasury Issue*" means the United States Treasury security or securities selected by an Independent Investment Banker as having an actual or interpolated maturity comparable to the remaining period until June 15, 2033 that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of a comparable maturity to the remaining period until June 15, 2033.

"*Comparable Treasury Price*" means with respect to any redemption date (1) the average of the Reference Treasury Dealer Quotations for such redemption date, after excluding the highest and lowest such Reference Treasury Dealer Quotation or (2) if the Independent Investment Banker obtains fewer than four such Reference Treasury Dealer Quotations, the average of all such quotations.

"*Condemnation Event*" means any compulsory transfer or taking or transfer under threat of compulsory transfer or taking of all or a material part of the Projects (or the Capital Stock of the Issuer) by any Governmental Authority or entity acting under power of eminent domain or similar power or authority.

"*Condemnation Proceeds*" means all eminent domain proceeds, Insurance Proceeds or other amounts actually received on account of a Condemnation Event.

"*Conditional Assignment*" means each of the following conditional assignment of rights governed under the laws of Chile, as amended and restated on the Issue Date, and as the same may be further amended from time to time or replaced:

1.    Conditional assignment of rights on existing Material Project Documents (other than Long Term Power Purchase Agreements) and promise to grant conditional assignment of rights on Additional Material Project Documents (consisting in Long Term Power Purchase Agreements with non-DisCos) (*cesión condicional de derechos y promesa de cesión condicional de derechos*), by and among San Juan, and the Onshore Collateral Agent, for the benefit of the Secured Parties, and LAP S.A.

12

2.      Conditional assignment of rights on existing Material Project Documents (other than Long Term Power Purchase Agreements) and promise to grant conditional assignment of rights on Additional Material Project Documents (consisting in Long Term Power Purchase Agreements with non-DisCos) (*cesión condicional de derechos y promesa de cesión condicional de derechos*), by and among Norvind, the Onshore Collateral Agent, for the benefit of the Secured Parties, and LAP S.A.

3.      Promise to grant conditional assignment of rights on Additional Material Project Documents (*promesa de cesión condicional de derechos*) by and among ILAP, and the Onshore Collateral Agent, for the benefit of the Secured Parties.

4.      Conditional assignment of rights on existing Material Project Documents (consisting in Long Term Power Purchase Agreements with DisCos) (*cesión condicional de derechos*), by and among San Juan, and the Onshore Collateral Agent, for the benefit of the Secured Parties.

5.      Conditional assignment of rights on existing Material Project Documents (consisting in Long Term Power Purchase Agreements with DisCos) (*cesión condicional de derechos*), by and among Norvind, and the Onshore Collateral Agent, for the benefit of the Secured Parties.

6.      Conditional assignment of rights on existing Material Project Documents (Transelec S.A.) (*cesión condicional de derechos*), by and among San Juan, and the Onshore Collateral Agent, for the benefit of the Secured Parties.

7.      Conditional assignment of rights on existing Material Project Documents (Transelec S.A.) (*cesión condicional de derechos*), by and among Norvind, and the Onshore Collateral Agent, for the benefit of the Secured Parties.

8.      Conditional assignment of rights on existing Material Project Documents (consisting in Long Term Power Purchase Agreement with Empresa de Transporte de Pasajeros Metro S.A.) (*cesión condicional de derechos*), by and among San Juan, and the Onshore Collateral Agent, for the benefit of the Secured Parties.

"*Convert Notes*" means the convertible notes issued by ILAP Holdings Ltd. under the Convert Notes Indenture.

"*Convert Notes Indenture*" means the indenture by which the Convert Notes will be issued to be dated as of the date of initial issuance of such Convert Notes among ILAP Holdings Ltd., the guarantors thereof and the trustee named therein, as originally executed or, if amended or supplemented as therein provided, as so amended or supplemented.

"Convert Trustee" means the trustee under the Convert Notes Indenture.

"*Corporate Trust Office of the Trustee*" will be at the address of the Trustee specified in Section 13.01 hereof or such other address as to which the Trustee may give notice to the Issuer.

"*Currency Agreement*" means with respect to any Person any currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts or other similar agreement or arrangement as to which such Person is a party or a beneficiary.

"*Custodian*" means the Trustee, as custodian with respect to the Notes in global form, or any successor entity thereto.

"*Debtor Relief Laws*" means the Bankruptcy Code of the United States, the Chilean Law 20,720 and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States, Chile or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"*Default*" means any occurrence, circumstance or event, or any combination thereof, which, with the lapse of time and/or the giving of notice, would constitute an Event of Default.

"*Definitive Note*" means a certificated Note registered in the name of the Holder thereof and issued in accordance with Section 2.06 hereof, substantially in the form of Exhibit A-1 hereto (with respect to the Take-back SSNs) or Exhibit A-2 hereto (with respect to the Super Priority Notes) except that such Note shall not bear the Global Note Legend and shall not have the "Schedule of Exchanges of Interests in the Global Note" attached thereto.

"*Depositary*" means, with respect to the Notes issuable or issued in whole or in part in global form, the Person specified in Section 2.03 hereof as the Depositary with respect to the Notes, and any and all successors thereto appointed as depositary hereunder and having become such pursuant to the applicable provisions of this Indenture.

"*Depositary Banks*" means the Onshore Depositary Bank and the Offshore Depositary Bank.

"*DisCos*" means power distribution companies.

"*Disposition*" means any direct or indirect sale, lease (other than an operating lease entered into in the ordinary course of business), transfer, issuance or other disposition, or a series of related sales, leases, transfers, issuances or dispositions that are part of a common plan, of shares of Capital Stock of a Subsidiary (other than directors' and employees' qualifying shares), Property or other assets by the Issuer or any of its Subsidiaries, including any disposition by means of a merger, consolidation or similar transaction.

"*Disqualified Stock*" means any Capital Stock that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case, at the option of the holder of the Capital Stock), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or redeemable at the option of the holder of the Capital Stock, in whole or in part, on or prior to the date that is ninety-one (91) days after the Stated Maturity of the Notes.

"*DTC*" means the Depositary Trust Company.

"*Effective Date*" means the date the Plan becomes effective.

"*Emergency Costs*" means unforeseen O&M Costs incurred by an Obligor on an urgent basis due to the occurrence of any event or circumstance that poses a serious and imminent risk to the integrity of any Property or the health and safety of an Obligor's officers or employees or the release or discharge of any hazardous substance, waste, pollutant or contaminant that may be harmful to human health or the environment, in each case, at a Project Site, in an amount not to exceed $5,000,000 unless otherwise approved by the Independent Engineer.

"*Environmental Laws*" means any law (including common law), statute, code, ordinance, order, determination, rule, regulation or decree of any Governmental Authority, whether now or hereinafter in effect, relating to pollution or protection of the environment or human health and safety (as affected by exposure to hazardous or toxic substances), including any of the foregoing relating to discharges or the clean-up or remediation of hazardous or toxic substances.

"*Equity Interests*" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"*Euroclear*" means Euroclear Bank, S.A./N.V., as operator of the Euroclear system.

"*Event of Abandonment*" means, with respect to a Project, the suspension or cessation for a period of at least fifteen (15) consecutive days of all or substantially all of the operational and maintenance activities at a Project; *provided, however*, that any such suspension or cessation that arises from an Event of Loss, a requirement of Applicable Law or Governmental Approval, an event of force majeure, curtailment or failure to be dispatched, or other bona fide business reasons shall not constitute an Event of Abandonment, in each case, so long as the Issuer is taking commercially reasonable actions to overcome or mitigate the effects of the cause of the suspension or cessation so that maintenance and/or operations, as the case may be, can be resumed. Any period of cessation or suspension shall end on the date that work of a substantial nature is resumed and thereafter diligently pursued.

"*Event of Loss*" means a Casualty Event or a Condemnation Event.

"*Event of Loss Proceeds*" means Casualty Proceeds and Condemnation Proceeds.

"*Excess Cash*" means any amount of Cash Balance in excess of $15 million (excluding from this concept any proceeds obtained from the Super Priority Notes and including any proceeds obtained from financings and PEC Receivables sales).

"*Exchange Act*" means the U.S. Securities Exchange Act of 1934, as amended.

"*Existing Holders*" means GMR Holding B.V., BTG Pactual Brazil Infrastructure Fund II LP, Patria Infrastructure Fund II LP, Patria Infrastructure Fund II LAP Co-Invest, LP, Patria Infrastructure Fund II LAP Co-Invest, UK LP, PI Fund II (Ontario) LP, PI Fund II (Ontario 1) LP, PI Fund II (Ontario 2) LP and their respective Affiliates.

"*Existing Indebtedness*" means the Indebtedness outstanding on the Issue Date, including under the Convert Notes Indenture, as contemplated pursuant to the Plan.

"*Fair Market Value*" means, with respect to any Person, the value that would be paid by a willing buyer to an unaffiliated willing seller in a transaction not involving distress or necessity of either party, determined in good faith by the board of directors and the Independent Director.

"*Feasible Repair Certificate*" means, with respect to any Property, or applicable portion thereof, of the Issuer or any of the Guarantors, certificate of a Responsible Officer (a) describing in reasonable detail the nature of the rebuilding, repair or restoration of such Property or portion thereof as a result of the Event of Loss, (b) stating the expected cost of such rebuilding, repair or restoration (including a reasonable contingency), (c) certifying that such Property or portion thereof is reasonably expected to be rebuilt, repaired or restored to permit operation thereof on a commercially feasible basis in accordance in all material respects with all Material Project Documents and relevant Governmental Approvals, (d) certifying that the funds available to the Issuer or any such Guarantors for such rebuilding, repair or restoration (other than proceeds of business interruption insurance) are reasonably expected to be sufficient to permit such rebuilding, repair or restoration and (e) certifying that the Issuer or any such Guarantor shall use its commercially best efforts to cause any repairs or restoration to be commenced and completed promptly and diligently at its own cost and expense.

"*Fitch*" means Fitch Ratings Inc. or any successor thereto.

"*Future PEC Receivables*" means any subsequent "*Saldos*", "*Documentos de Pago*", receivables, collection rights or other similar rights in favor of the Issuer or the Guarantors, created by the relevant governmental authority (including, without limitation, by the *Comisión Nacional de Energía of Chile* or the Ministry of Energy of Chile), either by an extension of the existing PEC II Receivables program or the creation of a new program.

"*Global Note Legend*" means the legend set forth in Section 2.06(f)(ii) hereof, which is required to be placed on all Global Notes issued under this Indenture.

"*Global Notes*" means, individually and collectively, each of the Restricted Global Notes and the Unrestricted Global Notes deposited with or on behalf of and registered in the name of the Depositary or its nominee, substantially in the form of Exhibit A-1 hereto (with respect to the Take-back SSNs) or Exhibit A-2 hereto (with respect to the Super Priority Notes) and that bears the Global Note Legend and that has the "Schedule of Exchanges of Interests in the Global Note" attached thereto, issued in accordance with Sections 2.01, 2.06(b)(iii), 2.06(b)(iv) or 2.06(d)(ii) hereof.

"*Governmental Approval*" means any applicable consent, license, approval, registration, filing, permit, authorization, ruling, certification, exemption, variance, order, decree, publication, notice, or declaration by or with (as applicable) any Governmental Authority.

"*Governmental Authority*" means any government, governmental department, ministry, commission, board, bureau, agency, regulatory authority, instrumentality of any government (central or state), judicial, legislative or administrative body, federal, state or local, having jurisdiction over the matter or matters in question.

16

"*Governmental Rules*" means any statute, law, treaty, regulation, ordinance, rule, judgment, order, decree, permit, concession, grant, franchise, license, agreement, directive, requirement or other governmental restriction or any similar form of decision of or determination by, or any interpretation or administration of any of the foregoing, in each case, having the force of law by, any Governmental Authority, which is applicable to any Person, whether now or hereafter in effect.

"*Ground Lease*" means, with respect to any Project Site that is leased by any Guarantor, the lease or use agreement entered into by such Guarantor for such Project Site.

"*Guarantee*" means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Indebtedness of any other Person and any obligation, direct or indirect, contingent or otherwise, of any Person (1) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness of such other Person (whether arising by virtue of partnership arrangements, or by agreement to keep-well, to purchase assets, goods, securities or services, to take-and-pay, or to maintain financial statement conditions or otherwise) or (2) entered into for purposes of assuring in any other manner the obligee of such Indebtedness of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part); *provided, however*, that the term "Guarantee" shall not include endorsements of negotiable instruments for collection or deposit in the ordinary course of business. The term "Guarantee" used as a verb has a correlative meaning.

"*Guarantors*" means ILAP Holdings Ltd., San Juan S.A. and Norvind S.A.

"*Hedging Obligations*" of any Person means the obligations of such Person pursuant to any Swap Agreement.

"*Holder*" means a Person in whose name a Note is registered.

"*IFRS*" means the International Financial Reporting Standards and applicable accounting requirements set by the International Accounting Standards Board or any successor thereto, as in effect from time to time.

"*ILAP*" means Inversiones Latin America Power SpA, a stock corporation (*sociedad por acciones*) formed under the laws of Chile.

"*ILAP Sponsors*" means GMR Holding B.V., BTG Pactual Brazil Infrastructure Fund II LP, Patria Infrastructure Fund II LP, Patria Infrastructure Fund II LAP Co-Invest, LP, Patria Infrastructure Fund II LAP Co-Invest, UK LP, PI Fund II (Ontario) LP, PI Fund II (Ontario 1) LP, PI Fund II (Ontario 2) LP.

"*Indebtedness*" of any Person means, without duplication, (a) all obligations of such Person for borrowed money of any kind; (b) all obligations of such Person evidenced by Notes, debentures or similar instruments; (c) all obligations of such Person under conditional sale or other title retention agreements relating to Property or assets purchased by such Person; (d) all obligations of such Person issued or assumed as the deferred purchase price of Property or services (excluding trade accounts payable arising in the ordinary course of business); (e) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or

otherwise, to be secured by) any Lien on Property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, calculated as the lower of the Indebtedness so secured and the Fair Market Value of the Property subject to such Lien; (f) all Guarantees by such Person of Indebtedness of others; (g) all Capitalized Lease Obligations of such Person; (h) all obligations of such Person in respect of Hedging Obligations; and (i) all obligations of such Person as an account party in respect of letters of credit and bankers' acceptances (other than obligations described in clauses (a) through (h) above) entered into in the ordinary course of business of such Person to the extent such letters of credit are not drawn upon or, if and to the extent drawn upon, such drawing is reimbursed no later than the fifth (5th) Business Day following payment on the letter of credit), provided that "Indebtedness" shall not include customer deposits and advance payments received from customers for the sale, lease or license of goods and services (including natural gas transportation) in the ordinary course of business, whether or not such deposits or advance payments have been expensed in accordance with IFRS.

"*Indenture*" means this instrument as originally executed or, if amended or supplemented as herein provided, as so amended or supplemented.

"*Indenture Documents*" means, collectively, the Notes, the Note Guarantee, this Indenture, the Convert Notes Indenture and the Security Documents.

"*Independent Director*" shall have the meaning specified in Section 4.31.

"*Independent Engineer*" means Arup Latin America S.A or any successor or replacement thereof; provided that any such replacement shall be an independent engineering consulting firm with substantial expertise and experience in the construction, operation and maintenance of assets substantially similar to the Projects.

"*Independent Investment Banker*" means an independent investment banking institution of national standing appointed by the Issuer.

"*Indirect Participant*" means a Person who holds a beneficial interest in a Global Note through a Participant.

"*Insurance Proceeds*" means all amounts payable to the Issuer or the Guarantors, the Offshore Depositary Bank or the Collateral Agent in respect of any insurance required to be maintained (or caused to be maintained) pursuant to the terms of this Indenture.

"*Insolvency Proceeding*," with respect to any Person, means (a) entry by any competent Governmental Authority of any jurisdiction or a court having jurisdiction in the premises of (i) a decree or order for relief in respect of such Person in an involuntary case or proceeding under any applicable Debtor Relief Law or (ii) an involuntary or contested decree or order adjudging such Person as bankrupt or insolvent, or approving as properly filed a petition seeking suspension of payment, reorganization, moratorium, arrangement, adjustment or composition of or in respect of such Person under any applicable Debtor Relief Law, or appointing a custodian, receiver, liquidator, assignee, trustee, sequestrator or other similar official of such Person or of any substantial part of the property of such Person, or ordering the dissolution, winding up or liquidation of the affairs of such Person and the continuance of any such decree or order referred to in clauses (i) and (ii) above remains undismissed or unstayed and in effect for a period of ninety

18

(90) consecutive days, (b) commencement by such Person of a voluntary case or proceeding under any applicable Debtor Relief Law or of any other case or proceeding to be adjudicated as bankrupt or insolvent, or the consent by such Person to the entry of a decree or order for relief in respect of such Person in an involuntary case or proceeding under any applicable Debtor Relief Law or to the commencement of any bankruptcy or insolvency case or proceeding against such Person, or the filing by such Person of a petition or answer or consent seeking reorganization or relief under any applicable Debtor Relief Law; or consent by such Person to the filing of such petition or to the appointment of or taking possession by a custodian, receiver, liquidator, assignee, trustee, sequestrator or other similar official of such Person or of any substantial part of the property of such Person, or the making by such Person of an assignment for the benefit of creditors or (c) the admission by such Person in writing of its inability to pay its debts generally as they become due, or the taking of corporate action by such Person in furtherance of any such action.

"*Intercompany Loan*" or "*Intercompany Indebtedness*" means any Indebtedness incurred between or among the Issuer or any Guarantor, provided that such Indebtedness shall be pledged as Collateral for the benefit of the Secured Parties and provided, further, that collection and other enforcement rights thereunder shall be expressly subordinated to the prior payment in full of all obligations with respect to the Notes or the Note Guarantees.

"*Interest Payment Date*" means each June 15 and December 15 from the Effective Date of the Plan until the Notes are paid in full.

"*Interest Rate Agreement*" means with respect to any Person any interest rate protection agreement, interest rate futures contract, interest rate option agreement, interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedge agreement or other similar agreement or arrangement as to which such Person is party or a beneficiary.

"*Investment*" in any Person means, without duplication: (1) the acquisition (whether for cash, securities, other Property, services or otherwise) or holding of bonds, notes, debentures, partnership, Equity Interests or other ownership interests or other securities of such Person, or any agreement to make any such acquisition or to make any capital contribution (excluding commissions, travel and similar advances to officers and employees made in the ordinary course of business) to such Person; or (2) the making of any deposit with, or advance, loan or other extension of credit to, such Person.

"*Issue Date*" means each of the dates on which Notes are originally issued under this Indenture, as contemplated pursuant to the Plan.

"*LAP S.A.*" means Latin America Power S.A., a corporation (*sociedad anónima*) formed under the laws of Chile.

"*Lien*" means any mortgage, deed of trust, lien, security interest, pledge, hypothecation, assignment, deposit arrangement or other charge or encumbrance of any kind, or a mandate to create the same, including, without limitation, the Lien or retained security title of a conditional vendor (excluding operating leases) and any easement, right of way or other encumbrance on title to real Property or anything analogous to any of the foregoing under the laws of any jurisdiction.

For the avoidance of doubt, any preference of one creditor in the ordinary course over another arising by operation of law shall not be considered as a Lien.

"*Long-Term Power Purchase Agreements*" means each of the power purchase agreements listed below:

(1)     Energy and Power Supply Contract (PPA) Block 2-A, between San Juan and CGE Distribución S.A., executed by public deed dated June 9, 2015, granted in the Santiago Notary office of Juan Ricardo San Martín Urrejola, under repertoire number 19531/2015.

(2)     Energy and Power Supply Contract (PPA) Block 2-C, between San Juan and CGE Distribución S.A., executed by public deed dated June 9, 2015, granted in the Santiago Notary office of Juan Ricardo San Martín Urrejola, under repertoire number 19533/2015.

(3)     Energy and Power Supply Contract (PPA) Block 3, between San Juan and CGE Distribución S.A., executed by public deed dated June 9, 2015, granted in the Santiago Notary office of Juan Ricardo San Martín Urrejola, under repertoire number 19534/2015.

(4)     Energy and Power Supply Contract (PPA) Block 2-A, between San Juan and Compañía Nacional de Fuerza Eléctrica S.A., executed by public deed dated June 9, 2015, granted in the Santiago Notary office of Juan Ricardo San Martín Urrejola, under repertoire number 19525/2015.

(5)     Energy and Power Supply Contract (PPA) Block 2-C, between San Juan and Compañía Nacional de Fuerza Eléctrica S.A., executed by public deed dated June 9, 2015, granted in the Santiago Notary office of Juan Ricardo San Martín Urrejola, under repertoire number 19526/2015.

(6)     Energy and Power Supply Contract (PPA) Block 3, between San Juan and Compañía Nacional de Fuerza Eléctrica S.A., executed by public deed dated June 10, 2015, granted in the Santiago Notary office of Juan Ricardo San Martín Urrejola, under repertoire number 19707/2015.

(7)     Energy and Power Supply Contract (PPA) Block 2-A, between San Juan and Empresa Eléctrica Atacama S.A., executed by public deed dated June 9, 2015, granted in the Santiago Notary office of Juan Ricardo San Martín Urrejola, under repertoire number 19505/2015.

(8)     Energy and Power Supply Contract (PPA) Block 2-C, between San Juan and Empresa Eléctrica Atacama S.A., executed by public deed dated June 9, 2015, granted in the Santiago Notary office of Juan Ricardo San Martín Urrejola, under repertoire number 19511/2015.

(9)     Energy and Power Supply Contract (PPA) Block 3, between San Juan and Empresa Eléctrica Atacama S.A., executed by public deed dated June 9, 2015, granted in the

Santiago Notary office of Juan Ricardo San Martín Urrejola, under repertoire number 19513/2015.

(10)    Energy and Power Supply Contract (PPA) Block 2-A, between San Juan and Empresa Eléctrica de Antofagasta S.A., executed by public deed dated June 9, 2015, granted in the Santiago Notary office of Juan Ricardo San Martín Urrejola, under repertoire number 19522/2015.

(11)    Energy and Power Supply Contract (PPA) Block 2-C, between San Juan and Empresa Eléctrica de Antofagasta S.A., executed by public deed dated June 9, 2015, granted in the Santiago Notary office of Juan Ricardo San Martín Urrejola, under repertoire number 19524/2015.

(12)    Energy and Power Supply Contract (PPA) Block 3, between San Juan and Empresa Eléctrica de Antofagasta S.A., executed by public deed dated June 9, 2015, granted in the Santiago Notary office of Juan Ricardo San Martín Urrejola, under repertoire number 19518/2015.

(13)    Energy and Power Supply Contract (PPA) Block 2-A, between San Juan and Luzlinares S.A., executed by public deed dated June 17, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 6.896/2015.

(14)    Energy and Power Supply Contract (PPA) Block 2-C, between San Juan and Luzlinares S.A., executed by public deed dated June 17, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 6.902/2015.

(15)    Energy and Power Supply Contract (PPA) Block 3, between San Juan and Luzlinares S.A., executed by public deed dated June 17, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 6.900/2015.

(16)    Energy and Power Supply Contract (PPA) Block 2-A, between San Juan and Luzparral S.A., executed by public deed dated June 17, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 6.909/2015.

(17)    Energy and Power Supply Contract (PPA) Block 2-C, between San Juan and Luzparral S.A., executed by public deed dated June 17, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 6.910/2015.

(18)    Energy and Power Supply Contract (PPA) Block 3, between San Juan and Luzparral S.A., executed by public deed dated June 17, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 6.911/2015.

(19)     Energy and Power Supply Contract (PPA) Block 2-A, between San Juan and Chilquinta Energía S.A., executed by public deed dated June 17, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 6.885/2015.

(20)     Energy and Power Supply Contract (PPA) Block 2-C, between San Juan and Chilquinta Energía S.A., executed by public deed dated June 17, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 6.886/2015.

(21)     Energy and Power Supply Contract (PPA) Block 3, between San Juan and Chilquinta Energía S.A., executed by public deed dated June 17, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 6.867/2015.

(22)     Energy and Power Supply Contract (PPA) Block 2-A, between San Juan and Energía de Casablanca S.A., executed by public deed dated June 17, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 6.858/2015.

(23)     Energy and Power Supply Contract (PPA) Block 2-C, between San Juan and Energía de Casablanca S.A., executed by public deed dated June 17, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 6.857/2015.

(24)     Energy and Power Supply Contract (PPA) Block 3, between San Juan and Energía de Casablanca S.A., executed by public deed dated June 17, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 6.856/2015.

(25)     Energy and Power Supply Contract (PPA) Block 2-A, between San Juan and Compañía Eléctrica del Litoral S.A., executed by public deed dated June 17, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 6.891/2015.

(26)     Energy and Power Supply Contract (PPA) Block 2-C, between San Juan and Compañía Eléctrica del Litoral S.A., executed by public deed dated June 17, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 6.892/2015.

(27)     Energy and Power Supply Contract (PPA) Block 3, between San Juan and Compañía Eléctrica del Litoral S.A., executed by public deed dated June 17, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 6.894/2015.

(28)     Energy and Power Supply Contract (PPA) Blocks 2-A, 2-C, 3, between San Juan and Chilectra S.A. (currently named Enel Distribución Chile S.A), executed by

22

public deed dated June 5, 2015, granted in the Santiago Notary office of Osvaldo Pereira González, under repertoire number 5.397/2015.

(29)   Energy and Power Supply Contract (PPA) Block 2-A, between San Juan and Compañía Eléctrica Osorno S.A., executed by public deed dated May 8, 2015, granted in the Santiago Notary office of Mr. José Musalem Saffie, under repertoire number 4.711/2015.

(30)   Energy and Power Supply Contract (PPA) Block 2-C, between San Juan and Compañía Eléctrica Osorno S.A., executed by public deed dated May 8, 2015, granted in the Santiago Notary office of Mr. José Musalem Saffie, under repertoire number 4.710/2015.

(31)   Energy and Power Supply Contract (PPA) Block 3, between San Juan and Compañía Eléctrica Osorno S.A., executed by public deed dated May 8, 2015, granted in the Santiago Notary office of Mr. José Musalem Saffie, under repertoire number 4.706/2015.

(32)   Energy and Power Supply Contract (PPA) Block 2-A, between San Juan and Empresa Eléctrica de la Frontera S.A., executed by public deed dated May 8, 2015, granted in the Santiago Notary office of Mr. José Musalem Saffie, under repertoire number 4.709/2015.

(33)   Energy and Power Supply Contract (PPA) Block 2-C, between San Juan and Empresa Eléctrica de la Frontera S.A., executed by public deed dated May 8, 2015, granted in the Santiago Notary office of Mr. José Musalem Saffie, under repertoire number 4.689/2015.

(34)   Energy and Power Supply Contract (PPA) Block 3, between San Juan and Empresa Eléctrica de la Frontera S.A., executed by public deed dated May 8, 2015, granted in the Santiago Notary office of Mr. José Musalem Saffie, under repertoire number 4.707/2015.

(35)   Energy and Power Supply Contract (PPA) Block 2-A, between San Juan and Sociedad Austral de Electricidad S.A., executed by public deed dated May 8, 2015, granted in the Santiago Notary office of Mr. José Musalem Saffie, under repertoire number 4.712/2015.

(36)   Energy and Power Supply Contract (PPA) Block 2-C, between San Juan and Sociedad Austral de Electricidad S.A., executed by public deed dated May 8, 2015, granted in the Santiago Notary office of Mr. José Musalem Saffie, under repertoire number 4.705/2015.

(37)   Energy and Power Supply Contract (PPA) Block 3, between San Juan and Sociedad Austral de Electricidad S.A., executed by public deed dated May 8, 2015, granted in the Santiago Notary office of Mr. José Musalem Saffie, under repertoire number 4.713/2015.

(38)   Energy and Power Supply Contract (PPA) Block 2-A, between San Juan and Empresa Eléctrica de Casablanca S.A., executed by public deed dated July 31, 2015, granted in the Santiago Notary office of Mr. Eduardo Avello Concha, under repertoire number 21.430/2015.

(39)   Energy and Power Supply Contract (PPA) Block 2-C, between San Juan and Empresa Eléctrica de Casablanca S.A., executed by public deed dated July 31, 2015, granted in the Santiago Notary office of Mr. Eduardo Avello Concha, under repertoire number 21.432/2015.

(40)   Energy and Power Supply Contract (PPA) Block 3, between San Juan and Empresa Eléctrica de Casablanca S.A., executed by public deed dated July 31, 2015, granted in the Santiago Notary office of Mr. Eduardo Avello Concha, under repertoire number 21.433/2015.

(41)   Energy and Power Supply Contract (PPA) Block 2-A, between San Juan and Cooperativa Eléctrica Curicó Ltda., executed by public deed dated June 19, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 7.066/2015.

(42)   Energy and Power Supply Contract (PPA) Block 2-C, between San Juan and Cooperativa Eléctrica Curicó Ltda., executed by public deed dated June 19, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 7.083/2015.

(43)   Energy and Power Supply Contract (PPA) Block 3, between San Juan and Cooperativa Eléctrica Curicó Ltda., executed by public deed dated June 19, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 7.070/2015.

(44)   Energy and Power Supply Contract (PPA) Block 2-A, between San Juan and Cooperativa de Consumo de Energía Eléctrica de Chillán Ltda., executed by public deed dated June 11, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 6.584/2015.

(45)   Energy and Power Supply Contract (PPA) Block 2-C, between San Juan and Cooperativa de Consumo de Energía Eléctrica de Chillán Ltda., executed by public deed dated June 11, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 6.585/2015.

(46)   Energy and Power Supply Contract (PPA) Block 3, between San Juan and Cooperativa de Consumo de Energía Eléctrica de Chillán Ltda., executed by public deed dated June 11, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 6.586/2015.

(47)   Energy and Power Supply Contract (PPA) Block 2-A, between San Juan and Cooperativa Eléctrica Los Ángeles Ltda., executed by public deed dated June 19,

2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 7.068/2015.

(48) Energy and Power Supply Contract (PPA) Block 2-C, between San Juan and Cooperativa Eléctrica Los Ángeles Ltda., executed by public deed dated June 19, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 7.085/2015.

(49) Energy and Power Supply Contract (PPA) Block 3, between San Juan and Cooperativa Eléctrica Los Ángeles Ltda., executed by public deed dated June 19, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 7.073/2015.

(50) Energy and Power Supply Contract (PPA) Block 2-A, between San Juan and Cooperativa Eléctrica Paillaco Ltda., executed by public deed dated July 8, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 7.852/2015.

(51) Energy and Power Supply Contract (PPA) Block 2-C, between San Juan and Cooperativa Eléctrica Paillaco Ltda., executed by public deed dated July 8, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 7.853/2015.

(52) Energy and Power Supply Contract (PPA) Block 3, between San Juan and Cooperativa Eléctrica Paillaco Ltda., executed by public deed dated July 8, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci under repertoire number 7.851/2015.

(53) Energy and Power Supply Contract (PPA) Block 2-A, between San Juan and Cooperativa Regional Eléctrica de Llanquihue Ltda., executed by public deed dated June 19, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 7.065/2015.

(54) Energy and Power Supply Contract (PPA) Block 2-C, between San Juan and Cooperativa Regional Eléctrica de Llanquihue Ltda., executed by public deed dated June 19, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 7.081/2015.

(55) Energy and Power Supply Contract (PPA) Block 3, between San Juan and Cooperativa Regional Eléctrica de Llanquihue Ltda., executed by public deed dated June 19, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 7.069/2015.

(56) Energy and Power Supply Contract (PPA) Block 2-A, between San Juan and Cooperativa Rural Eléctrica de Río Bueno Ltda., executed by public deed dated June 25, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 7.316/2015.

25

(57)   Energy and Power Supply Contract (PPA) Block 2-C, between San Juan and Cooperativa Rural Eléctrica de Río Bueno Ltda., executed by public deed dated June 25, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 7.318/2015.

(58)   Energy and Power Supply Contract (PPA) Block 3, between San Juan and Cooperativa Rural Eléctrica de Río Bueno Ltda., executed by public deed dated June 25, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 7.317/2015.

(59)   Energy and Power Supply Contract (PPA) Block 2-A, between San Juan and Sociedad Cooperativa de Consumo de Energía Eléctrica Charrúa Ltda., executed by public deed dated June 19, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 7.067/2015.

(60)   Energy and Power Supply Contract (PPA) Block 2-C, between San Juan and Sociedad Cooperativa de Consumo de Energía Eléctrica Charrúa Ltda., executed by public deed dated June 19, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 7.084/2015.

(61)   Energy and Power Supply Contract (PPA) Block 3, between San Juan and Sociedad Cooperativa de Consumo de Energía Eléctrica Charrúa Ltda., executed by public deed dated June 19, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 7.071/2015.

(62)   Energy and Power Supply Contract (PPA) Block 2-A, between San Juan and Compañía Distribuidora de Energía Eléctrica CODINER Ltda., executed by public deed dated July 31, 2015, granted in the Santiago Notary office of Eduardo Diez Morello, under repertoire number 19.073/2015.

(63)   Energy and Power Supply Contract (PPA) Block 2-C, between San Juan and Compañía Distribuidora de Energía Eléctrica CODINER Ltda., executed by public deed dated July 31, 2015, granted in the Santiago Notary office of Eduardo Diez Morello, under repertoire number 19.074/2015.

(64)   Energy and Power Supply Contract (PPA) Block 3, between San Juan and Compañía Distribuidora de Energía Eléctrica CODINER Ltda., executed by public deed dated July 31, 2015, granted in the Santiago Notary office of Eduardo Diez Morello, under repertoire number 19.075/2015.

(65)   Energy and Power Supply Contract (PPA) Block 2-A, between San Juan and Empresa Eléctrica Puente Alto Ltda., executed by public deed dated July 31, 2015, granted in the Santiago Notary office of Eduardo Avello Concha, under repertoire number 21.418/2015.

(66)   Energy and Power Supply Contract (PPA) Block 2-C, between San Juan and Empresa Eléctrica Puente Alto Ltda., executed by public deed dated July 31, 2015,

26

granted in the Santiago Notary office of Eduardo Avello Concha, under repertoire number 21.420/2015.

(67)    Energy and Power Supply Contract (PPA) Block 3, between San Juan and Empresa Eléctrica Puente Alto Ltda., executed by public deed dated July 31, 2015, granted in the Santiago Notary office of Eduardo Avello Concha, under repertoire number 21.421/2015.

(68)    Power Purchase Agreement Metro, between San Juan and Empresa de Transporte de Pasajeros Metro S.A., dated May 19, 2016, and amended September 11, 2017, and May 13, 2021.

(69)    Energy and Power Supply Contract (PPA) Block 4, between Norvind and CGE Distribución S.A., executed by public deed dated June 9, 2015, granted in the Santiago Notary office of Ricardo San Martín Urrejola, under repertoire number 19.493/2015.

(70)    Energy and Power Supply Contract (PPA) Block 4, between Norvind and Compañía Nacional de Fuerza Eléctrica S.A., executed by public deed dated June 9, 2015, granted in the Santiago Notary office of Ricardo San Martín Urrejola, under repertoire number 19.499/2015.

(71)    Energy and Power Supply Contract (PPA) Block 4, between Norvind and Empresa Eléctrica Atacama S.A., executed by public deed dated June 9, 2015, granted in the Santiago Notary office of Ricardo San Martín Urrejola, under repertoire number 19.500/2015.

(72)    Energy and Power Supply Contract (PPA) Block 4, between Norvind and Empresa Eléctrica de Antofagasta S.A., executed by public deed dated June 9, 2015, granted in the Santiago Notary office of Ricardo San Martín Urrejola, under repertoire number 19.503/2015.

(73)    Energy and Power Supply Contract (PPA) Block 4, between Norvind and Luzlinares S.A., and executed by public deed dated June 17, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 6.903/2015.

(74)    Energy and Power Supply Contract (PPA) Block 4, between Norvind and Luzparral S.A., executed by public deed dated June 17, 2015, granted in the Santiago Notary office of Humberto Santelices under repertoire number 6.912/2015.

(75)    Energy and Power Supply Contract (PPA) Block 4, between Norvind and Chilquinta Energía S.A., executed by public deed dated June 17, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 6.887/2015.

(76)    Energy and Power Supply Contract (PPA) Block 4, between Norvind and Energía de Casablanca S.A., executed by public deed dated June 17, 2015, granted in the

27

Santiago Notary office of Humberto Santelices Narducci, under repertoire number 6.855/2015.

(77)    Energy and Power Supply Contract (PPA) Block 4, between Norvind and Compañía Eléctrica del Litoral S.A., executed by public deed dated June 17, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 6.895/2015.

(78)    Energy and Power Supply Contract (PPA) Block 4, between Norvind and Chilectra S.A. (currently named Enel Distribución Chile S.A), executed by public deed dated June 5, 2015, granted in the Santiago Notary office of Osvaldo Pereira González, under repertoire number 5.398/2015.

(79)    Energy and Power Supply Contract (PPA) Block 4, between Norvind and Compañía Eléctrica Osorno S.A., executed by public deed dated May 8, 2015, granted in the Santiago Notary office of Mr. José Musalem Saffie, under repertoire number 4.691/2015.

(80)    Energy and Power Supply Contract (PPA) Block 4, between Norvind and Empresa Eléctrica de la Frontera S.A., executed by public deed dated May 8, 2015, granted in the Santiago Notary office of Mr. José Musalem Saffie, under repertoire number 4.708/2015.

(81)    Energy and Power Supply Contract (PPA) Block 4, between Norvind and Sociedad Austral de Electricidad S.A., executed by public deed dated May 8, 2015, granted in the Santiago Notary office of Mr. José Musalem Saffie, under repertoire number 4.692/2015.

(82)    Energy and Power Supply Contract (PPA) Block 4, between Norvind and Empresa Eléctrica de Casablanca S.A., executed by public deed dated July 31, 2015, granted in the Santiago Notary office of Mr. Eduardo Avello Concha, under repertoire number 21.434/2015.

(83)    Energy and Power Supply Contract (PPA) Block 4, between Norvind and Cooperativa Eléctrica de Curicó Ltda., executed by public deed dated June 19, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 7.058/2015.

(84)    Energy and Power Supply Contract (PPA) Block 4, between Norvind and Cooperativa de Consumo de Energía Eléctrica de Chillan Ltda., executed by public deed dated June 11, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 6.583/2015.

(85)    Energy and Power Supply Contract (PPA) Block 4, between Norvind and Cooperativa Eléctrica Los Ángeles Ltda., executed by public deed dated June 19, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 7.060/2015.

(86)    Energy and Power Supply Contract (PPA) Block 4, between Norvind and Cooperativa Eléctrica Paillaco Ltda., executed by public deed dated July 8, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 7.850/2015.

(87)    Energy and Power Supply Contract (PPA) Block 4, between Norvind and Cooperativa Regional Eléctrica Llanquihue Ltda., executed by public deed dated July 10, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 8.004/2015.

(88)    Energy and Power Supply Contract (PPA) Block 4, between Norvind and Cooperativa Rural Eléctrica de Rio Bueno Ltda., executed by public deed dated June 25, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 7.315/2015.

(89)    Energy and Power Supply Contract (PPA) Block 4, between Norvind and Sociedad Cooperativa de Consumo de Energía Eléctrica Charrúa Ltda., executed by public deed dated June 19, 2015, granted in the Santiago Notary office of Humberto Santelices Narducci, under repertoire number 7.064/2015.

(90)    Energy and Power Supply Contract (PPA) Block 4, between Norvind and Compañía Distribuidora de Energía Eléctrica CODINER Ltda., executed by public deed dated July 31, 2015, granted in the Santiago Notary office of Eduardo Diez Morello, under repertoire number 19.072/2015.

(91)    Energy and Power Supply Contract (PPA) Block 4, between Norvind and Empresa Eléctrica Puente Alto Ltda., executed by public deed dated July 31, 2015, granted in the Santiago Notary office of Eduardo Avello Concha, under repertoire number 21.423/2015.

"*Loss Proceeds Accounts*" has the meaning ascribed thereto in the Security and Depositary Agreement.

"*Majority Holders*" shall mean the Holders of over 50% in aggregate principal amount of the Notes then outstanding.

"*Material Adverse Effect*" means an event or circumstance that would, or would reasonably be expected to, have a material adverse effect on: (a) the Issuer's financial position, results of operations, asset conditions or operations, (b) the Issuer's ability to perform the Issuer's obligations under any Transaction Document to which the Issuer is a party or (c) the validity or priority of the Liens on the Collateral or the ability of the Trustee or any Security Agent to enforce their rights and remedies under the Indenture Documents.

"*Material Project Documents*" means, collectively:

(i)    each Long-Term Power Purchase Agreement,

(ii)    each O&M Agreement,

(iii)      each Ground Lease,

(iv)      each other contract (including relating to the operation, maintenance, repair, financing or use of the Projects) or any other power purchase agreement or similar agreement entered into after the Issue Date with respect to the sale, transfer or disposal of the electrical output and ancillary services of any Project involving annual payments in excess of US$5.0 million (or its equivalent in the currency of payment) or that contains any obligations, the non-performance of which would reasonably be expected to have a Material Adverse Effect, and

(v)      any Additional Material Project Document, in each case entered into by the Issuer or any Guarantor with any other Person.

"*Moody's*" means Moody's Investors Service, Inc. and its successors.

"*Mortgage Agreement*" means each of the following mortgage agreements governed under the laws of Chile, as amended and restated on the Issue Date, and as the same may be further amended from time to time or replaced:

1.      Mortgage over existing and future real estate (*hipoteca sobre inmuebles existentes y futuros*) by and among San Juan, acting as mortgagor, and the Onshore Collateral Agent, for the benefit of the Secured Parties.

2.      Mortgage over future mining concessions (*hipoteca sobre concesiones mineras futuras*) by and among San Juan, acting as mortgagor, and the Onshore Collateral Agent, for the benefit of the Secured Parties.

3.      Mortgage over future water rights (*hipoteca sobre derechos de aprovechamiento de agua futuros*) by and among San Juan, acting as mortgagor, and the Onshore Collateral Agent, for the benefit of the Secured Parties.

4.      Mortgage over existing and future real estate (*hipoteca sobre inmuebles existentes y futuros*) by and among Norvind, acting as mortgagor, and the Onshore Collateral Agent, for the benefit of the Secured Parties.

5.      Mortgage over future mining concessions (*hipoteca sobre concesiones mineras futuras*) by and among Norvind, acting as mortgagor, and the Onshore Collateral Agent, for the benefit of the Secured Parties.

6.      Mortgage over future water rights (*hipoteca sobre derechos de aprovechamiento de agua futuros*) by and among Norvind, acting as mortgagor, and the Onshore Collateral Agent, for the benefit of the Secured Parties.

7.      Mortgage over future real estate (*hipoteca sobre inmuebles futuros*) by and among ILAP, acting as mortgagor, and the Onshore Collateral Agent, for the benefit of the Secured Parties.

8.    Mortgage over future mining concessions (*hipoteca sobre concesiones mineras futuras*) by and among ILAP, acting as mortgagor, and the Onshore Collateral Agent, for the benefit of the Secured Parties.

9.    Mortgage over future water rights (*hipoteca sobre derechos de aprovechamiento de agua futuros*) by and among ILAP, acting as mortgagor, and the Onshore Collateral Agent, for the benefit of the Secured Parties.

"*Net Available Amount*" means with respect to any Proceeds, such proceeds net of the related reasonable out-of-pocket costs or expenses (if any) and, if applicable, reasonable transaction costs, incurred by the Issuer in connection with the collection, enforcement, negotiation, consummation, settlement, proceedings, administration or other activity related to the receipt and/or collection of the relevant proceeds, as applicable and excluding the proceeds of any business interruption insurance.

"*Non-Material Project Documents*" means, collectively, each other contract or any other power purchase agreement or similar agreement entered into before, on or after the Issue Date with respect to the sale, transfer or disposal of the electrical output and ancillary services of any Project involving annual payments below US$5.0 million (or its equivalent in the currency of payment) or that contains any obligations, the non-performance of which would not reasonably be expected to have a Material Adverse Effect.

"*Non-U.S. Person*" means a Person who is not a U.S. Person.

"*Norvind*" means Norvind S.A., a corporation (*sociedad anónima*) formed under the laws of Chile.

"*Note Guarantee*" means the Guarantee by each Guarantor of the Issuer's obligations under the Notes, this Indenture and each other Indenture Document, executed pursuant to the provisions of this Indenture.

"*Notes*" means the Take-back SSNs and the Super Priority Notes, and any Note authenticated and delivered under this Indenture.

"*O&M Agreement*" means each of the operation and maintenance and turbine service agreements listed below, or any operation and maintenance or turbine service agreement or similar agreement entered into after the Issue Date in accordance with this Indenture related to the operation and maintenance of any Project:

(A)    Service and Availability Agreement, between San Juan and Vestas Chile Turbinas Eólicas Limitada, dated March 25, 2015 and amended by private instruments dated: December 14, 2016 and January 29, 2021.

(B)    Parent Company Guarantee over the Service and Availability Agreement, between San Juan and Vestas Wind Systems A/S, dated March 31, 2015.

(C)    Service and Availability Agreement, between Norvind and Vestas Chile Turbinas Eólicas Limitada, dated April 1, 2013, and amended December 14, 2016.

31

"*O&M Costs*" means, for any period, the amount actually paid by the Issuer in respect of (i) capital expenditures, (ii) purchases of materials, goods or services and other obligations of the Issuer under the Project Documents, (iii) all applicable Taxes and (iv) other obligations relating to the operation, maintenance, repair or improvement of the Projects; provided, "O&M Costs" shall not include (i) any payments made in respect of the Indenture Documents or with respect to Indebtedness (including mandatory prepayments of principal), (ii) any Restricted Payments, (iii) any Tax paid or payable by any of our direct or indirect equity owners with respect to the income or receipts of the Issuer; and (iv) without duplication, any costs in respect of repairs and restoration, the cost of which (A) is funded from Event of Loss Proceeds deposited into the Loss Proceeds Accounts and are transferred by the Depositary Bank into the applicable Revenue Account in accordance with the Security and Depositary Agreement, or (B) paid from Permitted Equity Issuances or Permitted Subordinated Indebtedness, except, with respect to clause (B) above, such expenses incurred to rebuild, replace, repair or restore the Project are reimbursed to the Issuer or the Guarantors from the Revenue Accounts.

"*Obligor*" means the Issuer and each of the Guarantors.

"*Obligations*" means any principal, interest (including in the case of the Notes, all interest accrued thereon after the commencement of any action or proceeding described in Section 6.01(vi) or (vii), even if such interest is not enforceable, allowable or allowed as a claim in such proceeding), premium (if any), fees, indemnifications, reimbursements, expenses, damages and other liabilities payable under the Indenture Documents.

"*Obsolete Asset*" means any asset that is worn out, obsolete or damaged from ordinary course wear and tear (to the extent of being unfit for normal use) or no longer necessary or required for the operation or maintenance of the Projects.

"*Offer to Purchase*" means an offer made by the Issuer pursuant to and in accordance with Sections 4.14 or 4.18 hereof to purchase some or all of the Notes from the Holders thereof.

"Offshore Accounts" means the Payment Account and the Prepayment Account.

"*Offshore Collateral Agent*" means UMB Bank, N.A., in its capacity as Offshore Collateral Agent.

"*Onshore Accounts*" means:

      (i)        the USD Revenue Account(s);

      (ii)      the Peso Revenue Account(s);

      (iii)     the USD Loss Proceeds Account(s);

      (iv)     the Peso Loss Proceeds Account(s);

      (v)      the USD Operations Account(s); and

      (vi)     the Peso Operations Account(s).

"*Onshore Collateral Agent*" means Banco de Chile, in its capacity as Onshore Collateral Agent.

"*Operating Report*" means a semiannual operating report, prepared in good faith by the Issuer that includes in reasonable detail for each semi-annual period: (i) the generation profile of the Projects, (ii) the turbine availability of the Projects, (iii) any maintenance or other events impacting the operation of the Projects and (iv) environmental impact events including $CO_2$ avoidance and other green portfolio statistics.

"*Opinion of Counsel*" means an opinion from independent legal counsel, which may include counsel to the Issuer or the Guarantors, who is reasonably acceptable to the Trustee or a Collateral Agent, as applicable, that meets the requirements of Section 13.04 hereof.

"*Organizational Documents*" means, with respect to any Person, (1) the memorandum or articles of incorporation, memorandum and articles of association, limited liability company agreement, partnership agreement, *acta constitutiva* or other similar organizational document of such Person, (2) the by-laws, *estatutos* or other similar document of such Person, (3) any certificate of designation or instrument relating to the rights of preferred shareholders or other holders of Capital Stock of such Person and (4) any shareholder rights agreement or other similar agreement.

"*Paying Agent*" means UMB Bank, N.A., in its capacity as Paying Agent.

"*Payment Account*" has the meaning ascribed thereto in the Security and Depositary Agreement.

"*Participant*" means, with respect to the Depositary, Euroclear or Clearstream, a Person who has an account with the Depositary, Euroclear or Clearstream, respectively (and, with respect to DTC, shall include Euroclear and Clearstream).

"*PEC I Receivables*" means "*Saldos*" assigned to in the Tariff Stabilization Resolution (*Resolución Exenta* No. 72) issued on March 5, 2020, by the *Comisión Nacional de Energía* of Chile, as clarified and rectified by the *Resolución Exenta* No. 114 issued on April 9, 2020, by the *Comisión Nacional de Energía* of Chile, as further amended, clarified or rectified in accordance with Applicable Law.

"*PEC II Receivables*" means "*Documentos de Pago*" according to the *Resolución Exenta* No. 86, issued on March 2, 2023, by the *Comisión Nacional de Energía of Chile*, as amended and restated by the *Resolución Exenta* No. 334 issued on August 9, 2023 by the *Comisión Nacional de Energía* of Chile, as further amended, clarified or rectified in accordance with Applicable Law.

"*PEC Receivables*" means, collectively, the PEC I Receivables, the PEC II Receivables and Future PEC Receivables, at Fair Market Value and used strictly for O&M Costs or as otherwise authorized under this Indenture.

"*PEC Receivables Transaction*" means a monetization transaction whereby (i) Latin America Power S.A. or (ii) a third party purchaser acquires from the Issuer or the Guarantors PEC Receivables, free and clear of any liens, in a single transaction or a series of transactions.

"*Permitted Business*" means the ownership, development, financing, construction, operation or maintenance of the Projects and any activities ancillary or incidental thereto.

"*Permitted Equity Issuance*" means the issuance of any Equity Interests by any of the Issuer or the Guarantors, which such Equity Interests will be subject to a first-priority Lien in favor of the Collateral Agent for the benefit of the Holders pursuant to the terms of this Indenture.

"*Permitted Investments*" means any of the following:

(1)     Investments in cash or Cash Equivalents;

(2)     Investments in (a) Hedging Obligations entered into in the ordinary course of business and not for speculative purposes and (b) any Intercompany Loan;

(3)     promissory notes and other noncash consideration (other than Equity Interests) received in connection with Dispositions;

(4)     Investments (including Indebtedness and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers arising in the ordinary course of business or upon the foreclosure with respect to any secured investment or other transfer of title with respect to any secured investment;

(5)     Investments constituting pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations; and

(6)     Investments constituting deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business.

"*Permitted Liens*" means any of the following:

(1)     Liens in favor of all of the Secured Parties specifically created or required to be created by this Indenture or any other Indenture Document;

(2)     Liens, deposits or pledges incurred or created in the ordinary course of business or under applicable Governmental Rules in connection with or to secure the performance of bids, tenders, contracts, leases, statutory obligations, surety bonds or appeal bonds;

(3)     Mechanics', materialmen's, workers', repairmen's, employees', warehousemen's or carriers' Liens or other like Liens arising in the ordinary course of business or under Governmental Rules securing obligations incurred in connection with the Issuer's business which are not yet due, or which are adequately bonded and which are being contested;

34

(4)    Liens imposed by Applicable Law for Taxes, assessments, governmental charges or labor claims, in each case that are secured by a bond or which are not yet due or which are being contested in good faith by appropriate proceedings and as to which the Issuer shall have set aside on its books such reserves as may be required pursuant to IFRS;

(5)    Liens on property or assets under construction (and related rights) in favor of a contractor or developer or arising from progress or partial payments by a third party relating to such property or assets; provided that such Liens shall be subject to customary lien waivers upon the making of progress payments;

(6)    Liens created by or resulting from any litigation or legal proceeding as to which the execution thereof has been effectively stayed while the underlying claims are being contested in good faith by appropriate proceedings, so long as such litigation, legal proceeding or claim does not give rise to an Event of Default;

(7)    defects, easements, rights of way, zoning restrictions, irregularities, encumbrances (other than for borrowed money) and clouds on title, any interest or title of a licensor, lessor or sublicensor or sublessor under any license or sublicense and statutory Liens that do not materially impair the value or use of the Property affected and that do not individually or in the aggregate materially impair the validity, perfection or priority (except Liens granted priority by operation of law) of the Liens granted under the Security Documents;

(8)    Liens securing or arising by reason of any netting or set-off arrangement entered into in the ordinary course of banking activities;

(9)    Liens on PEC Receivables granted to a buyer of such PEC Receivables in a PEC Receivables Transaction as a "back-up" security interest in a "true sale" transaction; and

(10)    Liens in existence on the Issue Date that do not secure Indebtedness for borrowed money detailed in Schedule C hereto.

"*Permitted Refinancing*" means, with respect to any Person, any modification, refinancing, refunding, replacement, renewal or extension of any Indebtedness of such Person; *provided* that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, replaced, renewed or extended except by an amount equal to unpaid accrued interest and premium (including tender premiums and Additional Amounts) thereon, plus reasonable original issue discount and upfront fees plus other fees and expenses reasonably incurred, in connection with such modification, refinancing, refunding, replacement, renewal or extension and by an amount equal to any existing commitments unutilized thereunder, (b) such modification, refinancing, refunding, renewal or extension has a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being modified, refinanced, refunded, replaced, renewed or extended, (c) if the Indebtedness being modified, refinanced, refunded, replaced,

renewed or extended is subordinated in right of payment to the Notes and any other Senior Secured Obligations, the Indebtedness so modified, refinanced, refunded, replaced, renewed or extended is subordinated in right of payment to the Notes and any other Senior Secured Obligations on terms at least as favorable to the Holders as those contained in the documentation governing the Indebtedness being modified, refinanced, refunded, replaced, renewed or extended and (d) the terms of such modification, refinancing, refunding, replacement, renewal or extension shall otherwise contain customary market terms (as reasonably determined by the Issuer).

"*Permitted Subordinated Indebtedness*" means, with respect to any Person, any unsecured Indebtedness of such Person that (1) is expressly subordinated in right of payment and liquidation to the Notes and the Note Guarantees pursuant to a subordination agreement substantially in the form of Schedule B hereto, (2) is pledged pursuant to a first-priority Lien in favor of the relevant Collateral Agent for the benefit of the Secured Parties pursuant to this Indenture, (3) does not require or permit any cash payment of any obligation thereunder prior to its Stated Maturity, (4) does not mature prior to the date that is one-hundred and eighty (180) days after the Stated Maturity of the Notes, (5) does not have any Guarantees and (6) does not permit acceleration or any other enforcement until the Notes have been irrevocably discharged.

"*Person*" means an individual, partnership, corporation, limited liability company, exempted company, business trust, joint stock company, trust, unincorporated association, joint venture, other entity or Governmental Authority.

"*Peso*" or "*CLP*" means Chilean Pesos, the legal and official currency in Chile.

"*Peso Loss Proceeds Account*" has the meaning ascribed thereto in the Security and Depositary Agreement.

"*Peso Operations Account*" has the meaning ascribed thereto in the Security and Depositary Agreement.

"*Peso Revenue Account*" has the meaning ascribed thereto in the Security and Depositary Agreement.

"*PIK Option*" has the meaning set forth in the Form of Reverse of Note contained in Exhibit A-1 for the Take-back SSNs and Exhibit A-2 for the Super Priority Notes.

"*PIK Interest*" has the meaning set forth in the Form of Reverse of Note contained in Exhibit A-1 for the Take-back SSNs and Exhibit A-2 for the Super Priority Notes.

"*Plan*" means the Issuer's prepackaged Chapter 11 plan of reorganization.

"*Pledge Agreement*" means each of the following pledge agreements governed under the laws of Chile, as amended and restated on the Issue Date, where applicable, and as the same may be further amended from time to time or replaced:

1.  Pledge without conveyance over existing and future shares issued by ILAP (*prenda sin desplazamiento sobre acciones presentes y futuras*) by and among ILAP Holdings Ltd., acting as pledgor, ILAP, and the Onshore Collateral Agent, for the

benefit of the Secured Parties, over one-hundred percent (100%) of the existing and future shares issued by ILAP owned by ILAP Holdings Ltd.

2.     Pledge without conveyance over existing and futures shares issued by Norvind (*prenda sin desplazamiento sobre acciones presentes y futuras*) by and among ILAP and Latin America Power S.A., acting as pledgors, and the Onshore Collateral Agent, for the benefit of the Secured Parties, over one-hundred percent (100%) of the existing and future shares of Norvind owned by ILAP and Latin America Power S.A.

3.     Pledge without conveyance over existing and futures shares issued by San Juan (*prenda sin desplazamiento sobre acciones presentes y futuras*) by and among ILAP and Latin America Power S.A., acting as pledgors, and the Onshore Collateral Agent, for the benefit of the Secured Parties, over one-hundred percent (100%) of the existing and future shares of San Juan owned by ILAP and Latin America Power S.A.

4.     Pledge without conveyance over rights on Additional Material Project Documents (other than Long Term Power Purchase Agreements with non-DisCos) (*prenda sin desplazamiento sobre derechos*), by and among San Juan, as pledgor, and the Onshore Collateral Agent, for the benefit of the Secured Parties, over all future Additional Material Project Documents entered into by San Juan.

5.     Pledge without conveyance over rights on Additional Material Project Documents (other than Long Term Power Purchase Agreements with non-DisCos) (*prenda sin desplazamiento sobre derechos*), by and among Norvind, as pledgor, and the Onshore Collateral Agent, for the benefit of the Secured Parties, over all future Additional Material Project Documents entered into by Norvind.

6.     Pledge without conveyance over rights on Additional Material Project Documents (other than Long Term Power Purchase Agreements with non-DisCos) (*prenda sin desplazamiento sobre derechos*), by and among ILAP, as pledgor, and the Onshore Collateral Agent, for the benefit of the Secured Parties, over all future Additional Material Project Documents entered into by ILAP.

7.     Pledge without conveyance over existing and future movable Property (*prenda sin desplazamiento sobre activos presentes y futuros*) by and among San Juan, as pledgor, and the Onshore Collateral Agent, for the benefit of the Secured Parties, over all existing and future movable Property owned by San Juan.

8.     Pledge without conveyance over existing and future movable Property (*prenda sin desplazamiento sobre activos presentes y futuros*) by and among Norvind, as pledgor, and the Onshore Collateral Agent, for the benefit of the Secured Parties, over all existing and future movable Property owned by Norvind.

37

9.      Pledge without conveyance over future movable Property (*prenda sin desplazamiento sobre activos futuros*) by and among ILAP, as pledgor, and the Onshore Collateral Agent, for the benefit of the Secured Parties, over all future movable Property owned by ILAP.

10.     Pledge without conveyance over existing and future Intercompany Indebtedness (*prenda sin desplazamiento sobre créditos*), by and among San Juan, as subordinated lender and pledgor, ILAP, and the Onshore Collateral Agent, for the benefit of the Secured Parties.

11.     Pledge without conveyance over existing and future Intercompany Indebtedness (*prenda sin desplazamiento sobre créditos*), by and among Norvind, as subordinated lender and pledgor, ILAP, and the Onshore Collateral Agent, for the benefit of the Secured Parties.

12.     Pledge without conveyance over existing and future Intercompany Indebtedness (*prenda sin desplazamiento sobre créditos*), by and among ILAP Holdings Ltd., as subordinated lender and pledgor, ILAP, and the Onshore Collateral Agent, for the benefit of the Secured Parties.

13.     Pledge without conveyance over money and permitted investments (*prenda sin desplazamiento sobre dinero e inversiones permitidas*) by and among San Juan, as pledgor, and the Onshore Collateral Agent, for the benefit of the Secured Parties, over existing and future amounts deposited in certain onshore accounts and permitted investments.

14.     Pledge without conveyance over money and permitted investments (*prenda sin desplazamiento sobre dinero e inversiones permitidas*) by and among Norvind, as pledgor, and the Onshore Collateral Agent, for the benefit of the Secured Parties, over existing and future amounts deposited in certain onshore accounts and permitted investments.

15.     Pledge without conveyance over money and permitted investments (*prenda sin desplazamiento sobre dinero e inversiones permitidas*) by and among ILAP, as pledgor, and the Onshore Collateral Agent, for the benefit of the Secured Parties, over existing and future amounts deposited in certain onshore accounts and permitted investments.

16.     Commercial pledge over collection rights under existing Material Project Documents (other than Long Term Power Purchase Agreements) and promise to grant commercial pledge over collection rights under Additional Material Project Documents (consisting in Long Term Power Purchase Agreements with non-DisCos) (*prenda comercial sobre derechos y promesa de prenda comercial sobre derechos*), by and among San Juan, as pledgor, the Onshore Collateral Agent, for the benefit of the Secured Parties, and LAP S.A.

38

17. Commercial pledge over collection rights under existing Material Project Documents (other than Long Term Power Purchase Agreements) and promise to grant commercial pledge over collection rights under Additional Material Project Documents (consisting in Long Term Power Purchase Agreements with non-DisCos) (*prenda comercial sobre derechos y promesa de prenda comercial sobre derechos*), by and among Norvind, as pledgor, the Onshore Collateral Agent, for the benefit of the Secured Parties, and LAP S.A.

18. Pledge without conveyance over collection rights under existing Material Project Documents (consisting in Long Term Power Purchase Agreements with DisCos) (*prenda sin desplazamiento sobre derechos*), by and among San Juan, as pledgor, and the Onshore Collateral Agent, for the benefit of the Secured Parties.

19. Pledge without conveyance over collection rights under existing Material Project Documents (consisting in Long Term Power Purchase Agreements with DisCos) (*prenda sin desplazamiento sobre derechos*), by and among Norvind, as pledgor, and the Onshore Collateral Agent, for the benefit of the Secured Parties.

20. Commercial pledge over collection rights under existing Material Project Documents (consisting in Long Term Power Purchase Agreement with Empresa de Transporte de Pasajeros Metro S.A.) (*prenda comercial sobre derechos*), by and among San Juan, as pledgor, and the Onshore Collateral Agent, for the benefit of the Secured Parties.

21. Pledge without conveyance over electric concession (*prenda sin desplazamiento sobre concesión eléctrica*) by and among San Juan, as pledgor, and the Onshore Collateral Agent, for the benefit of the Secured Parties.

22. Pledge without conveyance over collection rights under existing Material Project Documents (Transelec S.A.) (*prenda sin desplazamiento sobre derechos*), by and among San Juan, as pledgor, and the Onshore Collateral Agent, for the benefit of the Secured Parties.

23. Pledge without conveyance over collection rights under existing Material Project Documents (Transelec S.A.) (*prenda sin desplazamiento sobre derechos*), by and among Norvind, as pledgor, and the Onshore Collateral Agent, for the benefit of the Secured Parties.

"*Prepayment Account*" has the meaning ascribed thereto in the Security and Depositary Agreement.

"*Private Placement Legend*" means the legend in Section 2.06(f).

"*Proceeding*" means the voluntary reorganization cases that will confirm the Plan under chapter 11 of Title 11 of the United States Code to be commenced by the Issuer in the United States Bankruptcy Court for the Southern District of New York.

"*Proceeds*" means Event of Loss Proceeds and proceeds from Dispositions as permitted by this Indenture.

"*Project Documents*" means, collectively, the Material Project Documents and the Non-Material Project Documents.

"*Project Party*" means each party to a Material Project Document other than the Issuer and the Guarantors.

"*Project Revenue*" means, for any period, the sum (without duplication) of all cash deposited into the Revenue Accounts during the most recently ended period completed on or prior to such date of determination, including (i) PEC Receivables and proceeds received in connection with PEC Receivables Transactions, (ii) proceeds of any business interruption insurance actually received and required to be deposited in the Revenue Accounts in accordance with the Security and Depositary Agreement, and (iii) interest and other amounts received on, and other income derived from, the balance outstanding during such period in the Collateral Accounts (including, without limitation, proceeds from Permitted Investments), but excluding (A) cash proceeds from any other insurance policies, from warranty or indemnity payments or from damages and (B) cash deposited into the Revenue Account from Permitted Equity Issuances or Permitted Subordinated Indebtedness.

"*Project Site*" means, with respect to each Project, (i) the land upon which such Project is located, and (ii) the rights-of-way, licenses, leases and other interests in real property vested in the applicable Guarantor in connection with such Project.

"*Projects*" means the wind generation assets corresponding to the San Juan Project and the Totoral Project.

"*Property*" means any property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, and any right or interest therein. The term "Properties" shall have a correlative meaning.

"*Prudent Industry Practices*" means those practices, methods, techniques and standards that are generally accepted in Chile, as they may change from time to time, for use in the electric energy industry and commonly used in safe and prudent electric energy engineering and operations to design, engineer, construct, test, operate and maintain equipment similar to the Projects.

"*Rating Agency*" means, initially, each of Moody's, S&P and Fitch or, if Moody's, S&P or Fitch or any of them shall not make a rating on the Notes publicly available, a nationally recognized statistical rating organization (or two such organizations, as the case may be), as such term is defined in Section 3(a)(62) of the Exchange Act, selected by the Issuer which shall be substituted for any of Fitch, Moody's or S&P, as the case may be, and their respective successors.

"*Ratings Affirmation*" shall mean, with respect to any particular action or proposed action, any two of S&P, Moody's or Fitch or, if any or all of such ratings agencies do not then rate the Notes, such other Rating Agencies then having issued long-term debt ratings for the Notes, affirms that such long-term debt ratings will not be lowered as a result of the taking of such action or proposed action.

"*Reference Treasury Dealer*" means not less than three leading primary United States government securities dealers in New York City reasonably designated by the Issuer; *provided* that if any of the foregoing ceases to be a primary United States government securities dealer in New York City (a "Primary Treasury Dealer"), the Issuer will substitute therefor another Primary Treasury Dealer.

"*Reference Treasury Dealer Quotation*" means, with respect to each Reference Treasury Dealer and any redemption date, the average, as determined by the Independent Investment Banker, of the bid and asked price for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Independent Investment Banker by such Reference Treasury Dealer at 3:30 pm New York time on the third (3rd) Business Day preceding such redemption date.

"*Regulation S*" means Regulation S promulgated under the Securities Act.

"*Regulation S Global Note*" means a Global Note in the form of Exhibit A-1 hereto (with respect to the Take-back SSNs) or Exhibit A-2 hereto (with respect to the Super Priority Notes) bearing the Global Note Legend and the Private Placement Legend and deposited with or on behalf of and registered in the name of the Depositary or its nominee, issued in a denomination equal to the outstanding principal amount of the Notes initially sold in reliance on Rule 903 of Regulation S.

"*Remedies Instruction*" means, upon the occurrence and continuance of an Event of Default, the instruction to the Trustee made by the Majority Holders (including Holders of at least 50% in aggregate principal amount of the Take-back SSNs then outstanding) to direct the applicable Collateral Agent to take any or all of the actions permitted under this Indenture and the Notes.

"*Replacement Assets*" means tangible Property that will be used or useful in connection with a Permitted Business other than the Capital Stock of any Person.

"*Responsible Officer*" means the Chief Executive Officer, the President, any of the managers, any of the directors, or any Vice President of such Person or of the controlling shareholder of such Person, in each case whose name appears on a certificate of incumbency of such Person delivered in accordance with the terms of this Indenture, as such certificate may be amended from time to time.

"*Responsible Officer of the Trustee*" means any officer or authorized representative of the Trustee within the Corporate Trust Office of the Trustee with direct responsibility for the administration of this Indenture and/or the Indenture Documents and also, with respect to a particular matter, any other officer of the Trustee to whom such matter is referred because of such officer's knowledge and familiarity with the particular subject and who shall be directly responsible for the administration of this Indenture and/or the Indenture Documents.

"*Restricted Definitive Note*" means a Definitive Note bearing the Private Placement Legend.

"*Restricted Global Note*" means a Global Note bearing the Private Placement Legend. "*Restricted Period*" means the 40-day distribution compliance period as defined in Regulation S.

"*Revenue Accounts*" means the USD Revenue Account and the Peso Revenue Account.

"*Rule 144*" means Rule 144 promulgated under the Securities Act.

"*Rule 144A*" means Rule 144A promulgated under the Securities Act.

"*Rule 903*" means Rule 903 promulgated under the Securities Act.

"*Rule 904*" means Rule 904 promulgated under the Securities Act.

"*S&P*" means, Standard & Poor's Ratings Services, Inc. or any successor thereto.

"*Sale and Lease-Back Transaction*" means any arrangement with any Person, or to which any such Person is a party, providing for the leasing to the Issuer for a period of more than three (3) years of any Property or assets that have been or are to be sold or transferred by the Issuer to such Person or to any other Person to which funds have been or are to be advanced by such Person on the security of the leased Property or assets.

"*Sales Facilitation Agreement*" means the sales facilitation agreement dated as of the Issue Date among the Issuer, ILAP Holdings Ltd., LAP S.A., and UMB Bank, N.A., a national banking association, in its capacity as trustee under the Convert Indenture and in its capacity as trustee under this Indenture.

"*San Juan*" means San Juan S.A., a corporation (*sociedad anónima*) formed under the laws of Chile.

"*San Juan Project*" means a 193.2 MW wind farm facility located in Freirina, Vallenar, in the region of Atacama, Chile (approximately 650 km north Santiago) that has been fully operational since March 2017.

"*SEC*" means the Securities and Exchange Commission.

"*Secured Parties*" means the Holders under this Indenture, the Trustee, the Agents and the Security Agents.

"*Securities Act*" means the U.S. Securities Act of 1933, as amended.

"*Security Agents*" means, collectively, the Trustee, the Collateral Agents and the Depositary Banks, as applicable.

"*Security and Depositary Agreement*" means the Security and Depositary Agreement dated as of the Issue Date among the Issuer, the Guarantors, the Trustee, the Offshore Collateral Agent, UMB Bank, N.A. as offshore depositary bank (in such capacity, the "*Offshore Depositary Bank*"), the Onshore Collateral Agent, and Banco de Chile as onshore depositary bank (in such capacity, the "*Onshore Depositary Bank*").

42

"*Security Documents*" means, collectively, (i) each Chilean Security Document, (ii) the Security and Depositary Agreement and (iii) any other mortgages, deeds of trust, security agreements, mandates, trust arrangements, pledge agreements or control agreements entered into after the Issue Date and of a similar nature relating to the Projects or the financing contemplated by this issuance, in each case for the benefit of the Secured Parties.

"*Senior Secured Obligations*" means, collectively, without duplication: (i) all of our Indebtedness, financial liabilities and obligations, of whatsoever nature and howsoever evidenced (including, but not limited to, principal, interest, fees, reimbursement obligations, penalties, indemnities and legal and other expenses, whether due after acceleration or otherwise) to the Secured Parties in their capacity as such under the applicable Indenture Documents or any other agreement, document or instrument evidencing, securing or relating to such Indebtedness, financial liabilities or obligations, in each case, direct or indirect, primary or secondary, fixed, variable or contingent, now or hereafter arising out of or relating to any such agreements; (ii) any and all sums advanced by the Security Agents in order to preserve the Collateral or preserve its security interest in the Collateral; and (iii) in the event of any proceeding for the collection or enforcement of the obligations described in clauses (i) and (ii) above, after an Event of Default under this Indenture has occurred and is continuing and has not been waived, the reasonable expenses of retaking, holding, preparing for sale or lease, selling or otherwise disposing of or realizing on the Collateral, or of any exercise by the Security Agents of their respective rights under the Security Documents, together with reasonable attorneys' fees and court costs.

"*Series*" means each of the Take-Back SSNs and the Super Priority Notes.

"*Stated Maturity*" means (1) with respect to any Indebtedness, the date specified as the fixed date on which the final installment of principal of such Indebtedness is due and payable or (2) with respect to any scheduled installment of principal of or interest on any Indebtedness, the date specified as a fixed date on which such installment is due and payable as set forth in the documentation governing such Indebtedness, not including any contingent obligation to repay, redeem or repurchase prior to the regularly scheduled date for payment.

"*Subsidiary*" means with respect to any Person, any corporation, association or other business entity of which more than 50% of the outstanding Voting Stock is owned, directly or indirectly, by such Person and one or more Subsidiaries of such Person (or a combination thereof).

"*Subsidiary Guarantor*" means each of San Juan and Norvind.

"*Swap Agreement*" means any Commodity Agreement, Currency Agreement or Interest Rate Agreement.

"*Taxes*" means any and all income, stamp or other taxes, duties, levies, imposts, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by or on behalf of a Taxing Jurisdiction.

"*Taxing Jurisdiction*" means any Governmental Authority of Chile or any other jurisdiction or political subdivision thereof or therein in which the Issuer or any of the Guarantors (or, in each case a successor thereof) is organized or is a resident for tax purposes, or any jurisdiction from or

through which the Issuer, the Guarantors or any paying agent, as the case may be, makes payment hereunder, or any political subdivision thereof.

"*Totoral Project*" means a 46.0 MW wind farm facility located in Canela, in the region of Coquimbo, Chile (approximately 300 km north of Santiago) that has been fully operational since January 2010.

"*Transaction Documents*" means the Indenture Documents, the Sales Facilitation Agreement and the Material Project Documents.

"*Transfer Agent*" means UMB Bank, N.A., in its capacity as Transfer Agent hereunder.

"*Trustee*" means UMB Bank, N.A., in its capacity as Trustee hereunder.

"*Treasury Rate*" means, with respect to any redemption date, the rate per annum equal to the semi-annual equivalent yield to maturity or interpolated maturity (on a day count basis) of the Comparable Treasury Issue, assuming a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such redemption date.

"*United States*" and "*U.S.*" each mean the United States of America.

"*U.S. dollars*," "*Dollars,*" "*USD*," or "*$*" means United States dollars, the legal and official currency of the United States of America.

"*Unrestricted Definitive Note*" means a Definitive Note that does not bear and is not required to bear the Private Placement Legend.

"*Unrestricted Global Note*" means a Global Note that does not bear and is not required to bear the Private Placement Legend.

"*USD Loss Proceeds Account*" has the meaning ascribed thereto in the Security and Depositary Agreement.

"*USD Operations Account*" means one or more operations and maintenance accounts which shall each be a special, segregated *cuenta corriente* (current account) in the name of each such Obligor denominated in Dollars.

"*USD Revenue Account*" has the meaning ascribed thereto in the Security and Depositary Agreement.

"*U.S. Government Obligations*" means securities that are (a) non-callable direct obligations of the United States of America for the timely payment of which its full faith and credit is pledged or (b) obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States of America the timely payment of which is unconditionally guaranteed as a full faith and credit obligation of the United States of America, which, in either case, are not callable or redeemable at the option of the issuer thereof, and shall also include a depositary receipt issued by a bank (as defined in Section 3(a)(2) of the Securities Act), as custodian with respect to

44

any such U.S. Government Obligations or a specific payment of principal of or interest on any such U.S. Government Obligations held by such custodian for the account of the holder of such depositary receipt; *provided* that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depositary receipt from any amount received by the custodian in respect of the U.S. Government Obligations or the specific payment of principal of or interest on the U.S. Government Obligations evidenced by such depositary receipt.

"*U.S. Person*" means a U.S. Person as defined in Rule 902(k) promulgated under the Securities Act.

"*Voting Stock*," with respect to any Person, means Capital Stock the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person, even if the right so to vote has been suspended by the happening of a contingency.

"*Weighted Average Life to Maturity*" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment by (b) the then outstanding principal amount of such Indebtedness; *provided* that for purposes of determining the Weighted Average Life to Maturity of any Indebtedness that is being modified, refinanced, refunded, renewed, replaced or extended (the "*Applicable Indebtedness*"), the effects of any prepayments made on such Applicable Indebtedness prior to the date of the applicable modification, refinancing, refunding, renewal, replacement or extension shall be disregarded.

Section 1.02.   Other Definitions.

| Term | Defined in Section |
| --- | --- |
| "*Action*" | 10.10 |
| "*Affiliate Transaction*" | 4.10 |
| "*Additional Amounts*" | 4.08 |
| "*Additional Indebtedness*" | 4.09(a) |
| "*Affiliate Transaction*" | 4.10 |
| "*Authentication Order*" | 2.02 |
| "*Cash Sweep Mandatory Redemption*" | 3.09 |
| "*Covenant Defeasance*" | 8.03 |
| "*Default Interest*" | 2.12 |
| "*Distribution*" | 4.07(b) |
| "*Distribution Release Conditions*" | 4.07(b) |
| "*DTC*" | 2.03 |
| "*Event of Default*" | 6.01 |
| "*Excess Loss Offer*" | 4.18(b) |
| "*Excess Loss Proceeds*" | 4.18(b) |

"*Guarantor*" ................................................................................... Preamble
"*Issuer*" ......................................................................................... Preamble
"*Legal Defeasance*" ...................................................................... 8.02
"*Luxembourg Paying Agent*" ....................................................... 2.03
"*Offer Amount*" ............................................................................ 3.03
"*Offer Period*" .............................................................................. 3.03
"*Patriot Act*" ................................................................................ 13.19
"*Paying Agent*" ............................................................................ 2.03
"*Permitted Capital Increases*" ................................................... 5.01(a)(iv)
"*Permitted Indebtedness*" ......................................................... 4.09(a)
"*PIK Payment*" .............................................................................. Form of Notes
"*Purchase Date*" .......................................................................... 3.03
"*Registrar*" ................................................................................... Preamble
"*Restricted Payments*" ................................................................ 4.07(a)
"*Subordination Agreement*" ...................................................... 4.09(a)(iv)
"*Super Priority Notes*" ................................................................ Preamble
"*Take-back SSNs*" ......................................................................... Preamble
"*Transfer*" ..................................................................................... 4.25
"*Trustee*" ....................................................................................... Preamble

Section 1.03.   [Reserved]

Section 1.04.   Rules of Construction.

Unless the context otherwise requires:

(i)       a term has the meaning assigned to it;

(ii)      an accounting term not otherwise defined has the meaning assigned to it in accordance with IFRS (based on the manner in which the financial statements are prepared and delivered pursuant to Section 4.03 hereof);

(iii)     "or" is not exclusive;

(iv)     words in the singular include the plural, and in the plural include the singular;

(v)      "will" shall be interpreted to express a command;

(vi)     provisions apply to successive events and transactions;

(vii)    references to sections of or rules under the Securities Act will be deemed to include substitute, replacement of successor sections or rules adopted by the SEC from time to time; and

(viii)    any action required to be taken on a given date pursuant to any Indenture Document shall, to the extent such date is not a Business Day, be deemed to be required to be taken on the next succeeding Business Day.

## ARTICLE 2
## THE NOTES

Section 2.01.    Form and Dating.

(a)    *General*. The Notes will be substantially in the form of Exhibit A-1 hereto (with respect to the Take-back SSNs) or Exhibit A-2 hereto (with respect to the Super Priority Notes). The Notes may have notations, legends or endorsements required by law, stock exchange rule or usage. Each Note will be dated the date of its authentication. The Notes shall be in minimum denominations of $1,000 and integral multiples of $1.00 above such amount (and, if a PIK Payment has been made, such PIK Interest will be added to the principal amount of the outstanding Notes, as applicable, rounded up to the nearest $1.00).

The terms and provisions contained in the Notes will constitute, and are hereby expressly made, a part of this Indenture and the Issuer, the Guarantors and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby. However, to the extent any provision of any Note conflicts with the express provisions of this Indenture, the provisions of this Indenture shall govern and be controlling.

(b)    *Global Notes*. Notes issued in global form will be substantially in the form of Exhibit A-1 hereto (with respect to the Take-back SSNs) or Exhibit A-2 hereto (with respect to the Super Priority Notes) (including the Global Note Legend thereon and the "Schedule of Exchanges of Interests in the Global Note" attached thereto). Notes issued in definitive form will be substantially in the form of Exhibit A-1 hereto (with respect to the Take-back SSNs) or Exhibit A-2 hereto (with respect to the Super Priority Notes) (but without the Global Note Legend thereon and without the "Schedule of Exchanges of Interests in the Global Note" attached thereto). Each Global Note will represent such of the outstanding Notes as will be specified therein and each shall provide that it represents the aggregate principal amount of outstanding Notes from time to time endorsed thereon and that the aggregate principal amount of outstanding Notes represented thereby may from time to time be reduced or increased, as appropriate, to reflect exchanges and redemptions. Any endorsement of a Global Note to reflect the amount of any increase or decrease in the aggregate principal amount of outstanding Notes represented thereby will be made on the Schedule of Exchanges of Interests in the Global Note by the Trustee or the Custodian, at the direction of the Trustee, in accordance with instructions given by the Holder thereof as required by Section 2.06 hereof.

(c)    *Euroclear and Clearstream Procedures Applicable.* The provisions of the "Operating Procedures of the Euroclear System" and "Terms and Conditions Governing Use of Euroclear" and the "General Terms and Conditions of Clearstream Banking" and "Customer Handbook" of Clearstream will be applicable to transfers of beneficial interests in the Regulation S Global Note that are held by Participants through Euroclear or Clearstream.

(d)    *Additional Notes.* No additional Notes shall be permitted to be issued under this Indenture, other than as expressly contemplated under Articles IV and VI of the Plan.

Section 2.02.    <u>Execution and Authentication</u>.

At least one Responsible Officer must sign the Notes for the Issuer by manual or facsimile signature.

If a Responsible Officer whose signature is on a Note no longer holds that office at the time a Note is authenticated, the Note will nevertheless be valid.

A Note will not be valid until authenticated by the manual signature of the Trustee. The signature will be conclusive evidence that the Note has been authenticated under this Indenture.

The Trustee will, upon receipt of a written order of the Issuer signed by a Responsible Officer (an "*Authentication Order*"), authenticate (i) Take-back SSNs for original issue that may be validly issued under this Indenture, up to the aggregate principal amount of $264,305,966.00, and (ii) Super Priority Notes for original issue that may be validly issued under this Indenture, up to the aggregate principal amount of $14,000,000.00. The aggregate principal amount of Notes outstanding at any time may not exceed the aggregate principal amount of Notes authorized for issuance by the Issuer pursuant to one or more Authentication Orders, except as provided in Section 2.07 hereof.

The Trustee may appoint an authenticating agent acceptable to the Issuer to authenticate Notes. An authenticating agent may authenticate Notes whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by such agent. An authenticating agent has the same rights as an Agent to deal with Holders or an Affiliate of the Issuer.

Section 2.03.    <u>Registrar and Paying Agent</u>.

The Issuer will maintain an office or agency where Notes may be presented for registration of transfer or for exchange ("*Registrar*") and an office or agency where Notes may be presented for payment. The Registrar will keep a register of the Notes and of their transfer and exchange. The Issuer may appoint one or more co-registrars and one or more additional paying agents. The term "Registrar" includes any co-registrar and the term "Paying Agent" includes any additional paying agent. The Issuer may change any Paying Agent or Registrar without notice to any Holder. The Issuer will notify the Trustee in writing of the name and address of any Agent not a party to this Indenture. If the Issuer fails to appoint or maintain another entity as Registrar or Paying Agent, the Trustee shall act as such. The Issuer may act as Paying Agent or Registrar.

The Issuer initially appoints The Depository Trust Company ("*DTC*") to act as Depositary with respect to the Global Notes.

The Issuer initially appoints the Trustee to act as the Registrar and Paying Agent and to act as Custodian with respect to the Global Notes.

Section 2.04.   Paying Agent to Hold Money in Trust.

The Issuer will require each Paying Agent other than the Trustee to agree in writing that the Paying Agent will hold in trust for the benefit of Holders of the relevant Series or the Trustee all money held by the Paying Agent for the payment of principal, premium, if any, or interest on the relevant Series of Notes, and will notify the Trustee of any Default by the Issuer in making any such payment. While any such Default continues, the Trustee may require a Paying Agent to pay all money held by it to the Trustee. The Issuer at any time may require a Paying Agent to pay all money held by it to the Trustee. Upon payment over to the Trustee, the Paying Agent (if other than the Issuer) will have no further liability for the money. If the Issuer acts as Paying Agent, it will segregate and hold in separate trust funds for the benefit of the Holders of each Series all money held by it for such Series as Paying Agent. Upon any bankruptcy or reorganization proceedings relating to the Issuer, the Trustee will serve as Paying Agent for the Notes.

Section 2.05.   Holder Lists.

The Trustee will preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of all Holders of each Series. If the Trustee is not the Registrar, the Issuer will furnish, or cause any successor registrar to furnish, to the Trustee at least seven (7) Business Days before each interest payment date and at such other times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of the Holders of Notes.

Section 2.06.   Transfer and Exchange.

(a)      *Transfer and Exchange of Global Notes*. A Global Note may not be transferred except as a whole by the Depositary to a nominee of the Depositary, by a nominee of the Depositary to the Depositary or to another nominee of the Depositary, or by the Depositary or any such nominee to a successor Depositary or a nominee of such successor Depositary. All Global Notes will be exchanged by the Issuer for Definitive Notes if:

(i)      the Issuer delivers to the Trustee notice from the Depositary that it is unwilling or unable to continue to act as Depositary or that it is no longer a clearing agency registered under the Exchange Act and, in either case, a successor Depositary is not appointed by the Issuer within ninety (90) days after the date of such notice from the Depositary;

(ii)      the Issuer in its sole discretion determines that the Global Notes (in whole but not in part) should be exchanged for Definitive Notes and delivers a written notice to such effect to the Trustee; *provided* that in no event shall the Regulation S Global Note be exchanged by the Issuer for Definitive Notes prior to the expiration of the Restricted Period; or

(iii)      there has occurred and is continuing a Default with respect to the Notes and any Holder of the Notes requests that Definitive Notes be issued.

Upon the occurrence of any of the preceding events in clauses (i), (ii) or (iii) above, Definitive Notes shall be issued in such names as the Depositary shall instruct the Trustee. Global

Notes also may be exchanged or replaced, in whole or in part, as provided in Sections 2.07 and 2.10 hereof. Every Note authenticated and delivered in exchange for, or in lieu of, a Global Note or any portion thereof, pursuant to this Section 2.06 or Sections 2.07 or 2.10 hereof, shall be authenticated and delivered in the form of, and shall be, a Global Note. A Global Note may not be exchanged for another Note other than as provided in this Section 2.06(a), however, beneficial interests in a Global Note may be transferred and exchanged as provided in Section 2.06(b), (c) or (d) hereof.

(b)    *Transfer and Exchange of Beneficial Interests in the Global Notes*. The transfer and exchange of beneficial interests in the Global Notes will be effected through the Depositary, in accordance with the provisions of this Indenture and the applicable procedures of DTC. Beneficial interests in the Restricted Global Notes will be subject to restrictions on transfer comparable to those set forth herein to the extent required by the Securities Act. Transfers of beneficial interests in the Global Notes also will require compliance with either Section 2.06(b)(i) or (ii) below, as applicable, as well as one or more of the other following subparagraphs, as applicable:

(i)    *Transfer of Beneficial Interests in the Same Global Note*. Beneficial interests in any Restricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in the same Restricted Global Note in accordance with the transfer restrictions set forth in the Private Placement Legend; *provided*, *however*, that prior to the expiration of the Restricted Period, transfers of beneficial interests in the Regulation S Global Note may not be made to a U.S. Person or for the account or benefit of a U.S. Person (other than the initial purchasers). Beneficial interests in any Unrestricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note. No written orders or instructions shall be required to be delivered to the Registrar to effect the transfers described in this Section 2.06(b)(i).

(ii)    *All Other Transfers and Exchanges of Beneficial Interests in Global Notes*. In connection with all transfers and exchanges of beneficial interests that are not subject to Section 2.06(b)(i) above, the transferor of such beneficial interest must deliver to the Registrar either:

(i)    both:

(i)    a written order from a Participant or an Indirect Participant given to the Depositary in accordance with the applicable procedures of DTC directing the Depositary to credit or cause to be credited a beneficial interest in another Global Note in an amount equal to the beneficial interest to be transferred or exchanged; and

(ii)    instructions given in accordance with the applicable procedures of DTC containing information regarding the Participant account to be credited with such increase; or

(ii)    both:

50

(i)       a written order from a Participant or an Indirect Participant given to the Depositary in accordance with the applicable procedures of DTC directing the Depositary to cause to be issued a Definitive Note in an amount equal to the beneficial interest to be transferred or exchanged; and

(ii)      instructions given by the Depositary to the Registrar containing information regarding the Person in whose name such Definitive Note shall be registered to effect the transfer or exchange referred to in (B)(i) above;

*provided* that in no event shall Definitive Notes be issued upon the transfer or exchange of beneficial interests in the Regulation S Global Note prior to the expiration of the Restricted Period.

Upon satisfaction of all of the requirements for transfer or exchange of beneficial interests in Global Notes contained in this Indenture and the Notes or otherwise applicable under the Securities Act, the Trustee shall adjust the principal amount of the relevant Global Note(s) pursuant to Section 2.06(g) hereof.

(iii)      *Transfer of Beneficial Interests to Another Restricted Global Note*. A beneficial interest in any Restricted Global Note may be transferred to a Person who takes delivery thereof in the form of a beneficial interest in another Restricted Global Note if the transfer complies with the requirements of Section 2.06(b)(ii) above and the Registrar receives the following:

(i)       if the transferee will take delivery in the form of a beneficial interest in the 144A Global Note, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (1) thereof; and

(ii)      if the transferee will take delivery in the form of a beneficial interest in the Regulation S Global Note, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (2) thereof.

(iv)      Transfer and Exchange of Beneficial Interests in a Restricted Global Note for Beneficial Interests in an Unrestricted Global Note. A beneficial interest in any Restricted Global Note may be exchanged by any holder thereof for a beneficial interest in an Unrestricted Global Note or transferred to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note if the exchange or transfer complies with the requirements of Section 2.06(b)(ii) above and:

(i)       such exchange or transfer is effected pursuant to an effective registration statement under the Securities Act, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (4) thereof; or

(ii)      the Registrar receives the following:

51

(i)      if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a beneficial interest in an Unrestricted Global Note, a certificate from such holder in the form of Exhibit C hereto, including the certifications in item (1)(a) thereof; or

(ii)      if the holder of such beneficial interest in a Restricted Global Note proposes to transfer such beneficial interest to a Person who shall take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note, a certificate from such holder in the form of Exhibit B hereto, including the certifications in item (4) thereof;

and, in each such case set forth in this subparagraph (B), if the Registrar or Issuer so requests or if the applicable procedures of DTC so require, an Opinion of Counsel in form reasonably acceptable to the Registrar or Issuer to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

If any such transfer is effected pursuant to Section 2.06(b)(iv) above at a time when an Unrestricted Global Note has not yet been issued, the Issuer shall issue and, upon receipt of an Authentication Order in accordance with Section 2.02 hereof, the Trustee shall authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the aggregate principal amount of beneficial interests transferred pursuant to subparagraph (B) above.

Beneficial interests in an Unrestricted Global Note cannot be exchanged for, or transferred to Persons who take delivery thereof in the form of, a beneficial interest in a Restricted Global Note.

(c)      Transfer or Exchange of Beneficial Interests for Definitive Notes.

(i)      *Beneficial Interests in Restricted Global Notes to Restricted Definitive Notes*. If any holder of a beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a Restricted Definitive Note or to transfer such beneficial interest to a Person who takes delivery thereof in the form of a Restricted Definitive Note, then, upon receipt by the Registrar of the following documentation:

(i)      if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a Restricted Definitive Note, a certificate from such holder in the form of Exhibit C hereto, including the certifications in item (2)(a) thereof;

(ii)      if such beneficial interest is being transferred to a QIB in accordance with Rule 144A, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (1) thereof;

(iii)      if such beneficial interest is being transferred to a Non-U.S. Person in an offshore transaction in accordance with Rule 903 or Rule 904, a certificate to

52

the effect set forth in Exhibit B hereto, including the certifications in item (2) thereof;

(iv)     if such beneficial interest is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(a) thereof;

(v)     if such beneficial interest is being transferred to an Institutional Accredited Investor in reliance on an exemption from the registration requirements of the Securities Act other than those listed in subparagraphs (B) through (D) above, a certificate to the effect set forth in Exhibit B hereto, including the certifications, certificates and Opinion of Counsel required by item (3) thereof, if applicable;

(vi)     if such beneficial interest is being transferred to the Issuer, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(b) thereof; or

(vii)     if such beneficial interest is being transferred pursuant to an effective registration statement under the Securities Act, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(c) thereof,

the Trustee shall cause the aggregate principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.06(g) hereof, and the Issuer shall execute and the Trustee upon receipt of an Authentication Order shall authenticate and deliver to the Person designated in the instructions a Definitive Note in the appropriate principal amount. Any Definitive Note issued in exchange for a beneficial interest in a Restricted Global Note pursuant to this Section 2.06(c) shall be registered in such name or names and in such authorized denomination or denominations as the holder of such beneficial interest shall instruct the Registrar through instructions from the Depositary and the Participant or Indirect Participant. The Trustee shall deliver such Definitive Notes to the Persons in whose names such Notes are so registered. Any Definitive Note issued in exchange for a beneficial interest in a Restricted Global Note pursuant to this Section 2.06(c)(i) shall bear the Private Placement Legend and shall be subject to all restrictions on transfer contained therein.

(ii)     *Beneficial Interests in Regulation S Global Note to Definitive Notes*. Notwithstanding Sections 2.06(c)(i)(A) and (C) hereof, a beneficial interest in the Regulation S Global Note may not be exchanged for a Definitive Note or transferred to a Person who takes delivery thereof in the form of a Definitive Note prior to the expiration of the Restricted Period, except in the case of a transfer pursuant to an exemption from the registration requirements of the Securities Act other than Rule 903 or Rule 904.

(iii)     *Beneficial Interests in Restricted Global Notes to Unrestricted Definitive Notes*. A holder of a beneficial interest in a Restricted Global Note may exchange such beneficial interest for an Unrestricted Definitive Note or may transfer such beneficial interest to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note only if:

(i)        such exchange or transfer is effected pursuant to an effective registration statement under the Securities Act, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (4) thereof; or

(ii)       the Registrar receives the following:

(i)        if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for an Unrestricted Definitive Note, a certificate from such holder in the form of Exhibit C hereto, including the certifications in item (1)(b) thereof; or

(ii)       if the holder of such beneficial interest in a Restricted Global Note proposes to transfer such beneficial interest to a Person who shall take delivery thereof in the form of an Unrestricted Definitive Note, a certificate from such holder in the form of Exhibit B hereto, including the certifications in item (4) thereof;

and, in each such case set forth in this subparagraph (B), if the Registrar or Issuer so requests or if the applicable procedures of DTC so require, an Opinion of Counsel in form reasonably acceptable to the Registrar or Issuer to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

(iv)       *Beneficial Interests in Unrestricted Global Notes to Unrestricted Definitive Notes*. If any holder of a beneficial interest in an Unrestricted Global Note proposes to exchange such beneficial interest for a Definitive Note or to transfer such beneficial interest to a Person who takes delivery thereof in the form of a Definitive Note, then, upon satisfaction of the conditions set forth in Section 2.06(b)(ii) hereof, the Trustee will cause the aggregate principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.06(g) hereof, and the Issuer will execute and upon receipt of an Authentication Order, the Trustee will authenticate and deliver to the Person designated in the instructions a Definitive Note in the appropriate principal amount. Any Definitive Note issued in exchange for a beneficial interest pursuant to this Section 2.06(c)(iv) will be registered in such name or names and in such authorized denomination or denominations as the holder of such beneficial interest requests through instructions to the Registrar from or through the Depositary and the Participant or Indirect Participant. The Trustee will deliver such Definitive Notes to the Persons in whose names such Notes are so registered. Any Definitive Note issued in exchange for a beneficial interest pursuant to this Section 2.06(c)(iv) will not bear the Private Placement Legend.

(d)        *Transfer and Exchange of Definitive Notes for Beneficial Interests*.

(i)        *Restricted Definitive Notes to Beneficial Interests in Restricted Global Notes*. If any Holder of a Restricted Definitive Note proposes to exchange such Note for a beneficial interest in a Restricted Global Note or to transfer such Restricted Definitive

Notes to a Person who takes delivery thereof in the form of a beneficial interest in a Restricted Global Note, then, upon receipt by the Registrar of the following documentation:

(i)      if the Holder of such Restricted Definitive Note proposes to exchange such Note for a beneficial interest in a Restricted Global Note, a certificate from such Holder in the form of Exhibit C hereto, including the certifications in item (2)(b) thereof;

(ii)      if such Restricted Definitive Note is being transferred to a QIB in accordance with Rule 144A, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (1) thereof;

(iii)      if such Restricted Definitive Note is being transferred to a Non-U.S. Person in an offshore transaction in accordance with Rule 903 or Rule 904, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (2) thereof;

(iv)      if such Restricted Definitive Note is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(a) thereof;

(v)      if such Restricted Definitive Note is being transferred to the Issuer, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(b) thereof; or

(vi)      if such Restricted Definitive Note is being transferred pursuant to an effective registration statement under the Securities Act, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(c) thereof, the Trustee will cancel the Restricted Definitive Note, increase or cause to be increased the aggregate principal amount of, in the case of clause (A) above, the appropriate Restricted Global Note, in the case of clause (B) above, the 144A Global Note, or in the case of clause (C) above, the Regulation S Global Note.

(ii)      *Restricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes*. A Holder of a Restricted Definitive Note may exchange such Note for a beneficial interest in an Unrestricted Global Note or transfer such Restricted Definitive Note to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note only if the Registrar receives the following:

(i)      such an exchange or transfer is effected pursuant to an effective registration statement under the Securities Act, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (4) thereof; or

(ii)      if the Holder of such Definitive Notes proposes to exchange such Notes for a beneficial interest in the Unrestricted Global Note, a certificate from such Holder in the form of Exhibit C hereto, including the certifications in item (1)(c) thereof; or

(iii)    if the Holder of such Definitive Notes proposes to transfer such Notes to a Person who shall take delivery thereof in the form of a beneficial interest in the Unrestricted Global Note, a certificate from such Holder in the form of Exhibit B hereto, including the certifications in item (4) thereof;

and, in each such case set forth in this Section 2.06(d)(ii), if the Registrar or Issuer so requests or if the applicable procedures of DTC so require, an Opinion of Counsel in form reasonably acceptable to the Registrar or Issuer to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

Upon satisfaction of the conditions of any of the subparagraphs in this Section 2.06(d)(ii), the Trustee will cancel the Definitive Notes and increase or cause to be increased the aggregate principal amount of the Unrestricted Global Note.

(iii)    *Unrestricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes*. A Holder of an Unrestricted Definitive Note may exchange such Note for a beneficial interest in an Unrestricted Global Note or transfer such Definitive Notes to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note at any time. Upon receipt of a request for such an exchange or transfer, the Trustee will cancel the applicable Unrestricted Definitive Note and increase or cause to be increased the aggregate principal amount of one of the Unrestricted Global Notes.

If any such exchange or transfer from a Definitive Note to a beneficial interest is effected pursuant to subparagraphs (ii) or (iii) above at a time when an Unrestricted Global Note has not yet been issued, the Issuer will issue and, upon receipt of an Authentication Order in accordance with Section 2.02 hereof, the Trustee will authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the principal amount of Definitive Notes so transferred.

(e)    *Transfer and Exchange of Definitive Notes for Definitive Notes.* Upon request by a Holder of Definitive Notes and such Holder's compliance with the provisions of this Section 2.06(e), the Registrar will register the transfer or exchange of Definitive Notes. Prior to such registration of transfer or exchange, the requesting Holder must present or surrender to the Registrar the Definitive Notes duly endorsed or accompanied by a written instruction of transfer in form satisfactory to the Registrar duly executed by such Holder or by its attorney, duly authorized in writing. In addition, the requesting Holder must provide any additional certifications, documents and information, as applicable, required pursuant to the following provisions of this Section 2.06(e).

(i)    *Restricted Definitive Notes to Restricted Definitive Notes*. Any Restricted Definitive Note may be transferred to and registered in the name of Persons who take delivery thereof in the form of a Restricted Definitive Note if the Registrar receives the following:

56

(i)        if the transfer will be made pursuant to Rule 144A, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (1) thereof;

(ii)        if the transfer will be made pursuant to Rule 903 or Rule 904, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (2) thereof; and

(iii)        if the transfer will be made pursuant to any other exemption from the registration requirements of the Securities Act, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications, certificates and Opinion of Counsel required by item (3) thereof, if applicable.

(ii)        *Restricted Definitive Notes to Unrestricted Definitive Notes*. Any Restricted Definitive Note may be exchanged by the Holder thereof for an Unrestricted Definitive Note or transferred to a Person or Persons who take delivery thereof in the form of an Unrestricted Definitive Note if the Registrar receives the following:

(i)        such an exchange or transfer is effected pursuant to an effective registration statement under the Securities Act, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (4) thereof; or

(ii)        if the Holder of such Restricted Definitive Notes proposes to exchange such Notes for an Unrestricted Definitive Note, a certificate from such Holder in the form of Exhibit C hereto, including the certifications in item (1)(d) thereof; or

(iii)        if the Holder of such Restricted Definitive Notes proposes to transfer such Notes to a Person who shall take delivery thereof in the form of an Unrestricted Definitive Note, a certificate from such Holder in the form of Exhibit B hereto, including the certifications in item (4) thereof;

and, in each such case set forth in this Section 2.06(e)(ii), if the Registrar or Issuer so requests, an Opinion of Counsel in form reasonably acceptable to the Registrar or Issuer to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

(iii)        *Unrestricted Definitive Notes to Unrestricted Definitive Notes*. A Holder of Unrestricted Definitive Notes may transfer such Notes to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note. Upon receipt of a request to register such a transfer, the Registrar shall register the Unrestricted Definitive Notes pursuant to the instructions from the Holder thereof.

(f)        *Legends.* The following legends will appear on the face of all Global Notes and Definitive Notes issued under this Indenture unless specifically stated otherwise in the applicable provisions of this Indenture.

(i)        Private Placement Legend.

(i)        Except as permitted by subparagraph (B) below, each Global Note and each Definitive Note (and all Notes issued in exchange therefor or substitution thereof) shall bear the legend in substantially the following form:

"THE NOTES AND THE NOTE GUARANTEES EVIDENCED HEREBY HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT (A) (1) TO A PERSON WHO THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, (2) IN AN OFFSHORE TRANSACTION COMPLYING WITH RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURITIES ACT, (3) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT (IF AVAILABLE) OR (4) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND (B) IN ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF THE STATES OF THE UNITED STATES AND OTHER JURISDICTIONS. AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTION" AND "UNITED STATES" HAVE THE MEANING GIVEN TO THEM BY REGULATION S UNDER THE SECURITIES ACT.

THE FOREGOING LEGEND WILL ONLY BE REMOVED AT THE OPTION OF THE ISSUER."

(ii)        Notwithstanding the foregoing, any Global Note or Definitive Note issued pursuant to subparagraphs (b)(iv), (c)(iii), (c)(iv), (d)(ii), (d)(iii), (e)(ii) or (e)(3)(iii) of this Section 2.06 (and all Notes issued in exchange therefor or substitution thereof) will not bear the Private Placement Legend.

(ii)        *Global Note Legend*. Each Global Note will bear a legend in substantially the following form:

"THIS GLOBAL NOTE IS HELD BY THE DEPOSITARY (AS DEFINED IN THE INDENTURE GOVERNING THIS NOTE) OR ITS NOMINEE IN CUSTODY FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT TRANSFERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT THAT (1) THE TRUSTEE MAY MAKE SUCH NOTATIONS HEREON AS MAY BE REQUIRED PURSUANT TO SECTION 2.06 OF THE INDENTURE, (2) THIS GLOBAL NOTE MAY BE EXCHANGED IN WHOLE BUT NOT IN PART PURSUANT TO SECTION 2.06(a) OF THE INDENTURE, (3) THIS GLOBAL NOTE MAY BE DELIVERED TO THE TRUSTEE FOR CANCELLATION PURSUANT TO SECTION 2.11 OF THE INDENTURE AND (4) THIS GLOBAL NOTE MAY BE TRANSFERRED TO A SUCCESSOR DEPOSITARY WITH THE PRIOR WRITTEN CONSENT OF THE ISSUER.

UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR NOTES IN DEFINITIVE FORM, THIS NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY. UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY (55 WATER STREET, NEW YORK, NEW YORK) ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN."

       (iii)    *Regulation S Global Note Legend*. Each Regulation S Global Note will bear a legend in substantially the following form:

"THE NOTES AND THE NOTE GUARANTEES EVIDENCED HEREBY HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION AND IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY OTHER APPLICABLE JURISDICTION. THE FOREGOING LEGEND MAY BE REMOVED FROM THIS NOTE AFTER 40 DAYS BEGINNING ON AND INCLUDING THE LATER OF (A) THE DATE ON WHICH THE NOTES ARE OFFERED TO PERSONS OTHER THAN DISTRIBUTORS (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) AND (B) THE ORIGINAL ISSUE DATE OF THE NOTES."

       (g)    *Cancellation and/or Adjustment of Global Notes.* At such time as all beneficial interests in a particular Global Note have been exchanged for Definitive Notes or a particular Global Note has been redeemed, repurchased or cancelled in whole and not in part, each such Global Note will be returned to or retained and cancelled by the Trustee in accordance with Section 2.11 hereof. At any time prior to such cancellation, if any beneficial interest in a Global Note is exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note or for Definitive Notes, the principal amount of Notes represented by such Global Note will be reduced accordingly and an endorsement will be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such reduction; and if the beneficial interest is being exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note, such other Global Note will be increased accordingly and an endorsement will be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such increase.

(h)      *General Provisions Relating to Transfers and Exchanges.*

(i)      To permit registrations of transfers and exchanges, the Issuer will execute and the Trustee will authenticate Global Notes and Definitive Notes upon receipt of an Authentication Order in accordance with Section 2.02 hereof or at the Registrar's request.

(ii)      No service charge will be made to a Holder of a beneficial interest in a Global Note or to a Holder of a Definitive Note for any registration of transfer or exchange, but the Issuer may require payment of a sum sufficient to cover any transfer Tax or similar governmental charge payable in connection therewith (other than any such transfer Taxes or similar governmental charge payable upon exchange or transfer pursuant to Sections 2.10, 3.06, 4.14, 4.18 and 9.05 hereof).

(iii)      The Registrar will not be required to register the transfer of or exchange of any Note selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part.

(iv)      All Global Notes and Definitive Notes issued upon any registration of transfer or exchange of Global Notes or Definitive Notes will be the valid obligations of the Issuer, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Global Notes or Definitive Notes surrendered upon such registration of transfer or exchange.

(v)      Neither the Registrar nor the Issuer will be required:

(i)      to issue, to register the transfer of or to exchange any Notes during a period beginning at the opening of business fifteen (15) days before the mailing of a notice of redemption with respect to any Notes which are to be redeemed under Section 3.02 hereof and ending at the close of business on the day of selection;

(ii)      to register the transfer of or to exchange any Note selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part; or

(iii)      to register the transfer of or to exchange a Note between a record date and the next succeeding interest payment date.

(vi)      Prior to due presentment for the registration of a transfer of any Note, the Trustee, any Agent and the Issuer may deem and treat the Person in whose name any Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal of and interest on such Notes and for all other purposes, and none of the Trustee, any Agent or the Issuer shall be affected by notice to the contrary.

(vii)      The Trustee will authenticate Global Notes and Definitive Notes in accordance with the provisions of Section 2.02 hereof.

(viii)      All certifications, certificates and Opinions of Counsel required to be submitted to the Registrar pursuant to this Section 2.06 to effect a registration of transfer

60

or exchange may be submitted electronically (except as otherwise requested by the Registrar).

None of the Trustee or Agents shall have any responsibility or obligation to any beneficial owner of an interest in a Global Note, any agent member or other member of, or a participant in, DTC or other person with respect to the accuracy of the records of DTC or any nominee or participant or member thereof, with respect to any ownership interest in the Notes or with respect to the delivery to any agent member or other participant, member, beneficial owner or other person (other than DTC) of any notice or the payment of any amount or delivery of any Notes (or other security or property) under or with respect to such Notes. All notices and communications to be given to the Holders and all payments to be made to Holders in respect of the Notes shall be given or made only to or upon the order of the registered Holders (which shall be DTC or its nominee in the case of a Global Note). The rights of beneficial owners in any Global Note shall be exercised only through DTC, subject to its applicable rules and procedures. The Trustee and Agents may rely and shall be fully protected in relying upon information furnished by DTC with respect to its agent members and other members, participants and any beneficial owners.

Neither the Trustee nor the Agents shall have any obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Indenture or under Applicable Law with respect to any transfer of any interest in any Note (including any transfers between or among Participants or Indirect Participants in any Global Note) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by, the terms of this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

Section 2.07.   Replacement Notes.

If any mutilated Note is surrendered to the Trustee or the Issuer and the Trustee receives evidence to its satisfaction of the destruction, loss or theft of any Note, the Issuer will issue and the Trustee, upon receipt of an Authentication Order, will authenticate a replacement Note if the Trustee's requirements are met. An indemnity bond must be supplied by the Holder that is sufficient in the judgment of (i) the Trustee to protect the Trustee and (ii) the Issuer to protect the Issuer, the Trustee, any Agent and any authenticating agent, from any loss that any of them may suffer if a Note is replaced. The Issuer may charge for its expenses (including the Trustee's expenses) in replacing a Note.

Every replacement Note is an additional obligation of the Issuer and will be entitled to all of the benefits of this Indenture equally and proportionately with all other Notes duly issued hereunder.

Section 2.08.   Outstanding Notes.

The Notes outstanding at any time are all the Notes authenticated by the Trustee except for those cancelled by it, those delivered to it for cancellation, those reductions in the interest in a Global Note effected by the Trustee in accordance with the provisions hereof, and those described in this Section 2.08 as not outstanding. Except as set forth in Section 2.09 hereof, a Note does not cease to be outstanding because the Issuer or an Affiliate of the Issuer holds the Note; however,

Notes held by the Issuer or an Affiliate of the Issuer shall not be deemed to be outstanding for purposes of Section 3.07(a) hereof.

If a Note is replaced pursuant to Section 2.07 hereof, it ceases to be outstanding unless the Trustee receives proof satisfactory to it that the replaced Note is held by a protected purchaser.

If the principal amount of any Note is considered paid under Section 4.01 hereof, it ceases to be outstanding and interest on it ceases to accrue.

If the Paying Agent (other than the Issuer or an Affiliate of any thereof) holds, on a redemption date or maturity date, money sufficient to pay Notes payable on that date, then on and after that date such Notes will be deemed to be no longer outstanding and will cease to accrue interest.

Section 2.09.   Treasury Notes.

In determining whether the Holders of the required principal amount of Notes have concurred in any direction, waiver or consent, Notes owned by the Issuer or a Guarantor, or by any of their respective Affiliates, will be considered as though not outstanding, except that for the purposes of determining whether the Trustee will be protected in conclusively relying on any such direction, waiver or consent, only Notes that a Responsible Officer of the Trustee actually knows are so owned will be so disregarded.

Section 2.10.   Temporary Notes.

Until certificates representing Notes are ready for delivery, the Issuer may prepare and the Trustee, upon receipt of an Authentication Order, will authenticate temporary Notes. Temporary Notes will be substantially in the form of certificated Notes but may have variations that the Issuer considers appropriate for temporary Notes and as may be reasonably acceptable to the Trustee. Without unreasonable delay, the Issuer will prepare and the Trustee will authenticate definitive Notes in exchange for temporary Notes.

Holders of temporary Notes will be entitled to all of the benefits of this Indenture.

Section 2.11.   Cancellation.

The Issuer at any time may deliver Notes to the Trustee for cancellation. The Registrar and Paying Agent will forward to the Trustee any Notes surrendered to them for registration of transfer, exchange or payment. The Trustee and no one else will cancel all Notes surrendered for registration of transfer, exchange, payment, replacement or cancellation and will dispose of cancelled Notes (subject to the record retention requirement of the Exchange Act or the Trustee) in accordance with its customary procedures. Evidence of the disposal or cancellation of all cancelled Notes will be delivered to the Issuer upon written request. The Issuer may not issue new Notes to replace Notes that it has paid or that have been delivered to the Trustee for cancellation.

Section 2.12.   Defaulted Interest.

If the Issuer defaults in a payment of interest on the Notes, it will pay the defaulted interest in any lawful manner at a rate equal to the then-prevailing rate for cash interest payments plus 200 basis points (2.00%) *per annum* (the "*Default Interest*"), to the Persons who are Holders on a subsequent special record date, in each case at the rate provided in the Notes and in Section 4.01 hereof. The Default Interest will be payable only in cash (and there will be no PIK Option). The Issuer will notify the Trustee in writing of the amount of defaulted interest proposed to be paid on each Note and the date of the proposed payment. The Issuer will fix or cause to be fixed each such special record date and payment date; *provided* that no such special record date may be less than ten (10) days prior to the related payment date for such defaulted interest. At least fifteen (15) days before the special record date, the Issuer (or, upon the written request of the Issuer, the Trustee in the name and at the expense of the Issuer) will mail or cause to be mailed to Holders a notice that states the special record date, the related payment date and the amount of such interest to be paid. Notwithstanding the foregoing, any interest which is paid prior to the expiration of the five (5) Business Day period set forth in Section 6.01(i) shall be paid to Holders as of the record date for the Interest Payment Date for which interest has not been paid.

Section 2.13.   CUSIP Numbers

The Issuer in issuing the Notes may use "CUSIP" numbers (if then generally in use), and, if so, the Trustee shall use "CUSIP" numbers in notices of redemption as a convenience to Holders; *provided* that the Trustee shall have no liability for any defect in the "CUSIP" numbers as they appear on the any Note, notice or elsewhere, and, *provided* further that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Notes or as contained in any notice of a redemption and that reliance may be placed only on the other identification numbers printed on the Notes, and any such redemption shall not be affected by any defect in or omission of such numbers. The Issuer will promptly notify the Trustee in writing of any change in the "CUSIP" numbers.

ARTICLE 3
REDEMPTION AND PREPAYMENT

Section 3.01.   Notices to Trustee.

If the Issuer elects to redeem Notes pursuant to the optional redemption provisions of Section 3.07 hereof, it must furnish to the Trustee, at least thirty (30) days but not more than sixty (60) days before a redemption date, a Certificate of a Responsible Officer setting forth:

(i)      the clause of this Indenture pursuant to which the redemption shall occur;

(ii)     the redemption date;

(iii)    the Series of Notes to be redeemed;

(iv)     the principal amount of Notes to be redeemed; and

(v)      the redemption price.

Section 3.02.   <u>Selection of Notes to Be Redeemed or Purchased</u>.

If less than all of a Series of Notes are to be redeemed or purchased in an offer to purchase at any time, the Trustee will select Notes of such Series for redemption or purchase on a *pro rata* basis (or, in the case of Global Notes, in accordance with the procedures of the Depositary), unless otherwise required by Applicable Law, applicable stock exchange requirements or unless otherwise provided for herein, and subject to restrictions on transfer applicable to debt instruments issued pursuant to exemptions under Rule 144A and Regulation S under the Securities Act.

In the event of partial redemption, the particular Notes of a Series to be redeemed or purchased will be selected, unless otherwise provided herein, not less than thirty (30) nor more than sixty (60) days prior to the redemption or Purchase Date by the Trustee from the outstanding Notes of such Series not previously called for redemption or purchase.

The Trustee will promptly notify the Issuer in writing of the Notes selected for redemption or purchase and, in the case of any Note selected for partial redemption or purchase, the principal amount thereof to be redeemed or purchased. Notes and portions of Notes selected will be in amounts of $1,000 and whole multiples of $1.00 in excess thereof; *provided* that if all of the Notes of a Holder are to be redeemed or purchased, the entire outstanding amount of Notes held by such Holder, even if not a multiple of $1.00, shall be redeemed or purchased. No Notes will be redeemed in part if such partial redemption results in Notes with less than $1.00. Except as provided in the preceding sentence, provisions of this Indenture that apply to Notes called for redemption or purchase also apply to portions of Notes called for redemption or purchase.

Section 3.03.   <u>Notice of Redemption or Offer to Purchase</u>.

At least thirty (30) days but not more than sixty (60) days before a redemption date, the Issuer will mail or cause to be mailed, by first class mail, postage prepaid, a notice of redemption to each Holder whose Notes are to be redeemed at its registered address (with a copy to the Trsutee).

The notice will identify the Notes (including CUSIP numbers) of a Series or both Series of Notes to be redeemed and will state:

> (i)      the redemption date;

> (ii)     the redemption price;

> (iii)    if any Note is being redeemed in part, the portion of the principal amount of such Note to be redeemed although no Note of $200,000 in principal amount or less will be redeemed in part, and that, after the redemption date upon surrender of such Note, a new Note or Notes in principal amount equal to the unredeemed portion will be issued upon cancellation of the original Note;

> (iv)     the name and address of the Paying Agent;

> (v)      that Notes called for redemption must be surrendered to the Paying Agent to collect the redemption price;

64

(vi)     that, unless the Issuer defaults in making such redemption payment, interest on Notes called for redemption ceases to accrue on and after the redemption date;

(vii)     the paragraph of the Notes and/or Section of this Indenture pursuant to which the Notes called for redemption are being redeemed; and

(viii)     that no representation is made as to the correctness or accuracy of the CUSIP number, if any, listed in such notice or printed on the Notes.

At the Issuer's request, the Trustee will give the notice of redemption in the Issuer's name and at its expense; *provided, however*, that the Issuer has delivered to the Trustee, at least ten (10) days prior to the date the notice needs to be sent, a Certificate of a Responsible Officer requesting that the Trustee give such notice and setting forth the information to be stated in such notice as provided in the preceding paragraph.

For Notes which are represented by global certificates held on behalf of DTC, Euroclear or Clearstream, notices may be given by delivery of the relevant notices to DTC, Euroclear or Clearstream for communication to entitled account holders in substitution for the aforesaid mailing.

An Offer to Purchase shall be made by the Issuer by mailing (or otherwise communicating in accordance with the applicable procedures of DTC) the notice required pursuant to the terms of this Indenture, with a copy to the Trustee. The Offer to Purchase will remain open for a period of twenty (20) Business Days following its commencement, except to the extent that a longer period is required by Applicable Law (the "*Offer Period*"). No later than five (5) Business Days after the termination of the Offer Period (the "*Purchase Date*"), the Issuer or applicable Guarantor will apply all Proceeds to the purchase of the aggregate principal amount of Notes required to be offered for purchase pursuant to this Indenture (the "*Offer Amount*") or, if less than the Offer Amount has been so validly tendered, all Notes validly tendered in response to the Offer to Purchase. Payment for any Notes so purchased will be made in the same manner as interest payments are made.

Section 3.04.   Effect of Notice of Redemption.

Once notice of redemption is mailed in accordance with Section 3.03 hereof, Notes called for redemption become irrevocably due and payable on the redemption date at the redemption price. A notice of redemption may not be conditional.

Section 3.05.   Deposit of Redemption or Purchase Price.

One (1) Business Day prior to the redemption or Purchase Date, the Issuer will deposit with the Trustee or with the Paying Agent money sufficient to pay the redemption or purchase price of all Notes to be redeemed or purchased on that date together with accrued and unpaid interest (including accrued and unpaid PIK Interest) and additional amounts, if any, thereon, to, but excluding, the applicable redemption or Purchase Date. The Trustee or the Paying Agent will promptly return to the Issuer any money deposited with the Trustee or the Paying Agent by the Issuer in excess of the amounts necessary to pay the redemption or purchase price of all Notes to be redeemed or purchased on that date together with accrued and unpaid interest (including accrued

and unpaid PIK Interest) and Additional Amounts, if any, thereon, to, but excluding, the applicable redemption or Purchase Date.

If the Issuer complies with the provisions of the preceding paragraph, on and after the redemption or Purchase Date, interest will cease to accrue on the Notes or the portions of Notes called for redemption or purchase. If a Note is redeemed or purchased on or after an interest record date but on or prior to the related interest payment date, then any accrued and unpaid interest (including accrued and unpaid PIK Interest) shall be paid to the Person in whose name such Note was registered at the close of business on such record date. If any Note called for redemption or purchase is not so paid upon surrender for redemption or purchase because of the failure of the Issuer to comply with the preceding paragraph, interest shall be paid on the unpaid principal, from the redemption or Purchase Date until such principal is paid, and to the extent lawful on any interest not paid on such unpaid principal.

Section 3.06.    Notes Redeemed or Purchased in Part.

Upon surrender of a Note that is redeemed or purchased in part, the Issuer will issue and, upon receipt of an Authentication Order, the Trustee will authenticate for the Holder at the expense of the Issuer a new Note equal in principal amount to the unredeemed or unpurchased portion of the Note surrendered.

Section 3.07.    Optional Redemption.

(a)      Redemptions of Take-back SSNs. At any time and from time to time (unless there is a Default or Event of Default that has occurred and is continuing, in which case no such redemptions shall be permitted), the Issuer will have the right, at its option, to redeem any of the Take-back SSNs at a redemption price equal to 100.0% of the principal amount of such Take-Back SSNs being redeemed *plus* Additional Amounts and accrued and unpaid interest (including accrued and unpaid PIK Interest), if any, on the principal amount of such Take-Back SSNs to, but excluding, the date of redemption.

(b)      Redemptions of Super Priority Notes. At any time and from time to time (unless there is a Default or Event of Default that has occurred and is continuing, in which case no such redemptions shall be permitted) on or after December 31, 2025, the Issuer may redeem the Super Priority Notes, at its option, at a price equal to 103.0% of the principal amount of such Super Priority Notes being redeemed *plus* Additional Amounts and accrued and unpaid interest (including accrued and unpaid PIK Interest), if any, on the principal amount of such Super Priority Notes to, but excluding, the date of redemption.

(c)      Any redemption pursuant to this Section 3.07 shall be made in accordance with the provisions of Sections 3.01 through 3.06 hereof.

(d)      The Trustee will have no obligation to calculate or verify any calculation of the redemption price.

Section 3.08.    <u>Offers to Purchase</u>.

(a)    If the Purchase Date is on or after an applicable interest record date and on or before the related Interest Payment Date, any accrued and unpaid interest (including accrued and unpaid PIK Interest) to the Purchase Date and Additional Amounts, if any, will be paid on the Purchase Date to the Person in whose name a Note is registered at the close of business on such record date.

(b)    On or before the Purchase Date, the Issuer will, to the extent lawful, accept for payment, on a pro rata basis to the extent necessary, the Offer Amount of Notes and Senior Secured Obligations or portions thereof validly tendered and not properly withdrawn pursuant to the Offer to Purchase, or, if less than the principal amount sought has been validly tendered and not properly withdrawn, all Notes and Senior Secured Obligations so tendered, in the case of the Notes in integral multiples of $1,000; provided that if, following repurchase of a portion of a Note, the remaining principal amount of such Note outstanding immediately after such repurchase would be less than $200,000, then the portion of such Note so repurchased shall be reduced so that the remaining principal amount of such Note outstanding immediately after such repurchase is $200,000. If the aggregate principal amount of Notes and Senior Secured Obligations validly tendered and not properly withdrawn pursuant to an Offer to Purchase exceeds the amount of Proceeds, the Issuer shall select the Notes and such Senior Secured Obligations to be purchased on a pro rata basis on the basis of the aggregate accreted value or principal amount of tendered Notes and Senior Secured Obligations, *provided* that the selection of such Senior Secured Obligations shall be made pursuant to the terms of such Senior Secured Obligations.

(c)    The Issuer will deliver, or cause to be delivered, to the Trustee the Notes so accepted and a certificate of a Responsible Officer stating the aggregate principal amount of Notes so accepted and that such Notes were accepted for payment by the Issuer in accordance with the terms of this Indenture. In addition, the Issuer will deliver all certificates and instruments required, if any, by the agreements governing the Senior Secured Obligations. The Paying Agent or the Issuer, as the case may be, will promptly, but in no event later than five (5) Business Days after termination of the Offer Period, mail (or otherwise deliver in accordance with the applicable procedures of DTC) to each tendering Holder or lender of Senior Secured Obligations, as the case may be, an amount equal to the purchase price of the Notes or Senior Secured Obligations so validly tendered and not properly withdrawn by such holder or lender, as the case may be, and accepted by the Issuer for purchase, and the Issuer will promptly issue a new Note, and the Trustee, upon delivery of an Authentication Order from the Issuer, will authenticate and mail (or otherwise deliver in accordance with the applicable procedures of DTC) (or cause to be transferred by book entry) such new Note to such holder (it being understood that, notwithstanding anything in this Indenture to the contrary, no Opinion of Counsel or certificate of a Responsible Officer will be required for the Trustee to authenticate and mail or deliver such new Note) in a principal amount equal to any unpurchased portion of the Note surrendered; provided that each such new Note will be in a principal amount of US$200,000 or an integral multiple of US$1,000 in excess thereof. In addition, the Issuer will take any and all other actions required by the agreements governing the Senior Secured Obligations. Any Note not so accepted will be promptly mailed or delivered by the Issuer to the holder thereof.

(d)    Notwithstanding the foregoing, in connection with any "Offer to Purchase" under this section at a price equal to (i) 100% of the principal amount thereof plus accrued and unpaid

interest (including accrued and unpaid PIK Interest) and Additional Amounts, if any, to, but excluding, the applicable Purchase Date in the case of the Take-Back SSNs and (ii) 103% of the principal amount thereof plus accrued and unpaid interest (including accrued and unpaid PIK Interest) and Additional Amounts, if any, to, but excluding, the applicable Purchase Date, in the case of the Super Priority Notes, if Holders of not less than 90% in aggregate principal amount of the outstanding Notes validly tender and do not withdraw such Notes in such tender offer and the Issuer, or any third party making such tender offer in lieu of the Issuer, purchases all of the Notes validly tendered and not withdrawn by such Holders, the Issuer or such third party will have the right, upon not less than thirty (30) nor more than ninety (90) days' prior notice, given not more than thirty (30) days following such purchase date, to redeem all Notes that remain outstanding following such purchase at a price equal to the price offered to each other Holder in such tender offer plus, to the extent not included in the tender offer payment, accrued and unpaid interest (including accrued and unpaid PIK Interest) to but excluding the date of redemption.

(e)    The Issuer will comply with Rule 14e-1 under the Exchange Act (to the extent applicable) and all other Applicable Laws in making any Offer to Purchase, and the above procedures will be deemed modified as necessary to permit such compliance. To the extent that the provisions of any Applicable Laws or regulations conflict with provisions of this covenant, the Issuer will comply with the Applicable Laws and regulations and will not be deemed to have breached its obligations under this covenant by virtue of its compliance with such Applicable Laws or regulations.

(f)    The Issuer and the Guarantors shall additionally obtain all necessary consents and approvals from any Governmental Authority for any required remittance of funds outside of any jurisdiction in connection with any Offer to Purchase.

(g)    Offers to Purchase may not be conditional, *provided*, *however*, that an Offer to Purchase made in connection with a Change of Control may be made in advance of a Change of Control and conditioned upon the consummation of such Change of Control, if a definitive agreement is in place for the Change of Control at the time the Offer to Purchase is made.

(h)    Notwithstanding anything herein to the contrary, the Issuer shall not be required to make an Offer to Purchase pursuant to the terms of this Indenture if (i) a third party makes an offer to purchase Notes in the manner, at the times and otherwise in compliance with the requirements set forth in this Indenture applicable to an Offer to Purchase made by the Issuer and such third party purchases all Notes properly tendered and not withdrawn by the Holders thereof under such offer to purchase or (ii) if notice of redemption for all outstanding Notes has been given pursuant to Section 3.03 hereof, unless and until there is a Default in payment of the applicable redemption price.

(i)    In the case of an Offer to Purchase following a Change of Control, the Issuer will ensure that it retains sufficient financial resources following such Change of Control to make the required repurchase of the Notes or will allocate the necessary funds received from the purchaser in connection with the relevant transaction.

(j)    The Issuer will not engage in any repurchase of notes, except in the case of an Offer to Purchase following a Change of Control.

Section 3.09.   Cash Sweep Mandatory Redemption

(a)      Thirty (30) days following each Cash Sweep Calculation Date, the Issuer will redeem Notes at a redemption price equal to 100% of the outstanding principal amount of the Notes being redeemed, plus accrued and unpaid interest (including accrued and unpaid PIK Interest) to the redemption date (provided that, for the avoidance of doubt, PIK Payments shall be considered principal for all purposes), plus Additional Amounts, if any (but without payment of any "make-whole" premium) in an amount equal to the lesser of: (i) 100% of Excess Cash (if any) and (ii) the total outstanding principal of the Notes as of such Interest Payment Date (calculated after accounting for any principal payments made or any PIK Payments made as of  such Interest Payment Date) (the "*Cash Sweep Mandatory Redemption*").

(b)      Cash Sweep Mandatory Redemptions will be applied in a manner such that the entire amount of Cash Sweep Payment will be sufficient to make the maximum principal payment plus accrued interest and additional amounts thereon, in the following order of priority (i) *first*, *pro rata* among Holders of Super Priority Notes, and (ii) *second*, *pro rata* among Holders of Take-back SSNs.  The Issuer shall deliver a Certificate of a Responsible Officer to the Trustee evidencing the calculation of the Cash Balance and the Cash Sweep Payment and any allocation of Cash Sweep Payments pursuant to this Section 3.09.

(c)      Notwithstanding the foregoing, if, for any Cash Sweep Calculation Date, the Issuer obtained any proceeds from new financings or sales of PEC I Receivables closed in the period from the immediately preceding Cash Sweep Calculation Date until the present Cash Sweep Calculation Date (or, if there was no immediately preceding Cash Sweep Calculation Date, the Issue Date), the redemption price to redeem any Super Priority Notes will be equal to 103% of the outstanding principal amount of the Super Priority Notes being redeemed, plus accrued and unpaid interest (including accrued and unpaid PIK Interest) to the redemption date, plus Additional Amounts, if any, up to an amount equivalent to the total amount of new proceeds obtained by the Issuer from such financings and/or PEC I Receivables sales. For the avoidance of doubt, proceeds of PEC II Receivables or Future PEC Receivables shall not be subject to this premium.

(d)      Any redemption pursuant to this Section 3.09 shall be made in accordance with the provisions of Sections 3.01 through 3.06 hereof.


ARTICLE 4
COVENANTS

Section 4.01.   Payment of Notes.

The Issuer will pay or cause to be paid the principal of, premium, if any, and interest on, the Notes on the dates and in the manner provided in the Notes. Principal, premium, if any, and interest will be considered paid on the date due if the Paying Agent, if other than the Issuer, holds as of noon Eastern Time on the Business Day before the due date money deposited by the Issuer in immediately available funds and designated for and sufficient to pay all principal, premium, if any, and interest then due.

69

The Issuer will pay interest (including post petition interest in any proceeding under any Bankruptcy Law) on overdue payments on the Notes.

Section 4.02.   <u>Maintenance of Office or Agency</u>.

The Issuer will maintain an office or agency (which may be an office of the Trustee or an Affiliate of the Trustee, Registrar or co-registrar) where Notes may be surrendered for registration of transfer or for exchange and where notices and demands to or upon the Issuer in respect of the Notes and this Indenture may be served. The Issuer will give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency. If at any time the Issuer fails to maintain any such required office or agency or fails to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office of the Trustee; provided, however, that the Trustee shall not be deemed an agent of the Issuer for service of legal process.

The Issuer may also from time to time designate one or more other offices or agencies where the Notes may be presented or surrendered for any or all such purposes and may from time to time rescind such designations. The Issuer will give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

The Issuer hereby designates the Corporate Trust Office of the Trustee as one such office or agency of the Issuer in accordance with Section 2.03 hereof.

Section 4.03.   <u>Reports</u>.

(a)    So long as any Notes are outstanding, the Issuer will furnish to the Holders and the Trustee:

(i)    as soon as available and in any event within sixty (60) days after the end of the first three fiscal quarters of each fiscal year of the Issuer, a copy of the complete unaudited, condensed consolidated statements of income, retained earnings and cash flow of the Issuer and the Guarantors, and the related unaudited, consolidated balance sheet of the Issuer and the Guarantors as at the end of such period, setting forth in each case in comparative form the corresponding figures for the corresponding period in the preceding fiscal year, if any, prepared in accordance with IFRS and presented in the English language, accompanied by a Certificate of a Responsible Officer of the Issuer, which certificate shall state that said financial statements fairly present the financial condition and results of operations of the Issuer and the Guarantors in accordance with IFRS, consistently applied, as at the end of, and for, such periods (subject to normal year-end audit adjustments);

(ii)    as soon as available and in any event within one-hundred and twenty (120) days after the end of each fiscal year of the Issuer, a copy of the complete audited, consolidated statements of income, retained earnings and cash flow of the Issuer and the Guarantors, and the related audited, consolidated balance sheet of the Issuer and the Guarantors as at the end of such year prepared in accordance with IFRS and any related audit letter, setting forth in each case in comparative form the corresponding figures for the preceding fiscal year, and accompanied by an opinion thereon of a firm of independent

70

certified public accountants of recognized international standing prepared in accordance with IFRS and presented in the English language;

(iii)    at the time it furnishes each set of financial statements as described in Section 4.03(a)(ii) above, a Certificate of a Responsible Officer of the Issuer stating that: (i) to the best of such person's knowledge, no Default has occurred and is continuing (or, if any Default has occurred and is continuing, describing the same in reasonable detail and describing what action the Issuer has taken and proposes to take with respect thereto) and; (ii) there has been no notice, demand or other communication given or received by the Issuer (A) pursuant to or relating to any of the Transaction Documents (including all requests for amendments or waivers) or pursuant to or relating to any Governmental Approval or (B) to or from any Governmental Authority relating in any way to the Projects; in each case identifying matters which would reasonably be expected to result in a Material Adverse Effect, or except as detailed in such certificate;

(iv)    promptly after any officer or director of the Issuer or any Guarantor knows that any Default or any material default by any Project Party under any Material Project Document has occurred, a written notice of such event describing the same in detail and, together with such notice, a description of what action if the Issuer or any such Guarantor or, if known by the Issuer or such Guarantor, such Project Party has taken and/or proposes to take with respect thereto;

(v)    not fewer than thirty (30) days before the commencement of each fiscal year following the Issue Date, an Annual Budget in respect of the immediately succeeding fiscal year together with a certificate of a Responsible Officer certifying that such Annual Budget complies with the definition of "Annual Budget" herein; *provided, however*, that the failure by the Issuer and the Guarantors to comply with the limits included in the Annual Budget in respect of such fiscal year shall not constitute a Default or an Event of Default; and

(vi)    not fewer than thirty (30) days after the end of (i) each fiscal year following the Issue Date and (ii) each second fiscal quarter following the Issue Date, an Operating Report in respect of the immediately preceding two fiscal quarters.

(b)    The Issuer will also, for so long as any Notes remain outstanding, furnish or cause to be furnished to the Holders and prospective investors the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act.

(c)    The Trustee shall have no duty to review or analyze reports or budgets delivered to it. Delivery of such reports, information and documents to the Trustee is for informational purposes only and the Trustee's receipt of such shall not constitute actual or constructive notice of any information contained therein or determinable from information contained therein, including the Issuer's compliance with any of its covenants hereunder (as to which the Trustee is entitled to rely exclusively on Certificates of Responsible Officers). The Trustee shall not be obligated to monitor or confirm, on a continuing basis or otherwise, the Issuer's compliance with the covenants or with respect to any reports or other documents filed with any website, or participate in any conference calls.

Section 4.04.    Taxes.

Each of the Issuer and the Guarantors shall duly pay and discharge before they become overdue all Taxes, assessments and other governmental charges or levies imposed by a Governmental Authority upon it or its Property, income or profits except to the extent that the failure to so pay any such Tax would not, alone or in the aggregate, reasonably be expected to result in a Material Adverse Effect; *provided* that any of the Issuer or the Guarantors may contest in good faith any such Tax, assessment, charge, levy, claim or obligation and, in such event, may permit the Tax, assessment, charge, levy, claim or obligation to remain unpaid during any period, including appeals, when the Issuer or such Guarantor is in good faith contesting the same by proper proceedings, so long as (i) adequate reserves shall have been established with respect to any such Tax, assessment, charge, levy, claim or obligation, accrued interest thereon and potential penalties or other costs relating thereto, or other adequate provision for payment thereof shall have been made, and (ii) such contest would not reasonably be expected to result in a Material Adverse Effect.

Section 4.05.    Compliance with Laws.

Each of the Issuer and the Guarantors shall conduct its business and shall operate the Projects in compliance with, all requirements of Applicable Law, including all applicable Governmental Approvals, Environmental Laws, Anti-Money Laundering Laws and Anti-Corruption Laws, except where any failure to comply would not individually or in the aggregate reasonably be expected to result in a Material Adverse Effect, and except that any of the Issuer or the Guarantors may, at their expense, contest by appropriate proceedings conducted in good faith the validity or application of any such requirement of Applicable Law, so long as (1) none of the Secured Parties would be subject to any liability for failure to comply therewith and (2) the institution of such proceedings would not reasonably be expected to result in a Material Adverse Effect.

Section 4.06.    [Reserved]

Section 4.07.    Restricted Payments.

Neither the Issuer nor any Guarantor shall:

(i)    declare or pay any dividend or make any other payment or distribution on account of the Issuer or such Guarantor's Equity Interests or to the direct or indirect holders of the Issuer's or such Guarantor's Equity Interests in their capacity as such, other than dividends or distributions payable to the Issuer or such Guarantor;

(ii)    purchase, redeem or otherwise acquire or retire for value any Equity Interests of the Issuer or such Guarantor or any direct or indirect parent of the Issuer or such Guarantor;

(iii)    make any payment on or with respect to, or purchase, redeem, defease or otherwise acquire or retire for value any Indebtedness of the Issuer or such Guarantor that is contractually subordinated to the Notes or the Note Guarantees (other than Intercompany Loans permitted under clause (6) of the definition of "Permitted Indebtedness";

(iv)    make any Investment other than a Permitted Investment; or

(v)    become contractually obligated to do any of the foregoing.

(all such payments and other actions set forth in these clauses (i) through (v) above being collectively referred to as "*Restricted Payments*").

Section 4.08.    Additional Amounts.

(a)    Any and all payments of principal of, premium, if any, and interest on or with respect to the Notes, by or on behalf of the Issuer or the Guarantors, to Holders, will be made free and clear of, and without withholding or deduction for or on account of, Taxes imposed by any Taxing Jurisdiction, unless required by Applicable Law. Subject to the exceptions described in more detail below, if any withholding or deduction on account of Taxes is required to be imposed by any Taxing Jurisdiction, the Issuer or the Guarantors (or, in each case a successor thereof) will:

(i)    pay to the Holders such additional amounts as may be necessary ("*Additional Amounts*") so that after making all required deductions or withholdings, including those applicable to additional sums payable under this heading, the net amount received by Holders or other beneficial owners of the Notes will not be less than the amounts as would have been received by them had no such withholding or deduction been required,

(ii)    deduct or withhold such Taxes; and

(iii)    remit the full amount deducted or withheld to the relevant taxing or other Governmental Authority.

(b)    Notwithstanding Section 4.08(a), no such Additional Amounts shall be payable for or on account of:

(i)    any Taxes which would not have been imposed or levied on a Holder but for the existence of any present or former connection between the Holder or beneficial owner of the Notes and the relevant Taxing Jurisdiction, including, without limitation: (1) being or having been a citizen or resident for tax purposes of the relevant Taxing Jurisdiction, (2) maintaining or having maintained an office, permanent establishment or branch in the relevant Taxing Jurisdiction, or (3) being or having been present or engaged in a trade or business in the relevant Taxing Jurisdiction, except for a connection solely arising from the mere ownership of, or receipt of payment under, the Notes or the exercise of rights under the Notes or this Indenture, either personally or through the Trustee;

(ii)    any estate, inheritance, gift, or similar tax, assessment or other governmental charge;

(iii)    any Taxes that are imposed or levied by reason of the failure by the Holder or beneficial owners of the Notes to timely comply, subject to Section 4.08, with a written request by or on behalf of the Issuer, to provide information, documentation or other evidence concerning (i) such Holder or beneficial owner's nationality, residence, identity,

73

eligibility for benefits under a treaty for avoidance of double taxation, (ii) such Holder or beneficial owner's present or former connection with the relevant Taxing Jurisdiction or (iii) any other information about the Holder or beneficial owner that is necessary from time to time to determine the appropriate rate of deduction or withholding of Taxes applicable to that Holder or beneficial owner, *provided* that (x) any information, documentation or other evidence requested is required under Applicable Law or treaties for the avoidance of double taxation to determine such rate, and (y) at least thirty (30) days prior to the first payment date with respect to which the Issuer shall apply this Section 4.09(b)(iii), the Issuer shall have notified the Trustee, in writing, that the Holders or beneficial owners of the Notes will be required to provide that information, documentation or other evidence and requested that the Trustee provide notification thereof to the Holders at the Issuer's expense;

(iv)    the presentation of the Notes, when required, for payment on a date more than thirty (30) days after the date on which the payment became due and payable or the date on which payment is duly provided for, whichever occurs later, except to the extent that the Holder or the beneficial owner of the Notes would have been entitled to Additional Amounts in respect of those Taxes on presenting the note for payment on any date during the 30-day period;

(v)    any tax, duty, assessment or other governmental charge payable otherwise than by deduction or withholding from payments on or with respect to the Notes; and

(vi)    any combination of items (i) through (v) above.

(c)    Notwithstanding the foregoing, the limitations on the Issuer's obligation to pay Additional Amounts set forth in Section 4.08(b)(iii) shall not apply if the provision of the certification, identification, information, documentation, declaration or other evidence described in Section 4.08(b)(iii) would be materially more onerous, in form, in procedure or in the substance of information disclosed, to a Holder or beneficial owner of the Notes, after taking into account any relevant differences between United States and Chilean law, regulation or administrative practice, than comparable information or other applicable reporting requirements imposed or provided for under United States federal income tax law, including the United States-Chilean Income Tax Treaty, including proposed regulations, and administrative practice, for example IRS Forms W-8BEN, W-9 and 6166.

(d)    Upon the Trustee's receipt of notification from the Issuer that the Holders will be required to provide information or documentation as described in Section 4.08(b)(iii) above, the Trustee will provide notification thereof to the Holders. The Issuer or the Guarantors (or, in each case a successor thereof) will provide the Trustee, the Holders and the Paying Agent with a duly certified or authenticated copy of an original receipt of the payment of Taxes which the Issuer or the Guarantors (or, in each case a successor thereof) has withheld or deducted in respect of any payments made under or with respect to the Notes. The Trustee will, for a period of five (5) years following the due date for each payment, maintain in its files each such certified copy received from the Issuer or the Guarantors (or, in each case a successor thereof).

74

(e)    In addition, the Issuer or the Guarantors (or, in each case a successor thereof) will pay any stamp, issue, registration, documentary or other similar Taxes and other duties (including interest and penalties with respect thereto) imposed or levied by any Taxing Jurisdiction (or any political subdivision or taxing authority thereof or therein) in respect of the creation, issue and offering of the Notes.

(f)    Any reference in this Indenture, any supplemental indenture or the Notes to principal and premium, if any, interest, or any other amount payable in respect of the Notes by the Issuer or the Guarantors (or, in each case a successor thereof) will be deemed also to refer to any Additional Amount that may be payable with respect to that amount under the obligations referred to in this Section 4.08.

(g)    The obligations to make payments of Additional Amounts with respect to principal, interest or other amounts payable on the Notes or the Note Guarantees will survive any termination or discharge of this Indenture, payment of the Notes, discharge of the Note Guarantees and/or the resignation or removal of the Trustee or any Security Agent under the Indenture Documents.

(h)    If the Issuer or the Guarantors (or, in each case a successor thereof) is obligated to pay Additional Amounts with respect to any payment under or with respect to the Notes other than Additional Amounts payable under the law as in effect on the date of this Indenture, the Issuer or the Guarantors (or, in each case a successor thereof) shall deliver to the Trustee a certificate of a Responsible Officer stating the fact that Additional Amounts are payable and the amounts so payable.

Section 4.09.   Limitation on Indebtedness

(a)    The Issuer shall not create, incur, assume or suffer to exist any Indebtedness or issue Disqualified Stock and the Guarantors shall not incur any Indebtedness or issue Disqualified Stock, other than the following Indebtedness ("*Permitted Indebtedness*"):

(i)    the obligations pursuant to the Indenture Documents (including the Indebtedness evidenced by the Notes and the related Note Guarantees);

(ii)    current accounts payable arising, and accrued expenses incurred, in the ordinary course of business which are payable in accordance with customary practices that are not overdue for more than ninety (90) days or are being contested in good faith;

(iii)    Indebtedness constituting reimbursement obligations with respect to letters of credit, surety, performance bonds, completion guarantees, judgments, advance payment, customs, tax guarantees and bank guarantees, in each case in the ordinary course of business;

(iv)    Permitted Subordinated Indebtedness in an amount not to exceed US$10.0 million (or its equivalent), provided that the Majority Holders (including Holders of at least 50% in aggregate principal amount of the Take-back SSNs then outstanding) have provided consent following receipt of information on terms of the subordination;

(v)        Intercompany Loans, provided however that, if the Issuer or a Guarantor is the obligor on such debt incurred and the obligee is a Person other than the Issuer or a Guarantor, such debt must (1) be expressly subordinated in right of payment to the Notes in writing (the "*Subordination Agreement*") and any payments (including payment of interest or principal at Stated Maturity) under such debt shall not be due or enforceable until the repayment in full of all obligations under the Notes and (2) provide for the Trustee as a third party beneficiary under the Subordination Agreement with power to enforce obligations therein; and

(vi)        Indebtedness of the Issuer or any Guarantor incurred in the ordinary course of business, consisting in one or more unsecured revolving credit facilities with one or more commercial banks or other financial institutions, in an amount not to exceed individually or in the aggregate US$2.0 million (or its equivalent).

For purposes of determining compliance with any restriction on the incurrence of Indebtedness, the U.S. dollar amount of Indebtedness denominated in a currency other than the U.S. dollar shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred; provided that, the principal amount of any Permitted Refinancing Indebtedness shall be calculated based on the currency exchange rate that is in effect on the date of such refinancing.

Section 4.10.    Transactions with Affiliates.

(a)        Neither the Issuer nor any Guarantor will (1) make any Investment in or any payment to, (2) sell, lease, transfer, assign or otherwise dispose of any of its Property to, (3) purchase or acquire Property from or (4) enter into or make or amend any transaction, contract, agreement, arrangement, understanding, loan, advance or Guarantee with, or for the benefit of, any Affiliate (each, an "*Affiliate Transaction*"), unless the Affiliate Transaction is on fair and reasonable terms and on terms no less favorable to the Issuer or such Guarantor than could be obtained in a comparable arm's-length transaction with a Person that is not an Affiliate.

(b)        Prior to entering into any Affiliate Transaction for any transaction amount in excess of $5.0 million, the Issuer or applicable Guarantor shall (1) deliver to the Trustee a Certificate of a Responsible Officer of such Issuer or applicable Guarantor stating that such Affiliate Transaction complies with this Indenture, and (2) have received an affirmative vote of approval by the board of directors, including the vote of the Independent Director.

(c)        These restrictions and conditions shall not apply to (i) any Affiliate Transaction between or among the Issuer and any Guarantor or among Guarantors not otherwise restricted under this Indenture, (ii) PEC Receivables Transactions where the Affiliate acts as an intermediary, (iii) the transactions expressly contemplated by the Sales Facilitation Agreement , or (iv) Affiliate Transactions existing on the Issue Date and detailed in Schedule A hereto.

Section 4.11.    Liens.

Neither the Issuer nor any Guarantor will directly or indirectly, create, incur, assume or suffer to exist any Lien of any kind on any Property now owned or hereafter acquired, except for Permitted Liens.

Section 4.12.    <u>Limitation on Leases and Sale and Leaseback Transactions</u>.

No Guarantor shall enter into any agreement, or be or become liable as lessee under any agreement, for the lease, hire or use of any Property, except for (i) operating leases of Property (which do not constitute Capitalized Lease Obligations) and (ii) the Ground Leases existing on the Issue Date and any extensions or renewals thereof; *provided* that any Guarantor's aggregate payment obligations under all such operating leases shall not exceed $5.0 million in any calendar year. No Guarantor shall enter into any Sale and Lease-Back Transaction.

Section 4.13.    <u>Maintenance of Existence; Business Activities; Office or Agency</u>.

Each of the Issuer and the Guarantors shall (1) preserve and maintain its legal existence under the Applicable Law of its jurisdiction of incorporation or organization and all of its material licenses, rights, privileges and franchises necessary for the maintenance of its corporate existence, (2) preserve and maintain its office or agency as necessary for the maintenance of its corporate existence, (3) comply, in all material respects, with its Organizational Documents, (4) engage solely in a Permitted Business, (5) refrain from making any amendments to its Organizational Documents other than those that would not reasonably be expected to (x) result in a Material Adverse Effect or (y) increase the risk of the Issuer or such Guarantor being consolidated with another Person (other than the Issuer or another Guarantor) in the event of a bankruptcy of the Issuer or such Guarantor (including, for the avoidance of doubt, amendments necessary in connection with a merger or consolidation of any of the Issuer or the Guarantors permitted under Article 5 hereof).

Section 4.14.    <u>Offer to Repurchase Upon Change of Control</u>.

(a)      Subject to Section 3.08(f), upon the occurrence of a Change of Control the Issuer must make an Offer to Purchase all of the Notes then outstanding at a purchase price equal to (i) 100% of the principal amount thereof plus accrued and unpaid interest (including accrued and unpaid PIK Interest) and Additional Amounts, if any, to, but excluding, the applicable Purchase Date  in the case of the Take-Back SSNs and (ii) 103% of the principal amount thereof plus accrued and unpaid interest (including accrued and unpaid PIK Interest) and Additional Amounts, if any, to, but excluding, the applicable Purchase Date, in the case of the Super Priority Notes, in each case in accordance with Section 3.08 hereof. Any Notes purchased by the Issuer will be ineligible to vote and shall be immediately surrendered by the Issuer to the Trustee for cancellation. The closing of the Offer to Purchase must be completed as a condition precedent to consummating any Change of Control.

(b)      The issuer hereby agrees not to engage in any repurchase of Notes, except as mandated under Section 4.14 or Section 4.18 of this agreement.

Section 4.15.    <u>Inspection</u>.

(a)      The Issuer will permit representatives of the Holders, the Trustee, and any Collateral Agent under guidance of officers of the Issuer, to visit and inspect any of the properties of the Issuer or the Guarantors and to examine the Issuer's or such Guarantor's corporate, financial, operating and other records, no more than one time per year at the expense of the Holders and at such reasonable times during normal business hours, upon reasonable advance written notice to

the Issuer and with the Issuer's consent (such consent not to be unreasonably withheld); *provided* that when an Event of Default exists, representatives of the Holders, the Trustee and any Collateral Agent may do any of the foregoing as often as may be reasonably desired at the expense of the Issuer at any time during normal business hours and without advance notice.

(b)     The Issuer and the Guarantors will not be required to disclose information to the Holders, the Trustee or any Collateral Agent that is prohibited by Applicable Law or contract (provided that such prohibition is not entered into in contemplation of this covenant) or is subject to attorney-client or similar privilege or constitutes attorney work product.

Section 4.16.   Governmental Approvals.

Each Guarantor shall from time to time obtain and maintain, or cause to be obtained and maintained, each Governmental Approval as shall now or hereafter be required under Applicable Law, except if (a) the inability to obtain, or the rescission, termination, modification or suspension of such Governmental Approval is being contested in good faith by appropriate proceedings in accordance with this Indenture, and (b) the failure to obtain or maintain such Governmental Approval or any such proceedings would not reasonably be expected to result in a Material Adverse Effect.

Section 4.17.   Insurance.

(a)     The Issuer and each Subsidiary Guarantor shall maintain or cause to be maintained in full force and effect, with insurers of international standing, insurance coverage for each Project in relation to its operations and Property in such amounts and against such risks as is customarily maintained by companies operating in Chile engaged in the same or similar businesses as the Issuer and such Subsidiary Guarantor, as applicable. All insurance must be placed with insurance companies with financially sound and reputable insurers that have adequate capital and a credit rating no lower than the insurance companies providing insurance to the Issuer and the Subsidiary Guarantors on the Issue Date.

(b)     Such insurance shall name (i) the Issuer or such Subsidiary Guarantor as named insured and (ii) note the interest of the relevant Collateral Agent thereon as loss payee and all the Secured Parties as additional insured parties under insurance policies. The Issuer and the Subsidiary Guarantors will cause all Event of Loss Proceeds to be applied in accordance with this Indenture.

Section 4.18.   Application of Net Available Amounts from Events of Loss.

(a)     Within one-hundred and eighty (180) days after an Event of Loss with respect to the Project occurs, the Issuer shall (1) apply (or enter into a binding commitment within such 180-day period) any Net Available Amount received to rebuild, replace, repair or restore the Project (or affected portion thereof), and (2) provide to the Trustee within such 180-day period a Feasible Repair Certificate. For the avoidance of doubt, following an Event of Loss, any amount paid by the Issuer or any Guarantor to rebuild, repair or restore the Project (or affected portion thereof) in respect of such Event of Loss shall be counted toward the obligation in this paragraph irrespective of whether the Net Available Amount is received prior to or following such payment.

(b)       Subject to Section 3.08(f), any Net Available Amount received by or on behalf of the Issuer or any Guarantor as a result of any Event of Loss that is not applied as described above will be deemed "*Excess Loss Proceeds*", *provided*, however, that to the extent that the Net Available Amount received in respect of any Event of Loss (1) exceeds the amount applied to restore the Projects (or the affected portion thereof) in accordance with Section 4.18(a) and (2) does not exceed $5.0 million, such proceeds may be used for any purpose not prohibited under the Indenture Documents. To the extent Excess Loss Proceeds with respect to any Event of Loss exceed $5.0 million, the Issuer shall, within thirty (30) days, make to all Holders and all holders of Senior Secured Obligations an Offer to Purchase the maximum principal amount of Notes and other Senior Secured Obligations that may be purchased with the Excess Loss Proceeds (any such Offer to Purchase, an "*Excess Loss Offer*"), at a purchase price equal to 100% of the principal amount thereof (but without payment of any "make-whole" premium), together with accrued and unpaid interest (including accrued and unpaid PIK Interest)  and Additional Amounts, if any, to, but excluding, the applicable purchase date in accordance with Section 3.08 or the agreements governing the Senior Secured Obligations, as applicable; *provided* that if, following repurchase of a portion of a Note, the remaining principal amount of such Note outstanding immediately after such repurchase would be less than $200,000, then the portion of such Note so repurchased shall be reduced so that the remaining principal amount of such Note outstanding immediately after such repurchase is $200,000. Upon completion of any Excess Loss Offer, the amount of Excess Loss Proceeds will be reset at zero, and any Excess Loss Proceeds remaining after consummation of such Excess Loss Offer shall be deposited in the Revenue Accounts.

Section 4.19.   Project Maintenance.

(a)       The Issuer and each Guarantor shall maintain and preserve the Projects in good working order and in such condition that the Projects will have the capacity and functional ability to perform, on a continuing basis (ordinary wear and tear excepted), in normal commercial operation, in each case, pursuant to the Material Project Documents to which the Issuer or such Guarantor is a party.

(b)       The Issuer and each Guarantor shall cause its Projects to be operated, serviced, maintained and repaired so that the condition and operating efficiency thereof will be maintained and preserved (ordinary wear and tear excepted) in all material respects in accordance and compliance with (1) Prudent Industry Practices, (2) such operating standards as shall be required to enforce any material warranty claims against dealers, manufacturers, vendors, contractors, and sub-contractors and (3) the terms and conditions of all insurance policies maintained with respect to such Projects at any time, in each case, unless the failure to perform any such action would not reasonably be expected to result in a Material Adverse Effect.

Section 4.20.   Performance of Material Project Documents.

(a)       The Issuer and each Guarantor shall perform and observe in all material respects the covenants and agreements contained in any of the Material Project Documents to which it is or becomes a party, and shall take all necessary action to prevent the termination of any of such Material Project Documents in accordance with the terms thereof or otherwise (other than by virtue of the scheduled expiration in the ordinary course of such Material Project Document in accordance with its terms), unless the Issuer or such Guarantor shall deliver to the Trustee (x) a

Certificate of a Responsible Officer of the Issuer or such Guarantor stating that such failure to perform and observe or such termination would not reasonably be expected to result in a Material Adverse Effect, (y) solely in the case of a failure to comply with or observe, in all material respects, any covenants and agreements contained in the relevant Material Project Document, written verification by the Independent Engineer that such failure to perform and observe would not reasonably be expected to result in a material adverse effect on the viability of the Projects, taken as a whole, and (z) solely in the case of a failure to take all necessary action to prevent the termination of such Material Project Document, (i) written verification by the Independent Engineer that such termination would not reasonably be expected to result in a material adverse effect on the viability of the Projects taken as a whole; or (ii) the Issuer or Guarantor shall have delivered to the Trustee one or more Additional Material Project Documents within one hundred and twenty (120) days, together with a Certificate of a Responsible Officer certifying that the terms are substantially similar or materially no less favorable to the Issuer or the Guarantors than the Material Project Document being terminated; or (iii) the Issuer or such Guarantor shall have delivered to the Trustee a written report from a reputable market consultant certifying that projected prices in the spot market would reasonably be expected to produce sufficient Project Revenues to satisfy scheduled payments under the Notes.

(b)     The Issuer and each Guarantor shall instruct all Project Parties to make all payments payable to the Issuer or any Guarantor to the Onshore Depositary Bank for deposit in the applicable Guarantor Revenue Accounts in accordance with the Security and Depositary Agreement.

Section 4.21.   Amendment of Material Project Documents and Additional Material Project Documents.

(a)     Neither the Issuer nor any Guarantor shall (1) amend, supplement, modify in any material respect or give any consent to or waiver of any material matter under any Material Project Document or (2) except as required or otherwise permitted by the Indenture Documents, enter into any Additional Material Project Document, unless in either case the Issuer or such Guarantor shall deliver to the Trustee (x) a Certificate of a Responsible Officer of the Issuer or such Guarantor describing the relevant action and stating that such action would not reasonably be expected to result in a Material Adverse Effect and (y) written verification by the Independent Engineer that such action would not reasonably be expected to result in a material adverse effect on the viability of the Projects, taken as a whole.

Section 4.22.   Certain Agreements.

Neither the Issuer nor any Guarantor shall enter into any agreement or undertaking other than the Transaction Documents or as otherwise permitted pursuant to the terms of the Indenture Documents, restricting, or purporting to restrict, in any material respect, the ability of any of them to comply with the terms of this Indenture or to amend this Indenture or any other Indenture Document.

Section 4.23.   Use of Proceeds.

The Issuer shall use the net proceeds from the issuance of the Super Priority Notes as contemplated by the Plan.

Section 4.24.  Transfers of Equity Interests

Except as specifically provided for in Section 5.01, no Guarantor shall (a) permit or consent to the transfer (by assignment, sale or otherwise) of any of its Equity Interests, or (b) issue any new Equity Interests; *provided*, that (A) ILAP Holdings Ltd. may issue Equity Interests pursuant to Article 14 of the Convert Notes Indenture, and (B) any Subsidiary Guarantor may permit or consent to the assignment, sale or transfer of its Equity Interests or to the issuance of new Equity Interests in each case to the Issuer or another Subsidiary Guarantor (each a "*Transfer*") if such Transfer is consummated in compliance with the terms of this Indenture and each of the following conditions:

(i)      after giving effect to any such Transfer, no Change of Control shall have occurred;

(ii)      such Transfer shall be made expressly subject to the granting of a Lien in favor of the relevant Collateral Agent on the Equity Interests so being transferred, and any Person that owns any Equity Interest in a Guarantor as a result of such Transfer shall, simultaneously with such Transfer, sign a pledge agreement substantially similar to the relevant Pledge Agreements; and

(iii)      such Person referred to in Section 4.24(ii) shall, within ten (10) Business Days of such Transfer, execute and deliver to the relevant Collateral Agent such documents and instruments necessary or as such Collateral Agent may reasonably request in order to evidence, secure, and perfect such Collateral Agent's security interest in and Lien on such Equity Interests.

Section 4.25.  Accounting and Financial Management.

(a)      Each of the Issuer and the Guarantors shall (1) maintain adequate management information and (2) maintain a system of accounting of all financial transactions and the assets and business of such Person in accordance with IFRS. In the event that any of the Issuer or the Guarantors replaces its existing auditors for any reason, such Person shall appoint and maintain as auditors another firm of independent public accountants, which firm shall be internationally recognized.

Section 4.26.  Maintain Ratings.

(a)      The Issuer shall use commercially reasonable efforts to obtain or maintain ratings from at least two Ratings Agencies; *provided, however*, that, in the event that one or more Rating Agency (i) ceases to exist, (ii) ceases to issue ratings of the type issued in respect of the Notes as of the Issue Date or (iii) refuses or otherwise declines to provide a rating for the Notes other than due to the Issuer's failure to (a) provide such Rating Agency with such reports and other information or documents as it shall reasonably request to monitor and affirm the ratings assigned by it to the Notes, (b) pay customary fees to such Rating Agency in connection therewith or (c) take any other action reasonably requested by such Rating Agency in connection therewith (and, in each case of (i) through (iii) above, the Issuer is unable, using commercially reasonable efforts, to substitute such Ratings Agency), the failure by the Issuer to obtain or maintain such rating shall not constitute a Default or Event of Default; it being understood that the Issuer shall not request

any Rating Agency to cease rating the Notes without the consent of the Holders pursuant to Section 9.02, and it being further understood that the Issuer shall not be required to obtain or maintain any particular minimum rating of the Notes.

Section 4.27.  Listing.

(a)  The Issuer shall use its best efforts to list the Notes as soon as practicable but in no event later than at least forty-five (45) days as from the execution of this Indenture. The Issuer shall maintain the listing of the Notes on the Luxembourg, Irish or Singapore stock exchange. If the admission of the Notes on the Luxembourg, Irish or Singapore stock exchange would, in the future, require the Issuer to publish financial information either more regularly than it would otherwise be required to, or requires the Issuer to publish separate financial information, or if the listing, in the judgment of the Issuer, is unduly burdensome, the Issuer may seek an alternative admission to listing, trading and/or quotation for the Notes by another listing authority, recognized stock exchange and/or quotation system provided that the Notes shall at all times remain listed on a recognized stock exchange or admitted to trading on a multilateral trading facility operated by a regulated recognized stock exchange.

(b)  The Issuer shall promptly notify the Trustee and the Holders whenever the Notes become listed on any other stock exchange and of any delisting thereof.

Section 4.28.  Subsidiaries.

The Issuer and the Guarantors shall not (1) create or suffer to exist any Subsidiary, other than the Subsidiaries in existence as of the Issue Date, each of which is a Guarantor, or (2) purchase any Equity Interest in, or all or substantially all of the assets of, any other Person.

Section 4.29.  Maintenance of Priority of the Notes.

The Issuer and the Guarantors shall ensure that the Issuer's and the Guarantors' payment obligations with respect to:

(i)  the Super Priority Notes will constitute direct, unconditional and general super-priority obligations of the Issuer and the Guarantors, secured by the Collateral, and will rank senior to the Take-back SSNs and all Indebtedness (other than in the case of certain of its Tax or other obligations, which are granted preferential treatment over the Notes pursuant to law) to the extent of the value of the Collateral and will be senior in right of payment to any existing and any future Permitted Subordinated Indebtedness of the Issuer.

(ii)  the Take-back SSNs will constitute direct, unconditional and general senior obligations of the Issuer and the Guarantors, secured by the Collateral, and will rank junior to the Super Priority Notes but senior to all other Indebtedness (other than in the case of certain of its Tax or other obligations, which are granted preferential treatment over the Take-back SSNs pursuant to law) and will be senior in right of payment to any existing and any future Permitted Subordinated Indebtedness of the Issuer.

Section 4.30.   Compliance with Security Documents.

(a)      Each of the Issuer and the Guarantors shall, and shall cause each of their Subsidiaries to, comply in all material respects with all of their respective covenants, commitments and undertakings under each of the Security Documents to which it is a party.

Section 4.31.   Independent Director.

(a)      The Issuer shall ensure that, as further described in the Organizational Documents of the Issuer and the following paragraphs, the number of directors on the Issuer's board of directors will be no less than 3 and no more than 5, and at least one of the directors shall be an independent director, whose nomination and appointment shall comply with the requirements and procedures set forth below (the "*Independent Director*"). As of the date of this Indenture, the current Independent Director of the Issuer fully complies with the requirements set forth in the following paragraph and in the Organizational Documents of the Issuer.

(b)      In the event that the Independent Director then in place on the Issuer's Board of Directors resigns, is removed or otherwise vacates that office, the consent of Holders of a majority of the outstanding principal amount of the Notes will be required in order for the Issuer to nominate a replacement Independent Director. To that end, the Issuer shall send the Trustee, within thirty (30) days following the Independent Director's resignation or removal (or, if the Independent Director otherwise vacates that office, following another director having notice of such vacation), a written notice with the identity and biography of the proposed nominee, as well as certifying that the proposed nominee meets all the criteria described in the following paragraph (the "*New Independent Director Proposal Notice*"). The Trustee shall then send the New Independent Director Proposal Notice to the Holders (via DTC LENS if the Notes are Global Notes) as promptly as practicable and, in any event, within two (2) Business Days of receipt. If the Holders of a majority of the outstanding principal amount of the Notes fail to communicate to the Issuer (with a copy to the Trustee) in writing about their approval or rejection of the proposed nominee within 120 days after their receipt of the New Independent Director Proposal Notice, the nominee shall be deemed to be approved by the Holders and shall be appointed as the Independent Director by the Issuer's Board of Directors. Promptly after the expiration of the 120-day period described in the preceding sentence, the Issuer shall provide an Officer's Certificate to the Trustee, upon which the Trustee may conclusively and without further inquiry rely, certifying whether the proposed nominee was approved or rejected. It is hereby expressly agreed that, from the date on which the Independent Director resigns, is removed or otherwise vacates that office, until the date on which the new Independent Director is designated and appointed pursuant to this paragraph, no breach of this Section 4.31 will be considered to have occurred, provided that the Issuer has timely complied with all of its obligations under this paragraph for the designation and appointment of the new Independent Director.

(c)      In the event that the abovementioned Independent Director resigns, is removed or otherwise vacates that office, the Issuer will only propose for nomination as Independent Director a person (i) with experience in the sale of energy assets in South America, (ii) that does not directly or indirectly receive and has not in the past five years directly or indirectly received compensation from the ILAP Partner or any of its Affiliates, and (iii) that has good moral character and has not been convicted in the prior ten years of a crime of moral turpitude or fraud and has not been subject

to a bar on participation in the securities or banking industry and has not been in the prior ten years subject to a bankruptcy proceeding. The Issuer, in the New Independent Director Proposal Notice, will certify to the Trustee (for the benefit of the Holders) that any proposed Independent Director meets the foregoing requirements, and will deliver a reasonably detailed biography of such proposed Independent Director to the Trustee for distribution to the Holders (via DTC LENS if the Notes are Global Notes). If, at any point after his or her appointment, the new Independent Director fails to meet the aforementioned requirements, the Issuer's Board of Directors will remove the non-conforming director and designate a new Independent Director that meets said requirements, observing the procedure and voting thresholds described in the first paragraph of this section.

(d)     The Issuer will not (i) remove any Independent Director (except if, at any point after his or her designation, he or she fails to meet the aforementioned eligibility requirements), (ii) reduce the compensation payable to, or terminate or reduce the level of Directors and Officers insurance coverage for the benefit of, any Independent Director, or (iii) impose any limitations on the ability of the Independent Director to review any sort of documentation, including but not limited to documentation related to the ILAP Sale (as defined in the Convert Notes Indenture), in each case without the consent of the Holders of the majority of the outstanding principal amount of the Notes.

(e)     The Guarantors will also be required under this Indenture to have at least one Independent Director on their respective boards of directors and to comply at all times with the Independent Director nomination and appointment requirements and procedures set forth in this Section 4.31.

ARTICLE 5
SUCCESSORS

Section 5.01.   Merger or Consolidation, Sale of Property, Dispositions; Purchase of Property, and Capital Increases.

(a)     Neither the Issuer nor any Guarantor will, directly or indirectly: (1) merge into or consolidate with any other Person (whether or not such Guarantor is the surviving corporation or company) or change its form of organization; (2) sell, lease, convey or otherwise dispose of (or permit or consent to the sale, lease, conveyance or other Disposition of) all or substantially all of its Property, in each case, in one or more related transactions, to any Person; (3) make any other Disposition; or (4) allow for issuances of Capital Stock of the Issuer, other than:

(i)     sales or other Dispositions of Permitted Investments (including the unwinding of any Hedging Obligations entered into in accordance with this Indenture);

(ii)     sales of (A) PEC I Receivables for Fair Market Value and with the consent of the Majority Holders (including Holders of at least 50% in aggregate principal amount of the Take-back SSNs then outstanding), and (B) PEC Receivables Transactions (other than with respect to PEC I Receivables) for Fair Market Value;

(iii)     sales or other Dispositions of Obsolete Assets, subject to, without exception, an aggregate limit of US$5.0 million so long as any Notes are outstanding;

84

*provided* that, if the amount of all such sales or other Dispositions of Obsolete Assets by any Guarantor during any fiscal year exceeds US$1.0 million, such Guarantor shall deliver to the Trustee a certificate of a Responsible Officer of such Guarantor stating that (a) such Disposition is for Fair Market Value and (b) at least 90% of the consideration therefor received by the Issuer or the applicable Guarantor is in the form of cash, Cash Equivalents or Replacement Assets or any combination thereof. (For these purposes, the assumption by the purchaser of Indebtedness or other obligations of the Issuer or any Guarantor (other than Permitted Subordinated Indebtedness) pursuant to customary arrangements, and instruments or securities received from the purchaser that are promptly, but in any event within thirty (30) Business Days of the closing, converted by the Issuer or any Guarantor to cash or Cash Equivalents, to the extent of the cash or Cash Equivalents actually so received, shall be considered cash or Cash Equivalents, as applicable, received at closing); or

(iv)    issuances of shares of Capital Stock (a) in the case of ILAP Holdings Ltd., directly or indirectly to the ILAP Sponsors in exchange for cash contributions (other than the contribution of PEC Receivables on or about the Effective Date pursuant to the Plan) and in compliance with the terms under the Convert Notes Indenture, (b) in the case of the Issuer, to ILAP Holdings Ltd. in exchange for cash contributions (other than the contribution of PEC Receivables on or about the Effective Date pursuant to the Plan) and in compliance with the terms of the Convert Notes Indenture and (c) in the case of the Guarantors, to ILAP Holdings Ltd. or the Issuer (each of the foregoing, "*Permitted Capital Increases*").

Notwithstanding the foregoing, any Guarantor may consolidate with, merge into or transfer all of its Properties to the Issuer or another  Guarantor for the purposes of an internal reorganization, which, for the avoidance of doubt, shall include any payment made to the Issuer or a  Guarantor in connection with any merger or consolidation. The Issuer or any Guarantor will provide notice of such reorganization to the Holders and to the Trustee as soon as reasonably practicable following such consolidation, merger or transfer, but in no event later than thirty (30) days prior to the proposed date of its consummation.

(b)    ILAP Holdings Ltd. shall not purchase or acquire any Property other than (i) shares of the Issuer, (ii) Permitted Investments, (iii) the Convert Notes solely to the extent permitted by the Convert Notes Indenture or (iv) on the Effective Date, certain PEC Receivables as contemplated by the Plan.

(c)    No Guarantor shall purchase or acquire any Property other than (i) Property which is reasonably required in connection with a Permitted Business, or (ii) Permitted Investments.

(d)    The Issuer shall not purchase or acquire any Property, other than (i) Permitted Investments, (ii) the Notes solely to the extent permitted by this Indenture, (iii) on the Effective Date, certain PEC Receivables as contemplated by the Plan, or (iv) Property which is reasonably required in connection with a Permitted Business.

ARTICLE 6
DEFAULTS AND REMEDIES

Section 6.01.  Events of Default.

Each of the following is an "*Event of Default*":

(i)       failure to pay interest on any Note when the same becomes due and payable and such Default continues uncured for five (5) or more Business Days, failure to increase the principal amount of the Notes by an amount equal to the PIK Interest amount after electing to pay PIK Interest in lieu of cash interest;

(ii)      failure to pay the payment of principal, Additional Amounts, if any, or premium, if any, on the Notes as and when the same becomes due and payable, whether at Stated Maturity, upon redemption, upon required repurchase, redemption or prepayment by declaration, acceleration or otherwise;

(iii)     failure by the Issuer or any Guarantor to perform or observe in any material respect any covenant or agreement contained in the Indenture Documents (other than as described in Section 6.01(i) or 6.01(ii)) and such Default continues uncured for thirty (30) or more days from the earlier of (i) the date a Responsible Officer of the Issuer obtains actual knowledge thereof and (ii) notice from the Trustee or of at least 25% in aggregate principal amount of any Series of Notes then outstanding (with a copy to the Trustee); *provided*, *however*, that with respect to a Default pursuant to any of the covenants described under Sections 4.03, 4.16 and  4.19, of this Indenture, if the Issuer or such Guarantor commences and diligently pursues efforts to cure such Default within such 30-day period, it may continue to diligently pursue such cure of the Default (and such Default will not be deemed an Event of Default) for an additional thirty (30) days;

(iv)      any representation, warranty, certification or other statement made by the Issuer or any Guarantor in any (or pursuant to any) Indenture Document proves to have been incorrect in any material respect as of the time made, and the fact, event or circumstance that gave rise to the misrepresentation has resulted in or would reasonably expected to result in a Material Adverse Effect and such misrepresentation or such Material Adverse Effect continues uncured for thirty (30) or more days from the earlier of (i) the date a Responsible Officer of the Issuer obtains actual knowledge thereof and (ii) notice from the Trustee or of at least 25% in aggregate principal amount of any Series of Notes then outstanding (with a copy to the Trustee); *provided* that if the Issuer commences and diligently pursues efforts to cure such misrepresentation within such initial 30-day period, it may continue to diligently pursue such cure of the misrepresentation (and such Default will not be deemed an Event of Default) for an additional sixty (60) days;

(v)       Default (after the expiration of any applicable cure period) under any mortgage, indenture, agreement or instrument under which there is issued or by which there is secured or evidenced any Indebtedness for money borrowed by the Issuer or any Guarantor (or the payment of which is guaranteed by the Issuer or such Guarantor), whether such Indebtedness or Guarantee now exists, or is created after the date of this Indenture, if

86

in each case, the principal amount of any such Indebtedness, together with the principal amount of any other such Indebtedness under which there has been a Default, aggregates to (or has net mark-to-market exposure of) US$5.0 million or more;

(vi)    any Insolvency Proceeding occurs with respect to the Issuer or any of the Guarantors, other than the Proceeding currently contemplated;

(vii)    one or more final judgments, decrees or orders of any court, tribunal, arbitration, administrative or other governmental body or similar entity, which is not subject to appeal, for the payment of money is rendered against the Issuer or Guarantor or any of their respective Properties in an aggregate amount in excess of US$5.0 million (excluding the amount thereof covered by insurance or a performance or similar bond) and such judgment, decree or order remains unvacated, undischarged and unstayed for more than sixty (60) days, except while being contested in good faith by appropriate proceedings;

(viii)    any Security Document or similar agreement in favor of the relevant Collateral Agent ceases to be effective to grant a perfected first priority Lien on the Collateral for the benefit of the Holders, except as otherwise permitted under this Indenture or the Security Documents;

(ix)    except as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect (including as a result of a replacement thereof) (A) any provision of any Material Project Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder, ceases to be in full force and effect unless the same is being contested by the Issuer or any of the Guarantors that is party thereto; (B) the Issuer or any of the Guarantors contests in any manner the validity or enforceability of any provision of any Material Project Document; or (C) the Issuer or any of the Guarantors denies that it has any or further liability or obligation under any Material Project Document, or purports to revoke, terminate, suspend or rescind any Material Project Document;

(x)    except as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect (including as a result of a replacement thereof) (A) any Material Project Document is terminated, rescinded, cancelled or suspended in advance of its expiration unless such termination, rescission, cancellation or suspension is being contested by the Issuer or any of the Guarantors, or (B) the Issuer or any of the Guarantors breaches in any respect, or causes the termination, rescission, cancellation or suspension of, any Material Project Document, and such termination described in clauses (A) or (B) shall remain unremedied for sixty (60) Business Days after the earlier of (1) a Responsible Officer of such Person having knowledge of such termination, termination, rescission, cancellation or suspension and (2) written notice thereof has been given to the Issuer by the Trustee, or to the Trustee and the Issuer by the Holders of at least 25% in aggregate principal amount of any Series of Notes then outstanding;

(xi)    an uninsured casualty, loss or damage or any condemnation, nationalization or expropriation event with respect to the Issuer or any Guarantor occurs;

(xii)    an Event of Abandonment occurs;

(xiii)    any material Governmental Approvals necessary for the execution, delivery and performance of the material obligations under Security Documents shall be terminated or shall not be obtained, maintained, or materially complied with; unless such failure is remedied or waived within thirty (30) days after the Collateral Agent's provision of written notice thereof to the Issuer, or such longer period, not exceeding sixty (60) days after the expiration of the thirty-day (30) period set forth above as reasonably requested by the Issuer to remedy or waive such failure; and

(xiv)    Any Note Guarantee ceases to be in full force and effect or any Guarantor denies or disaffirms its obligations under the Note Guarantee.

Section 6.02.    <u>Acceleration</u>.

(a)    Upon an Event of Default specified in clause (vi) of Section 6.01 hereof, all Notes then outstanding will become due and payable immediately, including all unpaid principal and accrued and unpaid interest (including accrued and unpaid PIK Interest), if any, thereon, without further action or notice on the part of the Trustee or any Holder. Upon any such declaration, the Notes shall become automatically due and payable immediately and the Trustee and Collateral Agent shall be entitled to take any actions necessary to exercise remedies in respect of the Collateral.

(b)    If an Event of Default specified in any other clause of Section 6.01 hereof occurs and is continuing under this Indenture, the Trustee, or the Holders of at least 25% in aggregate principal amount of any Series of Notes then outstanding, by written notice to the Issuer (and to the Trustee if the notice is given by the Holders) may declare all the Notes of such Series to be due and payable immediately, including all unpaid principal and accrued and unpaid interest (including accrued and unpaid PIK Interest), if any, thereon.

(c)    If an Event of Default occurs and is continuing under this Indenture, the Majority Holders (including Holders of at least 50% in aggregate principal amount of the Take-back SSNs then outstanding) may, by written notice to the Issuer (and to the Trustee if the notice is given by the Holders), instruct the relevant Collateral Agent to exercise remedies in respect of the Collateral.

The Majority Holders (including Holders of at least 50% in aggregate principal amount of the Take-back SSNs then outstanding) by written notice to the Issuer and to the Trustee may rescind and annul a declaration of acceleration and its consequences if:

(i)    all existing Events of Default, other than the nonpayment of the principal of, premium, if any, and interest on the Notes that have become due solely by the declaration of acceleration, have been cured or waived; and

(ii)    the rescission would not conflict with any judgment or decree of a court of competent jurisdiction.

No such rescission shall affect any subsequent Default or impair any right consequent thereto.

Section 6.03.    Notice of Event of Default; Other Remedies.

(a)    If any Event of Default occurs and is continuing and is actually known to a Responsible Officer of the Trustee, the Trustee will send notice of the Event of Default to each Holder within thirty (30) days after it obtains such knowledge, unless the Event of Default has been cured or waived; *provided* that, except in the case of a Default in the payment of the principal of or interest on any Note, the Trustee may withhold the notice if and so long as the Trustee in good faith determines that withholding the notice is in the interest of the Holders.

(b)    If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy to collect the payment of principal, premium, if any, and interest on the Notes or to enforce the performance of any provision of the Notes or this Indenture.

(c)    The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding. A delay or omission by the Trustee or any Holder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default. All remedies are cumulative to the extent permitted by Applicable Law.

(d)    If an Event of Default occurs and is continuing and an acceleration of the Notes has occurred, the Trustee may, without derogating from any rights granted directly to the Trustee under the Security Documents, direct the Collateral Agent to take any and all actions and to exercise any and all rights, remedies and options which may be available to the Collateral Agent under the Security Documents, including realization on and exercise of remedies with respect to the Collateral, and any additional rights granted to the Trustee pursuant to the terms under any of the Security Documents.

Section 6.04.    Waiver of Past Defaults.

The Majority Holders (including Holders of at least 50% in aggregate principal amount of the Take-back SSNs then outstanding) may on behalf of the Holders waive any past Default or an Event of Default and its consequences, except that only the Holders affected thereby may waive a Default or an Event of Default (i) in the payment of the principal of and interest on, Additional Amounts or other amounts due under, such outstanding Notes; and (ii) in respect of a covenant or provision that under this Indenture cannot be modified or amended without the consent of the Holder of each outstanding Note affected thereby. Upon any such waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured for every purpose of this Indenture; but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereon.

Section 6.05.    Control by Majority.

The Majority Holders (including Holders of at least 50% in aggregate principal amount of the Take-back SSNs then outstanding) may direct the time, method and place of conducting any proceeding for exercising any remedy available to the Trustee or exercising any trust or power conferred on the Trustee. However, the Trustee may refuse to follow any direction that conflicts with Applicable Law or this Indenture, that may involve the Trustee in personal liability, or that the Trustee determines in good faith may be unduly prejudicial to the rights of other Holders not

89

joining in the giving of such direction, and may take any other action it deems proper that is not inconsistent with any such direction received from Holders (provided, that the Trustee shall not have an affirmative duty to determine whether such direction is prejudicial to any Holder).

Section 6.06.   Limitation on Suits

Except (subject to the provisions described under Article 9 hereof) to enforce the right to receive payment of principal, premium, if any, or interest or Additional Amounts when due, a Holder may not institute any proceeding, judicial or otherwise, with respect to this Indenture or the Notes, or for the appointment of a receiver or Trustee, or for any other remedy under this Indenture or the Notes, unless:

(i)     such Holder has previously given to a Responsible Officer of the Trustee written notice of the occurrence and continuance of an Event of Default;

(ii)    Holders of at least 25% in aggregate principal amount of the relevant Series of Notes then outstanding voting as a single class have made written request to the Trustee to institute proceedings in respect of the Event of Default in its own name as Trustee under this Indenture;

(iii)   such Holder or Holders offer and, if requested, provide to the Trustee indemnity or security reasonably satisfactory to the Trustee against any costs, liabilities or expenses to be incurred in compliance with such request;

(iv)    the Trustee within twenty (20) days after its receipt of such notice, request and offer of indemnity has failed to institute any such proceeding; and

(v)     during such 20-day period, the Holders of a majority in aggregate principal amount of the outstanding Notes of the relevant Series have not given the Trustee a direction that is inconsistent with such written request.

Notwithstanding anything to the contrary herein, the right of a Holder to receive payment of principal of or interest on its Note on or after the Stated Maturity thereof, or to bring suit for the enforcement of any such payment on or after such dates, may not be impaired or affected without the consent of that Holder.

Holders of the Notes may not enforce the Collateral, except as provided in the Security Documents.

Section 6.07.   Rights of Holders to Receive Payment

Notwithstanding any other provision of this Indenture, the right of any Holder to receive payment of principal, premium, if any, and interest on the Note, on or after the respective due dates expressed in the Note (including in connection with an offer to purchase), or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such Holder; *provided* that a Holder shall not have the right to institute any such suit for the enforcement of payment if and to the extent that the institution or prosecution thereof or the entry of judgment therein would, under Applicable Law, result in the

90

surrender, impairment, waiver or loss of the Lien of this Indenture upon any Property subject to such Lien.

Section 6.08.   Collection Suit by Trustee.

If an Event of Default specified in Section 6.01(i) or (ii) hereof occurs and is continuing, the Trustee is authorized to recover judgment in its own name and as trustee of an express trust against the Issuer for the whole amount of principal of, premium, if any, and interest remaining unpaid on, the Notes and interest on overdue principal and, to the extent lawful, interest and such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel.

Section 6.09.   Trustee May File Proofs of Claim.

The Trustee is authorized to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel) and the Holders of the Notes allowed in any judicial proceedings relative to the Issuer (or any other obligor upon the Notes), its creditors or its Property and shall be entitled and empowered to collect, receive and distribute any money or other Property payable or deliverable on any such claims and any custodian in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee, and in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for the reasonable compensation, expenses, disbursements and advances of the Trustee, the relevant Collateral Agent and their respective agents and counsel, and any other amounts due the Trustee under Section 7.06 hereof and the relevant Collateral Agent under Section 10.11 hereof. To the extent that the payment of any such compensation, expenses, disbursements and advances of the Trustee, the relevant Collateral Agent and their respective agents and counsel, and any other amounts due the Trustee under Section 7.06 hereof and the relevant Collateral Agent under Section 10.11 hereof out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Holders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise. Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

Section 6.10.   Priorities.

(a)      Subject to the terms of the Security and Depositary Agreement, if the Trustee collects any money or Property pursuant to this Article 6, it shall pay out the money or Property in the following order:

(i)      First: to the Trustee, the Agents and the Security Agents and their respective agents and attorneys for amounts due under the Indenture Documents, including payment

of all compensation, reasonable expenses and liabilities incurred, and all advances made by them and the costs and expenses of collection;

(ii)     *Second*: to Holders of Super Priority Notes for amounts due and unpaid on the Super Priority Notes for principal, premium, if any, and interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Super Priority Notes for principal, premium, if any and interest, respectively;

(iii)     *Third*: to Holders of Take-Back SSNs for amounts due and unpaid on the Take-Back SSNs for principal, premium, if any, and interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Take-Back SSNs for principal, premium, if any and interest, respectively; and

(iv)     *Fourth*: to the Issuer or to such party as a court of competent jurisdiction shall direct.

(b)     The Trustee may fix a record date and payment date for any payment to the Holders pursuant to this Section 6.10.

Section 6.11.   Undertaking for Costs.

In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as a Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section 6.11 does not apply to a suit by the Trustee, a suit by a Holder pursuant to Section 6.07 hereof, or a suit by Holders of more than 10% in aggregate principal amount of the then outstanding Notes.

Section 6.12.   Power of Attorney for Enforcement in Chile.

If an Event of Default occurs and is continuing, the Majority Holders (including Holders of at least 50% in aggregate principal amount of the Take-back SSNs then outstanding) may instruct the Trustee and/or the Collateral Agent in writing to initiate enforcement proceedings in Chile to collect the amounts specified in the preceding Section 6.08 and to enforce all of the Collateral set forth in the Chilean Security Documents. Upon receipt of such instructions and indemnity satisfactory to the Trustee and/or the Collateral Agent, with no need of further instruction or proceeding, the Trustee and/or the Collateral Agent shall as soon as possible grant a customary special double column power of attorney in order to appoint Chilean lawyers as counsel for the enforcement proceedings, and shall take all the measures required for such power of attorney to be legally valid in Chile and to start and continue the enforcement proceedings of any kind, including, without limitation, collection proceedings (*juicios ejecutivos*), collateral enforcement proceedings, bankruptcy proceedings, until complete collection of the Notes.

ARTICLE 7
TRUSTEE

Section 7.01.   Duties of Trustee.

(a)      If an Event of Default has occurred and is continuing, the Trustee will exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b)      Except during the continuance of an Event of Default:

(i)      the duties of the Trustee will be determined solely by the express provisions of this Indenture and the Trustee need perform only those duties that are specifically set forth in this Indenture and no others, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(ii)      in the absence of gross negligence or willful misconduct on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture. However, the Trustee will examine the certificates and opinions to determine whether or not they conform to the form requirements of this Indenture and may rely on the advice of counsel to determine such conformance (but need not investigate or confirm the accuracy of mathematical calculations therein).

(c)      The Trustee may not be relieved from liabilities for its own grossly negligent action or failure to act, or its own willful misconduct, except that:

(i)      this Section 7.01(c) does not limit the effect of Section 7.01(b); and

(ii)      the Trustee will not be liable for any error of judgment made in good faith by a Responsible Officer, unless it is proved that the Trustee was grossly negligent in ascertaining the pertinent facts.

(d)      Whether or not therein expressly so provided, every provision of this Indenture and the Indenture Documents or Sales Facilitation Agreement that in any way relates to the Trustee is subject to paragraphs (a), (b), and (c) of this Section 7.01 and Section 7.02.

(e)      The Trustee will not be liable for interest on any money received by it except as the Trustee may agree in writing with the Issuer. Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

(f)      Neither the Trustee nor any Agent shall incur any liability for not performing any act or fulfilling any duty, obligation or responsibility hereunder by reason of any occurrence beyond their control (including but not limited to any act or provision of any present or future law or regulation or Governmental Authority, any act of God or war, civil unrest, local or national disturbance or disaster, any act of terrorism, epidemics, riots, strikes or other work stoppages or

93

the unavailability of the Federal Reserve Bank wire or facsimile or other wire or communication facility).

Section 7.02.   Rights of Trustee.

(a)      The Trustee may conclusively rely upon any document believed by it to be genuine and to have been signed or presented by the proper Person. The Trustee need not investigate any fact or matter stated in the document.

(b)      Before the Trustee acts or refrains from acting, it may require a Certificate of a Responsible Officer or an Opinion of Counsel or both. The Trustee will not be liable for any action it takes or omits to take in good faith in reliance on such certificate of a Responsible Officer or Opinion of Counsel. The Trustee may consult with counsel of its selection and the advice of such counsel or any Opinion of Counsel will be full and complete authorization and protection from liability in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(c)      The Trustee may act through its attorneys and agents and will not be responsible for the misconduct or negligence of any agent appointed with due care.

(d)      The Trustee will not be liable for any action it takes or omits to take in good faith that it believes to be authorized or within the rights or powers conferred upon it by this Indenture.

(e)      Unless otherwise specifically provided in this Indenture, any demand, request, direction or notice from the Issuer will be sufficient if signed by a Responsible Officer of the Issuer.

(f)      The Trustee will be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the Holders unless such Holders have provided to the Trustee indemnity or security satisfactory to it against the losses, liabilities and expenses that might be incurred by it in compliance with such request or direction.

(g)      In no event shall the Trustee be responsible or liable for any incidental, special indirect punitive or consequential loss or damage of any kind whatsoever (including but not limited to, loss of profit), irrespective of whether the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(h)      The Trustee shall not be required to expend or risk any of its own funds or be under any obligation to take any action hereunder or otherwise incur any liability, financial or otherwise, in the performance of any of its duties hereunder or under any Security Document, or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to it against such risk or liability is not assured to it.

(i)      The Trustee shall not be deemed to have notice of any Default or Event of Default unless a Responsible Officer of the Trustee has actual knowledge thereof.

(j)     The Trustee shall not be required to give any bond or surety in respect of the performance of its powers and duties hereunder.

(k)     The Trustee may request that the Issuer deliver a certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture.

(l)     The permissive rights of the Trustee enumerated herein shall not be construed as duties.

(m)     The Trustee shall not be bound to make any investigation into (i) the performance of or compliance with any of the covenants or agreements set forth herein, (ii) the occurrence of any default, or the validity, enforceability, effectiveness or genuineness of this Indenture or any other agreement, instrument or document.

(n)     The Trustee shall be under no obligation to effect or maintain insurance or to renew any policies of insurance or to inquire as to the sufficiency of any policies of insurance carried by the Issuer or any Guarantor, or to report, or make or file claims or proof of loss for, any loss or damage insured against or that may occur, or to keep itself informed or advised as to the payment of any Taxes or assessments, or to require any such payment to be made.

(o)     Notwithstanding anything to the contrary in this Indenture or in the other Transaction Documents, the Trustee shall have no (A) obligation to monitor or supervise any other Security Agent, (B) liability for any acts or omission of any Security Agent under the Transaction Documents, or (C) responsibility for any failure or delay in performing any obligations of the Trustee under the Transaction Documents as a result of a failure or delay on the part of a Security Agent to perform its obligations.

Section 7.03.   Individual Rights of Trustee.

Each of the Trustee and the relevant Collateral Agent in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Issuer, the Guarantors or any Affiliate of the Issuer with the same rights it would have if it were not Trustee or the Collateral Agent, as the case may be. However, in the event that the Trustee or the Collateral Agent acquires any conflicting interest it must eliminate such conflict within ninety (90) days or resign (which such resignation shall become effective until a successor trustee has been appointed and has accepted the mandate). Any Agent may do the same with like rights and duties.

Section 7.04.   Trustee's Disclaimer.

The Trustee will not be responsible for and makes no representation as to the validity or adequacy of this Indenture or the Notes or any other Indenture Document or other Transaction Document, it shall not be accountable for the Issuer's use of the proceeds from the Notes or any money paid to the Issuer or upon the Issuer's direction under any provision of this Indenture, it will not be responsible for the use or application of any money received by any Paying Agent other than the Trustee, and it will not be responsible for any statement or recital herein or any statement in the Notes or any other document in connection with the sale of the Notes or pursuant to this Indenture other than its certificate of authentication.

95

Section 7.05.   Notice of Defaults.

If any Event of Default occurs and is continuing and is actually known to a Responsible Officer of the Trustee, the Trustee will send notice of the Event of Default to each Holder within thirty (30) days after it obtains knowledge thereof, unless the Event of Default has been cured or waived; *provided* that, except in the case of a Default in the payment of the principal of or interest on any Note, the Trustee may withhold the notice if and so long as the Trustee in good faith determines that withholding the notice is in the interest of the Holders.

Section 7.06.   Compensation and Indemnity.

(a)    The Issuer will pay to the Trustee from time to time such compensation for its acceptance of this Indenture and services hereunder as agreed upon in writing. The Trustee's compensation will not be limited by any law on compensation of a trustee of an express trust. The Issuer will reimburse the Trustee promptly upon request for all disbursements, advances and expenses incurred or made by it in addition to the compensation for its services. Such expenses will include the reasonable compensation, disbursements and expenses of the Trustee's agents and counsel.

(b)    The Issuer and the Guarantors will jointly and severally indemnify and hold harmless the Trustee, its Affiliates, and their respective officers, directors, agents, employees and servants, against any and all losses, liabilities or expenses incurred by it arising out of or in connection with the acceptance or administration of its duties or the exercise of any rights under this Indenture or any Indenture Document or other Transaction Document, including the costs and expenses of enforcing this Indenture against the Issuer and the Guarantors (including this Section 7.06) and defending itself against any claim (whether asserted by the Issuer, the Guarantors, any Holder or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, except to the extent any such loss, liability or expense may be attributable to its gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a non-appealable order or judgment). The obligation in the preceding sentence to indemnify the Trustee shall not apply in connection with Taxes incurred or owed as a result of the receipt by the Trustee of compensation for its services. The Trustee will notify the Issuer promptly of any claim for which it may seek indemnity. Failure by the Trustee to so notify the Issuer will not relieve the Issuer or the Guarantors of their obligations hereunder. The Issuer or the Guarantors will defend any third party claim and the Trustee will cooperate in the defense. The Trustee may have separate counsel and the Issuer will pay the reasonable fees and expenses of such counsel. Neither the Issuer nor the Guarantors need pay for any settlement made without its consent, which consent will not be unreasonably withheld, delayed or conditioned.

(c)    The obligations of the Issuer and the Guarantors under this Section 7.06 will survive the satisfaction and discharge of this Indenture and the resignation or removal of the Trustee.

(d)    To secure the Issuer's and the Guarantors' payment obligations in this Section 7.06, the Trustee will have a Lien prior to the Notes on all money or Property held or collected by the Trustee, except that held in trust to pay principal and interest on particular Notes. Such Lien will survive the satisfaction and discharge of this Indenture.

(e)      When the Trustee incurs expenses or renders services after an Event of Default specified in Section 6.01(vi) hereof occurs, the expenses and the compensation for the services (including the fees and expenses of its agents and counsel) are intended to constitute expenses of administration for purposes of priority under any Bankruptcy Law.

Section 7.07.   Replacement of Trustee.

(a)      A resignation or removal of the Trustee and appointment of a successor Trustee will become effective only upon the successor Trustee's acceptance of appointment as provided in this Section 7.07. The Issuer shall promptly appoint a successor Trustee; *provided*, *however*, that in case of a bankruptcy, the resigning Trustee will have the right to appoint a successor Trustee within ten (10) Business Days after giving such notice of resignation.

(b)      The Trustee may resign in writing at any time and be discharged by so notifying the Issuer. The Majority Holders may remove the Trustee by so notifying the Trustee and the Issuer in writing. The Issuer may remove the Trustee if:

(i)      the Trustee fails to comply with Section 7.10 hereof;

(ii)      the Trustee is adjudged a bankrupt or an insolvent or an order for relief is entered with respect to the Trustee under any Bankruptcy Law;

(iii)      a custodian or public officer takes charge of the Trustee or its Property; or

(iv)      the Trustee becomes incapable of acting.

(c)      If the Trustee resigns or is removed or if a vacancy exists in the office of Trustee for any reason, the Majority Holders will promptly appoint a successor Trustee.

(d)      If a successor Trustee does not take office within sixty (60) days after the retiring Trustee resigns or is removed, the retiring Trustee, the Issuer, or the Holders of at least 10% in aggregate principal amount of the then outstanding Notes may petition any court of competent jurisdiction for the appointment of a successor Trustee at the expense of the Issuer.

(e)      A successor Trustee will deliver a written acceptance of its appointment to the retiring Trustee and to the Issuer. Thereupon, the resignation or removal of the retiring Trustee will become effective, and the successor Trustee will have all the rights, powers and duties of the Trustee under this Indenture. The successor Trustee will mail a notice of its succession to Holders. The retiring Trustee will promptly transfer all Property held by it as Trustee to the successor Trustee; *provided* all sums owing to the Trustee hereunder have been paid and subject to the Lien provided for in Section 7.07 hereof. Notwithstanding replacement of the Trustee pursuant to this Section 7.08, the Issuer's obligations under Section 7.07 hereof will continue for the benefit of the retiring Trustee.

Section 7.08.   Successor Trustee by Merger, etc.

If the Trustee consolidates, merges or converts into, or transfers all or substantially all of its corporate trust business to, another corporation, the successor corporation without any further act will be the successor Trustee.

Section 7.09.   Eligibility; Disqualification.

There will at all times be a Trustee hereunder that is a corporation organized and doing business under the laws of the United States of America or of any state thereof that is authorized under such laws to exercise corporate trustee power, that is subject to supervision or examination by federal or state authorities and that has a combined capital and surplus of at least $50.0 million as set forth in its most recent published annual report of condition.

Section 7.10.   Rights Extended.

The rights, privileges, protections, immunities and benefits given to the Trustee, including its rights to be indemnified, are extended to, and shall be enforceable by the Trustee in each of its capacities it which it may serve, and to each Agent, each Collateral Agent and custodian and other person employed to act hereunder; provided in and during an Event of Default, only the Trustee, and not any Agent, Collateral Agent, custodian or any other person, shall be subject to the prudent person standard.  Each Holder, by acceptance of the Notes, hereby authorizes and directs the Trustee to execute, deliver and perform each of the Transaction Documents to which the Trustee is or is intended to be a party on its own behalf or on behalf of the Holders and the Trustee and each Holder agrees to be bound by all of the agreements of the Trustee contained in such Transaction Document.

Section 7.11.   Appointment of Co-Trustee.

(a)     Notwithstanding any other provisions in this Indenture, at any time, solely for the purpose of meeting the legal requirements of any jurisdiction, the Trustee shall have the power and may execute and deliver all instruments necessary to appoint one or more Persons to act as separate trustee or trustees or as co-trustee or co-trustees, and to vest in such Person or Persons, in such capacity and subject to the other provisions of this Indenture, such powers, duties, obligations and rights as the Trustee may consider necessary or desirable. No co-trustee hereunder shall be required to meet the terms of eligibility as a successor trustee under this Indenture and no notice to Holders of Notes of the appointment of a separate trustee or co-trustee shall be required under this Indenture.

(b)     Every separate trustee or co-trustee shall, to the extent permitted by law, be appointed and act subject to the following provisions and conditions:

(i)     all rights, powers, duties and obligations conferred or imposed upon the Trustee shall be conferred or imposed upon and exercised or performed by the Trustee and such separate trustee or co-trustee jointly (it being understood that such separate trustee or co-trustee is not authorized to act separately without the Trustee joining in such act), except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed the Trustee shall be incompetent or unqualified to perform such act or acts,

98

in which event such rights, powers, duties and obligations shall be exercised and performed singly by such co-trustee, but solely at the direction of the Trustee;

(ii)     no trustee hereunder shall be personally liable by reason of any act or omission of any other trustee hereunder; and

(iii)     the Trustee may at any time accept the resignation of or remove any separate trustee or co-trustee.

(c)     Any notice, request or other writing given to the Trustee shall be deemed to have been given to each of the then separate trustees or co-trustees, as effectively as if given to each of them. Every instrument appointing any separate trustee or co-trustee shall refer to this Indenture and the conditions of this Article VII. Each separate trustee or co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, jointly with the Trustee, subject to all the provisions of this Indenture, specifically including every provision of this Indenture relating to the conduct of, affecting the liability of, or affording protection or rights (including the rights to compensation, reimbursement and indemnification hereunder) to, the Trustee. Every such instrument shall be filed with the Trustee.

(d)     Any separate trustee or co-trustee may at any time constitute the Trustee or its agent or attorney-in-fact with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Indenture on its behalf and in its name. If any separate trustee or co-trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Trustee, to the extent permitted by law, without the appointment of a new or successor trustee.

Section 7.12.   Intercreditor Matters; Discretion.

Whenever the Trustee is required or requested to provide any consents, directions, determinations, acceptances, objections, rejections or other similar actions pursuant to this Indenture or other Transaction Document, or exercise any discretionary right or remedy under this Indenture or other Transaction Document (including providing a direction to the Collateral Agent to take any such actions), or to otherwise decide between two or more courses of action permitted or required by this Indenture or under any other Transaction Document, the Trustee shall promptly give notice (in such form as shall be appropriate under the circumstances) to the Holders requesting instruction as to the course of action to be adopted, and to the extent the Trustee acts in good faith in accordance with any written instruction of the Majority Holders and of Holders of at least 50% in aggregate principal amount of the Take-back SSNs then outstanding (or such other percentages as may be expressly provided), and in any such case the Trustee shall not be liable on account of such action to any Person and shall not be liable for any failure or delay in taking such actions resulting from any failure or delay by such Holders in providing such directions. The Trustee shall be fully justified in failing or refusing to take any such action if it shall not have received written instruction, advice or concurrence from such number or percentage of the Holders as shall be expressly provided for herein or in the other Transaction Documents. For the avoidance of doubt, the foregoing provisions of this Section 7.12 is intended solely for the benefit of the Trustee and is not intended to and do not confer any rights, benefits or claims on or to any other party; and does not limit the right and authority of the Trustee to take actions expressly permitted or

authorized by this Indenture and the other Transaction Documents, including as may be requested by the Issuer in accordance with the terms of this Indenture.

Section 7.13.   Voting by Beneficial Owners

Notwithstanding anything else in this Indenture to the contrary, with respect to any Global Note held through the Depositary (or a nominee thereof), each Person holding a beneficial interest in such Global Note may be considered to be a noteholder of its portion of the notes for purposes of voting on the matter relating thereto (for example, such Person may consent to any waiver or amendment directly without requiring the participation of the applicable clearing system or its nominee and may attend and vote at meetings of noteholders); it being understood that the Trustee must have received from (or on behalf of) such Person evidence satisfactory to the Trustee (in its sole discretion) that such Person holds the beneficial interests in such Global Note that it purports to vote, and such evidence of ownership may include a beneficial ownership certification, medallion guarantees, a securities position or participant list or other information obtained from the applicable clearing system, or such other information the Trustee deems satisfactory.  The Trustee shall have no liability to the extent it has acted in good faith on any such consent, waiver, direction, instruction or other vote from any such Person or for the sufficiency of the evidence deemed satisfactory to the Trustee.

## ARTICLE 8
## LEGAL DEFEASANCE AND COVENANT DEFEASANCE

Section 8.01.   Option to Effect Legal Defeasance or Covenant Defeasance.

The Issuer may at any time, at the option of its board of directors evidenced by a resolution set forth in a Certificate of a Responsible Officer, elect to have either Section 8.02 or 8.03 hereof be applied to all outstanding Notes upon compliance with the conditions set forth below in this Article 8.

Section 8.02.   Legal Defeasance and Discharge

Upon the Issuer's exercise under Section 8.01 hereof of the option applicable to this Section 8.02, the Issuer and the Guarantors will, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, be deemed to have been discharged from their obligations with respect to the Indenture Documents to which they are a party on the date the conditions set forth below are satisfied (hereinafter, "*Legal Defeasance*"). For this purpose, Legal Defeasance means that the Issuer and the Guarantors will be deemed to have paid and discharged the entire Indebtedness represented by the outstanding Notes (including the Note Guarantees), which will thereafter be deemed to be "outstanding" only for the purposes of Section 8.05 hereof and the other Sections of this Indenture referred to in Section 8.02(i) and (ii) below, and each of the Issuer and the Guarantors will have satisfied all their other obligations under such Notes, the Note Guarantees and this Indenture (and the Trustee, on demand of and at the expense of the Issuer, shall execute proper instruments acknowledging the same), except for the following provisions which will survive until otherwise terminated or discharged hereunder:

(i)        the rights of Holders of outstanding Notes to receive payments in respect of the principal of, or interest or premium, if any, on, such Notes when such payments are due from the trust referred to in Section 8.04 hereof;

(ii)        the Issuer's obligations with respect to such Notes under Article 2 and Section 4.02 hereof;

(iii)        the rights, powers, trusts, duties, indemnities and immunities of the Trustee hereunder and the Issuer's and the Guarantors' obligations in connection therewith; and

(iv)        this Article 8.

Subject to compliance with this Article 8, the Issuer may exercise its option under this Section 8.02 notwithstanding the prior exercise of its option under Section 8.03 hereof. The exercise by the Issuer of Legal Defeasance pursuant to this Section 8.02 shall in each case be effective when one-hundred twenty-three (123) days have passed since the date of the deposit in trust in accordance with the conditions set forth in Section 8.04 hereof.

Section 8.03.   Covenant Defeasance

Upon the Issuer's exercise under Section 8.01 hereof of the option applicable to this Section 8.03, each of the Issuer and the Guarantors will, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, be released from its obligations under the covenants contained in Sections 4.07 and 4.09 through 4.29 hereof (other than Section 4.13(1) to the extent such clause relates to the Issuer) with respect to the outstanding Notes on and after the date the conditions set forth in Section 8.04 hereof are satisfied (hereinafter, "*Covenant Defeasance*"), and the Notes will thereafter be deemed not "outstanding" for the purposes of any direction, waiver, consent or declaration or act of Holders (and the consequences of any thereof) in connection with such covenants, but will continue to be deemed "outstanding" for all other purposes hereunder (it being understood that such Notes will not be deemed outstanding for accounting purposes). For this purpose, Covenant Defeasance means that, with respect to the outstanding Notes and the Note Guarantees, each of the Issuer and the Guarantors may omit to comply with and will have no liability in respect of any term, condition or limitation set forth in any such covenant, whether directly or indirectly, by reason of any reference elsewhere herein to any such covenant or by reason of any reference in any such covenant to any other provision herein or in any other document and such omission to comply will not constitute a Default or an Event of Default under Section 6.01 hereof, but, except as specified above, the remainder of this Indenture and such Notes and the Note Guarantees will be unaffected thereby. In addition, upon the Issuer's exercise under Section 8.01 hereof of the option applicable to this Section 8.03, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, Sections 6.01(iii), 6.01(iv), 6.01(v), and 6.01(viii) through 6.01(xvi) hereof will not constitute Events of Default.

Section 8.04.   Conditions to Legal or Covenant Defeasance.

(a)        In order to exercise either the Legal Defeasance or the Covenant Defeasance under either Section 8.02 or 8.03 hereof:

101

(i)      the Issuer must irrevocably deposit with the Trustee, in trust, for the benefit of the Holders, cash in U.S. dollars, non-callable U.S. Government Obligations, or a combination of cash in U.S. dollars and non-callable U.S. Government Obligations, in such amounts as will be sufficient, without reinvestment, in the opinion of a nationally recognized investment bank, appraisal firm, or firm of independent public accountants (provided, that no opinion from a nationally recognized investment bank, appraisal firm or firm of independent public accountants will be needed if such deposit consists solely in cash), to pay the principal of, or interest and premium, if any, and Additional Amounts, if any, on the outstanding Notes on the stated date for payment thereof or on the applicable redemption date, as the case may be, and the Issuer must specify whether the Notes are being defeased to such stated date for payment or to a particular redemption date;

(ii)     no Default or Event of Default has occurred and is continuing on the date of such deposit or will result from such deposit (other than from the incurrence of Indebtedness the proceeds of which will be used for the Legal Defeasance or the Covenant Defeasance, as the case may be);

(iii)    in the case of an election under Section 8.02 hereof, the Issuer has delivered to the Trustee an Opinion of Counsel reasonably acceptable to the Trustee confirming that (a) the Issuer has received from, or there has been published by, the Internal Revenue Service a ruling or (b) since the date of this Indenture there has been a change in the applicable U.S. federal income tax law, in either case to the effect that, and based thereon such Opinion of Counsel will confirm that, neither the Holders nor the beneficial owners of the Notes will recognize income, gain or loss for U.S. federal income tax purposes as a result of such Legal Defeasance and will be subject to federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred;

(iv)     in the case of an election under Section 8.03 hereof, the Issuer must deliver to the Trustee an Opinion of Counsel reasonably acceptable to the Trustee confirming that neither the Holders nor the beneficial owners of the Notes will recognize income, gain or loss for U.S. federal income tax purposes as a result of such Covenant Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

(v)      such Legal Defeasance or Covenant Defeasance will not result in a breach or violation of, or constitute a Default under, any material agreement or instrument (other than this Indenture) to which the Issuer or any Guarantor is a party or by which the Issuer or any Guarantor is bound;

(vi)     the Issuer must deliver to the Trustee a Certificate of a Responsible Officer stating that the deposit was not made by the Issuer with the intent of preferring the Holders over any of the Issuer's other creditors with the intent of defeating, hindering, delaying or defrauding any of the Issuer's creditors or others; and

(vii)    the Issuer must deliver to the Trustee a Certificate of a Responsible Officer and an Opinion of Counsel, each stating that all conditions precedent and covenants, if any, relating to the Legal Defeasance or the Covenant Defeasance have been complied with.

Section 8.05.    Deposited Money and U.S. Government Obligations to be Held in Trust; Other Miscellaneous Provisions.

Subject to Section 8.06 hereof, all money and non-callable U.S. Government Obligations (including the proceeds thereof) deposited with the Trustee (or other qualifying trustee, collectively for purposes of this Section 8.05, the "*Trustee*") pursuant to Section 8.04 hereof in respect of the outstanding Notes will be held in trust and applied by the Trustee, in accordance with the provisions of such Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Issuer acting as Paying Agent) as the Trustee may determine, to the Holders of such Notes of all sums due and to become due thereon in respect of principal, premium, if any, and interest, but such money need not be segregated from other funds except to the extent required by law.

The Issuer will pay and indemnify the Trustee against any Tax, fee or other charge imposed on or assessed against the cash or non-callable U.S. Government Obligations deposited pursuant to Section 8.04 hereof or the principal and interest received in respect thereof other than any such Tax, fee or other charge which by law is for the account of the Holders of the outstanding Notes.

Notwithstanding anything in this Article 8 to the contrary, the Trustee will deliver or pay to the Issuer from time to time upon the request of the Issuer any money or non-callable U.S. Government Obligations held by it as provided in Section 8.04 hereof which, in the opinion of a nationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Trustee (which may be the opinion delivered under Section 8.04(i) hereof), are in excess of the amount thereof that would then be required to be deposited to effect an equivalent Legal Defeasance or Covenant Defeasance.

Section 8.06.    Repayment to Issuer.

Subject to Applicable Law, any money deposited with the Trustee or any Paying Agent, or then held by the Issuer, in trust for the payment of the principal of, premium, if any, or interest on, any Note and remaining unclaimed for two (2) years after such principal, premium, if any, or interest has become due and payable shall be paid to the Issuer on its request or (if then held by the Issuer) will be discharged from such trust; and the Holder of such Note will thereafter be permitted to look only to the Issuer for payment thereof, and all liability of the Trustee or such Paying Agent with respect to such trust money, and all liability of the Issuer as trustee thereof, will thereupon cease.

Section 8.07.    Reinstatement.

If the Trustee or Paying Agent is unable to apply any U.S. dollars or non-callable U.S. Government Obligations in accordance with Section 8.02 or 8.03, as the case may be, by reason of any order or judgment of any court or Governmental Authority enjoining, restraining or otherwise prohibiting such application, then each of the Issuer's and each Guarantor's obligations under this Indenture, the Notes and the Note Guarantees will be revived and reinstated as though

no deposit had occurred pursuant to Section 8.04 hereof until such time as the Trustee or Paying Agent is permitted to apply all such money in accordance with Section 8.04 hereof, *provided, however*, that, if the Issuer makes any payment of principal of, premium, if any, or interest on, any Note following the reinstatement of its obligations, the Issuer will be subrogated to the rights of the Holders of such Notes to receive such payment from the money held by the Trustee or Paying Agent.

ARTICLE 9
AMENDMENT, SUPPLEMENT AND WAIVER

Section 9.01.    <u>Without Consent of Holders of Notes</u>.

Notwithstanding Section 9.02 of this Indenture, the Issuer, the Guarantors, the Trustee and, if applicable, the Security Agent may amend or supplement this Indenture, the Notes, the Note Guarantees, the Sales Facilitation Agreement and the Security Documents (or provide the Security Agent with any necessary direction) without the consent of the Holders for certain specified purposes, including, among others, for any of the following purposes:

(i)    to establish the form and terms of the Notes of any series permitted by this Indenture;

(ii)    to add to the Issuer's covenants or to surrender any right or power conferred in this Indenture upon the Issuer;

(iii)    to convey, transfer and assign Properties or assets to the Trustee to secure the Senior Secured Obligations, and to correct or amplify the description of any Property at any time subject to the Lien of any Security Document, to perform any amendments that are ministerial in nature not negatively affecting the rights of Holders or to assure, convey and confirm unto the relevant Security Agent, any Property subject to or required to be subject to the Lien of the Security Documents;

(iv)    to evidence the release of any Note Guarantee in accordance with the terms of Section 11.04 this Indenture, including in connection with a merger of any Guarantor with or into the Issuer or another Guarantor as part of any internal reorganization permitted under this Indenture or a Transfer permitted under this Indenture;

(v)    to evidence the release of any Collateral in accordance with this Indenture or the Security Documents, including in connection with a merger of any Guarantor with or into the Issuer or another Guarantor as part of any internal reorganization permitted under this Indenture or a Transfer permitted under this Indenture;

(vi)    in connection with and to reflect any amendments to the provisions of this Indenture required by any Rating Agency in circumstances in which a Ratings Affirmation is required pursuant to this Indenture; *provided*, *however*, such amendments could not prejudice the Holders of the Notes or the Trustee;

(vii)    (a) to add a Guarantor, (b) to provide for the assumption of a Guarantor's obligations under this Indenture in connection with a merger of any Guarantor with or into

104

the Issuer or another Guarantor as part of any internal reorganization permitted under Section 4.07, 5.01(a) or 5.01(c) of this Indenture, or a Transfer permitted under Section 4.24 of this Indenture, or (c) to add any Collateral under this Indenture;

      (viii)    to comply with any applicable rules or regulations of the SEC or any securities exchange on which the Notes issued under this Indenture may be listed;

      (ix)    to evidence the appointment of a successor Security Agent;

      (x)    to comply with the requirements of the Luxembourg, Irish, or Singapore stock exchange (as applicable), DTC, Euroclear or Clearstream or any successor clearing system for the Notes; and

      (xi)    to cure any ambiguity, to correct or supplement any provision in any Indenture Document that may be defective or inconsistent with any other provision in such Indenture Document, *provided*, that such action shall not adversely affect the interests of the Holders of the Notes of any Series.

Upon the request of the Issuer accompanied by a Certificate of a Responsible Officer certifying to the due authorization of the execution of any such amended or supplemental indenture or amendment or supplement any other Indenture Document, and upon receipt by the Trustee and the Collateral Agent, as applicable, of the documents described in Section 7.02 hereof, the Trustee and, if applicable, the Collateral Agent will join with the Issuer and the Guarantors in the execution of any such document or supplemental indenture authorized or permitted by the terms of this Indenture (or provide any necessary direction) and to make any further appropriate agreements and stipulations that may be therein contained, but the Trustee or the Collateral Agent, as the case may be, will not be obligated to enter into such document or supplemental indenture (or provide such direction) that affects its own rights, duties or immunities under this Indenture or otherwise. The Trustee is authorized to execute and deliver any such supplemental indenture in accordance with Section 10.02(e) hereof.

Section 9.02.   <u>With Consent of Holders of Notes</u>.

(a)    Except as provided below in this Section 9.02 and as otherwise provided in Article 6 hereof, the Issuer, the Guarantor, the Trustee and the relevant Collateral Agent may amend or supplement this Indenture (or provide the Security Agent with any necessary direction), the Notes, the Note Guarantees, the Security Documents and the Sales Facilitation Agreement with the written consent of the Majority Holders and of at least 50% in aggregate principal amount of the Take-back SSNs then outstanding (in the case of the relevant Collateral Agent, at the direction of the Trustee acting on such Majority Holders' consent, which, for the avoidance of doubt, shall include the consent of Holders of at least 50% in aggregate principal amount of the Take-back SSNs then outstanding) voting as a single class (including, without limitation, consents obtained in connection with a tender offer or exchange offer for, or purchase of, the Notes), and, subject to Section 6.07 hereof, any existing Default or Event of Default or future compliance with any provision of this Indenture or the Notes may be waived with the written consent of the Majority Holders voting as a single class and of at least 50% in aggregate principal amount of the Take-back SSNs then outstanding (including, without limitation, consents obtained in connection with

a tender offer or exchange offer for, or purchase of, the Notes). Section 2.08 hereof shall determine which Notes are considered to be "outstanding" for purposes of this Section 9.02.

(b)    Subject to Section 6.07 hereof and clauses (c) and (d) of this Section 9.02, the Majority Holders voting as a single class (and including Holders of at least 50% in aggregate principal amount of the Take-back SSNs then outstanding) may waive compliance in a particular instance by the Issuer or any Guarantor with any provision of this Indenture, the Notes or the Note Guarantees.

(c)    Without the consent of each Holder affected, an amendment, supplement or waiver under this Section 9.02 may not (with respect to any Notes held by a non-consenting Holder):

(i)    change any Interest Payment Date of any Note or change the principal amount thereof or the interest thereon, or premium paid in connection therewith, or change the place of payment where, or the coin or currency in which, any Note or the interest thereon is payable, or impair the right to receive any principal payment on such Note, on or after the Stated Maturity thereof, or to institute suit for the enforcement of any such payment;

(ii)    permit the creation of any Lien with respect to any of the Collateral, terminate (except as specifically contemplated by this Indenture) the Lien of or deprive any noteholder of the security afforded by the Lien of the Security Documents;

(iii)    make any change in the percentage of the principal amount of the Notes required for amendments or waivers;

(iv)    reduce the amount payable upon the redemption of any Note or the times at which any Note may be redeemed or, once notice of redemption has been given, the time at which it must thereupon be redeemed;

(v)    modify or change any provision of this Indenture affecting the ranking of the Notes or the Note Guarantees by the Guarantors in a manner adverse to such Holder;

(vi)    after the time an Offer to Purchase is required to have been made, reduce the purchase amount or purchase price, or extend the latest expiration date or purchase date thereunder; or

(vii)    request that any Rating Agency cease rating the Notes.

No supplemental indenture or amendment to another Indenture Document or to the Sales Facilitation Agreement shall, without the consent of 100% of the Super Priority Notes, modify the senior ranking of the Super Priority Notes, permit any other indebtedness to be ranked *pari passu* with the Super Priority Notes or deprive the Super Priority Notes of their senior Lien on the Collateral.

No supplemental indenture or amendment to another Indenture Document or Sales Facilitation Agreement shall, without the consent of a majority of the affected Series of Notes,

modify any provision of this indenture in a manner that materially and adversely affects such Series of Notes as compared to the other Series of Notes.

A supplemental indenture or amendment that changes or eliminates any covenant or other provision of this Indenture or any other Indenture Document or Sales Facilitation Agreement which has expressly been included solely for the benefit of one or more particular series of Notes issued thereunder, or which modifies the rights of the noteholders of such series with respect to such covenant or other provision, shall be deemed not to affect the rights under this Indenture or such other Indenture Document or Sales Facilitation Agreement of the Holders of any other series.

In addition, any amendment to, or waiver of, the provisions of this Indenture or any Security Document that has the effect of releasing all or any part of the Collateral from the Liens securing the Notes will require the consent of the Holders of at least 75% in aggregate principal amount of the Notes then outstanding (including the consent of Holders of at least 75% in aggregate principal amount of the Take-back SSNs then outstanding).

Prior to the execution of any such modification (or any requisite direction from the Trustee as may be necessary), each of the Trustee and any applicable Security Agent will be entitled to receive and rely upon an Opinion of Counsel and an Officer's Certificate stating that the execution of such amendment (or direction) is authorized and permitted by this Indenture or other Indenture Document and that all conditions precedent and covenants, if any, under this Indenture and any applicable Indenture Document have been complied with.

(d)      Upon the request of the Issuer accompanied by a Certificate of a Responsible Officer certifying to the due authorization of the execution of any such amended or supplemental indenture or amendment or supplement to the applicable Indenture Document or Sales Facilitation Agreement, and upon the filing with the Trustee and the relevant Collateral Agent, as applicable, of evidence satisfactory to the Trustee and the relevant Collateral Agent, as applicable, of the consent of the Holders of Notes as aforesaid, and upon receipt by the Trustee and the relevant Collateral Agent, as applicable, of the documents described in Section 7.02(b) hereof, the Trustee and, if applicable, the relevant Collateral Agent (acting at the direction of the Trustee), will join with the Issuer and the Guarantors in the execution of such amended or supplemental indenture or amendment or supplement to the applicable Indenture Document or Sales Facilitation Agreement unless such document directly affects the rights, duties or immunities of the Trustee or the relevant Collateral Agent, as the case may be, under this Indenture or otherwise (or provide any necessary direction), in which case the Trustee or the relevant Collateral Agent, as the case may be, may in its discretion, but will not be obligated to, enter into such document (or provide any necessary direction).

(e)      After an amendment, supplement or waiver under this Section 9.02 becomes effective, the Issuer will mail to the Holders of Notes affected thereby a notice briefly describing the amendment, supplement or waiver. Any failure of the Issuer to mail such notice, or any defect therein, will not, however, in any way impair or affect the validity of any such amended or supplemental indenture or waiver.

(f)        It is not be necessary for the consent of the Holders under this Section 9.02 to approve the particular form of any proposed amendment, supplement or waiver, but it is sufficient if such consent approves the substance thereof.

Section 9.03.    Revocation and Effect of Consents.

(a)        Until an amendment, supplement or waiver becomes effective, a consent to it by a Holder is a continuing consent by the Holder and every subsequent Holder that evidences the same debt as the consenting Holder's Note, even if notation of the consent is not made on any Note. However, any such Holder or subsequent Holder may revoke the consent as to its Note if the Trustee receives written notice of revocation before the date the amendment, supplement or waiver becomes effective. An amendment, supplement or waiver becomes effective in accordance with its terms and thereafter binds every Holder, *provided, however* that a supplemental indenture or amendment that changes or eliminates any covenant or other provision of this Indenture or any other Indenture Document which has expressly been included solely for the benefit of one or more particular series of Notes issued thereunder, or which modifies the rights of the Holders of Notes of such series with respect to such covenant or other provision, shall be deemed not to affect the rights under this Indenture or such other Indenture Document of the Holders of Notes of any other series.

Section 9.04.    Notation on or Exchange of Notes

The Trustee may place an appropriate notation about an amendment, supplement or waiver on any Note thereafter authenticated. The Issuer in exchange for all Notes may issue and the Trustee shall, upon receipt of an Authentication Order, authenticate new Notes that reflect the amendment, supplement or waiver.

Failure to make the appropriate notation or issue a new Note will not affect the validity and effect of such amendment, supplement or waiver.

Section 9.05.    Trustee to Sign Amendments, etc.

The Trustee and each Collateral Agent, as applicable, will sign any amendment or supplement authorized pursuant to this Article 9 (or provide any necessary direction) if the amendment or supplement (or direction) does not adversely affect the rights, duties, liabilities or immunities of the Trustee and the relevant Collateral Agent, as applicable. In executing any amendment or supplement (or providing any necessary direction), the Trustee and the relevant Collateral Agent, as applicable, shall receive and (subject to Section 7.01 hereof) will be fully protected in conclusively relying upon, in addition to the documents required by Section 13.03 hereof, a Certificate of a Responsible Officer and an Opinion of Counsel stating that the execution of such amendment or supplement is authorized or permitted by this Indenture and the Notes or Note Guarantees, if applicable and such amendment or supplement is the legal, valid and binding obligation of the Issuer and the Guarantors, enforceable against them in accordance with its terms.

Section 9.06.   Payment.

None of the Issuer or the Guarantors nor any of their respective Subsidiaries or Affiliates may, directly or indirectly, pay or cause to be paid any consideration, whether by way of interest, fee or otherwise, to any Holder for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of this Indenture or the Notes unless such consideration is offered to be paid or agreed to be paid to all Holders that consent, waive or agree to amend such term or provision within the time period set forth in the solicitation documents relating to the consent, waiver or amendment.

ARTICLE 10
COLLATERAL AND SECURITY

Section 10.01. Collateral Documents.

(a)      The due and punctual payment of the principal of, premium, if any, and interest on the Notes and amounts due hereunder and under the Note Guarantees when and as the same shall be due and payable, whether on an interest payment date, by acceleration, purchase, repurchase, redemption or otherwise, and interest on the overdue principal of, premium, if any, and interest (to the extent permitted by law), if any, on the Notes and the performance of all other Obligations of the Issuer and the Guarantors to the Holders, the relevant Collateral Agent or the Trustee under this Indenture, the Notes and the Note Guarantees will be secured by the Security Documents. The Security Documents will provide for the grant by the Issuer and the Guarantors party thereto in favor of the relevant Collateral Agent for the benefit of the Secured Parties of security interests in the Collateral, subject to Permitted Liens. The Secured Parties will also benefit from customary assignments of insurance policies, payment instructions and consents to assignments, to the extent required by such Security Documents.

Section 10.02. Security Documents; Future Guarantees.

(a)      Except as otherwise permitted herein, each of the Issuer and the Guarantors shall take, or cause to be taken, all actions necessary to maintain each Security Document to which it is a party in full force and effect and enforceable in accordance with its terms and to maintain and preserve the Liens created by such Security Documents and the priority thereof, including (i) making filings and recordations, (ii) making payments of fees and other charges on a timely basis, (iii) issuing and, if necessary, filing or recording supplemental documentation, including continuation statements, declaration or amendment deeds, discharging all claims or other Liens adversely affecting the rights of any Secured Party in any Collateral, publishing or otherwise delivering notice to third parties, (iv) depositing title documents and (v) taking all other actions either necessary or otherwise reasonably requested by the relevant Collateral Agent (acting at the instruction of the Trustee, who shall act as directed by the Majority Holders (including Holders of at least 50% in aggregate principal amount of the Take-back SSNs then outstanding)) to ensure that all Collateral (including any after-acquired Property of the Issuer or a Guarantor, as applicable, in each case intended to be covered by any Security Document to which it is a party) is subject to a valid and enforceable first-priority Lien in favor of the relevant Collateral Agent for the benefit of the Secured Parties (except as otherwise permitted under the Indenture Documents). In furtherance of the foregoing, (A) each of the Issuer and the Guarantors shall ensure that all of its

109

after-acquired Property, subject to any exemptions therein or under this Indenture, other than such Property not intended to be covered by such Security Documents shall become subject to the Lien of the Security Documents having the priority contemplated thereby promptly upon the acquisition thereof and (B) each of the Issuer and the Guarantors shall not open or maintain any bank account without first taking all such actions as may be necessary or otherwise requested by the Collateral Agents (acting at the instruction of the Trustee, who shall act as directed by the Majority Holders (including Holders of at least 50% in aggregate principal amount of the Take-back SSNs then outstanding)) to ensure that such bank account is subject to a valid and enforceable first priority Lien in favor of the relevant Collateral Agent for the benefit of the Secured Parties.

(b)      Each of the Issuer and the Guarantors shall take, or cause to be taken, all actions necessary to cause each Additional Material Project Document intended to be covered by a Security Document to which it is a party to be or become subject to the Liens of the Security Documents (whether by amendment to any Security Document, execution of a declaration deed or a new Security Document or otherwise) in favor of the relevant Collateral Agent, and shall deliver or cause to be delivered to the relevant Collateral Agent such certificates or other documents with respect to each Additional Material Project Document as are necessary or as the relevant Collateral Agent (acting at the instruction of the Trustee, who shall act as directed by the Majority Holders (including Holders of at least 50% in aggregate principal amount of the Take-back SSNs then outstanding)) may reasonably request, in each case to the extent required by the Security Documents.

(c)      Each of the Issuer and the Guarantors shall grant (and shall take all actions necessary to cause) a first priority Lien in favor of the relevant Collateral Agent for the benefit of the Secured Parties on any future Property, in each case to the extent required by the Security Documents and subject to Permitted Liens.

(d)      On the Issue Date and or at such other times as the Trustee may reasonably request in writing, each of the Issuer and the Guarantors shall furnish, or cause to be furnished, to the Trustee and the Collateral Agents, an opinion or Opinions of Counsel either stating that, in the opinion of such counsel, such action has been taken pursuant to the terms of the Security Documents with respect to (i) amending or supplementing the Security Documents (or providing additional Security Documents, notifications or acknowledgments) as is necessary to subject all the Collateral (including any after- acquired Property of the Issuer or the Guarantors, as applicable, in each case intended to be covered by a Security Document) to the Lien of the Security Documents and (ii) (A) the recordation of the Security Documents (including, without limitation, any amendment or supplement thereto) and any other requisite documents and (B) the execution and filing of any financing statements and continuation statements as are necessary to perfect and maintain the Liens purported to be created by the Security Documents and reciting the details of such action or stating that, in the opinion of such counsel, no such action is necessary to perfect and maintain such Liens. Such opinion or opinions of counsel shall also describe the recordation of the Security Documents and any other requisite documents and the execution and filing of any financing statements and continuation statements, or the taking of any other action that will, in the opinion of such counsel, be required to perfect and maintain the Liens purported to be created by the Security Documents after the date of such opinion.

110

Subject to the terms of this Indenture and the Security Documents, the Issuer and the Guarantors will have the right to remain in possession and retain exclusive control of the Collateral securing the Notes, to freely operate the Collateral and to collect, invest and dispose of any income therefrom.

(e)    The Issuer shall cause any Subsidiary formed or acquired by the Issuer or any Guarantor after the Issue Date, (a) within ten (10) Business Days of such formation or acquisition, to enter into a supplemental indenture to this Indenture substantially in the form attached hereto as Exhibit D hereto pursuant to which such entity shall guarantee, jointly and severally with the other Guarantors, all obligations under the Notes and this Indenture and (b) to the extent required by the Security Documents, all Equity Interests and other Property of assets of such entity shall be pledged as Collateral for the benefit of the Secured Parties in accordance with the terms of the Security Documents.

Section 10.03. Release of Collateral.

(a)    The Collateral Agent shall not at any time release the Collateral from the Liens created by the Security Documents unless such release is in accordance with the provisions of this Indenture and the applicable Security Documents and the Security and Depositary Agreement.

(b)    At any time when a Default or Event of Default has occurred and is continuing, no release of Collateral pursuant to the provisions of the Security Documents will be effective as against the Holders, other than upon payment in full and discharge of all Notes outstanding under this Indenture.

(c)    The release of any Collateral from the Liens created by the Security Documents shall not be deemed to impair the security under this Indenture in contravention of the provisions hereof if and to the extent the Collateral is released pursuant to this Indenture and the Security Documents.

Section 10.04. Specified Releases of Collateral.

(a)    Collateral may be released from the Liens created by the Security Documents at any time or from time to time in accordance with the provisions of the Security Documents, the Security and Depositary Agreement or as provided in this Indenture. The Issuer and the Guarantors will be entitled to releases of assets included in the Collateral from the Liens securing the Notes and the other Indenture Documents under any one or more of the following circumstances:

(i)    as described under Section 10.05;

(ii)    in connection with any Disposition of Property permitted under this Indenture, including Article 5 hereof; or

(iii)    with the consent of Holders in accordance with Section 9.02.

(b)    Upon the request of the Issuer pursuant to a Certificate of a Responsible Officer and Opinion of Counsel confirming that all conditions precedent and covenants, if any, hereunder and under the Security Documents have been complied with, and any necessary or proper

111

instruments of termination, satisfaction or release prepared by the applicable party, the Collateral Agent, without the consent of any Holder or the Trustee and at the expense of the Issuer or such other party, shall (and to the extent necessary, the Trustee may provide any directions to the Collateral Agent to) execute, deliver or acknowledge such instruments or releases to evidence the release from the Liens created by the Security Documents of any Collateral permitted to be released pursuant to this Indenture or the Security Documents.

Section 10.05. <u>Release upon Satisfaction or Defeasance of all Outstanding Obligations</u>.

(a)    The Liens on all Collateral that secure the Notes and the Note Guarantees will be automatically terminated and released without the need for further action by any Person:

(i)    if the Issuer exercises Legal Defeasance or Covenant Defeasance as described under Section 8.01;

(ii)    upon satisfaction and discharge of this Indenture as described under Article 12; or

(iii)    upon payment in full in immediately available funds of the principal of,

(iv)    premium, if any, and accrued and unpaid interest (including accrued and unpaid PIK Interest) on the Notes and all other Obligations under this Indenture and the Security Documents that are then due and payable (other than contingent indemnification obligations for which no claim has been asserted).

(b)    Upon the request of the Issuer pursuant to a Certificate of a Responsible Officer and Opinion of Counsel confirming that all conditions precedent and covenants, if any, hereunder and under the Security Documents have been complied with, any necessary or proper instruments of termination, satisfaction or release prepared by the Issuer or applicable Guarantor, the Collateral Agent, without the consent of any Holder or the Trustee and at the expense of the Issuer or such Guarantor, shall (and to the extent necessary, the Trustee may provide any directions to the Collateral Agent to) execute, deliver or acknowledge such instruments or releases to evidence the release from the Liens created by the Security Documents of any Collateral permitted to be released pursuant to this Indenture or the Security Documents.

Section 10.06. <u>Form and Sufficiency of Release</u>.

In the event that the Issuer or the Guarantors has sold, exchanged, or otherwise disposed of or proposes to sell, exchange or otherwise dispose of any portion of the Collateral that may be sold, exchanged or otherwise disposed of by the Issuer or the Guarantors to any Person other than the Issuer or the Guarantors, and the Issuer or the Guarantors requests that the Trustee or the relevant Collateral Agent furnish a written disclaimer, release or quit-claim of any interest in such Property under this Indenture and the Security Documents, the Trustee and the relevant Collateral Agent, as applicable, shall execute, acknowledge and deliver to the Issuer or the Guarantors (in the form prepared by the Issuer at the Issuer's sole expense) such an instrument promptly after satisfaction of the conditions set forth herein for delivery of any such release. Notwithstanding the preceding sentence, all purchasers and grantees of any Property or rights purporting to be released herefrom shall be entitled to rely upon any release executed by the Trustee or the relevant

112

Collateral Agent, as applicable, as sufficient for the purpose of this Indenture and as constituting a good and valid release of the Property therein described from the Lien of this Indenture or of the Security Documents.

Section 10.07. Purchaser Protected.

No purchaser or grantee of any Property or rights purported to have been released from the Lien of this Indenture or of the Security Documents shall be bound to ascertain the authority of the Trustee or the relevant Collateral Agent, as applicable, to execute the release or to inquire as to the existence of any conditions herein prescribed for the exercise of such authority; nor shall any purchaser or grantee of any Property or rights permitted by this Indenture to be sold or otherwise disposed of by the Issuer or the Guarantors be under any obligation to ascertain or inquire into the authority of the Issuer to make such sale or other Disposition.

Section 10.08. Authorization of Actions to be Taken by the Collateral Agents Under the Security Documents.

(a)    Subject to the provisions of the applicable Security Documents and the Security and Depositary Agreement, each Holder, by acceptance of the Notes, and the Trustee hereby (i) appoints, designates and authorizes the relevant Collateral Agent to take such action on its behalf under the provisions of this Indenture and each other Indenture Document to which it is a party and to exercise such powers and perform such duties as are expressly delegated to it by the terms of this Indenture or any such other Indenture Document, together with such powers as are reasonably incidental thereto, (ii) to the extent required by the laws of any jurisdiction for the purposes of the enforcement of any Collateral, shall assign to the relevant Collateral Agent all its rights and interests to and under, the Indenture Documents, on a free payment basis, for the exclusive purpose of allowing the relevant Collateral Agent to perform its powers and discretions under the Security Documents to which it is a party and (iii) authorizes the relevant Collateral Agent to execute, deliver and perform each of the Indenture Documents to which the Collateral Agent is or is intended to be a party on its own behalf or on behalf of the Holders and the Trustee and each Holder agrees to be bound by all of the agreements of the relevant Collateral Agent contained in such Indenture Documents.

(b)    Notwithstanding any provision to the contrary contained elsewhere in this Indenture or in any other Indenture Document, the relevant Collateral Agent shall not have any duties or responsibilities except those expressly set forth herein, the Security and Depositary Agreement and in the other Indenture Documents, nor shall the relevant Collateral Agent have or be deemed to have any fiduciary relationship with any Holder or the Trustee, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Indenture or any other Indenture Document or otherwise exist against the relevant Collateral Agent. Without limiting the generality of the foregoing sentence, the use of the term "Collateral Agent" in this Indenture with reference to the relevant Collateral Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any Applicable Law. Instead, such term is used merely as a matter of market custom, and are intended to create or reflect only a relationship between independent contracting parties.

113

(c)    So long as no Event of Default shall have occurred and be continuing, and subject to certain terms and conditions in this Indenture, the Security and Depositary Agreement and the Security Documents, the Issuer and the Guarantors will be entitled to exercise any voting, consensual rights and other rights pertaining to such Collateral pledged by it. Upon the occurrence and during the continuance of an Event of Default for which an acceleration of the Notes has occurred, upon prior written notice and demand from the relevant Collateral Agent, (a) all rights of the Issuer and the Guarantors to exercise such voting, consensual rights, or other rights shall cease and all such rights shall become vested in the relevant Collateral Agent, which, to the extent permitted by Applicable Law, shall have the sole right to exercise such voting, consensual rights or other rights and (b) all rights of the Issuer and the Guarantors to receive cash dividends, interest and other payments made upon or with respect to the Collateral shall cease, and such cash dividends, interest and other payments shall be paid to the relevant Collateral Agent, for the benefit of the Secured Parties. All funds distributed in respect of the Collateral under the Security Documents and received by the relevant Collateral Agent for the ratable benefit of the Secured Parties shall be turned over to the Trustee to be distributed by it in accordance with the provisions of this Indenture.

Section 10.09. <u>Authorization of Receipt of Funds by the Trustee Under the Security Documents</u>.

The relevant Collateral Agent is authorized to receive any funds for the benefit of itself, the Trustee and the Holders distributed under the Security Documents and, to the extent not prohibited under the Security Documents, the Security and Depositary Agreement or the applicable Accounts Agreement, to make further distributions of such funds to itself and the Trustee. The Trustee will make all distributions to the Holders in accordance with the provisions of Section 6.10, the Security and Depositary Agreement and the other provisions of this Indenture.

Section 10.10. <u>Action by the Collateral Agents</u>.

In each case that the relevant Collateral Agent may or is required hereunder or under any Security Document or the Security and Depositary Agreement to take any action (an "Action"), including without limitation to make any determination, to give consents, to exercise rights, powers or remedies, to release or sell Collateral or otherwise to act hereunder or under any Security Document, the relevant Collateral Agent may (i) with respect to any Action to be taken at the request of the Issuer pursuant to the terms of this Indenture or any Security Document, receive a Certificate from a Responsible Officer of the Issuer and an Opinion of Counsel confirming that all conditions precedent and covenants, if any, hereunder and under the Security Documents have been complied with in taking such Action and that the Action is authorized or permitted hereunder and under the Security Documents or (ii) seek direction from the Majority Holders (including Holders of at least 50% in aggregate principal amount of the Take-back SSNs then outstanding) or from the Trustee, who may seek direction from such Holders. The relevant Collateral Agent shall not be liable with respect to any Action taken or omitted to be taken by it in accordance with the preceding sentence. If the relevant Collateral Agent shall request direction from the Trustee, the relevant Collateral Agent shall be entitled to refrain from such Action unless and until the Majority Holders (including Holders of at least 50% in aggregate principal amount of the Take-back SSNs then outstanding) have provided such instruction to the Trustee together with an

indemnification satisfactory to the relevant Collateral Agent (and the Trustee), and the relevant Collateral Agent shall not incur liability to any Person by reason of so refraining.

Notwithstanding anything to the contrary in this Indenture or any Security Document, in no event shall the relevant Collateral Agent or the Trustee be responsible for, or have any duty or obligation with respect to, the recording, filing, registering, perfection, protection or maintenance of the security interests or Liens intended to be created by this Indenture or the Security Documents (including the filing or continuation of any Uniform Commercial Code financing or continuation statements or similar documents or instruments), nor shall the relevant Collateral Agent or the Trustee be responsible for, and the relevant Collateral Agent and the Trustee make no representations regarding, the validity, effectiveness or priority of any of the Security Documents or the security interests or Liens intended to be created thereby.

In the event that the relevant Collateral Agent is required to acquire title to an asset, or take any managerial action of any kind in regard thereto, in order to perform any obligation under this Agreement or any other Indenture Document, which in the relevant Collateral Agent's sole discretion may cause the relevant Collateral Agent to incur potential liability under any Environmental Law, the relevant Collateral Agent reserves the right, instead of taking such action, to either resign as the relevant Collateral Agent or arrange for the transfer of the title or control of the asset to a court-appointed receiver.

Notwithstanding anything else to the contrary herein, whenever reference is made in this Indenture or any Security Document to any discretionary action by, consent, designation, specification, requirement or approval of, notice, request or other communication from, or other direction given or action to be undertaken or to be (or not to be) suffered or omitted by the relevant Collateral Agent or to any election, decision, opinion, acceptance, use of judgment, expression of satisfaction, reasonable satisfaction or other exercise of discretion, rights or remedies to be made (or not to be made) by the relevant Collateral Agent, it is understood that in all cases the Collateral Agent shall be fully justified in failing or refusing to take any such action under this Agreement if it shall not have received such written instruction, advice or concurrence of the Trustee, acting on the direction of the Majority Holders (including Holders of at least 50% in aggregate principal amount of the Take-back SSNs then outstanding), as it deems appropriate. This provision is intended solely for the benefit of the Collateral Agent and the Trustee and its successors and permitted assigns and is not intended to and will not entitle the other parties hereto to any defense, claim or counterclaim, or confer any rights or benefits on any party hereto.

Section 10.11. <u>Compensation and Indemnity</u>.

(a)    The Issuer will pay to the relevant Collateral Agent, its Affiliates, and their respective officers, directors, agents, employees and servants, from time to time reasonable compensation as shall be agreed to in writing by the Issuer and the relevant Collateral Agent for its acceptance and administration of this Indenture, the Security Documents and services hereunder. The Issuer will reimburse the relevant Collateral Agent promptly upon request for all reasonable and documented disbursements, advances and expenses incurred or made by it in addition to the compensation for its services. Such expenses will include the reasonable compensation, disbursements and expenses of the relevant Collateral Agent's agents and counsel.

(b)       The Issuer and the Guarantors will, jointly and severally, indemnify and hold harmless the relevant Collateral Agent and their respective officers, directors, agents, employees and servants against any and all losses, liabilities (including environmental liability) or expenses incurred by it arising out of or in connection with the acceptance or administration of its duties or the exercise of any rights under this Indenture and the Security Documents, including (i) any claim relating to the grant to the relevant Collateral Agent of any Lien in any Property or assets of the Issuer, each Guarantor and (ii) the costs and expenses of enforcing this Indenture and the Security Documents against the Issuer, the Guarantors and the Issuer and the Guarantors (including this Section 10.11) and defending itself against any claim (whether asserted by the Issuer or any Guarantor, any Holder or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder or thereunder, except to the extent any such loss, liability or expense may be attributable to its gross negligence or willful misconduct as determined by a court of competent jurisdiction in a non-appealable order or judgment. The relevant Collateral Agent will notify the Issuer promptly of any third party claim for which it may seek indemnity. Failure by the relevant Collateral Agent to so notify the Issuer will not relieve the Issuer or any Guarantor of their obligations hereunder. The Issuer and the Guarantors will defend such claim and the relevant Collateral Agent will cooperate in the defense. The relevant Collateral Agent may have separate counsel and the Issuer will pay the reasonable fees and expenses of such counsel. None of the Issuer or the Guarantors need pay for any settlement made without its consent, which consent will not be unreasonably withheld, delayed or conditioned.

(c)       [Reserved].

(d)       The obligations of the Issuer and the Guarantors under this Section 10.11 will survive the satisfaction and discharge of this Indenture and the resignation, removal or replacement of the relevant Collateral Agent.

(e)       Each Collateral Agent shall not incur any liability for not performing any act or fulfilling any duty, obligation or responsibility hereunder by reason of any occurrence beyond the control of the relevant Collateral Agent (including but not limited to any act or provision of any present or future law or regulation or Governmental Authority, any act of God or war, civil unrest, local or national disturbance or disaster, any act of terrorism, epidemics, riots, strikes or other work stoppages, or the unavailability of the Federal Reserve Bank wire or facsimile or other wire or communication facility).

Section 10.12. <u>Delegation of Duties of the Collateral Agent</u>.

Each Collateral Agent may execute any of its duties under this Indenture or any other Indenture Document by or through agents, employees or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. Each Collateral Agent shall not be responsible for the negligence or misconduct of any agent or attorney-in-fact that it selects with reasonable care.

Section 10.13. <u>Liability of the Collateral Agent</u>.

Each Collateral Agent shall not (a) be liable for any action taken or omitted to be taken by it under or in connection with this Indenture or any other Transaction Document or the transactions

116

contemplated hereby (except for its own gross negligence or willful misconduct), or (b) be responsible in any manner to any of the Holders or the Trustee or any other Person for any recital, statement, representation or warranty made by the Issuer or any Affiliate of the Issuer, or any officer thereof, contained in this Indenture or in any other Transaction Document, or in any certificate, report, statement or other document referred to or provided for in, or received by the relevant Collateral Agent under or in connection with, this Indenture or any other Transaction Document, or for the value of or title to any Collateral, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Transaction Document, or for any failure of the Issuer or any other party to any Transaction Document to perform its obligations hereunder or thereunder. Each Collateral Agent shall not be under any obligation to any Holder or the Trustee to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Indenture or any other Transaction Document, or to inspect the properties, books or records of the Issuer or any Affiliate of the Issuer. In executing and delivering any Transaction Document or acting thereunder, each Collateral Agent and the Trustee shall be entitled to all the rights, benefits, protections, immunities and indemnities afforded to it hereunder or under any other Indenture Document.

Section 10.14. <u>Reliance by the Collateral Agent</u>.

The relevant Collateral Agent shall be entitled to conclusively rely, and shall be fully protected in conclusively relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, facsimile, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to the Issuer), independent accountants and other experts selected by the relevant Collateral Agent. The relevant Collateral Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Indenture or any other Transaction Document in accordance with a request or consent of the Trustee and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the Holders and the Trustee.

Section 10.15. <u>Successor Collateral Agent</u>.

(a)    Subject to the appointment and acceptance of a successor as provided below, each Collateral Agent may resign at any time by giving notice thereof to the Trustee and the Issuer, and each Collateral Agent may be removed on thirty (30) days' advance written notice with or without cause by the Majority Holders. Upon any such resignation or removal, the Majority Holders shall have the right to appoint a successor to the relevant Collateral Agent. If no successor Collateral Agent shall have been appointed, and shall have accepted such appointment within thirty (30) days after the resigning Collateral Agent's giving of notice of resignation or the giving of any notice of removal thereof, then the resigning Collateral Agent or Collateral Agent being removed, as the case may be, may apply to a court of competent jurisdiction to appoint a successor thereto at the expense of the Issuer. If the Collateral Agent shall resign or be removed pursuant to the foregoing provisions of this Section 10.15(a), upon the acceptance of appointment by a successor Collateral Agent hereunder, the former Collateral Agent shall deliver all Collateral then in its possession to the successor Collateral Agent. Upon the acceptance of its appointment as a successor Collateral Agent hereunder, such successor Collateral Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of such resigning or removed Collateral Agent,

117

and such resigning Collateral Agent or removed Collateral Agent shall be discharged from its duties and obligations hereunder. Notwithstanding anything to the contrary hereunder or under any other Indenture Document, a successor of the Collateral Agent shall, to the extent required by Applicable Law, be a Holder of all or part of the Obligations. If a Collateral Agent consolidates, merges or converts into, or transfers all or substantially all of its corporate trust business to, another corporation, the successor corporation without any further act will be the successor Collateral Agent.

(b)     After a Collateral Agent's resignation or removal, the provisions of Section 10.11 and this Section 10.15 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Collateral Agent.

ARTICLE 11
NOTE GUARANTEE

Section 11.01. <u>Note Guarantee</u>.

(a)     Subject to this Article 11, the Guarantors (including any Guarantor that becomes a party to this Indenture pursuant to Section 10.02(e)) hereby jointly, severally, fully and unconditionally and irrevocably guarantee to each Holder of a Note authenticated and delivered by the Trustee and to the Trustee and its successors and assigns, and to the Trustee, the relevant Collateral Agent and their respective successors and assigns, irrespective of the validity and enforceability of this Indenture, the Notes or the obligations of the Issuer hereunder or thereunder, that:

(i)     the principal of, premium, if any, and interest on, the Notes will be promptly paid in full when due, whether at Stated Maturity, by acceleration, redemption or otherwise, and interest on the overdue principal of and interest on the Notes, if any, if lawful, any Additional Amounts required to be paid in connection with certain Taxes, and all other Obligations of the Issuer to the Holders, the Trustee or the relevant Collateral Agent under the Notes or this Indenture will be promptly paid in full or performed, all in accordance with the terms hereof and thereof; and

(ii)     in case of any extension of time of payment or renewal of any Notes or any of such other Obligations, that same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at Stated Maturity, by acceleration or otherwise.

Failing payment when due of any amount so guaranteed or any performance so guaranteed for whatever reason, the Guarantors will each be obligated to pay the same immediately. The Guarantors agree that this is a Guarantee of payment and not a Guarantee of collection.

(b)     Each of the Guarantors hereby agree that its obligations hereunder are unconditional, irrespective of the validity, regularity or enforceability of the Notes or this Indenture, the absence of any action to enforce the same, any waiver or consent by any Holder of the Notes with respect to any provisions hereof or thereof, the recovery of any judgment against the Issuer, any action to enforce the same or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor. The Guarantors hereby waive

118

diligence, presentment, demand of payment, filing of claims with a court in the event of insolvency or bankruptcy of the Issuer, any right to require a proceeding first against the Issuer or any other Guarantor or a proceeding to foreclose on any assets of the Issuer or any other Guarantor, any requirement that liability be divided among the Issuer and the Guarantors or among the Guarantors, protest, notice and all demands whatsoever and covenant that this Note Guarantee will not be discharged except by complete performance of the obligations contained in the Notes and this Indenture.

(c)    If any Holder, Collateral Agent or the Trustee is required by any court or otherwise to return to the Issuer, the Guarantors or any custodian, trustee, liquidator or other similar official acting in relation to either the Issuer or the Guarantors, any amount paid to any of the Trustee, Collateral Agent or such Holder, this Note Guarantee, to the extent theretofore discharged, will be reinstated in full force and effect.

(d)    Each of the Guarantors agrees that it will not be entitled to any right of subrogation in relation to the Holders in respect of any Obligations guaranteed hereby until payment in full of all Obligations guaranteed hereby. Each of the Guarantors further agrees that, as between any of the Guarantors, on the one hand, and the Holders, Collateral Agents and the Trustee, on the other hand, (1) the maturity of the Obligations guaranteed hereby may be accelerated as provided in Article 6 hereof for the purposes of this Note Guarantee, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the Obligations guaranteed hereby, and (2) in the event of any declaration of acceleration of such obligations as provided in Article 6 hereof, such Obligations (whether or not due and payable) will forthwith become due and payable by the Guarantors for the purpose of this Note Guarantee. The Guarantors shall have the right to seek contribution from any non-paying Guarantor so long as the exercise of such right does not impair the rights of the Holders under the Note Guarantees.

(e)    Each Note Guarantee shall remain in full force and effect and continue to be effective should any petition be filed by or against the Issuer for liquidation, reorganization, should the Issuer become insolvent or make an assignment for the benefit of creditors or should a receiver or trustee be appointed for all or any significant part of the Issuer's assets, and shall, to the fullest extent permitted by law, continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Notes are, pursuant to Applicable Law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee on the Notes or Note Guarantees, whether as a "voidable preference," "fraudulent transfer" or otherwise, all as though such payment or performance had not been made. In the event that any payment or any part thereof, is rescinded, reduced, restored or returned, the Notes shall, to the fullest extent permitted by law, be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

(f)    In case any provision of any Note Guarantee shall be invalid, illegal or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

(g)    Each payment to be made by a Guarantor in respect of its Note Guarantee shall be made without set-off, counterclaim, reduction or diminution of any kind or nature.

119

(h)      The Note Guarantees will be senior secured obligations of the Guarantors, will rank equally with all other existing unsubordinated obligations of the Guarantors, and will benefit from a first priority Lien on the Collateral as provided for herein.

Section 11.02. <u>Limitation on Guarantor Liability</u>.

(a)      The Guarantors, and by its acceptance of Notes, each Holder, hereby confirm that it is the intention of all such parties that the Note Guarantees of the Guarantors not constitute a fraudulent transfer or conveyance for purposes of any Bankruptcy Law, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar federal, state or foreign law to the extent applicable to any Note Guarantee. To effectuate the foregoing intention, the Trustee, the relevant Collateral Agent, the Holders and the Guarantors hereby irrevocably agree that the Obligations of the Guarantors will be limited to the maximum amount that will, after giving effect to such maximum amount and all other contingent and fixed liabilities of the Guarantors that are relevant under such laws, result in the obligations of the Guarantors under their respective Note Guarantee not constituting a fraudulent transfer or conveyance under Applicable Law. Each Guarantor that makes a payment under its Note Guarantee shall be entitled upon payment in full of all guaranteed obligations under this Indenture to a contribution from each other Guarantor in an amount equal to such other Guarantor's pro rata portion of such payment based on the respective net assets of all the Guarantors at the time of such payment determined in accordance with IFRS.

Section 11.03. <u>Benefits Acknowledged</u>.

Each Guarantor acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated by this Indenture and that the guarantee and waivers made by it pursuant to its Note Guarantee are knowingly made in contemplation of such benefits.

Section 11.04. <u>Releases</u>.

Upon Legal Defeasance in accordance with Article 8 hereof or satisfaction and discharge of this Indenture in accordance with Article 12 hereof, the Guarantors, as the case may be, will be released and relieved of any Obligations under the Note Guarantees.

ARTICLE 12
SATISFACTION AND DISCHARGE

Section 12.01. <u>Satisfaction and Discharge</u>.

This Indenture will be discharged and will cease to be of further effect as to all Notes issued hereunder, when:

(i)      either:

(a)      all Notes issued under this Indenture theretofore authenticated and delivered (other than (1) Notes which have been destroyed, lost or stolen and which have been replaced or paid as provided in this Indenture and (2) Notes for whose payment money has been deposited in trust or segregated and held in trust by us and thereafter repaid to us or discharged from such trust, as provided in this Indenture) have been delivered to the Trustee for cancellation; or

120

(b)     all Notes that have not been delivered to the Trustee for cancellation (1) have become due and payable by reason of the mailing of a notice of redemption or otherwise, (2) will become due and payable at their Stated Maturity within one year, or (3) are to be called for redemption within one year under arrangements provided in this Indenture and the Issuer, in the case of (1), (2) or (3) of this Section 12.01(i)(b), has irrevocably deposited or caused to be deposited with the Trustee as trust funds in trust solely for the benefit of the Holders, cash in U.S. dollars, non-callable U.S. Government Obligations, or a combination thereof, in such amounts as will be sufficient, without consideration of any reinvestment of interest, in the written opinion of an internationally recognized accounting firm, to pay and discharge the entire Indebtedness on the Notes not delivered to the Trustee for cancellation for principal, premium, if any, and accrued interest to the date of maturity or redemption;

(i)     no Default or Event of Default has occurred and is continuing on the date of such deposit (other than a Default or Event of Default resulting from the borrowing of funds to be applied to such deposit) and the deposit will not result in a breach or violation of, or constitute a default under, any other instrument to which the Issuer is a party or by which the Issuer is bound;

(ii)     the Issuer has paid or caused to be paid all sums payable by it under this Indenture; and

(iii)     the Issuer has delivered to the Trustee a certificate of a Responsible Officer and an Opinion of Counsel, each stating that all conditions precedent provided in this Indenture with respect to the satisfaction and discharge of this Indenture have been satisfied.

Notwithstanding the satisfaction and discharge of this Indenture, if money has been deposited with the Trustee pursuant to Section 12.01(i)(b), the provisions of Sections 12.02 and 8.06 hereof will survive. In addition, nothing in this Section 12.01 will be deemed to discharge those provisions of Section 7.07 hereof, that, by their terms, survive the satisfaction and discharge of this Indenture.

Upon discharge of this Indenture in accordance with this Section 12.01, all Note Guarantees shall automatically terminate and cease to be of effect.

Section 12.02. <u>Application of Trust Money</u>.

Subject to the provisions of Section 8.06 hereof, all money deposited with the Trustee pursuant to Section 12.01 hereof shall be held in trust and applied by it, in accordance with the provisions of the Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Issuer acting as its own Paying Agent) as the Trustee may determine, to the Persons entitled thereto, of the principal (and premium, if any) and interest for whose payment such money has been deposited with the Trustee; but such money need not be segregated from other funds except to the extent required by law.

If the Trustee or Paying Agent is unable to apply any money or U.S. Government Obligations in accordance with Section 12.01 hereof by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or

otherwise prohibiting such application, the obligations of the Issuer and the Guarantors under this Indenture and the Notes shall be revived and reinstated as though no deposit had occurred pursuant to Section 12.01 hereof; *provided* that if the Issuer has made any payment of principal of, premium, if any, or interest on, any Notes because of the reinstatement of its obligations, the Issuer shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money or U.S. Government Obligations held by the Trustee or Paying Agent.

ARTICLE 13
MISCELLANEOUS

Section 13.01. <u>Notices</u>.

Any notice or communication by the Issuer, the Guarantors, the Trustee or the relevant Collateral Agent to the others is duly given if in writing and in English and delivered in Person or by first class mail (registered or certified, return receipt requested), facsimile transmission or overnight air courier guaranteeing next day delivery, to the others' address:

If to the Issuer or the Guarantors:

Inversiones Latin America Power SpA
Cerro El Plomo, 5680
Of. 1202, Las Condes
Santiago, Chile
Attention: Esteban Moraga
Phone: +56 2-2820-3235
Email: esteban.moraga@latampower.com

With a copy to:

Greenberg Traurig, LLP
One Vanderbilt Avenue
New York, NY 10017Attention: Marc Rossell
Phone: 212-801-9200
Email: rossellm@gtlaw.com

If to the Trustee:

UMB Bank, N.A.
100 William Street, Suite 1850
New York, New York 10038
Attention: Prital Patel
Email: Prital.Patel@umb.com

If to the Offshore Collateral Agent:

UMB Bank, N.A.
100 William Street, Suite 1850
New York, New York 10038

122

Attention: Prital Patel
Email: Prital.Patel@umb.com

If to the Onshore Collateral Agent:

Banco de Chile
Estado 260 Piso 2
Santiago, Chile
Attention: Uri Heinz Manz Leclerc
Email: umanzl@bancochile.cl

The Issuer, the Guarantors, the Trustee, the Offshore Collateral Agent or the Onshore Collateral Agent, by notice to the others, may designate additional or different addresses for subsequent notices or communications.

All notices and communications (other than those sent to Holders) will be deemed to have been duly given: at the time delivered by hand, if personally delivered; when mailed, postage prepaid, if mailed; when receipt acknowledged, if transmitted by facsimile or electronically; and the next Business Day after timely delivery to the courier, if sent by overnight air courier guaranteeing next day delivery.

Any notice or communication to a Holder will be mailed by first class mail, to its address shown on the register kept by the Registrar. Failure to mail a notice or communication to a Holder or any defect in it will not affect its sufficiency with respect to other Holders. Notwithstanding anything to the contrary herein, any notice to a Holder of a Global Note shall be made in accordance with the rules of the Depositary.

If a notice or communication is mailed in the manner provided above within the time prescribed, it is duly given, whether or not the addressee receives it.

If the Issuer mails a notice or communication to Holders, it will deliver a copy to the Trustee and each Agent at the same time.

Neither the failure to give any notice to a particular Holder, nor any defect in a notice given to a particular Holder, will affect the sufficiency of any notice given to another Holder.

Notwithstanding any other provision of this Indenture or any Note, where this Indenture or any Note provides for notice of any event (including any notice of redemption) to a Holder of a Global Note (whether by mail or otherwise), such notice shall be sufficiently given if given to the Depositary for such Note (or its designee) pursuant to the standing instructions from such Depositary. For so long as the Notes are listed on the Luxembourg, Irish, or Singapore stock exchange (as applicable), the Issuer will publish notices in the manner required by the Luxembourg, Irish, or Singapore stock exchange (as applicable). Notices shall be deemed to have been given on the first date of publication.

The Trustee and Collateral Agents shall have the right to accept and act upon instructions, including funds transfer instructions ("Instructions") given pursuant to this Indenture and delivered

using Electronic Means; provided, however, that the Issuer, shall provide to the Trustee and Collateral Agents an incumbency certificate listing officers with the authority to provide such Instructions ("Authorized Officers") and containing specimen signatures of such Authorized Officers, which incumbency certificate shall be amended by the Issuer whenever a person is to be added or deleted from the listing. If the Issuer elects to give the Trustee or Collateral Agent Instructions using Electronic Means and the Trustee or Collateral Agent in its discretion elects to act upon such Instructions, the Trustee's or Collateral Agent's understanding of such Instructions shall be deemed controlling. The Issuer understands and agrees that the Trustee and Collateral Agents cannot determine the identity of the actual sender of such Instructions and that the Trustee and Collateral Agents shall conclusively presume that directions that purport to have been sent by an Authorized Officer listed on the incumbency certificate provided to the Trustee and Collateral Agents have been sent by such Authorized Officer. The Issuer shall be responsible for ensuring that only Authorized Officers transmit such Instructions to the Trustee and Collateral Agents and that the Issuer and all Authorized Officers are solely responsible to safeguard the use and confidentiality of applicable user and authorization codes, passwords and/or authentication keys upon receipt by the Issuer. The Trustee and Collateral Agents shall not be liable for any losses, costs or expenses arising directly or indirectly from the Trustee's and Collateral Agents' reliance upon and compliance with such Instructions notwithstanding such directions conflict or are inconsistent with a subsequent written instruction. The Issuer agrees: (i) to assume all risks arising out of the use of Electronic Means to submit Instructions to the Trustee and Collateral Agents, including without limitation the risk of the Trustee and Collateral Agents acting on unauthorized Instructions, and the risk of interception and misuse by third parties; (ii) that it is fully informed of the protections and risks associated with the various methods of transmitting Instructions to the Trustee and Collateral Agents and that there may be more secure methods of transmitting Instructions than the method(s) selected by the Issuer; (iii) that the security procedures (if any) to be followed in connection with its transmission of Instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances; and (iv) to notify the Trustee and Collateral Agents immediately upon learning of any compromise or unauthorized use of the security procedures. "Electronic Means" shall mean the following communications methods: e-mail, facsimile transmission, secure electronic transmission containing applicable authorization codes, passwords and/or authentication keys issued by the Trustee or Collateral Agents, or another method or system specified by the Trustee or Collateral Agents as available for use in connection with its services hereunder.

Section 13.02.  [Reserved]

Section 13.03. Certificate and Opinion as to Conditions Precedent.

Upon any request or application by the Issuer to the Trustee or the relevant Collateral Agent to take any action under this Indenture or other Indenture Document, the Issuer shall furnish to the Trustee and, if applicable, the relevant Collateral Agent:

(i)      a Certificate of a Responsible Officer in form and substance reasonably satisfactory to the Trustee and, if applicable, the relevant Collateral Agent (which must include the statements set forth in Section 13.04 hereof) stating that, in the opinion of the signers, all conditions precedent and covenants, if any, provided for in this Indenture and

any applicable Indenture Document relating to the proposed action have been complied with; and

(ii)     an Opinion of Counsel in form and substance reasonably satisfactory to the Trustee and, if applicable, the relevant Collateral Agent (which must include the statements set forth in Section 13.04 hereof) stating that, in the opinion of such counsel, all such conditions precedent and covenants have been complied with; *provided*, *however*, that an Opinion of Counsel will not be required upon the initial issuance of Notes hereunder.

Section 13.04. <u>Statements Required in Certificate</u>.

Each certificate with respect to compliance with a condition or covenant provided for in this Indenture must include:

(i)     a statement that the Person making such certificate or opinion has read such covenant or condition;

(ii)     a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(iii)     a statement that, in the opinion of such Person, he or she has made such examination or investigation as is necessary to enable him or her to express an informed opinion as to whether or not such covenant or condition has been satisfied; and

(iv)     a statement as to whether or not, in the opinion of such Person, such condition or covenant has been satisfied.

Section 13.05. <u>Rules by Trustee and Agents</u>.

The Trustee may make reasonable rules for action by or at a meeting of Holders. The Registrar or Paying Agent may make reasonable rules and set reasonable requirements for its functions.

Section 13.06. <u>No Personal Liability of Directors, Officers, Employees and Stockholders</u>.

No director, officer, employee, incorporator, partner or shareholder of the Issuer or any Guarantor, as such, will have any liability for any obligations of the Issuer or the Guarantors under the Notes, this Indenture, the Note Guarantees, the Security Documents or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder of Notes by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes.

Section 13.07. <u>No Immunity</u>.

(a)     To the extent that any of the Issuer or the Guarantors may be entitled, in any jurisdiction in which judicial proceedings may at any time be commenced with respect to this Indenture, the Notes, the Note Guarantee or any other Indenture Document to which the Issuer or

125

such Guarantor is a party, to claim for itself or its revenues, assets or Properties any immunity from suit, the jurisdiction of any court, attachment prior to judgment, attachment in aid of execution of judgment, set-off, execution of a judgment or any other legal process, and to the extent that in any such jurisdiction there may be attributed to such Person such an immunity (whether or not claimed), each of the Issuer and the Guarantors hereby irrevocably agrees not to claim and hereby irrevocably waives such immunity to the fullest extent permitted by Applicable Law.

Section 13.08. Judgment Currency.

U.S. Dollars are the sole currency of account and payment for all sums due and payable by the Issuer and the Guarantors under this Indenture, the Notes and the Note Guarantees. If, for the purpose of obtaining judgment in any court, it is necessary to convert a sum due hereunder in U.S. Dollars into another currency, the Issuer and the Guarantors will agree, to the fullest extent that they may legally and effectively do so, that the rate of exchange used shall be that at which in accordance with normal banking procedures the Trustee determines a Person could purchase U.S. Dollars with such other currency in New York, New York, on the Business Day immediately preceding the day on which final judgment is given.

The obligation of each of the Issuer and the Guarantors in respect of any sum due to any Holder or the Trustee in U.S. Dollars shall, to the extent permitted by Applicable Law, notwithstanding any judgment in a currency other than Dollars, be discharged only to the extent that on the Business Day following receipt of any sum adjudged to be so due in the judgment currency such Holder or Trustee may in accordance with normal banking procedures purchase

U.S. Dollars in the amount originally due to such Person with the judgment currency. If the amount of U.S. Dollars so purchased is less than the sum originally due to such Person, each of the Issuer and the Guarantors agrees, jointly and severally, as a separate obligation and notwithstanding any such judgment, to indemnify such Person against the resulting loss; and if the amount of U.S. Dollars so purchased is greater than the sum originally due to such Person, such Person will, by accepting a Note, be deemed to have agreed to repay such excess.

Section 13.09. Submission to Jurisdiction; Appointment of Process Agent.

(a)       Each of the parties hereto hereby irrevocably submits to the jurisdiction of any New York State or United States Federal court sitting in the City of New York, New York County over any suit, action or proceeding arising out of or relating to this Indenture or any Note (and each Holder by their acceptance of the Notes) or the Note Guarantees. Each of the Issuer and the Guarantors hereby irrevocably waives, to the fullest extent permitted by Applicable Law, any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding brought in such courts and any claim that any such suit, action or proceeding brought in such courts, has been brought in an inconvenient forum and any right to any other jurisdiction to which it may be entitled on account of place of residence or domicile. To the extent the Issuer or the Guarantors have or hereafter may acquire any immunity from jurisdiction of any court or from any legal process with respect to itself or its Property, each of the Issuer and the Guarantors hereby irrevocably waives such immunity in respect of (i) its obligations under this Indenture and (ii) any Note or the Note Guarantees. Each of the Issuer and the Guarantors hereby agrees that

126

final judgment in any such suit, action or proceeding brought in such a court shall be conclusive and binding on them and may be enforced in any court to the jurisdiction of which each of them is subject by a suit upon such judgment, *provided*, that service of process is effected upon the Issuer or the Guarantors in the manner specified in Section 13.09(b) or as otherwise permitted by Applicable Law.

(b)   As long as any of the Notes remain outstanding, the Issuer and the Guarantors will at all times have an authorized agent in the City of New York, upon whom process may be served in any legal action or proceeding arising out of or relating to this Indenture or any Note or the Note Guarantees. Service of process upon such agent and written notice of such service mailed or delivered to the Issuer or the Guarantors shall to the extent permitted by Applicable Law be deemed in every respect effective service of process upon the Issuer or such Guarantor, as the case may be, in any such legal action or proceeding. The Issuer and the Guarantors will appoint Corporation Service Company as their agent for such purpose and, in the case of the Issuer and any Guarantor, shall grant an irrevocable power of attorney in favor of such process agent with sufficient authority for lawsuits and collections. The Issuer and Guarantors further covenant and agree that service of process in any suit, action or proceeding may be made upon it at the office of such agent at 19 West 44th Street, Suite 200, New York, New York, 10036-8401 (or at such other address or at the office of such other authorized agent as the Issuer or the Guarantors may designate by written notice to the Trustee).

Section 13.10. <u>Governing Law</u>.

THE INTERNAL LAW OF THE STATE OF NEW YORK WILL GOVERN AND BE USED TO CONSTRUE THIS INDENTURE, THE NOTES, AND THE NOTE GUARANTEES

WITHOUT GIVING EFFECT TO APPLICABLE PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY.

Section 13.11. <u>Waiver of Jury Trial</u>.

EACH OF THE ISSUER, THE GUARANTORS, THE TRUSTEE AND THE COLLATERAL AGENT, AND HOLDERS BY THEIR ACCEPTANCE OF THE NOTES, HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE NOTES, THE NOTE GUARANTEES, THE INDENTURE DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

Section 13.12. <u>No Adverse Interpretation of Other Agreements</u>.

This Indenture may not be used to interpret any other indenture, loan or debt agreement of the Issuer, the Guarantors or of any other Person. Any such indenture, loan or debt agreement may not be used to interpret this Indenture.

Section 13.13. <u>Successors</u>.

All agreements of the Issuer and the Guarantors in this Indenture, the Notes, the Note Guarantees and each other Indenture Document will bind their successors. All agreements of the Trustee and the Collateral Agent in this Indenture will bind its successors.

Section 13.14. <u>Severability</u>.

In case any provision in this Indenture, the Notes or the Note Guarantees is invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions will not in any way be affected or impaired thereby.

Section 13.15. <u>Security Documents</u>.

The Trustee, the Collateral Agent and the Holders are bound by the terms of the Security Documents to which they are a party.

Section 13.16. <u>Counterpart Originals</u>.

The parties may sign any number of copies of this Indenture. Each signed copy will be an original, but all of them together represent the same agreement. The exchange of copies of this Indenture and of signature pages by facsimile, PDF or other electronic transmission shall constitute effective execution and delivery of this Indenture as to the parties hereto and may be used in lieu of the original Indenture and signature pages for all purposes. In furtherance of the foregoing, the words "execution", "signed", "signature", "delivery" and words of like import in or relating to any document to be signed in connection with this Indenture and the transactions contemplated hereby or thereby shall be deemed to include Electronic Signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; provided that, notwithstanding anything herein to the contrary, the Trustee is not under any obligation to agree to accept electronic signatures in any form or in any format unless expressly agreed to by the Trustee, pursuant to procedures approved by the Trustee. As used herein, "Electronic Signature" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or other record.

Section 13.17. <u>Table of Contents, Headings, etc</u>.

The Table of Contents, Cross-Reference Table and Headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part of this Indenture and will in no way modify or restrict any of the terms or provisions hereof.

Section 13.18. <u>English Language</u>.

This Indenture has been negotiated and executed in the English language. All certificates, reports, notices and other documents and communications given or delivered pursuant to this Agreement (including, without limitation, any modifications or supplements hereto) shall be in the English language, or accompanied by a certified English translation thereof. In the case of any Indenture Document originally issued in a language other than English, the English language version of any such Indenture Document shall for purposes of this Indenture, and absent manifest error, control the meaning of the matters set forth therein.

Section 13.19. <u>Patriot Act</u>

The parties hereto acknowledge that in accordance with the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56 (the "*Patriot Act*"), the Trustee and the relevant Collateral Agent, like all financial institutions, are required to obtain, verify, and record information that identifies each Person or legal entity that establishes a relationship or opens an account with UMB Bank, N.A. The parties hereto agree that they will provide the Trustee or the relevant Collateral Agent with such information as they may request in order for them to satisfy the requirements of the Patriot Act.

Section 13.20. <u>Statute of Limitations</u>

Any claims against the Issuer or any Guarantor for the payment of principal, interest or Additional Amounts will expire six (6) years after the applicable date for payment thereof.

[Signatures on following page]

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be executed as of the date first written above.

<u>Issuer</u>:

INVERSIONES LATIN AMERICA POWER SpA,

By: _____

      Name:  **[●]**

      Title:  **[●]**

Guarantors:

ILAP HOLDINGS LTD.,

By: _____

Name: **[●]**

Title:  **[●]**

SAN JUAN S.A.,

By: _____

    Name:  **[●]**

    Title:  **[●]**

[*Signature Page to Indenture*]

NORVIND S.A.,

By: _____

     Name:  **[●]**

     Title:  **[●]**

UMB BANK, N.A.

As Trustee, Offshore Collateral Agent,
Registrar, Transfer Agent and Paying Agent

By: _____
    Name:  **[●]**
    Title:   **[●]**

BANCO DE CHILE

As Onshore Collateral Agent

By: _____
    Name:   **[●]**
    Title:   **[●]**

EXHIBIT A-1

## FORM OF TAKE-BACK SENIOR SECURED NOTE

[*Insert the Global Note Legend, if applicable pursuant to the provisions of the Indenture*]

[*Insert the Private Placement Legend, if applicable pursuant to the provisions of the Indenture*]

[*Insert the Regulation S Global Note Legend, if applicable pursuant to the provisions of the Indenture*]

[Face of Note]

INVERSIONES LATIN AMERICA POWER SpA
**TAKE-BACK SENIOR SECURED NOTES DUE 2033**

CUSIP _____

ISIN _____ [1]

Common Code_____

No. _____                                          $_____

Inversiones Latin America Power SpA promises to pay to _____ or registered assigns,

the principal sum of _____ DOLLARS
as set forth in the Principal Payment Schedule in this Note [as revised by the Schedule of
Exchanges of Interests in the Global Note attached hereto]*.

Interest Payment Dates: June 15 and December 15, commencing on June 15, 2024.

Record Dates: June 1 and December 1

Dated: _____, 20____

Reference is made to the further provisions of this Note contained on the reverse side of
this Note, which for all purposes have the same effect as if set forth at this place.

---

[1]      Reg.  S CUSIP: [●]
         Rule 144A CUSIP: [●]
         Reg S.  ISIN: [●]
         Rule 144A ISIN: [●]
         *For inclusion in Global Notes only

A-1-2

IN WITNESS WHEREOF, INVERSIONES LATIN AMERICA POWER SpA has caused this instrument to be duly executed.

INVERSIONES LATIN AMERICA POWER SpA,

By: _____

    Name:

    Title:

This is one of the Notes referred to in the within-mentioned Indenture:

UMB Bank, N.A.,
as Trustee

By: _____

    Authorized Signatory

Date: _____

[REVERSE OF NOTE]

INVERSIONES LATIN AMERICA POWER SpA
TAKE-BACK SENIOR SECURED NOTES DUE 2033

Capitalized terms used herein have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

      i.      *PRINCIPAL AND INTEREST*. Inversiones Latin America Power SpA, a stock corporation (*sociedad por acciones*) incorporated under the laws of Chile (the "*Issuer*"), promises to pay interest on this Take-back SSN semi-annually in arrears on each June 15 and December 15 (the "*Interest Payment Dates*") from the Effective Date until this Note is paid in full, to the registered Holders of the Take-back SSNs on the June 1 and December 1 preceding the applicable Interest Payment Date.

Note payment date. Interest on the Take-back SSNs will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from and including the Effective Date. Interest on overdue principal will be computed on the basis of a 360-day year comprised of twelve 30-day months. The first interest payment shall be calculated based on the period from the Effective Date through the first Interest Payment Date. The redemption of Take-back SSNs with unpaid and accrued interest to the date of redemption will not affect the right of Holders of record on a record date to receive interest due on an Interest Payment Date.

This Take-back SSN will accrue interest at the following rates per annum:

| Period | Interest Rate if PIK Option Elected | Interest Rate if Cash Option Elected |
|---|---|---|
| From the Effective Date to December 31, 2024 | 11.50% | 9.50% |
| From January 1, 2025 to June 30, 2025 | 12.25% | 10.25% |
| From July 1, 2025 to the 24 months after the Effective Date (the "*Cash Pay Date*") | 13.00% | 11.00% |
| From the Cash Pay Date to June 15, 2033 | No PIK option | 11.00% |

      ii.      *PIK PAYMENTS*. Subject to the table above, the Issuer will have the option (the "PIK Option") to pay all or a portion of the interest due on the Take-back SSNs on the relevant Interest Payment Date (rounded up to the nearest US$1.00) by increasing the outstanding principal amount of the Take-back SSNs in the amount of PIK interest (in each case, the "*PIK Payment*") unless a Default or Event of Default has occurred and is continuing. Unless the context requires otherwise, references to "principal amount" of the Take-back SSNs includes any increase in the principal amount of the outstanding Take-back SSNs as a result of a PIK Payment.

No less than fifteen (15) Business Days prior to each Interest Payment Date on which the Issuer may elect to pay PIK Interest in lieu of cash interest, the Issuer shall notify the Trustee in writing of its intention to pay PIK Interest or cash interest on such Interest Payment Date. Any election to pay PIK Interest must be for a minimum amount of $1,000,000 of interest and increments of $1,000

in excess thereof (or the total amount of interest payable on such date). In the event the Issuer fails to timely deliver such notice, the Issuer shall be deemed to have elected to pay cash interest.

Except as set forth above, the insufficiency or lack of funds available to the Issuer to make an interest payment in cash as required by the Indenture shall not permit the Issuer to make a PIK Payment in respect of any interest period and the sole right of the Issuer to elect to make a PIK Payment shall be as (and to the extent) provided in the immediately preceding paragraph.

   *iii.* *DEFAULT INTEREST*. From and after the occurrence of an Event of Default until the date such Event of Default is cured or waived in accordance with the Indenture, (i) interest on the Take-back SSNs will accrue at a rate equal to the then-prevailing rate for cash interest payments plus 200 basis points (2.00%) *per annum* and (ii) interest will be payable only in cash (and there will be no PIK option).

   *iv.* *METHOD OF PAYMENT*. The Issuer will pay interest on the Take-back SSNs (except defaulted interest) to the Persons who are registered Holders of Take-back SSNs at the close of business on each June 1 and December 1, respectively, immediately preceding the applicable Interest Payment Date, even if such Take-back SSNs are canceled after such record date and on or before such Interest Payment Date. The Take-back SSNs will be payable as to principal, premium, if any, and interest at the office or agency of the Issuer maintained for such purpose or, at the option of the Paying Agent, payment of interest may be made by check mailed to the Holders at their addresses set forth in the register of Holders; *provided* that payment by wire transfer of immediately available funds will be required with respect to principal of and interest, premium on, all Global Notes and all other Take-back SSNs the Holders of which will have provided wire transfer instructions to the Issuer or the Paying Agent. Such payment will be in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.

   *v.* *PAYING AGENT AND REGISTRAR*. Initially, UMB Bank, N.A., the Trustee under the Indenture, will act as the paying agent and registrar for the Take-back SSNs. The Issuer may appoint other paying agents and registrars instead of, or in addition to, the Trustee.

   *vi.* *INDENTURE AND SECURITY DOCUMENTS*. The Issuer issued the Take-back SSNs under an Indenture dated as of [January] [●], 2024 (the "*Indenture*") among the Issuer, the Guarantors, the Trustee, the Offshore Collateral Agent, the Onshore Collateral Agent, the Registrar, the Transfer Agent, and the Paying Agent. The Take-back SSNs are subject to all such terms, and Holders are referred to the Indenture for a statement of such terms. To the extent any provision of this Take-back SSN conflicts with the express provisions of the Indenture, the provisions of the Indenture shall govern and be controlling. The Take-back SSNs are secured obligations of the Issuer, secured on a first priority basis by a security interest in substantially all of the Issuer's and the Guarantors' assets, pursuant to the Security Documents referred to in the Indenture. To guarantee the due and punctual payment of the principal and interest on the Take-back SSNs and all other amounts payable by the Issuer under the Indenture and the Take-back SSNs when and as the same shall be due and payable, whether at maturity, by acceleration or otherwise, according to the terms of the Take-back SSNs and the Indenture, the Guarantors have, jointly and severally, unconditionally guaranteed the Obligations of the Issuer under the Take-back

SSNs pursuant to the terms of the Indenture. The Guarantees are secured obligations of the Guarantors.

vii.    *DENOMINATIONS, TRANSFER, EXCHANGE*. The Take-back SSNs are in registered form without coupons in denominations of US$1,000 and integral multiples of US$1.00 in excess thereof. The transfer of Take-back SSNs may be registered and Take-back SSNs may be exchanged as provided in the Indenture. The Registrar and the Trustee may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and the Issuer may require a Holder to pay any Taxes and fees required by law or permitted by the Indenture. Neither the Issuer nor the Registrar will be required (i) to issue, to register the transfer of or to exchange any Take-back SSNs during a period beginning at the opening of business fifteen (15) days before the day of any selection of Take-back SSNs for redemption under Section 3.02 of the Indenture and ending at the close of business on the day of selection; (ii) to register the transfer of or to exchange any Note selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part; or (iii) to register the transfer of or to exchange a Note between a record date and the next succeeding interest payment date.

viii.    *PERSONS DEEMED OWNERS*. The registered Holder of a Note may be treated as its owner for all purposes.

ix.    *STATUS AND RANKING*. The Take-back SSNs will rank junior to the Super Priority Notes but senior to all other Indebtedness (other than in the case of certain of its tax or other obligations, which are granted preferential treatment over the Take-back SSNs pursuant to law) and will be senior in right of payment to any existing and any future Permitted Subordinated Indebtedness of the Issuer.

x.    *DEFAULTS AND REMEDIES*. Events of Default are set forth in Section 6.01 of the Indenture. In the case of an Event of Default arising from certain events of bankruptcy or insolvency, all outstanding Take-back SSNs will become immediately due and payable without further action or notice. In the case of an Event of Default arising from a failure to pay principal of, premium or Additional Amounts, if any, or interest on the Take-back SSNs, Holders of at least 25% in aggregate principal amount of the then outstanding Take-back SSNs may declare the Take-back SSNs to be immediately due and payable. Subject to certain limitations, in the case of any other Event of Default, the Holders of a majority in aggregate principal amount of the outstanding Take-back SSNs may declare the Take-back SSNs to be immediately due and payable and may instruct the Collateral Agent to enforce the Collateral). Holders of the Take-back SSNs may not enforce the Collateral, except as provided in the Security Documents.

If any Event of Default occurs and is continuing and is known to a Responsible Officer of the Trustee, the Trustee will send notice of the Event of Default to each Holder within thirty (30) days after it obtains such knowledge, unless the Event of Default has been cured or waived; *provided* that, except in the case of a Default in the payment of the principal of or interest on any Note, the Trustee may withhold the notice if and so long as the Trustee in good faith determines that withholding the notice is in the interest of the Holders.

The Majority Holders (including Holders of at least 50% in aggregate principal amount of the Take-back SSNs then outstanding) may on behalf of the Holders of all Take-back SSNs waive

any past Default or an Event of Default and its consequences, except that only the Holders affected thereby may waive a Default or an Event of Default (i) in the payment of the principal of and interest on, Additional Amounts or other amounts due under, such outstanding Take-back SSNs; and (ii) in respect of a covenant or provision that under the Indenture cannot be modified or amended without the consent of the Holder of each outstanding Take-back SSN affected thereby. Upon any such waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured for every purpose of the Indenture; but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereon.

If an Event of Default occurs and is continuing, the Majority Holders (including Holders of at least 50% in aggregate principal amount of the Take-back SSNs then outstanding) may instruct the Trustee and/or the Collateral Agent in writing to initiate enforcement proceedings in Chile to collect the amounts specified in Section 6.08 of the Indenture and to enforce all of the Collateral set forth in the Chilean Security Documents. Upon receipt of such instructions, with no need of further instruction or proceeding, the Trustee and/or the Collateral Agent shall as soon as possible grant a customary special double column power of attorney in order to appoint Chilean lawyers as counsel for the enforcement proceedings, and shall take all the measures required for such power of attorney to be legally valid in Chile and to start and continue the enforcement proceedings of any kind, including, without limitation, collection proceedings (*juicios ejecutivos*), collateral enforcement proceedings, bankruptcy proceedings, until complete collection of the Take-back SSNs.

*xi.    TRUSTEE DEALINGS WITH COMPANY.* The Trustee, in its individual or any other capacity, may make loans to, accept deposits from, and perform services for the Issuer or its Affiliates, and may otherwise deal with the Issuer or its Affiliates, as if it were not the Trustee. However, in the event that the Trustee or the Collateral Agent acquires any conflicting interest it must eliminate such conflict within ninety (90) days or resign.

*xii.    NO RECOURSE AGAINST OTHERS.* No director, officer, employee, incorporator, partner or shareholder of the Issuer or any Guarantor, as such, will have any liability for any obligations of the Issuer or the Guarantors under the Take-back SSNs, the Indenture, the Note Guarantees, the Security Documents or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder of Take-back SSNs by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Take-back SSNs.

*xiii.    AUTHENTICATION.* This Note will not be valid until authenticated by the manual signature of the Trustee or an authenticating agent.

*xiv.    ABBREVIATIONS.* Customary abbreviations may be used in the name of a Holder or an assignee, such as: TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian), and U/G/M/A (= Uniform Gifts to Minors Act).

*xv.    CUSIP NUMBERS.* Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Issuer has caused CUSIP numbers to be printed on the Take-back SSNs, and the Trustee may use CUSIP numbers in notices of

redemption as a convenience to Holders. No representation is made as to the accuracy of such numbers either as printed on the Take-back SSNs or as contained in any notice of redemption, and reliance may be placed only on the other identification numbers placed thereon.

      *xvi.*     *GOVERNING LAW.* THE INTERNAL LAW OF THE STATE OF NEW YORK WILL GOVERN AND BE USED TO CONSTRUE THE INDENTURE, THIS NOTE, AND THE NOTE GUARANTEES WITHOUT GIVING EFFECT TO APPLICABLE PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY.

      The Issuer will furnish to any Holder upon written request and without charge a copy of the Indenture and/or any of the other Indenture Documents. Requests may be made to:

Inversiones Latin America Power SpA
Cerro El Plomo, 5680
Of. 1202, Las Condes
Santiago, Chile
Attention: Esteban Moraga
Phone: +56 2-2820-3235
Email: esteban.moraga@latampower.com

Assignment Form

To assign this Note, fill in the form below:

(I) or (we) assign and transfer this Note to:_____

(Insert assignee's legal name)

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____
_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint  _____

to transfer this Note on the books of the Issuer. The agent may substitute another to act for him.

Date: _____

Your Signature:_____

(Sign exactly as your name appears on the face of this Note)

Signature Guarantee*:_____

*        Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

SCHEDULE OF EXCHANGES OF INTERESTS IN THE GLOBAL NOTE[*]

The following exchanges of a part of this Global Note for an interest in another Global Note or for a Definitive Note, or exchanges of a part of another Global Note or Definitive Note for an interest in this Global Note, have been made:

| Date of Exchange | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following such decrease (or increase) | Signature of authorized officer of Trustee or Custodian |
|---|---|---|---|---|

---

[*] *This schedule should be included only if the Note is issued in global form.*

A-1-10

EXHIBIT A-2

## FORM OF SUPER PRIORITY NOTE

[*Insert the Global Note Legend, if applicable pursuant to the provisions of the Indenture*]

[*Insert the Private Placement Legend, if applicable pursuant to the provisions of the Indenture*]

[*Insert the Regulation S Global Note Legend, if applicable pursuant to the provisions of the Indenture*]

[Face of Note]

## INVERSIONES LATIN AMERICA POWER SpA
**SUPER PRIORITY NOTES DUE 2033**

CUSIP _____

ISIN _____ [2]

Common Code_____

No. _____                                          $_____

Inversiones Latin America Power SpA promises to pay to _____ or registered assigns,

the principal sum of _____ DOLLARS as set forth in the Principal Payment Schedule in this Note [as revised by the Schedule of Exchanges of Interests in the Global Note attached hereto]*.

Interest Payment Dates: June 15 and December 15, commencing on June 15, 2024.

Record Dates: June 1 and December 1

Dated: _____, 20\_\_\_\_

      Reference is made to the further provisions of this Note contained on the reverse side of this Note, which for all purposes have the same effect as if set forth at this place.

---

[2]     Reg.  S CUSIP: [●]
      Rule 144A CUSIP: [●]
      Reg S.  ISIN: [●]
      Rule 144A ISIN: [●]
      *For inclusion in Global Notes only

IN WITNESS WHEREOF, INVERSIONES LATIN AMERICA POWER SpA has caused this instrument to be duly executed.

INVERSIONES LATIN AMERICA POWER SpA,

By: _____

    Name:

    Title:

This is one of the Notes referred to in the within-mentioned Indenture:

UMB Bank, N.A.,
as Trustee

By: _____

    Authorized Signatory

Date: _____

[REVERSE OF NOTE]

INVERSIONES LATIN AMERICA POWER SpA
SUPER PRIORITY NOTES DUE 2033

Capitalized terms used herein have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

i.    *PRINCIPAL AND INTEREST*. Inversiones Latin America Power SpA, a stock corporation (*sociedad por acciones*) incorporated under the laws of Chile (the "*Issuer*"), promises to pay interest on this Super Priority Note semi-annually in arrears on each June 15 and December 15 (the "*Interest Payment Dates*") from the Effective Date until this Super Priority Note is paid in full, to the registered Holders of the Super Priority Notes on the June 1 and December 1 preceding the applicable Interest Payment Date.

Note payment date. Interest on the Super Priority Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from and including the Effective Date. Interest on overdue principal will be computed on the basis of a 360-day year comprised of twelve 30-day months. The first interest payment shall be calculated based on the period from the Effective Date through the first Interest Payment Date. The redemption of Super Priority Notes with unpaid and accrued interest to the date of redemption will not affect the right of Holders of record on a record date to receive interest due on an Interest Payment Date.

This Note will accrue interest at the following rates per annum:

| Period | Interest Rate if PIK Option Elected | Interest Rate if Cash Option Elected |
|---|---|---|
| From the Effective Date to June 15, 2033 | 14.00% | 12.00% |

ii.    *PIK PAYMENTS.* Subject to the table above, the Issuer will have the option (the "PIK Option") to pay all or a portion of the interest due on the Super Priority Notes on the relevant Interest Payment Date (rounded up to the nearest US$1.00) by increasing the outstanding principal amount of the Super Priority Notes in the amount of PIK interest (in each case, the "*PIK Payment*") unless a Default or Event of Default has occurred and is continuing. Unless the context requires otherwise, references to "principal amount" of the Super Priority Notes includes any increase in the principal amount of the outstanding Super Priority Notes as a result of a PIK Payment.

No less than fifteen (15) Business Days prior to each Interest Payment Date on which the Issuer may elect to pay PIK Interest in lieu of cash interest, the Issuer shall notify the Trustee in writing of its intention to pay PIK Interest or cash interest on such Interest Payment Date. Any election to pay PIK Interest must be for a minimum amount of $1,000,000 of interest and increments of $1,000 in excess thereof (or the total amount of interest payable on such date). In the event the Issuer fails to timely deliver such notice, the Issuer shall be deemed to have elected to pay cash interest.

Except as set forth above, the insufficiency or lack of funds available to the Issuer to make an interest payment in cash as required by the Indenture shall not permit the Issuer to make a PIK Payment in respect of any interest period and the sole right of the Issuer to elect to make a PIK Payment shall be as (and to the extent) provided in the immediately preceding paragraph.

       *iii.*    *DEFAULT INTEREST*. From and after the occurrence of an Event of Default until the date such Event of Default is cured or waived in accordance with the Indenture, (i) interest on the Super Priority Notes will accrue at a rate equal to the then-prevailing rate for cash interest payments plus 200 basis points (2.00%) *per annum* and (ii) interest will be payable only in cash (and there will be no PIK option).

       *iv.*    *METHOD OF PAYMENT*. The Issuer will pay interest on the Super Priority Notes (except defaulted interest) to the Persons who are registered Holders of Super Priority Notes at the close of business on each June 1 and December 1, respectively, immediately preceding the applicable Interest Payment Date, even if such Super Priority Notes are canceled after such record date and on or before such Interest Payment Date. The Super Priority Notes will be payable as to principal, premium, if any, and interest at the office or agency of the Issuer maintained for such purpose or, at the option of the Paying Agent, payment of interest may be made by check mailed to the Holders at their addresses set forth in the register of Holders; *provided* that payment by wire transfer of immediately available funds will be required with respect to principal of and interest, premium on, all Global Notes and all other Super Priority Notes the Holders of which will have provided wire transfer instructions to the Issuer or the Paying Agent. Such payment will be in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.

       *v.*    *PAYING AGENT AND REGISTRAR*. Initially, UMB Bank, N.A., the Trustee under the Indenture, will act as the paying agent and registrar for the Super Priority Notes. The Issuer may appoint other paying agents and registrars instead of, or in addition to, the Trustee.

       *vi.*    *INDENTURE AND SECURITY DOCUMENTS*. The Issuer issued the Super Priority Notes under an Indenture dated as of [January] [●], 2024 (the "*Indenture*") among the Issuer, the Guarantors, the Trustee, the Offshore Collateral Agent, the Onshore Collateral Agent, the Registrar, the Transfer Agent, and the Paying Agent. The Super Priority Notes are subject to all such terms, and Holders are referred to the Indenture for a statement of such terms. To the extent any provision of this Super Priority Note conflicts with the express provisions of the Indenture, the provisions of the Indenture shall govern and be controlling. The Super Priority Notes are secured obligations of the Issuer, secured on a first priority basis by a security interest in substantially all of the Issuer's and the Guarantors' assets, pursuant to the Security Documents referred to in the Indenture. To guarantee the due and punctual payment of the principal and interest on the Super Priority Notes and all other amounts payable by the Issuer under the Indenture and the Super Priority Notes when and as the same shall be due and payable, whether at maturity, by acceleration or otherwise, according to the terms of the Super Priority Notes and the Indenture, the Guarantors have, jointly and severally, unconditionally guaranteed the Obligations of the Issuer under the Super Priority Notes pursuant to the terms of the Indenture. The Guarantees are secured obligations of the Guarantors.

*vii.*      *DENOMINATIONS, TRANSFER, EXCHANGE.* The Super Priority Notes are in registered form without coupons in denominations of US$1,000 and integral multiples of US$1.00 in excess thereof. The transfer of Super Priority Notes may be registered and Super Priority Notes may be exchanged as provided in the Indenture. The Registrar and the Trustee may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and the Issuer may require a Holder to pay any Taxes and fees required by law or permitted by the Indenture. Neither the Issuer nor the Registrar will be required (i) to issue, to register the transfer of or to exchange any Super Priority Notes during a period beginning at the opening of business fifteen (15) days before the day of any selection of Notes for redemption under Section 3.02 of the Indenture and ending at the close of business on the day of selection; (ii) to register the transfer of or to exchange any Super Priority Note selected for redemption in whole or in part, except the unredeemed portion of any Super Priority Note being redeemed in part; or (iii) to register the transfer of or to exchange a Super Priority Note between a record date and the next succeeding interest payment date.

*viii.*      *PERSONS DEEMED OWNERS.* The registered Holder of a Super Priority Note may be treated as its owner for all purposes.

*ix.*      *STATUS AND RANKING.* The Super Priority Notes will rank senior to the Take-back SSNs and all Indebtedness (other than in the case of certain of its tax or other obligations, which are granted preferential treatment over the Super Priority Notes pursuant to law) to the extent of the value of the Collateral and will be senior in right of payment to any existing and any future Permitted Subordinated Indebtedness of the Issuer.

*x.*      *DEFAULTS AND REMEDIES.* Events of Default are set forth in Section 6.01 of the Indenture. In the case of an Event of Default arising from certain events of bankruptcy or insolvency, all outstanding Super Priority Notes will become immediately due and payable without further action or notice. In the case of an Event of Default arising from a failure to pay principal of, premium or Additional Amounts, if any, or interest on the Super Priority Notes, Holders of at least 25% in aggregate principal amount of the then outstanding Super Priority Notes may declare the Super Priority Notes to be immediately due and payable. Subject to certain limitations, in the case of any other Event of Default, the Holders of a majority in aggregate principal amount of the outstanding Super Priority Notes may declare the Notes to be immediately due and payable and may instruct the Collateral Agent to enforce the Collateral). Holders of the Super Priority Notes may not enforce the Collateral, except as provided in the Security Documents.

If any Event of Default occurs and is continuing and is known to a Responsible Officer of the Trustee, the Trustee will send notice of the Event of Default to each Holder within thirty (30) days after it obtains such knowledge, unless the Event of Default has been cured or waived; *provided* that, except in the case of a Default in the payment of the principal of or interest on any Super Priority Note, the Trustee may withhold the notice if and so long as the Trustee in good faith determines that withholding the notice is in the interest of the Holders.

The Majority Holders may on behalf of the Holders of all Super Priority Notes waive any past Default or an Event of Default and its consequences, except that only the Holders affected thereby may waive a Default or an Event of Default (i) in the payment of the principal of and interest on, Additional Amounts or other amounts due under, such outstanding Super Priority

Notes; and (ii) in respect of a covenant or provision that under the Indenture cannot be modified or amended without the consent of the Holder of each outstanding Super Priority Note affected thereby. Upon any such waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured for every purpose of the Indenture; but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereon.

If an Event of Default occurs and is continuing, the Majority Holders may instruct the Trustee and/or the Collateral Agent in writing to initiate enforcement proceedings in Chile to collect the amounts specified in Section 6.08 of the Indenture and to enforce all of the Collateral set forth in the Chilean Security Documents. Upon receipt of such instructions, with no need of further instruction or proceeding, the Trustee and/or the Collateral Agent shall as soon as possible grant a customary special double column power of attorney in order to appoint Chilean lawyers as counsel for the enforcement proceedings, and shall take all the measures required for such power of attorney to be legally valid in Chile and to start and continue the enforcement proceedings of any kind, including, without limitation, collection proceedings (*juicios ejecutivos*), collateral enforcement proceedings, bankruptcy proceedings, until complete collection of the Super Priority Notes.

      *xi.*    *TRUSTEE DEALINGS WITH COMPANY.* The Trustee, in its individual or any other capacity, may make loans to, accept deposits from, and perform services for the Issuer or its Affiliates, and may otherwise deal with the Issuer or its Affiliates, as if it were not the Trustee. However, in the event that the Trustee or the Collateral Agent acquires any conflicting interest it must eliminate such conflict within ninety (90) days or resign.

      *xii.*    *NO RECOURSE AGAINST OTHERS.* No director, officer, employee, incorporator, partner or shareholder of the Issuer or any Guarantor, as such, will have any liability for any obligations of the Issuer or the Guarantors under the Super Priority Notes, the Indenture, the Note Guarantees, the Security Documents or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder of Super Priority Notes by accepting a Super Priority Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Super Priority Notes.

      *xiii.*    *AUTHENTICATION.* This Super Priority Note will not be valid until authenticated by the manual signature of the Trustee or an authenticating agent.

      *xiv.*    *ABBREVIATIONS.* Customary abbreviations may be used in the name of a Holder or an assignee, such as: TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian), and U/G/M/A (= Uniform Gifts to Minors Act).

      *xv.*    *CUSIP NUMBERS.* Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Issuer has caused CUSIP numbers to be printed on the Super Priority Notes, and the Trustee may use CUSIP numbers in notices of redemption as a convenience to Holders. No representation is made as to the accuracy of such numbers either as printed on the Super Priority Notes or as contained in any notice of redemption, and reliance may be placed only on the other identification numbers placed thereon.

*xvi.* *GOVERNING LAW.* THE INTERNAL LAW OF THE STATE OF NEW YORK WILL GOVERN AND BE USED TO CONSTRUE THE INDENTURE, THIS NOTE, AND THE NOTE GUARANTEES WITHOUT GIVING EFFECT TO APPLICABLE PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY.

The Issuer will furnish to any Holder upon written request and without charge a copy of the Indenture and/or any of the other Indenture Documents. Requests may be made to:

Inversiones Latin America Power SpA
Cerro El Plomo, 5680
Of. 1202, Las Condes
Santiago, Chile
Attention: Esteban Moraga
Phone: +56 2-2820-3235
Email: esteban.moraga@latampower.com

Assignment Form

To assign this Note, fill in the form below:

(I) or (we) assign and transfer this Note to:_____

(Insert assignee's legal name)

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____
_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint _____

to transfer this Note on the books of the Issuer. The agent may substitute another to act for him.

Date: _____

Your Signature: _____

(Sign exactly as your name appears on the face of this Note)

Signature Guarantee*:_____

*       Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

## SCHEDULE OF EXCHANGES OF INTERESTS IN THE GLOBAL NOTE[*]

The following exchanges of a part of this Global Note for an interest in another Global Note or for a Definitive Note, or exchanges of a part of another Global Note or Definitive Note for an interest in this Global Note, have been made:

| Date of Exchange | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following such decrease (or increase) | Signature of authorized officer of Trustee or Custodian |
|---|---|---|---|---|

---

[*] *This schedule should be included only if the Note is issued in global form.*

EXHIBIT B

FORM OF CERTIFICATE OF TRANSFER

Inversiones Latin America Power SpA
Cerro El Plomo, 5680
Of. 1202, Las Condes
Santiago, Chile
Attention: Esteban Moraga
Phone: +56 2-2820-3235
Email: esteban.moraga@latampower.com

UMB Bank, N.A.
100 William Street, Suite 1850
New York, New York 10038
Attention: Prital Patel
Email: Prital.Patel@umb.com

      Re: Inversiones Latin America Power SpA [Take-back Senior Secured Notes Due 2033]/[Super Priority Notes Due 2033]

      Reference is hereby made to the Indenture, dated as of [January] [●], 2024 (the "*Indenture*"), among Inversiones Latin America Power SpA, a stock corporation (*sociedad por acciones*) incorporated under the laws of Chile (the "*Issuer*"), the guarantors thereto (collectively the "*Guarantors*"), UMB Bank, N.A., as Trustee (in such capacity, the "*Trustee*"), offshore collateral agent, registrar, transfer agent and paying agent, and Banco de Chile, as onshore collateral agent. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

      _____, (the "*Transferor*") owns and proposes to transfer the Note[s] or interest in such Note[s] specified in Annex A hereto, in the principal amount of $ _____ in such Note[s] or interests (the "*Transfer*"), to _____ (the "*Transferee*"), as further specified in Annex A hereto. In connection with the Transfer, the Transferor hereby certifies that:

[CHECK ALL THAT APPLY]

      1.    ☐    **Check if Transferee will take delivery of a beneficial interest in the 144A Global Note or a Restricted Definitive Note pursuant to Rule 144A**. The Transfer is being effected pursuant to and in accordance with Rule 144A under the Securities Act of 1933, as amended (the "*Securities Act*"), and, accordingly, the Transferor hereby further certifies that the beneficial interest or Definitive Note is being transferred to a Person that the Transferor reasonably believes is purchasing the beneficial interest or Definitive Note for its own account, or for one or more accounts with respect to which such Person exercises sole investment discretion, and such Person and each such account is a "qualified institutional buyer" within the meaning of Rule 144A in a transaction meeting the requirements of Rule 144A, and such Transfer is in compliance with any applicable blue sky securities laws of any state of the United States. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will be subject to the restrictions on transfer enumerated in the Private

Placement Legend printed on the 144A Global Note and/or the Restricted Definitive Note and in the Indenture and the Securities Act.

2.    ☐    **Check if Transferee will take delivery of a beneficial interest in the Regulation S Global Note or a Restricted Definitive Note pursuant to Regulation S**. The Transfer is being effected pursuant to and in accordance with Rule 903 or Rule 904 under the Securities Act and, accordingly, the Transferor hereby further certifies that (i) the Transfer is not being made to a Person in the United States and (x) at the time the buy order was originated, the Transferee was outside the United States or such Transferor and any Person acting on its behalf reasonably believed and believes that the Transferee was outside the United States or (y) the transaction was executed in, on or through the facilities of a designated offshore securities market and neither such Transferor nor any Person acting on its behalf knows that the transaction was prearranged with a buyer in the United States, (ii) no directed selling efforts have been made in contravention of the requirements of Rule 903(b) or Rule 904(b) of Regulation S under the Securities Act, (iii) the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act and (iv) if the proposed transfer is being made prior to the expiration of the Restricted Period, the transfer is not being made to a U.S. Person or for the account or benefit of a U.S. Person (other than the initial purchasers) and the interest so transferred will be held immediately thereafter through Euroclear or Clearstream. Upon consummation of the proposed transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will be subject to the restrictions on Transfer enumerated in the Private Placement Legend printed on the Regulation S Global Note and/or the Restricted Definitive Note and in the Indenture and the Securities Act.

3.    ☐    **Check and complete if Transferee will take delivery of a beneficial interest in a Restricted Definitive Note pursuant to any provision of the Securities Act other than Rule 144A or Regulation S.** The Transfer is being effected in compliance with the transfer restrictions applicable to beneficial interests in Restricted Global Notes and Restricted Definitive Notes and pursuant to and in accordance with the Securities Act and any applicable blue sky securities laws of any state of the United States, and accordingly the Transferor hereby further certifies that (check one):

(a)    ☐    such Transfer is being effected pursuant to and in accordance with Rule 144 under the Securities Act;

or

(b)    ☐    such Transfer is being effected to the Issuer or a subsidiary thereof;

or

(c)    ☐    such Transfer is being effected pursuant to an effective registration statement under the Securities Act and in compliance with the prospectus delivery requirements of the Securities Act.

4.    ☐    Check if Transferee will take delivery of a beneficial interest in an Unrestricted Global Note or of an Unrestricted Definitive Note.

(a)    ☐    Check if Transfer is being effected pursuant to an effective registration statement under the Securities Act and in compliance with the prospectus delivery requirement of the Securities Act.

(b)    ☐    **Check if Transfer is pursuant to Rule 144**. (i) The Transfer is being effected pursuant to and in accordance with Rule 144 under the Securities Act and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any state of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will no longer be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes, on Restricted Definitive Notes and in the Indenture.

(c)    ☐    **Check if Transfer is Pursuant to Regulation S**. (i) The Transfer is being effected pursuant to and in accordance with Rule 903 or Rule 904 under the Securities Act and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any state of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will no longer be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes, on Restricted Definitive Notes and in the Indenture.

(d)    ☐    **Check if Transfer is Pursuant to Other Exemption**. (i) The Transfer is being effected pursuant to and in compliance with an exemption from the registration requirements of the Securities Act other than Rule 144, Rule 903 or Rule 904 and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any State of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will not be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes or Restricted Definitive Notes and in the Indenture.

This certificate and the statements contained herein are made for your benefit and the benefit of the Issuer.

_____
[Insert Name of Transferor]


_____
Name:
Title:


Dated: _____

## ANNEX A TO CERTIFICATE OF TRANSFER

1.      The Transferor owns and proposes to transfer the following:

[CHECK ONE OF (a) OR (b)]

(a)      ☐      a beneficial interest in the:

      (i)      ☐      144A Global Note, or

      (ii)      ☐      Regulation S Global Note; or

(b)      ☐      a Restricted Definitive Note.

2.      After the Transfer the Transferee will hold:

[CHECK ONE]

(a)      ☐      a beneficial interest in the:

      (i)      ☐      144A Global Note, or

      (ii)      ☐      Regulation S Global Note, or

      (iii)      ☐      Unrestricted Global Note; or

(b)      ☐      a Restricted Definitive Note; or

(c)      ☐      an Unrestricted Definitive Note, in accordance with the terms of the
Indenture.

EXHIBIT C

FORM OF CERTIFICATE OF EXCHANGE

Inversiones Latin America Power SpA
Cerro El Plomo, 5680
Of. 1202, Las Condes
Santiago, Chile Attention:
Esteban Moraga
Phone: +56 2-2820-3235
Email: esteban.moraga@latampower.com

UMB Bank, N.A.
100 William Street, Suite 1850
New York, New York 10038
Attention: Prital Patel
Email: Prital.Patel@umb.com

      Re: Inversiones Latin America Power SpA [Take-back Senior Secured Notes Due 2033]/[Super Priority Notes Due 2033]

      Reference is hereby made to the Indenture, dated as of [January] [●], 2024 (the "*Indenture*"), among Inversiones Latin America Power SpA, a stock corporation (*sociedad por acciones*) incorporated under the laws of Chile (the "*Issuer*"), the guarantors thereto (collectively the "*Guarantors*"), UMB Bank, N.A., as Trustee (in such capacity, the "*Trustee*"), offshore collateral agent, registrar, transfer agent and paying agent, and Banco de Chile, as onshore collateral agent. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

      _____, (the "*Owner*") owns and proposes to exchange the Note[s] or interest in such Note[s] specified herein, in the principal amount of $ _____ in such Note[s] or interests (the "*Exchange*"). In connection with the Exchange, the Owner hereby certifies that:

**1.      Exchange of Restricted Definitive Notes or Beneficial Interests in a Restricted Global Note for Unrestricted Definitive Notes or Beneficial Interests in an Unrestricted Global Note**

      **(a)      ☐      Check if Exchange is from beneficial interest in a Restricted Global Note to beneficial interest in an Unrestricted Global Note**. In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for a beneficial interest in an Unrestricted Global Note in an equal principal amount, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Global Notes and pursuant to and in accordance with the Securities Act of 1933, as amended (the "*Securities Act*"), (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and

(iv) the beneficial interest in an Unrestricted Global Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

(b)    ☐    **Check if Exchange is from beneficial interest in a Restricted Global Note to Unrestricted Definitive Note**. In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for an Unrestricted Definitive Note, the Owner hereby certifies (i) the Definitive Note is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Restricted Global Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the Definitive Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

(c)    ☐    **Check if Exchange is from Restricted Definitive Note to beneficial interest in an Unrestricted Global Note**. In connection with the Owner's Exchange of a Restricted Definitive Note for a beneficial interest in an Unrestricted Global Note, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to Restricted Definitive Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the beneficial interest is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

(d)    ☐    **Check if Exchange is from Restricted Definitive Note to Unrestricted Definitive Note**. In connection with the Owner's Exchange of a Restricted Definitive Note for an Unrestricted Definitive Note, the Owner hereby certifies (i) the Unrestricted Definitive Note is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to Restricted Definitive Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the Unrestricted Definitive Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

**2.    Exchange of Restricted Definitive Notes or Beneficial Interests in Restricted Global Notes for Restricted Definitive Notes or Beneficial Interests in Restricted Global Notes**

(a)    ☐    **Check if Exchange is from beneficial interest in a Restricted Global Note to Restricted Definitive Note.** In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for a Restricted Definitive Note with an equal principal amount, the Owner hereby certifies that the Restricted Definitive Note is being acquired for the Owner's own account without transfer. Upon consummation of the proposed Exchange in accordance with the terms of the Indenture, the Restricted Definitive Note issued will continue to be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Definitive Note and in the Indenture and the Securities Act.

C-2

(b)        ☐        **Check if Exchange is from Restricted Definitive Note to beneficial interest in a Restricted Global Note**. In connection with the Exchange of the Owner's Restricted Definitive Note for a beneficial interest in the [CHECK ONE] ☐ 144A Global Note, ☐ Regulation S Global Note with an equal principal amount, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer and (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Restricted Global Notes and pursuant to and in accordance with the Securities Act, and in compliance with any applicable blue sky securities laws of any state of the United States. Upon consummation of the proposed Exchange in accordance with the terms of the Indenture, the beneficial interest issued will be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the relevant Restricted Global Note and in the Indenture and the Securities Act.

This certificate and the statements contained herein are made for your benefit and the benefit of the Issuer.

_____

[Insert Name of Transferor]

By:_____
    Name:
    Title:

Dated: _____

C-3

EXHIBIT D

[FORM OF SUPPLEMENTAL INDENTURE
TO BE DELIVERED BY SUBSEQUENT GUARANTORS]

Supplemental Indenture (this "*Supplemental Indenture*"), dated as of, among (the "*Guaranteeing Subsidiary*"), a subsidiary of Inversiones Latin America Power SpA a stock corporation (*sociedad por acciones*) incorporated under the laws of Chile (the "*Issuer*"), and UMB Bank, N.A. as trustee (the "*Trustee*").

W I T N E S S E T H

WHEREAS, each of the Issuer and the Guarantors (as defined in the Indenture) have heretofore executed and delivered to the Trustee an indenture (the "*Indenture*"), dated as of [January] [●], 2024, providing for the issuance of $264,305,966.00 principal amount of Take-back Senior Secured Notes due 2033 (the "*Take-back SSNs*") and $14,000,000 principal amount of Super Priority Notes due 2033 (the "*Super Priority Notes*", and together with the Take-back SSNs, the "*Notes*");

WHEREAS, the Indenture provides that under certain circumstances the Guaranteeing Subsidiary shall execute and deliver to the Trustee a supplemental indenture pursuant to which the Guaranteeing Subsidiary shall unconditionally guarantee all of the Issuer's Obligations under the Notes and the Indenture on the terms and conditions set forth herein and under the Indenture (the "*Guarantee*"); and

WHEREAS, pursuant to Section 9.01 of the Indenture, the Trustee is authorized to execute and deliver this Supplemental Indenture.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties mutually covenant and agree for the equal and ratable benefit of the Holders of the Notes as follows:

(1)     Capitalized Terms. Capitalized terms used herein without definition shall have the meanings assigned to them in the Indenture.

(2)     Agreement to Guarantee. The Guaranteeing Subsidiary hereby agrees to become a Guarantor under the Indenture and as follows:

(a)     Along with all Guarantors named in a supplemental indenture to the Indenture, to jointly, severally, fully and unconditionally guarantee to each Holder of a Note authenticated and delivered by the Trustee and to the Trustee and its successors and assigns, and to the Trustee, Collateral Agent and their respective successors and assigns, irrespective of the validity and enforceability of the Indenture, the Notes or the obligations of the Issuer hereunder or thereunder, that:

(i)     the principal of, premium, if any, and interest on, the Notes will be promptly paid in full when due, whether at Stated Maturity, by acceleration, redemption or otherwise, and interest on the overdue principal of and

D-1

interest on the Notes, if any, if lawful, any Additional Amounts required to be paid in connection with certain Taxes, and all other Obligations of the Issuer to the Holders,

the Trustee or the Collateral Agent under the Notes or the Indenture will be promptly paid in full or performed, all in accordance with the terms hereof and thereof; and

(ii)    in case of any extension of time of payment or renewal of any Notes or any of such other Obligations, that same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at Stated Maturity, by acceleration or otherwise.

Failing payment when due of any amount so guaranteed or any performance so guaranteed for whatever reason, the Guaranteeing Subsidiary will be obligated to pay the same immediately. The Guaranteeing Subsidiary agrees that this is a Guarantee of payment and not a Guarantee of collection.

(b)    The obligations hereunder are unconditional, irrespective of the validity, regularity or enforceability of the Notes or the Indenture, the absence of any action to enforce the same, any waiver or consent by any Holder of the Notes with respect to any provisions hereof or thereof, the recovery of any judgment against the Issuer, any action to enforce the same or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor. The Guaranteeing Subsidiary hereby waives diligence, presentment, demand of payment, filing of claims with a court in the event of insolvency or bankruptcy of the Issuer, any right to require a proceeding first against the Issuer, protest, notice and all demands whatsoever and covenant that this Note Guarantee will not be discharged except by complete performance of the obligations contained in the Notes and the Indenture.

(c)    If any Holder, Collateral Agent or the Trustee is required by any court or otherwise to return to the Issuer, the Guarantors (including the Guaranteeing Subsidiary), or any custodian, trustee, liquidator or other similar official acting in relation to either the Issuer or the Guaranteeing Subsidiary, any amount paid to any of the Trustee, Collateral Agent or such Holder, this Note Guarantee, to the extent theretofore discharged, will be reinstated in full force and effect.

(d)    The Guaranteeing Subsidiary will not be entitled to any right of subrogation in relation to the Holders in respect of any Obligations guaranteed hereby until payment in full of all Obligations guaranteed hereby. The Guaranteeing Subsidiary further agrees that, as between any of the Guarantors, on the one hand, and the Holders, Collateral Agents and the Trustee, on the other hand, (1) the maturity of the Obligations guaranteed hereby may be accelerated as provided in Article 6 hereof for the purposes of this Note Guarantee, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the Obligations guaranteed hereby, and (2) in the event of any declaration of acceleration of such obligations as provided in Article 6 hereof, such Obligations (whether or not due and payable) will forthwith become due and payable by

the Guaranteeing Subsidiary for the purpose of this Note Guarantee. The Guaranteeing Subsidiary shall have the right to seek contribution from any non- paying Guarantor so long as the exercise of such right does not impair the rights of the Holders under the Note Guarantees.

(e)     Each Note Guarantee shall remain in full force and effect and continue to be effective should any petition be filed by or against the Issuer for liquidation, reorganization, should the Issuer become insolvent or make an assignment for the benefit of creditors or should a receiver or trustee be appointed for all or any significant part of the Issuer's assets, and shall, to the fullest extent permitted by law, continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Notes are, pursuant to Applicable Law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee on the Notes or Note Guarantees, whether as a "voidable preference," "fraudulent transfer" or otherwise, all as though such payment or performance had not been made. In the event that any payment or any part thereof, is rescinded, reduced, restored or returned, the Notes shall, to the fullest extent permitted by law, be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

(f)     In case any provision of any Note Guarantee shall be invalid, illegal or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

(g)     Each payment to be made by the Guaranteeing Subsidiary in respect of its Note Guarantee shall be made without set-off, counterclaim, reduction or diminution of any kind or nature.

(h)     The Note Guarantees will be senior secured obligations of the Guaranteeing Subsidiary, will rank equally with all other existing unsubordinated obligations of the Guaranteeing Subsidiary, and will benefit from a first priority Lien on the Collateral as provided for in the Indenture.

(3)     Execution and Delivery. The Guaranteeing Subsidiary agrees that the Guarantee shall remain in full force and effect notwithstanding the absence of the endorsement of any notation of such Guarantee on the Notes.

(4)     Releases. The Guarantee of the Guaranteeing Subsidiary shall be automatically and unconditionally released and discharged, and no further action by the Guaranteeing Subsidiary, the Issuer or the Trustee is required for the release of the Guaranteeing Subsidiary's Guarantee, upon Legal Defeasance in accordance with Article 8 of the Indenture or satisfaction and discharge of the Indenture in accordance with Article 12 of the Indenture.

(5)     No Recourse Against Others. No director, officer, employee, incorporator, partner or shareholder of the Issuer or any Guaranteeing Subsidiary, as such, will have any liability for any obligations of the Issuer or the Guarantors (including the Guaranteeing Subsidiary) under the Notes, the Indenture, the Note Guarantees, the Security Documents or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder of Notes by accepting

a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes.

(6)  <u>Submission to Jurisdiction</u>. The Guaranteeing Subsidiary hereby irrevocably submits to the jurisdiction of any New York State or United States Federal court sitting in the City of New York over any suit, action or proceeding arising out of or relating to this Supplemental Indenture or any Note or the Note Guarantees. The Guaranteeing Subsidiary hereby irrevocably waives, to the fullest extent permitted by Applicable Law, any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding brought in such courts and any claim that any such suit, action or proceeding brought in such courts, has been brought in an inconvenient forum and any right to any other jurisdiction to which it may be entitled on account of place of residence or domicile. To the extent the Guaranteeing Subsidiary has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process with respect to itself or its Property, the Guaranteeing Subsidiary hereby irrevocably waives such immunity in respect of (i) its obligations under this Indenture and (ii) any Note or the Note Guarantees. The Guaranteeing Subsidiary hereby agrees that final judgment in any such suit, action or proceeding brought in such a court shall be conclusive and binding on them and may be enforced in any court to the jurisdiction of which each of them is subject by a suit upon such judgment, provided, that service of process is effected upon the Guaranteeing Subsidiary in the manner specified in Section 13.09(b) of the Indenture or as otherwise permitted by Applicable Law.

(7)  <u>Appointment of Process Agent.</u> As long as any of the Notes remain outstanding, the Guaranteeing Subsidiary will at all times have an authorized agent in the City of New York, upon whom process may be served in any legal action or proceeding arising out of or relating to this Indenture or any Note or the Note Guarantees. Service of process upon such agent and written notice of such service mailed or delivered to the Guaranteeing Subsidiary shall to the extent permitted by Applicable Law be deemed in every respect effective service of process upon the Guaranteeing Subsidiary, as the case may be, in any such legal action or proceeding. The Guaranteeing Subsidiary will appoint Corporation Service Company as their agent for such purpose and, in the case of the Issuer and any Guarantor, shall grant an irrevocable power of attorney in favor of such process agent with sufficient authority for lawsuits and collections. The Guaranteeing Subsidiary further covenants and agrees that service of process in any suit, action or proceeding may be made upon it at the office of such agent at 19 West 44th Street, Suite 200, New York, New York, 10036-8401 (or at such other address or at the office of such other authorized agent as the Guaranteeing Subsidiary may designate by written notice to the Trustee).

(8)  <u>Governing Law</u>. THE INTERNAL LAW OF THE STATE OF NEW YORK WILL GOVERN AND BE USED TO CONSTRUE THIS SUPPLEMENTAL INDENTURE, THE NOTES, AND THE NOTE GUARANTEES WITHOUT GIVING EFFECT TO APPLICABLE PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY.

(9)  <u>Counterparts</u>. The parties may sign any number of copies of this Supplemental Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.

(10)    <u>Effect of Headings</u>. The Section headings herein are for convenience only and shall not affect the construction hereof.

(11)    <u>The Trustee</u>. The Trustee shall not be responsible in any manner whatsoever for or in respect of the validity or sufficiency of this Supplemental Indenture or for or in respect of the recitals contained herein, all of which recitals are made solely by the Guaranteeing Subsidiary.

(12)    <u>Subrogation</u>. The Guaranteeing Subsidiary shall be subrogated to all rights of Holders of Notes against the Issuer in respect of any amounts paid by the Guaranteeing Subsidiary pursuant to the provisions of Section 2 hereof and Section 11.01 of the Indenture; *provided* that, if an Event of Default has occurred and is continuing, the Guaranteeing Subsidiary shall not be entitled to enforce or receive any payments arising out of, or based upon, such right of subrogation until all amounts then due and payable by the Issuer under the Indenture or the Notes shall have been paid in full.

(13)    <u>Benefits Acknowledged</u>. The Guaranteeing Subsidiary's Guarantee is subject to the terms and conditions set forth in the Indenture. The Guaranteeing Subsidiary acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated by the Indenture and this Supplemental Indenture and that the guarantee and waivers made by it pursuant to this Guarantee are knowingly made in contemplation of such benefits.

(14)    <u>Successors</u>. All agreements of the Guaranteeing Subsidiary in this Supplemental Indenture shall bind its Successors, except as otherwise provided in Section 2(e) hereof or the Indenture. All agreements of the Trustee in this Supplemental Indenture shall bind its successors.

[Signature Pages Follow]

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed, all as of the date first above written.

[GUARANTEEING SUBSIDIARY]

By:_____
    Name:
    Title:


UMB BANK, N.A.,
As Trustee

By:_____
    Name:
    Title:

## <u>SCHEDULE A</u>

1.  Service Agreement entered into by and among LAP Chile and San Juan dated as of April 29, 2015, as amended on October 4, 2016.

2.  Service Agreement entered into by and among LAP Chile and Norvind dated as of September 6, 2016.

3.  Intercompany loan between ILAP and San Juan and Norvind granted by public deed before the Public Notary Mr. Roberto Antonio Cifuentes Allel dated as of September 28, 2017, and amended by public deed granted before the Public Notary Mr. Roberto Antonio Cifuentes Allel on June 15, 2021.

4.  Acknowledgment of debt (*reconocimiento de deuda*) dated as of December 31, 2022, by Norvind for San Juan.

5.  Acknowledgment of debt (*reconocimiento de deuda*) dated as of December 31, 2022, by ILAP for LAP S.A.

6.  Acknowledgment of debt (*reconocimiento de deuda*) dated as of December 31, 2022, by San Juan for ILAP.

7.  Acknowledgment of debt (*reconocimiento de deuda*) dated as of December 31. 2022, by Norvind for ILAP.

## SCHEDULE B[3]

**FORM OF SUBORDINATION AGREEMENT**

---

[3] **NTD:** Form of Subordination Agreement to come post-filing.

## SCHEDULE C

1.    Chilean Subordination Agreement (*convenio de subordinación*) by and among the Onshore Collateral Agent, for the benefit of the Secured Parties, ILAP and Norvind, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

2.    Chilean Subordination Agreement (*convenio de subordinación*) by and among the Onshore Collateral Agent, for the benefit of the Secured Parties, ILAP and San Juan, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

3.    Chilean Subordination Agreement (*convenio de subordinación*) by and among the Onshore Collateral Agent, for the benefit of the Secured Parties, San Juan and Norvind, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

4.    Mortgage over future real estate (*hipoteca sobre bienes inmuebles futuros*) by and among ILAP, acting as mortgagor, and the Onshore Collateral Agent, for the benefit of the Secured Parties, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

5.    Mortgage over future water rights (*hipoteca sobre derechos de aprovechamiento de aguas futuros*) by and among ILAP, acting as mortgagor, among ILAP, acting as mortgagor, and the Onshore Collateral Agent, for the benefit of the Secured Parties, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

6.    Mortgage over future mining concessions (*hipoteca sobre concesiones mineras futuras*) by and among ILAP, acting as mortgagor, among ILAP, acting as mortgagor, and the Onshore Collateral Agent, for the benefit of the Secured Parties, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

7.    Mortgage over existing and future real estate (*hipoteca sobre bienes inmuebles existentes y futuros*) by and among San Juan, acting as mortgagor, and the Onshore Collateral Agent, for the benefit of the Secured Parties, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

8.    Mortgage over future water rights (*hipoteca sobre derechos de aprovechamiento de aguas futuros*) by and among San Juan, acting as mortgagor, among ILAP, acting as mortgagor, and the Onshore Collateral Agent, for the benefit of the Secured Parties, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

9.    Mortgage over future mining concessions (*hipoteca sobre concesiones mineras futuras*) by and among San Juan, acting as mortgagor, among ILAP, acting as mortgagor, and the Onshore Collateral Agent, for the benefit of the Secured Parties, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

10.   Mortgage over existing and future real estate (*hipoteca sobre bienes inmuebles existentes y futuros*) by and among Norvind, acting as mortgagor, and the Onshore Collateral Agent,

for the benefit of the Secured Parties, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

11.     Mortgage over future water rights (*hipoteca sobre derechos de aprovechamiento de aguas futuros*) by and among Norvind, acting as mortgagor, among ILAP, acting as mortgagor, and the Onshore Collateral Agent, for the benefit of the Secured Parties, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

12.     Mortgage over future mining concessions (*hipoteca sobre concesiones mineras futuras*) by and among Norvind, acting as mortgagor, among ILAP, acting as mortgagor, and the Onshore Collateral Agent, for the benefit of the Secured Parties, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

13.     Pledge without conveyance over existing and future equity rights (*prenda sin desplazamiento sobre derechos sociales*) by and among LAP and Latin America Power Holding B.V., acting as pledgors, ILAP, and the Onshore Collateral Agent, for the benefit of the Secured Parties, over one-hundred percent (100%) of their existing and future ownership interests in ILAP, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel. Amended by public deed dated as of November 29th, 2023 granted before the Notary Public of Santiago Mr. Luis Ignacio Manquehual Mery, reflecting the new partner of ILAP, LAP Renewables B.V.

14.     Pledge without conveyance over existing and futures shares (*prenda sin desplazamiento sobre acciones presentes y futuras*) by and among ILAP and LAP S.A., acting as pledgors, Norvind, and the Onshore Collateral Agent, for the benefit of the Secured Parties, over one-hundred percent (100%) of the existing and future shares of Norvind owned by ILAP and LAP S.A., dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

15.     Pledge without conveyance over existing and futures shares (*prenda sin desplazamiento sobre acciones presentes y futuras*) by and among by and among ILAP and LAP S.A., acting as pledgors, San Juan, and the Onshore Collateral Agent, for the benefit of the Secured Parties, over one-hundred percent (100%) of the existing and future shares of San Juan owned by ILAP and LAP S.A., dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

16.     Pledge without conveyance over existing and future movable property (*prenda sin desplazamiento sobre activos presentes y futuros*) by and among San Juan, as pledgor, and the Onshore Collateral Agent, for the benefit of the Secured Parties, over all existing and future movable Property owned by San Juan, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

17.     Pledge without conveyance over existing and future movable property (*prenda sin desplazamiento sobre activos presentes y futuros*) by and among Norvind, as pledgor, and the Onshore Collateral Agent, for the benefit of the Secured Parties, over all existing and

future movable Property owned by Norvind, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

18.    Pledge without conveyance over future movable property (*prenda sin desplazamiento sobre activos futuros*) by and among ILAP, as pledgor, and the Onshore Collateral Agent, for the benefit of the Secured Parties, over all future movable Property owned by ILAP, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

19.    Pledge without conveyance over existing and future Intercompany Indebtedness (*prenda sin desplazamiento sobre créditos*), by and among San Juan, as subordinated lender and pledgor, ILAP, and the Onshore Collateral Agent, for the benefit of the Secured Parties, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

20.    Pledge without conveyance over existing and future Intercompany Indebtedness (*prenda sin desplazamiento sobre créditos*), by and among Norvind, as subordinated lender and pledgor, ILAP, and the Onshore Collateral Agent, for the benefit of the Secured Parties, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

21.    Pledge without conveyance over money and permitted investments (*prenda sin desplazamiento sobre dinero e inversiones permitidas*) by and among San Juan, as pledgor, and the Onshore Collateral Agent, for the benefit of the Secured Parties, over existing and future amounts deposited in certain onshore accounts and permitted investments, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

22.    Pledge without conveyance over money and permitted investments (*prenda sin desplazamiento sobre dinero e inversiones permitidas*) by and among Norvind, as pledgor, and the Onshore Collateral Agent, for the benefit of the Secured Parties, over existing and future amounts deposited in certain onshore accounts and permitted investments, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

23.    Commercial pledge over electric concession (*prenda comercial sobre concesión eléctrica*) by and among San Juan, acting as pledgor, and the Onshore Collateral Agent, for the benefit of the Secured Parties, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

24.    Promise to grant commercial pledges over future Material Project Documents (consisting in Long Term Power Purchase Agreements with non-DisCos) (*promesa de prenda comercial sobre derechos*) by and among ILAP, acting as pledgor, and the Onshore Collateral Agent, for the benefit of the Secured Parties, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

25.     Commercial pledge over Material Project Documents (other than Long Term Power Purchase Agreements) and promise to grant commercial pledge over future Material Project Documents (consisting in Long Term Power Purchase Agreements with non-DisCos) (*prenda comercial sobre derechos y promesa de prenda comercial sobre derechos*) by and among San Juan, acting as pledgor, and the Onshore Collateral Agent, for the benefit of the Secured Parties, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

26.     Commercial pledge over Material Project Documents (other than Long Term Power Purchase Agreements) and promise to grant commercial pledge over future Material Project Documents (consisting in Long Term Power Purchase Agreements with non-DisCos) (*prenda comercial sobre derechos y promesa de prenda comercial sobre derechos*) by and among Norvind, acting as pledgor, and the Onshore Collateral Agent, for the benefit of the Secured Parties, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

27.     Commercial pledge over Material Project Documents (consisting in Long Term Power Purchase Agreements with DisCos) (*prenda comercial sobre derechos*) by and among San Juan, acting as pledgor, and the Onshore Collateral Agent, for the benefit of the Secured Parties, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

28.     Commercial pledge over Material Project Documents (consisting in Long Term Power Purchase Agreements with DisCos) (*prenda comercial sobre derechos*) by and among Norvind, acting as pledgor, and the Onshore Collateral Agent, for the benefit of the Secured Parties, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

29.     Commercial pledge over Material Project Documents (consisting in Long Term Power Purchase Agreement with Empresa de Transporte de Pasajeros Metro S.A) (*prenda comercial sobre derechos*) by and among San Juan, acting as pledgor, and the Onshore Collateral Agent, for the benefit of the Secured Parties, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

30.     Commercial pledge over Material Project Documents (consisting in Long Term Power Purchase Agreement with Enel) (*prenda comercial sobre derechos*) by and among San Juan, acting as pledgor, and the Onshore Collateral Agent, for the benefit of the Secured Parties, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

31.     Commercial pledge over Material Project Documents (Transelec) (*prenda comercial sobre derechos*) by and among San Juan, acting as pledgor, and the Onshore Collateral Agent, for the benefit of the Secured Parties, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

32. Commercial pledge over Material Project Documents (Transelec) (*prenda comercial sobre derechos*) by and among Norvind, acting as pledgor, and the Onshore Collateral Agent, for the benefit of the Secured Parties, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

33. Pledge without conveyance over rights on future Material Project Documents (other than Long Term Power Purchase Agreements with non-DisCos) (*prenda sin desplazamiento sobre derechos*), by and among San Juan, as pledgor, and the Onshore Collateral Agent, for the benefit of the Secured Parties, over all future Material Project Documents entered into by San Juan, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

34. Pledge without conveyance over rights on future Material Project Documents (other than Long Term Power Purchase Agreements with non-DisCos) (*prenda sin desplazamiento sobre derechos*), by and among Norvind, as pledgor, and the Onshore Collateral Agent, for the benefit of the Secured Parties, over all future Material Project Documents entered into by Norvind, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

35. Pledge without conveyance over rights on future Material Project Documents (other than Long Term Power Purchase Agreements with non-DisCos) (*prenda sin desplazamiento sobre derechos*), by and among ILAP, as pledgor, and the Onshore Collateral Agent, for the benefit of the Secured Parties, over all future Material Project Documents entered into by ILAP, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

36. Promise to grant conditional assignment of rights under future Material Project Documents (*promesa de cesión condicional de derechos*) by and among ILAP, and the Onshore Collateral Agent, for the benefit of the Secured Parties, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

37. Conditional assignment of rights under Material Project Documents (other than Long Term Power Purchase Agreements) and promise to grant conditional assignment of rights under future Material Project Documents (*cesión condicional de derechos y promesa de cesión condicional de derechos*) by and among San Juan, and the Onshore Collateral Agent, for the benefit of the Secured Parties, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

38. Conditional assignment of rights under Material Project Documents (other than Long Term Power Purchase Agreements) and promise to grant conditional assignment of rights under future Material Project Documents (*cesión condicional de derechos y promesa de cesión condicional de derechos*) by and among Norvind, and the Onshore Collateral Agent, for the benefit of the Secured Parties, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

39.     Conditional assignment of rights on existing Material Project Documents (consisting in Long Term Power Purchase Agreements with DisCos) (*cesión condicional de derechos*), by and among San Juan, and the Onshore Collateral Agent, for the benefit of the Secured Parties, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

40.     Conditional assignment of rights on existing Material Project Documents (consisting in Long Term Power Purchase Agreements with DisCos) (*cesión condicional de derechos*), by and among Norvind, and the Onshore Collateral Agent, for the benefit of the Secured Parties, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

41.     Conditional assignment of rights on existing Material Project Documents (Transelec) (*cesión condicional de derechos*), by and among San Juan, and the Onshore Collateral Agent, for the benefit of the Secured Parties, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

42.     Conditional assignment of rights on existing Material Project Documents (Transelec) (*cesión condicional de derechos*), by and among Norvind, and the Onshore Collateral Agent, for the benefit of the Secured Parties, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

43.     Conditional assignment of rights on existing Material Project Documents (consisting in Long Term Power Purchase Agreement with Empresa de Transporte de Pasajeros Metro S.A.) (*cesión condicional de derechos*), by and among San Juan, and the Onshore Collateral Agent, for the benefit of the Secured Parties, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

44.     Conditional assignment of rights on existing Material Project Documents (consisting in Long Term Power Purchase Agreement with Enel) (*cesión condicional de derechos*), by and among San Juan, and the Onshore Collateral Agent, for the benefit of the Secured Parties, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

45.     Promise to grant collection mandate over payments under Additional Material Project Documents (*promesa de mandato irrevocable de cobro*) by and among ILAP, and the Onshore Collateral Agent, for the benefit of the Secured Parties, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

46.     Collection mandate over payments under existing Material Project Documents (other than Long Term Power Purchase Agreements) and promise to grant collection mandate over payments under Additional Material Project Documents (consisting in Long Term Power Purchase Agreements with non-DisCos) (*mandato irrevocable de cobro y promesa de mandato irrevocable de cobro*), by and among San Juan, the Onshore Collateral Agent, for the benefit of the Secured Parties, and LAP S.A., dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

47.     Collection mandate over payments under existing Material Project Documents (other than Long Term Power Purchase Agreements) and promise to grant collection mandate over payments under Additional Material Project Documents (consisting in Long Term Power Purchase Agreements with non-DisCos) (*mandato irrevocable de cobro y promesa de mandato irrevocable de cobro*), by and among Norvind, the Onshore Collateral Agent, for the benefit of the Secured Parties, and LAP S.A., dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

48.     Collection mandate over payments under existing Material Project Documents (consisting in Long Term Power Purchase Agreements with DisCos) (*mandato irrevocable de cobro*), by and among San Juan, and the Onshore Collateral Agent, for the benefit of the Secured Parties, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

49.     Collection mandate over payments existing Material Project Documents (consisting in Long Term Power Purchase Agreements with DisCos) (*mandato irrevocable de cobro*), by and among Norvind, and the Onshore Collateral Agent, for the benefit of the Secured Parties, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

50.     Collection mandate over payments under existing Material Project Documents (Transelec S.A.) (*mandato irrevocable de cobro*), by and among San Juan, and the Onshore Collateral Agent, for the benefit of the Secured Parties, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

51.     Collection mandate over payments under existing Material Project Documents (Transelec S.A.) (*mandato irrevocable de cobro*), by and among Norvind, and the Onshore Collateral Agent, for the benefit of the Secured Parties, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

52.     Collection mandate over payments under existing Material Project Documents (consisting in Long Term Power Purchase Agreement with Empresa de Transporte de Pasajeros Metro S.A.) (*mandato irrevocable de cobro*), by and among San Juan, and the Onshore Collateral Agent, for the benefit of the Secured Parties, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

53.     Collection mandate over payments under existing Material Project Documents (consisting in Long Term Power Purchase Agreement with Enel) (*mandato irrevocable de cobro*), by and among San Juan, and the Onshore Collateral Agent, for the benefit of the Secured Parties, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

54.     Insurance designation as beneficiary or sole loss payee under all the insurance policies issued by Chilean companies (*designación de asegurado adicional o beneficiario exclusivo de pólizas de seguros*) by and among San Juan, and the Onshore Collateral Agent, for the

benefit of the Secured Parties, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

55.     Insurance designation as beneficiary or sole loss payee under all the insurance policies issued by Chilean companies (*designación de asegurado adicional o beneficiario exclusivo de pólizas de seguros*) by and among Norvind, and the Onshore Collateral Agent, for the benefit of the Secured Parties, dated June 15, 2021, granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel.

56.     Joint and several guarantee (*fianza y codeuda solidaria*), granted before the Notary Public of Santiago Mr. Roberto Antonio Cifuentes Allel, dated June 15, 2021, by and among San Juan and Norvind as guarantors, and Banco de Chile as the Onshore Collateral Agent.

*Final Version for Solicitation*

---

ILAP HOLDINGS LTD.,

as the Company,


INVERSIONES LATIN AMERICA POWER SpA, SAN JUAN S.A. AND NORVIND S.A.

as Guarantors,

AND

UMB BANK, N.A.,

as Trustee and Collateral Agent

INDENTURE

Dated as of [●], 2024


5% Convertible Senior Notes due 2033

---

# TABLE OF CONTENTS

**PAGE**

### ARTICLE 1
### DEFINITIONS

Section 1.01.    Definitions ........................................................................................ 1

### ARTICLE 2
### ISSUE, DESCRIPTION, EXECUTION, REGISTRATION AND EXCHANGE OF NOTES

Section 2.01.    Designation and Amount ................................................................ 13
Section 2.02.    Form of Notes ................................................................................ 13
Section 2.03.    Date and Denomination of Notes; Payments of Interest and Default
                 Interest .......................................................................................... 14
Section 2.04.    Execution, Authentication and Delivery of Notes ......................... 15
Section 2.05.    Transfer and Exchange. ................................................................. 16
Section 2.06.    Mutilated, Destroyed, Lost or Stolen Notes .................................. 28
Section 2.07.    Cancellation of Notes Paid, Converted, Etc. ................................. 29
Section 2.08.    CUSIP Numbers ............................................................................ 30
Section 2.09.    Ranking ......................................................................................... 30
Section 2.10.    Redemption ................................................................................... 30

### ARTICLE 3
### SATISFACTION AND DISCHARGE

Section 3.01.    Satisfaction and Discharge ............................................................ 30

### ARTICLE 4
### COVENANTS OF THE COMPANY

Section 4.01.    Payment of Principal and Interest .................................................. 31
Section 4.02.    Maintenance of Office or Agency .................................................. 31
Section 4.03.    Appointments to Fill Vacancies in Trustee's Office ...................... 32
Section 4.04.    Provisions as to Paying Agent ....................................................... 32
Section 4.05.    Maintenance of Existence and Business Activities; Modification of
                 Organization Documents ............................................................... 33
Section 4.06.    Rule 144A Information Requirement .............................................. 33
Section 4.07.    Stay, Extension and Usury Laws ................................................... 33
Section 4.08.    Compliance Certificate; Statements as to Defaults ........................ 34
Section 4.09.    Further Instruments and Acts ........................................................ 34
Section 4.10.    Limitations on Indebtedness ......................................................... 34
Section 4.11.    Limitations on Restricted Payments .............................................. 34

i

Section 4.12.    Limitations on Liens ................................................................. 34
Section 4.13.    Limitations on Transactions with Related Parties .......................... 35
Section 4.14.    Limitations on Leases and Sale and Lease-Back Transactions ......... 35
Section 4.15.    Limitations on Merger, Consolidation and Capital Increases; Limitation on
                 Asset Sales ........................................................................ 35
Section 4.16.    Compliance with Laws ............................................................. 35
Section 4.17.    Payments of Additional Amounts ................................................ 35
Section 4.18.    Reporting Requirements ........................................................... 36
Section 4.19.    Maintenance of Insurance ........................................................ 38
Section 4.20.    Listing of Notes ..................................................................... 38
Section 4.21.    Independent Director .............................................................. 38
Section 4.22.    Compliance with the Sales Facilitation Agreement ......................... 39
Section 4.23.    Certain Tax Matters ............................................................... 39

ARTICLE 5

LISTS OF HOLDERS AND REPORTS BY THE COMPANY AND THE TRUSTEE

Section 5.01.    Lists of Holders .................................................................... 40
Section 5.02.    Preservation and Disclosure of Lists............................................ 40

ARTICLE 6

DEFAULTS AND REMEDIES

Section 6.01.    Events of Default ................................................................... 40
Section 6.02.    Acceleration; Rescission and Annulment ...................................... 41
Section 6.03.    Payments of Notes on Default; Suit Therefor................................. 42
Section 6.04.    Application of Monies Collected by Trustee .................................. 43
Section 6.05.    Proceedings by Holders and Trustee............................................ 44
Section 6.06.    Remedies Cumulative and Continuing ......................................... 45
Section 6.07.    Undertaking to Pay Costs......................................................... 45
Section 6.08.    Direction of Proceedings and Waiver of Defaults by Majority of Holders ....... 46
Section 6.09.    Notice of Defaults ................................................................. 46

ARTICLE 7

CONCERNING THE TRUSTEE

Section 7.01.    Duties and Responsibilities of Trustee ......................................... 47
Section 7.02.    Reliance on Documents, Opinions, Etc ........................................ 48
Section 7.03.    No Responsibility for Recitals, Etc.............................................. 50
Section 7.04.    Trustee, Paying Agents, Conversion Agents, or Note Registrar May Own
                 Notes ................................................................................ 51
Section 7.05.    Monies to Be Held in Trust....................................................... 51
Section 7.06.    Compensation and Expenses of Trustee ....................................... 51
Section 7.07.    Responsible Officer's Certificate as Evidence ................................ 52
Section 7.08.    Eligibility of Trustee............................................................... 52
Section 7.09.    Resignation or Removal of Trustee ............................................. 52
Section 7.10.    Acceptance by Successor Trustee................................................ 53

ii

Section 7.11.    Succession by Merger, Etc. ........................................................... 54
Section 7.12.    Trustee's Application for Instructions from the Company ............... 54
Section 7.13.    Voting by Beneficial Owners ......................................................... 55

ARTICLE 8
CONCERNING THE HOLDERS

Section 8.01.    Action by Holders .......................................................................... 55
Section 8.02.    Proof of Execution by Holders ...................................................... 55
Section 8.03.    Who Are Deemed Absolute Owners ............................................... 55
Section 8.04.    Company-Owned Notes Disregarded .............................................. 56
Section 8.05.    Revocation of Consents; Future Holders Bound ............................. 56
Section 8.06.    Instructions in connection with the Sales Facilitation Agreement .... 57

ARTICLE 9
SUPPLEMENTAL INDENTURES

Section 9.01.    Supplemental Indentures Without Consent of Holders .................... 57
Section 9.02.    Supplemental Indentures with Consent of Holders .......................... 58
Section 9.03.    Effect of Supplemental Indentures .................................................. 59
Section 9.04.    Notation on Notes .......................................................................... 59
Section 9.05.    Evidence of Compliance of Supplemental Indenture to Be Furnished to
                 Trustee and the Collateral Agent .................................................... 59

ARTICLE 10
CONSOLIDATION, MERGER, SALE, AND CAPITAL INCREASES

Section 10.01.   Limitations on Merger, Consolidation, Sale and Capital Increases ... 60
Section 10.02.   Subsidiaries ................................................................................... 60

ARTICLE 11
IMMUNITY OF INCORPORATORS, STOCKHOLDERS, OFFICERS AND DIRECTORS

Section 11.01.   Indenture and Notes Solely Corporate Obligations ......................... 60

ARTICLE 12
GUARANTEE OF NOTES

Section 12.01.   Unconditional Guarantee ............................................................... 61
Section 12.02.   Limitation on Guarantor Liability ................................................... 62
Section 12.03.   Release of a Guarantee ................................................................... 62
Section 12.04.   Waiver of Subrogation ................................................................... 63
Section 12.05.   No Set Off ...................................................................................... 63
Section 12.06.   Note Guarantees Continuing .......................................................... 63
Section 12.07.   Note Guarantees Not Reduced ........................................................ 63
Section 12.08.   Note Guarantees Reinstated ........................................................... 64
Section 12.09.   Note Guarantees Not Affected ........................................................ 64

Section 12.10.   Waiver ........................................................................................... 65
Section 12.11.   No Obligation to Take Action Against the Company ................. 65
Section 12.12.   Dealing with the Company and Others ...................................... 65
Section 12.13.   Default and Enforcement ........................................................... 66
Section 12.14.   Amendment, Etc. ........................................................................ 66
Section 12.15.   Costs and Expenses .................................................................... 66
Section 12.16.   No Merger or Waiver; Cumulative Remedies ............................ 66

## ARTICLE 13
### CONVERSION OF NOTES

Section 13.01.   Conversion ................................................................................... 67
Section 13.02.   Conversion upon Specific Default .............................................. 68
Section 13.03.   Conversion upon Liquidation Event ........................................... 68
Section 13.04.   Conversion upon Change of Control ........................................... 69
Section 13.05.   Conversion upon Unauthorized Sale .......................................... 69
Section 13.06.   Conversion upon the Final Conversion Date .............................. 69
Section 13.07.   Conversion Procedure ................................................................ 70
Section 13.08.   Settlement upon Conversion ....................................................... 71
Section 13.09.   Conversion Rate Adjustment ...................................................... 72
Section 13.10.   Shares to Be Reserved ................................................................ 72
Section 13.11.   Responsibility of Trustee ............................................................ 72
Section 13.12.   Certain Covenants ...................................................................... 72

## ARTICLE 14
### COLLATERAL AND COLLATERAL AGENT

Section 14.01.   Share Pledge ................................................................................ 73
Section 14.02.   Directors and Officers Resignation Letters ............................... 73
Section 14.03.   Sales Facilitation Agreement – Trustee Intervention ................. 74
Section 14.04.   Share Pledge and Release of Collateral ..................................... 74
Section 14.05.   The Collateral Agent ................................................................... 75

## ARTICLE 15
### REDEMPTION

Section 15.01.   Mandatory Redemption upon an ILAP Sale ................................ 80
Section 15.02.   Mandatory Redemption Mechanics ............................................ 81

## ARTICLE 16
### MISCELLANEOUS PROVISIONS

Section 16.01.   Provisions Binding on Company's Successors ............................ 83
Section 16.02.   Appointment of Process Agent .................................................... 83
Section 16.03.   Addresses for Notices, Etc .......................................................... 83
Section 16.04.   Governing Law; Jurisdiction ....................................................... 85

iv

Section 16.05.    Evidence of Compliance with Conditions Precedent; Certificates and
Opinions of Counsel to Trustee ........................................................ 85
Section 16.06.    Benefits of Indenture ........................................................................ 86
Section 16.07.    Table of Contents, Headings, Etc ..................................................... 86
Section 16.08.    Authenticating Agent ........................................................................ 86
Section 16.09.    Execution in Counterparts .................................................................. 87
Section 16.10.    Severability ........................................................................................ 87
Section 16.11.    Waiver of Jury Trial .......................................................................... 87
Section 16.12.    Calculations ........................................................................................ 88
Section 16.13.    USA PATRIOT Act ........................................................................... 88
Section 16.14.    Electronic Signatures ........................................................................ 88

v

INDENTURE dated as of [●], 2024 among ILAP Holdings Ltd., an exempted company incorporated with limited liability under the laws of the Cayman Islands, as issuer (the "**Company**," as more fully set forth in Section 1.01), Inversiones Latin America Power SpA, a stock corporation (*sociedad por acciones*) organized and existing under the laws of Chile ("**ILAP**"), San Juan S.A. and Norvind S.A., corporations (*sociedades anónimas*) formed under the laws of Chile (ILAP, San Juan S.A. and Norvind S.A., collectively the "**Guarantors**"), as guarantors, and UMB Bank, N.A., a national banking association, as trustee (the "**Trustee**") and as collateral agent (the "**Collateral Agent**").

W I T N E S S E T H :

WHEREAS, for its lawful corporate purposes, the Company has duly authorized the issuance of its 5% Convertible Senior Notes due 2033 (the "**Notes**"), initially in an aggregate principal amount not to exceed $[_____], and in order to provide the terms and conditions upon which the Notes are to be authenticated, issued and delivered, the Company has duly authorized the execution and delivery of this Indenture; and

WHEREAS, the Guarantors have duly authorized the execution and delivery of this Indenture and their Guarantee hereunder; and

WHEREAS, the Form of Note, the certificate of authentication to be borne by each Note and the other certifications included as Exhibits hereto are to be substantially in the forms hereinafter provided; and

WHEREAS, all acts and things necessary to make the Notes, when executed by the Company and authenticated and delivered by the Trustee or a duly authorized authenticating agent, as in this Indenture provided, the valid, binding and legal obligations of the Company, and this Indenture a valid agreement according to its terms, have been done and performed, and the execution of this Indenture and the issuance hereunder of the Notes have in all respects been duly authorized.

NOW, THEREFORE, THIS INDENTURE WITNESSETH:

That in order to declare the terms and conditions upon which the Notes are, and are to be, authenticated, issued and delivered, and in consideration of the premises and of the purchase and acceptance of the Notes by the Holders thereof, the Company and each Guarantor covenants and agrees with the Trustee for the equal and proportionate benefit of the respective Holders from time to time of the Notes (except as otherwise provided below), as follows:

ARTICLE 1
DEFINITIONS

Section 1.01.  *Definitions.*  The terms defined in this Section 1.01 (except as herein otherwise expressly provided or unless the context otherwise requires) for all purposes of this Indenture and of any indenture supplemental hereto shall have the respective meanings specified

in this Section 1.01.  The words "herein," "hereof," "hereunder" and words of similar import refer to this Indenture as a whole and not to any particular Article, Section or other subdivision. The terms defined in this Article include the plural as well as the singular.

"**144A Global Note**" means a Global Note substantially in the form of Exhibit A hereto bearing the Global Note Legend and the Private Placement Legend and deposited with or on behalf of, and registered in the name of, the Depositary or its nominee that will be issued in a denomination equal to the outstanding principal amount of the Notes sold in reliance on Rule 144A.

"**Additional Amounts**" shall have the meaning specified in Section 4.17.

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with") with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of Voting Stock, by contract or otherwise, provided that each of the Existing Holders will be deemed to individually control the Company for purposes of this definition.

"**Affiliate Transaction**" shall have the meaning specified in Section 4.13.

"**Annual Budget**" has the meaning set forth in the Senior Notes Indenture.

"**Anti-Corruption Laws**" means all applicable anti-corruption and anti-bribery laws, rules and regulations of any jurisdiction from time to time, including, without limitation, the U.S. Foreign Corrupt Practices Act of 1977, as amended.

"**Anti-Money Laundering Laws**" means any and all laws, rules and regulations of any jurisdiction applicable to the Company or its subsidiaries or Affiliates from time to time concerning or relating to terrorism financing, money laundering or any predicate crime to money laundering, including, without limitation, any applicable provision of the Patriot Act and The Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act," 31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959).

"**Applicable Law**" means any constitution, statute, law, rule, regulation, ordinance, judgment, order or any decree, directive or requirement which has the force of law, or other governmental restriction which has the force of law, or any determination by, or interpretation of any of the foregoing by, any judicial authority, applicable to and/or binding on a given Person or the Projects, as the context may require, whether in effect as of the Issuance Date or thereafter and in each case as amended (including, without limitation, all Environmental Laws and any of the foregoing pertaining to land use or zoning restrictions).

"**Authentication Order**" shall have the meaning specified in Section 2.04.

2

"**Board of Directors**" means the board of directors of the Company or a committee of such board duly authorized to act for it hereunder.

"**Business Day**" means any day that is not a day on which banks are required or authorized to close in the City of New York, in Santiago, Chile or in the Cayman Islands (or, in connection with any payment, the place of payment).

"**Capital Stock**" means, with respect to any Person, any and all shares, interests, participations and/or rights in or other equivalents (however designated, whether voting or nonvoting, ordinary or preferred) in the equity or capital of such Person, now or hereafter outstanding, and any and all rights, warrants or options exchangeable for or convertible into any thereof.

"**Capitalized Lease Obligations**" means an obligation that is required to be classified and accounted for as a capitalized lease for financial reporting purposes in accordance with IFRS and the amount of Indebtedness represented by such obligation shall be the capitalized amount of such obligation determined in accordance with IFRS.

"**Change of Control**" means (A) the ILAP Sponsors shall cease to beneficially own, at any time, in the aggregate, directly or indirectly, all of the Capital Stock of the Company, ILAP or any of their direct or indirect subsidiaries (other than as a result of the conversion of the Notes pursuant to the "Conversion Rights" section); (B) the ILAP Sponsors shall cease to have the right to elect all of the Company's directors or all of the directors of ILAP or any of their respective subsidiaries; (C) there is a sale, lease or transfer, directly or indirectly, of all or substantially all of the assets of ILAP or any of its subsidiaries to any Person other than an ILAP Sponsor; or (D) the adoption of a plan or resolution relating to the liquidation or dissolution of ILAP or the other Guarantors.

"**Clearstream**" means Clearstream Banking, S.A.

"**Collateral**" shall have the meaning specified in Section 14.01.

"**Collateral Agent**" shall have the meaning specified in the first paragraph of the recitals of this Indenture until a successor trustee shall have become such pursuant to the applicable provisions of this Indenture and thereafter "Collateral Agent" shall mean or include each person who is a Collateral Agent hereunder.

"**Commodity Agreement**" means with respect to any Person any commodity swaps, commodity options or forward commodity contracts or other similar agreement or arrangement as to which such Person is party or a beneficiary.

"**Common Stock**" means the ordinary shares in the Company's share capital of no par value.

"**Company**" shall have the meaning specified in the first paragraph of this Indenture.

3

"**Company Order**" means a written order of the Company, signed by the Company's Chief Executive Officer, President, Executive or Senior Vice President, any Vice President, any director or, in absence of any such positions, any authorized legal representative of the Company, and delivered to the Trustee.

"**Conversion Agent**" shall have the meaning specified in Section 4.02.

"**Conversion Board Approval**" shall have the meaning specified in Section 13.01.

"**Conversion Date**" shall have the meaning specified in Section 13.01.

"**Conversion Events**" shall have the meaning specified in Section 13.01.

"**Corporate Trust Office**" means the designated office of the Trustee or the Collateral Agent, as applicable, at which at any time this Indenture shall be administered, which office at the date hereof is located at UMB Bank, N.A. 100 William Street, Suite 1850, New York, New York 10038; Attention: Prital K. Patel, or such other address as the Trustee or the Collateral Agent may designate from time to time by notice to the Holders and the Company, or the designated corporate trust office of any successor trustee (or such other address as such successor trustee may designate from time to time by notice to the Holders and the Company).

"**Currency Agreement**" means with respect to any Person any currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts or other similar agreement or arrangement as to which such Person is a party or a beneficiary.

"**Custodian**" means the Trustee, as custodian for DTC, with respect to the Global Notes, or any successor entity thereto.

"**Debtor Relief Laws**" means the Bankruptcy Code of the United States, the Chilean Law 20,720, the applicable provisions of the Companies Act (As Revised) of the Cayman Islands and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States, Chile, the Cayman Islands or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Default**" means any event that is, or after notice or passage of time, or both, would be, an Event of Default.

"**Default Interest**" has the meaning set forth in Section 2.03(c).

"**Definitive Note**" means a certificated Note registered in the name of the Holder thereof and issued in accordance with Section 2.05 hereof, substantially in the form of Exhibit A hereto except that such Note shall not bear the Global Note Legend and shall not have the "Schedule of Exchanges of Interests in the Global Note" attached thereto.

"**Depositary**" means, with respect to the Notes issuable or issued in whole or in part in global form, the Person specified in Section 4.02 hereof as the Depositary with respect to the

4

Notes, and any and all successors thereto appointed as depositary hereunder and having become such pursuant to the applicable provisions of this Indenture.

"**Disqualified Stock**" means any Capital Stock that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case, at the option of the holder of the Capital Stock), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or redeemable at the option of the holder of the Capital Stock, in whole or in part, on or prior to the date that is 91 days after the Stated Maturity of the Notes.

"**Distribution Date**" has the meaning set forth in Section 15.01.

"**DTC**" means the Depository Trust Company.

"**Environmental Laws**" means any law (including common law), statute, code, ordinance, order, determination, rule, regulation or decree of any Governmental Authority, whether now or hereinafter in effect, relating to pollution or protection of the environment or human health and safety (as affected by exposure to hazardous or toxic substances), including any of the foregoing relating to discharges or the clean-up or remediation of hazardous or toxic substances.

"**Equity Interests**" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"**Euroclear**" means Euroclear Bank, S.A./N.V., as operator of the Euroclear system.

"**Event of Abandonment**" has the meaning set forth in the Senior Notes Indenture.

"**Event of Default**" shall have the meaning specified in Section 6.01.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"**Existing Holders**" means GMR Holding B.V., BTG Pactual Brazil Infrastructure Fund II LP, Patria Infrastructure Fund II LP, Patria Infrastructure Fund II LAP Co-Invest, LP, Patria Infrastructure Fund II LAP Co-Invest, UK LP, PI Fund II (Ontario) LP, PI Fund II (Ontario 1) LP, PI Fund II (Ontario 2) LP and their respective Affiliates.

"**Extended Conversion Date**" has the meaning set forth in Section 13.06.

"**Fair Market Value**" means, with respect to any Person, the value that would be paid by a willing buyer to an unaffiliated willing seller in a transaction not involving distress or necessity of either party, determined in good faith by the board of directors and the Independent Director.

"**Final Conversion Date**" has the meaning set forth in Section 13.06.

5

"**Final Determination Distribution Date**" has the meaning set forth in the Sales Facilitation Agreement.

"**First Threshold Amount**" shall have the meaning specified in Section 15.01.

"**Form of Note**" means the "Form of Note" attached hereto as Exhibit A.

"**Full Repayment of Notes**" shall have the meaning specified in Section 15.01.

"**Global Note Legend**" means the legend set forth in Section 2.05(f)(ii) hereof, which is required to be placed on all Global Notes issued under this Indenture.

"**Global Notes**" means, individually and collectively, each of the Restricted Global Notes and the Unrestricted Global Notes deposited with or on behalf of and registered in the name of the Depositary or its nominee, substantially in the form of Exhibit A hereto and that bears the Global Note Legend and that has the "Schedule of Exchanges of Interests in the Global Note" attached thereto.

"**Governmental Approval**" means any applicable consent, license, approval, registration, filing, permit, authorization, ruling, certification, exemption, variance, order, decree, publication, notice, or declaration by or with (as applicable) any Governmental Authority.

"**Governmental Authority**" means any government, governmental department, ministry, commission, board, bureau, agency, regulatory authority, instrumentality of any government (central or state), judicial, legislative or administrative body, federal, state or local, having jurisdiction over the matter or matters in question.

"**Ground Lease**" has the meaning set forth in the Senior Notes Indenture.

"**Guarantors**" shall have the meaning specified in the first paragraph of the recitals of this Indenture.

"**Guarantee**" means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Indebtedness of any other Person and any obligation, direct or indirect, contingent or otherwise, of any Person (1) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness of such other Person (whether arising by virtue of partnership arrangements, or by agreement to keep-well, to purchase assets, goods, securities or services, to take-and-pay, or to maintain financial statement conditions or otherwise) or (2) entered into for purposes of assuring in any other manner the obligee of such Indebtedness of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part). The term "Guarantee" used as a verb has a correlative meaning.

"**Holder**" as applied to any Note, or other similar terms, means any Person in whose name at the time a particular Note is registered on the Note Register. References to a "Holder" or "Holders" of Notes that are held through the DTC are references to the registered owner of such Notes, unless the context otherwise requires.

6

"**Hedging Obligations**" of any Person means the obligations of such Person pursuant to any Swap Agreement.

"**IFRS**" means the International Financial Reporting Standards and applicable accounting requirements set by the International Accounting Standards Board or any successor thereto, as in effect from time to time.

"**ILAP**" shall have the meaning specified in the first paragraph of the recitals of this Indenture.

"**ILAP Partner**" means Latin America Power S.A.

"**ILAP Sale**" shall have the meaning specified in Section 14.03.

"**ILAP Sponsors**" means GMR Holding B.V., BTG Pactual Brazil Infrastructure Fund II LP, Patria Infrastructure Fund II LP, Patria Infrastructure Fund II LAP Co-Invest, LP, Patria Infrastructure Fund II LAP Co-Invest, UK LP, PI Fund II (Ontario) LP, PI Fund II (Ontario 1) LP, and PI Fund II (Ontario 2) LP.

"**Indebtedness**" of any Person means, without duplication, (a) all obligations of such Person for borrowed money of any kind; (b) all obligations of such Person evidenced by notes, debentures or similar instruments; (c) all obligations of such Person under conditional sale or other title retention agreements relating to Property or assets purchased by such Person; (d) all obligations of such Person issued or assumed as the deferred purchase price of Property or services (excluding trade accounts payable arising in the ordinary course of business); (e) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on Property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, calculated as the lower of the Indebtedness so secured and the Fair Market Value of the Property subject to such Lien; (f) all Guarantees by such Person of Indebtedness of others; (g) all Capitalized Lease Obligations of such Person; (h) all obligations of such Person in respect of Hedging Obligations; and (i) all obligations of such Person as an account party in respect of letters of credit and bankers' acceptances (other than obligations described in clauses (a) through (h) above) entered into in the ordinary course of business of such Person.

"**Indenture**" means this instrument as originally executed or, if amended or supplemented as herein provided, as so amended or supplemented.

"**Indenture Documents**" has the meaning set forth in the Senior Notes Indenture.

"**Independent Director**" shall have the meaning specified in Section 4.21.

"**Independent Director Certificate**" shall mean a certificate signed by the Independent Director certifying as to the conditions set forth in Section 15.02.

"**Indirect Participant**" means a Person who holds a beneficial interest in a Global Note through a Participant.

7

"**Insolvency Proceeding**," with respect to any Person, means (a) entry by any competent Governmental Authority of any jurisdiction or a court having jurisdiction in the premises of (i) a decree or order for relief in respect of such Person in an involuntary case or proceeding under any applicable Debtor Relief Law or (ii) an involuntary or contested decree or order adjudging such Person as bankrupt or insolvent, or approving as properly filed a petition seeking suspension of payment, reorganization, moratorium, arrangement, adjustment or composition of or in respect of such Person under any applicable Debtor Relief Law, or appointing a custodian, receiver, liquidator, assignee, trustee, sequestrator or other similar official of such Person or of any substantial part of the property of such Person, or ordering the dissolution, winding up or liquidation of the affairs of such Person and the continuance of any such decree or order referred to in clauses (i) and (ii) above remains undismissed or unstayed and in effect for a period of ninety (90) consecutive days, (b) commencement by such Person of a voluntary case or proceeding under any applicable Debtor Relief Law or of any other case or proceeding to be adjudicated as bankrupt or insolvent, or the consent by such Person to the entry of a decree or order for relief in respect of such Person in an involuntary case or proceeding under any applicable Debtor Relief Law or to the commencement of any bankruptcy or insolvency case or proceeding against such Person, or the filing by such Person of a petition or answer or consent seeking reorganization or relief under any applicable Debtor Relief Law; or consent by such Person to the filing of such petition or to the appointment of or taking possession by a custodian, receiver, liquidator, assignee, trustee, sequestrator or other similar official of such Person or of any substantial part of the property of such Person, or the making by such Person of an assignment for the benefit of creditors or (c) the admission by such Person in writing of its inability to pay its debts generally as they become due, or the taking of corporate action by such Person in furtherance of any such action.

"**Interest Rate Agreement**" means with respect to any Person any interest rate protection agreement, interest rate futures contract, interest rate option agreement, interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedge agreement or other similar agreement or arrangement as to which such Person is party or a beneficiary.

"**Interest Payment Date**" means every anniversary of the Issuance Date.

"**Investment**" in any Person means, without duplication: (1) the acquisition (whether for cash, securities, other Property, services or otherwise) or holding of bonds, notes, debentures, partnership, Equity Interests or other ownership interests or other securities of such Person, or any agreement to make any such acquisition or to make any capital contribution (excluding commissions, travel and similar advances to officers and employees made in the ordinary course of business) to such Person; or (2) the making of any deposit with, or advance, loan or other extension of credit to, such Person.

"**Issuance Date**" means the issuance date of the Notes.

"**Lien**" means any mortgage, deed of trust, lien, security interest, pledge, hypothecation, assignment, deposit arrangement or other charge or encumbrance of any kind, or a mandate to create the same, including, without limitation, the Lien or retained security title of a conditional

vendor (excluding operating leases) and any easement, right of way or other encumbrance on title to real Property or anything analogous to any of the foregoing under the laws of any jurisdiction. For the avoidance of doubt, any preference of one creditor in the ordinary course over another arising by operation of law shall not be considered as a Lien.

"**Material Adverse Effect**" means an event or circumstance that would, or would reasonably be expected to, have a material adverse effect on: (a) the Company's financial position, results of operations, asset conditions or operations, (b) the Company's ability to perform its obligations under any Transaction Document to which the Company is a party or (c) the validity or priority of the Liens on the Collateral or the ability of the Trustee or any Security Agent to enforce its rights and remedies under the Indenture Documents.

"**Material Project Documents**" has the meaning set forth in the Senior Notes Indenture.

"**Maturity Date**" means June 15, 2033.

"**New Independent Director Proposal Notice**" shall have the meaning specified in Section 4.21.

"**Non-U.S. Person**" means a Person who is not a U.S. Person.

"**Note**" or "**Notes**" shall have the meaning specified in the first paragraph of the recitals of this Indenture.

"**Note Guarantees**" shall have the meaning specified in Section 12.01.

"**Note Register**" means the register kept by the Note Registrar at the Corporate Trust Office in which, subject to such reasonable regulations as the Company may prescribe, shall provide for the registration of Notes and of transfers of Notes.

"**Note Registrar**" shall have the meaning specified in Section 4.02.

"**Operating Report**" has the meaning set forth in the Senior Notes Indenture.

"**Opinion of Counsel**" means an opinion from independent legal counsel, which may include counsel to the Company or the Guarantors, who is reasonably acceptable to the Trustee or the Collateral Agent, as applicable.  Each such opinion shall include the statements provided for in Section 16.05 if and to the extent required by the provisions of such Section 16.05.

"**Participant**" means, with respect to the Depositary, Euroclear or Clearstream, a Person who has an account with the Depositary, Euroclear or Clearstream, respectively (and, with respect to DTC, shall include Euroclear and Clearstream).

"**Paying Agent**" shall have the meaning specified in Section 4.02.

"**Person**" means an individual, partnership, corporation, limited liability company, exempted company, business trust, joint stock company, trust, unincorporated association, joint venture, other entity or Governmental Authority.

9

"**Physical Notes**" means permanent certificated Notes in registered form issued in minimum denominations of $1,000 principal amount and integral multiples of $1.00 in excess thereof.

"**Predecessor Note**" of any particular Note means every previous Note evidencing all or a portion of the same debt as that evidenced by such particular Note; and, for the purposes of this definition, any Note authenticated and delivered under Section 2.06 in lieu of or in exchange for a mutilated, lost, destroyed or stolen Note shall be deemed to evidence the same debt as the mutilated, lost, destroyed or stolen Note that it replaces.

"**Private Placement Legend**" means the legend in Section 2.05(f).

"**Projects**" has the meaning set forth in the Senior Notes Indenture.

"**Project Party**" has the meaning set forth in the Senior Notes Indenture.

"**Property**" means any property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, and any right or interest therein.

"**Proposed Distribution Date**" has the meaning set forth in the Sales Facilitation Agreement.

"**Regulation S**" means Regulation S promulgated under the Securities Act.

"**Regulation S Global Note**" means a Global Note in the form of Exhibit A bearing the Global Note Legend and the Private Placement Legend and deposited with or on behalf of and registered in the name of the Depositary or its nominee, issued in a denomination equal to the outstanding principal amount of the Notes initially sold in reliance on Rule 903 of Regulation S.

"**Resignation Letters**" shall have the meaning specified in Section 14.02.

"**Responsible Officer**" when used with respect to the Company means the Chief Executive Officer, the President, any of the managers, any of the directors, or any Vice President of such Person or of the controlling shareholder of such Person, in each case whose name appears on a certificate of incumbency of such Person delivered in accordance with the terms of the Indenture, as such certificate may be amended from time to time. In the specific case of the Company, in case of absence of the abovementioned positions within its internal organization, any authorized legal representative of the Company shall be considered a Responsible Officer for purposes of this Indenture. When used with respect to the Trustee, "Responsible Officer" means any officer within the Corporate Trust Office of the Trustee, including any vice president, assistant vice president, assistant secretary, assistant treasurer trust officer or any other officer of the Trustee who customarily performs functions similar to those performed by the persons who at the time shall be such officers, respectively, or to whom any corporate trust matter relating to this Indenture is referred because of such person's knowledge of and familiarity with the particular subject and who, in each case, shall have direct responsibility for the administration of this Indenture.

"**Responsible Officer's Certificate**" means (a) when used with respect to the Company, a certificate that is delivered to the Trustee and that is signed by a Responsible Officer of the Company and (b) when used with respect to a Guarantor, a certificate that is delivered to the Trustee and that is signed by a Responsible Officer of such Guarantor. Each such certificate shall include the statements provided for in Section 16.05 if and to the extent required by the provisions of such Section.

"**Restricted Definitive Note**" means a Definitive Note bearing the Private Placement Legend.

"**Restricted Global Note**" means a Global Note bearing the Private Placement Legend.

"**Restricted Period**" means the 40-day distribution compliance period as defined in Regulation S.

"**Rule 144**" means Rule 144 promulgated under the Securities Act.

"**Rule 144A**" means Rule 144A promulgated under the Securities Act.

"**Rule 903**" means Rule 903 promulgated under the Securities Act.

"**Rule 904**" means Rule 904 promulgated under the Securities Act.

"**Sale and Lease-Back Transaction**" means any arrangement with any Person, or to which any such Person is a party, providing for the leasing to the Company for a period of more than three years of any Property or assets that have been or are to be sold or transferred by the Company to such Person or to any other Person to which funds have been or are to be advanced by such Person on the security of the leased Property or assets.

"**Sale Outside Date**" shall have the meaning specified in Section 14.03.

"**Sale Proceeds**" has the meaning set forth in the Sales Facilitation Agreement.

"**Sales Facilitation Agreement**" shall have the meaning specified in Section 14.03.

"**Sales Facilitation Trustee Notice**" shall have the meaning specified in Section 14.03.

"**Secured Parties**" means the Holders, the Trustee and the Collateral Agent.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"**Security Agent**" has the meaning set forth in the Senior Notes Indenture.

"**Security Documents**" means, collectively, the Share Pledge, the Sales Facilitation Agreement, and any other mortgages, deeds of trust, security agreements, mandates, trust arrangements, pledge agreements or control agreements entered into after the date hereof for the benefit of the Secured Parties.

11

"**Senior Notes Indenture**" shall have the meaning specified in Section 15.01.

"**Senior Notes Trustee**" means the Trustee under the Senior Notes Indenture.

"**SGX**" means the Singapore Exchange Securities Trading Limited.

"**Share Pledge**" shall have the meaning specified in Section 14.01.

"**Share Registrar**" shall have the meaning specified in Section 4.02.

"**Stated Maturity**" means (1) with respect to any Indebtedness, the date specified as the fixed date on which the final installment of principal of such Indebtedness is due and payable or (2) with respect to any scheduled installment of principal of or interest on any Indebtedness, the date specified as a fixed date on which such installment is due and payable as set forth in the documentation governing such Indebtedness, not including any contingent obligation to repay, redeem or repurchase prior to the regularly scheduled date for payment.

"**Subsidiary**" means with respect to any Person, any corporation, association or other business entity of which more than 50% of the outstanding Voting Stock is owned, directly or indirectly, by such Person and one or more Subsidiaries of such Person (or a combination thereof).

"**Super Priority Notes**" shall have the meaning specified in Section 15.01.

"**Swap Agreement**" means any Commodity Agreement, Currency Agreement or Interest Rate Agreement.

"**Take-back SSNs**" shall have the meaning specified in Section 15.01.

"**Taxes**" means any and all income, stamp or other taxes, duties, levies, imposts, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by or on behalf of a Taxing Jurisdiction.

"**Taxing Jurisdiction**" means any Governmental Authority of the Cayman Islands, Chile or any other jurisdiction or political subdivision thereof or therein in which the Company is organized or in which the Company is a resident for tax purposes, or any jurisdiction from or through which the Company or any paying agent, as the case may be, makes payment hereunder, or any political subdivision thereof.

"**Transaction Document**" has the meaning set forth in the Senior Notes Indenture.

"**Trust Indenture Act**" means the Trust Indenture Act of 1939, as amended, as it was in force at the date of execution of this Indenture; *provided*, *however*, that in the event the Trust Indenture Act of 1939 is amended after the date hereof, the term "Trust Indenture Act" shall mean, to the extent required by such amendment, the Trust Indenture Act of 1939, as so amended.

12

"**Trustee**" shall have the meaning specified in the first paragraph of the recitals of this Indenture until a successor trustee shall have become such pursuant to the applicable provisions of this Indenture and thereafter "Trustee" shall mean or include each person who is a Trustee hereunder.

"**Unauthorized Sale**" shall have the meaning specified in Section 13.05.

"**Unrestricted Definitive Note**" means a Definitive Note that does not bear and is not required to bear the Private Placement Legend.

"**Unrestricted Global Note**" means a Global Note that does not bear and is not required to bear the Private Placement Legend.

"**U.S. Person**" means a U.S. Person as defined in Rule 902(k) promulgated under the Securities Act.

"**Voting Stock**" with respect to any Person, means Capital Stock the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person, even if the right so to vote has been suspended by the happening of a contingency.

## ARTICLE 2
### ISSUE, DESCRIPTION, EXECUTION, REGISTRATION AND EXCHANGE OF NOTES

Section 2.01.  *Designation and Amount.*  The Notes shall be designated as the "5% Convertible Notes due 2033." The aggregate principal amount of Notes that may be authenticated and delivered under this Indenture is limited to $[_____].

Section 2.02.  *Form of Notes.*  The Notes and the Trustee's certificate of authentication to be borne by such Notes shall be substantially in the respective forms set forth in Exhibit A, the terms and provisions of which shall constitute, and are hereby expressly incorporated in and made a part of this Indenture.  To the extent applicable, the Company and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby.  In the case of any conflict between this Indenture and a Note, the provisions of this Indenture shall control and govern to the extent of such conflict.

Any Global Note may be endorsed with or have incorporated in the text thereof such legends or recitals or changes not inconsistent with the provisions of this Indenture as may be required by the Custodian or the Depositary, or as may be required to comply with any applicable law or any regulation thereunder or with the rules and regulations of any securities exchange or automated quotation system upon which the Notes may be listed or traded or designated for issuance or to conform with any usage with respect thereto, or to indicate any special limitations or restrictions to which any particular Notes are subject.

Any of the Notes may have such letters, numbers or other marks of identification and such notations, legends or endorsements as the Responsible Officer executing the same may approve (execution thereof to be conclusive evidence of such approval) and as are not

13

inconsistent with the provisions of this Indenture, or as may be required to comply with any law or with any rule or regulation made pursuant thereto or with any rule or regulation of any securities exchange or automated quotation system on which the Notes may be listed or designated for issuance, or to conform to usage or to indicate any special limitations or restrictions to which any particular Notes are subject.

Each Global Note shall represent such principal amount of the outstanding Notes as shall be specified therein and shall provide that it shall represent the aggregate principal amount of outstanding Notes from time to time endorsed thereon and that the aggregate principal amount of outstanding Notes represented thereby may from time to time be increased or reduced to reflect redemptions, repurchases, cancellations, conversions, transfers or exchanges permitted hereby. Any endorsement of a Global Note to reflect the amount of any increase or decrease in the amount of outstanding Notes represented thereby shall be made by the Trustee or the Custodian, at the direction of the Trustee, in such manner and upon instructions given by the Holder of such Notes in accordance with this Indenture. Payment of principal (including under a mandatory redemption, if applicable) of, and accrued interest on, a Global Note shall be made to the Holder of such Note on the date of payment, unless a record date or other means of determining Holders eligible to receive payment is provided for herein.

Section 2.03.    *Date and Denomination of Notes; Payments of Interest and Default Interest.*  (a) The Notes shall be issuable in registered form without coupons in minimum denominations of $1,000 principal amount and integral multiples of $1.00 excess thereof.  Each Note shall be dated the date of its authentication and shall bear interest from the date specified on the face of such Note.  Accrued interest on the Notes shall be computed on the basis of a 360-day year composed of twelve 30-day months and, for partial months, on the basis of the number of days actually elapsed in a 30-day month.

(b)    The Company shall pay interest at an annual rate of 5.0%, to be paid annually in arrears commencing on the first anniversary of the Issuance Date by capitalizing such amount and adding it to the principal amount of the Notes, following which capitalization such amount shall constitute principal for all purposes hereunder.

(c)    Upon the occurrence of an Event of Default until the date such Event of Default is cured or waived in accordance with this Indenture, the Notes will accrue default interest at a rate equal to 7% *per annum*, and such interest shall be payable only in cash (the "**Default Interest**"). Such Default Interest shall be paid by the Company, at its election in each case, as provided in clause (i) or (ii) below:

(i)    The Company may elect to make payment of any Default Interest to the Persons in whose names the Notes (or their respective Predecessor Notes) are registered at the close of business on a special record date for the payment of such Default Interest, which shall be fixed in the following manner. The Company shall notify the Trustee in writing of the amount of the Default Interest proposed to be paid on each Note and the date of the proposed payment (which shall be not less than 25 days after the receipt by the Trustee of such notice, unless the Trustee shall consent to an earlier date), and at the same time the Company shall deposit with the Trustee an amount of money equal to the

14

aggregate amount to be paid in respect of such Default Interest or shall make
arrangements satisfactory to the Trustee for such deposit on or prior to the date of the
proposed payment, such money when deposited to be held in trust for the benefit of the
Persons entitled to such Default Interest as in this clause provided.  Thereupon the
Company shall fix a special record date for the payment of such Default Interest which
shall be not more than 15 days and not less than 10 days prior to the date of the proposed
payment, and not less than 10 days after the receipt by the Trustee of the notice of the
proposed payment.  The Company shall promptly notify the Trustee in writing of such
special record date at least three Business Days prior to the date such notice is to be sent
to the Holders (unless the Trustee shall agree to a shorter period) and the Trustee, in the
name and at the expense of the Company, shall cause notice of the proposed payment of
such Default Interest and the special record date therefor to be delivered to each Holder at
its address as it appears in the Note Register, or by electronic means to the Depositary in
the case of Global Notes, not less than 10 days prior to such special record date.  Notice
of the proposed payment of such Default Interest and the special record date therefor
having been so delivered, such Default Interest shall be paid to the Persons in whose
names the Notes (or their respective Predecessor Notes) are registered at the close of
business on such special record date and shall no longer be payable pursuant to the
following clause (ii) of this Section 2.03(c). The Trustee shall have no responsibility
whatsoever for the calculation of the Defaulted Amounts.

(ii)     The Company may make payment of any Default Interest in any other
lawful manner not inconsistent with the requirements of any securities exchange or
automated quotation system on which the Notes may be listed or designated for issuance,
and upon such notice as may be required by such exchange or automated quotation
system, if, after notice given by the Company to the Trustee of the proposed payment
pursuant to this clause, such manner of payment shall be deemed practicable by the
Trustee. Notwithstanding the aforementioned, as indicated in the first paragraph of this
Section 2.03, the Default Interest shall in all cases be payable only in cash.

Section 2.04.   *Execution, Authentication and Delivery of Notes.*  The Notes shall be
signed in the name and on behalf of the Company by the manual, electronic or facsimile
signature of one of its Responsible Officers.

At any time and from time to time after the execution and delivery of this Indenture, the
Company may deliver Notes executed by the Company to the Trustee for authentication, together
with a Company Order for the authentication and delivery of such Notes (an "**Authentication
Order**"), and the Trustee in accordance with such Company Order shall authenticate and deliver
such Notes, without any further action by the Company hereunder; *provided* that the Trustee
shall be entitled to receive a Responsible Officer's Certificate and an Opinion of Counsel of the
Company with respect to the issuance, authentication and delivery of such Notes.

Only such Notes as shall bear thereon a certificate of authentication substantially in the
form set forth on the Form of Note attached as Exhibit A hereto, executed manually by an
authorized signatory of the Trustee (or an authenticating agent appointed by the Trustee as
provided by Section 16.08), shall be entitled to the benefits of this Indenture or be valid or

15

obligatory for any purpose. Such certificate by the Trustee (or such an authenticating agent) upon any Note executed by the Company shall be conclusive evidence that the Note so authenticated has been duly authenticated and delivered hereunder and that the Holder is entitled to the benefits of this Indenture.

In case any Responsible Officer of the Company who shall have signed any of the Notes shall cease to be such Responsible Officer before the Notes so signed shall have been authenticated and delivered by the Trustee, or disposed of by the Company, such Notes nevertheless may be authenticated and delivered or disposed of as though the person who signed such Notes had not ceased to be such Responsible Officer of the Company; and any Note may be signed on behalf of the Company by such persons as, at the actual date of the execution of such Note, shall be the Officers of the Company, although at the date of the execution of this Indenture any such person was not such an Responsible Officer.

Section 2.05.  *Transfer and Exchange.*

(a)  *Transfer and Exchange of Global Notes*. A Global Note may not be transferred except as a whole by the Depositary to a nominee of the Depositary, by a nominee of the Depositary to the Depositary or to another nominee of the Depositary, or by the Depositary or any such nominee to a successor Depositary or a nominee of such successor Depositary. All Global Notes will be exchanged by the Company for Definitive Notes if:

(i)  the Company delivers to the Trustee notice from the Depositary that it is unwilling or unable to continue to act as Depositary or that it is no longer a clearing agency registered under the Exchange Act and, in either case, a successor Depositary is not appointed by the Company within 90 days after the date of such notice from the Depositary;

(ii)  the Company in its sole discretion determines that the Global Notes (in whole but not in part) should be exchanged for Definitive Notes and delivers a written notice to such effect to the Trustee; *provided* that in no event shall the Regulation S Global Note be exchanged by the Company for Definitive Notes prior to the expiration of the Restricted Period; or

(iii)  there has occurred and is continuing a Default with respect to the Notes and any Holder of the Notes requests that Definitive Notes be issued.

Upon the occurrence of any of the preceding events in clauses (i), (ii) or (iii) above, Definitive Notes shall be issued in such names as the Depositary shall instruct the Trustee. Global Notes also may be exchanged or replaced, in whole or in part, as provided in Sections 2.07 and 2.10 hereof. Every Note authenticated and delivered in exchange for, or in lieu of, a Global Note or any portion thereof, pursuant to this Section 2.05, shall be authenticated and delivered in the form of, and shall be, a Global Note. A Global Note may not be exchanged for another Note other than as provided in this Section 2.05(a), however, beneficial interests in a Global Note may be transferred and exchanged as provided in Section 2.05(b), (c) or (d) hereof.

16

(b)    *Transfer and Exchange of Beneficial Interests in the Global Notes*. The transfer and exchange of beneficial interests in the Global Notes will be effected through the Depositary, in accordance with the provisions of this Indenture and the applicable procedures of DTC. Beneficial interests in the Restricted Global Notes will be subject to restrictions on transfer comparable to those set forth herein to the extent required by the Securities Act. Transfers of beneficial interests in the Global Notes also will require compliance with either Section 2.05(b)(i) or (ii) below, as applicable, as well as one or more of the other following subparagraphs, as applicable:

(i)    *Transfer of Beneficial Interests in the Same Global Note*. Beneficial interests in any Restricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in the same Restricted Global Note in accordance with the transfer restrictions set forth in the Private Placement Legend; *provided*, *however*, that prior to the expiration of the Restricted Period, transfers of beneficial interests in the Regulation S Global Note may not be made to a U.S. Person or for the account or benefit of a U.S. Person (other than the initial purchasers). Beneficial interests in any Unrestricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note. No written orders or instructions shall be required to be delivered to the Note Registrar to effect the transfers described in this Section 2.05(b)(i).

(ii)    *All Other Transfers and Exchanges of Beneficial Interests in Global Notes*. In connection with all transfers and exchanges of beneficial interests that are not subject to Section 2.05(b)(i) above, the transferor of such beneficial interest must deliver to the Note Registrar either:

(i)    both:

(i)    a written order from a Participant or an Indirect Participant given to the Depositary in accordance with the applicable procedures of DTC directing the Depositary to credit or cause to be credited a beneficial interest in another Global Note in an amount equal to the beneficial interest to be transferred or exchanged; and

(ii)    instructions given in accordance with the applicable procedures of DTC containing information regarding the Participant account to be credited with such increase; or

(ii)    both:

(i)    a written order from a Participant or an Indirect Participant given to the Depositary in accordance with the applicable procedures of DTC directing the Depositary to cause to be issued a Definitive Note in an amount equal to the beneficial interest to be transferred or exchanged; and

(ii)     instructions given by the Depositary to the Note Registrar containing information regarding the Person in whose name such Definitive Note shall be registered to effect the transfer or exchange referred to in (B)(i) above;

*provided* that in no event shall Definitive Notes be issued upon the transfer or exchange of beneficial interests in the Regulation S Global Note prior to the expiration of the Restricted Period.

Upon satisfaction of all of the requirements for transfer or exchange of beneficial interests in Global Notes contained in this Indenture and the Notes or otherwise applicable under the Securities Act, the Trustee shall adjust the principal amount of the relevant Global Note(s) pursuant to Section 2.06(g) hereof.

(iii)     *Transfer of Beneficial Interests to Another Restricted Global Note*. A beneficial interest in any Restricted Global Note may be transferred to a Person who takes delivery thereof in the form of a beneficial interest in another Restricted Global Note if the transfer complies with the requirements of Section 2.05(b)(ii) above and the Note Registrar receives the following:

(i)     if the transferee will take delivery in the form of a beneficial interest in the 144A Global Note, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (1) thereof; and

(ii)     if the transferee will take delivery in the form of a beneficial interest in the Regulation S Global Note, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (2) thereof.

(iv)     Transfer and Exchange of Beneficial Interests in a Restricted Global Note for Beneficial Interests in an Unrestricted Global Note. A beneficial interest in any Restricted Global Note may be exchanged by any holder thereof for a beneficial interest in an Unrestricted Global Note or transferred to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note if the exchange or transfer complies with the requirements of Section 2.05(b)(ii) above and:

(i)     such exchange or transfer is effected pursuant to an effective registration statement under the Securities Act, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (4) thereof; or

(ii)     the Note Registrar receives the following:

(i)     if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a beneficial interest in an Unrestricted Global Note, a certificate from such holder in the form of Exhibit C hereto, including the certifications in item (1)(a) thereof; or

18

        (ii)     if the holder of such beneficial interest in a Restricted Global Note proposes to transfer such beneficial interest to a Person who shall take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note, a certificate from such holder in the form of Exhibit B hereto, including the certifications in item (4) thereof;

and, in each such case set forth in this subparagraph (B), if the Note Registrar or Company so requests or if the applicable procedures of DTC so require, an Opinion of Counsel in form reasonably acceptable to the Note Registrar or Company to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

If any such transfer is effected pursuant to Section 2.05(b)(iv) above at a time when an Unrestricted Global Note has not yet been issued, the Company shall issue and, upon receipt of an Authentication Order, the Trustee shall authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the aggregate principal amount of beneficial interests transferred pursuant to subparagraph (B) above.

Beneficial interests in an Unrestricted Global Note cannot be exchanged for, or transferred to Persons who take delivery thereof in the form of, a beneficial interest in a Restricted Global Note.

    (c)    *Transfer or Exchange of Beneficial Interests for Definitive Notes.*

        (i)    *Beneficial Interests in Restricted Global Notes to Restricted Definitive Notes.* If any holder of a beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a Restricted Definitive Note or to transfer such beneficial interest to a Person who takes delivery thereof in the form of a Restricted Definitive Note, then, upon receipt by the Note Registrar of the following documentation:

        (i)     if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a Restricted Definitive Note, a certificate from such holder in the form of Exhibit C hereto, including the certifications in item (2)(a) thereof;

        (ii)     if such beneficial interest is being transferred to a QIB in accordance with Rule 144A, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (1) thereof;

        (iii)    if such beneficial interest is being transferred to a Non-U.S. Person in an offshore transaction in accordance with Rule 903 or Rule 904, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (2) thereof;

        (iv)    if such beneficial interest is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance

with Rule 144, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(a) thereof;

(v)    if such beneficial interest is being transferred to an Institutional Accredited Investor in reliance on an exemption from the registration requirements of the Securities Act other than those listed in subparagraphs (B) through (D) above, a certificate to the effect set forth in Exhibit B hereto, including the certifications, certificates and Opinion of Counsel required by item (3) thereof, if applicable;

(vi)    if such beneficial interest is being transferred to the Company, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(b) thereof; or

(vii)    if such beneficial interest is being transferred pursuant to an effective registration statement under the Securities Act, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(c) thereof,

the Trustee shall cause the aggregate principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.05(g) hereof, and the Company shall execute and the Trustee upon receipt of an Authentication Order shall authenticate and deliver to the Person designated in the instructions a Definitive Note in the appropriate principal amount. Any Definitive Note issued in exchange for a beneficial interest in a Restricted Global Note pursuant to this Section 2.05(c) shall be registered in such name or names and in such authorized denomination or denominations as the holder of such beneficial interest shall instruct the Note Registrar through instructions from the Depositary and the Participant or Indirect Participant. The Trustee shall deliver such Definitive Notes to the Persons in whose names such Notes are so registered. Any Definitive Note issued in exchange for a beneficial interest in a Restricted Global Note pursuant to this Section 2.05(c)(i) shall bear the Private Placement Legend and shall be subject to all restrictions on transfer contained therein.

(ii)    *Beneficial Interests in Regulation S Global Note to Definitive Notes*. Notwithstanding Sections 2.05(c)(i)(A) and (C) hereof, a beneficial interest in the Regulation S Global Note may not be exchanged for a Definitive Note or transferred to a Person who takes delivery thereof in the form of a Definitive Note prior to the expiration of the Restricted Period, except in the case of a transfer pursuant to an exemption from the registration requirements of the Securities Act other than Rule 903 or Rule 904.

(iii)    *Beneficial Interests in Restricted Global Notes to Unrestricted Definitive Notes*. A holder of a beneficial interest in a Restricted Global Note may exchange such beneficial interest for an Unrestricted Definitive Note or may transfer such beneficial interest to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note only if:

(i)    such exchange or transfer is effected pursuant to an effective registration statement under the Securities Act, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (4) thereof; or

20

(ii)     the Note Registrar receives the following:

(i)     if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for an Unrestricted Definitive Note, a certificate from such holder in the form of Exhibit C hereto, including the certifications in item (1)(b) thereof; or

(ii)     if the holder of such beneficial interest in a Restricted Global Note proposes to transfer such beneficial interest to a Person who shall take delivery thereof in the form of an Unrestricted Definitive Note, a certificate from such holder in the form of Exhibit B hereto, including the certifications in item (4) thereof;

and, in each such case set forth in this subparagraph (B), if the Note Registrar or Company so requests or if the applicable procedures of DTC so require, an Opinion of Counsel in form reasonably acceptable to the Note Registrar or Company to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

(iv)     *Beneficial Interests in Unrestricted Global Notes to Unrestricted Definitive Notes*. If any holder of a beneficial interest in an Unrestricted Global Note proposes to exchange such beneficial interest for a Definitive Note or to transfer such beneficial interest to a Person who takes delivery thereof in the form of a Definitive Note, then, upon satisfaction of the conditions set forth in Section 2.05(b)(ii) hereof, the Trustee will cause the aggregate principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.05(g) hereof, and the Company will execute and upon receipt of an Authentication Order, the Trustee will authenticate and deliver to the Person designated in the instructions a Definitive Note in the appropriate principal amount. Any Definitive Note issued in exchange for a beneficial interest pursuant to this Section 2.05(c)(iv) will be registered in such name or names and in such authorized denomination or denominations as the holder of such beneficial interest requests through instructions to the Note Registrar from or through the Depositary and the Participant or Indirect Participant. The Trustee will deliver such Definitive Notes to the Persons in whose names such Notes are so registered. Any Definitive Note issued in exchange for a beneficial interest pursuant to this Section 2.05(c)(iv) will not bear the Private Placement Legend.

(d)     Transfer and Exchange of Definitive Notes for Beneficial Interests.

(i)     *Restricted Definitive Notes to Beneficial Interests in Restricted Global Notes*. If any Holder of a Restricted Definitive Note proposes to exchange such Note for a beneficial interest in a Restricted Global Note or to transfer such Restricted Definitive Notes to a Person who takes delivery thereof in the form of a beneficial interest in a Restricted Global Note, then, upon receipt by the Note Registrar of the following documentation:

21

(i)      if the Holder of such Restricted Definitive Note proposes to exchange such Note for a beneficial interest in a Restricted Global Note, a certificate from such Holder in the form of Exhibit C hereto, including the certifications in item (2)(b) thereof;

(ii)     if such Restricted Definitive Note is being transferred to a QIB in accordance with Rule 144A, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (1) thereof;

(iii)    if such Restricted Definitive Note is being transferred to a Non-U.S. Person in an offshore transaction in accordance with Rule 903 or Rule 904, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (2) thereof;

(iv)     if such Restricted Definitive Note is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(a) thereof;

(v)      if such Restricted Definitive Note is being transferred to the Company, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(b) thereof; or

(vi)     if such Restricted Definitive Note is being transferred pursuant to an effective registration statement under the Securities Act, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(c) thereof, the Trustee will cancel the Restricted Definitive Note, increase or cause to be increased the aggregate principal amount of, in the case of clause (A) above, the appropriate Restricted Global Note, in the case of clause (B) above, the 144A Global Note, or in the case of clause (C) above, the Regulation S Global Note.

(ii)     *Restricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes*. A Holder of a Restricted Definitive Note may exchange such Note for a beneficial interest in an Unrestricted Global Note or transfer such Restricted Definitive Note to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note only if the Note Registrar receives the following:

(i)      such an exchange or transfer is effected pursuant to an effective registration statement under the Securities Act, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (4) thereof; or

(ii)     if the Holder of such Definitive Notes proposes to exchange such Notes for a beneficial interest in the Unrestricted Global Note, a certificate from such Holder in the form of Exhibit C hereto, including the certifications in item (1)(c) thereof; or

22

(iii)    if the Holder of such Definitive Notes proposes to transfer such Notes to a Person who shall take delivery thereof in the form of a beneficial interest in the Unrestricted Global Note, a certificate from such Holder in the form of Exhibit B hereto, including the certifications in item (4) thereof;

and, in each such case set forth in this Section 2.05(d)(ii), if the Note Registrar or Company so requests or if the applicable procedures of DTC so require, an Opinion of Counsel in form reasonably acceptable to the Note Registrar or Company to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

Upon satisfaction of the conditions of any of the subparagraphs in this Section 2.05(d)(ii), the Trustee will cancel the Definitive Notes and increase or cause to be increased the aggregate principal amount of the Unrestricted Global Note.

(iii)    *Unrestricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes*. A Holder of an Unrestricted Definitive Note may exchange such Note for a beneficial interest in an Unrestricted Global Note or transfer such Definitive Notes to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note at any time. Upon receipt of a request for such an exchange or transfer, the Trustee will cancel the applicable Unrestricted Definitive Note and increase or cause to be increased the aggregate principal amount of one of the Unrestricted Global Notes.

If any such exchange or transfer from a Definitive Note to a beneficial interest is effected pursuant to subparagraphs (ii) or (iii) above at a time when an Unrestricted Global Note has not yet been issued, the Company will issue and, upon receipt of an Authentication Order, the Trustee will authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the principal amount of Definitive Notes so transferred.

(e)    *Transfer and Exchange of Definitive Notes for Definitive Notes.* Upon request by a Holder of Definitive Notes and such Holder's compliance with the provisions of this Section 2.05(e), the Note Registrar will register the transfer or exchange of Definitive Notes. Prior to such registration of transfer or exchange, the requesting Holder must present or surrender to the Note Registrar the Definitive Notes duly endorsed or accompanied by a written instruction of transfer in form satisfactory to the Note Registrar duly executed by such Holder or by its attorney, duly authorized in writing. In addition, the requesting Holder must provide any additional certifications, documents and information, as applicable, required pursuant to the following provisions of this Section 2.05(e).

(i)    *Restricted Definitive Notes to Restricted Definitive Notes*. Any Restricted Definitive Note may be transferred to and registered in the name of Persons who take delivery thereof in the form of a Restricted Definitive Note if the Note Registrar receives the following:

23

(i)      if the transfer will be made pursuant to Rule 144A, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (1) thereof;

(ii)      if the transfer will be made pursuant to Rule 903 or Rule 904, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (2) thereof; and

(iii)      if the transfer will be made pursuant to any other exemption from the registration requirements of the Securities Act, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications, certificates and Opinion of Counsel required by item (3) thereof, if applicable.

(ii)      *Restricted Definitive Notes to Unrestricted Definitive Notes.* Any Restricted Definitive Note may be exchanged by the Holder thereof for an Unrestricted Definitive Note or transferred to a Person or Persons who take delivery thereof in the form of an Unrestricted Definitive Note if the Note Registrar receives the following:

(i)      such an exchange or transfer is effected pursuant to an effective registration statement under the Securities Act, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (4) thereof; or

(ii)      if the Holder of such Restricted Definitive Notes proposes to exchange such Notes for an Unrestricted Definitive Note, a certificate from such Holder in the form of Exhibit C hereto, including the certifications in item (1)(d) thereof; or

(iii)      if the Holder of such Restricted Definitive Notes proposes to transfer such Notes to a Person who shall take delivery thereof in the form of an Unrestricted Definitive Note, a certificate from such Holder in the form of Exhibit B hereto, including the certifications in item (4) thereof;

and, in each such case set forth in this Section 2.05(e)(ii), if the Note Registrar or Company so requests, an Opinion of Counsel in form reasonably acceptable to the Note Registrar or Company to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

(iii)      *Unrestricted Definitive Notes to Unrestricted Definitive Notes.* A Holder of Unrestricted Definitive Notes may transfer such Notes to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note. Upon receipt of a request to register such a transfer, the Note Registrar shall register the Unrestricted Definitive Notes pursuant to the instructions from the Holder thereof.

24

(f)    *Legends.* The following legends will appear on the face of all Global Notes and Definitive Notes issued under this Indenture unless specifically stated otherwise in the applicable provisions of this Indenture.

(i)    Private Placement Legend.

(i)    Except as permitted by subparagraph (B) below, each Global Note and each Definitive Note (and all Notes issued in exchange therefor or substitution thereof) shall bear the legend in substantially the following form:

"THE NOTES, THE COMMON STOCK OR ORDINARY SHARES, IF ANY, ISSUABLE UPON CONVERSION OF THESE NOTES, AND THE NOTE GUARANTEES EVIDENCED HEREBY HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT (A) (1) TO A PERSON WHO THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, (2) IN AN OFFSHORE TRANSACTION COMPLYING WITH RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURITIES ACT, (3) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT (IF AVAILABLE) OR (4) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND (B) IN ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF THE STATES OF THE UNITED STATES AND OTHER JURISDICTIONS. AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTION" AND "UNITED STATES" HAVE THE MEANING GIVEN TO THEM BY REGULATION S UNDER THE SECURITIES ACT.

THE FOREGOING LEGEND WILL ONLY BE REMOVED AT THE OPTION OF THE ISSUER."

(ii)    Notwithstanding the foregoing, any Global Note or Definitive Note issued pursuant to subparagraphs (b)(iv), (c)(iii), (c)(iv), (d)(ii), (d)(iii), (e)(ii) or (e)(3)(iii) of this Section 2.05 (and all Notes issued in exchange therefor or substitution thereof) will not bear the Private Placement Legend.

(ii)    *Global Note Legend.* Each Global Note will bear a legend in substantially the following form:

"THIS GLOBAL NOTE IS HELD BY THE DEPOSITARY (AS DEFINED IN THE INDENTURE GOVERNING THIS NOTE) OR ITS NOMINEE IN CUSTODY FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT TRANSFERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT THAT (1) THE TRUSTEE MAY MAKE SUCH NOTATIONS HEREON AS MAY BE REQUIRED PURSUANT TO SECTION 2.05 OF THE INDENTURE, (2) THIS GLOBAL NOTE MAY BE EXCHANGED IN WHOLE BUT NOT IN PART PURSUANT TO SECTION 2.05(a) OF THE INDENTURE, (3) THIS

25

GLOBAL NOTE MAY BE DELIVERED TO THE TRUSTEE FOR CANCELLATION PURSUANT TO SECTION 2.05(i) OF THE INDENTURE AND (4) THIS GLOBAL NOTE MAY BE TRANSFERRED TO A SUCCESSOR DEPOSITARY WITH THE PRIOR WRITTEN CONSENT OF THE ISSUER.

UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR NOTES IN DEFINITIVE FORM, THIS NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY. UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY (55 WATER STREET, NEW YORK, NEW YORK) ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN."

(iii)    *Regulation S Global Note Legend*. Each Regulation S Global Note will bear a legend in substantially the following form:

"THE NOTES, THE COMMON STOCK OR ORDINARY SHARES, IF ANY, ISSUABLE UPON CONVERSION OF THESE NOTES, AND THE NOTE GUARANTEES EVIDENCED HEREBY HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION AND IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY OTHER APPLICABLE JURISDICTION. THE FOREGOING LEGEND MAY BE REMOVED FROM THIS NOTE AFTER 40 DAYS BEGINNING ON AND INCLUDING THE LATER OF (A) THE DATE ON WHICH THE NOTES ARE OFFERED TO PERSONS OTHER THAN DISTRIBUTORS (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) AND (B) THE ORIGINAL ISSUE DATE OF THE NOTES."

(g)    *Cancellation and/or Adjustment of Global Notes.* At such time as all beneficial interests in a particular Global Note have been exchanged for Definitive Notes or a particular Global Note has been redeemed, repurchased or cancelled in whole and not in part, each such Global Note will be returned to or retained and cancelled by the Trustee in accordance with Section 2.05(i) hereof. At any time prior to such cancellation, if any beneficial interest in a Global Note is exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note or for Definitive Notes, the principal amount

26

of Notes represented by such Global Note will be reduced accordingly and an endorsement will be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such reduction; and if the beneficial interest is being exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note, such other Global Note will be increased accordingly and an endorsement will be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such increase.

(h)     *General Provisions Relating to Transfers and Exchanges*.

(i)     To permit registrations of transfers and exchanges, the Company will execute and the Trustee will authenticate Global Notes and Definitive Notes upon receipt of an Authentication Order or at the Note Registrar's request.

(ii)     No service charge will be made to a Holder of a beneficial interest in a Global Note or to a Holder of a Definitive Note for any registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any transfer Tax or similar governmental charge payable in connection therewith (other than any such transfer Taxes or similar governmental charge payable upon exchange or transfer).

(iii)     The Note Registrar will not be required to register the transfer of or exchange of any Note called for redemption.

(iv)     All Global Notes and Definitive Notes issued upon any registration of transfer or exchange of Global Notes or Definitive Notes will be the valid obligations of the Company, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Global Notes or Definitive Notes surrendered upon such registration of transfer or exchange.

(v)     Neither the Note Registrar nor the Company will be required to issue, to register the transfer or exchange of any Note during a period beginning at the opening of business fifteen (15) days before the mailing of a notice of redemption with respect to any Notes which are to be redeemed under Article 15 hereof.

(vi)     Neither the Note Registrar nor the Company will be required to register the transfer of or to exchange a Note between a record date and the next succeeding Interest Payment Date.

(vii)     Prior to due presentment for the registration of a transfer of any Note, the Trustee, any Agent and the Company may deem and treat the Person in whose name any Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal of and interest on such Notes and for all other purposes, and none of the Trustee, any Agent or the Company shall be affected by notice to the contrary.

(viii)     The Trustee will authenticate Global Notes and Definitive Notes in accordance with the provisions of Section 2.04 hereof.

27

(ix)    All certifications, certificates and Opinions of Counsel required to be submitted to the Note Registrar pursuant to this Section 2.05 to effect a registration of transfer or exchange may be submitted electronically (except as otherwise requested by the Note Registrar).

None of the Trustee or Agents shall have any responsibility or obligation to any beneficial owner of an interest in a Global Note, any agent member or other member of, or a participant in, DTC or other person with respect to the accuracy of the records of DTC or any nominee or participant or member thereof, with respect to any ownership interest in the Notes or with respect to the delivery to any agent member or other participant, member, beneficial owner or other person (other than DTC) of any notice or the payment of any amount or delivery of any Notes (or other security or property) under or with respect to such Notes. All notices and communications to be given to the Holders and all payments to be made to Holders in respect of the Notes shall be given or made only to or upon the order of the registered Holders (which shall be DTC or its nominee in the case of a Global Note). The rights of beneficial owners in any Global Note shall be exercised only through DTC, subject to its applicable rules and procedures. The Trustee and Agents may rely and shall be fully protected in relying upon information furnished by DTC with respect to its agent members and other members, participants and any beneficial owners.

Neither the Trustee nor the Agents shall have any obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Indenture or under Applicable Law with respect to any transfer of any interest in any Note (including any transfers between or among Participants or Indirect Participants in any Global Note) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by, the terms of this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

(i)    Cancellation.

The Company at any time may deliver Notes to the Trustee for cancellation. The Note Registrar and Paying Agent will forward to the Trustee any Notes surrendered to them for registration of transfer, exchange or payment. The Trustee and no one else will cancel all Notes surrendered for registration of transfer, exchange, payment, replacement or cancellation and will dispose of cancelled Notes (subject to the record retention requirement of the Exchange Act or the Trustee) in accordance with its customary procedures. Evidence of the disposal or cancellation of all cancelled Notes will be delivered to the Company upon written request. The Company may not issue new Notes to replace Notes that it has paid or that have been delivered to the Trustee for cancellation.

Section 2.06.  *Mutilated, Destroyed, Lost or Stolen Notes.*  In case any Note shall become mutilated or be destroyed, lost or stolen, the Company in its discretion may execute, and upon receipt of a Company Order the Trustee or an authenticating agent appointed by the Trustee shall authenticate and deliver, a new Note, bearing a registration number not contemporaneously outstanding, in exchange and substitution for the mutilated Note, or in lieu of and in substitution for the Note so destroyed, lost or stolen.  In every case the applicant for a substituted Note shall furnish to the Company, to the Trustee and, if applicable, to such authenticating agent such

28

security or indemnity as may be required by them to save each of them harmless from any loss, liability, cost or expense caused by or connected with such substitution, and, in every case of destruction, loss or theft, the applicant shall also furnish to the Company, to the Trustee and, if applicable, to such authenticating agent evidence to their satisfaction of the destruction, loss or theft of such Note and of the ownership thereof.

The Trustee or such authenticating agent may authenticate any such substituted Note and deliver the same upon the receipt of a Company Order and of such security or indemnity as the Trustee, the Company and, if applicable, such authenticating agent may require.  No service charge shall be imposed by the Company, the Trustee, the Note Registrar, any co-Note Registrar or the Paying Agent upon the issuance of any substitute Note, but the Company may require a Holder to pay a sum sufficient to cover any documentary, stamp or similar issue or transfer Tax required in connection therewith as a result of the name of the Holder of the new substitute Note being different from the name of the Holder of the old Note that became mutilated or was destroyed, lost or stolen.  In case any Note that has matured or is about to mature or has been surrendered for required repurchase or is about to be converted in accordance with Article 13 shall become mutilated or be destroyed, lost or stolen, the Company may, in its sole discretion, instead of issuing a substitute Note, pay or authorize the payment of or convert or authorize the conversion of the same (without surrender thereof except in the case of a mutilated Note), as the case may be, if the applicant for such payment or conversion shall furnish to the Company, to the Trustee and, if applicable, to such authenticating agent such security or indemnity as may be required by them to save each of them harmless for any loss, liability, cost or expense caused by or connected with such substitution, and, in every case of destruction, loss or theft, evidence satisfactory to the Company, the Trustee and, if applicable, any Paying Agent or Conversion Agent evidence to their satisfaction of the destruction, loss or theft of such Note and of the ownership thereof.

Every substitute Note issued pursuant to the provisions of this Section 2.06 by virtue of the fact that any Note is destroyed, lost or stolen shall constitute an additional contractual obligation of the Company, whether or not the destroyed, lost or stolen Note shall be found at any time, and shall be entitled to all the benefits of (but shall be subject to all the limitations set forth in) this Indenture equally and proportionately with any and all other Notes duly issued hereunder.  To the extent permitted by law, all Notes shall be held and owned upon the express condition that the foregoing provisions are exclusive with respect to the replacement, payment, redemption, conversion or repurchase of mutilated, destroyed, lost or stolen Notes and shall preclude any and all other rights or remedies notwithstanding any law or statute existing or hereafter enacted to the contrary with respect to the replacement, payment, redemption, conversion or repurchase of negotiable instruments or other securities without their surrender.

Section 2.07.  *Cancellation of Notes Paid, Converted, Etc.*  The Company shall cause all Notes surrendered for the purpose of payment, repurchase, redemption, registration of transfer or exchange or conversion, if surrendered to any Person other than the Trustee (including any of the Company's agents, Subsidiaries or Affiliates), to be surrendered to the Trustee for cancellation. All Notes surrendered to the Trustee shall be canceled promptly by it. Except for any Notes surrendered for registration of transfer or exchange, or as otherwise expressly permitted by any of the provisions of this Indenture, no Notes shall be authenticated in exchange for any Notes

surrendered to the Trustee for cancellation.  The Trustee shall dispose of canceled Notes in accordance with its customary procedures and, after such cancellation, shall deliver a certificate of such cancellation to the Company, at the Company's written request in a Company Order.

Section 2.08.  *CUSIP Numbers.*  The Company in issuing the Notes may use "CUSIP" numbers (if then generally in use), and, if so, the Trustee shall use "CUSIP" numbers in all notices issued to Holders as a convenience to such Holders; *provided* that the Trustee shall not be responsible for the accuracy of any CUSIP number printed on any Note, notice or elsewhere and *provided further* that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Notes or on such notice and that reliance may be placed only on the other identification numbers printed on the Notes.  The Company shall promptly notify the Trustee in writing of any change in the "CUSIP" numbers.

Section 2.09.  *Ranking.* The Notes will be the Company's general unsubordinated obligations, secured by the Collateral. As provided under Section 4.10, the Company will not incur, issue, assume or otherwise become responsible for any other Indebtedness besides the Notes and its guarantee of the Take-back SSNs and Super Priority Notes.

Section 2.10.  *Redemption.* The Company shall not repurchase Notes in the open market or otherwise, whether directly or through its subsidiaries or through counterparties to private agreements, including by cash-settled swaps or other derivatives (provided that the Company shall repurchase the Notes upon a mandatory redemption as set forth in Section 15.01).

ARTICLE 3

SATISFACTION AND DISCHARGE

Section 3.01.  *Satisfaction and Discharge.*  This Indenture shall upon request of the Company contained in a Responsible Officer's Certificate cease to be of further effect, and the Trustee, at the expense of the Company, shall execute such instruments reasonably requested by the Company acknowledging satisfaction and discharge of this Indenture, when (a) (i) all Notes theretofore authenticated and delivered (other than Notes which have been destroyed, lost or stolen and which have been replaced, paid or converted as provided in Section 2.06) have been delivered to the Trustee for cancellation; or (ii) the Company has deposited with the Trustee or delivered to Holders, as applicable, after the Notes have become due and payable, whether on the Maturity Date, upon mandatory redemption or otherwise, cash and, upon conversion, shares of Common Stock, solely to satisfy the Company's conversion obligation, sufficient, without consideration of reinvestment, to pay all of the outstanding Notes and all other sums due and payable under this Indenture by the Company; and (b) the Company has delivered to the Trustee a Responsible Officer's Certificate and an Opinion of Counsel, each stating that all conditions precedent herein provided for relating to the satisfaction and discharge of this Indenture have been complied with.  Notwithstanding the satisfaction and discharge of this Indenture, the obligations of the Company to the Trustee under Section 7.06 shall survive. For the avoidance of doubt, nothing in this Section 3.01 shall be deemed to permit the cancellation, discharge or redemption of the Notes or the satisfaction and discharge of this Indenture prior to the applicable Distribution Date on which the full amount of all Sale Proceeds (guaranteed, contingent or

30

otherwise) have been actually distributed to the Holders, in accordance with Section 15.01 and Section 15.02 herein.

## ARTICLE 4
### COVENANTS OF THE COMPANY

Section 4.01.  *Payment of Principal and Interest.*  The Company covenants and agrees that it will cause to be paid the principal (including capitalized interest) (including under a mandatory redemption, if applicable) of, and accrued interest on, each of the Notes at the places, at the respective times and in the manner provided herein and in the Notes.

Section 4.02.  *Maintenance of Office or Agency.*  The Company will maintain in the United States of America an office or agency where the Notes may be surrendered for registration of transfer or exchange ("**Note Registrar**"), for presentation for payment or repurchase ("**Paying Agent**") or for conversion ("**Conversion Agent**") and where notices and demands to or upon the Company in respect of the Notes and this Indenture may be served.  The Company will give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency.  If at any time the Company shall fail to maintain any such required office or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office in the United States of America; *provided* that the Corporate Trust Office shall not be a place of service for service of legal process.

The Company may also from time to time designate as co-Note Registrars one or more other offices or agencies where the Notes may be presented or surrendered for any or all such purposes and may from time to time rescind such designations; *provided* that no such designation or rescission shall in any manner relieve the Company of its obligation to maintain an office or agency in the United States of America for such purposes.  The Company will give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.  The terms **"Note Registrar"**, "**Paying Agent**" and "**Conversion Agent**" include any such additional or other offices or agencies, as applicable.

The Company hereby initially designates the Trustee as the Paying Agent, Note Registrar, Custodian and Conversion Agent and the Corporate Trust Office as the office or agency in the United States of America where Notes may be surrendered for registration of transfer or exchange or for presentation for payment or repurchase or for conversion and where notices and demands to or upon the Company in respect of the Notes and this Indenture may be served; *provided* that the Corporate Trust Office shall not be a place for service of legal process on the Company.

The Company shall appoint a third party share registrar and transfer agent for the purpose of registering shares of Common Stock and transfers of shares of Common Stock in the Company's register of members and in any other applicable share register (the "**Share Registrar**"). The identity of the Share Registrar shall be agreed upon in coordination with the Holders.

31

The Company initially appoints DTC to act as "**Depositary**" with respect to the Global Notes.

The Company may appoint one or more co-Note Registrars and, subject to Applicable Law, one or more co-Share Registrars.

Section 4.03.  *Appointments to Fill Vacancies in Trustee's Office.*  The Company, whenever necessary to avoid or fill a vacancy in the office of Trustee, will appoint, in the manner provided in Section 7.09, a Trustee, so that there shall at all times be a Trustee hereunder.

Section 4.04.  *Provisions as to Paying Agent.*  (a) If the Company shall appoint a Paying Agent other than the Trustee, the Company will cause such Paying Agent to execute and deliver to the Trustee an instrument in which such agent shall agree with the Trustee, subject to the provisions of this Section 4.04:

(i)    that it will hold all sums held by it as such agent for the payment of the principal (including under a mandatory redemption, if applicable) of, and accrued interest on, the Notes in trust for the benefit of the Holders of the Notes;

(ii)    that it will give the Trustee prompt written notice of any failure by the Company to make any payment of the principal (including under a mandatory redemption, if applicable) of, and accrued interest on, the Notes when the same shall be due and payable; and

(iii)    that at any time during the continuance of an Event of Default, upon request of the Trustee, it will forthwith pay to the Trustee all sums so held in trust.

The Company shall, on or before each due date of the principal (including under a mandatory redemption, if applicable) of, or accrued interest on, the Notes, deposit with the Paying Agent a sum in immediately available U.S. dollars sufficient to pay such principal (including under a mandatory redemption, if applicable) or accrued interest, and (unless such Paying Agent is the Trustee) the Company will promptly notify the Trustee in writing of any failure to take such action; *provided* that if such deposit is made on the due date, such deposit must be received by the Paying Agent by 11:00 a.m., New York City time, on such date.

(b)    If the Company shall act as its own Paying Agent, it will, on or before each due date of the principal (including under a mandatory redemption, if applicable) of, and accrued interest on, the Notes, set aside, segregate and hold in trust for the benefit of the Holders of the Notes a sum sufficient to pay such principal (including under a mandatory redemption, if applicable) and accrued interest so becoming due and will promptly notify the Trustee in writing of any failure to take such action and of any failure by the Company to make any payment of the principal (including under a mandatory redemption, if applicable) of, or accrued interest on, the Notes when the same shall become due and payable.

(c)    Anything in this Section 4.04 to the contrary notwithstanding, the Company may, at any time, for the purpose of obtaining a satisfaction and discharge of this Indenture, or for any other reason, pay, cause to be paid or deliver to the Trustee all sums or amounts held in trust by

32

the Company or any Paying Agent hereunder as required by this Section 4.04, such sums or amounts to be held by the Trustee upon the trusts herein contained and upon such payment or delivery by the Company or any Paying Agent to the Trustee, the Company or such Paying Agent shall be released from all further liability but only with respect to such sums or amounts. Upon the occurrence of any event specified in Section 6.01(i), the Trustee shall automatically become the Paying Agent.

(d)    Subject to applicable abandoned property laws, any money deposited with the Trustee, the Conversion Agent or any Paying Agent, or then held by the Company, in trust for the payment of the principal (including under a mandatory redemption, if applicable) of, or accrued interest on, any Note and remaining unclaimed for two years after such principal (including under a mandatory redemption, if applicable) or interest shall be paid to the Company on request of the Company contained in a Responsible Officer's Certificate, or (if then held by the Company) shall be discharged from such trust and the Trustee shall have no further liability with respect to such funds; and the Holder of such Note shall thereafter look only to the Company for payment thereof, and all liability of the Trustee, the Conversion Agent or such Paying Agent with respect to such trust money, and all liability of the Company as trustee thereof, shall thereupon cease.

Section 4.05.   *Maintenance of Existence and Business Activities; Modification of Organization Documents.*  The Company shall (1) preserve and maintain its legal existence under Cayman Islands law and all of its material licenses, rights, privileges and franchises necessary for the maintenance of its corporate existence, (2) comply, in all material respects, with its memorandum and articles of association, (3) limit its activities and scope of business exclusively to being the holding company of 100% of the common stock of ILAP, and any ancillary activity required in connection therewith, and (4) refrain from making any amendments to its memorandum and articles of association or, in general, corporate organization documents, other than those necessary to implement a conversion under this Indenture.

Section 4.06.   *Rule 144A Information Requirement.* At any time either the Company or a Guarantor is not subject to Section 13 or 15(d) of the Exchange Act, such Person shall, so long as any of the Notes or any shares of Common Stock issuable upon conversion thereof shall, at such time, constitute "restricted securities" within the meaning of Rule 144(a)(3) under the Securities Act, promptly provide to the Trustee and, upon written request, any Holder, beneficial owner or prospective purchaser of such Notes or any shares of Common Stock issuable upon conversion of such Notes, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act to facilitate the resale of such Notes or shares of Common Stock pursuant to Rule 144A.  The Company and each Guarantor shall take such further action as any Holder or beneficial owner of such Notes or such Common Stock may reasonably request to the extent from time to time required to enable such Holder or beneficial owner to sell such Notes or shares of Common Stock in accordance with Rule 144A, as such rule may be amended from time to time.

Section 4.07.   *Stay, Extension and Usury Laws.*  Each of the Company and each Guarantor covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay,

extension or usury law or other law that would prohibit or forgive the Company or such Guarantor from paying all or any portion of the principal of or interest on the Notes or the Note Guarantee of such Guarantor as contemplated herein, wherever enacted, now or at any time hereafter in force, or that may affect the covenants or the performance of this Indenture; and each of the Company and each Guarantor (to the extent it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it will not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

Section 4.08.  *Compliance Certificate; Statements as to Defaults.*  The Company shall deliver to the Trustee within 120 days after the end of each fiscal year of the Company a Responsible Officer's Certificate stating whether the signers thereof have knowledge of any Event of Default that occurred during the previous fiscal year and, if so, specifying each such Event of Default and the nature thereof.

In addition, the Company shall deliver to the Trustee, within 30 days after the occurrence of any Event of Default or Default, a Responsible Officer's Certificate setting forth the details of such Event of Default or Default, its status and the action that the Company is taking or proposing to take in respect thereof; *provided* that the Company is not required to deliver such notice if such Event of Default or Default has been cured.

Section 4.09.  *Further Instruments and Acts.*  Upon request of the Trustee, the Company will execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purposes of this Indenture.

Section 4.10.  *Limitations on Indebtedness.* The Company shall not create, incur, assume or suffer to exist any Indebtedness (except for the Notes and the Company's guarantee under the Senior Notes Indenture) or issue Disqualified Stock.

Section 4.11.  *Limitations on Restricted Payments.* The Company shall not (i) declare or pay any dividend or make any other payment or distribution on the Company's account or on account of the Guarantors' Equity Interests or to the direct or indirect holders of the Company's or of the Guarantors' Equity Interests in their capacity as such (except for those permitted under this Indenture and the Senior Notes Indenture); (ii) purchase, redeem or otherwise acquire or retire for value any of the Company's Equity Interests or the Guarantors' Equity Interests or any direct or indirect parent of the Company or such Guarantor; (iii) make any payment on or with respect to, or purchase, redeem, defease or otherwise acquire or retire for value any Indebtedness of the Company or such Guarantor that is contractually subordinated to the Notes; or (iv) make any Investment.

Section 4.12.  *Limitations on Liens.* Neither the Company nor any of the Guarantors will directly or indirectly, create, incur, assume or suffer to exist any Lien of any kind on any property now owned or hereafter acquired, except for those permitted under this Indenture and the Senior Notes Indenture.

Section 4.13.    *Limitations on Transactions with Related Parties.* (a) Neither the Company nor any Guarantor will (1) make any investment in or any payment to, (2) sell, lease, transfer, assign or otherwise dispose of any of its property to, (3) purchase or acquire property from or (4) enter into or make or amend any transaction, contract, agreement, arrangement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate (each, an "**Affiliate Transaction**"), unless (A) the Affiliate Transaction is on terms no less favorable to the Company or such Guarantor than could be obtained in a comparable arm's-length transaction with a person that is not an Affiliate, (B) are permitted under the Sales Facilitation Agreement, or (C) with respect to the Guarantors, are permitted under the Senior Notes Indenture, in compliance with the terms thereunder.

(b)    Prior to entering into any Affiliate Transaction for any transaction amount in excess of $5.0 million, the Company or the applicable Guarantor shall deliver to the Trustee a written notice certifying that such Affiliate Transaction complies with this Indenture.

Section 4.14.    *Limitations on Leases and Sale and Lease-Back Transactions.* The Company shall not enter into any agreement, or be or become liable as lessee under any agreement, for the lease, hire or use of any property, except for operating leases of property (which do not constitute Capitalized Lease Obligations).

No Guarantor shall enter into any agreement or be or become liable as lessee under any agreement, for the lease, hire or use of any property, except as permitted under the Senior Notes Indenture, in compliance with the terms thereunder.

Section 4.15.    *Limitations on Merger, Consolidation and Capital Increases; Limitation on Asset Sales.* This covenant is further described under Article 10 of this Indenture.

Section 4.16.    *Compliance with Laws.* The Company and the Guarantors shall conduct their businesses in compliance with, all requirements of Applicable Law, including all applicable Governmental Approvals, Environmental Laws, Anti-Money Laundering Laws and Anti-Corruption Laws.

Section 4.17.    *Payments of Additional Amounts.* (a) Any and all payments, if any, of principal of, premium, and interest on or with respect to the Notes, by or on behalf of the Company, to the Holders, will be made free and clear of, and without withholding or deduction for or on account of, Taxes imposed by any Taxing Jurisdiction, unless required by Applicable Law. If any withholding or deduction on account of Taxes is required to be imposed by any Taxing Jurisdiction, the Company will:

(i)    pay to the Holders such additional amounts as may be necessary ("**Additional Amounts**") so that after making all required deductions or withholdings, including those applicable to additional sums payable under this heading, the net amount received by Holders or other beneficial owners of the Notes will not be less than the amounts as would have been received by them had no such withholding or deduction been required,

(ii)    deduct or withhold such Taxes; and

35

(iii)    remit the full amount deducted or withheld to the relevant Taxing or other Governmental Authority.

(b)    In addition the Company will pay any stamp, issue, registration, documentary or other similar Taxes and other duties (including interest and penalties with respect thereto) imposed or levied by any Taxing Jurisdiction (or any political subdivision or taxing authority thereof or therein) in respect of the creation, issue and offering of the Notes.

(c)    Any reference in this Indenture, any supplemental indenture or the Notes to principal, interest and premium, if any, or any other amount payable in respect of the Notes by the Company will be deemed also to refer to any Additional Amount that may be payable with respect to that amount under the obligations referred to in this section.

(d)    The obligations to make payments of Additional Amounts with respect to principal, interest or other amounts payable on the Notes will survive any termination or discharge of the Indenture, payment of the Notes and/or the resignation or removal of the Trustee or any security agent under this Indenture or the Senior Notes Indenture.

(e)    If the Company withholds or deducts any Taxes in respect of any payment made under or with respect to the Notes, the Company shall provide the Trustee a duly certified or authenticated copy of an original receipt of the payment of such Taxes. The Trustee will, for a period of five years following the due date for each payment, maintain in its files each such copy received from the Company. If the Company is obligated to pay Additional Amounts with respect to any payment under or with respect to the Notes other than Additional Amounts payable under the law as in effect on the date of this Indenture, the Company shall deliver to the Trustee a written notice stating the fact that Additional Amounts are payable and the amounts so payable.

Section 4.18.    *Reporting Requirements.* (a) So long as any Notes are outstanding, the Company will furnish to the Holders (via DTC LENS, in the case of Global Notes) and the Trustee:

(i)    as soon as available and in any event within sixty (60) days after the end of the first three fiscal quarters of each fiscal year, a copy of the complete unaudited, condensed consolidated statements of income, retained earnings and cash flow of the Company and of the Guarantors, and the related unaudited, consolidated balance sheet of the Company and of the Guarantors as at the end of such period, setting forth in each case in comparative form the corresponding figures for the corresponding period in the preceding fiscal year, if any, prepared in accordance with IFRS and presented in the English language, accompanied by a written notice of the Company, certifying that said financial statements fairly present the financial condition and results of operations of the Company and of the Guarantors in accordance with IFRS, consistently applied, as at the end of, and for, such periods (subject to normal year-end audit adjustments);

(ii)    as soon as available and in any event within one-hundred and twenty (120) days after the end of each fiscal year, a copy of the complete audited, consolidated statements of income, retained earnings and cash flow of the Company and of the

Guarantors, and the related audited, consolidated balance sheet of the Company and of the Guarantors as at the end of such year prepared in accordance with IFRS and any related audit letter, setting forth in each case in comparative form the corresponding figures for the preceding fiscal year, and accompanied by an opinion thereon of a firm of independent certified public accountants of recognized international standing prepared in accordance with IFRS and presented in the English language;

(iii)     at the time it furnishes each set of financial statements as described in (ii) above, a written notice of the Company certifying that: (i) to the best of such person's knowledge, no Default has occurred and is continuing (or, if any Default has occurred and is continuing, describing the same in reasonable detail and describing what action the Company have taken and propose to take with respect thereto) and; (ii) there has been no notice, demand or other communication given or received by the Company (A) pursuant to or relating to any of the Indenture and the Notes (including all requests for amendments or waivers) or pursuant to or relating to any Governmental Approval or (B) to or from any Governmental Authority relating in any way to the Guarantors' Projects; in each case identifying matters which would reasonably be expected to result in a Material Adverse Effect, or except as detailed in such certificate;

(iv)     promptly after any officer or director of the Company or of any of the Guarantors knows that any Default or any material Default by any Project Party under any Material Project Document has occurred, a written notice of such event describing the same in detail and, together with such notice, a description of what action if the Company or any such Guarantor or, if known by the Company or such Guarantor, such Project Party has taken and/or proposes to take with respect thereto;

(v)     not fewer than 30 days before the commencement of each fiscal year following the Issuance Date, an Annual Budget related to the Guarantors in respect of the immediately succeeding fiscal year together with a written notice of a Responsible Officer certifying that such Annual Budget complies with the definition of "Annual Budget"; and

(vi)     not fewer than 30 days after the end of (i) each fiscal year following the Issuance Date and (ii) each second fiscal quarter following the Issuance Date, an Operating Report related to the Guarantors in respect of the immediately preceding two fiscal quarters.

(b)     The Company will also, for so long as any Notes remain outstanding, furnish or cause to be furnished to the Holders and prospective investors the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act.

(c)     The Trustee shall have no duty to review or analyze reports or budgets delivered to it. Delivery of such reports, information and documents to the Trustee is for informational purposes only and the Trustee's receipt of such shall not constitute actual or constructive notice or knowledge of any information contained therein or determinable from information contained therein, including the Company's compliance with any of its covenants hereunder (as to which the Trustee is entitled to rely exclusively on Certificates of Responsible Officers). The Trustee

37

shall not be obligated to monitor or confirm, on a continuing basis or otherwise, the Company's compliance with the covenants or with respect to any reports or other documents filed with any website, or participate in any conference calls.

Section 4.19.  *Maintenance of Insurance.*  (a) Each Guarantor shall maintain or cause to be maintained insurance in accordance with the insurance covenants set forth under the Senior Notes Indenture.

(b)      The Company will obtain and maintain in full force and effect, with insurers of international standing, Directors and Officers (D&O) insurance coverage for all of its Independent Directors in such amounts and against such risks as is customarily maintained by Cayman Islands companies issuing securities. Insurance must be placed with insurance companies with financially sound and reputable insurers that have adequate capital and a credit rating no lower than the insurance companies providing insurance to the Guarantors on the Issuance Date.

Section 4.20.  *Listing of Notes.* The Company will use reasonable best efforts to have the Notes listed on the Luxembourg Stock Exchange, on Euronext Dublin or on the SGX within forty-five (45) days as from the execution of this Indenture.

Section 4.21.  *Independent Director.* The Company shall ensure that, as further described in the Organizational Documents of the Company and the following paragraphs, the number of directors on the Company's Board of Directors will be no less than 3 and no more than 5, and at least one of the directors shall be an independent director, whose nomination and appointment shall comply with the requirements and procedures set forth below (the "**Independent Director**"). As of the date of this Indenture, the current Independent Director of the Company fully complies with the requirements set forth in the following paragraph and in the Organizational Documents of the Company.

In the event that the Independent Director then in place on the Company's Board of Directors resigns, is removed or otherwise vacates that office, the consent of Holders of a majority of the outstanding principal amount of the Notes will be required in order for the Company to nominate a replacement Independent Director. To that end, the Company shall send the Trustee, within thirty (30) days following the Independent Director's resignation or removal (or, if the Independent Director otherwise vacates that office, following another director having notice of such vacation), a written notice with the identity and biography of the proposed nominee, as well as certifying that the proposed nominee meets all the criteria described in the following paragraph (the "**New Independent Director Proposal Notice**"). The Trustee shall then send the New Independent Director Proposal Notice to the Holders (via DTC LENS if the Notes are Global Notes) as promptly as practicable and, in any event, within two (2) Business Days of receipt. If the Holders of a majority of the outstanding principal amount of the Notes fail to communicate to the Company (with a copy to the Trustee) in writing about their approval or rejection of the proposed nominee within 120 days after their receipt of the New Independent Director Proposal Notice, the nominee shall be deemed to be approved by the Holders and shall be appointed as the Independent Director by the Company's Board of Directors. Promptly after the expiration of the 120-day period described in the preceding sentence, the Company shall

provide an Officer's Certificate to the Trustee, upon which the Trustee may conclusively and without further inquiry rely, certifying whether the proposed nominee was approved or rejected. It is hereby expressly agreed that, from the date on which the Independent Director resigns, is removed or otherwise vacates that office, until the date on which the new Independent Director is designated and appointed pursuant to this paragraph, no breach of this Section 4.21 will be considered to have occurred, provided that the Company has timely complied with all of its obligations under this paragraph for the designation and appointment of the new Independent Director.

In the event that the abovementioned Independent Director resigns, is removed or otherwise vacates that office, the Company will only propose for nomination as Independent Director a person (i) with experience in the sale of energy assets in South America, (ii) that does not directly or indirectly receive and has not in the past five years directly or indirectly received compensation from the ILAP Partner or any of its Affiliates, and (iii) that has good moral character and has not been convicted in the prior ten years of a crime of moral turpitude or fraud and has not been subject to a bar on participation in the securities or banking industry and has not been in the prior ten years subject to a bankruptcy proceeding. The Company, in the New Independent Director Proposal Notice, will certify to the Trustee (for the benefit of the Holders) that any proposed Independent Director meets the foregoing requirements, and will deliver a reasonably detailed biography of such proposed Independent Director to the Trustee for distribution to the Holders (via DTC LENS if the Notes are Global Notes). If, at any point after his or her appointment, the new Independent Director fails to meet the aforementioned requirements, the Company's Board of Directors will remove the non-conforming director and designate a new Independent Director that meets said requirements, observing the procedure and voting thresholds described in the first paragraph of this section.

The Company will not (i) remove any Independent Director (except if, at any point after his or her designation, he or she fails to meet the aforementioned eligibility requirements), (ii) reduce the compensation payable to, or terminate or reduce the level of Directors and Officers insurance coverage for the benefit of, any Independent Director, or (iii) impose any limitations on the ability of the Independent Director to review any sort of documentation, including but not limited to documentation related to the ILAP Sale, in each case without the consent of the Holders of the majority of the outstanding principal amount of the Notes.

The Guarantors will also be required under this Indenture to have at least one Independent Director on their respective boards of directors and to comply at all times with the Independent Director nomination and appointment requirements and procedures set forth in this Section 4.21.

Section 4.22.  *Compliance with the Sales Facilitation Agreement*. The Company shall comply at all times and in all respects with, and shall duly and timely perform all of its obligations under, the Sales Facilitation Agreement further described in Section 14.03.

Section 4.23.  *Certain Tax Matters*. (a) For all U.S. federal, state and local income tax purposes, the Company, the Holders and the beneficial owners of the Notes agree to treat the

39

Notes as preferred stock of the Company and no party shall take any action inconsistent with such treatment unless required by law.

(b)  The Company shall provide to each Holder or beneficial owner, upon the written request of such Holder or beneficial owner, (i) all information that is required for U.S. federal income tax purposes (e.g., such Holder or beneficial owner's pro rata share of ordinary income and net capital gain) in order for a Holder or beneficial owner that is a "United States person" (within the meaning of Section 7701(a)(30) of the U.S. Internal Revenue Code of 1986, as amended (the "**Code**")) to make and maintain a "qualified electing fund" election (within the meaning of section 1295 of the Code) (a "**QEF Election**"), including a protective QEF Election, with respect to the Company and/or any subsidiary of the Company; and (ii) a "PFIC Annual Information Statement" as described in Treasury regulations section 1.1295–1 (or in any successor IRS release or Treasury regulation).

## ARTICLE 5
### LISTS OF HOLDERS AND REPORTS BY THE COMPANY AND THE TRUSTEE

Section 5.01.  *Lists of Holders.*  The Company covenants and agrees that it will furnish or cause to be furnished to the Trustee, semi-annually, not more than 10 days after each June 1 and December 1 in each year beginning with [•], and at such other times as the Trustee may request in writing, within 30 days after receipt by the Company of any such request (or such lesser time as the Trustee may reasonably request in order to enable it to timely provide any notice to be provided by it hereunder), a list in such form as the Trustee may reasonably require of the names and addresses of the Holders as of a date not more than 15 days (or such other date as the Trustee may reasonably request in order to so provide any such notices) prior to the time such information is furnished, except that no such list need be furnished so long as the Trustee is acting as Note Registrar.

Section 5.02.  *Preservation and Disclosure of Lists.*  The Trustee shall preserve, in as current a form as is reasonably practicable, all information as to the names and addresses of the Holders contained in the most recent list furnished to it as provided in Section 5.01 or maintained by the Trustee in its capacity as Note Registrar, if so acting.  The Trustee may destroy any list furnished to it as provided in Section 5.01 upon receipt of a new list so furnished.

## ARTICLE 6
### DEFAULTS AND REMEDIES

Section 6.01.  *Events of Default.*  Each of the following events shall be an "**Event of Default**" with respect to the Notes:

(a)      failure to increase the principal amount of the Notes by the amount of the applicable interest when the same becomes due;

(b)      default in the payment of principal, Additional Amounts, if any, premiums, if any, of the Notes when due and payable at its stated maturity, upon mandatory redemption, upon declaration of acceleration or otherwise;

40

(c)     conversion of the Notes not occurring automatically with effect on the Conversion Date upon the occurrence of any of the Conversion Events in accordance with Section 13.01;

(d)     default in the payment of any other debt obligation (including under the Take-back SSNs and the Super Priority Notes, provided that the Holders have waived a Conversion Event triggered by such payment default as established in Article 13) after expiration of any applicable grace period;

(e)     any other Event of Default (as defined under the Senior Notes Indenture) (other than a payment default) under the Senior Notes Indenture;

(f)     failure of the Note Guarantees and/or the Liens on the Collateral to be in full force and effect;

(g)     the Company's or a Guarantor's failure to comply with any of the covenants under this Indenture and such Default continues uncured for five (5) or more days from the earlier of (i) the date a Responsible Officer of the Company obtains actual knowledge thereof and (ii) notice from the Trustee or of Holders of at least 25% of the aggregate principal amount of Notes then outstanding (with a copy to the Trustee, if such notice is sent by the Holders);

(h)     one or more final judgments, decrees or orders of any court, tribunal, arbitration, administrative or other governmental body or similar entity, which is not subject to appeal, for the payment of money is rendered against the Company or any of the Guarantors or any of their respective Properties in an aggregate amount in excess of US$5.0 million (excluding the amount thereof covered by insurance or a performance or similar bond) and such judgment, decree or order remains unvacated, undischarged and unstayed for more than sixty (60) days, except while being contested in good faith by appropriate proceedings;

(i)     if an Insolvency Proceeding with respect to the Company or any Guarantor occurs;

(j)     an uninsured casualty, loss or damage or any condemnation, nationalization or expropriation event with respect to the Company or any Guarantor occurs; and

(k)     with respect to a Project of the Guarantors, an Event of Abandonment has occurred.

Section 6.02.   *Acceleration; Rescission and Annulment*.  If one or more Events of Default shall have occurred and be continuing (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body), then, and in each and every such case (other than an Event of Default specified in Section 6.01(i) with respect to the Company or any of its subsidiaries), unless the principal of all of the Notes shall have already become due and payable, either the Trustee or the Holders of at least 25% in principal amount of the outstanding Notes by written notice to the Company and the Trustee (if given by the Holders), may declare 100% of the principal of and accrued interest on all the Notes to be due and payable immediately, and upon such declaration the same shall become and shall automatically be immediately due and payable, anything contained in this Indenture or in the Notes to the contrary notwithstanding. In case of the events

41

described in Section 6.01(i) above involving the Company or a Guarantor, 100% of the principal of and accrued interest on the Notes will automatically become due and payable.

        If any portion of the amount payable on the Notes upon acceleration is considered by a court to be unearned interest (through the allocation of the value of the instrument to the embedded warrant or otherwise), the court could disallow recovery of any such portion.

        The holders of a majority of the outstanding principal amount of the Notes may waive all past defaults (except with respect to nonpayment of principal or interest) and rescind any such acceleration with respect to the Notes and its consequences if (i) rescission would not conflict with any judgment or decree of a court of competent jurisdiction and (ii) all existing events of default, other than the nonpayment of the principal of and interest on the Notes that have become due solely by such declaration of acceleration, have been cured or waived.

        Section 6.03.  *Payments of Notes on Default; Suit Therefor.*  If an Event of Default described in Section 6.01(b) shall have occurred and be continuing, the Company shall, upon demand of the Trustee, pay to the Trustee, for the benefit of the Holders of the Notes, the whole amount then due and payable on the Notes for principal and interest, if any, with Default Interest on any overdue principal and interest, if any, at the rate borne by the Notes at such time and, in addition thereto, such further amount as shall be sufficient to cover any amounts due to the Trustee under Section 7.06.  If the Company shall fail to pay such amounts forthwith upon such demand, the Trustee, in its own name and as trustee of an express trust, may institute a judicial proceeding for the collection of the sums so due and unpaid, may prosecute such proceeding to judgment or final decree and may enforce the same against the Company or any other obligor upon the Notes and collect the moneys adjudged or decreed to be payable in the manner provided by law out of the property of the Company or any other obligor upon the Notes, wherever situated.

        In the event there shall be pending proceedings for the bankruptcy or for the reorganization of the Company or any other obligor on the Notes under Title 11 of the United States Code, or any other applicable law, or in case a receiver, assignee or trustee in bankruptcy or reorganization, liquidator, sequestrator or similar official shall have been appointed for or taken possession of the Company or such other obligor, the property of the Company or such other obligor, or in the event of any other judicial proceedings relative to the Company or such other obligor upon the Notes, or to the creditors or property of the Company or such other obligor, the Trustee, irrespective of whether the principal of the Notes shall then be due and payable as therein expressed or by declaration or otherwise and irrespective of whether the Trustee shall have made any demand pursuant to the provisions of this Section 6.03, shall be entitled and empowered, by intervention in such proceedings or otherwise, to file and prove a claim or claims for the whole amount of principal and accrued and unpaid interest, if any, in respect of the Notes, and, in case of any judicial proceedings, to file such proofs of claim and other papers or documents and to take such other actions as it may deem necessary or advisable in order to have the claims of the Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel) and of the Holders allowed in such judicial proceedings relative to the Company or any other obligor on the Notes, its or their creditors, or its or their property, and to collect and receive any monies or other

42

property payable or deliverable on any such claims, and to distribute the same after the deduction of any amounts due to the Trustee under this Indenture; and any receiver, assignee or trustee in bankruptcy or reorganization, liquidator, custodian or similar official is hereby authorized by each of the Holders to make such payments to the Trustee, as administrative expenses, and, in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due it for reasonable compensation, expenses, advances and disbursements, including agents and counsel fees, and including any other amounts due to the Trustee under this Indenture, incurred by it up to the date of such distribution. To the extent that such payment of reasonable compensation, expenses, advances and disbursements out of the estate in any such proceedings shall be denied for any reason, payment of the same shall be secured by a lien on, and shall be paid out of, any and all distributions, dividends, monies, securities and other property that the Holders of the Notes may be entitled to receive in such proceedings, whether in liquidation or under any plan of reorganization or arrangement or otherwise.

Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting such Holder or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

All rights of action and of asserting claims under this Indenture, or under any of the Notes, may be enforced by the Trustee without the possession of any of the Notes, or the production thereof at any trial or other proceeding relative thereto, and any such suit or proceeding instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment shall, after provision for the payment of the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, be for the ratable benefit of the Holders of the Notes.

In any proceedings brought by the Trustee (and in any proceedings involving the interpretation of any provision of this Indenture to which the Trustee shall be a party) the Trustee shall be held to represent all the Holders of the Notes, and it shall not be necessary to make any Holders of the Notes parties to any such proceedings.

In case the Trustee shall have proceeded to enforce any right under this Indenture and such proceedings shall have been discontinued or abandoned because of any waiver pursuant to Section 6.08 or any rescission and annulment pursuant to Section 6.02 or for any other reason or shall have been determined adversely to the Trustee, then and in every such case the Company, the Holders and the Trustee shall, subject to any determination in such proceeding, be restored respectively to their several positions and rights hereunder, and all rights, remedies and powers of the Company, the Holders and the Trustee shall continue as though no such proceeding had been instituted.

Section 6.04.  *Application of Monies Collected by Trustee.*  Any monies or property collected by the Trustee pursuant to this Article 6 with respect to the Notes shall be applied in the following order, at the date or dates fixed by the Trustee for the distribution of such monies,

43

upon presentation of the several Notes, and stamping thereon the payment, if only partially paid, and upon surrender thereof, if fully paid:

**First**, to the payment of all amounts due the Trustee under this Indenture or the other Indenture Documents;

**Second**, in case the principal of the outstanding Notes shall have become due, by declaration, mandatory redemption or otherwise, and be unpaid, including any capitalized interest, then to the payment of such principal without preference or priority of any Note over any other Note, ratably to the aggregate of such principal, plus all accrued and unpaid interest (if any); and

**Third**, to the payment of the remainder, if any, to the Company.

Section 6.05.  *Proceedings by Holders and Trustee.*  Each Holder shall have the right to receive payment or delivery, as the case may be, of:

· the principal (including capitalized interest) of,

· accrued and unpaid interest, if any, on, and

· the accrued and unpaid Default Interest, if any, on

its Notes, on or after the respective due dates expressed or provided for in this Indenture, or to institute suit for the enforcement of any such payment or delivery, as the case may be.

The Trustee will be under no obligation to exercise any of the rights or powers under the Indenture at the request or direction of any of the Holders unless such holders have offered to the Trustee indemnity or security satisfactory to the Trustee against any loss, cost, liability or expense. Except to enforce the right to receive payment of principal or interest when due, or the right to receive delivery of the consideration due upon conversion, no Holder may pursue any remedy with respect to this Indenture, the Notes or the Collateral unless:

(1)       such Holder has previously given the Trustee written notice that an Event of Default is continuing;

(2)       Holders of at least 50% (fifty percent) of the outstanding principal amount of the Notes have requested the Trustee to pursue the remedy;

(3)       such Holders have offered the Trustee security or indemnity reasonably satisfactory to it against any loss, liability, cost or expense;

(4)       the Trustee has not complied with such request within 10 days after the receipt of the request and the offer of such security or indemnity; and

(5)       the Holders of a majority of the outstanding principal amount of the Notes have not given the Trustee a direction that is contrary to such request within

44

such 10-day period.

As set forth in Section 7.01, if an Event of Default has occurred and is continuing of which a Responsible Officer of the Trustee has actual knowledge, the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise that a prudent person would exercise or use under the same circumstances in the conduct of its own affairs. The Trustee, however, may refuse to follow any direction that conflicts with law or the Indenture or that the Trustee determines is unduly prejudicial to the rights of any other Holder (provided, however, that the Trustee shall not have an affirmative duty to determine whether such direction is unduly prejudicial to any other Holder) or that would involve the Trustee in personal liability. Prior to taking any action under the Indenture, the Trustee will be entitled to indemnification or security satisfactory to it against any loss, liability, cost or expense caused by taking or not taking such action.

Payments of the mandatory redemption price, principal and interest that are not made when due will accrue interest per annum at the then-applicable interest rate from the required payment date.

In case of an Event of Default, the Trustee may in its discretion proceed to protect and enforce the rights vested in it by this Indenture by such appropriate judicial proceedings as are necessary to protect and enforce any of such rights, either by suit in equity or by action at law or by proceeding in bankruptcy or otherwise, whether for the specific enforcement of any covenant or agreement contained in this Indenture or in aid of the exercise of any power granted in this Indenture, or to enforce any other legal or equitable right vested in the Trustee by this Indenture or by law.

Section 6.06.  *Remedies Cumulative and Continuing.*  Except as provided in the last paragraph of Section 2.06, all powers and remedies given by this Article 6 to the Trustee or to the Holders shall, to the extent permitted by law, be deemed cumulative and not exclusive of any thereof or of any other powers and remedies available to the Trustee or the Holders of the Notes, by judicial proceedings or otherwise, to enforce the performance or observance of the covenants and agreements contained in this Indenture, and no delay or omission of the Trustee or of any Holder of any of the Notes to exercise any right or power accruing upon any Default or Event of Default shall impair any such right or power, or shall be construed to be a waiver of any such Default or Event of Default or any acquiescence therein; and, subject to the provisions of Section 6.05, every power and remedy given by this Article 6 or by law to the Trustee or to the Holders may be exercised from time to time, and as often as shall be deemed expedient, by the Trustee or by the Holders.

Section 6.07.  *Undertaking to Pay Costs.*  All parties to this Indenture agree, and each Holder of any Note by its acceptance thereof shall be deemed to have agreed, that any court may, in its discretion, require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Trustee for any action taken or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees and expenses, against any party litigant in such suit, having due regard to the merits and good faith of

45

the claims or defenses made by such party litigant; *provided* that the provisions of this Section 6.07 (to the extent permitted by law) shall not apply to any suit instituted by the Trustee, to any suit instituted by any Holder, or group of Holders, holding in the aggregate more than 10% in principal amount of the Notes at the time outstanding determined in accordance with Section 8.04, or to any suit instituted by any Holder for the enforcement of the payment of the principal of or accrued and unpaid interest, if any, on any Note on or after the due date expressed or provided for in such Note or to any suit for the enforcement of the right to convert any Note, or receive the consideration due upon conversion, in accordance with the provisions of Article 13.

Section 6.08.    *Direction of Proceedings and Waiver of Defaults by Majority of Holders.* The Holders of a majority of the aggregate principal amount of the Notes at the time outstanding determined in accordance with Section 8.04 shall have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on the Trustee with respect to the Notes; *provided*, *however*, that (a) such direction shall not be in conflict with any rule of law or with this Indenture, and (b) the Trustee may take any other action deemed proper by the Trustee that is not inconsistent with such direction.  The Trustee may refuse to follow any direction that it determines is unduly prejudicial to the rights of any other Holder or that would involve the Trustee in personal liability (it being understood that the Trustee shall not have an affirmative duty to ascertain whether or not any such direction is unduly prejudicial to any other Holder).  The Holders of a majority in aggregate principal amount of the Notes at the time outstanding determined in accordance with Section 8.04 may on behalf of the Holders of all of the Notes waive any past Default or Event of Default hereunder and its consequences except (i) a default in the payment of principal (including under a mandatory redemption, if applicable) of the Notes when due, (ii) a failure by the Company to deliver the consideration due upon conversion of the Notes or (iii) a default in respect of a covenant or provision hereof which under Article 9 cannot be modified or amended without the consent of each Holder of an outstanding Note affected.  Upon any such waiver the Company, the Trustee and the Holders of the Notes shall be restored to their former positions and rights hereunder; but no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereon.  Whenever any Default or Event of Default hereunder shall have been waived as permitted by this Section 6.08, said Default or Event of Default shall for all purposes of the Notes and this Indenture be deemed to have been cured and to be not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereon.

Section 6.09.    *Notice of Defaults.*  The Trustee shall, within 90 days after the occurrence and continuance of a Default of which a Responsible Officer of the Trustee has actual knowledge, deliver to all Holders notice of all Defaults known to a Responsible Officer of the Trustee, unless such Defaults shall have been cured or waived before the giving of such notice; *provided* that, except in the case of a Default in the payment of the principal of (including under a mandatory redemption, if applicable), or a Default in the delivery of the consideration due upon conversion, the Trustee shall be protected in withholding such notice if and so long as the Trustee in good faith determines that the withholding of such notice is in the interests of the Holders.

## ARTICLE 7
### CONCERNING THE TRUSTEE

Section 7.01. *Duties and Responsibilities of Trustee.*  The Trustee, prior to the occurrence of an Event of Default and after the curing or waiver of all Events of Default that may have occurred, undertakes to perform such duties and only such duties as are specifically set forth in this Indenture.  In the event an Event of Default has occurred and is continuing of which a Responsible Officer of the Trustee has actual knowledge, the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

No provision of this Indenture shall be construed to relieve the Trustee from liability for its own grossly negligent action, its own grossly negligent failure to act or its own willful misconduct, except that:

(a)     prior to the occurrence of an Event of Default and after the curing or waiving of all Events of Default that may have occurred:

(i)     the duties and obligations of the Trustee shall be determined solely by the express provisions of this Indenture, and the Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Indenture and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(ii)     in the absence of gross negligence and willful misconduct on the part of the Trustee, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; but, in the case of any such certificates or opinions that by any provisions hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy of any mathematical calculations or other facts stated therein);

(b)     the Trustee shall not be liable for any action taken or any error of judgment made in good faith by a Responsible Officer of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts;

(c)     the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Holders of not less than a majority of the aggregate principal amount of the Notes at the time outstanding determined as provided in Section 8.04 relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture;

47

(d)     whether or not therein provided, every provision of this Indenture, the Security Documents and the Indenture Documents relating to the conduct or affecting the liability of, or affording protection to, the Trustee shall be subject to the provisions of this Section and Section 7.02;

(e)     the Trustee shall not be liable in respect of any payment (as to the correctness of amount, entitlement to receive or any other matters relating to payment) or notice effected by the Company or any Paying Agent or any records maintained by any co-Note Registrar with respect to the Notes;

(f)     if any party fails to deliver a notice relating to an event the fact of which, pursuant to this Indenture, requires notice to be sent to the Trustee, the Trustee may conclusively rely on its failure to receive such notice as reason to act as if no such event occurred, unless a Responsible Officer of the Trustee had actual knowledge of such event;

(g)     in the absence of written investment direction from the Company, all cash received by the Trustee shall be placed in a non-interest bearing trust account, and in no event shall the Trustee be liable for the selection of investments or for investment losses incurred thereon or for losses incurred as a result of the liquidation of any such investment prior to its maturity date or the failure of the party directing such investments prior to its maturity date or the failure of the party directing such investment to provide timely written investment direction, and the Trustee shall have no obligation to invest or reinvest any amounts held hereunder in the absence of such written investment direction from the Company; and

(h)     in the event that the Trustee is also acting as Custodian, Note Registrar, Paying Agent, Conversion Agent, or transfer agent hereunder, the rights, benefits, indemnities, immunities and protections afforded to the Trustee pursuant to this Article 7 shall also be afforded to such Custodian, Note Registrar, Paying Agent, Conversion Agent, or transfer agent and the Trustee shall be entitled to all of the rights, benefits, protections, immunities and indemnities hereunder or under any Security Document in acting hereunder or thereunder.

None of the provisions contained in this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur personal financial liability in the performance of any of its duties or in the exercise of any of its rights or powers.

Section 7.02.   *Reliance on Documents, Opinions, Etc.*  Except as otherwise provided in Section 7.01:

(a)     the Trustee may conclusively rely and shall be fully protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, note, coupon or other paper or document (whether in its original or facsimile form) believed by it in good faith to be genuine and to have been signed or presented by the proper party or parties;

(b)     any request, direction, order or demand of the Company mentioned herein shall be sufficiently evidenced by a Responsible Officer's Certificate (unless other evidence in respect

48

thereof be herein specifically prescribed); and any board resolution may be evidenced to the Trustee by a copy thereof certified by a Responsible Officer of the Company;

(c)    the Trustee may consult with counsel of its selection and require an Opinion of Counsel and any advice of such counsel or Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted by it hereunder in good faith and in accordance with such advice or Opinion of Counsel;

(d)    the Trustee will be under no obligation to exercise any of the rights or powers under this Indenture at the request or direction of any of the Holders unless such Holders have offered to the Trustee indemnity or security satisfactory to the Trustee against any cost, loss, liability or expense that might be incurred by it in compliance with such request or direction;

(e)    the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture or other paper or document, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Company, personally or by agent or attorney at the expense of the Company and shall incur no liability of any kind by reason of such inquiry or investigation;

(f)    the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents, custodians, nominees or attorneys and the Trustee shall not be responsible for any acts, omissions, misconduct or negligence on the part of any agent, custodian, nominee or attorney appointed by it with due care hereunder;

(g)    the permissive rights of the Trustee enumerated herein shall not be construed as duties;

(h)    the Trustee shall not be required to give any bond or surety in respect of the performance of its powers and duties hereunder;

(i)    the Trustee may request that the Company deliver a certificate setting forth the names of individuals and/or titles of directors and/or officers authorized at such time to take specified actions pursuant to this Indenture;

(j)    the Trustee shall not be liable for any action taken, suffered or omitted to be taken in good faith and reasonably believed by it to be authorized or within the discretion or rights or powers conferred upon it by the Indenture;

(k)    the Trustee (and the Conversion Agent, if other than the Trustee) shall not be obligated to take possession of any Common Stock, whether upon conversion or in connection with any discharge of this Indenture pursuant to Article 3 hereof;

(l)    the Trustee shall not incur any liability for not performing any act or fulfilling any duty, obligation or responsibility hereunder by reason of any occurrence beyond their control

49

(including but not limited to any act or provision of any present or future law or regulation or Governmental Authority, any act of God or war, civil unrest, local or national disturbance or disaster, any act of terrorism, epidemics, riots, strikes or other work stoppages or the unavailability of the Federal Reserve Bank wire or facsimile or other wire or communication facility);

(m)     The Trustee shall not be responsible for, nor chargeable with the knowledge of the or terms and conditions of any agreement, instrument or document to which it is not a party, whether or not an original or a copy of such agreement has been provided to the Trustee;

(n)     The Trustee shall have no obligation to give, execute, deliver, file, record, authorize or obtain any financing statements, notices, instruments, documents, agreements, consents or other papers as shall be necessary to (i) create, preserve, perfect or validate the security interest granted to the Trustee pursuant to this Indenture or the Share Pledge or (ii) enable the Trustee to exercise and enforce its rights under this Indenture or the Share Pledge with respect to such pledge and security interest.  In addition, the Trustee shall have no responsibility or liability (i) in connection with the acts or omissions of the Company in respect of the foregoing or (ii) for or with respect to the legality, validity and enforceability of any security interest created in the Collateral or the perfection and priority of such security interest;

(o)     The Trustee shall not be bound to make any investigation into (i) the performance of or compliance with any of the covenants or agreements set forth herein, (ii) the occurrence of any Default, or the validity, enforceability, effectiveness or genuineness of this Indenture or any other agreement, instrument, or document; and

(p)     The Trustee shall be under no obligation to effect or maintain insurance or to renew any policies of insurance or to inquire as to the sufficiency of any policies of insurance carried by the Company or any Guarantor, or to report, or make or file claims or proof of loss for, any loss or damage insured against or that may occur, or to keep itself informed or advised as to the payment of any Taxes or assessments, or to require any such payment to be made.

In no event shall the Trustee be liable for any consequential, punitive, special, incidental or indirect loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action. The Trustee shall not be charged with knowledge of any Default or Event of Default with respect to the Notes, unless either (1) a Responsible Officer shall have actual knowledge of such Default or Event of Default or (2) written notice of such Default or Event of Default shall have been given to the Trustee by the Company or by any Holder of the Notes at the Corporate Trust Office and such notice references the Notes and/or this Indenture and states that it is a notice of Default or Event of Default.

Section 7.03.   *No Responsibility for Recitals, Etc.*   The recitals contained herein and in the Notes (except in the Trustee's certificate of authentication), the Indenture Documents or the Security Documents shall be taken as the statements of the Company, and the Trustee assumes no responsibility for the correctness of the same.  The Trustee makes no representations as to the validity or sufficiency of this Indenture or of the Notes.  The Trustee shall not be accountable for the use or application by the Company of any Notes or the proceeds of any Notes authenticated

50

and delivered by the Trustee in conformity with the provisions of this Indenture or any money paid to the Company or upon the Company's direction under any provision of this Indenture.

Section 7.04.    *Trustee, Paying Agents, Conversion Agents, or Note Registrar May Own Notes.*  The Trustee, any Paying Agent, any Conversion Agent (if other than the Company or any Affiliate thereof) or any Note Registrar, in its individual or any other capacity, may become the owner or pledgee of Notes with the same rights it would have if it were not the Trustee, Paying Agent, Conversion Agent, or Note Registrar.

Section 7.05.    *Monies to Be Held in Trust.*  All monies received by the Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received.  Money held by the Trustee in trust hereunder need not be segregated from other funds or property except to the extent required by law.  The Trustee shall be under no liability for interest on any money received by it hereunder except as may be agreed from time to time by the Company and the Trustee.

Section 7.06.    *Compensation and Expenses of Trustee.*  The Company covenants and agrees to pay to the Trustee, from time to time, and the Trustee shall be entitled to, compensation for all services rendered by it hereunder in any capacity (which shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust) as mutually agreed to in writing between the Trustee and the Company, and the Company will pay or reimburse the Trustee upon its request for all reasonable expenses, disbursements and advances reasonably incurred or made by the Trustee in accordance with any of the provisions of this Indenture or any Security Document in any capacity thereunder (including the reasonable compensation and the expenses and disbursements of its agents and counsel and of all Persons not regularly in its employ) except any such expense, disbursement or advance as shall have been caused by its gross negligence, willful misconduct or bad faith.  The Company also covenants to indemnify the Trustee in any capacity under this Indenture and any other document or transaction entered into in connection herewith and its officers, directors, attorneys, employees and agents and any authenticating agent for, and to hold them harmless against, any loss, claim (whether asserted by the Company, a Holder or any other Person), suit or proceeding at law or in equity, action, damage, liability, fee, tax or expense (including reasonable and documented attorneys' fees) incurred without gross negligence, willful misconduct or bad faith on the part of the Trustee, its officers, attorneys, directors, agents or employees, or such agent or authenticating agent, as the case may be, and arising out of or in connection with the acceptance or administration of this Indenture or in any other capacity hereunder, including, without limitation, the costs and expenses of defending themselves against any claim of liability in the premises (including attorneys' fees) or enforcing this indemnity.  The obligations of the Company under this Section 7.06 to compensate or indemnify the Trustee and to pay or reimburse the Trustee for expenses, disbursements and advances shall be secured by a senior lien to which the Notes are hereby made subordinate on all money or property held or collected by the Trustee, except, subject to the effect of Section 6.04, funds held in trust herewith for the benefit of the Holders of particular Notes.  The Trustee's right to receive payment of any amounts due under this Section 7.06 shall not be subordinate to any other liability or indebtedness of the Company.  The obligation of the Company under this Section 7.06 shall survive the satisfaction and discharge of this Indenture, the payment of the Notes and the earlier resignation or removal of the Trustee.

51

The Company need not pay for any settlement made without its consent, which consent shall not be unreasonably withheld. The indemnification and reimbursement provided in this Section 7.06 shall extend to the officers, attorneys, directors, agents and employees of the Trustee.

Without prejudice to any other rights available to the Trustee under applicable law, when the Trustee and its agents and any authenticating agent incur expenses or render services after an Event of Default specified in Section 6.01(i) occurs, the expenses and the compensation for the services are intended to constitute expenses of administration under any bankruptcy, insolvency or similar laws.

Section 7.07. *Responsible Officer's Certificate as Evidence.* Except as otherwise provided in Section 7.01, whenever in the administration of the provisions of this Indenture the Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking or omitting any action hereunder, such matter (unless other evidence in respect thereof be herein specifically prescribed) may, in the absence of gross negligence, willful misconduct, and bad faith on the part of the Trustee, be deemed to be conclusively proved and established by an Responsible Officer's Certificate delivered to the Trustee, and such Responsible Officer's Certificate, in the absence of gross negligence, willful misconduct, and bad faith on the part of the Trustee, shall be full warrant to the Trustee for any action taken or omitted by it under the provisions of this Indenture upon the faith thereof.

Section 7.08. *Eligibility of Trustee.* There shall at all times be a Trustee hereunder which shall be a Person that is eligible pursuant to the Trust Indenture Act (as if the Trust Indenture Act were applicable hereto) to act as such and has a combined capital and surplus of at least $50,000,000. If such Person publishes reports of condition at least annually, pursuant to law or to the requirements of any supervising or examining authority, then for the purposes of this Section, the combined capital and surplus of such Person shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section, it shall resign immediately in the manner and with the effect hereinafter specified in this Article.

Section 7.09. *Resignation or Removal of Trustee.* (a) The Trustee may at any time resign by giving written notice of such resignation to the Company and by delivering notice thereof to the Holders. Upon receiving such notice of resignation, the Company shall promptly appoint a successor trustee by written instrument, in duplicate, executed by order of the Board of Directors, one copy of which instrument shall be delivered to the resigning Trustee and one copy to the successor trustee. If no successor trustee shall have been so appointed and have accepted appointment within 60 days after the giving of such notice of resignation to the Holders, the resigning Trustee may, upon ten Business Days' notice to the Company and the Holders and at the expense of the Company, petition any court of competent jurisdiction for the appointment of a successor trustee, or any Holder who has been a bona fide holder of a Note or Notes for at least six months (or since the date of this Indenture) may, on behalf of himself or herself and all others similarly situated, petition any such court for the appointment of a successor trustee. Such court may thereupon, after such notice, if any, as it may deem proper and prescribe, appoint a successor trustee.

(b)      In case at any time any of the following shall occur:

(i)      the Trustee shall cease to be eligible in accordance with the provisions of Section 7.08 and shall fail to resign after written request therefor by the Company or by any such Holder, or

(ii)      the Trustee shall become incapable of acting, or shall be adjudged a bankrupt or insolvent, or a receiver of the Trustee or of its property shall be appointed, or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation,

then, in either case, the Company may by a board resolution remove the Trustee and appoint a successor trustee by written instrument, in duplicate, executed by order of the Board of Directors, one copy of which instrument shall be delivered to the Trustee so removed and one copy to the successor trustee, or any Holder who has been a bona fide holder of a Note or Notes for at least six months (or since the date of this Indenture) may, on behalf of himself or herself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor trustee. Such court may thereupon, after such notice, if any, as it may deem proper and prescribe, remove the Trustee and appoint a successor trustee.

(c)      The Holders of a majority in aggregate principal amount of the Notes at the time outstanding, as determined in accordance with Section 8.04, may at any time upon thirty (30) days' prior notice to the Trustee, remove the Trustee and nominate a successor trustee that shall be deemed appointed as successor trustee unless within ten days after notice to the Company of such nomination the Company objects thereto, in which case the Trustee so removed or any Holder, upon the terms and conditions and otherwise as in Section 7.09(a) provided, may petition any court of competent jurisdiction for an appointment of a successor trustee.

(d)      Any resignation or removal of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section 7.09 shall become effective upon acceptance of appointment by the successor trustee as provided in Section 7.10.

Section 7.10.      *Acceptance by Successor Trustee.*  Any successor trustee appointed as provided in Section 7.09 shall execute, acknowledge and deliver to the Company and to its predecessor trustee an instrument accepting such appointment hereunder, and thereupon the resignation or removal of the predecessor trustee shall become effective and such successor trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, duties and obligations of its predecessor hereunder, with like effect as if originally named as Trustee herein; but, nevertheless, on the written request of the Company or of the successor trustee, the trustee ceasing to act shall, upon payment of any amounts then due it pursuant to the provisions of Section 7.06, execute and deliver an instrument transferring to such successor trustee all the rights and powers of the trustee so ceasing to act.  Upon request of any such successor trustee, the Company shall execute any and all instruments in writing for more fully and certainly vesting in and confirming to such successor trustee all such rights and powers. Any trustee ceasing to act shall, nevertheless, retain a senior lien to which the Notes are hereby made subordinate on all money or property held or collected by such trustee as such, except for

53

funds held in trust for the benefit of Holders of particular Notes, to secure any amounts then due it pursuant to the provisions of Section 7.06.

No successor trustee shall accept appointment as provided in this Section 7.10 unless at the time of such acceptance such successor trustee shall be eligible under the provisions of Section 7.08.

Upon acceptance of appointment by a successor trustee as provided in this Section 7.10, each of the Company and the successor trustee, at the written direction and at the expense of the Company shall deliver or cause to be delivered notice of the succession of such trustee hereunder to the Holders.  If the Company fails to deliver such notice within ten days after acceptance of appointment by the successor trustee, the successor trustee shall cause such notice to be delivered at the expense of the Company.

Section 7.11.  *Succession by Merger, Etc.*  Any corporation or other entity into which the Trustee may be merged or converted or with which it may be sold or consolidated, or any corporation or other entity resulting from any merger, conversion, sale or consolidation to which the Trustee shall be a party, or any corporation or other entity succeeding to all or substantially all of the corporate trust business of the Trustee (including the administration of this Indenture), shall be the successor to the Trustee hereunder without the execution or filing of any paper or any further act on the part of any of the parties hereto; *provided* that in the case of any corporation or other entity succeeding to all or substantially all of the corporate trust business of the Trustee such corporation or other entity shall be eligible under the provisions of Section 7.08.

In case at the time such successor to the Trustee shall succeed to the trusts created by this Indenture, any of the Notes shall have been authenticated but not delivered, any such successor to the Trustee may adopt the certificate of authentication of any predecessor trustee or authenticating agent appointed by such predecessor trustee, and deliver such Notes so authenticated; and in case at that time any of the Notes shall not have been authenticated, any successor to the Trustee or an authenticating agent appointed by such successor trustee may authenticate such Notes either in the name of any predecessor trustee hereunder or in the name of the successor trustee; and in all such cases such certificates shall have the full force which it is anywhere in the Notes or in this Indenture provided that the certificate of the Trustee shall have; *provided*, *however*, that the right to adopt the certificate of authentication of any predecessor trustee or to authenticate Notes in the name of any predecessor trustee shall apply only to its successor or successors by merger, conversion or consolidation.

Section 7.12.  *Trustee's Application for Instructions from the Company.*  Any application by the Trustee for written instructions from the Company (other than with regard to any action proposed to be taken or omitted to be taken by the Trustee that affects the rights of the Holders of the Notes under this Indenture) may, at the option of the Trustee, set forth in writing any action proposed to be taken or omitted by the Trustee under this Indenture and the date on and/or after which such action shall be taken or such omission shall be effective.  The Trustee shall not be liable for any action taken by, or omission of, the Trustee in accordance with a proposal included in such application on or after the date specified in such application (which date shall not be less than three Business Days after the date that notice is deemed to be received pursuant

54

to Section 16.02, unless any such officer shall have consented in writing to any earlier date), unless, prior to taking any such action (or the effective date in the case of any omission), the Trustee shall have received written instructions in accordance with this Indenture in response to such application specifying the action to be taken or omitted.

Section 7.13.   *Voting by Beneficial Owners.*  Notwithstanding anything else in this Indenture to the contrary, with respect to any Global Note held through the Depositary (or a nominee thereof), each Person holding a beneficial interest in such Global Note may be considered to be a noteholder of its portion of the Notes for purposes of voting on the matter relating thereto (for example, such Person may consent to any waiver or amendment directly without requiring the participation of the applicable clearing system or its nominee and may attend and vote at meetings of noteholders); it being understood that the Trustee must have received from (or on behalf of) such Person evidence satisfactory to the Trustee (in its sole discretion) that such Person holds the beneficial interests in such Global Note that it purports to vote, and such evidence of ownership may include a beneficial ownership certification, medallion guarantees, a securities position or participant list or other information obtained from the applicable clearing system, or such other information the Trustee deems satisfactory.  The Trustee shall have no liability to the extent it has acted in good faith on any such consent, waiver, direction, instruction or other vote from any such Person or for the sufficiency of the evidence deemed satisfactory to the Trustee.

## ARTICLE 8
### CONCERNING THE HOLDERS

Section 8.01.   *Action by Holders.*  Whenever in this Indenture it is provided that the Holders of a specified percentage of the aggregate principal amount of the Notes may take any action (including the making of any demand or request, the giving of any notice, consent or waiver or the taking of any other action), the fact that at the time of taking any such action, the Holders of such specified percentage have joined therein may be evidenced by any instrument or any number of instruments of similar tenor executed by Holders in person or by agent or proxy appointed in writing.  Whenever the Company or the Trustee solicits the taking of any action by the Holders of the Notes, the Company or the Trustee may, but shall not be required to, fix in advance of such solicitation, a date as the record date for determining Holders entitled to take such action.  The record date if one is selected shall be not more than fifteen days prior to the date of commencement of solicitation of such action.

Section 8.02.   *Proof of Execution by Holders.*  Subject to the provisions of Section 7.01 and Section 7.02, proof of the execution of any instrument by a Holder or its agent or proxy shall be sufficient if made in accordance with such reasonable rules and regulations as may be prescribed by the Trustee or in such manner as shall be satisfactory to the Trustee.  The holding of Notes shall be proved by the Note Register or by a certificate of the Note Registrar.

Section 8.03.   *Who Are Deemed Absolute Owners.*  The Company, the Trustee, any authenticating agent, any Paying Agent, any Conversion Agent and any Note Registrar may deem the Person in whose name a Note shall be registered upon the Note Register to be, and may treat it as, the absolute owner of such Note (whether or not such Note shall be overdue and

55

notwithstanding any notation of ownership or other writing thereon made by any Person other than the Company or any Note Registrar) for the purpose of receiving payment of or on account of the principal (including under a mandatory redemption, if applicable) of and (subject to Section 2.03) accrued interest on such Note, for conversion of such Note and for all other purposes; and neither the Company nor the Trustee nor any Paying Agent nor any Conversion Agent nor any Note Registrar shall be affected by any notice to the contrary. The sole registered Holder of a Global Note shall be the Depositary or its nominee. All such payments or deliveries so made to any Holder for the time being, or upon its order, shall be valid, and, to the extent of the sums or shares of Common Stock so paid or delivered, effectual to satisfy and discharge the liability for monies payable or shares deliverable upon any such Note. The rights of beneficial owners in any Global Note may be exercised only through the Depositary subject to its applicable procedures. Notwithstanding anything to the contrary in this Indenture or the Notes following an Event of Default, any holder of a beneficial interest in a Global Note may directly enforce against the Company, without the consent, solicitation, proxy, authorization or any other action of the Depositary or any other Person, such holder's right to exchange such beneficial interest for a Note in certificated form in accordance with the provisions of this Indenture.

Section 8.04.  *Company-Owned Notes Disregarded.*  In determining whether the Holders of the requisite aggregate principal amount of Notes have concurred in any direction, consent, waiver or other action under this Indenture or the Sales Facilitation Agreement, Notes that are owned by the Company, by any Subsidiary thereof or by any Affiliate of the Company or any subsidiary thereof shall be disregarded and deemed not to be outstanding for the purpose of any such determination; *provided* that for the purposes of determining whether the Trustee shall be protected in relying on any such direction, consent, waiver or other action only Notes that a Responsible Officer actually knows are so owned shall be so disregarded.  Notes so owned that have been pledged in good faith may be regarded as outstanding for the purposes of this Section 8.04 if the pledgee shall establish to the satisfaction of the Trustee the pledgee's right to so act with respect to such Notes and that the pledgee is not the Company, a subsidiary thereof or an Affiliate of the Company or a Subsidiary thereof.  In the case of a dispute as to such right, any decision by the Trustee taken upon the advice of counsel shall be full protection to the Trustee. Upon request of the Trustee, the Company shall furnish to the Trustee promptly a Responsible Officer's Certificate listing and identifying all Notes, if any, known by the Company to be owned or held by or for the account of any of the above described Persons; and, subject to Section 7.01, the Trustee shall be entitled to accept such Responsible Officer's Certificate as conclusive evidence of the facts therein set forth and of the fact that all Notes not listed therein are outstanding for the purpose of any such determination.

Section 8.05.  *Revocation of Consents; Future Holders Bound.*  At any time prior to (but not after) the evidencing to the Trustee, as provided in Section 8.01, of the taking of any action by the Holders of the percentage of the aggregate principal amount of the Notes specified in this Indenture in connection with such action, any Holder of a Note that is shown by the evidence to be included in the Notes the Holders of which have consented to such action may, by filing written notice with the Trustee at its Corporate Trust Office and upon proof of holding as provided in Section 8.02, revoke such action so far as concerns such Note. Except as aforesaid, any such action taken by the Holder of any Note shall be conclusive and binding upon such Holder and upon all future Holders and owners of such Note and of any Notes issued in

56

exchange or substitution therefor or upon registration of transfer thereof, irrespective of whether any notation in regard thereto is made upon such Note or any Note issued in exchange or substitution therefor or upon registration of transfer thereof.

Section 8.06. *Instructions in connection with the Sales Facilitation Agreement*. Holders of a majority of the outstanding principal amount of the Notes may also instruct at any time the Trustee to enforce any right or in general undertake any action on behalf of the Holders under the Sales Facilitation Agreement, and the Trustee will be obliged to comply with such instruction, except for the limitations set forth in Sections 6.08, 7.01 and 7.02. All the provisions set forth in this Article 8 will be applicable to any such instruction sent to the Trustee in connection with the Sales Facilitation Agreement.

ARTICLE 9
SUPPLEMENTAL INDENTURES

Section 9.01. *Supplemental Indentures Without Consent of Holders.* Without notice to or consent of any Holder, the Company, when authorized by the resolutions of the Board of Directors, the Guarantors, the Trustee, and the Collateral Agent, as applicable, at the Company's expense, may from time to time and at any time enter into an indenture or indentures supplemental hereto or amendments to the Security Documents for one or more of the following purposes:

(a)     to cure any ambiguity, omission, defect or inconsistency;

(b)     to add guarantees with respect to the Notes;

(c)     to add to the covenants or Events of Default for the benefit of the Holders or surrender any right or power conferred upon the Company;

(d)     to make any change that does not adversely affect the rights of any Holder;

(e)     to comply with the rules of any applicable Depositary, including DTC, so long as such amendment does not adversely affect the rights of any Holder in any material respect; or

(f)     to appoint a successor trustee or trustees, collateral agents or other agents, with respect to the Notes.

Upon the written request of the Company, the Trustee, the Collateral Agent, if applicable, and each Guarantor is hereby authorized to join with the Company in the execution of any such supplemental indenture or amendment, to make any further appropriate agreements and stipulations that may be therein contained, but neither the Trustee nor the Collateral Agent shall be obligated to, but may in its discretion, enter into any supplemental indenture or amendment that affects the Trustee's or the Collateral Agent's, as applicable, own rights, duties, liabilities, indemnities or immunities under this Indenture or otherwise.

Any supplemental indenture or amendment authorized by the provisions of this Section 9.01 may be executed by the Company, the Guarantors, the Trustee and the Collateral Agent, if

applicable, without the consent of the Holders of any of the Notes at the time outstanding, notwithstanding any of the provisions of Section 9.02.

Section 9.02.   *Supplemental Indentures with Consent of Holders.* Subject to the exceptions described below, the Company, when authorized by the resolutions of its Board of Directors, the Guarantors, the Trustee and the Collateral Agent, if applicable, at the Company's expense, may from time to time and at any time enter into an indenture or indentures supplemental hereto or amendments to the Security Documents for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Indenture or any supplemental indenture with the consent (evidenced as provided in Article 8) of the Holders of at least a majority of the aggregate principal amount of the Notes then outstanding (determined in accordance with Article 8 and including, without limitation, consents obtained in connection with a repurchase of, or tender or exchange offer for, Notes).

Despite the aforementioned, without the consent of each Holder of an outstanding Note affected, no such supplemental indenture shall:

(a)     modify or change any provision of the Indenture regarding the conversion terms of the Notes or affecting the conversion rights of the Holders, *provided however* that, as established in Article 13, prior to the occurrence of any Conversion Event, Holders of a majority of the outstanding principal amount of the Notes can waive or amend an event that would otherwise give rise to a conversion, following the procedure described therein;

(b)     change any principal or interest payment date, change the principal amount of the Notes or the interest payable, or any premium paid in connection therewith, or change the place of payment where, or the coin or currency in which, any Notes or the interest thereon is payable, or impair the right to receive any principal payment on such Notes, on or after the Stated Maturity thereof, or to institute suit for the enforcement of any such payment;

(c)     make any change in the percentage of the principal outstanding amount of Notes required for amendments or waivers;

(d)     reduce the amount payable upon the mandatory redemption of any Note or the times at which any Note is to be redeemed or, once notice of redemption has been given, the time at which it must thereupon be redeemed;

(e)     modify or change any provision of the Indenture affecting the ranking of the Notes in a manner adverse to such Holder;

(f)     after the time an offer to purchase is required to have been made, reduce the purchase amount or purchase price, or extend the latest expiration date or purchase date thereunder; or

(g)     other than in accordance with the provisions of this Indenture, eliminate any existing Note Guarantee of the Notes or modify the terms of any Note Guarantee in a manner adverse to holders.

Consent of Holders of at least 75% in aggregate principal amount of the Notes then outstanding will be required to release all or any part of the Collateral from the Liens securing the Notes.

Upon the written request of the Company, and upon the filing with the Trustee and the Collateral Agent, as applicable, of evidence of the consent of the requisite Holders as aforesaid and subject to Section 9.05, the Trustee, the Collateral Agent, if applicable, and each Guarantor shall join with the Company in the execution of such supplemental indenture or amendment unless such supplemental indenture or amendment affects the Trustee's or the Collateral Agent's own rights, duties, liabilities, indemnities or immunities under this Indenture or otherwise, in which case the Trustee or the Collateral Agent, as applicable, may in its discretion, but shall not be obligated to, enter into such supplemental indenture.

Section 9.03.   *Effect of Supplemental Indentures.*   Upon the execution of any supplemental indenture pursuant to the provisions of this Article 9, this Indenture shall be and be deemed to be modified and amended in accordance therewith and the respective rights, limitation of rights, obligations, duties and immunities under this Indenture of the Trustee, the Collateral Agent, the Company, each Guarantor and the Holders shall thereafter be determined, exercised and enforced hereunder subject in all respects to such modifications and amendments and all the terms and conditions of any such supplemental indenture shall be and be deemed to be part of the terms and conditions of this Indenture for any and all purposes.

Section 9.04.   *Notation on Notes.*   Notes authenticated and delivered after the execution of any supplemental indenture pursuant to the provisions of this Article 9 may, at the Company's request and expense, bear a notation as to any matter provided for in such supplemental indenture.  If the Company or the Trustee shall so determine, new Notes so modified as to conform, in the opinion of the Trustee and the Company, to any modification of this Indenture contained in any such supplemental indenture may, at the Company's expense, be prepared and executed by the Company, authenticated, upon receipt of a Company Order, by the Trustee (or an authenticating agent duly appointed by the Trustee pursuant to Section 16.08) and delivered in exchange for the Notes then outstanding, upon surrender of such Notes then outstanding.

Section 9.05.   *Evidence of Compliance of Supplemental Indenture to Be Furnished to Trustee and the Collateral Agent.*   In addition to the documents required by Section 16.05, the Trustee and the Collateral Agent, if applicable, shall receive a Responsible Officer's Certificate and an Opinion of Counsel as conclusive evidence that any amendment, waiver or supplemental indenture or amendment to a Security Document executed pursuant hereto complies with the requirements of this Article 9 and is permitted or authorized by this Indenture and, with respect to such Opinion of Counsel, that such amendment, waiver or supplemental indenture or amendment to such Security Document constitutes the valid and binding obligation of the Company, enforceable against it in accordance with its terms.

ARTICLE 10

*CONSOLIDATION, MERGER, SALE, AND CAPITAL INCREASES*

Section 10.01. *Limitations on Merger, Consolidation, Sale and Capital Increases.*  The Company shall not consolidate with or merge with or into, or sell, convey, transfer or lease all or substantially all of the Company's properties and assets to, another Person.

Furthermore, the Company and the Guarantors will not issue any additional shares of Capital Stock other than upon conversion of the Notes in accordance with the terms of this Indenture except:

(i)      in the case of the Company, to the ILAP Sponsors in exchange for cash contributions, provided that, (a) those additional shares shall be automatically charged pursuant to the Share Pledge on their issuance date, and (b) in advance of such cash contribution and share issuance, the Company's Board of Directors must have (1) passed a board resolution reserving a proportional number of new shares to be issued to the Holders upon conversion of the Notes and (2) if required, procured that the Company's shareholders pass any resolutions necessary to increase the Company's authorized share capital, in order to comply with the conversion mechanism established in Article 13; and

(ii)      in the case of the Guarantors, to the Company or to ILAP, or as otherwise permitted under the Senior Notes Indenture, in compliance with the terms thereunder.

Section 10.02. *Subsidiaries.* The Company and the Guarantors shall not (1) create or suffer to exist any Subsidiary, other than the Subsidiaries in existence as of the Issuance Date, each of which is a Guarantor, or (2) purchase any Equity Interest in, or all or substantially all of the assets of, any other Person.

ARTICLE 11

*IMMUNITY OF INCORPORATORS, STOCKHOLDERS, OFFICERS AND DIRECTORS*

Section 11.01. *Indenture and Notes Solely Corporate Obligations.*  No recourse for the payment of the principal of or accrued interest on any Note, nor for any claim based thereon or otherwise in respect thereof, and no recourse under or upon any obligation, covenant or agreement of the Company in this Indenture or in any supplemental indenture or in any Note, nor because of the creation of any indebtedness represented thereby, shall be had against any incorporator, shareholder, employee, agent, Responsible Officer or director or subsidiary, as such, past, present or future, of the Company or of any successor company or corporation, either directly or through the Company or any successor company or corporation, whether by virtue of any constitution, statute or rule of law, or by the enforcement of any assessment or penalty or otherwise; it being expressly understood that all such liability, except for any liability caused by gross negligence or willful misconduct, is hereby expressly waived and released as a condition of, and as a consideration for, the execution of this Indenture and the issue of the Notes.

60

## ARTICLE 12
### GUARANTEE OF NOTES

Section 12.01. *Unconditional Guarantee.*  Subject to the provisions of this Article 12 and to the fullest extent permitted by applicable law, each of the Guarantors hereby, jointly and severally, unconditionally and irrevocably guarantees, on a senior basis to each Holder of a Note authenticated and delivered by the Trustee and to the Trustee and its successors and assigns, irrespective of the validity and enforceability of this Indenture, the Notes or the obligations of the Company or any other Guarantors to the Holders or the Trustee hereunder or thereunder: (a) (x) the due and punctual payment of the principal of (including under a mandatory redemption, if applicable), premium, if any, and interest on the Notes when and as the same shall become due and payable, whether at maturity, upon redemption or repurchase, by acceleration or otherwise, (y) the due and punctual payment of Default Interest on the overdue principal and (to the fullest extent permitted by applicable law) overdue premium, if any, and interest, if any, on the Notes and (z) the due and punctual payment and performance of all other obligations of the Company to the Holders or the Trustee hereunder or thereunder (including, without limitation, the payment and delivery of the cash and, if applicable, shares of Common Stock due upon conversion of the Notes and amounts due the Trustee under Section 7.06 hereof), all in accordance with the terms hereof and thereof (collectively, the "**Note Guarantees**"); and (b) in case of any extension of time of payment or renewal of any Notes or any of such other obligations, the due and punctual payment and performance of the Note Guarantees in accordance with the terms of the extension or renewal, whether at maturity, upon redemption or repurchase, by acceleration or otherwise. Failing payment and/or delivery, as the case may be, by the Company when due of any amount so guaranteed, or failing performance of any other obligation of the Company to the Holders under this Indenture or under the Notes, for whatever reason, each Guarantor shall be obligated to pay and/or deliver, or to perform or cause the performance of, the same immediately.

Each of the Guarantors hereby agrees that (to the fullest extent permitted by law) its obligations hereunder shall be unconditional, irrespective of the validity, regularity or enforceability of the Notes or this Indenture, the absence of any action to enforce the same, any waiver or consent by any Holder of the Notes with respect to any provisions hereof or thereof, any release of any other Guarantor, the recovery of any judgment against the Company, any action to enforce the same or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a Guarantor. Each of the Guarantors hereby waives (to the fullest extent permitted by law) the benefit of diligence, presentment, demand of payment, filing of claims with a court in the event of insolvency or bankruptcy of the Company, any right to require a proceeding first against the Company, protest, notice and all demands whatsoever and covenants that its Note Guarantee shall not be discharged except by complete performance of the obligations contained in the Notes, this Indenture and this Note Guarantee. This Note Guarantee is a guarantee of payment and not of collection. If any Holder or the Trustee is required by any court or governmental authority to return to the Company or to any Guarantor, or any custodian, trustee, liquidator or other similar official acting in relation to the Company or such Guarantor, any amount paid or delivered by the Company or such Guarantor to the Trustee or such Holder, this Note Guarantee, to the extent theretofore discharged, shall be reinstated in full force and effect. Each Guarantor further agrees (to the fullest extent permitted by law) that, as between it, on the one hand, and the Holders of Notes and the Trustee, on the other hand, (a) subject to this

61

Article 12, the maturity of the obligations guaranteed hereby may be accelerated as provided in Article 6 for the purposes of this Note Guarantee, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the obligations guaranteed hereby, and (b) in the event of any acceleration of such obligations as provided in Article 6 hereof, such obligations (whether or not due and payable) shall forthwith become due and payable by the Guarantors for the purpose of this Note Guarantee. The Guarantors shall have the right to seek contribution from any non-paying Guarantor so long as the exercise of such right does not impair the rights of the Holders under the Note Guarantees.

Section 12.02. *Limitation on Guarantor Liability.* Each Guarantor, and by its acceptance of Notes, each Holder, hereby confirms that it is the intention of all such parties that the Note Guarantee of such Guarantor not constitute a fraudulent transfer or conveyance for purposes of Bankruptcy Law, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar federal, state or foreign law to the extent applicable to any Note Guarantee. To effectuate the foregoing intention, the Trustee, the Holders and the Guarantors hereby irrevocably agree that the obligations of each Guarantor under its Note Guarantee and this Article 12 shall be limited to the maximum amount as will, after giving effect to all other contingent and fixed liabilities of such Guarantor that are relevant under such laws, and after giving effect to any collections from, rights to receive contribution from, or payments or deliveries made by or on behalf of, any other Guarantor in respect of the obligations of such Guarantor under its Note Guarantee and this Article 12, result in the obligations of such Guarantor under its Note Guarantee and this Article 12 not constituting a fraudulent transfer or conveyance under such laws. Each Guarantor that makes a payment or delivery under its Note Guarantee shall be entitled upon satisfaction in full of such Note Guarantee obligation under this Indenture to a contribution from each other Guarantor in an amount equal to such other Guarantor's pro rata portion of such payment or delivery, as the case may be, based on the respective net assets of all the Guarantors at the time of such payment or delivery determined in accordance with IFRS, provided however that said right to receive a contribution from each other Guarantors will be subordinated to the right of the holders of Take-back SSNs and Super Priority Notes to receive payment in full of the principal and interest amounts due under the Senior Notes Indenture.

Section 12.03. *Release of a Guarantee.* The Note Guarantee of a Guarantor will be automatically released upon:

(a)    the satisfaction and discharge in full of the Company's obligations under this Indenture in accordance with the terms of this Indenture; or

(b)    the occurrence of a Conversion Event (and only after the Holders' ownership of 90% of the Company's total issued and outstanding Common Stock, on a fully diluted post-conversion basis, has been formalized).

As a condition precedent to any such release of a Note Guarantee of a Guarantor, such Guarantor shall deliver to the Trustee a Responsible Officer's Certificate stating that all conditions provided for in this Indenture relating to such release have been complied with.

62

Section 12.04. *Waiver of Subrogation.*  Until all amounts then due and payable and/or deliverable by the Company under this Indenture or the Notes have been paid and/or delivered in full, each Guarantor hereby irrevocably waives and agrees not to exercise any claim or other rights which it may now or hereafter acquire against the Company that arise from the existence, payment, performance or enforcement of the Company's obligations under the Notes or this Indenture and such Guarantor's obligations under this Note Guarantee and this Indenture, in any such instance including, without limitation, any right of subrogation, reimbursement, exoneration, contribution, indemnification, and any right to participate in any claim or remedy of the Holders against the Company, whether or not such claim, remedy or right arises in equity, or under contract, statute or common law, including, without limitation, the right to take or receive from the Company, directly or indirectly, in cash, Common Stock or other assets or by set off or in any other manner, payment or security on account of such claim or other rights. If any amount shall be paid or delivered to any Guarantor in violation of the preceding sentence and any amounts owing to the Trustee or the Holders of Notes under the Notes or this Indenture, shall not have been paid or delivered in full, such amount shall have been deemed to have been paid or delivered to such Guarantor for the benefit of, and held in trust for the benefit of, the Trustee or the Holders and shall forthwith be paid or delivered to the Trustee for the benefit of itself or such Holders to be credited and applied to the obligations in favor of the Trustee or the Holders, as the case may be, whether matured or unmatured, in accordance with the terms of this Indenture. Each Guarantor acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated by this Indenture and that the waiver set forth in this Section 12.04 is knowingly made in contemplation of such benefits.

Section 12.05. *No Set Off.*  Each payment or delivery to be made by a Guarantor hereunder in respect of the Note Guarantees shall be payable in the currency or currencies in which such Note Guarantees are denominated or deliverable in the consideration in which such Note Guarantees shall be delivered hereunder, as the case may be, and shall be made without set off, counterclaim, reduction or diminution of any kind or nature.

Section 12.06. *Note Guarantees Continuing.*  The obligations of each Guarantor hereunder shall be continuing and shall remain in full force and effect until all such obligations have been paid and satisfied in full. Each Guarantor agrees with the Trustee that, to the fullest extent permitted by applicable law, it will from time to time deliver to the Trustee suitable acknowledgments of this continued liability hereunder and under any other instrument or instruments in such form as the Trustee may reasonably request and as will prevent any action brought against it in respect of any default hereunder being barred by any statute of limitations now or hereafter in force and, in the event of the failure of a Guarantor so to do, it hereby irrevocably appoints the Trustee the attorney and agent of such Guarantor with the power (but not the obligation) to make, execute and deliver such written acknowledgment or acknowledgments or other instruments as may from time to time become necessary or reasonably advisable, in the judgment of the Trustee, to fully maintain and keep in force the liability of such Guarantor hereunder.

Section 12.07. *Note Guarantees Not Reduced.*  Subject to Section 12.03, the obligations of each Guarantor hereunder shall not be satisfied, reduced or discharged solely by the payment and/or delivery of such principal, premium, if any, interest, fees, consideration due upon

conversion and other monies or amounts as may at any time prior to discharge of this Indenture pursuant to Article 3 be or become owing or payable or deliverable under or by virtue of or otherwise in connection with the Notes or this Indenture.

Section 12.08. *Note Guarantees Reinstated.*  Subject to Section 12.03, to the fullest extent permitted by applicable law, the obligations of each Guarantor hereunder shall continue to be effective or shall be reinstated, as the case may be, if at any time any payment or delivery which would otherwise have reduced the obligations of any Guarantor hereunder (whether such payment or delivery shall have been made by or on behalf of the Company or by or on behalf of a Guarantor) is rescinded or reclaimed from any of the Holders upon the insolvency, bankruptcy, liquidation or reorganization of the Company or any Guarantor or otherwise, all as though such payment or delivery had not been made. If demand for, or acceleration of the time for, payment or delivery by the Company or any other Guarantor is stayed upon the insolvency, bankruptcy, liquidation or reorganization of the Company or such Guarantor, all such indebtedness otherwise subject to demand for payment or delivery or acceleration shall nonetheless be payable or deliverable, as the case may be, by each Guarantor as provided herein.

Section 12.09. *Note Guarantees Not Affected.*  Subject to Section 12.03, to the fullest extent permitted by applicable law, the obligations of each Guarantor hereunder shall not be affected, impaired or diminished in any way by any act, omission, matter or thing whatsoever, occurring before, upon or after any demand for payment or delivery hereunder (and whether or not known or consented to by any Guarantor or any of the Holders) which, but for this provision, might constitute a whole or partial defense to a claim against any Guarantor hereunder or might operate to release or otherwise exonerate any Guarantor from any of its obligations hereunder or otherwise affect such obligations, whether occasioned by default of any of the Holders or otherwise, including, without limitation:

(a)    any limitation of status or power, disability, incapacity or other circumstance relating to the Company or any other Person, including any insolvency, bankruptcy, liquidation, reorganization, readjustment, composition, dissolution, winding-up or other proceeding involving or affecting the Company or any other Person;

(b)    any irregularity, defect, unenforceability or invalidity in respect of any indebtedness or other obligation of the Company or any other Person under this Indenture, the Notes or any other document or instrument;

(c)    any failure of the Company or any other Guarantor, whether or not without fault on its part, to perform or comply with any of the provisions of this Indenture, the Notes or any Guarantee, or to give notice thereof to a Guarantor;

(d)    the taking or enforcing or exercising or the refusal or neglect to take or enforce or exercise any right or remedy from or against the Company or any other Person or their respective assets or the release or discharge of any such right or remedy;

(e)    the granting of time, renewals, extensions, compromises, concessions, waivers, releases, discharges and other indulgences to the Company or any other Person;

64

(f)     any change in the time, manner or place of payment of, or in any other term of, any of the Notes, or any other amendment, variation, supplement, replacement or waiver of, or any consent to departure from, any of the Notes or this Indenture, including, without limitation, any increase or decrease in the principal amount of or premium, if any, or interest on any of the Notes;

(g)     any change in the ownership, control, name, objects, businesses, assets, capital structure or constitution of the Company or a Guarantor;

(h)     any merger or amalgamation of the Company or a Guarantor with any Person or Persons;

(i)     the occurrence of any change in the laws, rules, regulations or ordinances of any jurisdiction by any present or future action of any governmental authority or court amending, varying, reducing or otherwise affecting, or purporting to amend, vary, reduce or otherwise affect, any of the Note Guarantees; and

(j)     any other circumstance (other than a release of a Guarantor pursuant to Section 12.03 and other than by complete, irrevocable payment and/or delivery, as the case may be), that might otherwise constitute a legal or equitable discharge or defense of the Company under this Indenture or the Notes or of a Guarantor in respect of its Note Guarantee hereunder.

Section 12.10. *Waiver.*  Without in any way limiting the provisions of Section 12.01, each Guarantor hereby waives (to the fullest extent permitted by law) notice of acceptance hereof, notice of any liability of any Guarantor hereunder, notice or proof of reliance by the Holders upon the obligations of any Guarantor hereunder, and diligence, presentment, demand for payment on the Company, protest, notice of dishonor or non-payment or non-delivery of any of the Note Guarantees, or other notice or formalities to the Company or any Guarantor of any kind whatsoever.

Section 12.11. *No Obligation to Take Action Against the Company.*  To the fullest extent permitted by applicable law, neither the Trustee nor any other Person shall have any obligation to enforce or exhaust any rights or remedies against the Company or any other Person or any property of the Company or any other Person before the Trustee is entitled to demand payment, delivery and/or performance by any or all Guarantors of their liabilities and obligations under their Note Guarantees or under this Indenture.

Section 12.12. *Dealing with the Company and Others.*  The Holders and the Trustee, without releasing, discharging, limiting or otherwise affecting in whole or in part the obligations and liabilities of any Guarantor hereunder and without the consent of or notice to any Guarantor, may to the fullest extent permitted by applicable law:

(a)     grant time, renewals, extensions, compromises, concessions, waivers, releases, discharges and other indulgences to the Company or any other Person;

(b)     take or abstain from taking additional security or collateral from the Company or from perfecting additional security or collateral of the Company;

65

(c)    release, discharge, compromise, realize, enforce or otherwise deal with or do any act or thing in respect of (with or without consideration) any and all collateral, mortgages or other security given by the Company or any third party with respect to the obligations or matters contemplated by this Indenture or the Notes;

(d)    accept compromises or arrangements from the Company;

(e)    apply all monies at any time received from the Company or from any security upon such part of the Note Guarantees as the Holders may see fit or change any such application in whole or in part from time to time as the Holders may see fit; and

(f)    otherwise deal with, or waive or modify their right to deal with, the Company and all other Persons and any security as the Holders or the Trustee may see fit.

Section 12.13. *Default and Enforcement.*  If any Guarantor fails to pay or deliver in accordance with Section 12.01 hereof, the Trustee may proceed in its name as trustee hereunder in the enforcement of the Note Guarantee of any such Guarantor thereunder and hereunder by any remedy provided by law, whether by legal proceedings or otherwise, and to recover from such Guarantor the Note Guarantees.

Section 12.14. *Amendment, Etc.*  Without limitation to the provisions of Article 9, no amendment, modification or waiver of any provision of this Indenture relating to any Guarantor or consent to any departure by any Guarantor or any other Person from any such provision will in any event be effective unless it is signed by such Guarantor and the Trustee.

Section 12.15. *Costs and Expenses.*  Each Guarantor shall pay on demand by the Trustee any and all costs, fees and expenses (including, without limitation, reasonable legal fees) incurred by the Trustee, its agents, advisors and counsel or any of the Holders in enforcing any of their rights under any Guarantee.

Section 12.16. *No Merger or Waiver; Cumulative Remedies.*  To the fullest extent permitted by applicable law, no Note Guarantee shall operate by way of merger of any of the obligations of a Guarantor under any other agreement, including, without limitation, this Indenture. To the fullest extent permitted by applicable law, no failure to exercise and no delay in exercising, on the part of the Trustee or the Holders, any right, remedy, power or privilege hereunder or under this Indenture or the Notes, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder or under this Indenture or the Notes preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. To the fullest extent permitted by applicable law, the rights, remedies, powers and privileges in the Note Guarantee and under this Indenture, the Notes and any other document or instrument between a Guarantor and/or the Company and the Trustee are cumulative and not exclusive of any rights, remedies, powers and privilege provided by law.

ARTICLE 13
CONVERSION OF NOTES

Section 13.01. *Conversion.*  Notwithstanding any additional steps or actions required for the formalization of the conversion of the Notes as set forth in Section 13.07, the Notes will automatically and irrevocably convert, and shall be deemed to have automatically and irrevocably converted for all purposes under this Indenture, into shares of the Common Stock of the Company upon the earlier to occur of any of the events described in Sections 13.02, 13.03, 13.04, 13.05, and 13.06 (each a "**Conversion Event**" and, collectively, the "**Conversion Events**"), being the date on which any such Conversion Event occurs first, the "**Conversion Date**". Upon the occurrence of any Conversion Event, the Company shall send notice of such Conversion Event and the related Conversion Date to the Trustee, the Conversion Agent (if other than the Trustee), the Share Registrar, any co-Share Registrars and the Holders of the Notes. For the avoidance of doubt, the delivery of said Conversion Event notice by the Company to the Trustee, the Conversion Agent, Share Registrar, any co-Share Registrars and the Holders is for information purposes only, and is not a condition for the effectiveness of the conversion, which will occur automatically and irrevocably on the Conversion Date.

Notwithstanding the foregoing, prior to the occurrence of any of the Conversion Events described above, Holders of a majority of the outstanding principal amount of the Notes can waive or amend an event that would otherwise give rise to a conversion. In order to do so, Holders representing at least the abovementioned amount of Notes shall send a written instruction to the Company, with a copy to the Trustee, describing the potential Conversion Event and communicating their decision to waive or amend the Note conversion for that specific event. Upon receipt of that notice, the Board of Directors shall pass a board resolution acknowledging and confirming, in accordance with the Conversion Board Approval (as defined below), that the specific Conversion Event indicated in the holders' written communication will not trigger the automatic conversion of the Notes. The aforementioned board resolution will be specific to the Conversion Event being waived or amended in writing by the Holders, and shall not be interpreted as a general waiver or amendment of any other past, contemporaneous or future Conversion Events. The Company shall provide to the Trustee a Responsible Officer's Certificate, upon which the Trustee may conclusively rely, attaching such board resolution and certifying that all covenants and conditions precedent to such waiver set forth in this Indenture have been complied with and that such waiver is authorized or permitted by this Indenture.

The conversion rate will be calculated by dividing the total outstanding principal amount of the Notes on the Conversion Date by the number of shares of the Company's Common Stock necessary for the Holders, as a whole and on a ratable basis, to own 90% of the Company's total issued and outstanding Common Stock, on a fully diluted post-conversion basis, on the Conversion Date. For illustration purposes only, as of the date of this Indenture, a total number of  [    ] newly issued shares would represent 90% of the Company's total number of issued and outstanding shares of Common Stock, and the initial outstanding principal amount of the Notes will be $ [    ], therefore, the initial conversion rate would be [    ] shares of Common Stock per $1,000 principal amount of Notes (equivalent to an initial conversion price of $ [    ] per share of Common Stock). The conversion rate is subject to adjustment depending on the total outstanding

67

principal amount of the Notes and the total number of shares of Common Stock of the Company issued and outstanding at the Conversion Date.

If the number of shares of Common Stock to be delivered in connection with the conversion of a Note is not a whole number, then such number of shares of Common Stock to be delivered will be rounded up to the nearest whole number.

The Trustee will initially act as the Conversion Agent.

In order for the Notes to automatically and irrevocably convert into shares of the Company's Common Stock upon the occurrence of any of the Conversion Events described below, on [•], the Company's Board of Directors passed a resolution authorizing the issuance of additional shares of Common Stock and their irrevocable issuance to the Holders at the conversion rate described above upon the occurrence of any of the Conversion Events (subject to the ability for Holders to waive or amend a particular Conversion Event, as outlined above), and approving the Company's issuance of the Notes and the execution of this Indenture and other related documents (the "**Conversion Board Approval**").

The issuance to the Holders of the full number of shares of the Company's Common Stock into which a Note is convertible will be deemed to satisfy in full the Company's obligation to pay:

- the principal amount of the Note; and

- accrued interest and any Additional Amounts to, but not including, the relevant Conversion Date.

As a result, upon a conversion of Notes, accrued interest to, but not including, the relevant Conversion Date will be deemed to be paid in full rather than cancelled, extinguished or forfeited.

The Company will pay any documentary, stamp or similar issue or transfer Tax due on any issuance of any shares of the Company's Common Stock upon the conversion of Notes pursuant to this Indenture, unless the Tax is due because the Holder requested such shares to be issued in a name other than the Holder's name, in which case the Holder shall pay that Tax.

Section 13.02. *Conversion upon Specific Default*. If at any moment prior to the Final Conversion Date (or Extended Conversion Date) the Company or ILAP, as applicable, fail to make a principal and/or interest payment of the Take-back SSNs or the Super Priority Notes within the term and form established in the Senior Notes Indenture (including, any cure periods provided thereunder), on such date, the Notes will be automatically and irrevocably converted into a number of shares of Common Stock representing 90% of the Company's total issued and outstanding Common Stock, on a fully diluted post-conversion basis, following the procedures described in Section 13.01 above.

Section 13.03. *Conversion upon Liquidation Event*. If at any moment prior to the Final Conversion Date (or Extended Conversion Date), the Company or any Guarantor commences a

voluntary case or proceeding under any applicable Debtor Relief Law (as defined below) or of any other case or proceeding to be adjudicated as bankrupt or insolvent, or consents to the entry of a decree or order for its relief in an involuntary case or proceeding under any applicable Debtor Relief Law or to the commencement of any bankruptcy or insolvency case or proceeding against itself, or files a petition or answer or consent seeking its reorganization or relief under any applicable Debtor Relief Law; or consents to the filing of such petition or to the appointment of or taking possession by a custodian, receiver, liquidator, assignee, trustee, sequestrator or other similar official of its shares, business or of any substantial part of its property, or makes an assignment for the benefit of creditors, or admits in writing of its inability to pay its debts generally as they become due, or takes any corporate action in furtherance of any such action, on such date, the Notes will be automatically and irrevocably converted into a number of shares of Common Stock representing 90% of the Company's total issued and outstanding Common Stock, on a fully diluted post-conversion basis, following the procedures described in Section 13.01 above.

Section 13.04. *Conversion upon Change of Control*. If at any moment prior to the Final Conversion Date (or Extended Conversion Date), a Change of Control occurs (other than as a result of an ILAP Sale agreed under the terms and conditions of the Sales Facilitation Agreement), on such date, the Notes will be automatically and irrevocably converted into a number of shares of Common Stock representing 90% of the Company's total issued and outstanding Common Stock, on a fully diluted post-conversion basis, following the procedures described in Section 13.01 above.

Section 13.05. *Conversion upon Unauthorized Sale.* If at any moment prior to the Final Conversion Date (or Extended Conversion Date), the Company or any Affiliate consummates, or enters into an agreement to consummate, any sale of ILAP, in whole or in part, in breach of the terms of the Sales Facilitation Agreement (an "**Unauthorized Sale**"), on such date on which the Unauthorized Sale was consummated or agreed to be consummated (whichever occurs first), the Notes will be automatically and irrevocably converted into a number of shares of Common Stock representing 90% of the Company's total issued and outstanding Common Stock, on a fully diluted post-conversion basis, following the procedures described in Section 13.01 above.

Furthermore, any such Unauthorized Sale shall not be deemed to be an ILAP Sale for the purposes of this Indenture and the Sales Facilitation Agreement.

Section 13.06. *Conversion upon the Final Conversion Date*. Provided that the events described under Sections 13.02, 13.03, 13.04 and 13.05 above have not occurred, the Notes will automatically and irrevocably convert as described in Section 13.01 above on December 31, 2025 (the "**Final Conversion Date**").

Despite the foregoing, if the Company sends a written notice to the Trustee by 5:00 pm (Eastern Standard Time) on the Final Conversion Date (i) requesting an extension to the Final Conversion Date, and (ii) attaching a copy of an executed definitive agreement for an ILAP Sale pursuant to the Sales Facilitation Agreement, the Final Conversion Date will be extended until June 30, 2026, provided that no other Conversion Event referred to in the preceding paragraph occurs on or before such extended Final Conversion Date (the "**Extended Conversion Date**").

On the Final Conversion Date (or on the Extended Conversion Date pursuant to the preceding paragraph), the Notes will be automatically and irrevocably converted into a number of shares of Common Stock representing 90% of the Company's total issued and outstanding Common Stock, on a fully diluted post-conversion basis, following the procedures described in Section 13.01 above.

Section 13.07. *Conversion Procedure*. Notwithstanding the fact that the conversion of the Notes will become effective automatically and irrevocably upon the occurrence of any Conversion Event, if a Holder holds a beneficial interest in a Global Note, to convert, such Holder must comply with DTC's procedures for converting a beneficial interest in a Global Note; *provided, however* notwithstanding the foregoing, the Company shall cause the Notes to be converted automatically and irrevocably through the applicable procedures of DTC upon the occurrence of a Conversion Event, including the delivery to DTC of a mandatory exchange request or similar filing required by DTC. As such, if a Holder is a beneficial owner of the Notes, said Holder must allow for sufficient time to comply with DTC's procedures upon conversion.

Each Note shall be convertible at the office of the Conversion Agent and, if applicable, in accordance with the applicable procedures of DTC.

To formalize the conversion with respect to a beneficial interest in a Global Note, the Holder must complete the appropriate instruction form for conversion pursuant to DTC's book-entry conversion program, furnish appropriate enforcements and transfer documents, if required by the Company or the Conversion Agent, and pay any taxes or duties required and the Conversion Agent must be informed of the conversion in accordance with the applicable procedures of DTC.

If a Holder holds a certificated Note or if the applicable procedures at DTC are unavailable to facilitate any conversion of the beneficial interests of any Global Note, to formalize the conversion such Holder must:

- complete and manually sign the conversion notice on the back of the note;

- deliver the conversion notice, which is irrevocable, and the Note to the Conversion Agent (or, in the case of any Global Note, causing surrender of such beneficial interests in the Global Note pursuant to the Deposit Withdrawal at Custodian procedures of DTC); and

- if required, furnish appropriate endorsements and transfer documents.

If, upon conversion of a security, any shares of Common Stock are to be issued to a person other than the Holder of such security, the related conversion notice shall include such other person's name and address.

For any Note, the first Business Day on which the Holder of such Note satisfies all of the applicable requirements set forth above with respect to such Note and on which conversion of

70

such Note is not otherwise prohibited by this Indenture (as determined by the Company) shall be the settlement date (the "**Settlement Date**") with respect to such conversion. The Conversion Agent shall notify the Company and the Trustee (if other than the Conversion Agent) upon the satisfaction of the requirements set forth above.

Likewise, notwithstanding the fact that the conversion of the Notes will become effective automatically and irrevocably upon the occurrence of any Conversion Event, the Company and the Holders shall comply with any and all formal requirements that may be needed, if any, to perfect and register the conversion of the Notes and the issuance of the new shares of Common Stock to the name of the Holders, including but not limited to any DTC requirements for the conversion of the Notes, any requirements of Applicable Law and any requirements of the Share Registrar and any co-Share Registrars.

Notwithstanding the aforementioned requirements, and to the extent that the Share Registrar or any co-Share Registrar has not undertaken these actions yet, upon the occurrence of a Conversion Event Holders of a majority of the outstanding principal amount of the Notes can instruct the Share Registrar and any co-Share Registrars to register in the Company's register of members or other share register the issuance of a number of shares of Common Stock representing 90% of the Company's total issued and outstanding Common Stock to the Holders, as well as to undertake any and all acts that may be necessary to perfect or formalize the conversion of the Notes. To that effect, the Share Registrar and any co-Share Registrars are hereby expressly authorized to comply with any such instruction without the need of any notification, action or consent from the Company, the Board of Directors or any member of the Company, or from the Trustee.

Section 13.08. *Settlement upon Conversion*. On the Conversion Date immediately following a Conversion Event (i) regarding Notes not held as Global Notes, the Company will issue shares of its Common Stock (and the Notes shall be deemed irrevocably surrendered and cancelled for all purposes under this Indenture (and the Holders thereof agree to deliver their Notes promptly upon request)), and (ii) regarding beneficial interests in Global Notes, the Company will initiate the procedure described in Section 13.07 above for the issuance of shares of its Common Stock (being understood that the conversion of such Global Notes shall be deemed to have automatically and irrevocably occurred on the Conversion Date for all purposes under this Indenture), in both cases in exchange for the aggregate principal amount of the Notes and for any remainder, if any, of the Company's conversion obligation in excess of the aggregate principal amount of the Notes being converted (including accrued interest and any Additional Amounts to, but not including, the relevant Conversion Date), all as described in Section 13.01.

On the Conversion Date, the Company will deliver to Holders a settlement amount of shares of its Common Stock to be calculated by dividing the total outstanding principal amount of the Notes on the Conversion Date by the conversion rate to be determined as set forth in the third paragraph of Section 13.01 above. The conversion rate is subject to adjustment depending on the total outstanding principal amount of the Notes and the total number of shares of the Company's Common Stock issued and outstanding at the Conversion Date. Under all circumstances, the Notes will be converted into 90% of the total issued and outstanding shares of the Company's Common Stock.

The person in whose name any shares of the Company's Common Stock shall be issuable upon conversion will become the holder of record of such shares as of the Conversion Date.

Section 13.09. *Conversion Rate Adjustment.* The conversion rate will be adjusted based on the total outstanding principal amount of the Notes at the Conversion Date and the total number of shares of the Company's Common Stock necessary for the Holders, as a whole and on a ratable basis, to own 90% of the total issued and outstanding Common Stock of the Company on the Conversion Date. Therefore, the conversion rate will vary depending on these two factors.

For illustration purposes only, as of the date hereof, a total number of  [     ] newly issued shares would represent 90% of the total number of issued and outstanding shares of Common Stock of the Company, and the initial outstanding principal amount of the Notes will be $ [     ], therefore, the initial conversion rate would be [     ] shares of Common Stock per $1,000 principal amount of Notes (equivalent to an initial conversion price of $ [     ] per share of Common Stock).

Adjustments to the conversion rate will be calculated to the nearest $1/10,000^{th}$ of a share.

Section 13.10. *Shares to Be Reserved.*  The Company shall at all times reserve, free from preemptive rights, out of its authorized but unissued shares, such number of shares of Common Stock as shall be required to provide for the conversion of the Notes into 90% of the total issued and outstanding shares of the Company's Common Stock pursuant to this Indenture.

Section 13.11. *Responsibility of Trustee.*  The Trustee and any other Conversion Agent shall not at any time be under any duty or responsibility to any Holder to determine the conversion rate (or any adjustment thereto) or whether any facts exist that may require any adjustment (including any increase) of the conversion rate, or with respect to the nature or extent or calculation of any such adjustment when made, or with respect to the method employed, or herein or in any supplemental indenture provided to be employed, in making the same.  The Trustee and any other Conversion Agent shall not be accountable with respect to the validity or value (or the kind or amount) of any shares of Common Stock that may at any time be issued or delivered upon the conversion of any Note; and the Trustee and any other Conversion Agent make no representations with respect thereto.  Neither the Trustee nor any Conversion Agent shall be responsible for any failure of the Company to issue, transfer or deliver any shares of Common Stock upon the surrender of any Note for the purpose of conversion or to comply with any of the duties, responsibilities or covenants of the Company contained in this Article. Neither the Trustee nor any other agent acting under this Indenture (other than the Company, if acting in such capacity), shall have an obligation to make any calculation or to determine whether the Notes may be surrendered for conversion pursuant to this Indenture, or to notify the Company, the Depositary or any of the Holders if the Notes are convertible pursuant to the terms of this Indenture.

Section 13.12. *Certain Covenants.*  (a) The Company covenants that all shares of Common Stock issued upon conversion of Notes shall be fully paid and non-assessable by the Company and free from all Taxes, liens, encumbrances and charges with respect to the issue thereof.

(b)     The Company covenants that, if any shares of Common Stock to be provided for the purpose of conversion of Notes hereunder require registration with or approval of any governmental authority under any federal or state law before such shares of Common Stock may be validly issued upon conversion, the Company shall secure such registration or approval, as the case may be.

(c)     The Company further covenants that if at any time the Common Stock shall be listed on any national securities exchange or automated quotation system the Company shall list and keep listed, so long as the Common Stock shall be so listed on such exchange or automated quotation system, any Common Stock issuable upon conversion of the Notes.

ARTICLE 14
COLLATERAL AND COLLATERAL AGENT

Section 14.01. *Share Pledge.* The Company's obligations and the obligations of the Guarantors under the Notes will be secured by a Lien on all of the Company's issued Common Stock (the "**Collateral**") pursuant to a Cayman Islands law-governed share charge entered into by the Company's current shareholders (as chargors) and the Collateral Agent (as chargee), as collateral agent for the Holders (the "**Share Pledge**").

On the Issuance Date, the Liens on the Collateral shall be created for the benefit of the Holders.

Section 14.02. *Directors and Officers Resignation Letters.* On the Issuance Date, the Company will deliver in escrow to the Collateral Agent (i) executed undated resignation letters from all of the members of the board of directors and all officers (if any) of the Company and of the Guarantors (the "**Resignation Letters**"), and (ii) executed and undated share transfer forms in respect of all issued ordinary shares of the Common Stock of the Company, as well as other customary ancillary documents necessary to enable the enforcement of the Share Pledge upon an Event of Default.

Upon the occurrence of an Event of Default, Holders of a majority of the outstanding principal amount of the Notes may instruct the Collateral Agent in writing to, as part of the enforcement actions under the Share Pledge, complete the dates in the Resignation Letters and deliver them to the Company to cause the removal of all the members of the board of directors and officers (if any) of the Company and the Guarantors, and to undertake any and all necessary actions with the share transfer forms in order to perfect the enforcement of the Share Pledge upon an Event of Default, including but not limited to the appointment of new board members and the removal of existing officers and appointment of new officers.

Upon the satisfaction in full of the Company's obligations under the Notes or the occurrence of a Conversion Event (in which case only after the Holders' ownership of 90% of the issued and outstanding total Common Stock, on a fully diluted post-conversion basis, of the Company has been formalized), the Collateral Agent shall promptly release the Liens created by the Share Pledge as outlined below and return the Resignation Letters, the share transfer forms

and all other ancillary documents delivered to the Collateral Agent and in its possession pursuant to the Share Pledge to the Company and destroy any copies thereof.

Section 14.03. *Sales Facilitation Agreement – Trustee Intervention.* The Trustee is hereby authorized and instructed to enter into a Sales Facilitation Agreement with ILAP, the ILAP Partner, the Company and the Senior Notes Trustee (the "**Sales Facilitation Agreement**"), pursuant to which the parties will make their best efforts (a) to sell one hundred percent (100%) of ILAP's Equity Interests or (b) to concurrently sell one hundred percent (100%) of the Equity Interests of each of San Juan S.A. and Norvind S.A., in each case, to a third party purchaser by December 31, 2025 ("**Sale Outside Date**") in a manner designed to maximize the sales proceeds to all stakeholders (a sale under the terms of the Sales Facilitation Agreement being an "**ILAP Sale**").

Whenever the Trustee is required to, on behalf of the Holders, notify a decision, enforce any right, or in general undertake any action under the Sales Facilitation Agreement, the Trustee shall notify the Holders in writing as promptly as practicable via DTC LENS if the Notes are Global Notes (the "**Sales Facilitation Trustee Notice**"). Holders of a majority of the outstanding principal amount of the Notes shall instruct the Trustee in writing what action to take on their behalf under the Sales Facilitation Agreement within [thirty (30)] days as from the date of receipt of the Sales Facilitation Trustee Notice. If the Holders of a majority of the outstanding principal amount of the Notes fail to communicate to the Trustee their decision, the Trustee will not be obliged to take any action regarding that specific matter under the Sales Facilitation Agreement.

The Sales Facilitation Agreement shall establish that no ILAP Sale may be consummated unless concurrently with such ILAP Sale the payment of the Super Priority Notes, the Take-back SSNs and any payments required to be made in connection with the mandatory redemption of the Notes (pursuant to Article 15 below) has been completed for in full.

Section 14.04. *Share Pledge and Release of Collateral.* The Share Pledge will be governed by the laws of the Cayman Islands.

Except as outlined herein, the Collateral may only be released from the Lien securing the Notes with the consent of Holders of 75% or more of the total outstanding principal amount of the Notes.

The Liens on the Collateral that secure the Company's obligations and the Guarantors' obligations under the Notes also will automatically, without the need for any further action by any Person, be released, terminated and discharged in whole upon (i) payment in full of the principal of, and the accrued and unpaid interest and premium, if any, on the Notes or (ii) the occurrence of a Conversion Event (in which case only after the Holders' ownership of 90% of the total issued and outstanding Common Stock, on a fully diluted post-conversion basis, of the Company has been formalized).

Upon receipt of a Responsible Officer's Certificate, the Collateral Agent will take all necessary actions, including the granting of releases or waivers in any applicable jurisdiction, to effectuate any release in accordance with these provisions. The Collateral Agent will be under no obligation to exercise any of the rights or powers described herein at the request or direction of

any of the Holders unless such Holders have offered to the Collateral Agent indemnity or security satisfactory to the Trustee against any loss, liability, cost or expense.

Section 14.05. *The Collateral Agent.* (a) The Company and the Guarantors hereby appoint UMB Bank, N.A. to act as Collateral Agent, and each Holder, by its acceptance of any Notes and the guarantees thereof, irrevocably consents and agrees to such appointment. The Collateral Agent shall have the privileges, powers and immunities as set forth in this Indenture and the Security Documents. Notwithstanding any provision to the contrary contained elsewhere in this Indenture or the Security Documents, the duties of the Collateral Agent shall be ministerial and administrative in nature, and the Collateral Agent shall not have any duties or responsibilities, except those expressly set forth herein and in the Security Documents to which the Collateral Agent is a party, nor shall the Collateral Agent have or be deemed to have any trust or other fiduciary relationship with the Trustee, any Holder, the Company or any Guarantor, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Indenture or the Security Documents or otherwise exist against the Collateral Agent.  Without limiting the generality of the foregoing sentence, the use of the term "agent" in this Indenture with reference to the Collateral Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

(b)     The Company and the Guarantors hereby agree that the Collateral Agent shall hold the Collateral on behalf of and for the benefit of all of the Holders, the Trustee and the Collateral Agent, in each case pursuant to the terms of the Security Documents and that the Collateral as now or hereafter constituted shall be held for the benefit of all the Holders, the Collateral Agent and the Trustee, and that the Lien of this Indenture and the Security Documents in respect of the Trustee, the Collateral Agent and the Holders is subject to and qualified and limited in all respects by the Security Documents and actions that may be taken thereunder. The Collateral Agent is each Holder's agent for the purpose of perfecting the Holders' security interest in assets which, in accordance with Article 9 of the Uniform Commercial Code can be perfected only by possession. Should the Trustee obtain possession of any such Collateral, upon request from the Company, the Trustee shall notify the Collateral Agent thereof and promptly shall deliver such Collateral to the Collateral Agent or otherwise deal with such Collateral in accordance with the Collateral Agent's instructions.

(c)     Each Holder, by its acceptance of any Notes and the guarantees thereof, irrevocably consents and agrees to the terms of the Security Documents (including, without limitation, the provisions providing for foreclosure and release of Collateral) as the same may be in effect or may be amended from time to time in accordance with their terms, agrees to the appointment of the Collateral Agent and authorizes and directs the Collateral Agent (i) to enter into the Security Documents, whether executed on or after the date hereof, and perform its obligations and exercise its rights, powers and discretions under the Security Documents in accordance therewith, (ii) make the representations of the Holders set forth in the Security Documents and (iii) bind the Holders on the terms as set forth in the Security Documents.

(d)    The Collateral Agent shall be accountable only for amounts that it actually receives as a result of the exercise of such powers, and neither the Collateral Agent nor any of its officers, directors, employees or agents shall be responsible for any act or failure to act hereunder or under any Security Documents to which it is a party, except for its own gross negligence or willful misconduct. The Collateral Agent shall have no liability for any action taken, or errors in judgment made, in good faith by it or any of its officers, employees or agents, unless it shall have been grossly negligent in ascertaining the pertinent facts.

(e)    The Collateral Agent shall be entitled to seek and shall be fully justified in failing or refusing to take any action under this Indenture or the Security Documents unless it shall first receive such advice or concurrence of the Trustee or the Holders of a majority in aggregate principal amount of the Notes as it determines and, if it so requests, it shall first be indemnified to its satisfaction by the Holders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.  Except as otherwise provided in the Security Documents, the Collateral Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Indenture or the Security Documents in accordance with a request, direction, instruction or consent of the Trustee or the Holders of a majority in aggregate principal amount of the then outstanding Notes and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the Holders. If the Collateral Agent shall request direction from the Holders of a majority in aggregate principal amount of the then outstanding Notes with respect to any action, the Collateral Agent shall be entitled to refrain from taking such action unless and until the Collateral Agent shall have received direction from the Holders of a majority in aggregate principal amount of the then outstanding Notes, and the Collateral Agent shall not incur liability to any Person by reason of so refraining.

(f)    The Collateral Agent shall take such action with respect to such Default or Event of Default as may be requested by the Trustee or the Holders of a majority in aggregate principal amount of the Notes (subject to this Section 14.05), subject to the terms of the Security Documents.

(g)    Except as otherwise explicitly provided herein or in the Security Documents, neither the Collateral Agent nor any of its respective officers, directors, employees or agents or other related persons shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of any other Person or to take any other action whatsoever with regard to the Collateral or any part thereof.

(h)    If at any time or times the Trustee shall receive (i) by payment, foreclosure, set-off or otherwise, any proceeds of Collateral or any payments with respect to the obligations arising under, or relating to, this Indenture, except for any such proceeds or payments received by the Trustee from the Collateral Agent pursuant to the terms of this Indenture, or (ii) payments from the Collateral Agent in excess of the amount required to be paid to the Trustee pursuant to Article 6, the Trustee shall promptly turn the same over to the Collateral Agent, in kind, and with such endorsements as may be required to negotiate the same to the Collateral Agent such proceeds to be applied by the Collateral Agent pursuant to the terms of this Indenture or the Security Documents.

76

(i)    Neither the Trustee nor the Collateral Agent shall have any obligation whatsoever to any of the Holders or to the Trustee, in the case of the Collateral Agent, to assure that the Collateral exists or is owned by any the Company or any Guarantor or is cared for, protected, or insured or has been encumbered, or that the Collateral Agent's Liens have been properly or sufficiently or lawfully created, perfected, protected, maintained or enforced or are entitled to any particular priority, or to determine whether all of the Company's property constituting collateral intended to be subject to the Lien and security interest of the Security Documents has been properly and completely listed or delivered, as the case may be, or the value, genuineness, validity, ownership, marketability or sufficiency thereof or title thereto, or to exercise at all or in any particular manner or under any duty of care, disclosure, or fidelity, or to continue exercising, any of the rights, authorities, and powers granted or available to the Collateral Agent pursuant to this Indenture or any Security Document other than to exercise such rights, authorities and powers pursuant to the instructions of the Trustee or the Holders of a majority in aggregate principal amount of the then outstanding Notes or as otherwise provided in this Indenture or in the Security Documents. Further to the foregoing and notwithstanding anything to the contrary in this Indenture or in any Security Document, in no event shall the Collateral Agent or the Trustee be responsible for, or have any duty or obligation with respect to, the recording, filing, registering, perfection, protection or maintenance of the security interests or Liens intended to be created by this Indenture or any the Security Documents (including without limitation the filing or continuation of any Uniform Commercial Code financing or continuation statements or similar documents or instruments), nor shall the Collateral Agent be responsible for, or makes any representation regarding, the validity, effectiveness or priority of any of the Security Documents or the security interests or Liens intended to be created thereby.

(j)    The Collateral Agent shall exercise reasonable care in the custody of any Collateral in its possession or control or any income thereon. The Collateral Agent shall be deemed to have exercised reasonable care in the custody of Collateral in its possession if the Collateral is accorded treatment substantially equal to that which they accord similar property held for its own benefit and shall not be liable or responsible for any loss or diminution in value of any of the Collateral, including, without limitation, by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Collateral Agent in good faith. The Collateral Agent shall be permitted to use overnight carriers to transmit possessory collateral and shall be not liable for any items lost or damages in transmit.

(k)    Upon the receipt by the Collateral Agent of a written request of the Company signed by a Responsible Officer (a "**Security Document Order**"), the Collateral Agent is hereby authorized to execute and enter into, and shall execute and enter into, without the further consent of any Holder or the Trustee, any Security Document to be executed after the date hereof. Such Security Document Order shall (i) state that it is being delivered to the Collateral Agent pursuant to, and is a Security Document Order referred to in, this Section 14.05(k) (ii) instruct the Collateral Agent to execute and enter into such Security Document and (iii) certify that all covenants and conditions precedent, if any to the execution and delivery of the Security Document have been compiled with; provided that in no event shall the Collateral Agent be required to enter into a Security Document that it determines adversely affects the Collateral Agent. The Holders, by their acceptance of the Notes, hereby authorize and direct the Collateral Agent to execute such Security Documents.

(l)      The Collateral Agent is authorized to receive any funds for the benefit of itself, the Trustee and the Holders distributed under the Security Documents, for turnover to the Trustee to make further distributions of such funds to itself, the Trustee and the Holders in accordance with the provisions of Section 6.04 and the other provisions of this Indenture.

(m)      In acting under this Indenture or any Security Document, the Collateral Agent shall have all the rights and protections provided hereunder and in the Security Documents as well as the rights and protections afforded to the Trustee (including its rights to be compensated, reimbursed and indemnified under Section 7.06). For the avoidance of doubt, the rights, privileges, protections, immunities and benefits given to the Collateral Agent hereunder, including, without limitation, its right to be indemnified prior to taking action, shall survive the satisfaction, discharge or termination of this Indenture or its earlier termination, resignation or removal of the Collateral Agent, in such capacity.

(n)      Without limiting the foregoing, with respect to any Collateral located outside of the United States ("**Foreign Collateral**"), the Collateral Agent shall have no obligation to directly enforce, or exercise rights and remedies in respect of, or otherwise exercise any judicial action or appear before any court in any jurisdiction outside of the United States. To the extent the Holders of a majority in aggregate outstanding amount of Notes outstanding determine that it is necessary or advisable in connection with any enforcement or exercise of rights with respect to Foreign Collateral to exercise any judicial action or appear before any such court, the Holders of a majority in aggregate outstanding amount of Notes outstanding shall be entitled to direct the Collateral Agent to appoint a local agent for such purpose (subject to the receipt of such protections, security and indemnities as the Collateral Agent shall determine in its sole discretion to protect the Collateral Agent.)

(o)      The Collateral Agent may resign at any time by notice to the Trustee and the Company, such resignation to be effective upon the acceptance of a successor agent to its appointment as Collateral Agent. The Collateral Agent may be removed following the procedure established in Section 7.09. If the Collateral Agent resigns or is removed under this Indenture, the Company shall appoint a successor collateral agent. If no successor collateral agent is appointed and has accepted such appointment within 30 days after the Collateral Agent gave notice of resignation or was removed, the retiring Collateral Agent may (at the expense of the Company), at its option, appoint a successor Collateral Agent or petition a court of competent jurisdiction for the appointment of a successor.  Upon the acceptance of its appointment as successor collateral agent hereunder, such successor collateral agent shall succeed to all the rights, powers and duties of the retiring Collateral Agent, and the term "Collateral Agent" shall mean such successor collateral agent, and the retiring or removed Collateral Agent's appointment, powers and duties as the Collateral Agent shall be terminated. After the retiring Collateral Agent's resignation or removal hereunder, the provisions of this Section 14.05 (and Section 7.06) shall continue to inure to its benefit and the retiring or removed Collateral Agent shall not by reason of such resignation or removal be deemed to be released from liability as to any actions taken or omitted to be taken by it while it was the Collateral Agent under this Indenture.

(p)      If the Collateral Agent consolidates, mergers, converts into or transfers all or substantially all of its corporate trust business to another corporation, such successor corporation without any further act shall be the successor Collateral Agent.

(q)      Permissive rights of the Collateral Agent to do things enumerated in this Indenture or in the Security Documents shall not be construed as a duty.

(r)      Nothing in this Indenture shall require the Collateral Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties or in the exercise of any of its rights or powers hereunder.

(s)      The Collateral Agent shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of the Holders, unless the Holders have offered to the Collateral Agent security or indemnity satisfactory to the Collateral Agent against the costs, expenses and liabilities which may be incurred by it in compliance with such direction or request.

(t)      In no event shall the Collateral Agent be responsible or liable for special, indirect, punitive, incidental or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Collateral Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

(u)      Before the Collateral Agent acts or refrains from acting in each case at the request or direction of the Company or the Guarantors, it may require a Responsible Officer's Certificate and an Opinion of Counsel, which shall conform to the provisions of Section 16.05. The Collateral Agent shall not be liable for any action it takes or omits to take in good faith in reliance on such certificate or opinion. The Collateral Agent shall be entitled to rely on and shall not be liable for any action taken or omitted to be taken by the Collateral Agent in accordance with the advice of counsel or other professionals retained or consulted by the Collateral Agent.

(v)      The Collateral Agent shall not be charged with knowledge of (A) any events or other information, or (B) any default under this Indenture or any other agreement unless a Responsible Officer of the Collateral Agent shall have actual knowledge thereof.

(w)      The Collateral Agent may conclusively rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document believed by them to be genuine and to have been signed or presented by the proper party or parties, not only as to due execution, validity and effectiveness, but also as to the truth and accuracy of any information contained therein.

(x)      The Collateral Agent shall not incur any liability for not performing any act or fulfilling any duty, obligation or responsibility hereunder by reason of any occurrence beyond their control (including but not limited to any act or provision of any present or future law or regulation or Governmental Authority, any act of God or war, civil unrest, local or national disturbance or disaster, any act of terrorism, epidemics, riots, strikes or other work stoppages or

79

the unavailability of the Federal Reserve Bank wire or facsimile or other wire or communication facility).

(y)    The Collateral Agent shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.08 hereof. The Holders of a majority in aggregate principal amount of the outstanding Notes may direct the time, method and place of conducting any proceeding for any remedy available to the Collateral Agent or of exercising any trust or power conferred on the Collateral Agent. However, the Collateral Agent may refuse to follow any direction that conflicts with law or this Indenture or the Notes or that the Collateral Agent  determines is unduly prejudicial to the rights of other Holders (provided that the Collateral Agent shall not have an affirmative duty to determine whether any such action is unduly prejudicial) or would involve the Collateral Agent in personal liability; provided, however, that the Collateral Agent may take any other action deemed proper by the Collateral Agent that is not inconsistent with such direction. Prior to taking any such action hereunder or under any Security Document, the Collateral Agent shall be entitled to indemnification satisfactory to it against all fees, losses, liabilities and expenses (including attorney's fees and expenses) that may be caused by taking or not taking such action.

(z)    The Collateral Agent shall not be liable for interest on any money received by it except as the Collateral Agent may agree in writing with the Company (and money held in trust by the Collateral Agent need not be segregated from other funds except to the extent required by law).

ARTICLE 15
REDEMPTION

Section 15.01. *Mandatory Redemption upon an ILAP Sale*. No "sinking fund" is provided for the Notes, which means that the Company is not required to redeem or retire the Notes periodically.

Provided that no Conversion Event has occurred, the Notes will be mandatorily redeemable upon an ILAP Sale. If an ILAP Sale is closed on or before the Final Conversion Date (or the Extended Conversion Date, as applicable), and no Conversion Event has occurred, Sale Proceeds will be applied as follows:

1.  First, to repay the super priority notes (the "**Super Priority Notes**") issued by ILAP pursuant to the Indenture entered into on [   ] (the "**Senior Notes Indenture**") and accrued and unpaid interest and Additional Amounts (if any) thereon in full.

2.  Second, to repay the senior secured notes (the "**Take-back SSNs**") issued by ILAP pursuant to the Senior Notes Indenture and accrued and unpaid interest and Additional Amounts (if any) thereon in full and any other amounts due to the Trustee or agent under the Senior Notes Indenture.

3.  Third, an amount equivalent to $7,000,000 plus a 6% interest rate per annum as

80

from August 28, 2023 (the "**First Threshold Amount**"), will be allocated to the ILAP Partner.

4. Fourth, the Sale Proceeds in excess of the amounts mentioned in 1, 2 and 3 above, will be used to mandatorily redeem the Notes, to pay any amounts due to the Trustee, Note Registrar, Paying Agent, Collateral Agent or any other agent under this Indenture and make a distribution to the ILAP Partner as set forth below:

| | | Allocation of Excess Sale Proceeds above the First Threshold Amount to Holders of Convertible Notes ("Convertible Noteholders") and the ILAP Partner | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Distribution Date | First Threshold Amount - $70 million | | $70 million - $90 million | | $90 million to "Full Repayment of Notes" (as defined below) | | Above Full Repayment of Notes | |
| | Convertible Noteholders | ILAP Partner | Convertible Noteholders | ILAP Partner | Convertible Noteholders | ILAP Partner | Convertible Noteholders | ILAP Partner |
| On or before December 31, 2024 | 59.5% | 40.5% | 55% | 45% | 50% | 50% | 0% | 100% |
| January 1, 2025 to June 30, 2025 | 67.0% | 33.0% | 62.5% | 37.5% | | | | |
| July 1, 2025 to December 31, 2025 (or the Extended Conversion Date, as applicable) | 74.5% | 25.5% | 70.0% | 30.0% | | | | |

For purposes of the Sale Proceeds allocation established in the table above, (x) "**Full Repayment of Notes**" shall mean (i) the full repayment of the principal amount of the Notes *plus* (ii) any accrued and unpaid interest (including accrued and unpaid payment-in-kind interest) on the principal amount of such Notes to, but excluding, the date of redemption *plus* (iii) any Additional Amounts in respect of the payments described in clauses (i) and (ii), and (y) "**Distribution Date**" shall mean the date on which the Sale Proceeds are actually distributed to the holders of the Super Priority Notes, the holders of the Take-back SSNs and the Holders, as applicable, be it the Proposed Distribution Date, the Final Determination Distribution Date or any subsequent date on which additional obtained Sale Proceeds are so distributed.

Section 15.02. *Mandatory Redemption Mechanics*. (a) Upon the receipt by the Company of the Sale Proceeds, and provided that no Conversion Event has occurred, the Company shall

81

redeem the Notes on the Proposed Distribution Date, in the aggregate principal amounts set forth in numeral 4 of Section 15.01 above and only after said Sale Proceeds have been applied in accordance with the payments waterfall established in Section 15.01 above.

(b)    The redemption date for a mandatory redemption (the "**Redemption Date**") will be a Business Day. The redemption price for the Notes called for mandatory redemption will be such amount of Sale Proceeds corresponding to the Holders set forth in numeral 4 of Section 15.01 above, allocated on a *pro rata* pass through distribution of principal basis among all of the Holders of Notes (the "**Redemption Price**"). Following the full distribution of all Sales Proceeds (guaranteed, contingent or otherwise) on the Distribution Date (or, in the case of multiple payments, the last possible Distribution Date) in accordance with Section 15.01 above, the Notes shall be deemed to have been redeemed in full and the Company may request the Trustee to cancel the Notes in accordance with Section 2.07 hereto; *provided* that following such redemption and cancellation each Holder and beneficial owner of the Notes shall continue to be third party beneficiaries with rights to enforce certain obligations as set forth in the Sales Facilitation Agreement and no agent shall be required to participate in such enforcement as a condition thereto.

(c)    Upon the occurrence of an ILAP Sale, the Company shall, as soon as promptly practicable, deliver to the Trustee a Responsible Officer's Certificate, an Opinion of Counsel and an Independent Director Certificate informing (i) that the Notes are to be mandatorily redeemed, (ii) the Redemption Date, (iii) the Redemption Price, (iv) the aggregate principal amount of the Notes to be redeemed, and (v) the proposed application of the Sale Proceeds in accordance with Section 15.01 above.

(d)    To call the Notes for redemption, at least ten (10) days before the Redemption Date the Company must send to each Holder of such Notes, the Trustee and the Paying Agent a written notice of such redemption (a "**Redemption Notice**") containing the following information:

(i)    that such Notes have been called for mandatory redemption, briefly describing the Company's obligation to redeem under this Indenture;

(ii)    the Redemption Date for such Redemption;

(iii)    if the Sale Proceeds amount is not sufficient to constitute a Full Repayment of Notes following the proceeds application set forth in Section 15.01, state that mandatory redemption shall be on a pro-rata pass through distribution of principal basis;

(iv)    the Redemption Price per $1,000 principal amount of Notes for such redemption (including in that calculation capitalized interest and accrued and unpaid Default Interest, if any);

(v)    the name and address of the Paying Agent or the place where such Notes are to be surrendered for the payment of the Redemption Price;

82

(vi)   that all Notes being mandatorily redeemed will not be converted or eligible for conversion and will be cancelled following such mandatory redemption pursuant to this Indenture;

(vii)   that, on the Redemption Date, the Redemption Price shall become due and payable upon the surrender of each Note called for redemption and that interest thereon shall cease to be applicable after the Redemption Date;

(viii)   the CUSIP and ISIN numbers, if any, on the Notes; and

(ix)   a reasonably detailed calculation of the application of the Sale Proceeds in accordance with Section 15.01 above.

The Redemption Notice shall be given by the Company or, at the Company's request, by the Trustee, in the name of and at the expense of the Company, so long as the Trustee receives such request and a copy of the Redemption Notice in a Responsible Officer's Certificate at least two (2) Business Days prior to the requested date of delivery.

## ARTICLE 16
### MISCELLANEOUS PROVISIONS

Section 16.01. *Provisions Binding on Company's Successors.*  All the covenants, stipulations, promises and agreements of the Company and each Guarantor contained in this Indenture shall bind its successors and assigns whether so expressed or not.

Section 16.02. *Appointment of Process Agent.* As long as any of the Notes remain outstanding, the Company and the Guarantors will at all times have an authorized agent in the City of New York, upon whom process may be served in any legal action or proceeding arising out of or relating to this Indenture or any Note or the Note Guarantees. Service of process upon such agent and written notice of such service mailed or delivered to the Company or the Guarantors shall to the extent permitted by Applicable Law be deemed in every respect effective service of process upon the Company or such Guarantor, as the case may be, in any such legal action or proceeding. The Company and the Guarantors will appoint Corporation Service Company] as their agent for such purpose and, in the case of the Company and any Guarantor, shall grant an irrevocable power of attorney in favor of such process agent with sufficient authority for lawsuits and collections. The Company and Guarantors further covenant and agree that service of process in any suit, action or proceeding may be made upon it at the office of such agent at 19 West 44th Street, Suite 200, New York, New York, 10036-8401 (or at such other address or at the office of such other authorized agent as the Company or the Guarantors may designate by written notice to the Trustee).

Section 16.03. *Addresses for Notices, Etc.*  Any notice or communication by the Company, the Guarantors, or the Trustee to the others is duly given if in writing and in English and delivered in Person or by first class mail (registered or certified, return receipt requested), facsimile transmission or overnight air courier guaranteeing next day delivery, to the others' address:

83

If to the Company or the Guarantors:

ILAP Holdings Ltd.
Cerro El Plomo, 5680
Of. 1202, Las Condes
Santiago, Chile
Attention: Esteban Moraga
Phone: +56 2-2820-3235
Email: esteban.moraga@latampower.com


With a copy to:

Greenberg Traurig, LLP
One Vanderbilt Avenue
New York, NY 10017
Attention: Marc Rossell
Phone: 212-801-9200
Email: rossellm@gtlaw.com

If to the Trustee or the Collateral Agent:

UMB Bank, N.A.
100 William Street, Suite 1850
New York, NY 10038
Attention: Prital K. Patel
Email: Prital.Patel@umb.com

The Company, the Guarantors the Trustee or the Collateral Agent, by notice to the others, may designate additional or different addresses for subsequent notices or communications.

All notices and communications (other than those sent to Holders) will be deemed to have been duly given: at the time delivered by hand, if personally delivered; when mailed, postage prepaid, if mailed; when receipt acknowledged, if transmitted by facsimile or electronically; and the next Business Day after timely delivery to the courier, if sent by overnight air courier guaranteeing next day delivery.

Any notice or communication to a Holder will be mailed by first class mail, to its address shown on the register kept by the Note Registrar. Failure to mail a notice or communication to a Holder or any defect in it will not affect its sufficiency with respect to other Holders. Notwithstanding anything to the contrary herein, any notice to a Holder of a Global Note shall be made in accordance with the rules of the Depositary.

If a notice or communication is mailed in the manner provided above within the time prescribed, it is duly given, whether or not the addressee receives it.

If the Company mails a notice or communication to Holders, it will deliver a copy to the Trustee at the same time.

Neither the failure to give any notice to a particular Holder, nor any defect in a notice given to a particular Holder, will affect the sufficiency of any notice given to another Holder.

Notwithstanding any other provision of this Indenture or any Note, where this Indenture or any Note provides for notice of any event (including any notice of redemption) to a Holder of a Global Note (whether by mail or otherwise), such notice shall be sufficiently given if given to the Depositary for such Note (or its designee) pursuant to the standing instructions from such Depositary. For so long as the Notes are listed on the Luxembourg, Irish, or Singapore stock exchange (as applicable), the Company will publish notices in the manner required by the Luxembourg, Irish, or Singapore stock exchange (as applicable). Notices shall be deemed to have been given on the first date of publication.

Section 16.04. *Governing Law; Jurisdiction.*  THIS INDENTURE, EACH NOTE AND EACH GUARANTEE, AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS INDENTURE, ANY NOTE OR ANY GUARANTEE, SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS ENTERED INTO AND TO BE PERFORMED IN SUCH STATE.

The Company and each Guarantor irrevocably consents and agrees, for the benefit of the Holders from time to time of the Notes and the Trustee, that any legal action, suit or proceeding against it with respect to obligations, liabilities or any other matter arising out of or in connection with this Indenture, the Notes or the Guarantees may be brought in the courts of the State of New York or the courts of the United States of America located in the Borough of Manhattan, New York City, New York and, until amounts due and to become due in respect of the Notes have been paid, hereby irrevocably consents and submits to the non-exclusive jurisdiction of each such court *in personam*, generally and unconditionally with respect to any action, suit or proceeding for itself in respect of its properties, assets and revenues.

The Company and each Guarantor irrevocably and unconditionally waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions, suits or proceedings arising out of or in connection with this Indenture or any Note Guarantee brought in the courts of the State of New York or the courts of the United States of America located in the Borough of Manhattan, New York City, New York and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

Section 16.05. *Evidence of Compliance with Conditions Precedent; Certificates and Opinions of Counsel to Trustee.*  Upon any application or demand by the Company or a Guarantor to the Trustee to take any action under any of the provisions of this Indenture, the Company or such Guarantor shall, if requested by the Trustee, furnish to the Trustee a Responsible Officer's Certificate and an Opinion of Counsel stating that such action is permitted

85

by the terms of this Indenture and, in the opinion of the signor, that all conditions precedent and covenants, if any, provided for in this Indenture relating to such action have been complied with.

Each Responsible Officer's Certificate and Opinion of Counsel provided for, by or on behalf of the Company or a Guarantor in this Indenture and delivered to the Trustee with respect to compliance with this Indenture shall include (a) a statement that the person signing such certificate is familiar with the requested action and this Indenture; (b) a brief statement as to the nature and scope of the examination or investigation upon which the statement contained in such certificate is based; (c) a statement that, in the judgment of such person, he or she has made such examination or investigation as is necessary to enable him or her to express an informed judgment as to whether or not such action is permitted by this Indenture and whether all conditions precedent to such action, if any, have been complied with; and (d) a statement as to whether or not, in the judgment of such person, such action is permitted by this Indenture and that all conditions precedent have been complied with.

Notwithstanding anything to the contrary in this Section 16.05, if any provision in this Indenture specifically provides that the Trustee shall or may receive an Opinion of Counsel in connection with any action to be taken by the Trustee or the Company hereunder, the Trustee shall be entitled to such Opinion of Counsel.

Section 16.06. *Benefits of Indenture.* Nothing in this Indenture or in the Notes, expressed or implied, shall give to any Person, other than the Holders, the parties hereto, any Paying Agent, any Conversion Agent, any authenticating agent, any Note Registrar and their successors hereunder, any benefit or any legal or equitable right, remedy or claim under this Indenture.

Section 16.07. *Table of Contents, Headings, Etc.* The table of contents and the titles and headings of the articles and sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part hereof, and shall in no way modify or restrict any of the terms or provisions hereof.

Section 16.08. *Authenticating Agent.* The Trustee may appoint an authenticating agent that shall be authorized to act on its behalf and subject to its direction in the authentication and delivery of Notes in connection with the original issuance thereof and transfers and exchanges of Notes hereunder, including under Section 2.04, Section 2.05, Section 2.06, and Section 9.04 as fully to all intents and purposes as though the authenticating agent had been expressly authorized by this Indenture and those Sections to authenticate and deliver Notes. For all purposes of this Indenture, the authentication and delivery of Notes by the authenticating agent shall be deemed to be authentication and delivery of such Notes "by the Trustee" and a certificate of authentication executed on behalf of the Trustee by an authenticating agent shall be deemed to satisfy any requirement hereunder or in the Notes for the Trustee's certificate of authentication. Such authenticating agent shall at all times be a Person eligible to serve as trustee hereunder pursuant to Section 7.08.

Any corporation or other entity into which any authenticating agent may be merged or converted or with which it may be consolidated, or any corporation or other entity resulting from any merger, consolidation or conversion to which any authenticating agent shall be a party, or any corporation or other entity succeeding to the corporate trust business of any authenticating

86

agent, shall be the successor of the authenticating agent hereunder, if such successor corporation or other entity is otherwise eligible under this Section 16.08, without the execution or filing of any paper or any further act on the part of the parties hereto or the authenticating agent or such successor corporation or other entity.

Any authenticating agent may at any time resign by giving written notice of resignation to the Trustee and to the Company.  The Trustee may at any time terminate the agency of any authenticating agent by giving written notice of termination to such authenticating agent and to the Company.  Upon receiving such a notice of resignation or upon such a termination, or in case at any time any authenticating agent shall cease to be eligible under this Section, the Trustee may appoint a successor authenticating agent (which may be the Trustee), shall give written notice of such appointment to the Company and shall deliver notice of such appointment to all Holders.

The Company agrees to pay to the authenticating agent from time to time reasonable compensation for its services although the Company may terminate the authenticating agent, if it determines such agent's fees to be unreasonable.

The provisions of Section 7.02, Section 7.03, Section 7.04, Section 8.03 and this Section 16.08 shall be applicable to any authenticating agent.

If an authenticating agent is appointed pursuant to this Section 16.08, the Notes may have endorsed thereon, in addition to the Trustee's certificate of authentication, an alternative certificate of authentication in the following form:

_____,
as Authenticating Agent, certifies that this is one of the Notes described
in the within-named Indenture.

By: _____
Authorized signatory

Section 16.09. *Execution in Counterparts.*  This Indenture may be executed in any number of counterparts, each of which shall be an original, but such counterparts shall together constitute but one and the same instrument.  The exchange of copies of this Indenture and of signature pages by facsimile or PDF transmission shall constitute effective execution and delivery of this Indenture as to the parties hereto and may be used in lieu of the original Indenture for all purposes.  Signatures of the parties hereto transmitted by facsimile or PDF shall be deemed to be their original signatures for all purposes.

Section 16.10. *Severability.*  In the event any provision of this Indenture or in the Notes shall be invalid, illegal or unenforceable, then (to the extent permitted by law) the validity, legality or enforceability of the remaining provisions shall not in any way be affected or impaired.

Section 16.11. *Waiver of Jury Trial.*  EACH OF THE COMPANY, EACH GUARANTOR, THE TRUSTEE AND THE COLLATERAL AGENT HEREBY AND THE HOLDERS BY THEIR ACCEPTANCE OF THE NOTES THEREBY IRREVOCABLY

87

WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE NOTES, ANY GUARANTEE OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 16.12. *Calculations*.  The Company will be responsible for making all calculations called for under the Notes and this Indenture. These calculations include, but are not limited to, accrued interest payable on the Notes (including any additional interest payable on the Notes) and the conversion rate of the Notes. The Company will make all these calculations in good faith and, absent error, the Company's calculations will be final and binding on Holders of Notes, provided that these calculations are sent in advance to the Holders via DTC LENS if the Notes are Global Notes or through any other means acceptable to the Holders and the Company provides a reasonable term for the Holders to review and raise any reasonable observation. The Company will provide a schedule of its calculations to each of the Trustee and the Conversion Agent, and each of the Trustee and the Conversion Agent is entitled to rely conclusively upon the accuracy of the Company's calculations without independent verification.

Section 16.13. *USA PATRIOT Act.*  The parties hereto acknowledge that in accordance with Section 326 of the USA PATRIOT Act, the Trustee and the Collateral Agent, like all financial institutions and in order to help fight the funding of terrorism and money laundering, is required to obtain, verify, and record information that identifies each person or legal entity that establishes a relationship or opens an account with the Trustee or the Collateral Agent.  The parties to this Indenture agree that they will provide the Trustee with such information as it may request in order for the Trustee or the Collateral Agent, as applicable, to satisfy the requirements of the USA PATRIOT Act.

Section 16.14. *Electronic Signatures*. All notices, approvals, consents, requests and any communications hereunder must be in writing (provided that any communication sent to the Trustee hereunder must be in the form of a document that is signed manually or by way of a digital signature in English).

In furtherance of the foregoing, the words "execution", "signed", "signature", "delivery" and words of like import in or relating to any document to be signed in connection with this Indenture and the transactions contemplated hereby or thereby shall be deemed to include Electronic Signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; provided that, notwithstanding anything herein to the contrary, the Trustee is not under any obligation to agree to accept electronic signatures in any form or in any format unless expressly agreed to by the Trustee, pursuant to procedures approved by the Trustee. As used herein, "Electronic Signature" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or other record.

88

[*Remainder of page intentionally left blank*]

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed as of the date first written above.

ILAP HOLDINGS LTD.,
as the Company

By: _____
     Name:
     Title:

[*Signature Page to Indenture*]

Pg 557 of 578

INVERSIONES LATIN AMERICA
POWER SpA.,
as Guarantor


By: _____
    Name:
    Title:




SAN JUAN S.A.,
as Guarantor


By: _____
    Name:
    Title:


NORVIND S.A.,
as Guarantor


By: _____
    Name:
    Title:

*[Signature Page to Indenture]*

UMB BANK, N.A., as Trustee and
Collateral Agent


By: _____
     Name:
     Title:

[*Signature Page to Indenture*]

**EXHIBIT A**

[FORM OF FACE OF NOTE]

[*Insert the Global Note Legend, if applicable pursuant to the provisions of the Indenture*]

[*Insert the Private Placement Legend, if applicable pursuant to the provisions of the Indenture*]

[*Insert the Regulation S Global Note Legend, if applicable pursuant to the provisions of the Indenture*]

ILAP HOLDINGS LTD.

5% Convertible Senior Note due 2033

No. [_____]                                                [Initially][1] $[_____]

CUSIP No. [  ]

     ILAP Holdings Ltd., an exempted company duly incorporated with limited liability and validly existing under the laws of the Cayman Islands (the "**Company**"), for value received hereby promises to pay to [CEDE & CO.][2] [_____][3], or registered assigns, the principal sum [as set forth in the "Schedule of Exchanges of Notes" attached hereto][4] [of $[_____][5], which amount, taken together with the principal amounts of all other outstanding Notes, shall not, unless permitted by the Indenture, exceed $[_____], in accordance with the rules and procedures of the Depositary, on June 15, 2033, and interest thereon as set forth below.

     This Note shall bear interest at the rate of 5.0% per year from and including [•], 2024, or from and including the most recent date to which interest has been paid or provided for to, but excluding, the next scheduled Interest Payment Date until [•].  Interest is payable annually in arrears on each anniversary of the Issuance Date by capitalizing such amount and adding it to the principal amount of the Notes, following which capitalization such amount shall constitute principal for all purposes hereunder, to Holders of record at the close of business on the preceding [•].Accrued interest on the Notes shall be computed on the basis of a 360-day year composed of twelve 30-day months and, for partial months, on the basis of the number of days actually elapsed in a 30-day month.

     Any Event of Default under the Indenture shall accrue default interest per annum at a rate equal to 7%, payable in cash, subject to the enforceability thereof under applicable law, in accordance with Section 2.03(c) of the Indenture.

     The Company shall pay the principal of this Note, if and so long as such Note is a Global Note, in immediately available funds to the Depositary or its nominee, as the case may be, as the registered Holder of such Note.  As provided in and subject to the provisions of the Indenture, the Company shall pay the principal of any Notes (other than Notes that are Global Notes) at the office or agency designated by the Company for that purpose.  The Company has initially designated the Trustee as its Paying Agent and Note Registrar in respect of the Notes and the Corporate Trust Office in the United States of America as a place where Notes may be presented for payment or for registration of transfer and exchange.

     The Notes shall be guaranteed by the Guarantors pursuant to the terms and conditions set forth in Article 13 of the Indenture.

---

[1] Include if a global note.
[2] Include if a global note.
[3] Include if a physical note.
[4] Include if a global note.
[5] Include if a physical note.

Reference is made to the further provisions of this Note set forth on the reverse hereof, including, without limitation, provisions giving the Holder of this Note the right to convert this Note into cash and, if applicable, shares of Common Stock, on the terms and subject to the limitations set forth in the Indenture.  Such further provisions shall for all purposes have the same effect as though fully set forth at this place.

**This Note, and any claim, controversy or dispute arising under or related to this Note, shall be construed in accordance with and governed by the laws of the State of New York applicable to contracts entered into and to be performed in such state.**

In the case of any conflict between this Note and the Indenture, the provisions of the Indenture shall control and govern.

This Note shall not be valid or become obligatory for any purpose until the certificate of authentication hereon shall have been signed manually by the Trustee or a duly authorized authenticating agent under the Indenture.

*[Remainder of page intentionally left blank]*

B-3

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed.

ILAP HOLDINGS LTD.,

By: _____

Name:
Title:

Dated:

TRUSTEE'S CERTIFICATE OF AUTHENTICATION

UMB BANK, N.A.
as Trustee, certifies that this is one of the Notes described
in the within-named Indenture.

By:_____
    Authorized signatory

[FORM OF REVERSE OF NOTE]

ILAP HOLDINGS LTD.
5% Convertible Senior Note due 2033

This Note is one of a duly authorized issue of Notes of the Company, designated as its 5% Convertible Senior Notes due 2033 (the "**Notes**"), limited to the aggregate principal amount of $[_____] all issued or to be issued under and pursuant to an Indenture dated as of [●], 2024 (the "**Indenture**"), among the Company, the Guarantors and UMB Bank, N.A., as trustee (in such capacity, the "**Trustee**") and as collateral agent (in such capacity, the "**Collateral Agent**"), to which Indenture and all indentures supplemental thereto reference is hereby made for a description of the rights, limitations of rights, obligations, duties and immunities thereunder of the Trustee, the Company and the Holders of the Notes. Capitalized terms used in this Note and not defined in this Note shall have the respective meanings set forth in the Indenture.

In case certain Events of Default shall have occurred and be continuing, the principal of, and interest on, all Notes may be declared, by either the Trustee or Holders of at least 25% in aggregate principal amount of Notes then outstanding, and upon said declaration shall become, due and payable, in the manner, with the effect and subject to the conditions and certain exceptions set forth in the Indenture.

Subject to the terms and conditions of the Indenture, the Company will make all payments and deliveries in respect of the principal amount on the Maturity Date, as the case may be, to the Holder who surrenders a Note to a Paying Agent to collect such payments in respect of the Note.  The Company will pay cash amounts in money of the United States of America that at the time of payment is legal tender for payment of public and private debts.

The Indenture contains provisions permitting the Company and the Trustee in certain circumstances, without the consent of the Holders of the Notes, and in certain other circumstances, with the consent of the Holders of not less than a majority in aggregate principal amount of the Notes at the time outstanding, evidenced as in the Indenture provided, to execute supplemental indentures modifying the terms of the Indenture and the Notes as described therein. It is also provided in the Indenture that, subject to certain exceptions, the Holders of a majority in aggregate principal amount of the Notes at the time outstanding may on behalf of the Holders of all of the Notes waive any past Default or Event of Default under the Indenture and its consequences.

Each Holder shall have the right to receive payment or delivery, as the case may be, of (x) the principal (including under a mandatory redemption, if applicable) of, (y) accrued interest, if any, on, and (z) the consideration due upon conversion of, this Note at the place, at the respective times, at the rate and in the lawful money or shares of Common Stock, as the case may be, herein prescribed.

The Notes are issuable in registered form without coupons in denominations of $1,000 principal amount and integral multiples of $1.00 in excess thereof.  At the office or agency of the Company referred to on the face hereof, and in the manner and subject to the limitations provided in the Indenture, Notes may be exchanged for a like aggregate principal amount of

B-5

Notes of other authorized denominations, without payment of any service charge but, if required by the Company or Trustee, with payment of a sum sufficient to cover any transfer or similar Tax that may be imposed in connection therewith as a result of the name of the Holder of the new Notes issued upon such exchange of Notes being different from the name of the Holder of the old Notes surrendered for such exchange.

No sinking fund is provided for the Notes.

Subject to the provisions of the Indenture, upon the occurrence of certain Conversion Events specified in the Indenture, the Notes will automatically convert into shares of Common Stock.

**SCHEDULE A***
SCHEDULE OF EXCHANGES OF NOTES

ILAP Holdings Ltd.
5% Convertible Senior Notes due 2033

The initial principal amount of this Global Note is DOLLARS ($[●]).  The following increases or decreases in this Global Note have been made:

| Date of exchange | Amount of decrease in principal amount of this Global Note | Amount of increase in principal amount of this Global Note | Principal amount of this Global Note following such decrease or increase | Signature of authorized signatory of Trustee or Custodian |
|---|---|---|---|---|
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |

* Include if a global note.

B-7

## ABBREVIATIONS

The following abbreviations, when used in the inscription of the face of this Note, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM = as tenants in common

UNIF GIFT MIN ACT = Uniform Gifts to Minors Act

CUST = Custodian

TEN ENT = as tenants by the entireties

JT TEN  = joint tenants with right of survivorship and not as tenants in common

Additional abbreviations may also be used though not in the above list.

**EXHIBIT B**

FORM OF CERTIFICATE OF TRANSFER

ILAP Holdings Ltd.
Cerro El Plomo, 5680
Of. 1202, Las Condes
Santiago, Chile
Attention: Esteban Moraga
Phone: +56 2-2820-3235
Email: esteban.moraga@latampower.com


UMB Bank, N.A.
100 William Street, Suite 1850
New York, New York 10038
Attention: Prital Patel
Email: Prital.Patel@umb.com

Re: ILAP Holdings Ltd. Convertible Notes Due 2033

Reference is hereby made to the Indenture, dated as of [January] [●], 2024 (the "*Indenture*"), among ILAP Holdings Ltd., an exempted company incorporated with limited liability under the laws of the Cayman Islands (the "*Issuer*"), the guarantors thereto (collectively the "*Guarantors*"), and UMB Bank, N.A., as Trustee (in such capacity, the "*Trustee*") and collateral agent. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

_____, (the "*Transferor*") owns and proposes to transfer the Note[s] or interest in such Note[s] specified in Annex A hereto, in the principal amount of $ _____ in such Note[s] or interests (the "*Transfer*"), to _____ (the "*Transferee*"), as further specified in Annex A hereto. In connection with the Transfer, the Transferor hereby certifies that:

[CHECK ALL THAT APPLY]

1.      ☐      **Check if Transferee will take delivery of a beneficial interest in the 144A Global Note or a Restricted Definitive Note pursuant to Rule 144A**. The Transfer is being effected pursuant to and in accordance with Rule 144A under the Securities Act of 1933, as amended (the "*Securities Act*"), and, accordingly, the Transferor hereby further certifies that the beneficial interest or Definitive Note is being transferred to a Person that the Transferor reasonably believes is purchasing the beneficial interest or Definitive Note for its own account, or for one or more accounts with respect to which such Person exercises sole investment discretion, and such Person and each such account is a "qualified institutional buyer" within the meaning of Rule 144A in a transaction meeting the requirements of Rule 144A, and such Transfer is in compliance with any applicable blue sky securities laws of any state of the United States. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will be subject to the restrictions on transfer enumerated in the Private

Placement Legend printed on the 144A Global Note and/or the Restricted Definitive Note and in the Indenture and the Securities Act.

2.    ☐    **Check if Transferee will take delivery of a beneficial interest in the Regulation S Global Note or a Restricted Definitive Note pursuant to Regulation S**. The Transfer is being effected pursuant to and in accordance with Rule 903 or Rule 904 under the Securities Act and, accordingly, the Transferor hereby further certifies that (i) the Transfer is not being made to a Person in the United States and (x) at the time the buy order was originated, the Transferee was outside the United States or such Transferor and any Person acting on its behalf reasonably believed and believes that the Transferee was outside the United States or (y) the transaction was executed in, on or through the facilities of a designated offshore securities market and neither such Transferor nor any Person acting on its behalf knows that the transaction was prearranged with a buyer in the United States, (ii) no directed selling efforts have been made in contravention of the requirements of Rule 903(b) or Rule 904(b) of Regulation S under the Securities Act, (iii) the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act and (iv) if the proposed transfer is being made prior to the expiration of the Restricted Period, the transfer is not being made to a U.S. Person or for the account or benefit of a U.S. Person (other than the initial purchasers) and the interest so transferred will be held immediately thereafter through Euroclear or Clearstream. Upon consummation of the proposed transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will be subject to the restrictions on Transfer enumerated in the Private Placement Legend printed on the Regulation S Global Note and/or the Restricted Definitive Note and in the Indenture and the Securities Act.

3.    ☐    **Check and complete if Transferee will take delivery of a beneficial interest in a Restricted Definitive Note pursuant to any provision of the Securities Act other than Rule 144A or Regulation S.** The Transfer is being effected in compliance with the transfer restrictions applicable to beneficial interests in Restricted Global Notes and Restricted Definitive Notes and pursuant to and in accordance with the Securities Act and any applicable blue sky securities laws of any state of the United States, and accordingly the Transferor hereby further certifies that (check one):

(a)    ☐    such Transfer is being effected pursuant to and in accordance with Rule 144 under the Securities Act;

or

(b)    ☐    such Transfer is being effected to the Issuer or a subsidiary thereof;

or

(c)    ☐    such Transfer is being effected pursuant to an effective registration statement under the Securities Act and in compliance with the prospectus delivery requirements of the Securities Act.

4.    ☐    Check if Transferee will take delivery of a beneficial interest in an Unrestricted Global Note or of an Unrestricted Definitive Note.

(a)        ☐        Check if Transfer is being effected pursuant to an effective registration statement under the Securities Act and in compliance with the prospectus delivery requirement of the Securities Act.

(b)        ☐        **Check if Transfer is pursuant to Rule 144**. (i) The Transfer is being effected pursuant to and in accordance with Rule 144 under the Securities Act and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any state of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will no longer be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes, on Restricted Definitive Notes and in the Indenture.

(c)        ☐        **Check if Transfer is Pursuant to Regulation S**. (i) The Transfer is being effected pursuant to and in accordance with Rule 903 or Rule 904 under the Securities Act and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any state of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will no longer be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes, on Restricted Definitive Notes and in the Indenture.

(d)        ☐        **Check if Transfer is Pursuant to Other Exemption**. (i) The Transfer is being effected pursuant to and in compliance with an exemption from the registration requirements of the Securities Act other than Rule 144, Rule 903 or Rule 904 and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any State of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will not be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes or Restricted Definitive Notes and in the Indenture.

This certificate and the statements contained herein are made for your benefit and the benefit of the Issuer.

_____

[Insert Name of Transferor]

_____

Name:
Title:

Dated: _____

B-12

Dated: _____

_____

_____
Signature(s)

_____
Signature Guarantee

Signature(s) must be guaranteed
by an eligible Guarantor Institution
(banks, stock brokers, savings and
loan associations and credit unions)
with membership in an approved
signature guarantee medallion program
pursuant to Securities and Exchange
Commission Rule 17Ad-15 if shares
of Common Stock are to be issued, or
Notes are to be delivered, other than
to and in the name of the registered holder.

ANNEX A TO CERTIFICATE OF TRANSFER

1.      The Transferor owns and proposes to transfer the following:

[CHECK ONE OF (a) OR (b)]

(a) ☐      a beneficial interest in the:

(i)      ☐      144A Global Note, or

(ii)     ☐      Regulation S Global Note; or

(b) ☐      a Restricted Definitive Note.

2.      After the Transfer the Transferee will hold:

[CHECK ONE]

(a) ☐      a beneficial interest in the:

(i)      ☐      144A Global Note, or

(ii)     ☐      Regulation S Global Note, or

(iii)    ☐      Unrestricted Global Note; or

(b) ☐      a Restricted Definitive Note; or

(c) ☐      an Unrestricted Definitive Note, in accordance with the terms of the Indenture.

EXHIBIT C

FORM OF CERTIFICATE OF EXCHANGE

ILAP Holdings Ltd.
Cerro El Plomo, 5680
Of. 1202, Las Condes
Santiago, Chile
Attention: Esteban Moraga
Phone: +56 2-2820-3235
Email: esteban.moraga@latampower.com


UMB Bank, N.A.
100 William Street, Suite 1850
New York, New York 10038
Attention: Prital Patel
Email: Prital.Patel@umb.com

Re: ILAP Holdings Ltd. Convertible Notes Due 2033

Reference is hereby made to the Indenture, dated as of [January] [●], 2024 (the "*Indenture*"), among ILAP Holdings Ltd., an exempted company incorporated with limited liability under the laws of the Cayman Islands (the "*Issuer*"), the guarantors thereto (collectively the "*Guarantors*"), and UMB Bank, N.A., as Trustee (in such capacity, the "*Trustee*"), collateral agent, note registrar, transfer agent and paying agent. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

_____, (the "*Owner*") owns and proposes to exchange the Note[s] or interest in such Note[s] specified herein, in the principal amount of $ _____ in such Note[s] or interests (the "*Exchange*"). In connection with the Exchange, the Owner hereby certifies that:

**1.     Exchange of Restricted Definitive Notes or Beneficial Interests in a Restricted Global Note for Unrestricted Definitive Notes or Beneficial Interests in an Unrestricted Global Note**

**(a)     ☐     Check if Exchange is from beneficial interest in a Restricted Global Note to beneficial interest in an Unrestricted Global Note**. In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for a beneficial interest in an Unrestricted Global Note in an equal principal amount, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Global Notes and pursuant to and in accordance with the Securities Act of 1933, as amended (the "*Securities Act*"), (iii) the restrictions on transfer contained in the Indenture and the Private

1

Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the beneficial interest in an Unrestricted Global Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

(b)    ☐    **Check if Exchange is from beneficial interest in a Restricted Global Note to Unrestricted Definitive Note**. In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for an Unrestricted Definitive Note, the Owner hereby certifies (i) the Definitive Note is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Restricted Global Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the Definitive Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

(c)    ☐    **Check if Exchange is from Restricted Definitive Note to beneficial interest in an Unrestricted Global Note**. In connection with the Owner's Exchange of a Restricted Definitive Note for a beneficial interest in an Unrestricted Global Note, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to Restricted Definitive Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the beneficial interest is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

(d)    ☐    **Check if Exchange is from Restricted Definitive Note to Unrestricted Definitive Note**. In connection with the Owner's Exchange of a Restricted Definitive Note for an Unrestricted Definitive Note, the Owner hereby certifies (i) the Unrestricted Definitive Note is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to Restricted Definitive Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the Unrestricted Definitive Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

**2.    Exchange of Restricted Definitive Notes or Beneficial Interests in Restricted Global Notes for Restricted Definitive Notes or Beneficial Interests in Restricted Global Notes**

(a)    ☐    **Check if Exchange is from beneficial interest in a Restricted Global Note to Restricted Definitive Note.** In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for a Restricted Definitive Note with an equal principal amount, the Owner hereby certifies that the Restricted Definitive Note is being acquired for the Owner's own account without transfer. Upon consummation of the proposed Exchange in accordance with the terms of the Indenture, the Restricted Definitive Note issued will continue to

2

be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Definitive Note and in the Indenture and the Securities Act.

(b)    ☐    **Check if Exchange is from Restricted Definitive Note to beneficial interest in a Restricted Global Note**. In connection with the Exchange of the Owner's Restricted Definitive Note for a beneficial interest in the [CHECK ONE] ☐ 144A Global Note, ☐ Regulation S Global Note with an equal principal amount, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer and (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Restricted Global Notes and pursuant to and in accordance with the Securities Act, and in compliance with any applicable blue sky securities laws of any state of the United States. Upon consummation of the proposed Exchange in accordance with the terms of the Indenture, the beneficial interest issued will be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the relevant Restricted Global Note and in the Indenture and the Securities Act.

This certificate and the statements contained herein are made for your benefit and the benefit of the Issuer.

_____

[Insert Name of Transferor]

By: _____

     Name:

     Title:

3

Dated: _____

_____

_____
Signature(s)

_____
Signature Guarantee

Signature(s) must be guaranteed
by an eligible Guarantor Institution
(banks, stock brokers, savings and
loan associations and credit unions)
with membership in an approved
signature guarantee medallion program
pursuant to Securities and Exchange
Commission Rule 17Ad-15 if shares
of Common Stock are to be issued, or
Notes are to be delivered, other than
to and in the name of the registered holder.

4

**EXHIBIT D**

**CONVERSION NOTICE**

ILAP HOLDINGS LTD.

5% Convertible Senior Notes due 2033

Subject to the terms of the Indenture, by executing and delivering this Conversion Notice, the undersigned Holder of the Note identified below directs the Company to convert the entire principal amount of the Note identified by CUSIP No. _____ and Certificate No. _____.

Holder contact information:

      Contact Name: _____

      Contact Address: _____

      Contact Email: _____

      Contact Telephone: _____

The undersigned acknowledges that this Notice, duly endorsed for transfer, must be delivered to the Conversion Agent before any consideration in respect of a conversion will be delivered.

***Delivery Instructions:***

Unless the Holder directs otherwise below, the Holder hereby requests that the conversion consideration (which consists of shares of Common Stock in connection with the conversion of the Note) be delivered to the Holder as follows: (i) the shares of Common Stock in connection with the conversion of the Note shall be credited to the Holder's (or its designee's) account at the Depository Trust Company (DTC) through the transfer agent's Deposit/Withdrawal At Custodian (DWAC) system.

DTC Account Information for Delivery of Common Stock in Connection with Conversion of Note:

      Holder Name: _____

      DTC Participant Name and Number: _____

DTC Participant Phone Number and Contact Email: _____

Account Name: _____

Account Number: _____


Date: _____        _____
                                                     (Legal Name of Holder)



                                    By: _____
                                         Name:
                                         Title:

_____
Signature Guarantee

Signature(s) must be guaranteed
by an eligible Guarantor Institution
(banks, stock brokers, savings and
loan associations and credit unions)
with membership in an approved
signature guarantee medallion program
pursuant to Securities and Exchange
Commission Rule 17Ad-15 if shares
of Common Stock are to be issued, or
Notes are to be delivered, other than
to and in the name of the registered holder.

6