**GREENBERG TRAURIG, LLP**
One Vanderbilt Avenue
New York, New York 10017
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
Oscar N. Pinkas
Brian E. Greer
Leo Muchnik
Sara A. Hoffman
Jessica M. Wolfert

*Proposed Attorneys for the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re** | **Chapter 11** |
| **INVERSIONES LATIN AMERICA POWER LTDA.,** *et al.*,[1] | **Case No. 23-11891 (●)** |
| **Debtors.** | **(Joint Administration Requested)** |

**DECLARATION OF ESTEBAN MORAGA IN SUPPORT OF THE CHAPTER 11**
**PETITIONS AND REQUESTS FOR FIRST DAY RELIEF**

I, Esteban Moraga Morales, make this declaration under 28 U.S.C. § 1746:

1.       I am the Chief Executive Officer of Inversiones Latin America Power Ltda.,

a limited liability company formed under the laws of Chile ("**ILAP**" and together with its

subsidiaries, San Juan S.A. and Norvind S.A., the "**Debtors**" or the "**Company**").

2.       I joined the Company in 2017. Prior to assuming my role as the Chief Executive

Officer in March 2023, I served as the Chief Financial Officer. Based on my service in these roles,

I am familiar with the Debtors' day-to-day operations, business and financial affairs, books and

---

[1]       The Debtors, together with each Debtor's Chilean identification number, are: Inversiones Latin America Power Ltda. (76.299.635-9); San Juan S.A. (76.319.883-9); and Norvind S.A. (76.919.070-8). The location of the corporate headquarters and the service address for Inversiones Latin America Power Ltda. is Cerro El Plomo 5680, Oficina 1202, Las Condes, Santiago, Chile.

records, and the circumstances leading to the commencement of the Debtors' above-captioned

chapter 11 cases (the "**Chapter 11 Cases**").

3.        Prior to joining the Debtors, I was the Chief Financial Officer of Puerto Angamos,

a privately-owned terminal at the port of Mejillones, Chile, providing, among other things, vessel

docking services, cargo handling and portage, storage, and terrestrial container services; the

Deputy Finance Manager of Sitrans Ltda., a maritime logistics and transportation company based

out of Santiago, Chile; and the Chief Financial Officer of Atco Sabinco, a manufacturing,

architecture and engineering company based out of Santiago, Chile. I hold a degree in Commercial

Engineering and master's degree in Finance from Universidad Adolfo Ibáñez, in Santiago, Chile.

4.        On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary

petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*.

(the "**Bankruptcy Code**") with the United States Bankruptcy Court for the Southern District of

New York (the "**Court**").

5.        To enable the Debtors to operate effectively and minimize potential adverse effects

in these Chapter 11 Cases, the Debtors have requested certain relief in "first day" motions and

applications filed with the Court (collectively, the "**First Day Motions**") concurrently herewith.

6.        The First Day Motions, summarized below, seek, among other things, to (a) ensure

the continuation of the Debtors' cash management system and other business operations without

interruption, (b) allow the Debtors to use cash collateral on a consensual basis, (c) preserve the

Debtors' valuable relationships with customers, vendors and contract counterparties, and

(d) implement certain administrative procedures that will promote a seamless transition into

chapter 11. The relief requested in the First Day Motions is critical to the Debtors' efforts to

maximize value for the benefit of their creditors and stakeholders.

7.      I submit this declaration (this "**Declaration**") in support of the First Day Motions and pursuant to 28 U.S.C. § 1746, as well as Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"). Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtors' professionals and my staff, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and the energy industry. I am authorized to submit this Declaration on the Debtors' behalf. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

8.      This Declaration is intended to provide an overview of the Debtors' business and their need to commence the Chapter 11 Cases. Section I provides a brief overview of the Debtors' business operations. Section II describes the Debtors' prepetition capital structure and debt obligations. Section III describes certain circumstances that precipitated commencement of the Chapter 11 Cases and the Debtors' objectives in the Chapter 11 Cases. Section IV provides a summary of the First Day Motions and the factual bases supporting the relief requested therein. Finally, Section V provides additional information required by the Local Rules.

## Preliminary Statement

9.      The Company commenced the Chapter 11 Cases to restructure a balance sheet burdened by $408,730,000 in principal amount of outstanding funded indebtedness pursuant to the *Debtors' Joint Prepackaged Chapter 11 Plan* (the "**Plan**") filed concurrently herewith. A restructuring of the Company's balance sheet is necessary in order for the Company to be able to meet their financial obligations in the long term, which the Plan would effectuate by exchanging

the Existing Notes and indebtedness due under the LC Facility Agreement (each as defined *infra*
Section II.A) with new notes to be issued under the Plan.

10.    Critically, because the principal objective of the Plan, and of the Chapter 11 Cases
generally, is to address the debt service obligations under the Existing Notes and LC Facility
Agreement, only such claims are impaired under the Plan; with the interests in ILAP being
technically impaired in order to implement the restructuring. **All other claims and interests,
including all general unsecured claims and existing equity interests in San Juan and Norvind,
are unimpaired under the Plan.**

11.    The Plan embodies a comprehensive settlement among the Debtors and a majority
of their key creditor constituencies on a consensual transaction that will reduce the Debtors' debt
service obligations and position the Debtors for continued operations. Notably, the Debtors entered
into a Restructuring Support Agreement (as amended and supplemented and in effect from time to
time, the "**RSA**") with holders of approximately 84.5% of the aggregate outstanding principal
amount of the Senior Debt Claims (as defined in the Plan).

12.    Prior to the filing of the Chapter 11 Cases, on November 29, 2023, the Debtors
commenced solicitation of votes to accept or reject the Plan from holders of Senior Debt Claims
and ILAP's equity holders. As of the date hereof, the Debtors obtained the ballot from the Holder
of the LC Facility Claims and preliminary ballots from the Consenting Noteholders party to the
RSA, each evidencing their support of the Plan pursuant to the terms of the RSA.

I.    **THE DEBTORS' BUSINESS**

A.    **Summary of Operations**

13.    The Company is a clean energy company that owns and operates wind generation
plants with an aggregate installed capacity of 239.2 megawatts (MW) and is engaged in the

generation of electricity business in northern Chile.

14.     The Debtors own and operate two wind farm projects: (1) a 193.2 MW facility located in Freirina, Vallenar in the region of Atacama (the "**San Juan Project**"), currently the second largest wind farm project by capacity in Chile, and (2) a 46.0 MW facility located in Canela, in the region of Coquimbo (the "**Totoral Project**" and together with the San Juan Project, the "**Projects**"). The San Juan Project has been fully operational since March 2017 and the Totoral Project has been fully operational since January 2010. Both wind projects are located in areas characterized for their strong and highly predictable wind resource.



15.     The Company sells the electric power generated by its Projects into the SEN (*Sistema Eléctrico Nacional*), the national electric system of transmission that provides electricity to almost the entire country. The SEN was created in 2017 after the interconnection of the two largest existing systems in the country, the SIC (*Sistema Interconectado Central*) and the SING (*Sistema Interconectado del Norte Grande*). The National Electrical Coordinator coordinates the operation of the SEN, the SIC and the SING.

16.     The Company's main customers are distribution companies ("**DisCos**") and other large, experienced companies in varied industrial sectors through long-term power purchase agreements ("**PPAs**"), which provide a recurring source of cash flow.

17.     For the nine-month period ending September 30, 2023, the Company's total net generation was 405.8 GWh. For each of the years ended December 31, 2022 and 2021, the Company's aggregate net generation was 529.5 GWh and 591.5 GWh, respectively, with an aggregate availability factor of 97% and 97% and an aggregate capacity factor of 25% and 28%, respectively.

18.     For the nine-month period September 30, 2023, the Company's revenue totaled approximately $60.3 million, and with respect to each of the fiscal years ended December 31, 2022 and 2021, the Company's revenue totaled approximately $76.9 million and $68.3 million, respectively.

19.     The Company's principal executive offices and corporate headquarters are located at Cerro El Plomo 5680, Oficina 1202, Las Condes, Santiago, Chile.

**B.  Corporate Structure**

20.     ILAP is a limited liability company (*sociedad de responsabilidad limitada*) formed under the laws of Chile, and is 99.999991% owned by Latin America Power S.A., a corporation (*sociedad anónima*) formed under the laws of Chile ("**LAP Chile**") and 0.000009% by LAP Renewables B.V., a Dutch corporation ("**LAP BV**", together with LAP Chile, the "**ILAP Partners**"). LAP BV, in turn, owns all but one share of LAP Chile, and Latin America Power Panamá S.A. owns the remaining share.

21.     San Juan and Norvind are each corporations (*sociedades anónimas*) organized and existing under the laws of Chile. ILAP owns all but one share in San Juan and all but one share in Norvind; LAP Chile owns the remaining share in each of San Juan and Norvind.

22.     The Debtors' organizational chart is attached hereto as **Schedule 1**.

### C.  The Debtors' Business Operations

i.  The Projects

a.  *San Juan Project*



[Aerial View of San Juan Project]

23.     The San Juan Project is a 193.2 MW wind farm facility located in Freirina, Vallenar, Region of Atacama, Chile (approximately 650 km north of Santiago). The asset is comprised of 56 Vestas V117-3.45 MW wind turbines, making it the second largest independent wind farm in Chile by capacity. The San Juan Project began partial operations in July 2016 and achieved full commercial operation in March 2017.

24.     The San Juan Project was built by Elecnor, a leading global EPC and renewable energy investor, and employs wind turbines supplied by Vestas, one of the world's most experienced wind turbine manufacturers.

### b.   Totoral Project



[Aerial View of Totoral Project]

25.     The Totoral Project is a 46.0 MW wind farm facility located in Canela, Region of Coquimbo, Chile (approximately 300 km north of Santiago). The asset is comprised of 23 Vestas V90-2.0 MW wind turbines and began commercial operations in January 2010. The Totoral Project was built by SKANSKA, a world-leading project development and construction group, and with wind turbines supplied by Vestas.

### ii.   PPAs; and Sales and Purchases in the Spot Market

### a.   PPAs

26.     The Company earns contracted revenues from its PPAs with contracted customers (i.e., customers subject to a PPA), consisting of DisCos, unregulated customers and certain power companies. Unregulated customers range from large retail stores to universities and agro-industrial

facilities.  As discussed below, to supplement its revenue stream, the Company sells any power generated in excess of the amount necessary to satisfy its obligations under the PPAs in the spot market.

27.      San Juan and Norvind are party to 113 PPAs with 41 separate counterparties: San Juan is party to 72 PPAs with DisCos and four (4) with unregulated customers, while Norvind is party to 24 PPAs with DisCos and thirteen (13) with unregulated customers. The Company's PPAs, in the aggregate, have a weighted average term of 7.9 years.

28.      The PPAs generally consist of U.S. Dollar denominated 15-year "take-and-pay" agreements that were entered into after the tender process known as "2013-3 Second Call Auction/Tender Process" administered by the National Energy Commission (*Comisión Nacional de Energía*) ("**CNE**"), held in December 2014. During that process, San Juan was awarded Blocks 2-A, 2-C and 3, and Norvind was awarded Block 4, with end dates between December 31, 2031 and December 31, 2033. As a result, the Company currently has in place favorable long-term contracts with a diversified group of DisCos.

29.      For example, San Juan has a PPA with Enel Distribución Chile S.A. ("**Enel Distribución**"), a DisCo, pursuant to which San Juan is to provide, on average, 180 GWh of energy per year (with a "take-or-pay" of 70%, 126 GWh) through December 31, 2023.[2] In 2016, San Juan also entered into an offtake agreement with Metro S.A. (Empresa de Transporte de Pasajeros Metro S.A., the operator of Santiago's subway system), a government-controlled entity rated by Moody's. Under that agreement, San Juan is required to supply up to 60% of Metro's hourly consumption that is not supplied by solar power suppliers.

---

[2]    As a result of regulatory changes introduced to the Chilean General Law of Electrical Services (*Ley General de Servicios Eléctricos*, or D.F.L. No. 4/2006 of the Chilean Ministry of Economy, as amended from time to time), Enel Distribución assigned the PPA to Enel Generación S.A. ("**Enel Generación**"), effective January 1, 2021. Enel Generación is the largest power company in Chile.

30.     Pursuant to its PPAs, on average, San Juan provides (a) DisCos with 264.8 GWh of energy at \$101.27/MWh per year, (b) Metro with 55 GWh of energy at \$108.86/MWh per year, and (c) Enel Generación with 176.8 GWh of energy at \$50.39/MWh per year. Moreover, under San Juan's four (4) bilateral PPAs with unregulated customers, San Juan supplies such customers an average of 170 GWh of energy per year; these PPAs are set to expire between 2023 and 2025.

31.     Norvind's 24 PPAs with DisCos commenced in January 2019 and continue through December 2033. Under these agreements, on average, Norvind sells 31 GWh of energy at \$111.88/MWh. Under Norvind's thirteen (13) bilateral PPAs with unregulated customers, which are set to expire between 2023 and 2025, Norvind supplies these customers with an average of 7.9 GWh of energy per year.

32.     For the fiscal year 2023, the Company estimates that 652 GW/h of its total generation capacity (at P50) will be contracted, representing 103% of the estimated total generation for the period. By way of comparison, during the years ended December 31, 2022 and 2021, the Company sold 606.4 GW/h and 615.5 GW/h to contracted customers, respectively. During the nine months ended September 30, 2023, the Company sold 512.3 GW/h to contracted customers.

33.     During the nine months ended September 30, 2023, approximately 95% of the Company's total revenues corresponded to energy sold pursuant to its PPAs, and during the years ended December 31, 2022 and 2021, the energy the Company sold pursuant to its PPAs represented 92% and 91% of the Company's total revenues, respectively.[3]

---

[3]     The foregoing revenues *includes* the PEC 1 Receivables due from PPA counterparties and the PEC 2 Receivables, each as further discussed below.

*b.  Spot Market (Wholesale)*

34.    Chile has a highly-regulated spot merchant market run by National Electrical Coordinator, the system operator, which coordinates the dispatch of generation assets in the marketplace. All generators provide their variable operational cost parameters to the National Electrical Coordinator which, in turn, optimally dispatches the market, thereby minimizing total costs to the system. Because generators provide their full cost structure to National Electrical Coordinator, there is no "bidding" process.

35.    Generators, such as San Juan and Norvind, buy and sell energy from other generators in the real-time spot market. The market clearing price at each pricing node is called the Short Run Marginal Cost or spot price, and it is the marginal cost of the last generator required to balance supply and demand, taking into account transmission constraints and losses. Neither DisCos nor large consumers are allowed to buy and sell energy on the spot market; only generators are allowed to trade in the spot market.

36.    Generators receive merchant spot market revenue as a result of the net value of energy injected (supplied) into the system less the energy withdrawn (taken) from the system. The National Electrical Coordinator is responsible for conducting balancing analyses and overseeing the billing/payments on a monthly basis in order to ensure that generators receive the appropriate revenue for the supply they sell.

37.    During the nine months ended September 30, 2023, approximately 5% of the Company's total revenues corresponded to energy sold in the spot market, and during the years ended December 31, 2022 and 2021, the energy sold to the spot market represented 8% and 9% of the Company's total revenues, respectively.

38.    During the nine months ended September 30, 2023, the energy purchased in the spot market represented approximately 53% of the Company's total expenses, and during the years

ended December 31, 2022 and 2021, represented 50% and 49% of the Company's total expenses, respectively.

     iii.  <u>PEC Receivables</u>

*a.  Tariff Stabilization Law and PEC 1*

39.    On November 2, 2019, Chile enacted the Tariff Stabilization Law (Chilean Law No. 21,185, together with subsequent resolutions No. 72, 114 and 240 of 2020, issued by the CNE, the "**Tariff Stabilization Law**") which established the tariff stabilization mechanism for energy and power prices that regulated customers pay to distribution companies by bringing forward the projected reduction in supply prices for the following years, meant to occur by the replacement of old (and more expensive) contracts by new (and cheaper) contracts that reflect the latest bids for the CNE tenders of electricity (the "**Tariff Stabilization Mechanism**").

40.    The main purposes of the Tariff Stabilization Law are (i) to unwind the 9.2% electricity tariff increase which came into effect on October 10, 2019 and (ii) to avoid future increases on tariffs that regulated customers pay to distribution companies, temporarily stabilizing tariffs between July 1, 2019, and December 31, 2020, at the rates in effect on June 30, 2019. Tariffs applicable as of June 30, 2019, are known as the regulated customer stabilized price (*precio estabilizado a cliente regulado*), or "**PEC**".

41.    In addition, the Tariff Stabilization Mechanism provides that the PEC may be adjusted only for inflation by the Chilean CPI (*Indice de Precios al Consumidor*) from January 1, 2021 to December 31, 2024. The PEC so adjusted for inflation, is known as the "Adjusted PEC." The cost of the Tariff Stabilization Mechanism will be borne by the generation companies because distribution companies will pay the prices established by the rules issued by the CNE and not those prices previously agreed with the generation companies in PPAs currently in effect. Other

contractual indexations such as U.S. CPI, exchange rate differences or fuel price changes are not considered in PEC adjustments.

42.     As a result of the Tariff Stabilization Law, DisCos have paid their suppliers the lower of (a) the PNLPs[4] (i.e., the average PPAs prices over a tariff period), or (b) the PECs or Adjusted PECs set out in each tariff decree. If, as a result of the Tariff Stabilization Mechanism, the PEC or Adjusted PEC applicable during a tariff period is lower than the PNLP that would otherwise have applied during that tariff period by a distribution company to a generation company under a PPA were the Tariff Stabilization Mechanism would not be in effect, the difference between that PEC or Adjusted PEC and that PNLP will constitute an unpaid balance (*saldo*), and the Ministry of Energy of Chile will be required to recognize it in the subsequent tariff decrees as a receivable, creating a PEC Receivable payable by that distribution company to that generation company. The Tariff Stabilization Mechanism will be in effect from July 1, 2019, until the earlier of (a) December 31, 2027, and (b) the date on which the PEC Receivables have been paid in full.

*b.  PEC 1 Receivables due from PPA Counterparties*

43.     Generation companies, such as San Juan and Norvind, must record monthly a difference between "original" indexed prices under the PPAs with distribution companies and the stabilized prices. Receivables become irrevocable obligations of the distribution companies when they are recognized by the Ministry of Energy of Chile in a tariff decree, and they are required under the Tariff Stabilization Law to be paid in full by December 31, 2027 ("**PEC 1 Receivables**").

---

[4]    "**PNLPs**" means the purchase prices for electricity (*precios de nudo de largo plazo*) payable by the DisCos to electricity generation companies under a PPA awarded pursuant to a public tender (together with any adjustments).

44.     The Company estimates that as of December 31, 2023, distribution companies will owe the Company approximately $16.5 million in PEC 1 Receivables pursuant to the Tariff Stabilization Law.

*c.  PEC 1 Receivables Sale Transaction*

45.     On or about August 28, 2023, San Juan and Norvind entered into the *Cesión de Saldos* agreement with LAP Chile, pursuant to which they assigned to LAP Chile PEC 1 Receivables (i.e., accounts receivables) with a face value of approximately $10,000,000 for $7,000,000 (the "**PEC 1 Receivables Sale Transaction**" and the assigned PEC 1 Receivables, the "**Purchased PEC 1 Receivables**").

46.     The proceeds of the PEC 1 Receivables Sale Transaction were used to pay outstanding accounts payable, insurance premiums, and fees incurred in connection with the transaction.

*d.  Consumer Protection Mechanism MPC Law and PEC 2*

47.     On August 2, 2022, Chile enacted the Consumer Protection Mechanism MPC Law (the "**MPC Law**"), which, together with the MPC Resolution (*Resolución Exenta No. 86*) issued on March, 2023 by the CNE, regulates a newly-created Tariff Stabilization Fund.

48.     The MPC Law complements the Tariff Stabilization Mechanism set forth under the Tariff Stabilization Law because the aggregate amount of PEC 1 Receivables (or *Saldos*) reached the legal limit established by the Tariff Stabilization Law ($1,350 million) in March 2022. As a result, the Government of Chile, decided to implement a new mechanism to avoid an increase in energy tariffs affecting final consumers where the difference between the PPA prices charged by generator companies for sales of energy and the tariff amounts charged to consumers by distribution companies will originate a negotiable instrument ("**PEC 2 Receivables**") for the

benefit of the generator companies issued by the Chilean Ministry of Finance, hence, guaranteed by the full faith and credit of the Republic of Chile.

49.    The aggregate amount of PEC 2 Receivables that can be issued against the Tariff Stabilization Fund created by the MPC Law is $1,800 million, which includes the excess of $410 million in Saldos accounted under the Tariff Stabilization Law after its limit was reached in March 2022.

50.    PEC 2 Receivables will be payable over time as determined by the regulators and the Chilean Ministry of Finance in accordance with the levels forecasted for the Tariff Stabilization Fund vis-à-vis the tariffs charged to consumers by distribution companies, but in any event no later than December 31, 2032. Pursuant to the MPC Law, the regulators must coordinate the payments made under the PEC 1 and PEC 2 regimes to ensure compliance with the Tariff Stabilization Fund limits.

51.    PEC 2 Receivables have been, and in the future will be, issued as a "dematerialized" instrument that will allow generator companies to freely transfer or assign them for value. The Company estimates that as of December 31, 2023, the Company will be owed approximately $18.9 million in PEC 2 Receivables under the MPC Law.  PEC 2 Receivables are expected to be collected starting in January 2025 and, consequently, are classified as non-current assets.

52.    As a result of the enactment and application of the MPC Law to Chilean generator companies, San Juan and Norvind have or will become the legal and beneficial owner of certain PEC 2 Receivables. Pursuant to the MPC Law and other applicable laws of Chile, the sale of such PEC 2 Receivables is permitted.

iv.   Operations and Maintenance

53.     Under the Service and Availability Agreement between San Juan and Vestas Chile Turbinas Eólicas Limitada ("**Vestas**") dated March 25, 2015, as amended on December 14, 2016, and January 29, 2021 (the "**San Juan O&M Agreement**") and the Service and Availability Agreement between Norvind and Vestas dated April 1, 2013, as amended on December 14, 2016 (the "**Totoral O&M Agreement**," and together with the San Juan O&M Agreement, the "**O&M Agreements**"), Vestas is responsible for the operation and maintenance of the San Juan Project and Totoral Project.

54.     The terms of the O&M Agreements with Vestas guarantee generation availability of 98% per turbine with respect to the San Juan Project and 97% per turbine with respect to the Totoral Projects. As of the date hereof, availability per turbine has remained at or above the guaranteed level in both Projects.

55.     The O&M Agreements ensure the full productivity and long-term performance of the wind turbines. The operations and maintenance strategy for the Projects is built around original equipment manufacturer maintenance solutions. The O&M Agreements cover substantially all of the operation and maintenance costs, subject to certain exceptions, and effectively transfers the maintenance cost risk to Vestas, who has a long-standing history and experience with operating and maintaining wind turbines and is well positioned to manage the responsibilities thereof effectively. Under the O&M Agreements, Vestas will also provide repairs and replace parts of the turbines in the event of failures, thus ensuring the full productivity and long-term functionality of the wind turbines that comprise the Projects.

56.     In addition, Vestas offers a life extension program as part of their operation and maintenance services. Vestas offers this service, typically on or around the 15th to the 20th year

of operation mark, subject to detailed inspections, assessments and testings of certain key components.

57.     Further to the services provided under the O&M Agreements, the Company has instituted independent site maintenance and management personnel with a 24/7 control room. The control room is located at the Company's headquarters in Santiago, Chile, thus enabling highly qualified engineers and technicians to proactively troubleshoot challenges that may arise by providing real time oversight, supervision and monitoring capabilities for all generating units at both Projects.

58.     The operation and maintenance of other assets, excluding the wind turbines and towers, has been outsourced to local contractors who are used to support lower risk items, including building maintenance, estate management, and substation maintenance.

v.   Interconnection and Interconnection Maintenance Agreements

59.     Geographically, Chile is a long, thin country that extends 4,270 km (approximately 2,653 miles) from north to south, making it relatively expensive to connect the majority of the country. The transmission system in Chile is a key factor impacting the long-term locational marginal price forecast in the SEN.

60.     The San Juan Project is connected to the grid at the Punta Colorada substation via an 85 km transmission line at 220 kV. The Totoral Project also sells power into the SEN, and is connected to the grid at the Las Palmas substation via a 7 km transmission line at 220 kV. The Punta Colorada and Las Palmas substations are owned by Transelec S.A. ("**Transelec**"). In connection with the foregoing, the San Juan and Totoral Projects have entered into agreements with Transelec for the interconnection of the Projects.

vi.   Employees

61.     None of ILAP, San Juan nor Norvind have employees, and the operation of the energy generating plants is handled by third party contractors. Likewise, labor and bookkeeping aspects are covered under the Services Agreements (defined below) with LAP Chile, pursuant to which San Juan and Norvind pay LAP Chile a monthly fee.

vii.   Related Party Transactions

62.     In the ordinary course of business, the Company engages in a variety of transactions with certain of its affiliates, primarily for the purchase, at fair market prices negotiated on an arm's-length basis, of goods or services that may also be provided by other suppliers.

63.     LAP Chile is party to the following contracts with San Juan and Norvind (collectively, the "**Services Agreements**"): (i) that certain Agreement for the Provision of Services dated April 29, 2015, as amended on October 4, 2016 with San Juan and (ii) that certain Intercompany Services Agreement dated as of September 6, 2016. Pursuant to the Services Agreements, LAP Chile provides services in the following areas: legal, human resources, internal control, finance and budgets, purchasing and supplying, accounting, computer and information technology, marketing, and project evaluation for a monthly fee of approximately $170,000.

64.     In addition, on or about August 28, 2023, LAP Chile purchased from San Juan and Norvind the Purchased PEC 1 Receivables for $7,000,000. The proceeds of the PEC 1 Receivables Sale Transaction were used to pay outstanding accounts payable, insurance premiums, and fees incurred in connection with the transaction.

II.    **CAPITAL STRUCTURE**

A.  **Secured Debt**

i.  <u>5.125% Senior Secured Notes due 2033 (the "**Existing Notes**")</u>

65.    On June 15, 2021, ILAP issued $403,900,000 aggregate principal amount of its Existing Notes pursuant to an indenture dated as of such date (as amended and supplemented and in effect from time to time, the "**Existing Indenture**") among ILAP, as issuer, San Juan and Norvind, each as guarantors, and Citibank, N.A., as Trustee, Offshore Collateral Agent, Registrar, Transfer Agent and Paying Agent. (As discussed below, Citibank, N.A. subsequently resigned from all such positions.)

66.    Under the terms of the Existing Indenture, ILAP is required to pay fixed-rate interest at a rate of 5.125% per annum, payable semi-annual in arrears, on January 3 and July 3 of each year. In addition, the Existing Indenture provides for an amortization of principal also to be paid on January 3 and July 3 of each year. Finally, to the extent there is Available Cash (as defined in the Existing Indenture), ILAP is required to redeem the Existing Notes equal to 100% of the outstanding principal amount of the Existing Notes being redeemed based on a Target Debt Balance (as defined in the Existing Indenture), without premium.

67.    The Existing Notes are guaranteed by San Juan and Norvind, and are secured by substantially all of the assets of the Debtors. The Existing Notes are listed on the Singapore Exchange.

68.    As of the Petition Date, the aggregate outstanding principal amount of the Existing Notes was $391,230,000, which does not include unliquidated amounts including interest, fees, expenses, charges and other obligations, if applicable.

ii.  <u>LC Facility Agreement</u>

69.  The Company is party to the LC Facility Agreement, dated as of June 15, 2021, in the principal amount not to exceed $21,000,000. The LC Facility Agreement was entered into in connection with the Company's issuance of the Existing Notes and entry into Existing Indenture, for the purpose of the lenders under the LC Facility Agreement to issue one or more standby letters of credit to fund the Debt Service Reserve Account and O&M Reserve Account (each, as defined in the Security Agreement (as defined below)) to support payment of the Existing Notes. Given the issuance as part of the payment mechanisms of the Existing Notes, the obligations under the LC Facility Agreement are guaranteed by San Juan and Norvind, and are secured by substantially all of the assets of the Debtors, the liens over which are *pari passu* with those of the Existing Notes.

70.  As of the Petition Date, the aggregate outstanding principal amount under the LC Facility Agreement was $17,500,000, which does not include unliquidated amounts including interest, fees, expenses, charges and other obligations, if applicable.

iii.  <u>Security Agreement</u>

71.  In connection with the Existing Indenture and LC Facility Agreement, the Company is party to that certain Security and Depositary Agreement, dated as of June 15, 2021 (as amended and supplemented and in effect from time to time, the "**Security Agreement**"), between and among, the Debtors, Citibank, N.A., as the Trustee under the Existing Indenture, the LC Agent, and the Offshore Collateral Agent, Offshore Depository Bank and Intercreditor Agent under the Security Agreement, and Banco de Chile, as the Onshore Collateral Agent and Onshore Depository Bank.[5]

---

[5]  On August 2, 2023, Citibank, N.A. sent a notice of resignation, resigning its roles as the Trustee, Register, Paying Agent and Transfer Agent under the Notes Indenture and the Offshore Collateral Agent, Offshore Depository Bank and Intercreditor Agent under the Security Agreement. UMB Bank, N.A. was subsequently appointed as the replacement to Citibank, N.A. in such roles pursuant to the Agreement of Resignation, Appointment and

72.     Pursuant to the Security Agreement, the Company pledged substantially all of its assets as security for the obligations under the Existing Indenture and LC Facility Agreement. Furthermore, the Security Agreement provides that the obligations under the LC Facility Agreement rank *pari passu* with the Existing Notes. Each of the secured parties to the Security Agreement agreed that, with limited exceptions not applicable, all of the collateral was for the joint benefit for all secured parties. In addition, the Security Agreement includes certain intercreditor provisions, including voting, treatment of certain remedies and amendment of certain provisions that require the vote of all affected creditors.

### B.  Unsecured Debt

73.     The Company incurred (and continues to incur) trade debt and other unsecured debt in the ordinary course of business. As of the Petition Date, the Company estimates its unsecured claims total approximately $14.6 million.

### C.  Equity

74.     The equity interest of ILAP is fully paid and is 99.999991% owned by LAP Chile and 0.000009% by LAP BV.

75.     The capital stock of San Juan consists of a single class of 12,213 common shares without par value, fully subscribed and paid. ILAP owns all but one share in San Juan. LAP Chile holds the remaining share in San Juan.

76.     The capital stock of Norvind consists of a single class of 64,401,325 common shares without par value, fully subscribed and paid. ILAP owns all but one share in Norvind. LAP Chile holds the remaining share in Norvind.

---

Acceptance dated as of August 28, 2023 by and among the Debtors, UMB Bank, N.A., Citibank, N.A. and certain holders of the Existing Notes.

III.    THE NEED FOR CHAPTER 11 RELIEF AND THE EVENTS LEADING TO THE COMMENCEMENT OF THESE CHAPTER 11 CASES

### A.  Recent Operations

#### i.   Complex and Competitive Market Environment

77.    In 2019, the Chilean government announced a plan to phase out coal plants and make the country carbon neutral by 2050, resulting in an influx of renewable energy options and uncertainty in the conventional power industry. The disruption caused by the government's focus on renewable energy was further exacerbated by Covid-19 construction delays and high energy costs. These combined factors caused widespread distress across the power generation sector in Chile, which ultimately had a negative impact on energy prices.

78.    The authorities' transmission plan also did not anticipate the rapid growth of investments in new renewable projects, resulting in a shortage of transmission capacity, particularly in the northern part of Chile, where most of the renewable projects are located, to the central region. And as energy prices are determined and set at both the injection and withdrawal points, power generators like San Juan and Norvind are responsible for any discrepancies in prices between the injection node and the withdrawal node.

79.    Starting in mid-2022, the oversupply of renewable energy in northern Chile and the lack of transmission infrastructure led to lower prices at injection nodes, while high coal and gas prices inflated prices at withdrawal nodes in central Chile, generating a price decoupling between injection and withdrawal prices, leading to a strong decrease in San Juan's and Norvind's PPA margins.

80.    In addition, during the last few years, the Projects' generation has been affected by a lower availability of wind resources and congestion in the main transmission line, restricting the total potential energy generated from being transferred to the main consumption points. This

22

decrease in generation has required the Company to make purchases in the spot market to satisfy its obligations under its PPAs. These purchases have been made at notably high spot prices, leading to significant commercialization costs for both Projects.

81.     Relatedly, the Company's results have been adversely affected by volatility in the Chilean energy market driven by severe drought conditions, resulting in unusually high marginal cost and therefore the Company purchasing energy at significantly higher prices in the spot market in order to meet its PPA contract obligations when the Projects are not generating sufficient energy.

82.     Furthermore, increased government intervention in connection with the Tariff Stabilization Law and MPC Law, discussed above, have negatively impacted the short- and medium-term revenues of the Company.

### ii.   Downgrade Reports

83.     On August 17, 2023, the International Credit Risk Rating Company Ltd. (*ICR Compañía Clasificadora de Riesgo Ltda.*) downgraded the credit ratings of San Juan and Norvind from BBB-/Negative Category to the B+/Under Observation Category (the reports, the "**Downgrade Reports**") due to the low levels of generation with respect to the energy committed in San Juan's and Norvind's contracts and the sustained weakening of their liquidity position and the impact that the increase in operational costs and market conditions have had on their ability to generate cash flow.

84.     The Downgrade Reports caused defaults under the PPAs with the DisCos. If such defaults are not cured within six months, counterparties could seek to terminate their respective PPAs, which would have a material adverse effect on the Company's financial results.

### B. Debt Service Obligations

85.     The Debtors' current debt service obligations place significant strain on the Debtors' available cash flows. The principal amount of the Senior Debt Claims total $408.73 million. The Debtors are facing approximately $76 million in scheduled cash interest and amortization payments over the next nineteen months (through June 2025), putting severe pressure on the Debtors' ability to generate sufficient cash to service such debt obligations.

86.     The Debtors failed to make their scheduled principal and interest payments on the Existing Notes and interest payments under the LC Facility Agreement, both due on July 3, 2023, and have not cured such defaults.

87.     On July 4, 2023, the Debtors entered into a standstill and forbearance agreement with an *ad hoc* group of holders of the Existing Notes, pursuant to which the members of the *ad hoc* group agreed, subject to certain terms and conditions, not to exercise any enforcement rights, or otherwise take remedial actions, in respect of the foregoing defaults.

88.     On August 28, 2023, the Debtors entered into a standstill and forbearance agreement with the LC Facility Agent, on behalf of itself and the lenders and issuing lenders under the LC Facility Agreement, pursuant to which the LC Facility Agent agreed, subject to certain terms and conditions, not to exercise any enforcement rights, or otherwise take remedial actions, in respect of the foregoing defaults during the standstill period thereunder.

89.     Negotiations to a restructuring of the Debtors' balance sheet continued and, on October 30, 2023, the Debtors, their equity holders and the Consenting Noteholders (as defined in the Plan) executed the RSA; thereafter, the lender under the LC Facility Agreement joined the RSA, as amended pursuant to the Second Amendment, on November 29, 2023.

### C. Debtors' Goals in these Chapter 11 Cases

90.    The Debtors intend to commence the Chapter 11 Cases to restructure a balance sheet that, as of the date hereof, is burdened by $408.73 million in principal amount on account of the obligations under the Existing Notes and the LC Facility Agreement (plus accrued interest and fees). The proposed Plan will reduce significantly the Debtors' debt service obligations. The Debtors do not have the capacity to execute on their business strategy or continue paying their debt without the implementation and consummation of the Plan. Furthermore, the Debtors believe that, after giving effect to the restructuring transactions contemplated under the Plan, the defaults caused by the Downgrade Reports will be cured.

## IV.    FIRST DAY MOTIONS[6]

91.    To minimize the adverse effects on their businesses of seeking protection under Chapter 11, and to ensure continued ordinary course-operations post-petition, the Debtors have requested various types of customary relief in the following First Day Motions, all of which are being filed concurrently with this First Day Declaration. For the reasons discussed below, I believe that the relief requested in each of the First Day Motions is necessary and appropriate and is in the best interest of the Debtors' estates, creditors and other parties-in-interest.

### A. Procedural Motions

i. *Debtors' Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases (the "**Joint Administration Motion**")*

92.    The Debtors, being affiliates of one another, as that term is defined in section 101(2) of the Bankruptcy Code, seek entry of an order directing the joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b) for procedural purposes only, in order

---

[6]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in each of the First Day Motions summarized below.

to eliminate the need for duplicative notices, applications, motions, and orders and to avoid the time and expense that would otherwise be necessary to administer the cases separately.

93.     As the Joint Administration Motion requests only administrative, and not substantive, consolidation of the Debtors' cases, creditors' rights will not be adversely affected; rather, all parties in interest, the Court, and the United States Trustee will benefit from the streamlining of supervision and the reduced expenses that will result from joint administration.

> ii.   *Debtors' Motion for Entry of an Order Extending the Time, and, upon the Effective Date of the Plan, Waiving the Requirement to File Schedules and Statements of Financial Affairs* (the "**Schedules Extension/Waiver Motion**")

94.     The Debtors seek entry of an order (a) extending the time within which they must file their Schedules by sixty-one (61) days after the date required under Bankruptcy Rule 1007(c), and (b) waiving the requirement to file their Schedules upon the effective date of the Plan if the effective date occurs on or before seventy-five days from the Petition Date. The Debtors have filed the Plan and anticipate it will be consummated before such deadline.

95.     The Debtors do not expect to be able to file the Schedules until approximately the same time that the Debtors anticipate emerging from bankruptcy. Accordingly, the Debtors' resources would be better spent stabilizing their business operations and finalizing the documentation necessary to implement the transactions contemplated by the Plan. Furthermore, given the proposed treatment of the Debtors' stakeholders under the Plan, no party in interest will be prejudiced if the Court waives the requirement that the Debtors file the Schedules upon the effective date of the Plan should such date occur prior to the expiration of any extension to file granted by the Court. Therefore, I believe the relief requested in the Schedules Extension/Waiver Motion is necessary and appropriate under the circumstances of these Chapter 11 Cases.

iii.  *Debtors' Motion for Entry of an Order Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Separate Matrices and a Consolidated List of Creditors Holding the 30 Largest Unsecured Claims* (the "**Consolidated Creditors List Motion**")

96.     The Debtors estimate that as of the date hereof, they have over $400 million in liabilities and over one thousand potential creditors and parties in interest (on a consolidated basis) in these Chapter 11 Cases. The Debtors maintain computerized lists of the names and addresses of their creditors and equity security holders. Such information will be utilized more efficiently if it is consolidated rather than requiring the Debtors to prepare individual matrices of creditors and equity security holders for each of the Debtors. Moreover, I believe that filing a consolidated list of the thirty (30) largest unsecured creditors will be sufficient to reflect the universe of unsecured creditors in these cases.

iv.  *Debtors' Motion for Entry of (A) an Order (I) Scheduling a Combined Hearing to Consider the Adequacy of the Disclosure Statement and Confirmation of the Plan, (II) Establishing Deadlines and Procedures to File Objections to the Disclosure Statement and Plan, (III) Approving the Solicitation Procedures, (IV) Approving the Form and Manner of Notice of the Combined Hearing, (V) Approving the Form and Manner of Notice for Parties to Opt In to the Third Party Release, (VI) Establishing Procedures for any Proposed Assumption and Cure of Executory Contracts and Unexpired Leases Pursuant to the Plan, (VII) Directing that a Meeting of Creditors not be Convened and (VIII) Granting Related Relief; and (B) an Order (I) Approving the Adequacy of the Disclosure Statement and (II) Confirming the Plan* (the "**Scheduling and Solicitation Procedures Motion**")

97.     By the Scheduling and Solicitation Procedures Motion, the Debtors seek (a) an order (i) scheduling a combined hearing to consider the adequacy of the Disclosure Statement and confirmation of the Plan, (ii) establishing a deadline for objections to the adequacy of the Disclosure Statement and confirmation of the Plan and approving related procedures, (iii) approving the solicitation procedures used in connection with the Debtors' solicitation of the Plan, (iv) approving the form and manner of notice of the Confirmation Hearing and the

commencement of the Chapter 11 Cases, (v) approving the form and manner of notice of for parties to opt in to the Third-Party Release, (vi) establishing procedures for any proposed assumption and cure of executory contracts and unexpired leases pursuant to the Plan, (vi) directing that the United States Trustee for the Southern District of New York not convene a meeting of creditors under section 341 of the Bankruptcy Code if the Plan Effective Date occurs within seventy-five days after the Petition Date and (vii) granting the Debtors such other and further relief as the Court deems just and proper; and (b) entry of an order (i) approving the adequacy of the Disclosure Statement and (ii) confirming the Plan.

v. *Debtors' Application for Entry of an Order (A) Authorizing and Approving the Appointment of Epiq Corporate Restructuring, LLC as Claims and Noticing Agent and (B) Granting Related Relief* (the "**Claims and Noticing Agent Retention Application**")

98.    I have been informed that the numerous creditors and other parties in interest involved in these Chapter 11 Cases may impose heavy administrative and other burdens on the Office of the Clerk of the Court. Therefore, the Debtors seek to appoint Epiq Corporate Restructuring, LLC ("**Epiq**") as their claims and noticing agent pursuant to 28 U.S.C. § 156(c). The Debtors selected Epiq after reviewing engagement proposals from four (4) court-approved claims agents. The Debtors' decision to retain Epiq was based on Epiq's capabilities, its experience with chapter 11 cases of this size, and its favorable pricing terms.

99.    Among other things, Epiq will (a) prepare and serve required notices in these Chapter 11 Cases; (b) create and maintain electronic databases for creditor/party in interest information; and (c) create and maintain a website with general case information, documents, claim search function, and an unofficial case docket. I believe that Epiq is well-qualified to perform the services contemplated under its retention application.

### B. Motions Related to the Debtors' Operations in Chapter 11

    i. *Debtors' Motion for Entry of an Order Restating and Enforcing the Worldwide Automatic Stay, Ipso Facto Protections and Anti-Discrimination Provisions of the Bankruptcy Code* (the "**Automatic Stay Motion**")

100.    Many of the Debtors' creditors are located in Chile and do not transact business on a regular basis with companies that have filed for chapter 11 or are otherwise unfamiliar with the scope of a debtor-in-possession's authority to conduct its business. These creditors may also be unfamiliar with the operation of the automatic stay. If foreign creditors fail to understand the Debtors' authority to continue their operations and the Debtors operations are disrupted, the Debtors' business will be adversely impacted. For purposes of the Debtors' reorganization, it is critical that vendors, customers and other counterparties understand the nature of the Debtors' reorganization proceedings, and the protections that are afforded to the Debtors under the Bankruptcy Code. Accordingly, by the Automatic Stay Motion, the Debtors seek an order from the Court outlining and enforcing the automatic stay under section 362 of the Bankruptcy Code as well as the *ipso facto* and anti-discrimination provisions of the Bankruptcy Code. Such an order is necessary to inform affected parties of the impact of the Chapter 11 Cases on the Debtors' operations and their rights, and certain limitations thereof, during the proceedings.

    ii. *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Continue Prepetition Business Operations, Policies and Practices and Pay Related Claims in the Ordinary Course of Business on a Postpetition Basis* (the "**Ordinary Course of Business Motion**")

101.    Operating Creditors provide the Debtors with goods and services in the ordinary course of business including, among other things, maintenance, utilities, and other basic business necessities for the operation of the Debtors' business. The Debtors, in turn, incur payment and/or performance obligations to Operating Creditors in the ordinary course of business, which include,

but are not limited to, PPA obligations, Spot Market Obligations, O&M Obligations, and obligations related to service agreements with LAP Chile.

102.    Pursuant to the Ordinary Course of Business Motion, the Debtors seek authority to continue operating in the ordinary course and otherwise pay the Claims of their Operating Creditors on a post-petition basis, including, as applicable, in accordance with the terms and conditions of the Debtors' prepetition contractual relationships with Operating Creditors, and for certain related relief. As of the Petition Date, the Debtors have approximately $6 million of payment obligations under the PPAs, $2.3 million of Spot Market Obligations, $5 million of O&M Obligations, and $1.3 million of obligations for other services.

103.    The Debtors have filed these Chapter 11 Cases seeking to exit bankruptcy as quickly as possible in order to mitigate any risk to their business that may be associated with a bankruptcy process. Any instability in the Debtors' business would exacerbate such risk and would be highly detrimental to the goals of the prepackaged restructuring. No parties in interest will be prejudiced by the relief requested in the Ordinary Course of Business Motion because, pursuant to the Plan, the Claims the Debtors are seeking to pay pursuant to the Ordinary Course of Business Motion are unimpaired and will be paid in full in the ordinary course. The requested relief is vital to providing certainty to the Debtors' stakeholders, particularly Operating Creditors, and would only alter the timing, not the amount, of payments.

   iii. *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees* (the "**Taxes and Fees Motion**")

104.    The Debtors request authority to pay certain taxes, assessments, fees, and other charges (collectively, the "**Taxes and Fees**") that accrued and were due and owing prior to the Petition Date or become due and owing during the pendency of these Chapter 11 Cases. In the ordinary course business, the Debtors incur and pay various Taxes and Fees that they remit

periodically to various national and local taxing, regulatory and other governmental authorities. The Taxes and Fees include, without limitation, income taxes, value added taxes, certain property taxes, a tax imposed on all companies operating in Chile, a fee on hiring foreign advisors, certain taxes on credit operations in Chile, among others. Although the Debtors are generally up to date with their tax obligations, the Debtors anticipate that certain prepetition Taxes and Fees have accrued or incurred prior to the Petition Date and have not yet been paid or remitted to the relevant Authorities. The timely payment of Taxes and Fees is vital and necessary to the Debtors' operations.

105.    I understand that no parties in interest will be prejudiced by the relief requested in the Taxes and Fees Motion because under the Debtors' proposed Plan, all Taxes and Fees are unimpaired, will be paid in full in the ordinary course or otherwise provided treatment pursuant to section 1129(a)(9)(C) of the Bankruptcy Code. The relief sought in the Taxes and Fees Motion seeks only to alter the timing—not the amount—of payments. Delaying payments of Taxes and Fees could harm the Debtors' business, which could result in injury to the Debtors' estates and their stakeholders.

        iv.  *Debtors' Motion for Entry of Interim and Final Orders Authorizing, but not Directing, the Debtors to (A) Maintain Their Insurance Policies, and (B) Honor Obligations with Respect Thereto* (the "**Insurance Motion**")

106.    The Debtors maintain five insurance policies providing coverage related to general property, terrorism/malicious harm, environmental liability, directors' and officers' liability, and personal hazard liability (collectively, the "**Insurance Policies**"). Debtors San Juan and Norvind pay a portion of the annual premiums (the "**Insurance Premiums**") due under the general property and terrorism/malicious harm policies. LAP Chile pays the entirety of the premiums due under the other three policies. The Debtors believe that (a) no Insurance Premiums are outstanding as of the date hereof, (b) no Insurance Premiums will come due during the first thirty days following the

date hereof (the "**Interim Period**"), and (c) they will not be obligated to contribute financially to any renewal costs for the Insurance Policies during the pendency of the Chapter 11 Cases.

107.    The Debtors and their affiliates utilize the services an insurance broker (the "**Insurance Broker**") to assist with the procurement and negotiation of the Insurance Policies. Debtors San Juan and Norvind are invoiced for fees due to the Insurance Broker (the "**Broker Fees**") following LAP Chile's annual renewal of the Insurance Policies. Debtors San Juan and Norvind are only required to pay Broker Fees associated with the renewal of the general property and terrorism/malicious harm policies. The Debtors received an invoice for the Broker Fees the week of November 12, 2023; as of the date hereof, this invoice is unpaid.

108.    By the Insurance Motion, the Debtors request authority to pay the outstanding Broker Fees to ensure their continued access to the services of the Insurance Broker and, out of an abundance of caution, amounts due under the Insurance Policies that the Debtors are responsible for should any such amounts be discovered to be outstanding or otherwise come due during the Interim Period. As the Debtors have proposed a Plan that treats all such Insurance Obligations as unimpaired, I understand that no parties in interest will be prejudiced by the relief requested in the Insurance Motion, and that the relief sought in the motion seeks only to alter the timing—not the amount—of payments. Delaying payments of Insurance Obligations, including the Broker Fees, could jeopardize the Debtors' ability to maintain their Insurance Policies, possibly frustrating the Debtors' ability to successfully reorganize.

> v.    *Debtors' Motion for Entry of Interim and Final Orders Granting (A) Authority to (I) Continue Using Existing Cash Management System, Bank Accounts, and Business Forms, (II) Implement Changes to the Cash Management System in the Ordinary Course of Business, (III) Continue Intercompany Transactions, and (IV) Provide Administrative Expense Priority for Postpetition Intercompany Claims, and (B) Relief from the*

*Requirements of Section 345 of the Bankruptcy Code* (the "**Cash Management Motion**")

109.    In the ordinary course of business, the Debtors utilize an integrated, centralized cash management system to collect, concentrate, and disburse funds generated by their operations (the "**Cash Management System**"). The Cash Management System involves approximately twenty-one (21) bank accounts (collectively, the "**Bank Accounts**") at three different banks, two in Chile (Banco de Chile and Banco de Crédito e Inversiones) and one in the United States (UMB Bank, N.A in the United States). These banks are highly-rated financial institutions that are well-capitalized and financially stable.

110.    Through its Cash Management System, the Debtors are able to meet their operating needs, ensure cash availability and liquidity, maintain oversight over the Bank Accounts, reduce administrative costs, enhance the development of accurate account balances and generally facilitate the routine collection, transfer, and disbursement of cash. The Debtors request authority to continue the use of the Cash Management System in its current state as it is crucial to the Debtors' continued operations. Absent such an order, the resulting delays from establishing a new cash management system would unnecessarily and significantly hinder the Debtors' day-to-day operations and impede the successful administration of their Chapter 11 Cases.

111.    Relatedly, the Debtors also request, among other things, authority to continue certain Intercompany Transactions, grant administrative priority status to post-petition intercompany claims, authorize a waiver or extension of time to comply with the investment and deposit restrictions imposed by section 345 of the Bankruptcy Code, authorize the Debtors to continue using prepetition Bank Accounts, payment methods and existing Business Forms. The requested relief is necessary to ensure that the Debtors can best serve all parties in interest during the Chapter 11 Cases.

   vi. *Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral and Affording Adequate Protection, (II) Modifying the Automatic Stay, and (III) Scheduling a Final Hearing* (the "**Cash Collateral Motion**")

112. The Debtors require immediate access to Cash Collateral to operate their businesses in the ordinary course and transition successfully into chapter 11. More specifically, Cash Collateral is essential at the outset of these cases to (a) meet working capital and business operating needs, (b) fund the administration of these Chapter 11 Cases, and (c) enable the Debtors to pursue confirmation of the Plan, and to the extent confirmed by the Court, effectuate the terms and provisions thereof. Continued access to Cash Collateral will allow the Debtors to procure goods and services integral to their ongoing business operations, fund operational expenses, and allow the Debtors to maintain favorable relationships with their vendors, suppliers, and customers. Failure to obtain access to Cash Collateral to satisfy such expenses will result in immediate and irreparable harm to the Debtors and their stakeholders, as the Debtors may be unable to continue operating, their enterprise value would be destroyed, and the usefulness and value of the Debtors' assets would be significantly diminished.

113. The Debtors believe that the terms on which the Secured Parties ultimately agreed to permit the Debtors to use Cash Collateral are the most favorable terms the Debtors reasonably could have achieved under the circumstances. As a condition of such consensual usage, to protect against any postpetition diminution in value of the Prepetition Collateral and the Secured Parties' interests therein, the Debtors will provide for adequate protection in the form of, among other things, adequate protection liens, adequate protection superpriority claims, and budget and variance reporting. Without access to Cash Collateral, the Debtors ability to restructure as contemplated under the RSA and the Plan will be jeopardized.

## V.   ADDITIONAL INFORMATION REQUIRED BY THE LOCAL RULES

114.   In accordance with Local Rule 1007-2, the schedules attached hereto provide certain additional information related to the Debtors.[7]

115.   Pursuant to Local Rule 1007-2(a)(3), **Schedule 2** hereto identifies, to the best of the Debtors' knowledge, the sole official committee organized prior to the Petition Date

116.   Pursuant to Local Rule 1007-2(a)(4), **Schedule 3** hereto lists the holders of the Debtors' thirty (30) largest unsecured claims on a consolidated basis, excluding claims of insiders.

117.   Pursuant to Local Rule 1007-2(a)(5), **Schedule 4** hereto lists the holders of the only two (2) secured claims against the Debtors on a consolidated basis.

118.   Pursuant to Local Rule 1007-2(a)(6), **Schedule 5** hereto provides estimates of the Debtors' total assets and liabilities on a consolidated basis, as latest available.

119.   Pursuant to Local Rule 1007-2(a)(7), **Schedule 6** hereto provides that the Existing Notes (the 5.125% senior secured notes due 2033) issued by Debtor ILAP and guaranteed by Debtors San Juan and Norvind are listed on the Singapore Exchange.

120.   Pursuant to Local Rule 1007-2(a)(8), **Schedule 7** hereto provides a list of all of the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity, giving the name, address, and telephone number of each such entity and the location of the court in which any proceeding relating thereto is pending.

---

[7]   The information contained in **Schedule 2** through **Schedule 13** attached to this Declaration does not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim listed herein or therein is a disputed claim or debt and to challenge the priority, nature, amount, or status of any such claim or debt.

121.    Pursuant to Local Rule 1007-2(a)(9), **Schedule 8** hereto provides a list of the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses.

122.    Pursuant to Local Rule 1007-2(a)(10), **Schedule 9** hereto provides the location of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

123.    Pursuant to Local Rule 1007-2(a)(11), **Schedule 10** hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property where a judgment against the Debtors or a seizure of their property may be imminent.

124.    Pursuant to Local Rule 1007-2(a)(12), **Schedule 11** hereto provides a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

125.    Pursuant to Local Rule 1007-2(b)(1)-(2)(A), **Schedule 12** hereto provides the estimated amount to be paid to officers, stockholders, directors, members of any partnerships, and financial and business consultants retained by the Debtors for the thirty (30) day period following the filing of the Debtors' Chapter 11 Cases as the Debtors intend to continue to operate their businesses.

126.    Pursuant to Local Rule 1007-2(b)(3), **Schedule 13** hereto provides, for the thirty (30) day period following the filing of the Chapter 11 Cases, a list of estimated cash receipts and disbursements, net cash gain or loss, obligations, and receivables expected to accrue that remain unpaid, other than professional fees.

## <u>CONCLUSION</u>

This Declaration describes the factors that have precipitated the commencement of these Chapter 11 Cases and demonstrates the critical need for the Debtors to obtain the relief sought in the First Day Motions. I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed this 30th day of November, 2023

*/s/ Esteban Moraga Morales*
Esteban Moraga Morales

## Schedule 1

## Organizational Chart



*A minority interest in Latin America Power S.A.
is owned by Latin America Power Panamá S.A.

**Schedule 2**

**Committees Organized Prepetition**

Pursuant to Local Rule 1007-2(a)(3), to the best of the Debtors' knowledge and belief, only one official committee was organized prior to the Petition Date by certain holders, or investment advisors to funds and accounts that hold, the Existing Notes.

| Prepetition Committee | Counsel | Members |
|---|---|---|
| Ad Hoc Group of Consenting Noteholders | Cleary Gottlieb Steen & Hamilton LLP One Liberty Plaza New York, NY 10006 | Certain beneficial holders of, or the investment advisors to funds and accounts that hold, the Existing Notes listed in Schedule I of the RSA |

## Schedule 3

**Consolidated List of 30 Largest Unsecured Claims (Excluding Insiders)**

Pursuant to Local Rule 1007-2(a)(4), the following is a list of creditors holding, as of the Petition Date, the thirty (30) largest, unsecured claims against the Debtors, on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

*[Consolidated List of 30 Largest Unsecured Creditors on Official Form 204 Follows]*

## Schedule 4

### Consolidated List of Holders of Five Largest Secured Claims

Pursuant to Local Rule 1007-2(a)(5), to the best of the Debtors' knowledge, belief, and understanding, the following chart lists the creditors holding, as of the Petition Date, the only two (2) secured, non-contingent claims against the Debtors, on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101(31).

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve any and all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| No. | Name of Creditor and Complete Mailing Address | Claim Amount | Collateral Description |
|---|---|---|---|
| 1. | **UMB Bank, N.A. as Trustee under the Indenture for the 5.125% Senior Secured Notes Due 2033**<br>Attn: Gavin Wilkinson<br>120 South Sixth Street, Suite 1400<br>Minneapolis, MN 55402<br>Email: gavin.wilkinson@umb.com | $391,230,000 | Substantially all assets of the Debtors |
| 2. | **Citibank, N.A.**<br>Attn: Chirag Shah, Daniel O'Czerny, Marco Gomez<br>388 Greenwich Street, 7th Floor<br>New York, NY 10012<br>Email: chirag2.shah@citi.com<br>daniel.oczerny@citi.com<br>marco.gomez@citi.com | $17,500,000 | Substantially all assets of the Debtors |

## **Schedule 5**

### **Summary of Assets and Liabilities of the Debtor**

Pursuant to Local Bankruptcy Rule 1007-2(a)(6), the following are estimates of the Debtors' total assets and liabilities, on a consolidated basis. The following financial data is the latest available information and reflects the Debtors' financial condition, as consolidated among affiliated Debtors, as of the Petition Date.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt.

On a consolidated basis, the total value of the Debtors' assets is in excess of $400 million and the total amount of the Debtors' liabilities is in excess of $400 million.

## **Schedule 6**

### **Securities**

Local Rule 1007-2(a)(7) requires the disclosure of shares of stock, debentures, and other securities ("Securities") of the Debtors that are publicly held.

The 5.125% senior secured notes due 2033 issued by Debtor Inversiones Latin America Power Ltda. and guaranteed by Debtors San Juan S.A. and Norvind S.A. are listed on the Singapore Exchange.

Local Rule 1007-2(a)(7) also requires the disclosure of shares of Securities held by the Debtors' directors and officers as of the Petition Date.

None.

**<u>Schedule 7</u>**

**Debtors' Property Not in the Debtors' Possession**

Local Rule 1007-2(a)(8) requires the Debtors to list property that is in the possession or custody of any custodian, public officer, mortgage, pledgee, assignee of rents, secured creditor, or agent for any such entity.

Certain property of the Debtors may be in the possession of various other persons, including maintenance providers, shippers, common carriers, materialmen, custodians, public officers, mortgagees, pledges, assignees of rents, secured creditors or agents. Through these arrangements, the Debtors' ownership interest is not affected. In light of the movement of this property, providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers would be impractical.  There is no known court proceeding affecting such property.

**<u>Schedule 8</u>**

**Premises from Which Debtors Operate Their Business**

Pursuant to Local Rule 1007-2-(a)(9), the following lists the property or premises owned, leased, or held under other arrangement from which the Debtors operate their businesses.

| Debtor | Address |
|---|---|
| Inversiones Latin América Power Ltda. | Cerro El Plomo 5680, Oficina 1202, Las Condes, Santiago, Chile |
| San Juan S.A. | Commune of Freirina, Vallenar, Region of Atacama, Chile, approximately 650 km north of Santiago |
| Norvind S.A. | Canela, Region of Coquimbo, Chile, approximately 300 km north of Santiago |

### Schedule 9

### Location of Debtors' Assets, Books, and Records

Pursuant to Local Rule 1007-2(a)(10), the following lists the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

### Location of Debtors' Substantial Assets

The Debtors' assets are primarily located outside the territorial limits of the United States in the locations specified in Schedule 8.

### Books and Records

The Debtors' books and records are located at Cerro El Plomo 5680, Oficina 1202, Las Condes, Santiago, Chile.

### Debtors' Assets Outside the United States

The Debtors' assets are primarily located outside the territorial limits of the United States at the locations specified in Schedule 8.  Such assets are chiefly in the form of real estate, equipment and machinery (including, but not limited to wind turbines), inventory, office equipment, and account receivables.

## **Schedule 10**

### **Litigation**

Pursuant to Local Rule 1007-2(a)(11), to the best of the Debtors' knowledge, belief, and understanding, there are no actions or proceedings, pending or threatened, against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent.

## Schedule 11

### Senior Management

Pursuant to Local Rule 1007-2(a)(12), the following provides the names of the individuals who comprise the Debtors' existing senior management, a description of their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

| Name | Title | Functions |
|------|-------|-----------|
| Esteban Moraga | Chief Executive Officer | Mr. Moraga is currently the Chief Executive Officer of Latin America Power S.A. ("**LAP Chile**"), a position he assumed in March 2023 after having served as CFO since 2017. Prior to that, Mr. Moraga served as CFO of various companies, including: Britain American Tobacco Chile and Ultramar group companies (Full-Pak, ATCO Sabinco, Puerto Angamos & TGN). Mr. Moraga has nearly 14 years of experience as a CFO across various industries, including tobacco, industrial logistics, construction, ports and energy. Mr. Moraga received a degree in Commercial Engineering from Universidad Adolfo Ibáñez, along with a Masters in Finance. |
| Oscar Morales | Chief Commercial Officer | Mr. Morales is the Chief Commercial Officer of LAP Chile, bringing more than 25 years of experience in the electrical industry to the position. Prior to that, Mr. Morales served as a Commercial Manager at LAP Chile starting in March 2021, after having served as a consultant for electricity markets and as a professional in commercial departments of electricity companies in Venezuela, Chile and Peru. In his various roles, Mr. Morales led and executed tasks in the areas of operation and regulation at companies including ASINCRO and EDELCA in Venezuela, and Energetica and Systep in Chile. Mr. Morales received a degree in Electrical Engineer from the Simon Bolivar University in Venezuela, and later a Master in Energy Economics from the Comahue University in Argentina. |
| Vicente Orueta | Chief Financial Officer | Mr. Orueta is the Chief Financial Officer of LAP Chile, a position he assumed in March 2023 after serving as Corporate Finance VP starting in 2021. Prior to joining LAP Chile, Mr. Orueta worked as Senior Corporate Finance Analyst at BICE Inversiones. In his numerous roles, Mr. Orueta has led a variety of transactions, including project and business valuation, mergers and acquisitions (M&A), structured financing, and the establishment of key relationships with institutional investors. Mr. Orueta received a degree in Commercial Engineer from Pontifical Catholic University of Chile. |

| Name | Title | Functions |
|------|-------|-----------|
| Víctor Lopez | Chief Operating Officer | Mr. Lopez is the Chief Operating Officer of LAP Chile. Prior to starting at LAP Chile, Mr. Lopez served as an O&M manager at Mainstream Renewable Energy, and had different roles at AK Energy, Coordinador Eléctrico Nacional, Pacific Hydro, and CDEC SIC. Mr. Lopez received a degree in Electrical Engineering from Universidad de Chile and Masters in Business Administration from Universidad Adolfo Ibáñez. |
| José Salgado | HSSE Manager | Mr. Salgado is the Health, Safety, Security and Environment ("**HSSE**") Manager of LAP Chile, bringing 20 years of experience in the HSSE space within production and generation companies to the role. Prior to joining LAP Chile, Mr. Salgado worked as the HSSE Manager at Duke Energy Chile, as well as various HSSE roles at Masisa. Mr. Salgado received a degree in Risk Management Engineering and Master in Sustainability from Inacap Valdivia. |
| Francisca Pérez | Senior Legal Counsel | Ms. Perez is the Senior Legal Counsel of LAP Chile, bringing experience in corporate law, mergers, acquisitions and financing transactions to the position. Prior to joining LAP Chile, Ms. Perez was a member of the team at Baraona Fischer y Cía, a prestigious Chilean law firm, specializing in tax and corporate matters, and was a lawyer for the office of the General Counsel at Farmacias Ahumada S.A., a member of the Walgreens Boots Alliance. Ms. Perez received her law degree from Universidad Diego Portales. |
| Fabiola Cuello | HR Manager | Ms. Cuello is HR Manager at LAP Chile. Ms. Cuello has more than 15 years of experience leading multidisciplinary teams in the implementation and management of Human Resources issues, in various companies across the financial, aeronautical, consulting and energy sectors. Ms. Cuello holds a psychologist degree with a Diploma in People Management. |

10

## Schedule 12

**Estimated Payments Over First 30 Days of Chapter 11 Cases**

Pursuant to Local Rule 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount to be paid to officers, stockholders, directors, and financial and business consultants retained by the Debtors for the 30-day period following the filing of the chapter 11 petitions.  The Debtors do not directly employ any employees; therefore, there are no estimations of weekly payroll to disclose.

| Payments to Officers, Directors, and Equity holders (non-employees) | None |
|---|---|
| Payments to Financial and Business Consultant | None |

## Schedule 13

**Cash Receipts and Disbursements, Net Cash Gain or Loss,
Unpaid Obligations and Receivables**

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the filing of the chapter 11 petition, the estimated cash receipts and disbursements, new cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| | |
|---|---|
| **Cash Receipts** | $976,000 |
| **Cash Disbursements** | $5.7 million |
| **Net Cash Gain** | $3.0 million |
| **Unpaid Obligations** | $3.6 million |
| **Uncollected Receivables** | $6.8 million |